FILED by __ D.C.

JUN 12 '17

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA

CASE NO. ~~17-MJ-02836-TORRES~~

17-22197-MC-UNA

IN THE MATTER OF THE
EXTRADITION OF RICARDO
ALBERTO MARTINELLI BERROCAL

FILED UNDER SEAL

_____/

# COMPLAINT
(18 U.S.C. § 3184)

I, the undersigned Assistant United States Attorney, being duly sworn, state on information and belief that the following is true and correct:

1. In this matter, I represent the United States in fulfilling its treaty obligation to Panama.

2. There is an extradition treaty in force between the United States and Panama, the Treaty Between the United States of America and the Republic of Panama Providing for the Extradition of Criminals, U.S.-Pan., May 25, 1904, 34 Stat. 2851 (the "Treaty"). The United States and Panama are also parties to the U.N. Convention Against Corruption, Dec. 9, 2003, S. Treaty Doc. No. 109-6, 2349 U.N.T.S. 41; and the Convention on Cybercrime, Jan. 7, 2004, Council of Eur., T.I.A.S. No. 13174, C.E.T.S. No. 185.

3. Pursuant to the Treaty, the Government of Panama has submitted a formal request through diplomatic channels for the extradition of Ricardo Alberto Martinelli Berrocal ("Martinelli Berrocal").

4. According to the information provided by the Government of Panama, Martinelli Berrocal is charged with (1) interception of telecommunications without judicial authorization, in violation of Article 167 of the Criminal Code of Panama; (2) tracking, persecution, and surveillance without judicial authorization, in violation of Article 168 of the same code; (3)

1

embezzlement by theft and misappropriation, in violation of Article 338 of the same code; and (4) embezzlement of use, in violation of Article 341 of the same code. Harry Diaz, a Justice of the Criminal Chamber of the Supreme Court of Justice of the Republic of Panama, issued an indictment against Martinelli Berrocal for these offenses on October 9, 2015.

5. The offenses were committed within the jurisdiction of Panama. After Martinelli Berrocal failed to appear in court when summoned for a hearing on the charges, on December 21, 2015, the Supreme Court of Justice issued an order for Martinelli Berrocal's arrest.

6. The indictment and detention order were issued on the basis of the following facts, as alleged in the formal extradition documents sent from Panama to the United States:

> Martinelli Berrocal served as the President of Panama from July 2009 to July 2014. During that period, specifically, from 2012 to May 2014, he misappropriated government resources to illegally intercept and record the private communications of at least 150 individuals whom he identified as "targets," including his political allies and opponents, and family members thereof; judges of Panama's Supreme Court of Justice and Electoral Tribunal; journalists; businessmen, including Martinelli Berrocal's business rivals; union activists; professional and civic association leaders; Martinelli Berrocal's mistress; and others. Using equipment purchased with public funds, and using members of Panama's National Security Council ("NSC"), Martinelli Berrocal created and oversaw a sophisticated program that involved illegal wiretapping and other forms of surveillance through which he violated the privacy of his "targets," learning intimate details of their personal and professional lives without their knowledge or consent, and without authorization under Panamanian law.

Pursuant to Article 29 of the Political Constitution of the Republic of Panama and Article 311 of the Criminal Proceeding Code of the Republic of Panama, private communications may not be intercepted or recorded, electronic surveillance may not be conducted, and information may not be extracted from computers, cellular phones, and other electronic devices, unless proper judicial authorization has been obtained. No such authorization was sought or obtained in this case for the activities conducted by Martinelli Berrocal with respect to his "targets."

Rather than operating through proper channels, Martinelli Berrocal secretly commandeered the NSC, "a consultant and advisory body to the President of the Republic, on public security and national defense," as described in Article 1 of Executive Decree 263, for his own devices. On March 19, 2010, Martinelli Berrocal enacted Executive Decree 263 to reorganize the NSC so as to concentrate power in himself as the president, who was authorized under the Decree to convene and chair the NSC and to appoint and remove its members (Arts. 3, 6, & 20). Functionally, Martinelli Berrocal directed all matters and policies of the NSC.

Martinelli Berrocal created a special, covert unit within the NSC known as "Special Services," which included Ronny Rodríguez ("Rodríguez"), who was then the Chief of Intelligence and Deputy Director of the NSC, and two other NSC employees, William Pitti ("William") and Ismael Pitti ("Ismael"). The unit reported directly to, and all of its activities were governed by, Martinelli Berrocal. The Special Services officers referred to Martinelli Berrocal as "el Jefe" ("the

3

Boss") or "RM," rather than referring to him by name or title, given the confidential nature of their work for him.

The Special Services unit established an office on the top floor of an NSC building called "150" ("Building 150"), which was accessible only by its three members with an electronic key card. The office housed three computers, a server, a printer, and other equipment that supported a "PC Surveillance System" called "Pegasus." This system was used to intercept telephone calls, emails, and instant messages; to extract data, such as contacts lists and calendars, and video from computer hard-drives and cellular phone memory cards; to trace the GPS location of cellular phones; and to remotely activate microphone and video functions of electronic devices so as to capture ambient conversations and actions taking place in the vicinity of a device. Also integrated with the system were two laptops, at least one of which was provided to Martinelli Berrocal.

The system was purchased using public funds that had been allocated to the Social Investment Fund. Specifically, US $ 13,475,000 of those funds were used to purchase Pegasus and its associated equipment from M.L.M. Protection Ltd. ("MLM"), a private Israeli company. The contract between the Social Investment Fund and MLM was for a project entitled "Security Technology and Provision of Equipment and Installation, Training and Maintenance of the Same," which was outwardly intended to meet social interest needs and to improve the quality of life for underprivileged persons. MLM employees provided training on Pegasus to the Special Services unit, and returned periodically to service and update the system. The system also relied on broadband Internet service, along

with related antennae and fiber optic cables, which were purchased for US $2,400 per month (plus additional costs) from a company called Liberty Technologies Corp., through a contract entered into by William under the pseudonym "Guillermo Guerra." The cables were concealed within tubes inside the ventilation ducts of Building 150, and their presence was not disclosed to the NSC's Computer Department.

Martinelli Berrocal used Pegasus for wiretapping and surveillance of his "targets." He provided a list of the individuals he had identified as "targets" to Rodríguez, who in turn shared the list with William and Ismael. The Special Services officers then remotely installed the system on each target's telephone, either by electronically pushing a package of files that were installed directly on the phone or by sending the target a text message containing a link that would initiate installation when the target clicked on it, depending on the type of phone. They would also send each target an email with a link that would allow them to "hack" into the target's computer and gain access to its contents. Following its installation on the target's devices, Pegasus silently functioned to allow for covert information gathering.

Each Special Services officer was assigned to specific targets. They monitored and reviewed the information on those targets collected through Pegasus, and then produced daily written reports summarizing that information, including what was being discussed in the course of the target's communications, and where and with whom the target was meeting. These reports were separate from the daily reports prepared by the NSC's Public Order division, which

contained information regarding national security available from public sources and judicially authorized surveillance of people identified as public threats.

Rodríguez personally delivered the Special Services reports to Martinelli Berrocal in a sealed manila envelope every morning, except when Martinelli Berrocal was out of the country, in which case the reports were not printed out until his return. Certain information was reported to Martinelli Berrocal (via Rodríguez) immediately, including information damaging to the reputation of Martinelli Berrocal's political opponents. Martinelli Berrocal sometimes responded with specific instructions, such as requesting that the information be recorded onto a CD and given to him. He also sometimes instructed that particularly sensational audio or video—such as a political opponent having sexual intercourse, or another political opponent being accused of infidelity by her husband—be uploaded to YouTube, which was done via a public computer so that the computer's Internet Protocol address could not be traced back to the Special Services' office. Rodríguez occasionally reported to William and Ismael that "el Jefe is happy with our work and sends you this bonus," and provided each officer with an envelope full of money, usually in the amount of US $2,000.

On repeated occasions, Martinelli Berrocal discussed the information he had illegally intercepted. For example, he complained to Erasmo Pinilla Castillero, then President of the Electoral Tribunal, about an email exchange between the latter and members of the Democratic Revolutionary Party. He also fired his attorney, Rosendo Enrique Rivera, based on private communications between Mr. Rivera and a third party. In addition, during an interview given on

the Telémetro news program, Martinelli Berrocal threatened that he had "the dossier and pedigree on everyone, everything in this country" and that he knew "what each person has done and not done."

Shortly following the elections which took place on May 4, 2014, when Martinelli Berrocal was about to leave office, Rodríguez and William removed the surveillance equipment from Building 150 after business hours one evening. The only items that were left behind were a laptop, from which information had been deleted (but was later recovered forensically), and the printer, which had been inventoried and paid for out of the NSC budget. William poured acid on the printer to destroy it out of concern that it contained back-up copies of all of the information previously printed on the device. At Rodríguez's request, a black metal rack that had contained the computer server was relocated to the offices of Super 99, a supermarket company owned by Martinelli Berrocal, located at Monte Oscuro in Panama City.

An audit conducted by the Comptroller General concluded that the loss to the state sustained as a result of the purchase and disappearance of the surveillance equipment amounted to US $ 10,861,857.48.

7. Martinelli Berrocal maintains a residence in Miami-Dade County, Florida. Therefore, it is believed that Martinelli Berrocal may currently be found within the boundaries of the Southern District of Florida, and therefore within the jurisdiction of this Court.

8. Susan Benda, an attorney in the Office of the Legal Adviser of the U.S. Department of State, has provided the U.S. Department of Justice with a declaration authenticating a copy of the diplomatic note by which the request for extradition was made and a

copy of the Treaty, stating that the offenses for which extradition is demanded are provided for by the Treaty, and confirming that the documents supporting the request for extradition are properly certified by the principal U.S. diplomatic or consular officer in Panama, in accordance with 18 U.S.C. § 3190, so as to enable them to be received into evidence.

9. The declaration from the U.S. Department of State with its attachments, including a copy of the diplomatic note from Panama, a copy of the Treaty, and the certified documents submitted in support of the request, (marked collectively as Government's Exhibit #1) are filed with this complaint and incorporated by reference herein.

10. Martinelli Berrocal would be likely to flee if he learned of the existence of a warrant for his arrest.

WHEREFORE, the undersigned requests that a warrant for the arrest of the aforenamed person be issued in accordance with 18 U.S.C. § 3184 and the extradition treaty between the United States and Panama, so that the fugitive may be arrested and brought before this Court to the end that the evidence of criminality may be heard and considered and that this complaint and the attached warrant be placed under the seal of the Court until such time as the warrant is

executed.

                                      Respectfully submitted,

                                      BENJAMIN G. GREENBERG
                                      ACTING UNITED STATES ATTORNEY

By: _____
                                      ADAM S. FELS
                                      Assistant United States Attorney

Sworn to before me and subscribed in my presence this 12th day of June, 2017 at Miami, Florida.

                                      _____
                                      EDWIN G. TORRES
                                      UNITED STATES MAGISTRATE JUDGE