Court Exhibit 001

# Selected Excerpts of Panamanian Code



Constitución Política de la República de Panamá

**Artículo 191.** El Presidente y el Vicepresidente de la República sólo son responsables en los casos siguientes:

1. Por extralimitación de sus funciones constitucionales.
2. Por actos de violencia o coacción en el curso del proceso electoral; por impedir la reunión de la Asamblea Nacional; por obstaculizar el ejercicio de las funciones de esta o de los demás organismos o autoridades públicas que establece la Constitución.
3. Por delitos contra la personalidad internacional del Estado o contra la Administración Pública.

En los dos primeros casos, la pena será de destitución y de inhabilitación para ejercer cargo público por el término que fije la Ley. En el tercer caso, se aplicará el derecho común.

**Artículo 192.** No podrá ser elegido Presidente de la República:

1. El ciudadano que llamado a ejercer la Presidencia por falta absoluta del titular, la hubiera ejercido en cualquier

2015 - Armando Fuentes Rodríguez     Código Procesal Penal de la República de Panamá

**Artículo 158. Imputado de paradero desconocido.** La per-sona imputada que ha sido requerida y no comparezca sin justa causa, la que se evada del establecimiento en donde esté detenida, así como la que no es presentada oportuna-mente por su fiador, a pesar de habérsele hecho a esta el requerimiento correspondiente, o de la que se ignora su pa-radero, será declarada en rebeldía y se expedirá orden de detención si procediera.

La ausencia de la persona imputada no afectará la fase de investigación y quedará suspendida la prescripción de la acción penal hasta que dicha persona sea aprehendida o comparezca.

En caso de pluralidad de imputados, el proceso continuará sin la intervención del imputado ausente, quien será juzgado en proceso aparte, conforme a las reglas indicadas en el párrafo anterior.

7.

2015 - Armando Fuentes Rodríguez

**Artículo 167.** Quien, sin contar con la autorización de la auto-ridad judicial, intercepte telecomunicaciones o utilice artificios técnicos de escucha, transmisión, grabación o reproducción de conversaciones no dirigidas al público será sancionado con pena de dos a cuatro años de prisión.

**Artículo 168.** Quien, sin contar con la autorización corres-pondiente, practique seguimiento, persecución o vigilancia contra una persona, con fines ilícitos, será sancionado con dos a cuatro años de prisión. Igual sanción se impondrá a quien patrocine o promueva estos hechos.

Código Procesal Penal de la República de Panamá

**Artículo 237. Detención provisional.** El Juez de Garantías podrá ordenar la detención provisional de una persona cuando se proceda por delito que tenga señalada pena mínima de cuatro años de prisión, y exista evidencia que acredite el delito y la vinculación del imputado, así como posibilidad de fuga, desatención al proceso, peligro de destrucción de pruebas o de que pueda atentar contra la vida o salud de otra persona o contra sí mismo.

Excepcionalmente, cuando se trate de una persona cuya residencia fija no esté en el territorio nacional o en los casos en que a juicio de la autoridad competente se encuentre razonablemente amenazada la vida o la integridad personal de una tercera persona, el Juez podrá decretar la detención provisional aun cuando la pena mínima del delito imputado sea menor de cuatro años de prisión.

También se decretará la detención preventiva del acusado

Court Exhibit 006



2015 - Armando Fuentes Rodríguez

que no se presente a la audiencia del juicio oral, la que se dictará por el Tribunal de Juicio a solicitud del Fiscal.

La detención provisional no será mayor de un año, salvo el supuesto previsto en el artículo 504 de este Código.

↑ CONTINUATION OF↑
ARTICLE 237

366



2015 - Armando Fuentes Rodriguez

**Artículo 280. Formulación de la imputación.** Cuando el Ministerio Público considere que tiene suficientes evidencias para formular imputación contra uno o más individuos, solicitará audiencia ante el Juez de Garantías para tales efectos. En esta audiencia el Fiscal comunicará oralmente a los investigados que se desarrolla actualmente una investigación en su contra respecto de uno o más delitos determinados.

La imputación individualizará al imputado, indicará los hechos relevantes que fundamentan la imputación y enunciará los elementos de conocimiento que la sustentan.

A partir de la formulación de imputación hay vinculación formal al proceso.

Court Exhibit 008

2015 - Armando Fuentes Rodríguez

# Título II
## Fase Intermedia

### Capítulo I
### Audiencia de Formulación de Acusación

**Artículo 339. Reparto.** Concluida la fase de investigación, el negocio será sometido a las reglas de reparto entre los Jueces de Garantías.

**Artículo 340. La acusación.** Cuando el Ministerio Público estime que la investigación proporciona fundamentos para someter a juicio público al imputado, presentará al Juez de Garantías la acusación requiriendo la apertura a juicio.

La acusación solo podrá referirse a hechos y personas incluidos en la formulación de la imputación, aunque efectuara una distinta calificación jurídica, y deberá contener:

1. Los datos que sirvan para identificar al acusado o a los acusados.
2. La relación precisa y circunstanciada del hecho o de los hechos punibles y de su calificación jurídica.
3. La participación que se atribuya al acusado, con la expresión de los elementos de convicción que lo vinculan.
4. La pena cuya aplicación se solicite.
5. El anuncio de la prueba, presentando la lista de testigos y peritos, con indicación del nombre, la ocupación y el domicilio, salvo en los casos previstos en los numerales 1, 2 y 3 del artículo 332, en los cuales se deberán acompañar esos datos de individualización de testigos y peritos en sobre sellado; no obstante, la identidad podrá ser del conocimiento de la defensa. También se acompañarán los documentos o informes y se anunciarán las evidencias materiales que serán presentadas en el juicio.

Junto con la acusación el Fiscal deberá dejar copias de los antecedentes de la investigación al acusado o a su defensor en el Tribunal.

Los medios de prueba serán ofrecidos con indicación de los hechos o circunstancias que se pretenden probar.

404

2015 - Armando Fuentes Rodríguez

# Título X
## Delitos Contra la Administración Pública

### Capítulo I
### Diferentes Formas de Peculado

**Artículo 338.** El servidor público que sustraiga o malverse de cualquier forma, o consienta que otro se apropie, sustraiga o malverse de cualquier forma dinero, valores o bienes, cuya administración, percepción o custodia le hayan sido confiados por razón de su cargo, será sancionado con prisión de cuatro a diez años.

Si la cuantía de lo apropiado supera la suma de cien mil balboas (B/.100,000.00) o si el dinero, valores o bienes apropiados estuvieran destinados a fines asistenciales o a programas de desarrollo o de apoyo social, la pena será de ocho a quince años de prisión.

**Artículo 341.** El servidor público que, para fines ajenos al servicio, use en beneficio propio o ajeno, o permita que otro use dinero, valores o bienes que estén bajo su cargo por

240

---

Código Penal de la República de Panamá

razón de sus funciones o que se hallen bajo su guarda será sancionado con prisión de uno a tres años, o su equivalente en días-multa o arresto de fines de semana.

La misma pena se aplicará al servidor público que utilice trabajos o servicios oficiales en su beneficio o permita que otro lo haga.

241



2015 -Armando Fuentes Rodríguez

**Artículo 285. Ausencia del investigado.** Si el investigado, una vez citado legalmente, no concurre a la audiencia de for-mulación de imputación, el Juez de Garantías podrá decretar el sobreseimiento temporal de la causa hasta que el investi-gado se presente o sea localizado.

Court Exhibit 011

Código Procesal Penal de la República de Panamá

**Artículo 490. Medidas cautelares.** En la fase de investiga-
ción y en la fase de juicio, corresponderá al Pleno de la Corte
Suprema de Justicia autorizar la aplicación de toda medida
cautelar restrictiva de la libertad del Diputado y la que ordene
aprehensión o secuestro contra los bienes de estos.

1.

449

Court Exhibit 012

# TRANSLATED

Court Exhibit 013

**Constitution of the Republic of Panama**

**Article 191.** The President and the Vice-President of the Republic are responsible only in the following cases:

1. For exceeding their constitutional powers;
2. For acts of violence or coercion during the electoral process; for impeding the meeting of the National Assembly, for blocking the exercise of its functions or of the functions of the other public organizations or authorities that are established by this Constitution;
3. For offenses against the international personality of the State or against the public administration.

In the first and second case, the penalty shall be removal from office, and disqualification to hold public office for a period fixed by law. In the third case ordinary law shall apply.

1

Court Exhibit 014

**CRIMINAL CODE OF THE REPUBLIC OF PANAMA**

**Article 158. Accused Person with Unknown Whereabouts.** The accused person who has been required and does not appear, without due cause, who escapes the establishment where he or she is detained, as well as not appearing in due course to the guarantor, having received the corresponding requirement, or whose whereabouts are ignored, will be declared in default and will have a detention order expedited.

The absence of the accused person will not affect the investigation phase and the criminal procedure will remain suspended until such a person is apprehended or appears.

In the case of a plurality of accused persons, the process will continue without the intervention of the absent accused person, who will be judged in a separate procedure, according to the rules indicated in the previous paragraph.

**Article 167.** Any person, not counting those with judicial authority with authorization, who intercepts telecommunications or utilizes artificial techniques to listen, transmit, record, or reproduce conversations that are not directed to the public, will be sanctioned with a penalty of two to four years in prison.

**Article 168.** Any person, not counting those with the corresponding judicial authority and authorization, practices following, persecuting, or surveilling a person, with illicit purposes, will be sanctioned with two to four years in prison. The same sanction will be imposed on whomever sponsors or promotes such acts.

2

Court Exhibit 015

**Article 237. Provisional Arrest.** The Judge of Guarantees may order the provisional arrest of a person when the crime has stipulated a minimum penalty of four years in prison, and when there is evidence that proves the criminal offense, or of the association with the accused person, as well as the possibility of escape, neglect of the case, danger of the destruction of evidence, or that the evidence may put in danger the life or the health of another person or against him or herself.

Exceptionally, when it is a case of a person whose fixed residence is not in national territory, or in cases where, in the judgment of the competent authorities, are found to be a reasonable danger of life or personal integrity of a third person, the Judge may order the provisional detention, even when the minimum penalty of the criminal offense is under four years of prison.

The preventive detention of the accused will also be ordered when the accused does not appear to the oral hearing of the oral judicial proceedings, which is dictated by the Trial Court, at the request of the Prosecutor.

The provisional arrest will not be greater than one year, outside provisions established in Article 504 of this Code.

**Article 280. Formulation of Charges** When the Public Prosecutors Office considers it has sufficient evidence to formulate a charge against one or more individuals, it will petition a hearing before the Judge of Guarantees for such a purpose. In this hearing, the Public Prosecutor will communicate orally to those being investigated, that, at the moment, an investigation is being developed against them with respect to one or more determined criminal offenses.

The complaint will identify the individual against which the charge is done, will indicate the relevant facts that are the basis for the complaints and will list the known elements that support it.

Court Exhibit 016

**Title II**
**Intermediate Phase**

Chapter 1
Hearing of Formulation of Charges

**Article 339. Distribution.** Once the investigation phase is concluded, the case will be submitted to the distribution regulations of the Judges of Guarantees.

**Article 340. The charge.** When the Public Prosecutors Office estimates that the investigation warrants the basis to submit the accused to a public trial, it will present to the Judge of Guarantees the charge requiring a trial be held.

The charge will only be able to refer to the facts and individuals included in the formulation of the charges, even though it will take effect as a distinct judicial qualification, and will need to include:

1. The data that will serve to identify the accused.
2. The precise relation and circumstances of the facts and the punishable facts and of its judicial qualification or classification.
3. The participation that is attributed to the accused, with the expression of the associated elements of conviction.
4. The penalty requested in the petition.
5. The notification of evidence, presenting the list of witnesses and expert witnesses, indicating the name, the occupation, and the domicile, except in cases allowed in numerals 1, 2, and 3 of Article 332, where the information of the identification of witnesses, expert witnesses can be provided in a sealed envelope; however, the identity may be known by the defense. Documents and reports will accompany the publication of evidence, and these will include the physical evidence to be presented at trial.

With the accusation, the Prosecutor will give copies of the investigation background materials, to the accused or his or her attorney.

The means of proof will be offered indicating facts or circumstances that are intended to be proven.

4

Court Exhibit 017

**Title X**
**Crimes Against Public Administration**

Chapter 1
Different forms of Embezzlement

**Article 338.** The public servant who subtracts or misappropriates in any way, or consents that another appropriates himself or herself, subtracts, or misappropriates in any form, moneys, assets or properties, whose administration, perception, or custody have been entrusted by virtue of his or her position, will be sanctioned with imprisonment from four to ten years.

If the amount appropriated is above the sum of one hundred thousand balboas (B/100,000.00) or if the moneys, assets or properties appropriated were destined for programs of social development or assistance, the penalty shall be from eight to fifteen years of prison.

**Article 341.** The public servant who, for purposes outside the scope of his or her service, uses to his/her or other's benefit, or allows that another uses moneys, assets, or properties, which are under his or her custody by virtue of his or her functions, or that are under his or her responsibility, will be sanctioned with imprisonment from one to three years, or its equivalent in day-fines, or weekend-only arrest days.

The same punishment will be applied to the public servant that utilizes works or official services in his/her benefit, or that allows another to do so.

**Article 285**. **Absence of the Investigated Person**. If the investigated person, once summoned legally, does not attend the hearing of formulation of charges, the Judge of Guarantees may order a temporary stay of the case until the investigated person appears or is located.

**Article 490. Cautionary Measures.** In the investigative phase and in the trial phase, it will be the jurisdiction of the Supreme Court of Justice, in plenary session, to authorize the application of all cautionary measures that restrict the liberty of the Deputy, and orders the detainment, or seizure of property, of such Deputy.

Court Exhibit 018

# Statement of
# Dr. Silvio Guerra Morales

Court Exhibit 019

**Panamá, Junio 16 de 2017.**

**INFORME DE EXPERTO JURIDICO RENDIDO POR EL Dr. SILVIO GUERRA MORALES, PROFESOR DE DERECHO PENAL Y DERECHO PROCESAL PENAL POR LAS FACULTADES DE DERECHO Y CIENCIAS POLTICAS DE LA UNIVERSIDAD SANTA MARIA LA ANTIGUA Y LA UNIVERSIDAD DE PANAMA, PRESIDENTE DE LA ACADEMIA LATINOAMERICANA DE DERECHO PROCESAL GARANTISTA, MIEMBRO DEL INSTITUTO PANAMERICANO DE DERECHO PROCESAL, EX PROFESOR DE FILOSOFIA DEL DERECHO, DERECHOS HUMANOS E INTRODUCCION AL ESTUDIO DEL DERECHO, EX PRESIDENTE DE LA COMISION DE DERECHO PROCESAL PENAL DEL COLEGIO NACIONAL DE ABOGADOS DE PANAMA, MIEMBRO CODIFICADOR DEL ACTUAL CODIGO PROCESAL PENAL DE PANAMA, MIEMBRO DE LA COMISION REDACTORA DEL PROYECTO DE CODIGO PENAL TIPO PARA IBEROAMERICA, Y ELLO DENTRO DE LA CAUSA QUE SE LE SIGUE AL EX PRESIDENTE DE LA REPUBLICA DE PANAMA, LICDO. RICARDO MARTINELLI BERROCAL, ANTE EL TRIBUNAL FEDERAL DEL DOWNTOWN DE MIAMI-ESTADO DE LA FLORIDA, TRAS PEDIDO DE EXTRADICION PRESENTADO POR LA REPUBLICA DE PANAMA ANTE EL GOBIERNO DE LOS ESTADOS UNIDOS DE AMERICA.**

**PUNTOS CONSULTADOS AL EXPERTO:**

**CONSULTA NO.1. SE PUEDE, EN EL SISTEMA JUDICIAL O PROCESAL PENAL –DE CORTE ACUSATORIO- EN LA REPÚBLICA DE PANAMA, EXISTIR O DARSE UN PROCESO O JUZGAMIENTO EN CONTRA DE UNA PERSONA, SIN QUE HAYA IMPUTACION PENAL O AUDIENCIA DE FORMULACION DE CARGOS EN SU CONTRA?.**

1

Court Exhibit 020

## RESPUESTAS:

1. Empiezo por indicar que mediante **Fallo de Inconstitucionalidad de 19 de Noviembre de 2015**, bajo la ponencia del Magistrado Hernán De León B., y con el voto concurrente del Magistrado Harry Díaz,  tras decidir las acciones y advertencias de inconstitucionalidad interpuestas por los licenciados Carlos Eduardo Rubio y el Magistrado Oydén Ortega Durán, contra el último párrafo y todo el artículo 491-A de l Código Procesal Penal de la ley 55 de 2012 –Conocida en Panamá como la Ley Blindaje-, la Corte Suprema de Justicia de la República de Panamá, determinó o resolvió, como cuestión básica, que **en todos los procesos penales especiales establecidos en el Código Procesal Penal, rigen las normas y principios,   tal como lo prescribe el Artículo 481 de dicho Código**.

2. Cabe destacar,  que el citado artículo 481 del Código Procesal Penal de la República  de Panamá, preceptúa lo siguiente:

> **"En los procesos penales que conoce la Corte Suprema de Justicia como Tribunal de única instancia, se seguirá el procedimiento oral previsto en este código para os procesos  comunes u ordinarios"**.

> **Subrayado en negritas nuestro.**

3. Por otra parte, existe acuerdo o   consenso en la doctrina o pensamiento científico procesal penal, sobre este tema, que en los

2

Court Exhibit 021

**procesos penales especiales**, como lo serían aquellos que se siguen en contra de los diputados del país, incluido los del Parlacen, **tienen plena vigencia los principios, reglas y conceptos propios de los procesos penales comunes**.

Entra, en este sentido, sin duda alguna, lo que los autores de los libros llaman o denominan la **cesura del proceso.**

4. De manera tal que, la **imputación o juicio de atribuibilidad de acción o conducta delictiva** – la puesta en conocimiento del acusado de los cargos penales existentes en su contra- es un acto procesal que no puede dejar de observarse o cumplirse.

5. Su pretermisión u omisión conllevaría, de **modo indefectible**, a la nulidad del acto. Y no a cualquier tipo de nulidad, sino de aquellas que trascienden a la categoría de nulidades procesales absolutas por contener vicios que trascienden a la infracción de normas constitucionales como es el caso de lo prescrito en el Artículo 32 de la Constitución Nacional de Panamá, que a la letra, dice:

> **"Nadie será juzgado sino por autoridad competente y conforme a los trámites legales, ni más de una vez por la misma causa penal, administrativa, policiva o disciplinaria".**
>
> **Subrayado nuestro.**

6. Como es sabido, la garantía constitucional del debido proceso, entraña, entre otras cosas:

3

Court Exhibit 022

1. Respeto a los trámites legales que para el proceso se encuentran previamente previstos en la Ley.

2. Esto se conoce como principio de **legalidad procesal**.

3. Entraña el **derecho de las partes al contradictorio**.

4. Ese contradictorio significa que rige, primeramente, la **igualdad de las partes**. Sin esa igualdad, mal puede haber debido proceso, sino una pésima réplica o parodia vulgar de lo que **no es un proceso**. Pues como dice el procesalista y maestro rosarino **ADOLFO ALVARADO VELLOSO,** en su Teoría General del Proceso, Edit. Hammurabi, el "**Debido proceso no es otra cosa que el proceso que respeta sus propios principios**". Se trata de una idea lógica, no de un mero concepto coloquial.

5. El derecho de la partes, a ser tratadas en un plano de absoluta igualdad, igualdad ésta que, sin duda alguna, traduce implica la igualdad de oportunidades y ello significa, del mismo modo, **derecho a hacer uso, oportunamente, de un recurso efectivo en contra de las resoluciones que le causen agravios** dentro de un procedimiento o proceso, especialmente éste último.

6. Derecho a aportar pruebas, defensas, excepciones, incidencias, etc.

7. Derecho a que se les respete la **Cláusula Constitucional de la Inviolabilidad de la Defensa en Juicio**. Misma que entraña, primeramente, el respeto debido a la defensa letrada, es decir, profesional.

8. Derecho **a que las resoluciones dictadas dentro de un proceso estén fundadas en razones jurídicas, y que no estén divorciadas de la realidad del caso y menos de los Principios**

Court Exhibit 023

**Generales del Derecho, es decir cada decisión debe contener una <u>coherencia y armonía</u> internas que legitimen lo resuelto sobre bases de lógica y plena razonabilidad.**

Ahora bien, ninguno de estos postulados servirían para nada si no se está ante la presencia de Un <u>juzgador imparcial, impartial e independientes</u>. Objetivo y transparente en la causa.

En otro aspecto, debemos manifestar que el propio Código procesal Penal, respecto a dicha inobservancia, dice lo siguiente:

**Artículo 199: "<u>Es nula</u> la actuación o diligencia judicial cuando el vicio haya impedido al interviniente el pleno ejercicio de las garantías y de los derechos reconocidos en la ley, la Constitución Política y los tratados o convenios internacionales ratificados por la República de Panamá. Esta nulidad <u>es insubsanable</u>".**
**<u>Subrayado en negritas es nuestro.</u>**

7. Entiéndase por <u>**insubsanable**</u> cuando la infracción, violación o vicio de una garantía toca o golpea a una norma de rango constitucional.

El derecho a la defensa es inviolable y está reconocido con el nombre de "**Clausula Constitucional de la Inviolabilidad de la Defensa en Juicio**".

8. <u>E**n Panamá no puede haber proceso, juicio o juzgamiento penal, de ninguna persona, sin la previa celebración o realización de la**</u>

5

Court Exhibit 024

**Audiencia de Formulación de Cargos** o de Imputación, sin la presencia de los siguientes sujetos:

- **FISCAL**
- **DEFENSOR**
- **IMPUTADO O ACUSADO.**

9. Es de advertir, del mismo modo, que en ese sentido el Artículo 278 del Código Procesal Panameño, de modo categórico, prescribe que:

> **"A las audiencias de control de la aprehensión, de formulación de la imputación, las que versen sobre la nulidad de solicitud, modificación o rechazo o la proposición de medidas cautelares personales y las de la etapa intermedia deberán comparecer el Fiscal, el Defensor y el imputado o acusado".**

9. El Proceso Penal de Corte Acusatorio, en Panamá, tiene etapas o fases que permiten distinguirlo como un proceso de garantías y libertades constitucionales y legales, cuales son:

Antecede a ellas una etapa previa de investigaciones -**Etapa o Fase de Investigación, pero las más importantes son:**

- **Etapa o Fase de Imputación o Formulación de Cargos.**
- **Etapa Intermedia o de Audiencia de Acusación**
- **Etapa o Fase ante el tribunal de Juicio que implica el juzgamiento, propiamente tal**.

6

Court Exhibit 025

10. Respecto a la **formulación de la imputación**, tenemos que el Artículo 280 del Código Procesal Penal, advierte lo siguiente:

> "Cuando el **Ministerio Público considere que tiene suficientes evidencias para formular imputación contra uno o más individuos, solicitará audiencia ante el Juez de Garantías** para tales efectos. **En esta audiencia el Fiscal comunicará oralmente a los investigados que se desarrolla actualmente una investigación en su contra respecto de uno o más delitos determinados.**
> **La imputación individualizará al imputado, indicará los hechos relevante que fundamentan la imputación y enunciará los elementos de conocimiento que la sustentan.**
> A partir de la formulación de imputación hay vinculación formal al proceso".

**Subrayado en negritas nuestros.**


11. Como se puede observar, sin duda alguna, la fase o etapa de la audiencia de imputación o de formulación de cargos es, a nuestro juicio, la más importante toda vez que es, en dicha audiencia, en donde la persona investigada tiene, por vez primera, claridad jurídica de cuál es el cargo o delito cuya comisión presuntiva se le atribuye en grado de autor o cómplice, sea primario o secundario y teniendo conocimiento de ello determinará razonadamente cómo ejercitar o plantear su defensa sobre medios probatorios lícitos. Por ello es que el Artículo 281, en consonancia con lo expuesto, precisa que con la imputación o formulación de cargos, se producen una serie de efectos y de situaciones procesales, tales como:

7

Court Exhibit 026

"**La formulación de imputación producirá los siguientes efectos:**

1. **La interrupción de la prescripción de la acción penal.**
2. **Desde esta audiencia comienza a contarse los plazos previstos en los artículos 291 y 292, que tiene el Ministerio Público para declarar cerrada su investigación y comunicarlo así a las partes. Vencidos éstos tendrá un plazo de hasta diez días para acusar o solicitar sobreseimiento.**
3. **Se abre la posibilidad de aplicar el criterio de oportunidad, de celebrar acuerdos entre el ministerio Público y la defensa, de suspender condicionalmente el proceso y las formas alternas de resolución del conflicto dispuestas en este Código.**"

**<u>CONSULTA No.2:</u> ¿SE SATISFACE O CUMPLE EL DEBIDO PROCESO, A NIVEL DE LA CORTE SUPREMA DE JUSTICIA, EN DONDE, HASTA DONDE CONOCEMOS, LOS MAGISTRADOS SE ROTAN, EN LOS PROCESOS PENALES, EN CONTRA DE UNA MISMA PERSONA, FUNCIONES DE JUECES DE GARANTIAS Y DE FISCALES, LO CUAL SIGNIFICA QUE UN MAGISTRADO, EN UNA CAUSA, EN CONTRA DE UN CIUDADANO, PUEDE ACTUAR COMO JUEZ O MAGISTRADO DE GARANTÍAS, Y LUEGO, EN OTRA CAUSA, EN CONTRA DE ELLA, ACTUAR COMO FISCAL QUE ACUSA?.**

**<u>RESPUESTAS:</u>**

1. Observo que, cuando nos correspondió, siendo miembros de la Comisión Redactora del Proyecto de Código Procesal Penal y ser el Coordinador de dicha Sub Comisión, tratar el tema concerniente a la

8

Court Exhibit 027

existencia o no de un Magistrado de Garantías para la Corte, fuimos del criterio, y así quedó plasmado en la propuesta –Ver artículos 690 y 691 del proyecto-, que debía designarse un Magistrado de Garantías en propiedad y que cumpliera con los mismos requisitos exigidos para ser Magistrado de la Corte suprema de la República de Panamá, y que, por otra parte, dicho Magistrado **no integraría el Pleno y no intervendría en el juicio.**

2. Hoy, lamentamos la situación que se está dando. Y consiste en que se elige del propio Pleno de la Corte a un Magistrado de Garantías y es éste quien funge como tal ejerciendo las funciones propias de los Jueces de Garantías consagrados en el Código Procesal Penal. Sin embargo, ese mismo Magistrado que actúa como tutor de las garantías del ciudadano que es investigado o imputado o acusado, aparece, cosa ilógica, actuando en contra de ese mismo ciudadano, como Fiscal Acusador.

3. Ello, lo anterior, ha conllevado que el sistema se encuentre viciado.

Del pleno de la Corte quien es actúa como Magistrado de Garantías en un proceso, aparece en otro como Fiscal, pero frente al mismo sujeto investigado, imputado o acusado.

Se han dado situaciones como es el caso que habiendo un Magistrado intervenido en un acto de audiencia ordenando la detención provisional del investigado, se declara luego, por ese hecho, impedido para conocer como ponente de un habeas corpus.

Court Exhibit 028

4. Y, obviamente, que no podía ser de otro modo.  Lo cual viene  a significar,  para contestar a la interrogante planteada, que un Magistrado que actúa como Juez de Garantías y luego como Fiscal, frente a un mismo sujeto investigado o acusado, aunque sea por un delito distinto, violenta la garantía constitucional del Juez Independiente, Objetivo e imparcial, por cuanto recaen sobre su inteligencia   y facultades un mismo parecer o sentir.

5. La cuestión se agrava aún más si consideramos, desde la óptica constitucional y convencional –Pacto de San José Costa Rica –Ley 15 de 1977 en Panamá- lo siguiente:   ¿Dónde se ha visto que un Juez tenga dos vestidos:  uno de Juez y otro de Fiscal?; ¿Que se quita uno cuando ejerce jurisdicción y se pone el otro cuando es investigador?. Irracional!

6. El propio **Código Procesal Penal** prohíbe esta **dualidad de funciones**, cuando a la letra prescribe lo siguiente:

> **"Las funciones de investigación están separadas de la función jurisdiccional. Corresponderá, exclusivamente,  al Ministerio Público, la dirección de la investigación.**
> **El Juez no puede realizar actos que impliquen  investigación o el ejercicio de la acción penal ni el Ministerio Público puede realizar actos  jurisdiccionales, sin perjuicio de los casos especiales previstos en este Código.**
> **<u>Sin formulación de cargos no habrá juicio ni habrá pena ni acusación probada"</u>.**

10

Court Exhibit 029

**CONSULTA NO.3: ¿CABE LA POSIBILIDAD QUE SE INFRINJA O VIOLE LA GARANTIA DEL DEBIDO PROCESO SI A UNA PERSONA QUE ES INVESTIGADA NO SE LE REALICE UNA AUDIENCIA DE FORMULACION DE CARGOS O DE IMPUTACION?: EXPLIQUE.**

**RESPUESTAS:**

1. Desde luego. Sin audiencia de formulación de cargos o ¡audiencia de imputación, no puede haber, jamás, debido proceso.

Esta audiencia de imputación es esencial al proceso penal de corte acusatorio en nuestro país, tal y como ya lo hemos venido desarrollando en aparados anteriores.

2. No creo que la Corte Suprema de Panamá soslaye u omita la necesidad de que en todo proceso penal, ordinario o especial, es menester preservar o guardar la plena vigencia de la cesura del proceso. Esto se encuentra, de **modo imperativo,** señalado en el Código Procesal Penal de nuestro país.

3. Es incuestionable, notorio, que no puede existir proceso allí en donde los principios, reglas y normas de éste no se vigencian o simplemente devienen en ser omitidos o desoídos. Que si entendemos que el debido proceso entraña la idea lógica de "todo proceso que respeta sus propios principios", un proceso indebido connota la existencia de una parodia procesal, de un no ejercicio de la jurisdicción, y como diría el maestro **VICTOR FAIREN GUILLEN,** un **pseudo** ejercicio de la jurisdicción.

11

4. Que, en consecuencia de lo anterior y siguiendo la idea lógica del concepto proceso, es claro que la imputación o formulación de cargos surge como parte fundamental de la cesura procesal y de las formas propias o esenciales del juicio o juzgamiento penal.

5. Estimo, no obstante de lo anterior, que la Corte se ha planteado un dilema: ¿Cómo hacer imputación sin la presencia del acusado en el proceso? O, tal vez, ¿Cómo adelantar un proceso o las etapas propias del proceso sin la presencia del acusado? ¿Se le puede hacer o formular imputación una persona en ausencia?.

6. Obviamente que no, de ninguna manera y, sin duda alguna, desde esta perspectiva se podría asimilar la declaratoria de rebeldía del acusado, lo cual conllevaría a las siguientes hipótesis:

a. Que compareciendo el acusado al proceso, se le mantenga la detención provisional en la causa.

b. Que compareciendo el acusado al proceso, se ordene, luego de formulados cargos, la inmediata libertad.

c. Que compareciendo el acusado, se le sustituya la medida de la detención provisional y, en su defecto, se le imponga otro tipo de medida cautelar: v.gr. prohibición de abandonar el territorio nacional, casa por cárcel, presentación periódica ante la autoridad, etc.

7. Sin embargo, quedará claro que no puedo soslayar, en este análisis, que paralelo a las consideraciones jurídicas corren las consideraciones de carácter político que no me corresponde discernir, ya que soy del criterio o de la opinión, junto a Carrara, que política y derecho no

nacieron hermanas y que cuando ambas se encuentran, frente a frente, en el templo de la justicia, justicia prefiere levantar alas al cielo.

8. Pero, por otra parte, ¿Cómo explicarle a la justicia, sobre todo en aquellas jurisdicciones en donde rige, de modo preclaro, el sistema acusatorio, que se ordena la detención de una persona que no ha comparecido al proceso?.

Si las medidas cautelares, reales o personales –entre ellas la más gravosa, la detención provisional- deben emanar de un proceso justo y legal, cómo entender luego la declaratoria de rebeldía y consiguiente orden de detención provisional de un ciudadano?.

9. De modo tal que, en grado de conclusión:  **Si la propia Constitución nacional prescribe en ya visto Artículo 32 la garantía del debido proceso, cómo entender que si no se cumplen los trámites legales, los procedimientos legales, pueda hablarse o intentarse siquiera afirmar que se ha respetado tal garantía?.    La imputación o formulación de cargos entroniza en dicho garantía del debido proceso.**

**CONSULTA No.4:** ¿A SU OPINION,  EL ARTICULO 191 DE LA CONSTITUCION NACIONAL DE PANAMÁ, PERMITE QUE A UN PRESIDENTE O VICEPRESIDENTE DE LA REPUBLICA SE LE JUZGUE POR DIVERSOS DELITOS O DISTINTOS DELITOS A LOS SEÑALADOS EN DICHO ARTÍCULO CONSTITUCIONAL?.

Court Exhibit 032

**RESPUESTAS:**

1. El Artículo 191 de la Constitución Nacional de la República de Panamá, prescribe lo siguiente:

> **"El Presidente y el Vicepresidente de la república sólo son responsables en os casos siguientes:**
>
> 1. **Por extralimitación de sus funciones constitucionales.**
> 2. **Por actos de violencia o coacción en el curso del proceso electoral; por impedir la reunión de la Asamblea Nacional; por obstaculizar el ejercicio de las funciones de ésta o de los demás organismos o autoridades públicas que establece la constitución.**
> 3. **Por delitos contra la personalidad internacional del Estado o contra la administración pública.**
>    **En los dos primeros casos, la pena será de destitución y de inhabilitación para ejercer cargo público por el término que fije la Ley.  En el tercer caso, se aplicará el derecho común."**

2. Como se desprende del texto constitucional transcrito,  el encabezado de dicha norma al señalar o prescribir mediante el giro idiomático "**sólo son responsables**", excluye todo delito distinto a los señalados en la norma constitucional.

3. Préstese atención que el Constituyente, sin duda alguna, en este tipo de normas,   legisló penalmente, incluso haciendo suya la potestad, como hacedor de las normas de la Carta Magna, de variar las penas que generalmente están indicadas, de modo expreso, para este tipo de delitos, en el Código Penal, creando las suyas,  y ello por una sola razón: La responsabilidad penal, como tal, siempre debe emanar de un

14

proceso penal, público y conforme a las garantías constitucionales, legales y convencionales, de modo que una sentencia de condena, firme y ejecutoriada es la expresión más jurídica para estacionar a una persona, en el ámbito de dicha responsabilidad penal.  El constituyente decidió, por razones de Estado, no someter al Presidente ni al Vicepresidente de la República a los rigores de un proceso penal con penas distintas a las indicadas en el tenor constitucional y, de este modo, poner en peligro a la majestad de la primera y segunda figura más representativa del Estado panameño.

4. Como es de observarse, dejó sobreviviente el **derecho penal común u ordinario para los delitos contra la administración  pública, cuestión que se advierte el la historia constitucional panameña;** sin embargo, aún en estos casos, pareciera indicar algún contrasentido el texto constitucional habida consideración que el Presidente de una nación, lo mismo que su Vicepresidente, son los Jefes de la Administración  Pública y no puede ser cierto que todo cuanto atañe o toca, golpea, a la cosa pública, tengan ellos que responder, necesariamente, por el mero o solo hecho de ser los jefes de la Administración Pública.

5. De allí que el concepto de **Administración Pública** que preconiza el texto constitucional es mucho más amplio, abierto, que el que en materia penal, de modo preciso, contemplan los códigos penales.  No obstante, los delitos a tomar en consideración, conforme al numeral 3 del Artículo 191 de la Constitución, sin duda alguna, son los que

consagra el Código Penal teniendo como bien jurídico a la Administración Pública.

6. El artículo 78 de la Constitución Nacional de 1904 indica o hace uso de la expresión "**sólo es responsable**", y también formulaba la distinción entre si el Presidente se encontraba en funciones o si ya había cesado en ellas. Para el primer caso, la pena era la **destitución** y para el segundo caso la **inhabilitación para ejercer cargos públicos.**

Igual tónica la encontraremos en la Constitución de 1941, ya que conforme al Artículo 113 se expresaba o utilizaba la expresión "**sólo será responsable**", y seguía la redacción de la Constitución de 1904, por cuanto distinguía que si el Presidente se encontraba en uso de sus funciones se le aplicaba la destitución y si ya había cesado en ellas tan solo la inhabilitación para ejercer cualquier cargos públicos.

7. La Constitución de 1946, casi de igual regulación o redacción que el artículo 191 de la Constitución actual, en su Artículo 148 no contemplaba o no incluía los Delitos contra la Administración Pública, sino que en su lugar integraba al delito de **alta traición**, sometido al derecho común. Cosa igual referían las constituciones de 1904, 1941 y 1946.

8. Es de notar que el artículo 171, conforme al texto original de la Constitución de 1972, no usaba la expresión delitos contra la administración pública, sino que hablaba o expresaba delitos contra la patria o contra la cosa pública, aplicándose, en todo caso, el derecho común para este tipo de delitos. La nota en común, del

16

constitucionalismo panameño, es que se reserva el uso del giro idiomático "**sólo será responsable**".

9. A nuestro criterio jurídico, esto viene a fortalecer la idea de que, conforme al Artículo 191 Constitucional, la actual Constitución, no es posible juzgar al Presidente o Vicepresidente de la República por delitos distintos a los señalados en los numerales que la propia norma incorpora en la descripción normativa constitucional, siempre y cuando la conducta o la acción, inclusive la omisión desenvuelta sea dentro del marco constitucional, es decir, dentro del claro ejercicio de sus funciones.

**CONSULTA No.5:** **¿EXPRESE SI LOS DIPUTADOS DEL PARLACEN, PRIMERO, TIENE LAS MISMOS DERECHOS Y PRERROGATIVAS QUE LOS DIPUTADOS NACIONALES DE PANAMA Y SI UN DIPUTADO DEL PARLACEN PUEDE SER INVESTIGADO O PROCESADO, POR DELITO ALGUNO EN LA REPUBLICA DE PANAMA, SIN, PREVIAMENTE, HABER SIDO DESAFORADO POR EL PARLAMENTO CENTROAMERICANO?. EXPLIQUE SU RESPUESTA.**

**RESPUESTAS:**

1. Cabe destacar que nuestro país, la República de Panamá, es parte suscriptora y adherente del **Pacto Constitutivo del PARLACEN**. Para ello designa, previas elecciones que se celebran conjuntamente con las elecciones generales de nuestro país, diputados al PARLACEN.

17

Con ello lo que quiero expresar es que Panamá forma parte del Derecho Fundamental Comunitario Centroamericano.

2. En base a su interrogante, destaco que ya esta inquietud fue resuelta por la propia Corte Centroamericana de Justicia tras la causa sometida a su consideración –**Expediente No. 7-23-10-2013-** , previa consulta elevada por el Ex presidente MARTIN TORRIJOS ESPINO, de la República de Panamá, cuyas interrogantes versaron sobre puntos muy específicos, cuales eran, básicamente, las siguientes:

   a. Tienen inmunidad los diputados del PARLACEN?
   b. Pueden ser investigados o juzgados por causas penales sin el previo desaforo del PARLACEN?
   c. Permanecen los derechos como diputado del PARLACEN sin que exista previa sentencia de condena?
   d. Criterios o jurisprudencia de esa Corte sobre casos similares?

3. La respuesta dada por la Corte fue categórica:

   a. Los diputados del PARLACEN tienen las mismas prerrogativas que los diputados nacionales.
   b. Una vez un Presidente deja de serlo, esto es que termina su mandato o periodo para el cual fue elegido, de modo automático ingresa a ser Diputado del PARLACEN y por consiguiente tiene y ostenta la inmunidad parlamentaria otorgada o conferida a los diputados de dicho parlamento centroamericano –Artículo 2 del TCP-.

18

**c.** Que las reglas, normas y principios del Sistema de integración Centroamericana son obligatorias,  para los Estados, Órganos y Organismos del Sistema de la integración, por ello el Tratado o Pacto Constitutivo del PARLACEN   deviene en **Derecho Comunitario Fundamental para Centroamérica.**

**d.** Ningún diputado del PARLACEN puede ser investigado o enjuiciado, por delito alguno, si primeramente no es desaforado o de modo previo haya un levantamiento del fuero como parlamentario y ello conforme al procedimiento previsto en el Tratado Constitutivo del Parlamento Centroamericano.

**e.** Es el Artículo 22 del Tratado del PARLACEN  el que prescribe las inmunidades y privilegios de los diputados del PARLACEN.  Tiene inmunidad igual o similar a los diputados nacionales, y ante los demás estados partes gozan de las inmunidades y privilegios establecidos para funcionarios diplomáticos, tal y como lo prescribe la Convención de Viena sobre Relaciones diplomática; gozan de inmunidad permanente.

**f.** El Artículo 22 contempla que  para el desaforo, previa solitud de las  autoridades correspondientes del país, se fija un plazo de 60 días para reglamentar el procedimiento encaminado al levantamiento y suspensión de las inmunidades y los privilegios de los diputados.

**g.** Un país, sea Panamá o cualquier otro, miembro del PARLACEN, no puede ***motus proprio***, por voluntad propia, levantar la inmunidad ni los privilegios dados u otorgados a un Diputado del PARLACEN, ni siquiera pretextando aplicar un procedimiento interno.   Para ello debe, de modo indefectible, insoslayable,

19

solicitar el desaforo al PARLACEN, en los términos antes señalados y previstos en el Artículo 22 del Tratado.

h. Panamá, como **Estado Independiente y Soberano** *–ESTADO DE DERECHO-*, respetuoso del Derecho, en el Artículo 4 de la Constitución Nacional, ha acogido la cláusula *pacta servanda sunt,* con lo cual acepta, de modo incondicional, la primacía del derecho internacional –entiéndase las convenciones, pactos, tratados, convenios, etc., suscritos por ella y dentro de los cuales entra o ingresa como tal el TRATADO CONSTITUTIVO DEL PARLAMENTO CENTROAMERICANO.  La norma constitucional reza así:  **La República de Panamá acata las normas del Derecho Internacional**.

i. Cabe destacar que antes de las reformas introducidas en la Constitución en Abril de 1983, la norma acogía la *cláusula rebus sic stantibus* consistente en lo siguiente: La República de Panamá acata las normas del derecho internacional que no lesionen el interés nacional. Es decir, se excepcionaba el interés nacional, cosa que no acontece hoy día merced a la nueva fórmula constitucional antes indicada.

**CONSULTA No.6: ¿CÓMO OPERA EN PANAMÁ EL DERECHO DE FIANZA DE EXCARCELACION?,  ¿EL DELITO DE INTERVENCION O ESCUCHAS DE LLAMADAS TELEFONICAS,  AL MARGEN DE LA LEY,  TENDRIA DERECHO A FIANZA?.  EXISTE ALGUN PRECEDENTE EN EL QUE UNA PERSONA SOLICITADA EN EXTRADICION LE HAYA SIDO CONCEDIDO EL DERECHO A**

Court Exhibit 039

**FIANZA Y QUE SURTE HA TENDIO EL PEDIDO DE EXTRADICION FRENTE AL DERECHO DE FIANZA?.**

**RESPUESTAS:**

1. A partir del día 2 de Septiembre del año 2016, en Panamá, rige para la Provincia de Panamá el Sistema Acusatorio, es el Sistema de Juzgamiento vigente en Panamá ahora en todo el territorio dela nación.

Este sistema se recoge en el Código Procesal Penal aprobado mediante **Ley 63 de 28 de Agosto de 2016**.

2. Cabe advertir que ya había, en lo que respecta a otras provincias, entrado en vigencia y para el caso de los diputados, por ser el juzgamiento propio o adscrito a la Corte Suprema de Justicia, este sistema se aplicaba desde hace algunos años ya, en todos sus principios y reglas, normas y estructuras.

3. Contrario a la legislación anterior –Sistema Inquisitivo-, que contenía una serie de normas relativas al derecho de fianza de excarcelación permitida en algunos casos y en otros no, la nueva codificación vino a establecer como regla o brújula jurídica para los proceso penales que **todos los delitos son, en principio, excarcelables**. Así se estipula en el Artículo 241 del Código Procesal Penal.

Todo lo cual viene a indicar que el Juez de Garantías es quien concede la fianza de excarcelación para no ser detenido o simple y sencillamente, encontrándose privada de la libertad la persona, para ser liberada.

21

Court Exhibit 040

4. Respecto al tipo penal  de delito de escuchas o intervención de llamadas telefónicas al margen de la Ley, la respuesta es afirmativa, se trata de un delito excarcelable y ello merced a la especial consideración, adicional a lo anterior, de que tiene una penalidad baja.  Pero la regla general de toda detención provisional en nuestro país, y conforme al sistema procesal penal acusatorio, es que la detención o privación provisional de la libertad no se aplicar sino como ultima ratio  -Artículos 12 y 237 del Código Procesal Penal-.

5. Conocimiento de caso en extradición y que hayan conferido u otorgado nuestros jueces fianza de excarcelación?.
La repuesta es afirmativa. Se trata del caso del joven empresario panameño **MAYER MIZRACHI MATALON**, pedido en extradición a la República de Colombia por parte de Panamá.

6. **MAYER MIZRACHI MATALON** se encontraba detenido en la cárcel de La Picota, a raíz de dicho pedido.  Como abogados, dado que fui su Defensor, solicitamos fianza de excarcelación.  Le fue concedida por el Segundo Tribunal Superior de Justicia del Primer Distrito judicial de la Provincia de Panamá,  mismo que anuló el pedido de extradición y dispuso su libertad caucionada. Todo ello así consta en Auto Vario no.29 de Marzo 16 del año 2016 del Segundo Tribunal Superior de Justicia del Primer distrito Judicial  de la Provincia de Panamá.

Firmo y suscribo, responsablemente:

22

Court Exhibit 041

**Dr. SILVIO GUERRA MORALES**

**Fdo.**

**Idoneidad 1301 de 16 de Julio de 1985.**

**Otorgada por la Corte Suprema de Justicia de la República de Panamá.**


Panamá, Junio 16 de 2017.

## CURRUCLUM VITAE.

### Dr. SILVIO GUERRA MORALES.
### -Currículum Vitae



## A. ESTUDIOS ACADÉMICOS.

-Graduado con el Primer Puesto de Honor en el Colegio Secundario Moisés Castillo Ocaña de La Chorrera.

-Condecorado con la medalla al mérito Dr. GUILLERMO ANDREVE por su esfuerzo y dedicación al estudio por el Ministerio de Educación.

-Abogado por la Universidad de Panamá.

-Doctor en Filosofía y Ph.D en Teología. Graduado Summa Cum Lauda (Outstanding) por Vision International University-Dallas-Texas-Estados Unidos.

23

-Magister en Derecho Procesal por la Universidad Nacional de Rosario Argentina graduado con máximos honores. Su tesis: *Los principios Jurídicos en la Biblia y su Influencia en la Cultura Jurídica de Occidente*, recibió la nota máxima de 10 y ordenada su publicación.

-Culminó, además, sus estudios de Doctorado en Derecho por la misma universidad.

### B. <u>CONDECORACIONES Y DISTINCIONES.</u>

-Condecorado por el Colegio Nacional de Abogados con la medalla al mérito Dr**. CÉSAR A. QUINTERO** por su dedicación a los temas constitucionales.

-Condecorado por el Colegio Nacional de Abogados como Litigante del Año recibiendo la medalla al mérito Dr. ASCANIO MULFORD.

-Abogado distinguido por el Municipio de Panamá como ciudadano e hijo meritorio de la comuna capitalina.

### C. <u>ORGANISMO Y ASOCIACIONES.</u>

-Presidente de la Academia Latinoamericana de Derecho Procesal Garantista y reelecto en el cargo. Este Instituto tiene su sede en Rosario, Argentina.

-Miembro Académico del Instituto Panamericano de Derecho Procesal.

-Miembro de la Asociación Americana de Juristas y Presidente de la Rama Panameña.

-Miembro de la Asociación de Derecho del Trabajo Dr. Guillermo Cabanellas-Perú.

-Miembro del Instituto de Altos Estudios Penales y Criminológicos-Tenerife-España. Ex Becario de dicho instituto y especializado en Derecho Penal.

Court Exhibit 043

-Presidente de  Comisión en el XIV Congreso del Instituto Panamericano de Derecho procesal-Rosario-Argentina.

-Miembro del Instituto Panamericano de Derecho Procesal.

-Miembro del Colegio Nacional de Abogados y reelecto en tres períodos distintos como  Presidente  de la Comisión de Derecho Procesal Penal.

-Ex Candidato por la República de Panamá para integrar el Tribunal de Ruanda.

-Miembro titular del **INSTITUTO IBEROAMERICANO DE DERECHO CONSTITUCIONAL.**

-Miembro de la Comisión Redactora del Proyecto de Código Penal Tipo para Ibero América.

-Miembro de la Comisión Codificadora Nacional-2006. Coordinador de la Sub- Comisión de Derecho   Procesal Punitivo.

## D. DOCENCIA:

-Ex Profesor de Filosofía del Derecho y Derecho Procesal Penal por la Universidad de Panamá.

-Ex Profesor de Maestría en la Universidad Latina de Ciencia y Tecnología –ULACIT-.

-Ex Profesor de Maestría –Derecho Procesal- de la Universidad de Panamá.

-Designado recientemente por la Facultad de Derecho de la USMA para dictar la materia de Derecho Penal en el año 2017.

Postgrado en Epistemología del Derecho bajo la tutoría del maestro Miguel Ángel Ciuro Caldani-Argentina.

-Postgrado en Metodología Jurídica bajo la tutoría del maestro Ariel Álvarez Gardiol-Argentina.

-Postgrado en Teoría del Estado bajo la tutoría del maestro HORACIO ROSATTI-Argentina.

-Diplomado en Derecho Penal Económico y Empresarial-Universidad de Sevilla.

### E. PUBLICACIONES.

--Autor, entre otras, de las siguientes obras:

-Instituciones de Derecho Procesal Penal y Penal.

-Manual de Derecho Procesal Penal.

-Filosofía del Derecho-2 Tomos.

-Presunción de Inocencia y detención preventiva.

-Principios penales.

-Derecho Procesal Punitivo-Edit. Lerner.

-Derecho Procesal Punitivo-Sistema Acusatorio.

-Autor de numerosos artículos y ensayos sobre: : El Estado de Derecho; La Constitución y sus paradigmas; Constitución y Democracia; La Corte Suprema y los Derechos Humanos; Los arquetipos del Estado de Derecho; Los Profesionales y la Justicia Social; Los Derechos Humanos Justiciables; etc.

-Autor de ensayos y artículos jurídicos aparecidos en revistas especializadas en derecho Penal y Procesal Penal, de países como:  Argentina, México, España, Colombia, otros.

Court Exhibit 045

## F. **PAISES VISITADOS.**

-Conferencista en temas de Derecho Penal y Procesal Penal en países como Argentina, Chile, Brasil, España, Cuba, México, Paraguay, Colombia, Costa Rica y otros.

## F. **EJERCICIO PROFESIONAL.**

-Abogado penalista y  litigante por antonomasia.

En este sentido ha sido designado durante cuatro años consecutivos como el Abogado Litigante más distinguido de los años: 2004, 2005,2006 y 2007. La elección ha sido hecha por diversos organismos civiles y sociales de Panamá.

# TRANSLATED

Court Exhibit 047

Panamá, June 16, 2017-

      **EXPERT WITNESS REPORT PRODUCED BY DR. SILVIO GUERRA MORALES, CRIMINAL LAW AND CRIMINAL PROCEDURAL LAW PROFESSOR OF THE SCHOOL OF LAW AND POLITICAL SCIENCES OF THE UNIVERSITY SANTA MARIA LA ANTIGUA AND THE UNIVERSITY OF PANAMA, PRESIDENT OF THE LATIN AMERICAN ACADEMY OF PROCEDURAL LAW OF GUARANTEES, MEMBER OF THE PANAMAIAN INSTITUTE OF PROCEDURAL LAW, FORMER PROFESSOR OF PHILOSOPHY OF LAW, HUMAN RIGHTS AND THE INTRODUCTION TO LAW STUDIES, FORMER PRESIDENT OF THE COMMISSION OF CRIMINAL PROCEDURAL LAW OF OF THE NATIONAL BAR ASSOCIATION OF PANAMA, CODE WRITING MEMBER OF THE CURRENT CRIMINAL PROCEDURAL CODE OF PANAMA, MEMBER OF THE WRITING COMMITTEE OF THE IBERO-AMERICAN PROJECT TO WRITE A MODEL PENAL CODE, AND HERE**

      **FOR THE CASE THAT FOLLOWS OF THE FORMER PRESIDENT OF THE REPUBLIC OF PANAMA, LAWYER RICARDO MARTINELLI BERROCAL, BEFORE THE UNITED STATES FEDERAL COURTHOUSE OF DOWNTOWN MIAMI, IN THE STATE OF FLORIDA, DUE TO THE REQUEST OF EXTRADICTION PRESENTED BY THE REPUBLIC OF PANAMA TO THE GOVERNMENT OF THE UNITED STATES OF AMERICA.**

**POINTS OF CONSULTATION:**

<u>**CONSULTATION NO.1**</u>: **IN THE JUDICIAL OR CRIMINAL PROCEDURAL SYSTEMS –ACCUSATORY CRIMINAL PROCESS - IN THE REPUBLIC OF PANAMA - CAN A TRIAL PROCESS EXIST OR TAKE PLACE AGAINST A PERSON, WITHOUT A CRIMINAL INDICTMENT, OR A HEARING OF FORMULATION OF CHARGES AGAINST THIS PERSON?**

<u>**RESPONSES:**</u>

1. I begin by indicating that by means of the **Failure of Unconstitutionality of November 19 of 2015**, under the auspices of Magistrate Judge Hernán De León B., and with the concurrent vote of Magistrate Judge Harry Díaz, in deciding the actions and warnings of unconstitutionality filed by attorneys Carlos Eduardo Rubio and Magistrate Oydén Ortega Durán, against the last paragraph and the entire Article 491-A of l Code of Criminal Procedure Law 55 of 2012, known in Panama as the Shield Law, The Supreme Court of Justice of the Republic of Panama,

Court Exhibit 048

determined or resolved, as a basic question, that **all special criminal proceedings, established in the Code of Criminal Procedures, are governed by the norms and principles stipulated by Article 481 of such code**.

2. It is noteworthy that the cited Article 481 of the  Code of Criminal Procedure of the Republic of Panama, stipulates the following:

> **"In the criminal procedures before the Supreme Court of Justice, as the Court of the highest judicial instance, <u>expected oral procedures, stated in this code, will be followed for common or ordinary processes</u>".**

> **<u>Underline and bold by author.</u>**

3. On the other hand, there is agreement and consensus in the doctrine of, or in the scientific thought of criminal procedures, on this subject; that in **special criminal procedures**, such as those which follow against one of the representatives of the country, including of Parlacen, **the principles, rules and the common criminal procedural concepts themselves, have full validity.**

> In this sense, without any doubt, one will see what is denominated by book authors, what is called, **<u>censorship of the process.</u>**

4. In such a way that, the **<u>indictment or trial of attributability of action or criminal behavior</u>** – the notification of the criminal charges existentent against the accused, is a procedural act that cannot be not observed and unfulfilled.

5. The disregard or ommission of such act, would lead to **in unfailing manner**, the nullification of the act. And, not any type of nullification, but those that are in a category of absolute procedural nullity by containing vices that transcend the infraction of the constitutional norms, such as in the case of the stipulated in Article 32 of the National Constitution of Panama, which states:

Court Exhibit 049

"Persons will stand trial by no other body than by the competent authority and <u>in accordance to legal procedures</u>, not more than once for the same criminal, administrative, police, or disciplinary case".

**<u>Underline by author.</u>**

6. As known, the constitutional rights of such a procedure, lacks, among other things:

   1. Respect to legal procedures so that the process is found beforehand to be in accordance with the Law.

   2. This is known as **procedural legality**.

   3. Absence of **the parties' right to the principle of adversarial debate**.

   4. This principle of adversarial debate means that, first of all, the **<u>equality of the parties</u>** rule. Without this equality, due procedure can barely take place, other than a lousy replica of a vulgar parody which **is not a procedure**. As the prestigious litigator and professor **ROSARINO ADOLFO ALVARADO VELLOSO,** in his *Teoría General del Proceso*, (General Procedural Theory) Publisher: Hammurabi, "**<u>Due process is nothing more tan a process that respects its own principles</u>**".  This is a logical idea, not a mere coloquial concept.

   5. The rights of the parties to be treated in absolutely the same footing, equality that, without a doubt, translates and implies the equality of opportunities, and this means, in the same way, the **<u>right to make opportune use of effective recourse against resolutions that cause grievances</u>** within a procedure or process, especially the latter.

   6. The right to provide evidences, defenses, exceptions, incidents, etc.

   7. The right for the **Constitucional Clause of the Inviolability of a Defense in Court** to be respected.   This lacks, first of all, respect to a written defense, in other words, professional.

   8. The right that **the promulgated resolutions, within a process, are founded in legal reasoning, and that they not be divorced from the reality of the case, unless the General Principles of Law, in other words, each decisión should contain internal <u>coherence and harmony</u> to legitimize what was resolved on the basis of logic and full reasonability.**

Court Exhibit 050

Now, these claims would not have any worth if they were not in the presence of an **impartial and independent judge**. **Objetive and transparent in the case.**

One other aspect that should be pointed out is that the same Code of Criminal Procedure, with respect to such disregard, states the following:

> **Article 199: "The legal act or diligence is null when the vice has impeded the involved party the exercise of the rights and guarantees recognized by the law, the Political Constitution, and the ratified treaties and agreements by the Republic of Panama. This nullification is irremediable".**

> **Bold and underline by author.**

7. It is to be understood to be **irremediable** when the breach, violation or vice of a guarantee, touches or bruises a rule of constitutional level.

The right of defense is unviolable and is recognized with the name "**Constitutional Clause of the Unviolability of the Right of Defense in Court**".

8. **In Panamá, a criminal procedure, trial or prosecution, may not take place, against any person, without previously  holding a Hearing of the Formulation of Charges** or of the indictment, without the presence of the following persons:

- **-PROSECUTOR**
- **-DEFENSE ATTORNEY**
- **-ACCUSED OR DEFENDANT.**

9a. It must be noted, in the same manner, that in this sense, Article 278 of the Code of Panamanian Procedure, categorically stipulates that:

> **"Regarding the hearings of control of aprehensión, of formulation of charges, those that deal with the nullification of a petition, modification, or dismissal to the proposal of personal cautionary measures, and those of an intermediary step, should include the presence of the Prosecutor, the Defense Attorney, and the Accused or Defendant.".**

Court Exhibit 051

9b. The Accusatory Penal Process, in Panama  contains steps or phases, that allow it to be categorized as a process of guarantees the constitutional and legal liberties, which are:

Before these is the previous investigative step - **Step or Phase of the  Investigation, but more important are:**

**-The Step or Phase of the Formulation of Charges.**
**-Intermediate Step or Arraignment**
**-Step or Phase before the Trial Courts, that imply a trial, as such**.

10. With respect to the **Formulation of charges**, Article 280 of the Code of Criminal Procedure, warns of the following:

> **"When the Public Prosecutor's Office considers it has <u>sufficient evidence to formulate the indictment against one or more individuals, a hearing will be petitioned before the Judge of Guarantees,</u> for such purposes. In this hearing, the Prosecuter will orally communicate to those that are being investigated, that currently there is an investigation against him, her or them, with respect to one or more determined offenses.**
> **<u>The indictment will identify the accused, will indicate the relevant facts that substantiate the indictment, and will list the known elements that sustain it.</u>**
> **It is at the moment of the formulation of the indictment, that there is a formal vinculation to the process".**
>
> **<u>Underline and bold by author.</u>**

11. As can be observed, without a doubt, the phase or step of the indictment hearing or of the formulation of charges, in our view, is the most important, inasmuch as, it is in such a hearing that the investigated person has, for the first time, legal clarity of what charge or offense the presumptive commission is attributed to the individual as author or accomplice, be it primary or secondary and having such knowledge will reasonably determine how to exercise and prepare a defense by lawful means.  This is why Article 281, according to what has been stated, requires that, with the indictment, or formulation of charges, a series of procedural effects and situations are produced, such as:

**"The formulation of the indictment will produce the following effects:**

1. **The interruption of the criminal proceeding stipulation.**
2. **From the point of this hearing, foreseen deadlines are in effect in Articles 291 and 292, whereas the Public Prosecutors Office has to declare and communicate to the parties, the closure of his or her investigation. Once these deadlines are reached, he will have a term of up to ten days to acknowledge or request an discontinuance.**
3. **The possibility to apply the criteria of opportunity is opened, to reach agreements between the Public Prosecutors Office and the defense, to conditionally suspend the process and the alternate forms of conflict resolution  stipulated in this Code."**

**CONSULTATION NO.2: IS DUE PROCESS SATISFIED OR FULFILLED, AT THE LEVEL OF THE SUPREME COURT OF JUSTICE WHEN,  TO THE BEST OF OUR KNOWLEDGE, MAGISTRATE JUDGES ROTATE IN CRIMINAL CASES AGAINST A SAME PERSON, FUNCTIONS OF GUARANTEES JUDGES AND PROCECUTORS, WHICH MEANS THAT ONE MAGISTRATE JUDGE, IN ONE CASE, AGAINST ONE CITIZEN, CAN ACT AS A JUDGE OF GUARANTEES, AND THEN, IN ANOTHER CASE, ACT AS THE PROSECUTOR WHO ACCUSES?**

**RESPONSES:**

1. It is observed that, when it behooved us, being members of the Writing Committee of the Code of Criminal Procedure Project, and for me to be the Coordinator of such Subcommittee, when dealing with the subject concerning the existence or not of a Judge of Guarantees for the Court, our criteria was, as stipulated in the proposal –See Articles 690 and 691 of the project, that a Judge of Guarantees should be appointed to comply with the same required requisites required to be a Supreme Court Magistrate of the Republic of Panama, and that, on the other hand, such Magistrate **would not participate in the plenary and would not intervene in the trial.**

2. Today,  we regret the situation taking place. And it consists of the fact that a Judge of Guarantees is appointed from the plenary of the court and this is the one who serves as such,

exercising the ordinary affairs of the Judges of Guarantees, consecrated by the Code of Criminal Procedure. Nevertheless, this same Magistrate Judge who acts as the custodian or guardian of the guarantees of the citizen who is being investigated or indicted, appears, illogically, acting against this same citizen, as Prosecutor.

3. This, and the aforementioned, has led the system to become tainted.

In Court plenary, the person that acts as the Judge of Guarantees in a procedure, appears in another, as Prosecutor, nonetheless, before the same investigated, indicted, or accused individual.

There have been situations, as the case of an act of intervention by a Magistrate Judge in a hearing ordering the provisional detention of the investigated party, declared, then, for this fact, impeded to to come forward as a reporting judge for an habeas corpus.

4. And, obviously, it could not be any other way.  Which signifies,  to answer the question posed, that a Magistrate Judge who acts as a Judge of Guarantees and then as Prosecutor, before the same investigated or accused individual, even it is for a different offense, violates the constitutional guarantee of an independent, objective, and impartial judge, due to reverting to their intelligence, and faculties, to a same legal opinion or unconscious ideation.

5. The issue is further aggravated if we consider, from the constitutional and conventional views, the Pacto de San José Costa Rica (Pact of San José, Costa Rica) Law 15 of 1977 in Panama – the following:   Where has one seen a Judge wear two cloaks: one of a Judge and the other of a Prosecutor? What does one take off when one excercises the jurisdiction and then what does one put on when investigator?   Irrational!

6. The same **Code of Criminal Procedure** prohibits this **duality of functions**, when it stipulates the following:

**"The functions of an investigation are separate from the function of jurisdiction. It will correspond, exclusively, to the Public Prosecutors Office, the direction of the investigation.**

**The Judge cannot perform acts that imply an investigation or the excercise of a criminal action, and neither can the Public Prosecutors Office excercise jurisdictional acts, without prejudice of the special cases included in this Code.**

Court Exhibit 054

**Without the formulation of charges, there will be no proven trial, nor penalty, nor acusation".**

**CONSULTATION NO.3: IS IT POSSIBLE THAT THE GUARANTEE OF DUE PROCESS IS INFRINGED UPON OR VIOLATED IF A PERSON WHO IS INVESTIGATED DOES NOT HAVE A HEARING OF FORMULATION OF CHARGES OR AN INDICTMENT HEARING?: EXPLAIN.**

**RESPONSES:**

1. Certainly.  Without a formulation of charges hearing, or an indictment hearing, due process can never take place.

This indictment hearing is essential to the criminal accusatory procedure in our country, as we have been claiming in the aforementioned provisions.

2. I do not believe that the Supreme Court of Panama will bypass or omit the requirement that every criminal procedure, ordinary or special, needs to be preserved or guarded in full effect of the caesura of the process. This is found, in **imperative manner,** indicated in the Code of Criminal Procedure of our country.

3. It is unquestionable, and notorious, that there cannot be a process where these principles, rules, and regulations are not enforced or simply are omitted or unheard. If we understand that due process entails the logical idea that "every process respects its own principles", then an improper or undue process connotes the existence of the procedural parody, of the exercise of jurisdiction, and as **VICTOR FAIREN GUILLEN** would say, is a **pseudo** excercise of jurisdiction.

4. In consequence of and following the logical idea of the concept of process, it is clear that the indictment or formulation of charges emerges as a fundamental part of the procedural caesura and of the appropriate or essential forms for a criminal trial or prosecution.

Court Exhibit 055

5. I consider, regardless of the aformentioned, that the Court has posed a dilemma: How can an indictment of an individual be made without the presence of the accused in the process? Or, perhaps, how can a process or the appropriate steps of a process be advanced without the presence of the accused? Can an indictment be formulated in that person's absence?

6. Obviously not, and that in no manner, without any doubt, from this perspective, could one assimilate the declaration of default of the accused, which would lead to the following hypotheses:

    a. That with the appearance of the accused to the proceeding, the provisional detention of the case will be maintained.

    b. That with the appearance of the accused to the proceeding, that the immediate release will be ordered, after which the formulation of charges will take place.

    c. That with the appearance of the accused to the proceeding, the measure of provisional detention will be substituted, and if in default, another cautionary measure will be placed in effect: v.gr. prohibition of abandoning national territory, house arrest, periodic appearance before authorities, etc.

7. Nevertheless, it remains clear that I cannot dismiss, in this analysis, that paralell to these legal considerations are the considerations of a political nature, which are not for me to discern, since I am of the opinion or criteria, together with Cararra, that politics and the law were not born sisters, and when they meet, face to face, in the temple of justice, justice prefers to raise its wings into the sky.

8. However, on the other hand, how does one explain to justice, especially in those jurisdictions where the accusatory system clearly reigns, where detention is ordered for an person who has not appeared in the process?

    If the cautionary, real, or personal measures, among them the most burdensome, the provisional detention must arise from a just and legal process, how can one understand a declaration of default, and the subsequent order of provisional detention of a citizen?

9. In conclusion:  **If the same national Constitution stipulates as seen in Article 32 the Guarantee of due process, how can one understand, if the legal procedures and legal**

Court Exhibit 056

paperwork are not followed, or can we speak of or attempt to even affirm that such guarantees have been respected?  The indictment or formulation of charges enthrones such Guarantee of due process.

**CONSULTATION No.4.:  IN YOUR OPINION, DOES ARTICLE 191 OF THE NATIONAL CONSTITUTION OF PANAMA, ALLOW FOR A PRESIDENT OR VICE-PRESIDENT TO STAND TRIAL FOR DIVERSE OFFENSES OR DIFFERENT OFFENSES THAN THOSE INDICATED IN SUCH CONSTITUTIONAL ARTICLE?**

**RESPONSES:**

1. Article 191 of the National Constitution of the Republic of Panama, stipulates the following:

> **"The President and the Vice-President of the Republic are responsible only in the following cases:**
>
> 1. **For exceeding their constitutional powers.**
> 2. **For acts of violence or coercion during the electoral process; for impeding the meeting of the National Assembly, for blocking the exercise of its functions or of the functions of the other public organizations or authorities that are established by this Constitution.**
> 3. **For offenses against the international personality of the State or against the public administration.**
>    **In the first and second case, the penalty shall be the removal from office, and disqualification to hold public office, for a period fixed by law. In the third case, ordinary law shall apply."**

2. As written in the transcribed Consitutional text,  the person in charge of such a rule, indicating or stipulating in the idiomatic expression "**are responsible only**", excludes all distinct offenses to those indicated in this constitutional rule.

3. I draw attention that the Constituent, without a doubt, in these type of rules, acted as penal legislator, including, having powers, such as the creator of the norms of the Magna Carta, to vary penalties that are generally and expressly indicated, for these types of offenses, in the Criminal Code, creating his or her own, and for only one reason:  Criminal responsibility, as such, always

Court Exhibit 057

needs to arise of a public criminal procedure, in accordance with the constitutional, legal, and conventional Guarantees, in such a way that a firm and executed sentence of conviction, is the most legal expression to station a person, in the scope of such criminal responsibility.   The constituent decided, for reasons of State, not to submit to the President nor to the Vice-President of the Republic, the rigors of a criminal procedure with distict penalties to those indicated in the constitutional wording, and in this manner, disregarding the authority of the first and second figure of greatest representation in the Panamanian State.

4. As observed, **common and ordinary criminal law was left in surviving format, for offenses against the public administration, an issue that is noted in the constitutional history of Panama;** however, even in these cases, it seems that the text indicates some contradition, given the consideration that the President of a nation, as well as the Vice-president, are the Chiefs of the Public Administration and it cannot be correct that in all that concerns, touches, or bruses public affairs, would  be of their responsibility, necessarily, by ther mere fact of being the Chiefs of the Public Administration.

5. Therefore, the concept of **__Public Administration__** advocated by the constitutional text is much broader and open, than in criminal scope, in precise manner, as contemplated by the criminal codes.  Notwithstanding, the offenses to be taken into consideration, according to number 3 of Article 191 of the Constitution, without a doubt, are the ones consecrated in the Criminal Code, providing legal protection to the Public Administration.

6. Article 78 of the National Constitution of  1904  indicates or has the expression "**__are responsible only__**",  and also formulated a distinction on whether the President found himself or herself in functions or if these had ceased. In the first case, the penalty was **impeachment,** and for the second case was **disqualification to hold public office.**

    An equal expression is found in the Constitution 1941, since, according to Article 113 the expression used was  "**will be responsible only**", followed by the text of the the Constitution of 1904,  where it was distinguished that if the President was found in use of his or her functions, the penalty applied was impeachment, and if he or she had finished his or her term, then the penalty was simply the disqualification to hold any public office.

Translation from Spanish into English by Izabel E. T. De V. Souza, M.Ed, CMI-S, Ph.D. (American Translators Association #263000)

11

Court Exhibit 058

7. The Constitution of 1946, is almost equal in regulations or wording to Article 191 of the current Constitution. In its Article 148 it did not contemplate or include the Offenses against the Public Administration, but in its place, included the offense of high treason, subject to common law.  The Constitutions of 1904, 1941 y 1946, included the same references.

8. It is noteworthy that Article 171, according to the original text of the Constitution of 1972, did not use the expression: offenses against the public administration, but rather spoke of and used the expression offenses against the homeland or against a public affair, applying, in all cases, the common law for these types of offenses.   The common thread of the Panamanean constitutionalism, is that the idiomatic expression, "**are responsible only**".

9. In our legal criteria, this strengthens the idea, that, according to the Constitutional Article 191, the current Constitution, it is not possible for the President or Vice-President to stand trial for distinct offenses to those indicated in the numerals of the same norm incorporating this normative constitutional description.

**<u>CONSULTATION NO.5</u>: DO THE REPRESENTATIVES OF PARLACEN, FIRST, DO THEY HAVE THE SAME RIGHTS AND PREROGATIVES OF THE NATIONAL REPRESENTATIVES OF PANAMA, AND IF YES, CAN A PARLACEN REPRESENTATIVE BE INVESTIGATED OR PROSECUTED, FOR ANY OFFENSE IN THE REPUBLIC OF PANAMA, WITHOUT, PREVIOUSLY HAVING BEEN REMOVED FROM THE CENTRAL AMERICAN PARLIAMENT? EXPLAIN YOUR RESPONSE.**

   **RESPONSES:**

1. It must be noted that, in our country, the Republic of Panama, is a Member State, subscribed and adherent to the PARLACEN Constitutive Treaty. For this purpose, it appoints representatives to PARLACEN conjunctly with the general elections of our country.

Translation from Spanish into English by Izabel E. T. De V. Souza, M.Ed, CMI-S, Ph.D. (American Translators Association #263000)   12

Court Exhibit 059

With this, I wish to express that Panama forms part of the Fundamental Rights of the Central American Community.

2. Based on your question, I note that this concern was resolved by the Central American Court of Justice itself, regarding the case submitted for its consideration - **Case No. 7-23-10-2013** – where a previous consultation was requested by the Former President MARTIN TORRIJOS ESPINO, of the Republic of Panama, where these questions are answered in very specific points, having been, basically, the following:

    a.  Do the representatives of PARLACEN have immunity?

    b.  Can they be investigated or stand trial for criminal cases without first having been removed from PARLACEN?

    c.  Do their rights as representatives of PARLACEN remain, without there having been a previous sentence or conviction?

    d.  What are the criteria or jurisprudence of this Court regarding similar cases?

3. The response given by the Court was categorical:

    a.  The representatives of PARLACEN have the same prerogatives as the national representatives.

    b.  Once a President ceases to be president, this is what determines his or her mandate or term for which he was selected, in an automatic manner being incorporated as a PARLACEN Representative, and hence has and holds the parlamentary immunity granted or afforded to the representatives of such a Central American parliament - Article 2 of the TCP –.

    c.  That the rules, norms, and principles of the Central American Integration System are mandatory, for the Member States, and the Bodies and Entities of the Integration System, through the PARLACEN Constitutive Treaty comes the **Fundamental Community Rights for Central America**.

    d.  No PARLACEN representative can be investigated or stand trial, for any offense, if he or she has not been removed first, or that previously a parlamentary fórum has been

Court Exhibit 060

requested, and this in accordence to the expected procedures in the Central American Parliament Consitutive Treaty.

e.  It is Article 22 of the PARLACEN Treaty that stipulates the immunities and priviledges of the PARLACEN representatives. They have immunity equal or similar to the national representatives, and before the other member states, they enjoy of the immunities and priviledges obtained for diplomats, as the Vienna Convention on Diplomatic Relations: they enjoy permanent immunity.

f.  Article 22 contemplates that for a removal, a previous request of the corresponding authorities of the country, has a period of 60 days to resolve the procedure raised for the removal and suspension of the representatives' immunity and priviledges.

g.  A country, be it Panama, or any other, who is a member of PARLACEN, cannot, ***motus proprio***, on his own impulse, remove the immunity nor the priviledges granted and awarded to a PARLACEN representative, note ven withe te pretext of applying an internal procedure. For this, there would need to be, in unfailing  and unavoidable manner, request for the removal of PARLACEN, in the terms previously noted and stipulated in Article 22 of the Treaty.

h.  Panama, as an **Independent and Sovereign State – *RULE OF LAW -* ,** respectful of the Right, in Article 4 of the National Constitution, has seen embraced the clause ***pacta servanda sunt***, where it accepts, in unconditional manner, the primacy of international law- be it the conventions, pacts, treaties, agreements, etc., subscribed by it, and from which enters withe the CENTRAL AMERICAN PARLIAMENT CONSITUTIVE TREATY. **The constitutional rule is this: The Republic of Panama abides to the rules of International Law**.

i.  It is worth mentioning that before the reforms of April 1983 were introduced to teh Constitution, the rule abided by the clause ***rebus sic stantibus*** consistent in the following: The Republic of Panama acts on international law when it doesn't harm national interests. In other words, national interests are excluded, something that does not happen today due to the new constitutional formula, previously noted.

Court Exhibit 061

**CONSULTATION NO.6:** IN PANAMA, HOW DOES THE RIGHT TO BAIL AGAINST INCARCERATION LAW OPERATE? DOES THE CRIME OF INTERVENTION OR LISTENING TO TELEPHONE CALLS, OUTSIDE THE LAW, HAVE THE RIGHT TO BAIL? IS THERE ANY PRECEDENT IN WHICH A PERSON WHO WAS REQUESTED FOR EXTRADICTION HAS RECEIVED THE RIGHT OF BAIL AND THAT THE REQUEST OF EXTRADICTION HAS BEEN WITH THE RIGHT OF BOND?

**RESPONSES:**

1. The Accusatory System reigns in Panama, in the Province of Panama, since the 2nd of September of year 2016, which is the System of Prosecution in place in Panama now in the entire national territory.

This system is base don the Code of Criminal Procedure, approved bia **Law 63 of the 28th of August of 2016**.

2. It is noteworthy that other provinces already had this system in place, and for the case of representatives, since the same subscribed trial was before the Supreme Court of Justice, where this system has been in place already for some years, in all of its principles, norms, and structures.

3. Contrary to previous legislation – Inquisitive System -, that contained a series of norms related to right to bail for reléase allowed in some cases and in others not. The new codification established as a general legal rule for all criminal procedures, that **all offenses are, in principle, may result in incarceration.** Therefore, it si stipulated in Article 241 of the Code of Criminal Procedure.

All indicates that the Judge of Guarantees is the person who concedes the bail against imprisionment to not be detained, or simply, if the person is deprived of freedom, to be released.

4. With regard of the type of criminal offense of listenting and tapping of telephone calls outside the law, the answer is affirmative; it is an imprisonable offense, and the person is at the mercy of

Court Exhibit 062

special consideration, additional to the above, which has a low penalti. But the general rule of every provisional inpriosionment in our country, and according to the accusatory system of criminal procedure, is that the incarceration or provisional deprivation of freedom is applied as a last resort. – Articles 12 and 237 of the Code of Criminal Procedure-.

5. Knowledge of a case of extradiction, where our judges have conferred or granted bail against incarcarceration?

The answer is affirmative. It is the case of the Young Panamanian entrepreneur **MAYER MIZRACHI MATALON**, with a request of extradiction from the Republic of Colombia, through a request from Panama.

6. **MAYER MIZRACHI MATALON** was found detained in the prison of La Picota, rooted in such a request. As attorneys, since I was his Defense Attorney, we requested a bail against incarceration. It was conceded by the Second Superior Court of Justice of the Judicial First District of the Province of Panama, same which nullified the request for extradiction and freedom on bail. All this is in the Case Minutes no.29 of March 16 of year 2016 of the Second Superior Court of Justice of the Judicial First District of the Province of Panama.

I sign and subscribe, responsibly:

**Dr. SILVIO GUERRA MORALES**

**Signature.**

**Certificate of Competency 1301 of the 16th of July, 1985**

**Granted by the Supreme Court of Justice of the Republic of Panama.**

Panama, June 16 of 2017.

# CURRICULUM VITAE.

## DR. SILVIO GUERRA MORALES
### -CurrIculum Vitae

### A.  ACADEMIC STUDIES.

-Graduated with Highest Honors at the *Moisés Castillo Ocaña de La Chorrera* High School.

-Condecorated with the medal for merit DR. GUILLERMO ANDREVE for his study dedication and effort by the Department of Education.

-Attorney by the Universidad de Panama.

-Doctor in Philosophy and Ph.D. in Theology. Graduated Suma Cum Laude  by Vision International University, Dallas, Texas, United States.

-Magister of Procedural Law by *Universidad Nacional de Rosario Argentina* graduating with highest honors. Thesis: ***The Legal Principles in the Bible and their Influence in the Western Culture of Law***, receiving the máximum grade 10, selected for publication.

-Culminated with a Doctorate of Law by the same university.

### B.  CONDECORATIONS AND DISTINCTIONS.

-Condecorated by the *Colegio Nacional de Abogados* (National Bar Association 'of Panama') with the medal for merit DR. CÉSAR A. QUINTERO for his dedication to constitutional subjects.

-Condecorated by *Colegio Nacional de Abogados* (National Bar Association 'of Panama') as Litigant of the Year, receiving the medal for merit DR. ASCANIO MULFORD.

-Distinguished Attorney by the Municipality of Panama as citizen and child of merit of the capital's commune.

### C.  ENTITIES AND ASSOCIATIONS.

Court Exhibit 064

-President of *the Academia Latinoamericana de Derecho Procesal Garantista* (Latin American Academy of Procedural and Guarantees Law) and was re-elected to the post. This Institute is headquarted in Rosario, Argentina.

-Academic member of the *Instituto Panamericano de Derecho Procesal* (Panamerican Institute of Procedural Law).

-Member of *Asociación Americana de Juristas* (American Association of Jurists) and President of the Panama Division.

-Member of *Asociación de Derecho del Trabajo Dr. Guillermo Cabanellas (*Association of Labour Law Dr. Guillermo Cabanellas) in Peru.

-Member of the *Instituto de Altos Estudios Penales y Criminológicos* (Institute of Penal and Criminological Studies), Tenerife, Spain. Former fellow of such institute and specialized in Penal Law.

-Committee President of the XIV Congress of the Panamerican Institute of Procedural Law, Rosario, Argentina.

-Member of *Instituto Panamericano de Derecho Procesal* (Panamerican Institute of Procedural Law).

-Member of the *Colegio Nacional de Abogados* (National Bar Association 'of Panama') and re-elected in three distinct terms as President of the Procedural Penal Law Committee.

-Former Candidate of the Republic of Panama to join the Tribunal of Rwanda.

-Standing member of **INSTITUTO IBEROAMERICANO DE DERECHO CONSTITUCIONAL** (Iberoamerican Institute of Constitutional Law)**.**

-Member of the Writing Committee of the Ibero-American Project to write a Model Penal Code.

-Member of the National Codifying Committee, 2006. Coordinator of the Punitive Procedural Law Subcommittee.

### D. UNIVERSITY TEACHING:

-Former Professor of Philosophy of Law and Criminal Procedural Law at the University of Panama.

-Former Graduate Professor in the University: *Universidad Latina de Ciencia y Tecnología – ULACIT- (Latin University of Science and Technology).*

-Former Graduate Professor – Procedural Law - of the University of Panama.

-Designated recently by the Law School of University *USMA* to teach the subject of Criminal Law in 2017.

Postgraduate teaching in Epistemology of Law under the supervision of professor Miguel Ángel Ciuro Caldani, Argentina.

-Postgraduate teaching in Judicial Methodology under the supervision of professor Ariel Álvarez Gardiol, Argentina.

-Postgraduate teaching in Theory of the State under the supervision of HORACIO ROSATTI, Argentina.

-Diploma in Economic and Corporate Criminal Law, University of Sevilla.

### E. **PUBLICATIONS.**

--Author, of the following writings, among others:

-Criminal Procedural Law and Criminal Law Institutions.

-Criminal Procedural Law Manual.

-Philosophy of Law – two volumes.

-Presumption of Innocence and preventive detention.

-Penal Principles.

-Punitive Procedural Law – Publisher: Lerner.

-Punitive Procedural Law – Accusatory Penal Process.

-Author of numerous articles and papers on: The Rule of Law; The Constitution and its Paradigms; Constitution and Democracy; The Supreme Court and Human Rights; The Archetypes of the Rule of Law; Professionals and Social Justice; Enforceable Human Rights; etc.

-Author of legal papers and articles published in magazines specialized in Criminal Law and Criminal Procedural Law, in countries such as:  Argentina, Mexico, Spain, Colombia, and others.

Court Exhibit 066

## F. **VISITED COUNTRIES.**

-Conference Speaker in subjects of Criminal Law and Criminal Procedural Law in various countries: Argentina, Chile, Brazil, Spain, Cuba, Mexico, Paraguay, Colombia, Costa Rica and others.

## G. **PROFESSIONAL PRACTICE.**

- Autonomous Criminal Lawyer and Litigant

In this sense, has been designated during four consecutive years as the most distinguished Litigant Attorney of the years: 2004, 2005, 2006 and 2007. The election was made by various civil and societal bodies of Panama.

Court Exhibit 068

# Declaration of Roberto J. Moreno (Imputacion)

Court Exhibit 069

# TRANSLATION FORTHCOMING

# DECLARACIÓN DE
## ROBERTO J. MORENO

Yo, Roberto J. Moreno, hago la siguiente declaración:

1. Soy ciudadano panameño y abogado con licencia No.4060 para ejercer la abogacía en la República de Panamá desde el año de 1998. Mi firma de abogados, Moreno Rigau & Asociados, tiene sus oficinas en Ciudad de Panamá, República de Panamá. Soy profesor Universitario en la Universidad Católica Santa María la Antigua (USMA) y en la Universidad de Las Américas (UDELAS) en ambos casos en la maestría en Sistema Penal Acusatorio que es como se denomina al procedimiento criminal, en las cátedras de Litigación Oral, Investigación Criminal y Crimen Organizado Transnacional. Desde el año de 1997 hasta el año 2015 fui funcionario de la Procuraduría General de la Nación, ejerciendo progresivamente distintos cargos de responsabilidad, siendo el último de ellos Fiscal Nacional Contra el Crimen Organizado. Los Fiscales en Panamá dirigen la investigación de delitos y sustentan en juicio sus casos. Obtuve mi Licenciatura en Derecho y ciencias Políticas en la USMA en 1998. En el año 2009 obtuve una Maestría en Leyes (LL.M.) con especialidad en Derechos Humanos Internacionales en los Estados Unidos de América, en la prestigiosa American University Washington College of Law, Washington D.C., gracias a una beca Fulbright del Departamento de Estado de los Estados Unidos de América y además poseo una Maestría en Criminología de la Universidad de Panamá.
2. Esta Opinión legal la hago a petición de los abogados quienes representan a RICARDO MARTINELLI BERROCAL en un proceso de extradición.
3. Se me ha pedido que me refiera, desde la óptica de la legislación panameña, a la falta de IMPUTACION en el proceso por el cual se pide la extradición del señor MARTINELLI BERROCAL.
4. En el proceso penal panameño la imputación de cargos es una garantía del debido proceso y parte fundamental del derecho de defensa.
5. La imputación se origina en la Constitución Nacional de la República de Panamá, concretamente en el artículo 22 que a la letra dice:
   "Artículo 22 CN: Toda persona detenida debe ser informada inmediatamente y en forma que le sea comprensible, de las razones de su detención y de sus derechos constitucionales y legales correspondientes. Las personas acusadas de haber cometido un delito tienen derecho a que se presuma su inocencia mientras no se pruebe su culpabilidad en juicio público que le haya asegurado todas las garantías establecidas para su defensa. Quien sea detenido tendrá derecho, desde ese momento, a la asistencia de un abogado en las diligencias policiales y judiciales. La Ley reglamentará esta materia."
6. Esta norma establece el derecho que tiene toda persona investigada a saber INMEDIATAMENTE de que se le acusa. El derecho de defensa descansa en el acto de imputación desde que permite al imputado, una vez conocidos los cargos en su contra, controvertirlos, confrontarlos y desvirtuarlos.
7. Este concepto se refuerza en la Convención Interamericana de Derechos Humanos (CIDH), convenio internacional que en la República de Panamá tiene rango constitucional. La Convención establece en su artículo 8.2 b. lo siguiente:
   Artículo 8.2 b CIDH: Garantías Judiciales

Court Exhibit 071

...

2. Toda persona inculpada de delito tiene derecho a que se presuma su inocencia mientras no se establezca legalmente su culpabilidad.  Durante el proceso, toda persona tiene derecho, en plena igualdad, a las siguientes garantías mínimas:
...b) comunicación previa y detallada al inculpado de la acusación formulada;

La Corte Interamericana de Derechos Humanos con sede en San José, Costa Rica, ha interpretado esta norma en fallo de fecha **de 20 de junio de 2005, en el asunto Fermín Ramírez vs.** Guatemala, indicando lo siguiente:

"La Convención no acoge un sistema procesal penal en particular. Deja a los Estados en libertad para determinar el que consideren preferible, siempre que respeten las garantías establecidas en la propia Convención, en el derecho interno, en otros tratados internacionales aplicables, en las normas consuetudinarias y en las disposiciones imperativas de derecho internacional.

Al determinar el alcance de las garantías contenidas en el artículo 8.2 de la Convención, la Corte debe considerar el papel de la "acusación" en el debido proceso penal *vis-à-vis* el derecho de defensa. La descripción material de la conducta imputada contiene los datos fácticos recogidos en la acusación, que constituyen la referencia indispensable para el ejercicio de la defensa del imputado y la consecuente consideración del juzgador en la sentencia. **De ahí que el imputado tenga derecho a conocer, a través de una descripción clara, detallada y precisa, los hechos que se le imputan.**

La calificación jurídica de éstos puede ser modificada durante el proceso por el órgano acusador o por el juzgador, sin que ello atente contra el derecho de defensa, cuando se mantengan sin variación los hechos mismos y se observen las garantías procesales previstas en la ley para llevar a cabo la nueva calificación…"

8.  Ha dicho la jurisprudencia de la Corte Suprema de Justicia de Panamá que es obligatorio para nuestros operadores de justicia en particular, y para los servidores públicos panameños en general, acatar la Convención Interamericana de Derechos Humanos en fallo de 16 de febrero de 2016, en el proceso que se siguió en contra de OLGA FUENTES GIL, al señalar que:

"… En consecuencia, la incorporación del segundo párrafo del artículo 17 de la Constitución Política, trae aparejado una protección extensiva de los derechos fundamentales previstos en los tratados o convenios internacionales de Derechos Humanos, imponiéndole a la República de Panamá, **la obligación de cumplir con los compromisos asumidos al ratificar estos instrumentos en materia de Derechos Humanos.**

...

Estas normas constitucionales y legales, de manera directa, **obligan al administrador de justicia a valorar y analizar las regulaciones contenidas** en

los Convenios y Tratados en materia de Derechos Humanos, suscritos por la República de Panamá.

…

En efecto, cuando un Estado es Parte de un Tratado Internacional, como la Convención Americana para la protección de los Derechos Humanos, todos sus órganos, **incluidos sus jueces**, también están sometidos a aquel…"

9. El proceso penal panameño de corte acusatorio tiene etapas bien definidas y con objetivos específicos. El proceso inicia con la notitia criminis, dando lugar a la investigación preliminar, que culmina con precisamente con la imputación de cargos, que da inicio a la fase de investigación preparatoria y termina con la acusación que a su vez da inicio a la fase intermedia que culmina con el auto de llamamiento a juicio para pasar a la fase de juicio oral que concluye con la sentencia.

10. La IMPUTACION está regulada en el artículo 280 del Código Procesal Penal (CPP) que establece que se trata de un acto de comunicación que hace el Fiscal al investigado, en el que le informa cuales son los hechos que se le imputan y en que delito los encuadra, al menos preliminarmente.

Artículo 280 CPP: Formulación de la imputación. Cuando el Ministerio Público considere que tiene suficientes evidencias para formular imputación contra uno o más individuos, solicitará audiencia ante el Juez de Garantías para tales efectos. En esta audiencia el Fiscal comunicará oralmente a los investigados que se desarrolla actualmente una investigación en su contra respecto de uno o más delitos determinados. La imputación individualizará al imputado, indicará los hechos relevantes que fundamentan la imputación y enunciará los elementos de conocimiento que la sustentan. A partir de la formulación de imputación hay vinculación formal al proceso.

11. La formulación de imputación tiene efectos jurídicos que consagra el artículo 281 CPP. Entre esos efectos esta la interrupción de la prescripción, inicia el plazo de investigación que regularmente es de 6 meses, se pueden celebrar acuerdos de pena o plea bargaining, entre otros.

Artículo 281 CPP: Efectos. La formulación de imputación producirá los siguientes efectos: 1. La interrupción de la prescripción de la acción penal. 2. Desde esta audiencia comienzan a contarse los plazos previstos en los artículos 291 y 292, que tiene el Ministerio Público para declarar cerrada su investigación y comunicarlo así a las partes. Vencidos estos tendrá un plazo de hasta diez días para acusar o solicitar sobreseimiento. 3. Se abre la posibilidad de aplicar el criterio de oportunidad, de celebrar acuerdos entre el Ministerio Público y la defensa, de suspender condicionalmente el proceso y las formas alternas de resolución del conflicto dispuestas en este Código.

12. Es en la etapa de investigación preparatoria que la defensa puede ser proactiva y presentar al fiscal elementos de convicción que lo hagan arribar a una decisión de cierre de investigación ya sea por principio de oportunidad, archivo o por sobreseimiento. Esto no puede ocurrir sin imputación pues no tendría la defensa conocimiento de la Teoría del Caso de la Fiscalía para poder controvertirla, inicialmente ante el propio fiscal que tiene obligación de objetividad durante la investigación según el artículo 24 CPP.

13. La falta de imputación adecuada puede incluso forzar un cierre de la investigación, al tenor de lo normado en el artículo 286 CPP.

Artículo 286 CPP: Control judicial anterior a la formulación de la imputación. En caso de que a alguna persona se le cause un  perjuicio a su patrimonio o a su libertad sin que medie formulación en su contra, acudirá ante el Juez de Garantías para instar la inmediata formulación de la imputación.  En este caso, el Juez dará un plazo de dos días al Fiscal para que la formule y, de no hacerlo, decretará el archivo de los antecedentes si los hubiera y dejará sin efecto toda medida intrusiva que afecte al solicitante.  Asimismo, la víctima podrá instar al Fiscal para que se pronuncie sobre la investigación, caso en el cual se aplicará el procedimiento previsto en el artículo 149 de este Código.

14. Las medidas cautelares personales como la detención provisional solo son aplicables a la persona imputada, y son excepcionales.

 "Artículo 221.CPP: Restricción a la libertad personal. La libertad personal del imputado solo podrá ser restringida de acuerdo con las previsiones de este Código."

"Artículo 222. Requisitos. Podrán aplicarse las medidas cautelares personales: 1. Si existen medios probatorios demostrativos del hecho punible y la vinculación del imputado con el hecho. 2. Si la medida es necesaria, en cuanto a la naturaleza y el grado de las exigencias cautelares requeridas en el caso concreto. 3. Si es proporcional a la naturaleza del hecho y a la sanción que se estime podría ser impuesta al imputado. 4. Si la afectación de los derechos del acusado es justificado por la naturaleza del caso. El Juez deberá aplicar la detención preventiva como medida excepcional."

15. La imputación delimita la Litis, pues de acuerdo al principio de congruencia, la Sentencia Condenatoria no puede exceder los hechos de la acusación, y la acusación no puede exceder los hechos de la imputación. Esto está contemplado en los artículos 135, 280, 340 y 428 del Código Procesal Penal (CPP).

"Artículo 135 CPP: Congruencia. La sentencia debe recaer sobre los hechos, los fundamentos jurídicos y las pruebas objeto de la acusación."

"Artículo 340 CPP: La acusación. Cuando el Ministerio Público estime que la investigación proporciona fundamentos para someter a juicio público al imputado, presentará al Juez de Garantías  la acusación requiriendo la apertura a juicio.  La acusación solo podrá referirse a hechos y personas incluidos en la formulación de la imputación, aunque efectuara una distinta calificación jurídica, y deberá contener lo siguiente…"

"Articulo 428 CPP: Congruencia. La sentencia condenatoria no podrá exceder el contenido de la acusación; por tanto, no se podrá condenar por hechos o circunstancias no contenidos en ella, salvo cuando favorezcan al imputado.  En la sentencia, el Tribunal podrá dar al hecho una calificación jurídica distinta a la que le dio la acusación o apreciar la concurrencia de circunstancias agravantes de la responsabilidad penal no incluidas en ella, siempre que hubiera advertido a los intervinientes durante la audiencia.  El imputado no podrá ser condenado en virtud de un precepto penal distinto del invocado en la acusación sin previa advertencia del Tribunal sobre esa posibilidad para que prepare su defensa."

16. Las normas que rigen el proceso en contra de diputados se ubican entre los procedimientos especiales del Título VII, artículos 487-496 CPP. En ellos no se hace referencia a la audiencia de imputación, sin embargo, en casos precedentes como por ejemplo, el proceso que se siguió en contra del diputado suplente SAMUEL BENNETT RIVERA por enriquecimiento injustificado, se realizó imputación previa a la acusación, siendo finalmente absuelto. Igualmente en el proceso en el que fue condenado el ex

Magistrado de la Corte Suprema Alejandro Moncada, se hizo imputación aun cuando las normas de proceso especial no lo indicaban taxativamente. Finalmente en los otros procesos que se sigue en contra de RICARDO MARTINELLI se ha programado audiencia de imputación. El proceso que nos ocupa es el único proceso que conozco, bajo el sistema adversarial, en el que se ha omitido la imputación del investigado para pasar directamente a la acusación, con lo que se ha utilizado un procedimiento sui generis, lo cual violenta la garantía del debido proceso consagrada en el artículo 32 de la Constitución Nacional y 3 del Código Procesal Penal

Articulo 32 CN: Nadie será juzgado, sino por autoridad competente y conforme a los trámites legales, y no más de una vez por la misma causa penal, administrativa, policiva o disciplinaria.

Articulo 3 CPP: Principios del proceso. En el proceso se observan los principios del debido proceso, contradicción, inmediación, simplificación, eficacia, oralidad, publicidad, concentración, estricta igualdad de las partes, economía procesal, legalidad, constitucionalización del proceso y derecho de defensa.

17. Siendo la imputación una garantía del debido proceso y fundamental para el derecho de defensa, y no habiéndose producido imputación en el proceso que se sigue a RICARDO MARTINELLI y por el cual se pide su extradición, los actos de acusación, declaratoria de rebeldía y orden de detención, son a nuestro juicio nulos, al tenor de lo establecido en el artículo 199 CPP.

Artículo 199 CPP: Nulidad procesal absoluta. Es nula la actuación o diligencia judicial cuando el vicio haya impedido al interviniente el pleno ejercicio de las garantías y de los derechos reconocidos en la ley, la Constitución Política y los tratados o convenios internacionales ratificados por la República de Panamá. Esta nulidad es insubsanable.

Declaro so pena de cometer perjurio conforme a las leyes de los Estados Unidos de América que la información anterior es verídica y correcta.

Suscrito este lunes diecinueve (19) día del mes de junio del año dos mil diecisiete (2017).

ROBERTO J. MORENO, LL.M.
Cedula 8-280-162

MILENA J. ORDENES
MY COMMISSION # FF956859
EXPIRES February 02, 2020
FloridaNotaryService.com

6/19/17

Court Exhibit 075

# Interview of Vice President
# Isabel de Saint Malo de Alvarado

Court Exhibit 076

# COUNCIL on FOREIGN RELATIONS

## Assessing Panama's Future

*Past Event — May 5, 2016 8:30am EDT*
*Reuters*

Isabel de Saint Malo de Alvarado, the vice president and minister of foreign affairs of Panama, joins Nelson Cunningham, president of McLarty Associates, to discuss the political, economic, and foreign policy issues facing Panama and the region, including the impact of the Panama Papers, the ongoing reform efforts of the Varela administration, and the economic benefits from the anticipated expansion of the Panama Canal, to be launched this summer.

CUNNINGHAM: Well, good morning. I'm Nelson Cunningham. I'm the president of McLarty Associates. And I'll be presiding here at this morning's session. Unlike most Council sessions, this one is on the record. You'll see the cameras here. There's some reporters in the room. We do ask you to silence—to turn off your mobile phones, because it interferes with the sound system. We'll be—I'll introduce the vice president, we'll spend—she and I—she'll make some remarks, she and I will spend until about 9:00 in a dialogue, and then we'll open it to the audience, as it typical here at the Council.

For me, it's a privilege, of course, to preside at any CFR event, but this one is a special one for me, because my family lived in Panama for six years when I was a boy, my father was a businessman in Panama City. He founded the American Chamber there almost 40 years ago. And for us, Panama has a very special place in my family's life.

And I'm fortunate today, and for the last 20 years, to be involved in U.S.-Latin American relations. And Panama, of course, has played such an important role at key moments there. So it's a pleasure for me to be able to be here to introduce the vice president.

Vice President Saint Malo has a very international background. She, of course, was raised in Panama, studied in the United States for both college and for her business degree, and then spent 15 years in Panama working for the U.N. Development Program as the country manager there. In that role, she spent a great deal of time both in Panama, and then dealing around the world with multilateral issues. And I understand that she got to know the current president, President Varela, during that time, working with him on various dialogues dealing with the canal and other issues. And so someone who came out of the multilateral world, out of the business world, found herself pulled into the political world. So you bring—you bring a great deal of experience and breadth to this position.

As is common in Panama—although you are of course the constitutional vice president —but as is common in Panama, the president also asked you to take a second role as foreign minister. And you now carry out that role. So you're here today in two capacities. It's a real pleasure to be able to introduce to all of you Vice President Isabel de Saint Malo. (Applause.)

SAINT MALO: Thank you very much, Nelson, for those kind words. I was walking in and he greeted me in Spanish. And I said, wow, where is that Spanish from? (Laughs.) And he said: I've lived in Panama. So it's a pleasure to be sharing this podium with you.

Good morning, everybody. It's really an honor to be here today. I've been actually an admirer of the Council's work for a long time, first as a student of international affairs, then when I began my career actually here in Washington, D.C. with the Center for Democracy, and later on as a practitioner of development and of democracy, and now

of diplomacy. You definitely make great contributions to policymaking in terms of foreign policy. And that's—I think that's very important. So it's an honor to be here today.

I've been told that the objective is to have a conversation. So I'll try to be brief in these remarks so that we move onto the interesting part of the morning, which is the conversation with you. I'll try to make some remarks to let you know a little bit more about my country where we are right now. And I'd like to begin by referring to Panama as a global place. And I like to say, Panama has been globalized before globalization was in fashion. And that's actually true. Ever since we were—we were born as a republic, we've been—we've been a crossroads of people, of trade. And with the Porto Bello (sp) affairs, and then through the gold rush, and then, of course, the Panama Canal. And that has really made us who we are as a country, a country really open to the world.

And this has been kind of like the basis of one of the principles of our foreign policy and our domestic policy in terms of our ability of bringing people together. Latin America enjoys today democracy, pretty much. And not too long ago I'm sure around these tables discussion of the dictatorships that were taking place in the region were happening every day. The guerilla warfare, we don't have that now. Fortunately, Panama has been part of that democratization of the region. We are proud to have been—recuperated our democracy. And for the past 25 years, we've had already five democratically elected governments. And we enjoy democracy. Panama, our country, our people, we value democracy. We value freedom of expression. We value a market economy, providing opportunities to all of those that wish to seize those opportunities.

In terms of our economy, we have a very diversified economy. According to the IMF, we are ranked third as the most economically prosperous country in Latin America. In terms of the World Economic Forum we rank second in terms of competitiveness. In the

past 10 years, we've enjoyed a growth of 7.6 percent, making it one of the fastest-growing economies in Latin America. Even during the difficult years, recently, Panama managed to continue to grow. We grew over 6 percent last year. Our projects for this year are also over 6 percent. And of course, the Panama Canal, which we are very proud to be inaugurating this year the enlarged Panama Canal, makes and important part of our economy.

However, our economy is very diversified and we do not depend on any particular sector of the economy. Our canal is complemented by a worldwide platform of logistics and services. One of the best ports and airports in the region are in Panama. And with the expanded canal, which we are proud to be inaugurating June 26th, capacity will triple in terms of volumetric capacity to transit through the canal. And I was actually yesterday at the—at the Energy Summit chaired by Vice President Biden. And we were discussing what this canal will offer in terms of the possibility of transit to LNG vessels from the United States Gulf Coast to Asia. So all of this, and given the difficulties of energy in the region and the efforts for integration, there are great opportunities and also possibilities for Panama to once again put our country to the service of the world, to the service of trade, and of development in the region.

Amidst this growth in economic terms, amidst our democracy, which we are proud to have recuperated, you would ask where are our challenges? And we do have important challenges in terms of development, particularly. Our challenges remain in terms of overcoming poverty, in terms of improving social indicators. And that is actually the core of our government plan. Our five-year government plan is concentrated in providing these opportunities to almost 4 million Panamanians. We have development budget of over $17 million, devoted primarily to education, to health. We've come a long way in terms of our poverty indicators—a long way.

But we still have important steps to take. And that is our concentration of our—of our government. A country that grows, a country that has the economic indicators that we have, a country that serves the world has all of the necessary capabilities to make this available to all Panamanians. And that is what we're working at. That is our concentration. And these investments in social and infrastructure projects will definitely help us deepen our social welfare, increase stability, expand human capital, and further develop our infrastructure.

In terms of our foreign policy, we base our foreign policy on two pillars. The first pillar being a country that promotes dialogue, that promotes understanding. This has been part of our foreign policy for many years. It's kind of who we are as a country, as a result of having been the crossroads of the Americas and of the world for a long time. An example of this vision was the Summit of the Americas, which we were proud to host last year, and which allowed for the participation of all countries from the Americas for the first time ever in the Summit of the Americas. I was that the—our effort was part of that vision of Panama as a country that promotes dialogue, that promotes understanding.

Our second pillar in terms of foreign policy is to have an active participation in the global development agenda. And we have been very, very active in this government in terms of, for example, of human rights, which led to have a seat for the first time. We were able to have a Panamanian elected to the Inter-American Commission of Human Rights for the first time ever. We were elected at the United Nations Commission on Human Rights, also for the first time.

And our participation in the Sustainable Development Goals, which were agreed upon by many countries last year at the United Nations General Assembly, it's not only a commitment in terms of the global development agenda, but it's at the core of our

national government plan. We have actually decided by decree that the SDGs will guide Panama's investments and Panama's social efforts. So in this regard, there is a complete alignment with the global development agenda and our domestic policy.

Our participation in the Paris agreement. Panama even led an effort in terms of the countries that have forest, and the efforts that the world needs to make in order to ensure that those countries that have forest can keep them, and the contribution that this makes to climate change. All of this is, again, a result of this importance that we give to the global development agenda, understanding that that is where the world needs to concentrate its attention.

We need, as a world, to overcome the issues of today, the issues of people migrating from countries where there is war and where there is lack of opportunities, to developed countries. The issues of human rights, which still today are violated in many parts of the world. The issues of incorporating those excluded from development into development. We see these not as an issue that is apart from our core domestic policy. And we see Panama as a country that can play a role in order to continue to push those efforts.

Now, we are today in the mind frame of many people not for everything that I've shared with you. We are at the top of mind of many people because of some publications that came out about a month ago, already. It seems like a year ago— (laughter)—so much has happened ever since—ever since that came out. Let me tell you something about the wrongfully called Panama Papers. And I'm sure they were named Panama Papers because Panama is a great name. (Laughter.) Panama is a great name. And this journalist needed to have a great name for their publications. And, you know, that's our problem for having a great name.

But the fact of the matter is that, yes, the publications referred to business conducted by a law firm in Panama. But furthermore, the publications refer to dealings of banks in 21 jurisdictions, none of them in Panama. Not one of the banks that have been mentioned in those publications is based in Panama. The publications referred to offshores. Twenty percent of those, registered in Panama. Eighty percent of those, registered elsewhere—British colonies, United States, everywhere. The publications really underline that there is a global problem in terms of the financial system, something that the world has recognized for a long time and this publication just make it clear that we still have a long way to go. We still have a long way to go as a world.

It's been hard on Panama that the publications are named Panama Papers. It's been very hard, particularly for our government. I must admit that Panama, as a country, we came a little late to the efforts of transparency for the financial sector. When President Varela was vice president and minister of foreign affairs, during the last government, Panama had not signed one treaty for double taxation. And under his leadership, we established a national commission, we initiated our signing of and negotiating of double taxation agreements. And we signed about 25 at that period of time. And then the alliance broke. And then he left the government. And then the previous government didn't do much in terms of this global effort.

And when we took office two years ago, Panama was on the gray list of the FATF because we had failed to comply with some of the global efforts. And we initiated a strategy which moved so fast, even recognized so by the FATF. I heard them at a meeting in Panama say that they had never seen a country move so fast in terms of the decisions that need to be made and the processes that need to be put in place in terms of transparency. And we were able to be removed last year from FATF's gray list as a result of Panama implementing anti-money laundering legislation, prevention of money from terrorism into our financial services. We installed the governance institutions that we needed to install.

6/18/2019 Case 1:17-cv-22197-EGT   Document 18-2   Entered on FLSD Docket 06/19/2017   Page 83 of 127
Assessing Panama's future | Council on Foreign Relations
Court Exhibit 083

And we got our act together. And we were able to be removed from the gray list. And we were able to move to the phase two of the peer review of the OECD. So all of these efforts that our government has been doing, and that have been recognized globally because FATF's decision to remove us from the list is a recognition of our efforts and the OECD's transition to phase two of the peer review is a recognition of our country's efforts, it's hit hard by some publications that have our name, because our name is pretty nice. (Laughter.)

So we have been in an effort to, again, share with the world what it is that we're doing. And, yes, there are problems with the financial system around the world, problems of which Panama must be a part of its solution, but the rest of the world as well. And we will continue to work in that direction. We are committed, not because of the Panama Papers. We were committed the day we took office. And the actions we've taken speak for themselves. But I wanted to take this opportunity to let you know our vision on these publications and what it is that our vision is in terms of transparency in the financial sector, transparency in general.

Transparency has been at the core of our government plan. Procurement in the past years in Panama has been known. And actually, the justice system can say a few things in that regard. Procurement in Panama was really permeated by corrupt practices. We have really, really cleaned Panama's act in that regard. And you can ask foreign companies now what it is to invest in our government investment plan. And we know what it was to invest previously. So our commitment to transparency in the financial services, in our procurement processes, we are committed to changing politics in Panama to really be what politics needs to be—a service to the people. Politics—not to have a personal agenda, not to enrich yourself, politics to be a tool to serve the people and to serve the country.

Court Exhibit 084

So our commitment is strong. Our commitment, once again, I would like to reiterate, is not the result of responding to some publications. Our commitment has been clear ever since we took office. The measures taken speak for themselves. And as I began sharing with you, Panama is a lot more than that. Panama is a country that enjoys democracy, that enjoys freedom of expression, that enjoys economic growth that is fighting to ensure that this economic growth transform into the improvement of life of all Panamanians. And we've seen some important progress in that regard in terms of education, in terms of health, in terms of water, and sanitation.

And our success story is there. I invite you all to come see for yourself. And more than that, we are truly committed to continue to make Panama a country that shares this prosperity with the rest of the region, and that ensures that this prosperity permeates not only Panama, but our neighbors that have difficulties a lot harder than we have. And we are working hard in terms of our foreign policy to play that role and make sure that the global development agenda, which guides multilateralism and foreign policy in many ways, really reaches the people of Central America, of Latin America. And that's what we're committed to do.

Thank you very much for your attention. (Applause.)

CUNNINGHAM: Madam Vice President, you touched on one of the issues that I know has been on the forefront of the minds of those here, which is the transparency issues in Panama. Your boss, your president, President Varela, as you mentioned, was vice president in the prior administration, was foreign minister, and had a very notorious split with President Martinelli because Vice President Varela no longer had confidence in the way President Martinelli was governing the country when it came to transparency and corruption issues. And he was, of course, relieved of his duties as foreign minister, but he could not be relieved of his duties as vice president. So he had

an empty desk for a number of years, which prepared him well to take on the role of running—again, running for president, and now serving as president. President Martinelli, meanwhile, former President Martinelli is living in Miami.

SAINT MALO: What can I tell you?

CUNNINGHAM: Your government has—your Supreme Court has issued some charges against him. I know you have an extradition request pending. There may be further charges—if one reads the newspapers—there may be further charges coming. What can you tell us about the status of President Martinelli here in the U.S. and your efforts to bring him to justice in Panama?

SAINT MALO: Interesting question. As you have mentioned, our Supreme Court has a few cases pending on Mr. Martinelli, former President Martinelli. One of those—which is for the issue of rigging telephone conversations—one of those has been approved by the board of the Supreme Court to, under that—under those charges request the extradition to the United States. Now, in terms of Panamanian legal framework, the Supreme Court needs to prepare the extradition request and submit it to the Ministry of Foreign Affairs. And then the Ministry of Foreign Affairs will be responsible for transferring that request to the United States. We have not yet received from the Supreme Court that request for extradition.

Now, we've of course evaluated and studied the issue. And it's a complicated situation. We understand in terms of—first of all, our extradition treaty with the United States dates as far as the beginning of the 1900s. So the crime by which the Supreme Court is authorized to request the extradition is not part of the treaty because, of course, at that time, there were no telephones, so even less there was a crime to listen to conversations. Of course, this can all—and we've had discussions with the United States authorities—of course, this can be supported. But that's an issue that we need to deal with.

Court Exhibit 086

The second issue is that according to the treaty, if we request Mr. Martinelli's extradition based on that case, we cannot judge him in Panama for any other case. And he—the cases—I believe it's almost 10 cases that are in the Supreme Court regarding Mr. Martinelli right now. And most of them are a lot more serious than listening into conversations, which is serious enough. The charges are basically referring to corruption, and his participation on corruption practices, on our procurement processes, and even linked to processes that are now at the judicial system in the United States.

So another issue that I understand our Supreme Court has is, how are we going to request his extradition and make sure, in the dealings with the United States, that we are not just protecting him from future processes? So those issues are critical issues there, and as of—as we have been told by our Supreme Court, and actually we've discussed, as mentioned, with U.S. authorities, the importance of making a very strong case so that the case doesn't fall through the cracks in the United States system. And we do know that Mr. Martinelli has the resources to hire knowledgeable lawyers, and we understand he has hired a large number of knowledgeable lawyers. That's an issue for Panama. We need to make sure that we can process him properly for all of these issues.

Now, that's one thing, the request for extradition. And I do hope that we will request his extradition soon enough. It's not in our hands, but we will definitely go on with the process once we receive a request. That is one thing.

But the second thing is what's happening in the United States with the fact that former President Martinelli is living in the United States. Now, I understand that your authorities cannot mention, for example, if he has requested asylum. He might have. Some of you might be lawyers and would probably know better than I what happens in terms of an extradition request if he's in an asylum request process. And I understand asylum request processes can take as long as three years for a decision. And I

6/18/2017  Case 1:17-cv-22197-EGT  Document 18-2  Entered on FLSD Docket 06/19/2017  Page 87 of 127
Assessing Panama's Future | Council on Foreign Relations
Court Exhibit 087

understand that once this is—this process is going on, this person cannot be touched. So, when and if Panama requests the extradition, I don't know what's going to happen with the United States system.

But what is—what is harder, I think, is not this judicial situation that I do hope for Panama's sake goes through. But the thing is that this person is living in the United States really just dedicated to Panamanian politics through social media. So I don't know, that is something that I'd like to pose the question to you. (Laughter.) You know, it just blows my mind. It blows my mind. And I think—I think the world has a long way to go to ensure that we stop protecting those that should be brought to justice.

CUNNINGHAM: I want to commend you, in your—in your remarks and just now, for the candor in which you've addressed some of the most complicated issues facing Panama today—the Panama Papers, the issues with former President Martinelli, the issues of development. You mentioned also—but I think you swallowed some of the good news, which is of course the opening of the—of the new locks in the Panama Canal. Forty years ago here in the United States, Panama was one of the hottest political topics over President Carter's—over, actually, President Ford and then President Carter's negotiation of a treaty to return the Canal Zone to Panama and to eventually turn over the management of the Panama Canal to the Panamanians. Those who may not have focused on Panama since then might not know that Panama successfully took over the management of the canal and have had really an unimpeachable, for the last 20 years—almost 20 years, management of the canal, belying all of the fears and concerns that had been raised at the time. You've also gone ahead and then moved ahead with a major expansion of the canal to permit much larger vessels to go through. Tell us how—and that will open in June, as you mentioned. Tell us how you expect that to impact Panama's economy, as well as further the global shipping lanes that go through Panama?

Court Exhibit 088

SAINT MALO: Thank you for that question, because we are very proud in Panama to be inaugurating our expanded canal June 26th. And let me share with you what I think we're most proud of.

And you've mentioned that we've successfully assumed the administration of the canal, and that it's recognized internationally by the trade world and by other countries the transition from U.S. management to Panamanian management was imperceptible to the world. That was—we've done it. We've done it well.

But more than that, over a hundred years ago, when we began the original canal, we had to turn to the French and that we had to turn to the United States, but this expansion was done by Panama. And if we look at the investment, which is over 5,000 million dollars, in terms of dollars in that time we're building a second canal. This is a major infrastructure project, and we are very proud to be inaugurating the canal, and being a Panamanian—a Panamanian project funded by Panama, led by Panama, contracted by Panama. And this just shows what Panama is capable of.

And this will represent a major transition to world trade. I mentioned the LNG vessels, for example, that will be able to transit through an enlarged canal. The administrator of the canal was just saying a few days ago that ever since the inauguration was announced, they have just been receiving the bookings, and it's booked for its initiation. The world—the maritime sector has been expecting the expansion of the canal and were just there ready to jump as soon as it was finalized, and that's great news.

An enlarged canal will represent important additional revenues for Panama. One of the most important things from the transfer—for the transfer of the canal to Panamanian management is that, under U.S. administration, the canal was managed—in terms of its budget, it was managed—money that came in, money that was—that came out. There were no revenues for Panama, nor the United States. That was definitely changed when

Panama assumed administration, and the canal is today an important source of income for our national budget. And an expanded canal will increase that dramatically. And we are—we are waiting for those resources in order to divert them to what I have mentioned is our most important challenge, which is development.

As mentioned earlier, our challenges in terms of water and sanitation are amazing. You go to Panama City—I don't know if you've been recently; if you haven't been recently, you should go—you go to Panama City, and Panama City looks like New York City. But in a country where we have a city that is booming, we have sectors of our country that are excluded. And we're working hard at ensuring that our human development indicators just jump, and the resources that we will receive from an expanded canal will definitely be diverted into that—into that direction.

CUNNINGHAM: I'm going to turn now to the audience. Those of you who have questions, I'll ask you first to tell us who you are, what institution you're with, and then to keep your questions brief, fierce, and decisive.

Well, the press has an interest in asking questions, so let me turn to the table here. The woman in the—in the red jacket, please.

Q: Hi. Welcome, Madam Secretary. My name is Nadia Chow, Washington correspondent for Liberty Times.

I have two question(s). The first one is, for the inauguration, Panama already extended an invitation to Taiwanese President-elect Tsai Ing-wen and both Chinese President Xi Jinping. I wonder, are you expecting both of them to attend? Because Madam Tsai already expressed his (sic) interest to, you know, participate.

6/18/20 Case 1:17-cv-22197-EGT Document 18-2 Entered on FLSD Docket 06/19/2017 Page 90 of 127
Assessing Panama's Future | Council on Foreign Relations
Court Exhibit 090

The second question, the Panama Paper(s). More detail were coming on Monday, next Monday, and you said that Panama has been hit hard by this paper. Can you elaborate, you know, if more detail is coming, what the impact will be on Panama's economy? Thank you.

SAINT MALO: Thank you very much.

On the first question, yes, we have extended invitations to both the president of China Taiwan and the president of People's Republic of China. Panama has diplomatic relations with Taiwan and Panama has commercial relations with China. We have an office in China. We have an office in Hong Kong. And we have an office in Taiwan. And we have invited to the inauguration of the Panama Canal the commercial sector of the world, and we have invited heads of state.

Now, what has defined which heads of state we have invited? We invited about 40 heads of state. The decision has been based primarily on those countries that are the primary users of the Panama Canal, and China is one of the primary users of the Panama Canal. So we would love to have them both, definitely. This is—this is an event where Panama places ourselves once again to the service of world trade and world commerce, and we hope to share this celebration with the rest of the countries that participate of this—of this service that Panama provides.

Regarding the second question, yes, we've heard that there is a second round of information coming. I said Panama has been hit hard because it bears Panama's name. But many countries have been hit hard because the information that has come out here touches, as I mentioned, 21 jurisdictions in terms of banking, many other jurisdictions in terms of the registration of offshores, and furthermore, people that have a public life all over the world.

What can come of those—of those publications? I would imagine more information on people that have offshores or that have registered businesses. And we're just as expecting as the rest of the world of these new publications.

CUNNINGHAM: Good. Yes, here at the front table?

Q: Good morning. Thank you for joining us. Clara Brillembourg of the law firm Foley Hoag.

I wanted to ask, given Panama's historic role as a leader in the region, and also given your close relationship with the United States, how the opening of the relationship between the United States and Cuba has affected Panama.

SAINT MALO: The opening of the relationship with the United States and Cuba, it's great news to Latin America. It's not only great news to Panama, but it's great news to Latin America. It was a—it was something that needed to happen at some point. We are very proud to have been the venue where the president of the United States and the president of Cuba met for the first time over 50 years. And it's interesting that the last time they had met before the Summit of the Americas, the last time a president of the United States and a president of Cuba had met, was in 1956 in Panama.

So we take pride in being a country that brings people together, that brings countries together. We have been open to the world forever. Due to our geography, geographic location, Panama has been a crossroads of people, of culture, of trade. And that has made us open to the world, and that has made us a country that takes pride in bringing people and countries together. So that's great news, and we do hope it will continue to move forward.

CUNNINGHAM: Let me ask a question that follows on the one about the expansion of the Panama Canal, because this—the opening of the canal and the new locks actually touches on another topic of global concern, because there may not be enough water to fully power the locks going forward, as I understand, at least for the moment, because of El Nino.

It's—not everyone may know that one of the miracles of the Panama Canal is that it's fed entirely by the waters of the rain forest in the interior of Panama. There are no pumps. It's not recirculated. The water starts in the interior of Panama and then flows through the locks into the sea. Because of El Nino, you've had a drought. Some have linked El Nino, and this particularly severe El Nino, to climate change.

What is Panama doing to both address the immediate issue of the water that it needs for the locks and the broader question of climate change?

SAINT MALO: Well, I'll begin with the second question first, the broader question of climate change. As mentioned, we were very active in the negotiations towards the Paris agreement. We think that's great news to the world that the world has finally reached an agreement in terms of climate change. The implementation will definitely be difficult.

There is a question here of the cost of taking measures and who bears the cost. When I mentioned the efforts of Panama, which led—Panama led a coalition of 52 countries towards the negotiations of the Paris agreement, 52 countries that have forest. And the proposal of these 52 countries was basically what do we do to conserve this forest, and who foots the bill? Because at the end there is a cost to development when you commit to conserving your forests. And forests are basically in the underdeveloped world. So countries like the United States will have an important role to play in this effort towards climate change.

6/18/2017    Case 1:17-cv-22197-EGT    Document 16-2   Entered on FLSD Docket 06/19/2017    Page 93 of
127
Assessing Panama's Future Council on Foreign Relations
Court Exhibit 093

Locally, we are doing a lot of things. We have a strong leader of the efforts right now in Panama, which is our minister of environment. She's been an advocate of environment for a long time. She's been trained in environment, and she's working in this regard.

We have a project of reforesting Panama, which is going very well. And we're just really turning around how we manage environmental processes in Panama, and we've really raised the commitment of our government in terms of environment in general.

Now, the water for the canal. The issue is that the lakes that feed the canal are also the lake that feed the Panamanian population for drinking water. So, yes, this is an important issue. The good news is that the new canal does recirculate water. So the locks that were built at the beginning of the last century, they were throwing that water into the sea. But the new locks work recirculating water. So that's the good news.

We have—President Varela mentioned last year at his speech at the National Assembly a project that we need to look into soon, which is a project to build further water reserves in Panama. And the lakes that feed the canal are manmade lakes, are lakes that were made for the canal, and they now provide the drinking water to the city.

There is a lot of water in Panama. We need to work at preserving this water. And there is an area of Rio Indio where there are several rivers come together. And we're looking towards in the future just building a large new water reservoir—reservoir.

Now, the other good news is that in Panama we had El Nino. But in Panama, when it starts raining, it starts raining. (Laughter.) And last week it started raining, and then we had floods. (Laughs.) So fortunately enough, the dry season has—it's over. The lakes will—how do you say that? They will regain—

CUNNINGHAM: Replenish.

Court Exhibit 094

SAINT MALO: Replenish—thank you—replenish with water. But that's an issue that Panama needs to look into for the future, the issue of water for the canal and water for our population. We're fine for the next—you know, for the near future. But long term we're already looking into additional projects that will ensure the supply of water.

CUNNINGHAM: Yes, the gentleman at the back table.

Q: Thank you. Madam Secretary, this is Alex. I am the Washington correspondent of United Daily News of Taiwan.

I have a question with regard to diplomatic tie between Panama and Taiwan. We know Panama and China have robust economic ties, which China have diplomatic tie with Taiwan. And Panama has been expressed its willingness to establish diplomatic tie with China before. And my question is, how would you describe the diplomatic relations between Taiwan and Panama at present? And is so-called dual recognition a possible way to figure out the diplomatic issue among Panama, Taiwan, and China? Thank you.

SAINT MALO: We have diplomatic relations with Taiwan. We have very good diplomatic relations. We have, as I have mentioned, commercial relations with China. We understand the two Chinas have an agreement, currently a truce, which we respect. And we are very respectful of the way they handle their relations and their rapprochement. It's been a long process for them.

Meanwhile, we are friends of Taiwan and have diplomatic relations with Taiwan. And we have strong relations, commercial relations, with China. And we do hope that both of them will continue to become stronger.

CUNNINGHAM: Yes, sir, over here.

Q: Hello. Steve Rodriguez. I'm a venture capitalist, but I spent some time in the region with the U.S. Mil Group in Colombia.

My question, Madam Vice President, is your country sits at the crossroads of a number of important issues related to terrorism, epidemiology, and, of course, trade. I guess my question is not so much getting a current update of where things are. I can read plenty of papers that have been written here in D.C. on that. My question is, how do you view your country's role at the crossroads of so many of those issues going forward?

SAINT MALO: Those issues that are global issues are—we are having to face them, as well as the rest of the world. And I take the opportunity of your question to refer to one particular issue, which is difficult for us and which is a current affair, in the situation of migrants going through the isthmus on their way to the United States.

For the past years, many years, there have been—there has been a flow of migrants through the Central American isthmus to reach the United States. Now, the flow is made up of Cubans, many of them wanting to reach the United States, given the policy that the United States has of welcoming Cuban migrants.

And there has also been a flow of people from another continent. There is a flow of people from Africa, from Asia. These people enter the continent, most of them, through Brazil or Ecuador. Brazil and Ecuador both have a migrant policy that they're open to the world and they don't require visas for many nationalities.

And I think it's a drama. I think it's a human drama to have people that flee their countries with their families. We have people going with their young children. We have pregnant women. We have entire families. And, you know, the issue of refugees in Europe, it's very visible right now because they're coming in large numbers. The issue of migrants going through the Central American isthmus towards the United States, it's a smaller number than the refugees in Europe so it's not as known. But it's a human drama. It's a human drama that people have situations in their country in terms of wars, in terms of lack of economic opportunities, that are so dramatic that they're willing to risk everything to find a better livelihood.

And I really think the world needs to look into what's happening in these countries. The response is not closing the gates, because at some point I don't know if you can close the gates. I mean, look what's happening in Europe. But I think the response needs to be a coherent, integral response. Addressing the issues of development and the issues of peace are countries that are far away from us, but that have these issues.

And the issue of migrants, right now we have 3,900 Cubans in Panama that cannot move to Costa Rica because Costa Rica closed the frontiers. And Costa Rica closed the frontiers because Nicaragua closed the frontiers. And we cannot close the frontiers with Colombia because we don't have a frontier with Colombia. We have a jungle on our frontier with Colombia.

So what are we to do? Are we to move these families with four-, three-, two-year children into the jungle, which we actually did with a few of them a couple of weeks ago, and a four-year-old got lost? And then we sent our police. After sending our police to stop them from coming in, we sent our police to look for the kid, because what are you going to do, ignore this human drama? I mean, we cannot be a world talking about a global agenda and talking about poverty and talking about human rights at the tables of the U.N. and then looking to the other side when there are people that are willing to risk everything because they have no future at their original countries.

I don't see an easy response. Panama is going to have to do something at some point. We're going to have to—I don't know—send Cubans back to Cuba, send them to Ecuador, which issued the visas. They have Ecuadorian visas. They don't have visas from Colombia. They don't have visas from Panama. We received about 400—a few months ago about 400, 390, people from Congo. And we were, like, what? Three hundred and ninety in one month? We've had people from Senegal, from Congo; you know, two, three. They come through Brazil and they walk their way up to the United States. Can you believe this? So we were, like, this doesn't make sense, you know, 390.

Well, we have some agreements with the United States and some systems to identify some people through their—what do you call this, their—

CUNNINGHAM: Fingerprints.

SAINT MALO: —fingerprints, thank you, because they claim they don't have papers. They "lose" their papers because they don't want to be sent back. And if countries don't know where they're from, you cannot send them back. They were Haitians. They were Haitians claiming to be from Congo.

So this is a human drama that the world needs to start looking at. And I don't think the result is to close the gates. I think the result is to push development in those countries. And I don't think we can any longer pretend that this does not affect us, because we thrive in development and economic prosperity because this is not so far away when these people are every day coming into our own countries.

CUNNINGHAM: Well, thank you for that very articulate description of the issues involved. Our country is about to embark on a—on a debate on this very issue, a presidential debate. And it's one of those who believes that America is much stronger when it welcomes those from around the world, I personally welcome your articulate comment, although it was not intended to be a comment at all affecting our own political debate here.

Other questions? Yes, sir, in the back.

Q: Hi, my name is Tony Perez. I'm a—

CUNNINGHAM: Wait for the microphone, sir.

Q: Yeah, thank you. My name is Tony Perez. I'm a professor at Catholic University. And earlier in my career, I had the lack of fortune of working on international extradition matters, so I was intrigued by your comment about the Martinelli situation.

The United States for the last 30, 40 years to my knowledge has been seeking to renegotiate extradition treaties into the modern dual-criminality format. And I was wondering—if I understood you correctly, Panama has not yet joined in that process, and I was wondering if you're changing your view about it, and whether or not you could utilize that change to extradite Mr. Martinelli? And the follow-up question is: Are you really better off with Martinelli in Panama or in Miami? (Laughter.)

SAINT MALO: I don't know if I want to answer your second question. (Laughter.)

We would welcome the renegotiation of a treaty. I don't think we have—we have a formal request. We have not initiated a request. Now, the negotiation of those agreements, which need to be passed by our legislative bodies, are not so quick. So I don't know if we should be waiting for that to deal with this and other cases. We certainly could move into that direction for the future.

And I take the Fifth Amendment on your second question. (Laughter, laughs.)

CUNNINGHAM: Yes, here at the back table. Wait for the microphone, sir. Thanks.

Q: So, thank you very much, Madam Vice President, for being here. And congratulations on the new government's commitment to transparency and to development issues.

So, my name's Itai Grinberg. I'm at Georgetown Law. Important, I guess, also relevantly, I was previously at the United States Office of International Tax Counsel, where I worked on offshore tax evasion issues.

Court Exhibit 099

In prior governments, Panama developed a reputation as being perhaps the most recalcitrant of the major or significant financial intermediary jurisdictions around the world with respect to offshore tax evasion issues. And in this government, you've only recently joined the Common Reporting Standard, which is kind of the new globally accepted standard for what countries will do to try to address offshore tax evasion. I think you did that last week.

Given this history, I think there's sort of this reputational question that Panama faces. And the question is, just tangibly, are there things Panama is prepared to do besides kind of the bare minimum to get off the, OK, they're different than everyone else list that you're prepared to share with this audience? So that would include, for example, changes in rules about how lawyers and accountants do due diligence, rules about beneficial ownership. There are a variety of things that Panama could do to change the way it's perceived. I'm curious if you have any thoughts about that.

SAINT MALO: Well, definitely. And actually, some of the things that you've mentioned we've already done in this past 20 months in government.

We have very strong know-your-client legislation in Panama. Actually, I invite you to go to Panama and try to open a bank account. It's a lot harder than opening a bank account in the United States. We have know-your-client legislation. We have due diligence legislation. The previous government approved a legislation changing bearer shares and making it obligatory for lawyers to know the end owners of shares. And they passed that legislation and they placed it in a hold for five years, until 2018 or something like that. We reinstalled that legislation, which was placed into effect January 1st this year. So, today, important changes have been made to our legislation.

Now, there is a question that I don't think is that well-known in terms of our commitment and in terms of our actions. And I think it's something that needs to be put into the table and just figure out how we deal with it. And it's part of our reality.

First of all, our taxing legislation, we do not tax Panamanians for income generated outside of Panama. That is our system, which works well for us. Now, we respect other countries' system(s). And we are committed to helping other countries follow the money of their own citizens that try to hide their money in other jurisdictions. We are committed to assisting those countries, and we will continue to do everything that we can to assist those countries.

However, the cost of implementing the Common Reporting Standards is going to be very high on our financial system. And we're going to do it. But fear—I mean, nobody has put onto the table what it represents for a small country to ensure that you commit to certain standards—because other countries need that information; you don't. There is a large cost in terms of operations for banks if they're going to exchange information.

Our taxing authority can barely collect taxes in Panama. I mean, we have our own problems of tax evasion that we're working hard at conquering. Now, we don't only need to concentrate now on strengthening our taxing authorities in order for them to collect the taxes that we need to improve the livelihoods of Panamanians, but now we need to make sure we strengthen our tax authorities so that they can share information with the rest of the world, with countries that are a lot more powerful and have a lot more resources than we do.

Now, we're going to do it. We think it's fair that we do it. But you need to know there is a cost involved here. And that is something that I think needs to be brought into the table at some point, because it's like—it's like developed countries—and I understand the need for additional resources, and I understand the need to go after your own citizens that find whatever way to evade taxes. And so international legislation has just been getting stronger to move that fence, and in the process you're setting up some standards to the rest of the world that are standards—that bear a high cost to your own

system at the—at the cost of your people, at the cost of money you need for development. So I just wish—since you're in that area, you know, I just wish that that reality was also placed on the table.

Now, regarding are we willing to do something more than just committing to the bare minimum, yes. I would love to see my country become a leader in terms of transparency. And this is something that we've debated. Locally, we've installed an international committee of experts as—last Friday, we installed it—as part of the measures that we've taken to respond to the information that has come out through the Panama Papers and as a part of our commitment to improve our system, committee to be co-chaired by Nobel Peace Prize Joseph Stiglitz. Now, we all know where Professor Stiglitz's views are in terms of transparency and in terms of development. And we are committed to just waiting for the recommendations of that committee and see what information they provide there that will help us be better.

And, yes, I would love to be at the forefront. But you've got to understand, just committing to what we've committed, it's not an easy thing. We are having to face questions of whether we devote money to education or we devote money to the standards. It's not an easy—it's not an easy position to be in. But, yes, we're committing, and we are working in that direction.

CUNNINGHAM: Well, we've just crossed the 9:30 hour. And so, as I—as we bring matters to a close, let me note that in this country we have a long tradition of vice presidents who use the job as a platform for other jobs. (Laughter.) We have a more recent tradition of secretaries of state, foreign ministers, even women secretaries of state using that as a position for further jobs. And I commend that to Panama. (Laughter.)

Thank you all. Thank you all for—thank you for joining us here. Thank you all. Please join me in welcoming and thanking the vice president. (Applause.)

6/18/2017
Assessing Panama's Future | Council on Foreign Relations
Case 1:17-cv-22197-EGT   Document 18-2   Entered on FLSD Docket 06/19/2017   Page 102 of 127
Court Exhibit 102

SAINT MALO: Thank you. Thank you very much. (Applause.)

(END)

# Affidavit of Ismael Pitti

### AFFIDAVIT

I, Ismael Pitti, a Panamanian citizen, of legal age, freely and voluntarily state the following in relation to the facts of which I have personal and direct knowledge.

I.   **MY WORK AT THE NATIONAL SECURITY COUNCIL OF PANAMA**

1.   Between 2012 and May of 2014, I worked as an analyst at the National Security Council (NSC); I was initially assigned to the Technical Procurement department, **where information on events related to maintaining public order in Panama was analyzed. This** department was directly supervised by the Intelligence Directorate of the NSC.

2.   While I was working in **Technical Procurement department,** the Director of Intelligence was Mr. Ronny Rodríguez, known within the NSC by his pseudonym "**Didier.**" I later joined a new unit known as Special Services.

3.   I joined the Special Services unit at Mr. Ronny Rodríguez' request. **One morning,** Ronny Rodriguez called me and asked me, along with another NSC employee, **William Pitti,** who was the driver assigned to Ronny Rodríguez, to pick him up from **the presidential palace,** as he was about to finish a meeting with President Martinelli. **Inside the NSC, William Pitti was** known by his pseudonym, "**Guillermo.**" **William Pitti and I waited in the car for Ronny** Rodriguez to finish his **meeting at the President's office.**

4.   After the meeting ended, we returned to Building 150 at the NSC. On the way there, Ronny Rodriguez informed me that the President Martinelli had tasked him with forming a

special group of which Ronny Rodríguez himself and William Pitti were already members, but he needed one more trusted person, and that I had been selected to complete the group. Ronny Rodríguez said that the activities of the group were going to be confidential, and would be led directly by the President, Ricardo Martinelli and reported solely to him.

5.      Given the confidential nature of the group's operations, as of that time we began to refer to President Ricardo Martinelli as "el Jefe" ["the Boss"] or otherwise by his initials "RM" only.

## II.    THE INSTALLATION OF THE ESPIONAGE SYSTEM AND THE TRAINING

6.      Ronny Rodríguez said that for purposes of conducting group activities we would receive special training in the use of technological equipment as soon as it was brought to Panama. In preparation for receiving the espionage system, preparations had to be made. The entire top floor of Building 150 was secured so that only Ronny Rodríguez, William Pitti and I had access to it with an electronic key.

7.      Also, in order for the espionage system to work, we had to install 15-megabyte broadband Internet service. To obtain this service, William Pitti signed a contract with Liberty Technology under his pseudonym, "Guillermo Guerra." In order to receive this service, antennae had to be installed near the Balboa tanks for which special permits had to be obtained, given that they are under the Panama Canal Administration Office's authority. The final connection of the broadband system was provided via fiber optic lines that ran from the antennae on the roof of the NSC administrative building to the top floor of Building 150, where the espionage equipment was installed.

8.      After the broadband system was installed, a relatively large group of six to eight Israelis, including a man by the name of Sharon Oknin, accompanied by a Uruguayan by the name of Martin Berenstein and by Ronny Rodríguez, arrived at Building 150 with the espionage equipment to install it and train us to use it. During this first visit they said they had already met with President Ricardo Martinelli before beginning the installation and training.

9.      The espionage equipment brought in by the Israelis consisted of three desktop computers, two portable laptop computers, and a server that was connected to the fiber optic network that was installed on the second floor of NSC's Building 150. The three desktop computers were installed in our offices on the top floor of Building 150, but the laptops were taken to the President's office located in the San Felipe quarter of Panama City, Panama District. Ronny Rodríguez told me that "el Jefe" had one laptop, but I don't know who had the other one.

10.     The three computers were installed in an office on the top floor of Building 150 that Ronny Rodríguez, William Pitti and I shared. A printer was also installed, which we used to print the daily analysis report.

11.     While the group of Israelis configured the server and the system, Martín Berenstein trained me, Ronny Rodríguez and William Pitti in the use of the espionage equipment. The training and installation took one week. During this time, the use of the espionage system and its functions were explained to us. Tests were also conducted of how the system worked with various telephone carriers. First, we tested it with our own cell phones, and then we bought other equipment to confirm the functionality of the system.

12.     The group of Israelis returned to Panama periodically, every two or three months, after that first visit, to perform maintenance and update the system. Each time the system was updated, it was necessary to bring the laptops that were in President Ricardo Martinelli's possession to the top floor of Building 150. Ronny Rodríguez would say that he had to go pick up the laptop from "el Jefe" and he would go to the President of the Republic's office with William Pitti, to later return with the laptops. After the updates were completed, they would take them back to the President's office.

13.     This espionage system in which we were trained had the ability to extract information flowing through a cellular telephone. It could access a cell phone's address book, or "contacts", including their telephone numbers and the photographs associated with each name. It could also locate cell phones via GPS, allowing us to follow the targets to key meetings. We had access to all the emails received by the cell phone, and any files saved on the phone's memory card. The system had access to the messages sent via instant messaging apps such as WhatsApp or BlackBerry Messenger. This access was not achieved with all phones; it depended on the cell phone model and its system.

14.     It was also possible to access the calendar that people kept on their telephones, gathering information on the dates, places and participants in meetings with a given person. Likewise, it could access the log of incoming and outgoing calls on the telephone, including the duration of the calls. It could also record and listen to calls that were made from these telephones.

- 4 -

15.    Lastly, it could remotely control the microphone and the camera on certain telephone models. With these capabilities we could obtain photographs and record "background audio," in other words, the conversations of the people close to the telephone.

16.    The system had to be installed on the target's telephone in order to activate its functions. This "infestation" as we used to call it, was achieved by two different methods. Depending on the technical characteristics of each telephone, it was possible in certain cases to simply input the telephone number of the target phone, preceded by the prefix "507," in an installation screen that sent a package of files that installed themselves directly on the cell phone.

17.    This package was practically invisible. The only visible effect was that the telephone turned on, blinked for two seconds and turned off again. If the person was not paying attention to his or her telephone for those brief moments, the installation went entirely unnoticed.

18.    The other method was to send attention-getting text messages, to get the target to follow an installation link included in the message by "clicking" on that link. This method was less effective because the person receiving the message could simply ignore it, either because it came from a strange number (beginning with 0034) or because they thought it was suspicious. Both methods required up to 24 hours to complete the infestation, depending on each telephone's connection speed. If, after 24 hours, the infestation was not successful, we would repeat the attempt.

19.    When the group of Israelis was not present, Reymundo Díaz, who is knowledgeable about computers and worked at the President's office, was the one who helped with technical problems that came up with the espionage system. He had nothing to do with the operation of the espionage system, but he was in charge of providing support to keep it running.

For example, I once heard Ronny Rodríguez call him and ask him "why are we having trouble logging into the system" in reference to the computers located on the top floor of Building 150. Reymundo Díaz responded that he would check into it. Reymundo Díaz later reported that electronic work was being performed at the place where the primary servers for the system were located, so the system was down. Based on this, I assume that Reymundo Diaz knew where these servers, which were not located inside Building 150, were located.

III.   THE ANALYSIS PROCESS AND USE OF THE INFORMATION GATHERED

20.     This espionage system was used to violate the privacy of Panamanian and non-Panamanian citizens. The system's capabilities were used to gather private information from individuals without following the legal procedure and for reasons that had nothing to do with national security. Moreover, the instructions for operating the system were given by Ricardo Martinelli himself through Ronny Rodríguez, who invariably said that "el Jefe" wanted us to tap a certain person's telephone. All the information was likewise transmitted to "el Jefe" directly, according to Ronny Rodríguez, without the participation of any other NSC employee.

21.     The results of our analysis were reported every day to Ricardo Martinelli and he regularly gave instructions to Ronny Rodríguez regarding whom he wanted monitored. A daily report was drafted containing the relevant information gathered from all the targets in the system. We printed the report with the most salient results and sometimes recorded the corresponding audio on a disk. Despite the fact that this report was prepared every day, it was only ever delivered personally to Ricardo Martinelli. I know this to be the case because when Ricardo Martinelli was out of the country, the reports prepared by the Special Services of the NSC were not printed, and were kept until the President returned to Panama. On these occasions Ronny

Rodríguez would say, for example, that "'el Jefe' is going to be out of the country all week", so we knew that we didn't have to print any reports until the following week.

22.    This report that we at the Special Services of the NSC printed was different from the daily report prepared by the Public Order division that was under the Intelligence Directorate of the NSC, known as the governability analysis report. This report monitored the events that were genuinely related to national security such as demonstrations, marches and protests. The governability analysis report contained information that was collected from public sources, such as the television, radio, press and other publications.

23.    The governability analysis report also contained information regarding the monitoring of individuals in Panama who were identified as threats to national security, through legal means following the legal process. This monitoring consisted of telephone taps that were conducted with the authorization of the competent court, and the observations made by field agents. In contrast, the monitoring conducted by the Special Services unit only required the authorization of "el Jefe."

24.    In order to tap telephone lines under Panamanian law, the Public Prosecutor must request authorization from a judge, who must grant approval before tapping a telephone line. After the judge issues an order allowing the taps, they can be conducted for thirty days, after which time a renewal of order must be requested from the court, providing the reasons why such an extension is necessary.

25.    With the court order in hand, the Prosecutor would go to the Public Order unit, specifically to the Technical Procurement department, where I used to work. Technical Procurement contacted the telephone carrier companies and obtained access to the numbers listed

- 7 -

on the court order using a code that only the telephone companies have and that they enter into their system. After the number was registered with the respective code, only the conversations on that telephone line could be listened to, there was no access to any messages or files on the telephone.

26.     The governability analysis was also delivered to Ronny Rodríguez, in his capacity as Director of Intelligence at the NSC, and he met daily with Ricardo Martinelli to deliver both reports (the Public Order report and the Special Services report) which were transported by Ronny Rodríguez himself from Building 150 to the presidential palace, generally in the morning. The reports were printed and placed in manila envelopes that Ronny Rodríguez picked up before his meetings with Ricardo Martinelli.

27.     Ronny Rodríguez also stayed in direct contact with Ricardo Martinelli throughout the day via text messages sent over BlackBerry Messenger. Ronny Rodríguez would tell us that he had certain instructions from "el Jefe," referring to Ricardo Martinelli, and on occasion I was able to see the message he was talking about.

28.     If during the day important information was intercepted, Ronny Rodríguez would immediately contact Ricardo Martinelli via BlackBerry Messenger informing him of what had been found. Martinelli would respond with specific instructions on the matter, sometimes ordering Ronny Rodríguez to meet with him or asking for the information to be recorded onto a CD and given to him. Sometimes in order to communicate the requested information to Ronny Rodríguez, I used an email account that was set up for the exclusive use of Special Services: brad.pty507@gmail.com. Emails and messages resulting from our target monitoring were sometimes saved there.

- 8 -

29.     Also, whenever we got audio or video that was particularly sensational, "el Jefe" would request that it be uploaded to YouTube. William Pitti then collected and edited the files into a video. Then, the video would be uploaded to YouTube from a public computer from some internet cafe, so that the IP address from which it was uploaded could not be connected to our computers.

30.     Ricardo Martinelli would also send other instructions to Ronny Rodríguez via text message, such as, for example, to input the telephone number of a certain person into the system. Ronny Rodríguez would say that "el Jefe" wanted to put someone on the list and we would then proceed to enter him into the system in order to try to infest his telephone.

31.     On several occasions, when information was found that was of interest to Ricardo Martinelli, Ronny Rodríguez would return from his usual meeting with the President and would tell us that "'el Jefe' is happy with our work and sends you this bonus." Ronny would then give us an envelope with money, generally two thousand dollars (US$2000), which I always left at the office and used when I needed it.

32.     Ricardo Martinelli was the one who determined the targets for the espionage system. The system was used to spy on individuals from various groups, including individuals affiliated with opposition political parties, such as Partido Panameñista [Panameñista Party] and members of the Partido Revolucionario Democrático [Democratic Revolutionary Party], members of the Electoral Tribunal, the Supreme Court of Justice, journalists, individuals with ties to the previous administration, individuals in civil society such as trade unionists, businessmen, Martinelli's business competitors, or activists; US citizens and diplomats were also among the targets, and even Ricardo Martinelli's mistress.

33.     Those who were spied on from Partido Panameñista included Juan Carlos Varela and his brother Popi Varela, Beby Valderrama, Rafael Rafa Flores, Priscila Miró, Raúl Sandoval, and Agapito Clejom. The primary targets in this group were always those closest to Mr. Juan Carlos Varela, so as to know what his strategies were and attack them. Ricardo Martinelli wanted to know what they talked about, what they commented on and the exchanges they had.

34.     Among those who were spied upon from Partido Revolucionario Democrático I remember presidential candidate Juan Carlos Navarro and his work group, Abdiel Villareal, Benicio Robinson, Javier Acha, Martín Torrijos, Vivian de Torrijos, "el Toro" [the Bull] Balladares, Mitchel Doens, Francisco "Pachi" Sanchez Cárdenas, Patricia Alfaro, Yassir Purcait, Leandro Ávila, Gabriel Carrera Pitti, Mebiseck Cedeño and Zulay Rodríguez, among others.

35.     The group of Judges from the Electoral Tribunal and the Supreme Court of Justice were monitored exclusively by Ronny Rodríguez. These included Judge Ayu Prado, Judge Víctor Benavides, Judge Mirta Varela and one of Judge Pinilla's assistants. Attempts were also made to infest the phone of Attorney General Ana Belfón, but it was not possible because of her cellular system.

36.     Trade unionists Genaro Lopez, Saúl Méndez, Jaime Caballero, Alba Pedrol, Fernando Cebamanos and Rafael Chavarría were also monitored. Highly credible journalists such as Álvaro Alvarado and Castalia Pascual were likewise monitored.

37.     Martinelli's business rivals were particularly spied upon, as well as national businessmen such as Stanley Motta, Nicolás González-Revilla (father and son), and Erasmo Orillac. Other members of civil society attacked through the espionage system were Ana Matilde

Gómez, an attorney who was critical of the Martinelli administration, José Isabel Blandón, a political analyst, and Magaly Castillo, director of a non-governmental organization.

38.     We also received instructions to spy on certain US citizens and diplomats. For example, Ermita Pérez at the U.S. Embassy in Panama. Also Richard Downing who was a retired military man. As well as Christian Ferry, who was the political advisor to Juan Carlos Varela.

39.     Notably, an important target for Ricardo Martinelli was Aurora Mudarráz. She was his mistress and Martinelli instructed us to spy on her. Her monitoring was performed exclusively by Ronny Rodríguez, who told us that President Martinelli would be happy with only having all the information about Ms. Mudarráz.

40.     Each one of us, Ronny Rodríguez, William Pitti and I, had a certain number of targets assigned to us; about twenty-five in my case. I would go over the information generated by the espionage system for the targets assigned to me and filter the information for inclusion in the reports. I had to know when my targets had meetings, where and with whom; in addition to recording the conversations that had to do with their political agendas and strategies. Ricardo Martinelli also wanted to know about the business of important entrepreneurs in this country. Moreover, I was required to immediately report any relevant information that could be used to damage the reputation of Ricardo Martinelli's opponents.

## IV.     RICARDO MARTINELLI USED THE INFORMATION FOR HIS PERSONAL BENEFIT

41.     Ricardo Martinelli received this information and used it for his personal purposes. At times, Ricardo Martinelli would reveal that he had information on them, perhaps for the purpose of intimidating someone or merely by accident. Such was the case during the Telémetro

news program, when during an interview with Álvaro Alvarado, Martinelli threatened that he had "The dossier and pedigree on everyone, everything in this country" and that he knew, "what each person has done and not done." I know that statement is true because the information from the espionage system at Special Services was being delivered to Ricardo Martinelli.

42.     On other occasions, the comments made by Ricardo Martinelli were more obvious because he liked to publish notes in the newspapers he owned with information obtained via the espionage system that he could not have obtained in any other way. Thus was the case of an audio, which was later published on YouTube, in which Mr. Francisco "Pachi" Sánchez Cárdenas, a member of the PRD, whom I was monitoring, is heard having sexual relations.

43.     The tactic of ruining the reputations of his political opponents using recordings obtained from the espionage system was used other times by Ricardo Martinelli. The most well-known was probably that of Zulay Rodríguez. Mrs. Rodríguez was one of the targets I monitored. When I obtained a recording of a call in which Mrs. Rodríguez was arguing with her husband, who was accusing her of infidelity, I immediately reported it to Ronny Rodríguez who informed Martinelli of the content of the recording. Martinelli gave instructions through Ronny Rodríguez for William Pitti to edit a video with the recording and upload it to YouTube. William followed the instructions and uploaded the video from a public Internet cafe. The video became national news[1]. I immediately recognized that the conversation in that video was the one that had been obtained from the espionage system[2].

---

[1] http://elpatio507.blogspot.com/2011/11/grabacion-de-audio-de-zulay-rodriguez-y.html
[2] http://www.dealante.com/index.php/cnodo/show/23733

- 12 -

44.     After the presidential elections in May of 2014, when then President Martinelli was about to leave office, we received instructions to dismantle the espionage system. Before dismantling the system, we recorded all the information that had been collected onto an external hard-drive that Ronny Rodríguez would give to President Martinelli. The three desktop computers installed on the top floor of Building 150 were disconnected and put back in the boxes in which they originally came. The server that was on the top floor of Building 150 was also disconnected and all the wiring was removed.

45.     The printer could not be removed because it was included in the inventory and paid for out of the NSC budget. But it was destroyed, given that we believed it could contain backup copies of all the information that had been sent to print there. In order to do that, it was taken to a bathroom on the top floor of Building 150 and William Pitti poured acid on it so that it would no longer work and any information it had saved would be lost.

46.     Afterwards, William Pitti and Ronny Rodríguez waited until around seven-thirty in the evening to remove the computers and the server so that no one who worked in Building 150 would see them. They loaded the equipment into the car assigned to Ronny Rodríguez and took it to a location I do not know.

47.     That same week, we took the furniture out of the office on the top floor of Building 150 to a NSC storage warehouse, with the exception of the Rack on which the espionage system server was connected. The Rack was not removed from the top floor of Building 150 when the rest of the equipment was removed because it would not fit in the car. In order to remove this Rack, they brought a white pickup truck driven by another NSC employee,

Júbilo Grael, known by his pseudonym, "Maycol." Júbilo Grael and Ronny Rodríguez took the Rack to a location I do not know.

48.     Lastly, I would like to state that I am doing this because I realize that during the Ricardo Martinelli administration all of these crimes against the freedom of citizens were committed. I hereby submit my statement with the firm intention of making it possible for justice to be done in this case. I should also mention that I am giving this statement despite the very high personal risk it entails. I fear for my own safety and life and that of my family, for which reason I earnestly ask that my identity be kept strictly confidential so as not to place us at risk of mortal harm.

I swear under penalty of perjury that everything I have stated herein is true to the best of my knowledge and belief.

[Signature]

_____

Ismael Pitti

Date: 01/23/17

[Notary Public Stamp]

Tucson, Arizona, USA

## CERTIFICATION BY TRANSLATOR

I, L. Clark Gillette, of Tucson, Arizona, USA, am a qualified, professional translator for the Spanish and English languages. My qualifications include a Master's Degree in Translation of Spanish to English and English to Spanish from the Monterey Institute of International Studies, and Spanish to English and English to Spanish Certification by the American Translators Association.

I herewith certify that the attached translation is, to the best of my knowledge and belief, a true and accurate translation from Spanish into English of the attached, entitled: Affidavit Pitti.

_R Clark Gillette_

Signature

_L. Clark Gillette_

Name

_1/23/17_

Dated

# Affidavit of
# Ronny Rodriguez Mendoza

Court Exhibit 120

### AFFIDAVIT

I, RONNY RODRIGUEZ MENDOZA, with official identification document No. 9-218-180, active duty subcommissioner of police, since I have not resigned nor have I been notified of my removal, hereby make this affidavit, on 15 July 2016, from some place in the mountains of Veraguas, freely and uncoerced, in order to leave a written account of the facts related to supposed telephone wiretaps at the Security Council of the Republic of Panama, and I do so as set forth below: I served as Director of Intelligence of the Security Council of Panama, during the Administration of former president RICARDO MARTINELLI, which position I resigned in May 2014, in order to avail myself of my retirement. In the course of the functions, proper to my position as Director of Intelligence of the Security Council of Panama, I conducted multiple activities for collection of information and intelligence in the struggle against organized crime, gangs, terrorism, and international narcotrafficking. In each and every one of these activities, I always acted in accordance with the Law and the National Constitution. As part of my efforts in defense of national security, I also had to monitor the development of the marches, protests, large scale strikes, and any other actions arising from social movements that might imply a potential disturbance to public order. These Intelligence activities with regard to social movements ranged from surveillance of the marches and protests, identification of their leaders, their magnitude, and their purpose. Once the information had been gathered, it was distributed among the corresponding bodies of State Security, such as the National Police, the National Border Service, the National Migration Services, among others. The work methodology that we followed was the legacy of previous governments, from GUILLERMO ENDARA, on through to the administrations of ERNESTO PEREZ BALLADARES, MIREYA MOSCOSO, and MARTIN TORRIJOS. This is so, because there should not be any disturbances in the public order without the Panamanian State being aware of them, in order to determine their level of danger to Panama's democracy. In our work, and in the struggle against organized crime, gangs, terrorism, and international narcotrafficking, we utilized all existing intelligence resources, and we collected the information necessary in order to neutralize the criminals, including enormous cooperation and assistance of the intelligence agencies of other countries, such as the UNITED STATES OF AMERICA, ISRAEL, COLOMBIA, TAIWAN, and SPAIN.

The intelligence resources included surveillance, telephone intercepts, GPS locations, information on public access to social media, undercover agents and information from open source media: television, radio, newspapers, magazines, among others. In order to make use of these intelligence resources, proper training is needed, which is possible only with the cooperation of friendly countries. Accordingly, at the Security Council there are constant intelligence missions to friendly countries who are dedicated to training our intelligence agents. I, in particular, took only one training course (handling of open source information); additionally, I assigned various intelligence agents of the Security Council so that they could receive other, more advanced, training courses, both in our country and overseas. With regard to the telephone intercepts, multiple operations were conducted at the request of the Entities of Security of Law Enforcement or the Office

With reference to the following materials/documents, we at ASTA-USA Translation Services, Inc., a professional document translation company, attest that the language translation completed by ASTA-USA's U.S. Courts Certified Professional Translators, represents an accurate and correct interpretation of the terminology & content of the source document(s). This is to certify the correctness of the translation only. We do not guarantee that the original is a genuine document or that the statements contained in the original document(s) are true. Every completed ASTA-USA translation is double checked for quality by a qualified proofreader before the entry appears on the document.

IN WITNESS WHEREOF, ASTA-USA Translation Services, Incorporated — a member in good standing of The National Association of Judiciary Interpreters and Translators - Member #12342 — and The American Translators Association Member #243198 - has caused the Certificate to be signed by its duly authorized officer.

www.asta-usatranslations.com | www.LegalTranslationSolutions.com          Mr Alvin J Roy, President/CEO

of the Public Prosecutor, and each and every one of them was conducted under a court authorization. There were operations for Migration, coordinated with the former assistant director of this Institution, Commissioner ROLANDO LOPEZ PEREZ; with the National Police, coordination took place with the current director of the National Police, Commissioner Omar Pinzón, with SENAFRONT, SENAN, the Office of the Narcotics Prosecutor, and even with the Vice President of the Republic of Panama, when JUAN CARLOS VARELA held that office. All these meetings were coordinated at the Security Council, which was attended by the chiefs of all the Entities of Law Enforcement, high-level officials of the Ministry of Public Security, the Security Secretary of the Office of the President of the republic, and other ministers, including Mr. JIMMY PAPADIMITRIU. All of these were aware of the intelligence operations being developed by the Security Council, and not just the President of the Republic, as has been sought to be sold to public opinion. There is indisputable material evidence of this. My problems started when the new President of the Republic, JUAN CARLOS VARELA, won the elections in May 2014, and they grew worse after his inauguration on 1 July 2014. As soon as VARELA won the elections, I was convoked by the new Director of the National Security Council, Commissioner ROLANDO LOPEZ PEREZ, who offered me a diplomatic post in Washington DC, at the Interamerican Defense Board, if I would collaborate with them to incriminate the former president, RICARDO MARTINELLI in cases of illegal wiretapping. In order to get out of this, I told them what I thought. But a few days later I received calls from the Intelligence Agents ISMAEL PITTI, WILLIAM PITTI, and another agent, since deceased, who told me that they were receiving similar pressure from these gentlemen to incriminate former President RICARDO MARTINELLI. One of these agents died on account of the pressure, psychological torture, and threats. I squared up with the remaining intelligence agents, and we agreed to remain firm and not submit. Nevertheless, a few days later I was summoned to the National Police Directorate; ROLANDO LOPEZ, ALEXIS BETHANCOURT, and OMAR PINZON were present, with the Commissioner ROLANDO LOPEZ speaking, who offered to take me directly to the Office of the President of the Republic, to Mr. JUAN CARLOS VARELA, who was willing to offer me "WHATEVER I WANTED" if I would incriminate former President RICARDO MARTINELLI, and that they, in January 2015, had seized the Office of the Procurator General of the Nation, and that I could testify as a "protected witness". I maintained that I would no do so. A few days later, ROLANDO LOPEZ PEREZ called me again, but this time in order to threaten and intimidate me. The conversation ended with these words: "we're going to cancel your retirement, we're going to open 3 criminal dockets against you, we're going to remove you from the National Police, we're going to throw you in jail, and you won't last a week at La Joya". With this by way of background, I had a conversation with WILLIAM PITTI and he too confirmed that he had been subject to the same threats and psychological torture. I could not find ISMAEL PITTI, but the Security Council itself informed me that ISMAIL PITTI had been confined in an SPI located in the Reverted areas, and that he was under pressure to incriminate former President RICARDO MARTINELLI.

I was I was extremely concerned, and told my brother ANTONIO what was happening, and he put me in touch with Lic. ALEJANDRO PEREZ, to whom I told

With reference to the following materials/documents, we at ASTA-USA Translation Services, Inc., a professional document translation company, attest that the language translation completed by ASTA-USA's U.S. Courts Certified Professional Translators, represents an accurate and correct interpretation of the terminology & content of the source document(s). This is to certify the correctness of the translation only. We do not guarantee that the original is a genuine document or that the statements contained in the original document(s) are true. Every completed ASTA-USA translation is double checked for quality by a qualified proofreader before the entry appears on the document.

IN WITNESS WHEREOF, ASTA-USA Translation Services, Incorporated – a member in good standing of The National Association of Judiciary Interpreters and Translators - Member #12342 – and The American Translators Association Member #243108 - has caused the Certificate to be signed by its duly authorized officer.

www.asta-usatranslations.com  |  www.LegalTranslatorSolutions.com

Mr. Axel J. Roy, President/CEO

CERTIFIED
ASTA-USA
INCORPORATED
TRANSLATION

Court Exhibit 122

everything. Lic PEREZ filed two kidnapping complaints in order to ascertain the whereabouts of ISMAEL PITT, since he had failed to appear. At this point I granted power of attorney to Lic. ALEJANDRO PEREZ to represent me, because I knew that the worst was yet to come, and I disappeared. After all this known history, my retirement was cancelled, 3 criminal cases were filed against me, I was declared in contempt of court, and I have a red alert to appear at one of the 3 criminal procedures against me. The criminal dockets that were opened against us, from what I have seen and heard in the media, are loaded with disinformation, lies, ignorance, malice, and the desire to associate us with all kinds of unlawful activities that we never engaged in. With regard to the particular case of the "equipment" that was lost, I had nothing to do with that. I did not request it, did not purchase it, and never saw it at the Security Council while I worked at that institution. As I understand it, all this took place at the PAN, as I found out through the media and the docket. What my subordinates who testified in these files stated, that they were trained on this "equipment", is impossible, since they not only do not know the detailed identification of the alleged equipment and other things that appear in the docket as purchased; but what was purchased, in accordance to the docket, was immaterial, in other words: INTERNET APPLICATIONS, WARRANTIES, TECHNICAL SUPPORT and TRAINING. It is worth underscoring that all these intelligence agents declared in this docket that they did so under threat of being fired or jailed if they did not. This information has been made known to me by officials of the Security Council itself. In availing myself of my retirement, I proceeded to return all the furniture I had borrowed from friends, including the "RAQUET" mentioned in the docket. But that was a simple piece of furniture, not "equipment". I was never trained in the use of any APPLICATIONS; I recall only having received training in a course provided by the Government of Spain. I DO NOT KNOW HOW TO TAP TELEPHONES, AND I AM NOT VERY GOOD WITH TECHNOLOGICAL MEDIA. In order to engage in wiretapping and use intelligence application, considerable computer knowledge is required, that neither WILLIAM PITTI nor I possess, and the ones who habitually did so in the Security Council have or had that specialized knowledge, and some of them even had university degrees in information technology, such as ISMAEL PITTI. The intelligence agents dedicated to these affairs were called the "technicians" because they were specialized in those information technology issues; almost all of them had spent years dedicated to this, and they continue to do so to this day. I remember "JIMMY", "MANUEL", "TIANI", "BRAD", etc. When I retired, and after William Pitti left, we delivered the computers and equipment that had been assigned to us. In my case, I returned the computer without the hard drive because it was damaged, and I had given it to "LUCHO" to fix; the truth is I don't know what he did with it. And when WILLIAM PITTI delivered his computer, he had it checked, and the content had no telephone intercept materials. At some point I suppose somebody, breaking the chain of custody, introduced information on illegal intercepts into WILLIAM PITTI's computer in order to incriminate him, and, accordingly, me as well, his direct report. My computer was not "infected" because I delivered it without the hard drive. The person who "infected" WILLIAM PITTI's computer is a "technician". If we review the file of "telephone wiretaps", we can see that what the supposed "protected witness" (who know fails to appear, according to the Auxiliary Prosecutor MARCELINO

With reference to the following materials/documents, we at ASTA-USA Translation Services, Inc., a professional document translation company, attest that the language translal-on completed by ASTA-USA's U.S. Courts Certified Professional Translators, represents an accurate and correct interpretation of the terminology & content of the source document(s). This is to certify the correctness of the translation only. We do not guarantee that the original is a genuine document or that the statements contained in the original document(s) are true. Every completed ASTA-USA translation is double checked for quality by a qualified proofreader before the entry appears on the document.

IN WITNESS WHEREOF, ASTA-USA Translation Services, Incorporated – a member in good standing of The National Association of Judiciary Interpreters and Translators - Member #12342 – and The American Translators Association Member #243198 - has caused the Certificate to be signed by its duly Authorized officer.

www.asta-usatranslations.com  |  www.LegalTranslationSolutions.com                    Mr. Alan J Ray, President/CEO

CERTIFIED  ASTA-USA INCORPORATED  TRANSLATION

Court Exhibit 123

AGUILAR) is a digital copy of the intercepts carried out by a "technician" expert in the use of internet applications, that neither WILLIAM PITTI nor I have the knowledge to make intercepts or recordings of this kind or any other.  These intercepts and recordings on the digitalized compact disk that is resting in the file were made by "technicians" and not necessarily from the installations of the Security Council, nor for the Security Council.  With regard to the case called "DA VINCI", I have absolutely nothing to do with it, and this is can be easily checked by reviewing what is published in the "WIKILEAKS" of the world, where neither WILLIAM PITTI nor RONNY RODRIGUEZ appear anywhere.  The Panamanian people need to know that all these criminal cases against us are being used by high officials of the current administration, in order to associate us and incriminate us in criminal proceedings, because we refused to incriminate former President RICARDO MARTINELLI in activities we know nothing about.  These manipulations, of dockets cobbled together after being subject to threats and psychological torture have left us no other recourse but to disappear, and return once political conditions are able to provide us the guaranties that today no longer exist, and we are able to face these spurious charges before an impartial judge, not one who is afraid of giving us a fair trial.  THAT IS WHEN WE WILL STATE OUR TRUTH.  "I SWEAR TO GOD THAT ALL THE FOREGOING IS TRUE".

[Signature]
RONNY RODRIGUEZ MENDOZA
OFFICIAL IDENTIFICATION CARD 9-218-180.

With reference to the following materials/documents, we at ASTA-USA Translation Services, Inc., a professional document translation company, attest that the language translation compiled by ASTA-USA's U.S. Courts Certified Professional Translators, represents an accurate and correct interpretation of the terminology & content of the source document(s)  This is to certify the correctness of the translation only.  We do not guarantee that the original is a genuine document or that the statements contained in the original document(s) are true. Every completed ASTA-USA translation is double checked for quality by a qualified proofreader before the entry appears on the document

IN WITNESS WHEREOF, ASTA-USA Translation Services, Incorporated – a member in good standing of The National Association of Judiciary Interpreters and Translators - Member #12342 – and The American Translators Association Member #243198 - has caused the Certificate to be signed by its duly authorized officer.

www.asta-usatranslations.com  |  www.LegalTranslationSolutions.com                    Mr. Kevin J Roy, President/CEO

CERTIFIED
ASTA-USA
INCORPORATED
TRANSLATION

## DECLARACION JURADA

Yo, RONNY RODRIGUEZ MENDOZA,  con cedula de identidad personal #9-218-180, subcomisionado de policía en activo, ya que ni he renunciado ni me han notificado mi destitución, hago la presente declaración bajo la gravedad del juramento, hoy 15 de julio de 2016, desde algún lugar de las montañas de Veraguas, sin apremio y voluntariamente, a fin de dejar por escrito la verdad de los hechos relacionados con supuestas escuchas telefónicas en el Consejo de Seguridad de la República de Panamá y la hago así: Fungí como Director  de Inteligencia del Consejo de Seguridad de Panamá durante la Administración del Ex presidente RICARDO MARTINELLI, cargo al cual renuncien el mes de mayo de 2014, para acogerme a mi jubilación. En el desempeño de mis funciones propias de mi cargo de Director de Inteligencia del Consejo de Seguridad de Panamá realice múltiples actividades de recolección de información e inteligencia en la lucha contra el crimen organizado, el pandillerismo, el terrorismo y el narcotráfico internacional. En todas y cada una de esas actividades, siempre actúe apegado a la Ley y a la Constitución Nacional. Como parte de mis labores en defensa de la seguridad Nacional también debía monitorear el desarrollo de las marchas, protestas, huelgas a gran escala y cualesquiera otras acciones que provinieran de los movimientos sociales que implicaran posibles alteraciones al orden público. Estas actividades de Inteligencia en referencia a los movimientos sociales incluían desde seguimientos a las marchas y protestas, identificación de sus líderes, la magnitud de las mismas y el destino de las mismas. Una vez recabada la información se distribuía entre los Estamentos de Seguridad del Estado correspondientes, como la Policía Nacional, Servicio Nacional de Fronteras, Servicio Nacional de Migración, entre otros. La metodología de trabajo que se seguía fue heredada de los gobiernos anteriores desde GUILLERMO ENDARA, pasando por los gobiernos de ERNESTO PEREZ BALLADARES, MIREYA MOSCOSO y MARTIN TORRIJOS. Esto es así, porque no pueden existir alteraciones al orden público sin que el Estado Panameño no esté en conocimiento de las mismas para determinar la peligrosidad para la democracia panameña. En nuestro trabajo y en la lucha contra el crimen organizado, el pandillerismo, el terrorismo y el narcotráfico internacional utilizamos todos los recursos de inteligencia existentes y recabamos la información que se requiera para neutralizar a los criminales; incluyendo la enorme colaboración y ayuda de organismos de inteligencia de otros países, tales como: ESTADOS UNIDOS DE AMERICA, ISRAEL, COLOMBIA, TAIWAN          y ESPAÑA. Los recursos de inteligencia incluyen seguimientos, interceptaciones telefónicas, ubicaciones por GPS, informaciones de acceso público en las redes sociales, agentes encubiertos e informaciones de medios informativos abiertos: televisión, radio, periódicos, revistas, entre otros. Para hacer uso de estos recursos de inteligencia se requiere de adiestramiento adecuado, que sólo es posible gracias a la cooperación de países amigos. Por eso, en el Consejo de Seguridad existen casi de manera permanente misiones de inteligencia de países amigos dedicados al entrenamiento de nuestros agentes de inteligencia. YO particularmente solo tome un curso de adiestramiento (manejo de fuentes de información abiertas), adicionalmente asigne a varios agentes de Inteligencia del Consejo de Seguridad para que recibieran otros cursos más avanzados

9-218-180

de adiestramiento, tanto en nuestro país como en el extranjero. En el caso de las interceptaciones telefónicas se realizaron múltiples operaciones a pedido de los Estamentos de Seguridad de la Fuerza Pública o del Ministerio Público, y todas y cada una de ellas se realizaron bajo autorizaciones judiciales. Se hicieron operaciones para Migración coordinadas con el entonces ex subdirector de esa Institución Comisionado ROLANDO LOPEZ PEREZ, con la Policía Nacional se hicieron coordinaciones con el actual Director General de la Policía Nacional Comisionado Omar Pinzón, con SENAFRONT, SENAN, FISCALIA DE DROGAS y hasta con la Vicepresidencia de la República de Panamá, cuando JUAN CARLOS VARELA fungía como tal. Todas estas reuniones se coordinaban en el Consejo de Seguridad a la cual asistían los jefes de todos los Estamentos de la Fuerza Pública, funcionarios de alto nivel del Ministerio de Seguridad Pública, el Secretario de Seguridad de la Presidencia de la República y otros ministros, entre ellos el señor JIMMY PAPADIMITRIU. Todos ellos estaban enterados de todas las operaciones de inteligencia que desarrollaba el Consejo de Seguridad y no solo el Presidente de la República como se ha querido vender a la opinión pública. De todo esto hay constancias materiales indiscutibles. Mis problemas empezaron desde que el nuevo Presidente de la República JUAN CARLOS VARELA gano las elecciones en mayo de 2014 y se profundizaron después de la toma de posesión el 1 de julio de 2014. Tan pronto VARELA gano las elecciones fui convocado por el nuevo Director del Consejo de Seguridad Nacional Comisionado ROLANDO LOPEZ PEREZ quien me ofreció un cargo diplomático en Washington D.C., en la Junta Interamericana de Defensa, si colaboraba con ellos para incriminar al Ex presidente RICARDO MARTINELLI en casos de escuchas telefónicas ilegales. Para zafarme, le dije que lo iba a pensar. Pero días después recibí llamadas de los agentes de Inteligencia ISMAEL PITTI, WILLIAM PITTI y de otro agente ya fallecido, donde me comunican que ellos estaban recibiendo presión similar de estos señores para declarar incriminando al Ex presidente RICARDO MARTINELLI. Uno de estos agentes por la presión, torturas sicológicas y amenazas murió. Yo cuadre con los otros agentes de inteligencia restantes mantenernos firmes y no someternos a ellos. Sin embargo, días después fui citado a la Dirección de la Policía Nacional en donde estaban ROLANDO LOPEZ, ALEXIS BETHANCOURT y OMAR PINZON, tomando la palabra el Comisionado ROLANDO LOPEZ quien me ofreció a llevarme inmediatamente a la Presidencia de la República frente al Sr. JUAN CARLOS VARELA el cual estaba en la disponibilidad de ofrecerme "LO QUE QUISIERA" si incriminaba al ex presidente RICARDO MARTINELLI y que ellos en enero de 2015 agarraban la Procuraduría de la General de la Nación y que podía testificar como "testigo protegido". Yo me mantuve que no lo haría. Días después me llamo nuevamente ROLANDO LOPEZ PEREZ, pero esta vez para amenazarme, intimidarme y termino la conversación con estas palabras: **"te vamos a revocar tu jubilación, te vamos a abrir 3 expedientes criminales, te vamos a destituir de la Policía Nacional, te vamos a meter preso y en la Joya no vas a durar vivo una semana"**. Ante esto, converse con WILLIAM PITTI y me confirmo que él había sido objeto de las mismas amenazas y torturas sicológicas. No pude localizar a ISMAEL PITTI, pero del propio Consejo de Seguridad me llego información de que ISMAEL PITTI lo tenían retenido en una cada del SPI ubicada en las áreas Revertidas y que lo

9-218-180

estaban presionando para que incriminara al ex presidente RICARDO MARTINELLI. Quede muy preocupado, le conté a mi hermano ANTONIO lo que estaba pasando y él me puso en contacto con el Licenciado ALEJANDRO PEREZ a quién le conté todo. El licenciado PEREZ puso dos denuncias de secuestro para saber el paradero de ISMAEL PITTI ya que este no aparecía. Ante esto le otorgué poder al licenciado ALEJANDRO PEREZ para que me representara porque yo sabía que lo peor venía contra mí y desaparecí. Después de toda la historia conocida: mi jubilación fue revocada, me iniciaron un proceso de destitución de la Policía Nacional, me montaron 3 casos criminales, me declararon reo rebelde y tengo una alerta roja para que acuda a uno de los 3 procesos criminales que me montaron. Los expedientes criminales que nos abrieron, por lo que he visto y escuchado en los medios, están recargados de desinformación, mentiras, ignorancia, maldad y deseos de vincularnos de todas maneras en actividades ilícitas que nunca realizamos. En el caso particular del "equipo" que se perdió no tengo nada que ver con eso. Ni lo solicite, ni lo compre, ni nunca lo vi en el Consejo de Seguridad mientras labore en esa Institución. Según tengo entendido todo eso se dio en el PAN según me entere por los medios de comunicación y en el expediente. Lo que mencionan mis subalternos que declararon en este expediente de que se entrenaron en este "equipo" es imposible que sea verdad ya que no sólo no saben la identificación detallada de los supuestos equipos y demás cosas que aparecen en el expediente como compradas, sino que lo que más se compró, según el expediente, era inmaterial, vale decir, APLICACIONES DE INTERNET, GARANTIAS, SOPORTE TECNICO y ADIESTRAMIENTO; vale la pena recalcar que todos estos agentes de inteligencia que declaran en este expediente lo hacen bajo amenazas de destitución o de ir presos si no lo hacía, dicha información ha sido de mi conocimiento por propios funcionarios del Consejo de Seguridad. Sobre el caso de "escuchas telefónicas" digo lo siguiente: al acogerme a mi jubilación procedí a devolver todos los muebles que pedí prestado a amigos, incluyendo el "RAQUET" que se menciona en el expediente. Pero eso, era un simple mueble y no un "equipo". Yo nunca fui entrenado en el uso de ninguna APLICACIÓN y de hecho, solo recuerdo haber recibido entrenamiento en un curso dado por el Gobierno de España. **NO SE PINCHAR TELEFONOS Y NO MANEJO MUY BIEN LOS MEDIOS TECNOLOGICOS.** Para pinchar y usar aplicaciones de inteligencia se requiere de mucho conocimiento computacional que ni WILLIAM PITTI ni YO lo tenemos, y los que hacían eso habitualmente en el Consejo de Seguridad si tienen o tenían ese conocimiento especializado y alguno de ellos hasta títulos universitarios en informática, como es el caso de ISMAEL PITTI. Los agentes de inteligencia dedicados a estos menesteres se le llamaban "técnicos" porque eran especialistas en estos temas informáticos, casi todos tenían y tienen años dedicados a esto, incluso hoy día lo hacen. Recuerdo a "JIMMY", "MANUEL", "TIANI", "BRAD", etc. Cuando me jubilé y después WILLIAM PITTI cuando se fue, entregamos las computadoras y los equipos asignados nosotros. En mi caso, la computadora la entregue sin el disco duro porque estaba dañado y este se lo había dado previamente a "LUCHO" para que lo arreglara, la verdad no sé qué hizo con él. Y cuando WILLIAM PITTI entrego su computadora la hizo revisar y en su contenido no tenía ningún material de interceptación telefónica. En algún momento supongo que alguien,

9-218-180

rompiendo la cadena de custodia, introdujo información de interceptaciones ilegales en la computadora de WILLIAM PITTI para incriminarlo a él y en consecuencia, a mí, su superior jerárquico. Mi computadora no la "infectaron" porque la entregue sin disco duro. La persona que "infecto" la computadora de WILIAM PITTI es un "técnico". Si revisamos el expediente de "escuchas telefónicas" nos podemos dar cuenta de que lo que entrego el supuesto "testigo protegido" (que resulta que ahora no aparece según el Fiscal Auxiliar MARCELINO AGUILAR)    es una copia digitalizada de interceptaciones realizadas por un "técnico" experto en el uso de aplicaciones de internet, que ni WILLIAM PITTI ni YO tenemos conocimientos para hacer interceptaciones o grabaciones ni de ese tipo ni de otro tipo. Estas interceptaciones y grabaciones en el disco compacto digitalizado que reposa en el expediente fueron realizadas por "técnicos", no necesariamente desde las instalaciones del Consejo de Seguridad, ni para el Consejo de Seguridad. Con respecto al caso denominado "DA VINCI" no tengo absolutamente nada que ver, y eso es fácil de averiguar revisando lo publicado en los "WIKILEAKS" en el mundo, en donde no aparece ni WILLIAM PITTI ni RONNY RODRIGUEZ por ningún lado. Los panameños deben saber que todos estos casos criminales en nuestra contra se usan por altos funcionarios del actual gobierno con el propósito de vincularnos e incriminarnos en expedientes criminales porque rehusamos en incriminar al Ex Presidente RIRCARDO MARTINELLI en actividades que no nos constan. Esas manipulaciones de eso expedientes montados después de ser sometidos a amenazas y torturas sicológicas no nos dejó otro camino que desaparecer y regresar cuando las condiciones políticas nos den las garantías que hoy no existes y podamos acudir a enfrentar estos espurios cargos ante un juez imparcial y no temeroso de darnos un juicio justo, ALLI DAREMOS NUESTRA VERDAD. ¡JURO ANTE DIOS QUE TODO LO ANTERIOR RELATADO ES VERDAD!

RONNY RODRIGUEZ MENDOZA

CEDULA No. 9-218-180