# ATTACHMENT G

## AFFIDAVIT

I, Ismael Pitti, a Panamanian citizen, of legal age, freely and voluntarily state the following in relation to the facts of which I have personal and direct knowledge:

### I. MY WORK AT THE NATIONAL SECURITY COUNCIL OF PANAMA

1. Between 2012 and May of 2014, I worked as an analyst at the National Security Council (NSC); I was initially assigned to the Technical Procurement department, where information on events related to maintaining public order in Panama was analyzed. This department was directly supervised by the Intelligence Directorate of the NSC.

2. While I was working in Technical Procurement department, the Director of Intelligence was Mr. Ronny Rodríguez, known within the NSC by his pseudonym "Didier." I later joined a new unit known as Special Services.

3. I joined the Special Services unit at Mr. Ronny Rodríguez' request. One morning, Ronny Rodriguez called me and asked me, along with another NSC employee, William Pitti, who was the driver assigned to Ronny Rodriguez, to pick him up from the presidential palace, as he was about to finish a meeting with President Martinelli. Inside the NSC, William Pitti was known by his pseudonym, "Guillermo." William Pitti and I waited in the car for Ronny Rodriguez to finish his meeting at the President's office.

4. After the meeting ended, we returned to Building 150 at the NSC. On the way there, Ronny Rodríguez informed me that the President Martinelli had tasked him with forming a

special group of which Ronny Rodríguez himself and William Pitti were already members, but he needed one more trusted person, and that I had been selected to complete the group. Ronny Rodríguez said that the activities of the group were going to be confidential, and would be led directly by the President, Ricardo Martinelli and reported solely to him.

5. Given the confidential nature of the group's operations, as of that time we began to refer to President Ricardo Martinelli as "el Jefe" ["the Boss"] or otherwise by his initials "RM" only.

## II. THE INSTALLATION OF THE ESPIONAGE SYSTEM AND THE TRAINING

6. Ronny Rodríguez said that for purposes of conducting group activities we would receive special training in the use of technological equipment as soon as it was brought to Panama. In preparation for receiving the espionage system, preparations had to be made. The entire top floor of Building 150 was secured so that only Ronny Rodríguez, William Pitti and I had access to it with an electronic key.

7. Also, in order for the espionage system to work, we had to install 15-megabyte broadband Internet service. To obtain this service, William Pitti signed a contract with Liberty Technology under his pseudonym, "Guillermo Guerra." In order to receive this service, antennae had to be installed near the Balboa tanks for which special permits had to be obtained, given that they are under the Panama Canal Administration Office's authority. The final connection of the broadband system was provided via fiber optic lines that ran from the antennae on the roof of the NSC administrative building to the top floor of Building 150, where the espionage equipment was installed.

8. After the broadband system was installed, a relatively large group of six to eight Israelis, including a man by the name of Sharon Oknin, accompanied by a Uruguayan by the name of Martín Berenstein and by Ronny Rodríguez, arrived at Building 150 with the espionage equipment to install it and train us to use it. During this first visit they said they had already met with President Ricardo Martinelli before beginning the installation and training.

9. The espionage equipment brought in by the Israelis consisted of three desktop computers, two portable laptop computers, and a server that was connected to the fiber optic network that was installed on the second floor of NSC's Building 150. The three desktop computers were installed in our offices on the top floor of Building 150, but the laptops were taken to the President's office located in the San Felipe quarter of Panama City, Panama District. Ronny Rodríguez told me that "el Jefe" had one laptop, but I don't know who had the other one.

10. The three computers were installed in an office on the top floor of Building 150 that Ronny Rodríguez, William Pitti and I shared. A printer was also installed, which we used to print the daily analysis report.

11. While the group of Israelis configured the server and the system, Martín Berenstein trained me, Ronny Rodríguez and William Pitti in the use of the espionage equipment. The training and installation took one week. During this time, the use of the espionage system and its functions were explained to us. Tests were also conducted of how the system worked with various telephone carriers. First, we tested it with our own cell phones, and then we bought other equipment to confirm the functionality of the system.

12. The group of Israelis returned to Panama periodically, every two or three months, after that first visit, to perform maintenance and update the system. Each time the system was updated, it was necessary to bring the laptops that were in President Ricardo Martinelli's possession to the top floor of Building 150. Ronny Rodríguez would say that he had to go pick up the laptop from "el Jefe" and he would go to the President of the Republic's office with William Pitti, to later return with the laptops. After the updates were completed, they would take them back to the President's office.

13. This espionage system in which we were trained had the ability to extract information flowing through a cellular telephone. It could access a cell phone's address book, or "contacts", including their telephone numbers and the photographs associated with each name. It could also locate cell phones via GPS, allowing us to follow the targets to key meetings. We had access to all the emails received by the cell phone, and any files saved on the phone's memory card. The system had access to the messages sent via instant messaging apps such as WhatsApp or BlackBerry Messenger. This access was not achieved with all phones; it depended on the cell phone model and its system.

14. It was also possible to access the calendar that people kept on their telephones, gathering information on the dates, places and participants in meetings with a given person. Likewise, it could access the log of incoming and outgoing calls on the telephone, including the duration of the calls. It could also record and listen to calls that were made from these telephones.

15. Lastly, it could remotely control the microphone and the camera on certain telephone models. With these capabilities we could obtain photographs and record "background audio," in other words, the conversations of the people close to the telephone.

16. The system had to be installed on the target's telephone in order to activate its functions. This "infestation" as we used to call it, was achieved by two different methods. Depending on the technical characteristics of each telephone, it was possible in certain cases to simply input the telephone number of the target phone, preceded by the prefix "507," in an installation screen that sent a package of files that installed themselves directly on the cell phone.

17. This package was practically invisible. The only visible effect was that the telephone turned on, blinked for two seconds and turned off again. If the person was not paying attention to his or her telephone for those brief moments, the installation went entirely unnoticed.

18. The other method was to send attention-getting text messages, to get the target to follow an installation link included in the message by "clicking" on that link. This method was less effective because the person receiving the message could simply ignore it, either because it came from a strange number (beginning with 0034) or because they thought it was suspicious. Both methods required up to 24 hours to complete the infestation, depending on each telephone's connection speed. If, after 24 hours, the infestation was not successful, we would repeat the attempt.

19. When the group of Israelis was not present, Reymundo Díaz, who is knowledgeable about computers and worked at the President's office, was the one who helped with technical problems that came up with the espionage system. He had nothing to do with the operation of the espionage system, but he was in charge of providing support to keep it running.

For example, I once heard Ronny Rodríguez call him and ask him "why are we having trouble logging into the system" in reference to the computers located on the top floor of Building 150. Reymundo Díaz responded that he would check into it. Reymundo Díaz later reported that electronic work was being performed at the place where the primary servers for the system were located, so the system was down. Based on this, I assume that Reymundo Díaz knew where these servers, which were not located inside Building 150, were located.

### III. THE ANALYSIS PROCESS AND USE OF THE INFORMATION GATHERED

20. This espionage system was used to violate the privacy of Panamanian and non-Panamanian citizens. The system's capabilities were used to gather private information from individuals without following the legal procedure and for reasons that had nothing to do with national security. Moreover, the instructions for operating the system were given by Ricardo Martinelli himself through Ronny Rodríguez, who invariably said that "el Jefe" wanted us to tap a certain person's telephone. All the information was likewise transmitted to "el Jefe" directly, according to Ronny Rodríguez, without the participation of any other NSC employee.

21. The results of our analysis were reported every day to Ricardo Martinelli and he regularly gave instructions to Ronny Rodríguez regarding whom he wanted monitored. A daily report was drafted containing the relevant information gathered from all the targets in the system. We printed the report with the most salient results and sometimes recorded the corresponding audio on a disk. Despite the fact that this report was prepared every day, it was only ever delivered personally to Ricardo Martinelli. I know this to be the case because when Ricardo Martinelli was out of the country, the reports prepared by the Special Services of the NSC were not printed, and were kept until the President returned to Panama. On these occasions Ronny

Rodríguez would say, for example, that "'el Jefe' is going to be out of the country all week", so we knew that we didn't have to print any reports until the following week.

22. This report that we at the Special Services of the NSC printed was different from the daily report prepared by the Public Order division that was under the Intelligence Directorate of the NSC, known as the governability analysis report. This report monitored the events that were genuinely related to national security such as demonstrations, marches and protests. The governability analysis report contained information that was collected from public sources, such as the television, radio, press and other publications.

23. The governability analysis report also contained information regarding the monitoring of individuals in Panama who were identified as threats to national security, through legal means following the legal process. This monitoring consisted of telephone taps that were conducted with the authorization of the competent court, and the observations made by field agents. In contrast, the monitoring conducted by the Special Services unit only required the authorization of "el Jefe."

24. In order to tap telephone lines under Panamanian law, the Public Prosecutor must request authorization from a judge, who must grant approval before tapping a telephone line. After the judge issues an order allowing the taps, they can be conducted for thirty days, after which time a renewal of order must be requested from the court, providing the reasons why such an extension is necessary.

25. With the court order in hand, the Prosecutor would go to the Public Order unit, specifically to the Technical Procurement department, where I used to work. Technical Procurement contacted the telephone carrier companies and obtained access to the numbers listed

on the court order using a code that only the telephone companies have and that they enter into their system. After the number was registered with the respective code, only the conversations on that telephone line could be listened to; there was no access to any messages or files on the telephone.

26. The governability analysis was also delivered to Ronny Rodríguez, in his capacity as Director of Intelligence at the NSC, and he met daily with Ricardo Martinelli to deliver both reports (the Public Order report and the Special Services report) which were transported by Ronny Rodríguez himself from Building 150 to the presidential palace, generally in the morning. The reports were printed and placed in manila envelopes that Ronny Rodríguez picked up before his meetings with Ricardo Martinelli.

27. Ronny Rodríguez also stayed in direct contact with Ricardo Martinelli throughout the day via text messages sent over BlackBerry Messenger. Ronny Rodríguez would tell us that he had certain instructions from "el Jefe," referring to Ricardo Martinelli, and on occasion I was able to see the message he was talking about.

28. If during the day important information was intercepted, Ronny Rodríguez would immediately contact Ricardo Martinelli via BlackBerry Messenger informing him of what had been found. Martinelli would respond with specific instructions on the matter, sometimes ordering Ronny Rodríguez to meet with him or asking for the information to be recorded onto a CD and given to him. Sometimes in order to communicate the requested information to Ronny Rodríguez, I used an email account that was set up for the exclusive use of Special Services: brad.pty507@gmail.com. Emails and messages resulting from our target monitoring were sometimes saved there.

29. Also, whenever we got audio or video that was particularly sensational, "el Jefe" would request that it be uploaded to YouTube. William Pitti then collected and edited the files into a video. Then, the video would be uploaded to YouTube from a public computer from some internet cafe, so that the IP address from which it was uploaded could not be connected to our computers.

30. Ricardo Martinelli would also send other instructions to Ronny Rodríguez via text message, such as, for example, to input the telephone number of a certain person into the system. Ronny Rodríguez would say that "el Jefe" wanted to put someone on the list and we would then proceed to enter him into the system in order to try to infest his telephone.

31. On several occasions, when information was found that was of interest to Ricardo Martinelli, Ronny Rodríguez would return from his usual meeting with the President and would tell us that "'el Jefe' is happy with our work and sends you this bonus." Ronny would then give us an envelope with money, generally two thousand dollars (US$2000), which I always left at the office and used when I needed it.

32. Ricardo Martinelli was the one who determined the targets for the espionage system. The system was used to spy on individuals from various groups, including individuals affiliated with opposition political parties, such as Partido Panameñista [Panameñista Party] and members of the Partido Revolucionario Democrático [Democratic Revolutionary Party], members of the Electoral Tribunal, the Supreme Court of Justice, journalists, individuals with ties to the previous administration, individuals in civil society such as trade unionists, businessmen, Martinelli's business competitors, or activists; US citizens and diplomats were also among the targets, and even Ricardo Martinelli's mistress.

33. Those who were spied on from Partido Panameñista included Juan Carlos Varela and his brother Popi Varela, Beby Valderrama, Rafael Rafa Flores, Priscila Miró, Raúl Sandoval, and Agapito Clejorn. The primary targets in this group were always those closest to Mr. Juan Carlos Varela, so as to know what his strategies were and attack them. Ricardo Martinelli wanted to know what they talked about, what they commented on and the exchanges they had.

34. Among those who were spied upon from Partido Revolucionario Democrático I remember presidential candidate Juan Carlos Navarro and his work group; Abdiel Villareal, Benicio Robinson, Javier Acha, Martín Torrijos, Vivian de Torrijos, "el Toro" [the Bull] Balladares, Mitchel Doens, Francisco "Pachi" Sanchez Cárdenas, Patricia Alfaro, Yassir Purcait, Leandro Ávila, Gabriel Carrera Pitti, Mebiseck Cedeño and Zulay Rodríguez, among others.

35. The group of Judges from the Electoral Tribunal and the Supreme Court of Justice were monitored exclusively by Ronny Rodríguez. These included Judge Ayu Prado, Judge Víctor Benavides, Judge Mirta Varela and one of Judge Pinilla's assistants. Attempts were also made to infest the phone of Attorney General Ana Belfón, but it was not possible because of her cellular system.

36. Trade unionists Genaro Lopez, Saúl Méndez, Jaime Caballero, Alba Pedrol, Fernando Cebamanos and Rafael Chavarría were also monitored. Highly credible journalists such as Álvaro Alvarado and Castalia Pascual were likewise monitored.

37. Martinelli's business rivals were particularly spied upon, as well as national businessmen such as Stanley Motta, Nicolás González-Revilla (father and son), and Erasmo Orillac. Other members of civil society attacked through the espionage system were Ana Matilde

Gómez, an attorney who was critical of the Martinelli administration, José Isabel Blandón, a political analyst, and Magaly Castillo, director of a non-governmental organization.

38. We also received instructions to spy on certain US citizens and diplomats. For example, Ermita Pérez at the U.S. Embassy in Panama. Also Richard Downing who was a retired military man. As well as Christian Ferry, who was the political advisor to Juan Carlos Varela.

39. Notably, an important target for Ricardo Martinelli was Aurora Mudarráz. She was his mistress and Martinelli instructed us to spy on her. Her monitoring was performed exclusively by Ronny Rodríguez, who told us that President Martinelli would be happy with only having all the information about Ms. Mudarráz.

40. Each one of us, Ronny Rodríguez, William Pitti and I, had a certain number of targets assigned to us; about twenty-five in my case. I would go over the information generated by the espionage system for the targets assigned to me and filter the information for inclusion in the reports. I had to know when my targets had meetings, where and with whom, in addition to recording the conversations that had to do with their political agendas and strategies. Ricardo Martinelli also wanted to know about the business of important entrepreneurs in this country. Moreover, I was required to immediately report any relevant information that could be used to damage the reputation of Ricardo Martinelli's opponents.

IV.   RICARDO MARTINELLI USED THE INFORMATION FOR HIS PERSONAL BENEFIT

41. Ricardo Martinelli received this information and used it for his personal purposes. At times, Ricardo Martinelli would reveal that he had information on them, perhaps for the purpose of intimidating someone or merely by accident. Such was the case during the Telémetro

-11-

news program, when during an interview with Álvaro Alvarado, Martinelli threatened that he had "The dossier and pedigree on everyone, everything in this country" and that he knew, "what each person has done and not done." I know that statement is true because the information from the espionage system at Special Services was being delivered to Ricardo Martinelli.

42. On other occasions, the comments made by Ricardo Martinelli were more obvious because he liked to publish notes in the newspapers he owned with information obtained via the espionage system that he could not have obtained in any other way. Thus was the case of an audio, which was later published on YouTube, in which Mr. Francisco "Pachi" Sánchez Cárdenas, a member of the PRD, whom I was monitoring, is heard having sexual relations.

43. The tactic of ruining the reputations of his political opponents using recordings obtained from the espionage system was used other times by Ricardo Martinelli. The most well-known was probably that of Zulay Rodríguez. Mrs. Rodríguez was one of the targets I monitored. When I obtained a recording of a call in which Mrs. Rodríguez was arguing with her husband, who was accusing her of infidelity, I immediately reported it to Ronny Rodríguez who informed Martinelli of the content of the recording. Martinelli gave instructions through Ronny Rodríguez for William Pitti to edit a video with the recording and upload it to YouTube. William followed the instructions and uploaded the video from a public Internet cafe. The video became national news[1]. I immediately recognized that the conversation in that video was the one that had been obtained from the espionage system[2].

---

[1] http://elpatio507.blogspot.com/2011/11/grabacion-de-audio-de-zulay-rodriguez-y.html
[2] http://www.dealante.com/index.php/cnodo/show/23733

44. After the presidential elections in May of 2014, when then President Martinelli was about to leave office, we received instructions to dismantle the espionage system. Before dismantling the system, we recorded all the information that had been collected onto an external hard-drive that Ronny Rodriguez would give to President Martinelli. The three desktop computers installed on the top floor of Building 150 were disconnected and put back in the boxes in which they originally came. The server that was on the top floor of Building 150 was also disconnected and all the wiring was removed.

45. The printer could not be removed because it was included in the inventory and paid for out of the NSC budget. But it was destroyed, given that we believed it could contain backup copies of all the information that had been sent to print there. In order to do that, it was taken to a bathroom on the top floor of Building 150 and William Pitti poured acid on it so that it would no longer work and any information it had saved would be lost.

46. Afterwards, William Pitti and Ronny Rodriguez waited until around seven-thirty in the evening to remove the computers and the server so that no one who worked in Building 150 would see them. They loaded the equipment into the car assigned to Ronny Rodriguez and took it to a location I do not know.

47. That same week, we took the furniture out of the office on the top floor of Building 150 to a NSC storage warehouse, with the exception of the Rack on which the espionage system server was connected. The Rack was not removed from the top floor of Building 150 when the rest of the equipment was removed because it would not fit in the car. In order to remove this Rack, they brought a white pickup truck driven by another NSC employee,

Júbilo Grael, known by his pseudonym, "Maycol." Júbilo Grael and Ronny Rodríguez took the Rack to a location I do not know.

48. Lastly, I would like to state that I am doing this because I realize that during the Ricardo Martinelli administration all of these crimes against the freedom of citizens were committed. I hereby submit my statement with the firm intention of making it possible for justice to be done in this case. I should also mention that I am giving this statement despite the very high personal risk it entails. I fear for my own safety and life and that of my family, for which reason I earnestly ask that my identity be kept strictly confidential so as not to place us at risk of mortal harm.

I swear under penalty of perjury that everything I have stated herein is true to the best of my knowledge and belief.

[Signature]

_____

Ismael Pitti

Date: 01/23/17

[Notary Public Stamp]

Tucson, Arizona, USA

## CERTIFICATION BY TRANSLATOR

I, L. Clark Gillette, of Tucson, Arizona, USA, am a qualified, professional translator for the Spanish and English languages. My qualifications include a Master's Degree in Translation of Spanish to English and English to Spanish from the Monterey Institute of International Studies, and Spanish to English and English to Spanish Certification by the American Translators Association.

I herewith certify that the attached translation is, to the best of my knowledge and belief, a true and accurate translation from Spanish into English of the attached, entitled: Affidavit Pitti.

*R Clark Gillette*

Signature

L. Clark Gillette

Name

1/23/17

Dated