**UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA**

CASE NO.: 17-22197-MC-UNA

IN THE MATTER OF THE
EXTRADITION OF RICARDO
ALBERTO MARTINELLI BERROCAL
_____/

## MEMORANDUM OF LAW IN SUPPORT OF EXTRADITION

On June 12, 2017, the United States filed a complaint for the extradition of Ricardo Alberto

Martinelli Berrocal ("Martinelli Berrocal") at the request of the Government of Panama pursuant

to the Treaty Between the United States of America and the Republic of Panama Providing for the

Extradition of Criminals, U.S.-Pan., May 25, 1904, 34 Stat. 2851 (the "Treaty"); the U.N.

Convention Against Corruption, Dec. 9, 2003, S. Treaty Doc. No. 109-6, 2349 U.N.T.S. 41 (the

"UNCAC"); and the Convention on Cybercrime, Jan. 7, 2004, Council of Eur., T.I.A.S. No. 13174,

C.E.T.S. No. 185 (the "Budapest Convention").  In support of its request for Martinelli Berrocal's

extradition, Panama has submitted the appropriate documents to the U.S. Department of State.  *See*

Declaration of Assistant Legal Adviser Susan Benda (DE 8).  Pursuant to 18 U.S.C. § 3184, this

Court must hold a hearing to consider the evidence of criminality presented by Panama and to

determine whether it is "sufficient to sustain the charge under the provisions of the proper treaty

or convention."

The United States respectfully submits this memorandum to set forth the procedural and

factual background of the case and to explain the legal standards and protocols that govern

extradition proceedings under Section 3184.  As detailed herein, the evidence submitted by

Panama fulfills the relevant Treaty requirements.  The Court should therefore "certify the same"

1

to the Secretary of State, who will decide whether to surrender the fugitive "according to the treaty." *Id.*[1]

## I.     BACKGROUND

### A.     Procedural Background

Martinelli Berrocal is wanted by Panama for trial on four charges: (1) interception of telecommunications without judicial authorization, in violation of Article 167 of the Criminal Code of Panama; (2) tracking, persecution, and surveillance without judicial authorization, in violation of Article 168 of the same code; (3) embezzlement by theft and misappropriation, in violation of Article 338 of the same code; and (4) embezzlement of use, in violation of Article 341 of the same code.   These offenses correspond to violations of various U.S. criminal statutes, including 18 U.S.C. § 2511 (illegal interception of communications) and 18 U.S.C. § 641 (embezzlement).   Harry Diaz, a Justice of the Criminal Chamber of the Supreme Court of Justice of the Republic of Panama, issued an indictment against Martinelli Berrocal for these offenses on October 9, 2015.   After Martinelli Berrocal failed to appear in court when summoned for a hearing on the charges, on December 21, 2015, the Supreme Court of Justice issued an order for Martinelli Berrocal's arrest.   The Government of Panama subsequently submitted a request to the United States for Martinelli Berrocal's extradition.   In response to arguments raised by Martinelli Berrocal in this proceeding, the Government of Panama submitted supplements to its request on June 16,

---

[1] After the Court has completed its "limited inquiry, the Secretary of State conducts an independent review of the case to determine whether to issue a warrant of surrender."   *Martin v. Warden, Atlanta Pen.*, 993 F.2d 824, 829 (11th Cir. 1993).   "The Secretary exercises broad discretion and may properly consider myriad factors affecting both the individual defendant as well as foreign relations, which an extradition magistrate may not."   *Id.*

2017 (DE 22-1, at 5-8), and July 31, 2017 (which is attached hereto as Exhibit 1, hereinafter "Supp. Aff. of Harry Diaz"), to clarify certain aspects of its case against Martinelli Berrocal.

Martinelli Berrocal was arrested in this case on June 12, 2017, in Coral Gables, Florida. He subsequently filed an emergency motion to dismiss (DE 12), alleging that Panama had failed to comply with the requirement in the Treaty that it provide a warrant in support of its extradition request; he also filed multiple motions for release on bond (DE 18, 24, 26, 34, 36). The government responded to his motions and filed a motion seeking Martinelli Berrocal's detention (DE 13, 15, 22, 32). After holding a hearing on June 20, 2017, this Court denied Martinelli Berrocal's motions and granted the government's request for detention in an opinion issued on July 7, 2017 (DE 38). An extradition hearing is scheduled in this case for August 3, 2017.

### B. Factual Background

#### 1. The President and the National Security Council

On July 1, 2009, Martinelli Berrocal was sworn in as the President of Panama. Minutes of National Assembly, July 1, 2009, Exhibit 2 to Extradition Complaint (DE 8) 409, 472. Less than a year later, on March 19, 2010, President Martinelli Berrocal issued Executive Decree No. 263, which created a "consultant and advisory body to the President" called the National Security Council ("NSC"). Executive Decree No. 263, Annex 1 to Aff. of Harry Diaz at 42 (RAMB000060). According to the decree, the NSC consisted of two individuals: the President himself and the Minister of the Presidential Office, although the President could select public officers to attend the meetings of the NSC. *Id*. In practice, the NSC was controlled by President Martinelli Berrocal. According to Mr. Demetrio Papadimitriu Bagatelas ("Papadimitriu Bagatelas"), former Minister of the Presidential Office, although the NSC consisted of Martinelli Berrocal and himself, "there has never been a meeting of the Board of Directors . . . everything

was with the President."  Papadimitriu Bagatelas Interview, Exh. 8 at 2312 (RAMB002276). Papadimitriu Bagatelas indicated that the Secretariat "reports directly to the President of the Republic." *Id.* at 2314 (RAMB002278).  Former Presidential Minister Mr. Robert Milton Cohen Henríquez Sasso stated that, according to the official organizational chart, both the NSC and the Secretariat "are not integrated neither subordinated to the Ministry of the Presidential Office, on the contrary, they are bodies reporting directly to the Presidential Office of the Republic." Cohen Henríquez Sasso Interview, Exh. 8 at 2321 (RAMB002285).

Several individuals served at the NSC until Martinelli Berrocal's Presidential term expired in 2014, including three individuals who comprised the NSC's new "Special Services" unit:  (1) Ronny[2] Rodriguez ("Rodriguez"), a/k/a "Didier," assigned to e-mail rrodriguez@csn.gob.pa, who served as the Director of Intelligence of the Executive Secretariat from September 29, 2009 to May 2014, Oct. 7, 2015 Letter from NSC Executive Secretariat, Exh. 2 at 501 (RAMB000510); (2) Ismael Pitti, a/k/a "Brad," assigned to e-mail ipitti@csn.gob.pa, who served as a First Corporal from December 12, 2009 to May 2014, *id.*; and (3) William Pitti, a/k/a "Guillermo," assigned to e-mail wpitti@csn.gob.pa, who served as a Deputy Chief of Intelligence from January 21, 2011 until September 3, 2014, William Pitti Personnel Records, Exh. 2 at 492-94.[3]

Ismael Pitti learned at the outset from Rodriguez that Martinelli Berrocal had tasked Rodriguez with forming a special group, that the activities of the group would be confidential, and

---

[2] Rodriguez's first name sometimes appears in the documentation as "Ronny" and other times as "Rony."  For purposes of this filing, his name will be spelled "Ronny."

[3] In the course of preparing this Memorandum, the undersigned learned that, due to a clerical error, a portion of Exhibit 2 was not scanned and Bates-stamped and, as a consequence was neither provided to the Court nor defense counsel.  The Government has scanned the missing documents and provided them to defense counsel, and attaches same to this Memorandum as attachments.  All citations without RAMB numbers can be found in these attachments.

that the group would be led directly by Martinelli Berrocal (a/k/a "El Jefe.")  I. Pitti Aff. ¶¶ 3-5. Other witnesses corroborated that Rodriguez reported directly to Martinelli Berrocal while working at the NSC.  *See* Interview of Jubilo Antonio Graell, Exh. 7 at 1978-79, 1982 (RAMB001942-43, RAMB001946) (witness indicated that Rodriguez's sole access to number one—President Martinelli—created friction between Rodriguez and the executive secretary and that Rodriguez would go to the Presidential Palace each day to deliver a yellow envelope).  The Special Services unit established an office on the top floor of an NSC building called "150" ("Building 150"), which was accessible only by its three members with an electronic key card. *See* Interview of Vildia Del Carmen Torres Potes, Exh. 7 at 2076-77 (RAMB002041-2042) (witness indicating that only Rodriguez, William Pitti, and Ismael Pitti remained in Building 150 when the Intelligence Directorate moved out, and that Rodriguez and William Pitti controlled who could enter the offices in that building); Interview of Elvin Noget Ortiz Gonzalez, Exh. 7 (RAMB001773) (witness was instructed to turn in his electronic key card to building 150, leaving only Rodriguez, William Pitti, and Ismael Pitti with access to the area); Ismael Pitti Aff. ¶ 6 (entire top floor of Building 150 was secured so only the three had a key).

2.   <u>Acquisition of the NSO and MLM Equipment</u>

Two separate sets of specialized equipment were purchased for the Special Services unit: one from an Israeli company called MLM Protection Limited ("MLM") and the other from an Israeli company called NSO Group Technologies Limited ("NSO").   The MLM equipment was purchased first, prior to February 13, 2011, when Director of the National Police Gustavo Perez signed a final acceptance letter regarding a contract between MLM and the Social Investment Fund of the Ministry of the Presidency notifying MLM that the equipment had been installed and training had been provided to "100% satisfaction."  Final Acceptance Letter, Exh. 2 at 404.  The

5

Government of Panama paid MLM USD $13,475,000 for the system.  Audit Report Summary, Exh. 3 at 684 (RAMB000692); *see also, e.g.*, Request of Banking Transfer, Exh. 4 at 1272 (RAMB001229) (showing December 10, 2010 transfer of approximately USD $5.4 million as partial payment to MLM from the Ministry of the Presidential Office – Social Investment Fund); Request of Banking Transfer, Exh. 5 at 1277 (RAMB001237) (showing August 10, 2010 transfer of approximately USD $3.3 million).  According to MLM's Proposal, submitted to the Presidential Office of Panama and to the Panamanian Police in March 2010, MLM was to provide a PC Surveillance System ("PSS"), which was designed to "silently install (PSS agents) into the target computers, using one of the supplied infection methods," then "acquire the target's required data, using the supplied acquisition modules such as files inquiry, audio captures, keyboard logger and much more."  MLM Proposal, Exh. 4 at 1024-27 (RAMB000937-40).  Thus, the PSS was able to render all contents on the computer capable of interception. Statement of Elvys Moreno Murillo, Exh. 7 at 1852-53 (RAMB001814-15).

On July 3, 2012, NSO sold to the NSC ("Consejo de Seguridad Nacional") a system called "Pegasus," which was designed for "collecting and gathering information from mobile devices fot the exclusive use of Panama's government."  End User Certificate signed by Gustavo Perez on behalf of the NSC, Exh. 2 at 614-615 (RAMB000621-22).  NSO did in fact install this Pegasus System after being paid US $8 million.  Letter from NSO to Government of Panama, Exh. 2 at 608, RAMB000615 (stating that NSO "installed the Pegasus System [pursuant to a purchase order signed by the Director of the NSC] in Panama City after receiving money transfer of 8 million American Dollars, the first stage was 6 million American Dollars and the second stage was additional 2 million American Dollars,").  This system had the ability to extract information flowing through a cellular telephone (including calls, call logs, and the calendar), and to give

access to emails on the phone, any files saved on the memory card, and all messages sent via WhatsApp or Blackberry Messenger, the camera, and microphone.  I. Pitti Aff. ¶¶ 13-15.

According to Ismael Pitti, a group of six to eight Israelis installed the equipment and trained him and others on how to use it; the Israelis said that they had already met with President Martinelli Berrocal.  *Id.* ¶ 8; *see also* Interview of Elvin Noget Ortiz Gonzalez, Exh. 7 at 1819 (RAMB001781) (witness received training along with Rodriguez, W. Pitti, I. Pitti, and Elvys Moreno from an Israeli on a system for tracking the geolocation of cell phones and recording of emails and data).  This equipment consisted of a server and multiple computers, one of which (according to Rodriguez) was given to "El Jefe."  I. Pitti Aff. ¶ 9.

Both the MLM and NSO systems were used to violate the privacy of Panamanians and non-Panamanians by gathering information without following the legal procedure and for reasons which had nothing to do with national security.  *Id.* ¶ 20*, see also* Statement of Elvys Moreno Murillo, Exh. 7 at 1858-59 (RAMB 001820-21) (witness noting that it did not appear that there were any resolutions for the list of targets to infect during the time he worked on the system).

3.    Martinelli Berrocal Directed the Electronic Surveillance

Martinelli Berrocal himself chose the targets of surveillance, and Rodriguez communicated these targets to Ismael Pitti and William Pitti.  I. Pitti Aff. ¶ 20 (Rodriguez would instruct I. Pitti and W. Pitti to tap a certain person's phone, and said that "El Jefe" wanted us to do it, and would then receive the results of the tap), *but see* Statement of Elvys Moreno Murillo, Exh. 7 at 1853 (RAMB001815) (witness, who used software to infect computers of targets from 2010 until 2011, received targets from William Pitti).  On occasion, Ismael Pitti personally observed messages sent by Martinelli Berocal to Rodriguez on Blackberry Messenger.  I. Pitti Aff. at ¶ 27.  Ismael Pitti's statement regarding Martinelli Berrocal's control of the activities of the Special Services Unit is

7

supported by the statement of the then-Executive Secretariat of the NSC, who was nominally Rodriguez's and William Pitti's boss, and who stated that he did not go into the workspace at the top floor of Building 150, did not authorize either of them, or know about, the work that they were doing "surpassing the law that stipulates their duties, obligations and responsibilities," and did not authorize any officer of the NSC to conduct extradjudicial surveillance against any citizen of Panama.  Statement of Alejandro Garuz Recuero, Exh. 8 at 2226-27, 2230, 2232 (RAMB002191-92, 002195, 002197).

Gustavo Pérez, Executive Secretary of the Security Council from March to September, 2012, stated: "when I get to the National Security Council, there was already a modus operandi of work between Ronny Rodríguez and the Presidential Office." Statement of Gustavo Pérez, Exh. 8 at 2279 (RAMB002244).  He stated that "Ronny did not report directly to me, due to he had strict orders to work with the Presidential Office."  *Id.* at 2266 (RAMB002231).  Secretary Pérez stated that when the President "spoke of something, that is, when he went on television talking about that he knew some information of someone of Deputies or any other, you could tell they did not come from my person the Council but from Ronny Rodriguez, he delivered all morning those envelopes in the Presidential Office, and the place where he came from with those envelopes, I was forbidden from entering because he had safe houses outside the premises of the Council.  *Id*. at 2280 (RAMB002245).

The targets selected by Martinelli Berrocal included members of opposition political parties, individuals with ties to the previous administration, members of the Electoral Tribunal, the Supreme Court of Justice, journalists, trade unionists, businessmen, Martinelli Berrocal's business competitors, activists, U.S. citizens and diplomats, and even Martinelli Berrocal's mistress.  I. Pitti Aff. ¶ 32; *see also* Interview of Elvys Moreno Murillo, Exh. 7 at 1853 (RAMB001815) (William

Pitti gave witness list of 20 to 25 people, trade unionists, and members of political parties). Victims included Zulay Rodríguez, Francisco Sánchez Cardenas, Mitchell Doens, Yassir Purcait, Raúl Sandoval, and others. I. Pitti Aff. ¶¶ 33-34. One witnesses corroborated that that Mitchell Doens was a victim of interception because he recalled transcribing a phone interception, which had been given to him by "Didier" (Ronny Rodriguez)" on a CD in approximately September 2010, and he recognized one of the voices belonging to Mr. Doens, and he was talking with another male about events occurring in Bocas del Toro. Statement of Julio Palacio Martinez, Exh. 7 at 1989, 1993 (RAMB0001953, 0001957). When Mr. Palacio Martinez finished with the transcription, he handed it in an envelope to Rodriguez; a few days later, Mr. Palacio Martinez saw that the transcription had been published in one of the major Panamanian newspapers. *Id.*

Not only did Martinelli Berrocal select the targets of the electronic surveillance, but he also received the results of the surveillance every day from Rodriguez. I. Pitti Aff. ¶ 21. This report was delivered by Rodriguez to Martinelli Berrocal, along with the "governability analysis report" (which dealt with events "genuinely related to national security") in a manila envelope. *Id.* at ¶¶ 22, 26; *see also* Interview of Jubilo Antonio Graell, Exh. 7 at 1978, 1979, 1982 (RAMB001942-43, RAMB001946) (Rodriguez would go to the Presidential Palace each day to deliver a yellow envelope); Interview of Elvin Noget Ortiz Gonzalez, Exh. 7 at 1831 (RAMB001793) (Rodriguez was picked up each morning by William Pitti and driven to the Presidential Office with a yellow envelope). On occasion, "El Jefe"—President Martinelli Berrocal—would request that audio or video be uploaded onto YouTube, which was done by William Pitti. I. Pitti Aff. ¶ 29. Two particular occasions recalled by William Pitti involved the publishing of an audio recording of a man named Francisco Sánchez Cardenas having sexual relations, and an audio recording of an argument between Zulay Rodriguez and her husband regarding Rodriguez's alleged infidelity. *Id.*

¶ 43.   The recordings were played for both victims, and each recalled the private conversations which had been intercepted.   Statement of Zulay Rodriguez, Exh. 8 at 2383 (RAMB002348); Statement of Francisco Sánchez Cardenas, Exh. 9 at 2559 (RAMB002527).   Ismael Pitti recalled that Martinelli Berrocal, on at least one occasion, appeared on a TV program to boast to a journalist named Alvaro Alvarado (whom he had had intercepted) that he had "the dossier and pedigree on everyone, everything in this country," and that he knew "what each person has done and not done." I. Pitti Aff. ¶¶ 36, 41.

Ismael Pitti stated that he would occasionally send emails to communicate requested information to Rodriguez on an email account specially set up for the Special Services unit: brad.pty507@gmail.com.   *Id.* ¶ 28.   Investigators located this e-mail address and, on August 14, 2014, used forensic analysis to recover 573 e-mails in the e-mail's inbox.   Statement of Luis Enrique Rivera Calles, Exh. 9 at 2703-04 (RAMB002670-72).   Forensic examiners examined the messenger program associated with the email brad.pty507@gmail.com and found the following e-mail addresses there:   guerranavarro@gmail.com,   csalinas@csn.gob.pa,   gdiaz@wipet.com, jpalacios@csn.gob.pa,   jpalacio@csn.gob.pa,   martinb@nsogroup.com,   rrodriguez@csn.gob.pa, rsalinas@csn.gob.pa, and sharono@nsogroup.com.   *Id.* at 2706 (RAMB002673).   When asked by investigators how the forensic examiner would describe the documents that were obtained from the eye witness inspection procedure conducted on the email brad.pty507@gmail.com, the examiner responded: "The downloaded emails made reference to ways to infect through messages some targets, resulting in telephone numbers through a platform designed to capture and present reports of telephone conversations of different people, either by Whatsapp messenger, texts, calls and emails, using a specialized software that could capture and intercept contacts, text messages, emails, call records, calendars, of any cellphone model that the platform used to that effect, could

manage, among these, private conversation applications such as blackberry messenger."  *Id.* at

2706-07 (RAMB002673-74).  The forensic examiner noted that among the content he found in the

e-mails:

> make reference to party agendas of political campaigns, conversations in meetings
> where specific political party were mentioned, proposals, personal business of
> political election candidates, personal business of candidates family, political
> campaign strategies, WhatsApp conversation, material about primary elections,
> electoral rolls, tracking to known political candidates, documents of public
> institutions or final minutes of congress or internal meetings of some political party,
> also different models of telephone devices to update current platforms of capturing
> of information or telephone messengers, audios of meetings of political campaigns,
> emails that mentioned name of possible public figures associated with phone
> numbers that presumably, they owned at that time, agendas of political candidates
> campaign, confidential documents (and other items).

*Id.* at 2707 (RAMB002674).

### 4.    Victims Identified Their Intercepted Communications

During the course of the investigation, multiple victims were interviewed to determine

whether they could recognize their e-mails or recordings taken from the brad.pty507@gmail.com

address.  Dozens of victims identified the discovered communications as their own.  For example,

Witness Luis Emilio Mouynes Kieswetter, a General Manager of National Television network

("TVN"), was shown an e-mail taken from the brad.pty e-mail account dated March 15, 2013, and

recognized it as an e-mail he had written to other members of TVN's management, commenting

on the departure of one of the TVN News anchors for NEXTV, a network owned by Martinelli

Berrocal.  Exh. 9 at 2618-20 (RAMB002585-87).  In this e-mail, the witness was telling the TVN

executives the reasons why he thought the anchor and others were leaving and what they were

going to do to control the exit of the entire staff.  *Id.*  Witness Juan Carlos Navarro Quelquejeu, a

member of the Panamanian Democratic Revolutionary Party, was shown an e-mail taken from the

brad.pty e-mail account dated March 15, 2013, and the witness recognized it as an e-mail sent to

him by a Carolyn Montenegro.  Exh. 9 at 2524-26 (RAMB002492-94).  He recognized the telephone number 6679-0808 as one of the public cell phones he used in a political campaign.  *Id.* at 2526 (RAMB002494).  Witness Raúl Alberto Sandoval Chiari, a member of the Panameñista Party, was shown an e-mail taken from the brad.pty e-mail account dated March 15, 2013, and recognized it as an email sent to him by a Ms. Marien Calviño, to him and other people who worked in the presidential political campaign of Juan Carlos Varela.  Exh. 9 at 2574 (RAMB002542).  Witness Rosendo Enrique Rivera Botello, an attorney who at one point represented Martinelli Berrocal in proceedings pursued against a Mrs. Balbina Herrera, was shown a Whatsapp conversation from his telephone number, 6534-7792, and recognized it as a private communication he had had on February 25, 2013 regarding an intervention in the case.  Exh. 8, at 2476 (RAMB002442).  After this conversation, Martinelli Berrocal had revoked Mr. Rivera Botello's power of attorney, based, according to the witness, on the interception of this private communication.  *Id.* at 2469-70 (RAMB002435-36).

As previously mentioned, two individuals who had their private conversations regarding alleged infidelity or sexual acts leaked on YouTube recognized their voices on the recordings. Statement of Zulay Rodriguez, Exh. 8 at 2383 (RAMB002348); Statement of Francisco Sánchez Cardenas, Exh. 9 at 2559 (RAMB002527).  Ms. Rodriguez, a member of the Panama Democratic Revolutionary Party, provided a statement to authorities regarding the fact that her private conversations were intercepted.  Statement of Zulay Rodriguez, Exh. 8 at 2377 (RAMB002342). When shown by investigators e-mails found on the brad.pty e-mail account, she recognized as hers emails dated May 23, 2012, and May 9, 2012, and a Chat via Blackberry PIN dated April 24, 2012, regarding legal actions that she wanted to take against the Martinelli Government over its plan to take over the National Sewage and Water Institute.  *Id.* at 2381-83 (RAMB002346-48).

12

Mitchell Constantino Doens Ambrosio, a member of the Panama Democratic Revolutionary Party, provided a statement to authorities regarding the fact that his private conversations were intercepted, chiefly because recordings of his conversations with friends and political leaders of the country were made public, and because a written communication that he had had with a man named David Murcia Guzman was produced by the former Panamanian Minister of Work Alma Cortez.  Exh. 8 at 2429 (RAMB002394).  Mr. Doens Ambrosia recognized as his own, among several intercepted communications in the prosecutor's possession, the conversations he held via BBPIN, namely, June 19, 2012 (*id.* at 2434) (RAMB002399); June 13, 2012 (*id.* at 2435) (RAMB002400); June 4, 2012 (*id.* at 2436) (RAMB002401). He also recognized as his own emails dated June 12, 2012, and June 6, 2012 (*id.* at 2435) (RAMB002400).  Mr. Doens also recognized some intercepted recordings he had had with a number of individuals, including some pertaining to the Ngabe Bugle Tribe.  *Id.* at 2446-47 (RAMB002412-13).   Another witness, Mauro Jose Zuniga Arauz ties the Ngabe Bugle Tribe to Bocas del Toro by stating that Martinelli Verrocal ordered the killing of the Ngabe Bugle in Bocas del Toro in 2010.  Statement of Mauro Jose Zuniga Arauz, Exh. 8 at 2417 (RAMB002382).  This connection is significant, because witness Julio Palacio Martinez testified that he transcribed an intercepted conversation by Mr. Doens Ambrosio discussing the events of Bocas del Toro in 2010.  Statement of Julio Palacio Martinez, Exh. 7 at 1989, 1993 (RAMB 0001953, 0001957).

Some of the victims of surveillance were directed confronted by Martinelli Berrocal himself.  For example, witness Erasmo Pinilla Castillero, a justice of the Panamanian Electoral Tribunal, was shown an e-mail taken from the brad.pty e-mail account dated April 29, 2012, and recognized it as an email exchange that he had had with the Democratic Revolutionary Party Leaders Mitchell Doens and Hugo Guiraud, who were requesting the intervention of the Tribunal

so that the National Sports Institute would allow the use of a gymnasium to hold a political event. Exh. 9 at 2577-78 (RAMB002545-46).  Later, Martinelli Berrocal complained to Justice Pinilla Castillero about that email exchange, and the witness replied to him that what the Democratic Revolutionary Party had requested is the usual support that the Electoral Tribunal gave to all political parties.  *Id.* at 2579 (RAMB002547).  At that point, the witness realized that the contents of the email exchange had been brought to Martinelli Berrocal's attention.  *Id.*

Yassir Purcait, a member of the Panama Democratic Revolutionary Party, testified that on an unspecified date in 2010 or 2011, the witness was summoned to the President's Office to have a conversation with Martinelli Berrocal.  Martinelli Berrocal played for him a series of recordings relating to an attempt on the witness's life that Martinelli Berrocal had saved on his computer. Exh. 9 at 2513-16, 2518-19 (RAMB002481-84, 2486-87).  Martinelli Berrocal told Purcait that he was not intercepting Purcait, but Purcait understood this as an acknowledgement that Martinelli Berrocal could make recordings of the witness if he wanted to.  *Id.*  Indeed, Purcait's fears ultimately came to be realized.  During the course of the investigation, Purcait was shown an email by prosecutors and recognized as his own a number of different private communications, including a June 13, 2012, e-mail containing a conversation through an instant messaging system between him and a Juan David Morgan regarding discussion of a law in the National Assembly concerning the maritime sector, and an April 23, 2012, e-mail containing a conversation through an instant messaging system between him and a friend named Carlos Young.  *Id.* at 2519-20 (RAMB002487-88).

Upon learning of the existence of interceptions of their private conversations, the victims responded with a range of emotions, including shock, anger, sadness, and frustration.  One of the most revealing reactions came from Ms. Zulay Rodriguez, whose private conversations with her

husband regarding her alleged infidelity were published on YouTube:

> I feel raped, like a victim of rape, I am not surprised anymore, because this people made fun of me, when I listened to them talking even when I was talking over the telephone, I am altered, annoyed, upset, I feel helpless, this is depressing to me, how these mobs and criminals, got into my private personal life, they intercepted BBPIN's, chats, Whatsapp's, emails, they took me photographs pursuing me, those photographs, it can be seen that they took them; because no one around me took them, and that these security departments; instead of using the technology to chase criminals, they mess up with us as opponents, our private lives, chasing us 24 hours a day, they watched my conversations with other political leaders, with lawyers, colleagues, with my father, with my cousin Renee, they saw our family issues, the cases I was handling with other lawyers, information that I had with journalists of the media, with union leaders, they were chasing with the activists and party leaders I held meetings with, they got into my personal banking accounts where my checks are, and above all that, they used information of my email, to upload news into their TV channels Panama America and NEXTV.

Statement of Zulay Rodriguez, Exh. 8 at 2390 (RAMB002355).

### 5.   Lack of Proper Legal Authorization

Article 29 of the Panamanian Constitution provides that judicial authorization is required for interception and recording of private communications.  Affidavit of Harry A. Diaz at 29 (RAMB000047); *see also* Article 29 of the Panamanian Constitution, *quoted in* Harry A. Diaz Aff. at 30 (RAMB000048) ("All private communications are inviolable and cannot be intercepted or recorded, but as ordered by judicial authority.").  The Panamanian President "does not bear neither Constitutional nor legal powers, to intercept communications, authorize recordings, or have people under surveillance nor to access and extract information, data, documents, audio, videos, etc., stored in computers, cellular telephones, electronic devices and related."  Harry A. Diaz Aff. at 30 (RAMB000048).  Instead, Article 311 of the Panamanian Criminal Code provides that the *Juez de Garantías*—a court—may decide to authorize recordings after receiving a petition from a prosecutor.  Article 311 of the Panamanian Criminal Code, *quoted in* Harry A. Diaz Aff. at 30 (RAMB000048).   A number of witnesses working at the NSC understood that electronic

surveillance had to be authorized by a court in order to be legal under Panamanian law. *See, e.g.*, Ismael Pitti Aff. ¶ 24 ("In order to tap telephone lines under Panamanian law, the Public Prosecutor must request authorization from a judge, who must grand approval before tapping a telephone line."); Statement of Julio Palacio Martinez, Exh. 7 at 2002 (RAMB001966) (based on the witness's understanding of wiretapping, the Intelligence Directorate needs judicial authorization to intercept calls and cannot make those decisions internally).

During the course of the investigation, the investigators sought confirmation from the Panamanian Supreme Court as to whether authorization to intercept at least 40 telephone numbers between January 2012 through May 30, 2014, was ever sought or provided. Letter from Harry A. Diaz to Supreme Court of Justice, Exh. 2 at 592-93 (RAMB000599-600). Among the numbers included were cellphone numbers recognized by some victims as belonging to them. *See* Statement of Juan Carlos Navarro Quelquejeu, Exh. 9 at 2526 (RAMB002494); Statement of Rosendo Enrique Rivera Botello, Exh. 8 at 2476 (RAMB002442). The Court responded that there was no record of a request for judicial authorization, much less judicial authorization to intercept, any of the 40 telephone numbers. Letter of Jose E. Ayu, Exh. 2 at 598-99 (RAMB000605-06). The Public Ministry corroborated that there was no record of any request to wiretap, monitor, register, record calls, instant messages, or e-mails of any of the 40 numbers. Letter of Marcelino Aguilar Aizprua, Exh. 2 at 602 (RAMB000609).

> 6. Dismantling the Surveillance Systems

Shortly following the elections which took place on May 4, 2014, when Martinelli Berrocal was about to leave office, members of the NSC removed the surveillance equipment from Building 150 after business hours one evening. Ismael Pitti stated that after the 2014 election, he received instruction to dismantle the system and remove the computers (Rodriguez took this equipment

away to a location unknown to the witness); but they could not remove the printer, as it was paid with the NSC budget, so they poured acid on it to destroy any information that might be saved.  I. Pitti Aff. ¶¶ 44-46.  The server rack was later taken by Jubilo Grael and Rodriguez to a location unknown to the witness.  *Id*. at ¶ 47.

Jubilo Graell recalled that after May 4 elections, Rodriguez called him and asked him to come over to NSC facilities in Building 150.  Statement of Jubilo Antonio Graell de Gracia, Exh. 2 at 376.  He, Ronny, and co-worker Javier Antonio Quiroz Andreve then drove a white Toyota Hilux with a server rack from Building 150 first to the Presidential Palace, and then later to a building by Monte Oscuro, where they left the rack.  *Id.* at 377.  Investigators followed the route described by Graell, and found that the building to which he referred had a "Super 99" sign.  *Id.* at 381.  Super 99 is a company owned by Martinelli Berrocal.  Aff. of Harry Diaz at 34 (RAMB000052).

Quiroz Andreve recalled going with Graell and "Didier" (Rodriguez) in a white Toyota from Building 150 to the Palace of the Herons, then to Monte Oscuro, to the administrative offices of Super 99.  Statement of Javier Antonio Quiroz Andreve, Exh. 2 at 391.  Once they arrived at the Super 99 offices, "Didier" got out, returned with three more people, but Quiroz Andreve does not know what they did with the rack.  *Id*. at Exh. 2 at 392.

Other witnesses observed that an entire area of Building 150 had been dismantled.  *See* Statement of Julio Palacio Martinez.  Exh. 7 at 2005 (RAMB0001970) (when the witness arrived at Building 150, the whole area had been dismantled with a big broken printer, shredded papers, cables pulled out of the computers assigned by the NSC to Ronny, W. Pitti, and I. Pitti, and parts of the furniture were found outside); *see also* Statement of Vildia Del Carmen Torres Potes, Exh. 7 at 2092 (RAMB002056) (witness, who was tasked with inventorying properties assigned to the

Intelligence Directorate, explains that a big printer left behind in building 150 was broken and full of water.).  The only items that were left behind were a laptop, from which information had been deleted (but was later recovered forensically), and the printer, which had been inventoried and paid for out of the NSC budget.  *See* Aug. 14, 2014 Note of Engineer Iris Gonzalez, Exh. 2 at 284 (RAMB000349) (Director of NSC Information Department, when asked about the status of the computers issued to Didier, Guillermo and Brad, noted that Didier's computer was returned without a hard drive; one laptop was reported stolen; and one laptop was not returned); Statement of Iris Gonzalez, Exh. 7 at 1888-89 (RAMB001850-1851) (witness explaining that of the equipment issued by the Computer Directorate to Rodriguez, W. Pitti, and I. Pitti, one computer was reported stolen and another computer was returned without the hard drive (for which no one took responsibility); Minutes of Eyewitness Inspection Procedure, Exh. 2 at 644-45 (RAMB000651-652) (report showing audio and video files were recovered at a forensic science lab from computers (identified in Aug. 14, 2014 Note of Engineer Iris Gonzalez as assigned to Rodriguez, W. Pitti, and I. Pitti)); Minutes of Eyewitness Inspection Procedure, Exh. 1 at 140-42 (RAMB000204-208) (document asserting that contents of the hard drive and other electronic devices were inspected and recorded according to protocol during the eye witness inspection procedure.)

An audit conducted by the Comptroller General concluded that the loss to Panama sustained as a result of the purchase and disappearance of the MLM surveillance equipment amounted to US $10,861,857.48.  May 4, 2015 Audit Report No. 03-003-2015-DIAF, Exh. 3 at 688 (RAMB000696).

### III.   DISCUSSION

Through the hearing prescribed by 18 U.S.C. § 3184, the Court must determine whether to certify to the Secretary of State that the evidence submitted by Panama is "sufficient to sustain" the four charges against Martinelli Berrocal.  If any evidence is offered by Martinelli Berrocal, the Court should rule on its admissibility.  Once the evidentiary record is complete, the Court should make written findings of fact and conclusions of law as to each of the elements for certification, including separate findings for each offense as to which extradition is sought.  *See Shapiro v. Ferrandina*, 478 F.2d 894, 906 (2d Cir. 1973).  If the Court finds that the requirements for certification have been met, it must provide the certification to the Secretary of State, together with a copy of any testimony taken before the Court, and must commit Martinelli Berrocal to the custody of the United States Marshal to await the Secretary's final determination regarding surrender.  18 U.S.C. § 3184; *see Martin v. Warden, Atlanta Pen.*, 993 F.2d 824, 828-29 (11th Cir. 1993).  The Secretary will then decide whether to surrender Martinelli Berrocal to Panama.

As discussed below, Panama's evidence satisfies the requirements of the Treaty and supports a finding that Martinelli Berrocal is extraditable for embezzlement and illegal wiretapping and surveillance.  None of the purported defenses Martinelli Berrocal has raised pursuant to Panamanian law and the Treaty is availing.  Accordingly, this Court should certify to the Secretary that Martinelli Berrocal is extraditable to Panama to stand trial on the four charges for which his extradition is sought.

### A.   The Documentary Evidence Submitted by Panama Supports Certification; Martinelli Berrocal May Only Submit Explanatory Evidence

As the government has previously explained, an extradition hearing is not a criminal proceeding, DE 15, at 12-13, and "unique rules of wide latitude govern reception of evidence."

19

*Sayne v. Shipley*, 418 F.2d 679, 685 (5th Cir. 1969) (citation and internal quotation marks omitted).

Among these rules are the following:

        1.    <u>Panama's Written Submissions Are Sufficient and Admissible</u>

Extradition treaties do not contemplate the introduction of live witness testimony at extradition proceedings because to do so "would defeat the whole object of the treaty." *Bingham v. Bradley*, 241 U.S. 511, 517 (1916). Thus, hearsay evidence is admissible at extradition hearings and may properly support a finding of extraditability. *See id.* (rejecting fugitive's claim that *ex parte* witness affidavits submitted in support of his extradition to Canada should not be considered because he had not had the opportunity to cross-examine those witnesses); *see also, e.g.*, *United States v. Zanazanian*, 729 F.2d 624, 626-27 (9th Cir. 1980) (unsworn written statements may properly form the basis for extradition); *Simmons v. Braun*, 627 F.2d 635, 636 (2d Cir. 1980) (same); *In re Stern*, No. 07-21704-MC-TORRES, 2007 WL 3171362, *3 (S.D. Fla. Oct. 25, 2007) (same). Accordingly, a finding of extraditability may be, and typically is, based entirely on the authenticated documentary evidence and information provided by the requesting government. *See, e.g.*, *Afanasjev v. Hurlburt*, 418 F.3d 1159, 1162-63 & 1166 (11th Cir. 2005) (upholding probable cause determination based on unsworn 106-page bill of indictment prepared by a foreign investigator describing witness statements and other hearsay evidence); *Manta v. Chertoff*, 518 F.3d 1134, 1139-40, 1145-47 (9th Cir. 2008) (upholding probable cause determination based on investigation report written by prosecutor); *Bovio v. United States*, 989 F.2d 255, 259-61 (7th Cir. 1993) (Swedish investigator's statement sufficient to establish probable cause); *Castro Bobadilla v. Reno*, 826 F. Supp. 1428, 1433-34 (S.D. Fla. 1993) (documents and statements sufficient for extradition to Honduras), *aff'd*, 28 F.3d 116 (11th Cir. 1994).

20

The certification of documents introduced during an extradition hearing is governed by the Treaty and by 18 U.S.C. § 3190.  Article III of the Treaty lists the documents the Government of Panama is required to submit when it makes a request for the extradition of a fugitive charged with a crime, specifically: "[a] duly authenticated copy of the warrant of arrest in the country where the crime has been committed, and of the depositions or other evidence upon which such warrant was issued."  Treaty, Art. III, App'x to Declaration of Susan R. Benda (DE 8).  Section 3190 provides that "properly and legally authenticated" documentary evidence including "depositions, warrants, or other papers or copies thereof . . . *shall be received and admitted.*"  18 U.S.C. § 3190 (emphasis added); *see Afanasjev*, 418 F.3d at 1164.  Proof that the authentication is proper exists if the documents are accompanied by the certificate of an appropriate U.S. diplomatic or consular officer in the requesting country attesting that the documents would be admissible for similar purposes in that country.  18 U.S.C. § 3190.  The documents filed in this case are accompanied by such a certification by Alice F. Seddon, Consul General of the United States Embassy in Panama City attesting to the authenticity of the foreign official's signature.  Certificate of Alice F. Seddon (RAMB000006).  Accordingly, the documents are properly authenticated and thereby admissible in this proceeding.  *See* 18 U.S.C. § 3190; *see also* Declaration of Susan R. Benda, at 2 (DE 8) ("The documents submitted by the Government of Panama in support of its extradition request were certified . . . in accordance with Title 18, United States Code, Section 3190.").

2.     Martinelli Berrocal's Right to Introduce Evidence Is Limited

Martinelli Berrocal's opportunity to challenge the evidence introduced against him is heavily circumscribed.  "The accused is not entitled to introduce evidence which merely goes to his defense but he may offer limited evidence to explain elements in the case against him, since the extradition proceeding is not a trial of the guilt or innocence but of the character of a

preliminary examination held before a committing magistrate to determine whether the accused shall be held for trial in another tribunal." *Jimenez v. Aristeguieta*, 311 F.2d 547, 556 (5th Cir. 1962); *see also Hooker v. Klein*, 573 F.2d 1360, 1368 (9th Cir. 1978) ("[T]he extraditing court properly may exclude evidence of alibi, of facts contradicting the government's proof, or of a defense such as insanity. . . .  Because of the limited function of an extradition proceeding and the limited participation permitted of the fugitive, the order of the court does not reflect a consideration of all the merits of the case."); *see also In re Stern,* 2007 WL 3171362 at *3 ("Defendant's right to introduce evidence is limited to testimony that explains (rather than contradicts) the demanding country's evidence.").

This allowance of "explanatory evidence" and prohibition on "contradictory evidence" is rooted in the fact that an extradition judge may not weigh conflicting evidence and determine what to credit, "but, rather, determines only whether there is competent evidence to support the belief that the accused has committed the charged offense." *Quinn v. Robinson*, 783 F.2d 776, 815 (9th Cir. 1986), *cert. denied*, 479 U.S. 882 (1986).  "Testimony that merely gives the opposite version of the facts does not destroy the probability of guilt" and thus is inadmissible. *United States v. Fernandez-Morris*, 99 F. Supp. 2d 1358, 1361 (S.D. Fla. 1999).  Similarly, evidence (or argument) regarding the credibility of the requesting country's witnesses must be disregarded. *See, e.g.*, *Bovio*, 989 F.2d at 259 (rejecting evidence that major witness lied during the investigation because "issues of credibility are to be determined at trial"); *In re Extradition of Shaw*, No. 14-cv-81475, 2015 WL 3442022, at *8 (S.D. Fla. May 28, 2015) ("Defendant has consistently attempted to contradict the case brought against him in [the requesting country]. . . . This the Defendant cannot do.").

**B.      The Requirements for Certification Are Satisfied**

The Court must certify a fugitive as extraditable where: (1) the judicial officer is authorized to conduct the extradition proceeding; (2) the Court has jurisdiction over the fugitive; (3) the applicable treaty is in full force and effect; (4) the crimes for which surrender is requested are covered by the applicable treaty; and (5) there is sufficient evidence to support a finding of probable cause as to each charge for which extradition is sought.  *See, e.g.*, *Shaw*, 2015 WL 3442022, at *5 (citing *Fernandez v. Phillips*, 268 U.S. 311, 312 (1925)); *see also In re Stern*, 2007 WL 3171362 at *3 (articulating similar six-part standard).  Each of these elements has been met in this case.

1.      This Court Has Authority Over the Proceeding

The extradition statute authorizes proceedings to be conducted by "any justice or judge of the United States, or any magistrate judge authorized so to do by a court of the United States, or any judge of a court of record of general jurisdiction of any State."  18 U.S.C. § 3184.  As such, the judicial officer conducting the extradition hearing prescribed by Section 3184 does not exercise "any part of the judicial power of the United States," *In re Extradition of Kirby*, 106 F.3d 855, 866 (9th Cir. 1996), but is rather acting in a "non-institutional capacity by virtue of a special authority," *In re Extradition of Howard*, 996 F.2d 1320, 1325 (1st Cir. 1993).  It is well settled that both magistrate judges and district judges may render a certification under Section 3184.  *See Austin v. Healey*, 5 F.3d 598, 601-02 (2d Cir. 1993), *cert. denied*, 510 U.S. 1165 (1994).  This Court is therefore authorized to conduct the hearing in this case.  *See id.*; *see also* S.D. Fla. Local Rules, Magistrate J. Local R. 1(a)(3) ("Each United States Magistrate Judge of this Court . . . may . . . [c]onduct extradition proceedings, in accordance with 18 U.S.C. § 3184.").

23

2.      This Court Has Jurisdiction Over Martinelli Berrocal

It is also well settled that the Court has jurisdiction over a fugitive found within its jurisdictional boundaries.  18 U.S.C. § 3184 ("[A judge] may, upon complaint made under oath, charging any person found within his jurisdiction, . . .  issue [its] warrant for the apprehension of the person so charged."); *Pettit v. Walshe*, 194 U.S. 205, 219 (1904); *Grin v. Shine*, 187 U.S. 181, 185-86 (1902).  Martinelli Berrocal was arrested in Coral Gables, Florida, in the Southern District of Florida.  Accordingly, this Court has jurisdiction over him.

3.      The Relevant Treaty Is in Full Force and Effect

Section 3184 provides for extradition in instances in which a treaty or convention is in force between the requesting state and the United States.  *See id.*  In this case, Susan Benda, Assistant Legal Adviser for Law Enforcement and Intelligence in the Office of the Legal Adviser for the Department of State, has provided a declaration attesting that the Treaty in full force and effect between Panama and the United States.  *See* DE 8.  She has further attested that the Treaty is supplemented by the UNCAC and the Budapest Convention, to which both Panama and the United States are parties.  *See id.*; *see also* UNCAC, Art. 44(4), App'x to Declaration of Susan R. Benda (DE 8) ("Each of the offenses to which this article applies shall be deemed to be included as an extraditable offense in any extradition treaty existing between State Parties."); Budapest Convention, Art. 24(2), App'x to Declaration of Susan R. Benda (DE 8) ("The criminal offenses described in paragraph 1 of this article shall be deemed to be included as extraditable offenses in any extradition treaty existing between or among the Parties.").  The Court must defer to the Department of State's determination in these regards.  *See, e.g.*, *Kastnerova v. United States*, 365 F.3d 980, 985-87 (11th Cir. 2004) ("[E]very other Court of Appeals to consider whether a treaty has lapsed has deferred to the Executive's determination."); *cf. United States v. Duarte-Acero,* 296

24

F.3d 1277, 1282 (11th Cir. 2002) ("[T]he State Department's interpretation of a treaty is entitled to great deference.").

4.    <u>The Charged Crimes Are Covered by the Treaty</u>

Article I of the Treaty provides for the return of fugitives charged with, or convicted of, an "extraditable offense," as that term is defined under the Treaty.   Treaty, Art. I, App'x to Declaration of Susan R. Benda (DE 8).   As set forth in the government's memorandum requesting detention, offenses are "extraditable" if (1) they are encompassed by the list set forth in Article II of the Treaty; or (2) they are encompassed by the lists of offenses set forth in the UNCAC and the Budapest Convention, and meet the requirement of dual criminality.   DE 15, at 9-11.   The dual criminality requirement is met where the description of criminal conduct provided by Panama in support of its charges would be criminal under U.S. federal law, the law of the state in which the hearing is held, or the law of a preponderance of the states, if it had been committed here— regardless of whether the Panamanian and U.S. crimes are identical. *See, e.g.*, *Gallo–Chamorro v. United States*, 233 F.3d 1298, 1306 (11th Cir. 2000), *cert. denied*, 533 U.S. 953 (2001); *Schmeer v. Warden of Santa Rosa County Jail*, No. 14-cv-285, 2014 WL 5430310, at *2 (N.D. Fla. Oct. 22, 2014); *United States v. Cardoso*, No. 604MC128ORLKRS, 2005 WL 1228826, *3 (M.D. Fla. May 10, 2005) (citing *Wright v. Henkel*, 190 U.S. 40, 61 (1903)).   Indeed, "[t]he law does not require that the name by which the crime is described in the two countries shall be the same; nor that the scope of the liability shall be coextensive, or, in other respects, the same in the two countries.   It is enough if the particular act charged is criminal in both jurisdictions." *Collins v. Loisel*, 259 U.S. 309, 312 (1922).

As explained below, all four of the charges currently pending against Martinelli Berrocal are "extraditable."   *See also* Declaration of Susan R. Benda, at 1 (DE 8) ("The offenses of

25

embezzlement for which extradition is sought are covered under Article II of the Treaty . . . [and] are among the offenses . . . specified [in the UNCAC]. . . .  The offenses of interception of private telecommunications without judicial authority and tracking, persecution and surveillance without judicial authority for which extradition is sought are among the offenses . . . specified [in the Budapest Convention].  Therefore, all crimes for which extradition is sought are incorporated as extraditable offenses under the Treaty.").  Moreover, even if there were some ambiguity as to whether the Panamanian offenses were covered under the Treaty—which there is not—the Court should find that the offenses are extraditable because in interpreting the Treaty, "a narrow and restricted construction is to be avoided . . . [and] if a treaty fairly admits of two constructions, one restricting the rights which may be claimed under it, and the other enlarging it, the more liberal construction is to be preferred."  *Factor v. Laubenheimer*, 290 U.S. 276, 293-94 (1933); *see also, e.g.*, *Martinez v. United States*, 828 F.3d 451, 463 (6th Cir. 2016) (en banc) ("default rule" is that any ambiguity in extradition treaty must be construed in favor of "facilitat[ing] extradition"), *cert. denied*, 137 S. Ct. 243 (2016).  Accordingly, because extradition treaties should be "interpreted with a view to fulfil our just obligations to other powers[,]" *Grin*, 187 U.S. at 184, the Court should "approach challenges to extradition with a view towards finding the offenses within the treaty," *McElvy v. Civiletti*, 523 F. Supp. 42, 48 (S.D. Fla. 1981).

a.  The Embezzlement Charges Are Extraditable Offenses

The two embezzlement charges are extraditable offenses because they are expressly provided for in Article II of the Treaty, which specifically enumerates "embezzlement by public officers" in excess of $200.  *See* Treaty, Art. II, App'x to Declaration of Susan R. Benda (DE 8). Article 338 of the Criminal Code of Panama (embezzlement by theft and misappropriation) provides: "A public officer who takes or embezzles in any way, or consents that somebody else

26

appropriates, takes or embezzles any form of money, securities or property which administration, collection or custody have been entrusted by virtue of his position, shall be punished . . ." (RAMB000031). Article 341 of the same code (embezzlement of use) provides: "A public officer who, for purposes other than service, uses in his own or another's benefit, or allows somebody else to use money, securities or property under his charge by reasons of his duties or which are in his custody, shall be punished . . . ." (RAMB000032). Thus, the conduct prohibited under Articles 338 and 341 clearly constitutes "embezzlement by public officers" under the Treaty. *See, e.g.*, *Factor*, 290 U.S. at 299-300.

Martinelli Berrocal is incorrect that Panama's embezzlement charges are not covered by the Treaty because they do not require proof of the embezzlement *of money*. As an initial matter, Panama's charges do, in fact, cover the embezzlement of money (*inter alia*). Moreover, the fact that Article II of the Treaty requires "embezzlement exceed[ing] the sum of two hundred dollars" does not necessarily mean that it covers only the embezzlement of money. *See* Treaty, Art. II, App'x to Declaration of Susan R. Benda (DE 8). The Treaty, particularly when interpreted liberally as it must be, may also refer to the embezzlement of anything of value in excess of $200. Regardless, "[t]here is no requirement in the Treaty that the crime charged needs to be the mirror image of an offense listed in the Treaty." *In the Matter of the Extradition of Pineda Lara*, No. 97 CR. MISC. 1 (THK), 1998 WL 67656, at *13 (S.D.N.Y. Feb. 18, 1998); *see also, e.g.*, *In the Matter of the Extradition of Matus*, 784 F. Supp. 1052, 1057 (S.D.N.Y. 1992) (the fact that a Chilean offense included "additional essential elements [when compared with the offense listed in the applicable treaty] . . . [did] not render [the Chilean offense] non-extraditable"); *Polo v. Horgan*, 828 F. Supp. 961, 964-65 (S.D. Fla. 1993) (treaty that listed "fraud" as extraditable encompassed offenses charged as "embezzlement" and "unfaithful management"); *Artukovic v. Rison*, 784 F.2d

27

1354, 1356 (9th Cir. 1986) (treaty that listed "murder" as extraditable encompassed offenses charged as "war crimes").

Furthermore, even if the Panamanian embezzlement charges were not encompassed by Article II of the Treaty, the UNCAC provides an independent basis for finding the embezzlement charges against Martinelli Berrocal extraditable.  That convention enumerates "embezzlement, misappropriation or other diversion of property by a public official."  UNCAC, Art. 17, App'x to Declaration of Susan R. Benda (DE 8).  Panama's embezzlement charges clearly falls within that definition (which broadly refers to "property" and not just "money").  The charges also meet the UNCAC's dual criminality requirement because Martinelli Berrocal's conduct is "punishable under the domestic law of both the requesting State Party and the requested State Party."  *Id.* Art. 44(1).  If Martinelli Berrocal had committed his offenses in the United States, his conduct would be criminal under U.S. law, including, for example, as embezzlement in violation of 18 U.S.C. § 641.  The elements required for a conviction under Section 641 are as follows: (1) the money or thing of value described in the indictment belonged to the United States; (2) the defendant embezzled, stole, or knowingly converted the money or thing of value to his own use or to someone else's use; (3) the defendant knowingly and willfully intended to deprive the United States of the use or benefit of the money or thing of value; and (4) the money or thing of value had a value greater than $1,000. [4] *See* Eleventh Circuit Pattern Jury Instructions (Criminal) (hereinafter "Pattern"), Offense Instruction No. 21 (2016); *see also, e.g.*, *United States v. McCree*, 7 F.3d 976,

---

[4] Section 641 reads in part: "Whoever embezzles, steals, purloins, or knowingly converts to his use or the use of another, or without authority, sells, conveys or disposes of any record, voucher, money, or thing of value of the United States or of any department or agency thereof, or any property made or being made under contract for the United States or any department or agency thereof . . . [s]hall be fined under this title or imprisoned not more than ten years, or both . . . ."

980 (11th Cir. 1993).  Martinelli Berrocal's conduct, described above, would satisfy each of those elements if it had been committed here.

b.   The Wiretapping Charges Are Extraditable Offenses

The wiretapping offenses against Martinelli Berrocal are extraditable offenses because they are encompassed by the Budapest Convention, which enumerates "illegal access" and "illegal interception."  *See* Budapest Convention, Arts. 2 & 3, App'x to Declaration of Susan R. Benda (DE 8).  Article 167 of the Criminal Code of Panama (interception of telecommunications without judicial authorization) provides: "Whoever, without the authorization of the judicial authority, intercepts telecommunications or uses technical devices for listening, transmission, recording, or reproducing conversations that are not for the public shall be punished from two to four years in prison" (RAMB000031).  Article 168 of the same code (tracking, persecution, and surveillance without judicial authorization) provides: "Whoever, without proper authorization, practices tracking, persecution, or surveillance against a person, for illicit purposes, shall be punished from two to four years in prison.  The same punishment is imposed on anyone who sponsors or promotes these facts" (*id.*).  These two charges meet the Budapest Convention's dual criminality requirement because Martinelli Berrocal's conduct is "punishable under the laws of both Parties concerned by deprivation of liberty for a maximum period of at least one year, or by a more severe penalty."  Budapest Convention, Art. 24(1)(a), App'x to Declaration of Susan R. Benda (DE 8).  If Martinelli Berrocal had committed the offenses in the United States, his conduct would be criminal under U.S. law, including, for example, as illegal interception of communications in violation of 18 U.S.C. § 2511(1)(a), for which the maximum term of imprisonment is five years, *see id.* § 2511(4)(a).  The elements required for a conviction under Section 2511(1)(a) are as follows: (1) the intercepting, endeavoring to intercept, or procuring any other person to intercept a wire, oral,

or electronic communication; and (2) the doing of such acts intentionally.[5]  *See, e.g.*, *United States v. Townsend*, 987 F.2d 927, 930 (2d Cir. 1993); U.S. Attorney's Manual, Ch. 1052, https://www.justice.gov/usam/criminal-resource-manual-1052-elements-section-2511-offenses. Martinelli Berrocal's conduct would satisfy each of those elements if it had been committed here.

Dual criminality is not defeated because, as Martinelli Berrocal has previously alleged "were President Donald Trump to engage in the same conduct [as Martinelli Berrocal] during his tenure as United States president, it would likely not qualify as a crime."  *See* DE 18, at 13.  In support of his argument, Martinelli Berrocal claims that a U.S. President may conduct surveillance without obtaining judicial authorization "to acquire foreign intelligence information" or "for national security purposes."  *Id.*  But even if that is true, that is not the type of conduct Martinelli Berrocal is alleged to have engaged in in Panama.

     5.     <u>Panama's Evidence Establishes Probable Cause that Martinelli Berrocal Committed the Charged Offenses</u>

The standard of proof to find the evidence "sufficient to sustain the charge . . ." pursuant to Section 3184 is the familiar domestic requirement of probable cause.  The Court must conclude there is probable cause to believe that the crimes charged by Panama were committed and that the person before the Court committed them.  *Castro Bobadilla*, 826 F. Supp. at 1432.  The evidence is sufficient, and probable cause is established, if it would cause a "prudent man" to "believ[e] that

---

[5] Section 2511 reads in part: "Except as otherwise specifically provided in this chapter any person who . . . intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication . . . shall be punished as provided in subsection (4)."  In addition to the elements enumerated above, a wire communication must be furnished or operated by a person engaged in providing facilities for the transmission of interstate or foreign communications or communications affecting interstate or foreign commerce; an oral communication must be uttered by a person having a justifiable expectation of privacy; and an electronic communication must be made through a system that affects interstate or foreign commerce.

the (suspect) had committed or was committing an offense." *Gerstein v. Pugh*, 420 U.S. 103, 111 (1975) (internal quotation marks and citation omitted); *see also Collins*, 259 U.S. at 316 ("The function of the committing magistrate is to determine whether there is competent evidence to justify holding the accused to await trial, and not to determine whether the evidence is sufficient to justify a conviction."); *Fernandez*, 268 U.S. at 312 (1925) ("Competent evidence to establish reasonable grounds is not necessarily competent evidence to convict."). *Accord Afanasjev*, 418 F.3d at 1165 n.11.

The extradition judge's probable cause determination is "not a finding of fact 'in the sense that the court has weighed the evidence and resolved disputed factual issues,'" but instead "'serve[s] only the narrow function of indicating those items of submitted evidence on which the decision to certify extradition is based.'" *Quinn*, 783 F.2d at 791 (citation omitted). Accordingly, probable cause in an extradition proceeding may not be defeated when a fugitive, such as Martinelli Berrocal alleges that the evidence submitted by the requesting country contains inconsistencies. *Cf.* DE 36 (alleging inconsistencies regarding the embezzlement charges vis-à-vis MLM and NSO equipment); *see, e.g.*, *Shaw*, 2015 WL 3442022, at *7-11 (finding probable cause despite fugitive's arguments that the evidence against him was "unreliable, contradictory, inconsistent, unbelievable, and inadmissible"); *In re Extradition of Figueroa*, No. 12-M-269, 2013 WL 3243096, at *8 (N.D. Ill. June 26, 2013) ("In sum, although we agree with [the fugitive] that the evidence that Mexico has provided is by no means perfect, the issue before us is not whether [he] should be convicted of the crime. . . . Although there may be some inconsistencies in the record, we do not believe that these are so compelling as to negate a finding of probable cause."); *Castro Bobadilla*, 826 F. Supp. at 1433-34 (upholding probable cause finding despite "contradictions in the evidence [that] may create a reasonable doubt as to [the fugitive's] guilt"). This principle accords with the fact that an

31

extradition hearing is only preliminary in nature and is not a determination of guilt; accordingly, the resolution of any inconsistencies in the record, as well as the weighing of inculpatory with exculpatory evidence, are tasks that are properly left to the courts in the requesting country.  *See, e.g.*, *Collins*, 259 U.S. at 316; *Neely v. Henkel*, 180 U.S. 109, 123 (1901); *In re Extradition of Nunez-Garrido*, 829 F. Supp. 2d 1277, 1282 (S.D. Fla. 2011).

Here, the evidence described above and summarized in the addendum attached hereto establishes probable cause that Martinelli Berrocal committed the four charged offenses. Addendum.[6]

### C.    The Court Should Defer to the Government of Panama on Issues of Panamanian Law

Martinelli Berrocal has raised a number of issues of Panamanian law, none of which provides a valid defense to a finding of his extraditability.  In resolving these issues, the Court should defer to the view of the Government of Panama in interpreting its own law.  *See, e.g.*, *Basic v. Steck*, 819 F.3d 897, 901 (6th Cir. 2016) (concluding that "[w]e will not second guess th[e] determination" by the Government of Bosnia that a "[d]irective to find and arrest" the fugitive constituted the "arrest warrant" required under the applicable extradition treaty); *Skaftouros v. United States*, 667 F.3d 144, 160 n.20 (2d Cir. 2011) (noting that "we defer to the Greek courts, which may consider whether [the fugitive] or the Greek prosecutors have the better of the

---

[6] The person arrested in this case has admitted that he is President Ricardo Martinelli Berrocal, *see, e.g.*, DE 18, at 2, whom multiple witnesses have implicated in the alleged wiretapping scheme, *see, e.g.*, Supp. Aff. of Harry Diaz, at 4-5.  Moreover, the person who has appeared before this Court strongly resembles the person in the photograph of Martinelli Berrocal provided by the Electoral Tribunal of Panama, which was included in the extradition request, Exh. 9 at 2804 (RAMB002771).  Accordingly, there is probable cause that the person before the Court is the person alleged to have committed embezzlement and illegal wiretapping and surveillance in Panama.

argument" regarding whether the warrant underlying the extradition request was valid under Greek law); *In re Extradition of Jimenez*, No. 14-2319-SAG, 2014 WL 7239941, at *1-2 (D. Md. Dec. 16, 2014) (noting that the court would not "question the reliability or trustworthiness of a judicial decree from a foreign nation" which stated that the fugitive's sentence had not lapsed, despite the fugitive's claim to the contrary); *In re Extradition of Robertson*, No. 11-MJ-0310, 2012 WL 5199152, at *7-12 (E.D. Cal. Oct. 19, 2012) (declining to examine Canadian law and Canada's representation that a "long term supervision order" forms part of the fugitive's sentence and is not separate therefrom); *In re Extradition of Basic*, No. 5:11–MJ–5002–REW, 2012 WL 3067466, at *19 (E.D. Ky. July 27, 2012) ("declin[ing] to weigh the extent of [Bosnia's] procedural compliance with its own laws" because "[t]his court is ill-equipped to parse Bosnian or Republika Srpska practice for the fine technical points on the topic of warrant issuance").

Indeed, it is not the role of U.S. judges presiding over extradition proceedings to opine on a foreign government's interpretation of its own law. *See, e.g.*, *Grin*, 187 U.S. at 190 ("[I]t can hardly be expected of us that we should become conversant with the criminal laws of Russia, or with the forms of warrants of arrest used for the apprehension of criminals."); *In re Mathison*, 974 F. Supp. 2d 1296, 1310 (D. Or. 2013) ("An American extradition court is neither equipped nor empowered to interpret and apply the Mexican constitution or to determine was rights it bestows upon the individuals charged with violating Mexican laws"). "Any arguments regarding the demanding country's compliance with its own laws . . . are properly reserved for the courts of that country." *Skaftouros*, 667 F.3d at 156.

The principle that a foreign government should not be required to prove to a U.S. judge that it is properly construing its own laws is supported by general notions of international comity and respect for foreign nations' sovereignty. *See, e.g.*, *Sainez v. Venables*, 588 F.3d 713, 717 (9th Cir.

2009) ("[W]e have declined to rule on the procedural requirements of foreign law out of respect for other nations' sovereignty . . . ."); *Koskotas v. Roche*, 931 F.2d 169, 174 (1st Cir. 1991) ("Extradition proceedings are grounded in principles of international comity, which would be ill-served by requiring foreign governments to submit their purposes and procedures to the scrutiny of United States courts."); *In re Application for an Order for Judicial Assistance in a Foreign Proceeding in the Labor Court of Brazil*, 466 F. Supp. 2d 1020, 1028 (N.D. Ill. 2006) ("American courts should treat foreign law the way American courts want foreign courts to treat American law: avoid determining foreign law whenever possible.").  It is further supported by the prudential policy of avoiding the high risk that a U.S. court might erroneously interpret the law of a foreign country.  *See Sainez*, 588 F.3d at 717 ("[W]e recognize the chance of erroneous interpretation is much greater when we try to construe the law of a country whose legal system is not based on common law principles.") (internal quotation marks and citation omitted); *In re Assarsson*, 635 F.2d 1237, 1244 (7th Cir. 1980), *cert. denied*, 451 U.S. 938 (1981) ("We often have difficulty discerning the laws of neighboring States, which operate under the same legal system as we do; the chance of error is much greater when we try to construe the law of a country whose legal system is much different from our own.  The possibility of error warns us to be even more cautious of expanding judicial power over extradition matters.").  For the foregoing reasons, the Court should decline to second-guess the conclusions of the Panamanian government regarding its law, which are set forth below.

    1.  <u>Panama Has Followed the Proper Procedure in its Case Against Martinelli Berrocal</u>

  Martinelli Berrocal has argued that several aspects of Panamanian procedure have been violated, including that Panama's warrant fails to recite extraditable offenses, DE 12, at 2; its

indictment is invalid because it failed to allow for the *imputación* phase (the hearing at which a defendant is informed of the charges against him) of the criminal proceeding against him, DE 18, at 10; and it cannot rely on the evidence set forth in Ismael Pitti's affidavit dated January 23, 2017, because Pitti was not properly announced as a witness in the criminal case, *id.* at 9.   As the Government of Panama has explained, none of these arguments has merit.

Although this Court already rejected Martinelli Berrocal's argument that Panama failed to produce a proper warrant, DE 38, at 25, Panama has since further confirmed that the warrant underlying its extradition request comports with Panamanian procedure.[7]   Indeed, the Government of Panama has unequivocally stated that the arrest warrant "complies with all legal requirements." Supp. Aff. of Harry Diaz ¶ 55.   It has explained that a copy of the accusation against Martinelli Berrocal was provided to his defense counsel on November 16, 2015, and a hearing on the charges was set for December 11, 2015.   *Id.* ¶ 52.   When Martinelli Berrocal failed to appear for that hearing, a warrant for his arrest was properly issued pursuant to Article 158 of Panama's Code of Criminal Procedure, which provides that when a defendant fails to appear when summoned, he "shall be declared in contempt and his provisional detention shall be ordered."   *Id.*   The warrant does not need to enumerate the specific charges for which the defendant failed to appear.   *See id.* ¶¶ 52-55.   In light of the Panamanian government's assertion that its warrant is proper, this Court should not find otherwise.

---

[7] Panama previously explained that its warrant serves as "the basis for detaining [Martinelli Berrocal] on . . . the charges for which his extradition was requested" and comports with Panamanian criminal procedure law.   Diaz Declaration, DE 22-1, ¶¶ 5-6.   Moreover, the U.S. Department of State has expressed its view that the warrant requirement of the Treaty has been satisfied—a view to which this Court should defer.   *See* DE 22, at 10-11; Declaration of Tom Heinemann, Assistant Legal Adviser for Law Enforcement and Intelligence in the Office of the Legal Adviser, Department of State (June 20, 2017), DE 22-1, ¶ 7.

The Government of Panama also disputes Martinelli Berrocal's suggestion that it failed to follow the proper process by foregoing the *imputación* phase of the investigation against him (DE 18, at 10).  In its extradition request, the Panamanian government provided an overview of the process applicable to its prosecution of Martinelli Berrocal.  DE 22-2, at 6-9.  It explained that, under its law, different procedures apply to general prosecutions (of anyone subject to Panama's jurisdiction) and to special prosecutions (of people holding special positions of authority such as PARLACEN Deputies).  *Id.* at 6-7; *see also* Supp. Aff. of Harry Diaz ¶¶ 43-45.  In its recent supplement, the Panamanian government has further clarified that an *imputación* is required in the case of the former—but not in the latter—to provide the defendant with notice of the charges against him.  Supp. Aff. of Harry Diaz ¶¶ 45-46.  For special prosecutions, such as the prosecution of Martinelli Berrocal, instead of an *imputación*, the defendant is provided notice of the charges against him through a detailed written complaint describing, *inter alia*, the acts underlying the crimes of which he is accused and the evidence proving those acts.[8]  *Id.* ¶¶ 47-48.  Thus, no *imputación* was required in Martinelli Berrocal's case.  *Id.* ¶ 50.  Regardless, the Government of Panama has affirmed that Martinelli Berrocal "has been allowed to exercise fully the guarantees and rights recognized in the Law, the Constitution, and the International Treaties and Conventions, which have been signed by the Republic of Panama, . . . and has been guaranteed the right to know the crimes of which he is being accused and the evidence that support these allegations."  *Id.* ¶ 51.  This Court should defer to its analysis in this regard.

---

[8] In its extradition request, the Government of Panama noted that in a general proceeding, an investigation may be initiated merely upon the filing of a report of a crime with the police or prosecution office, without any specific evidentiary showing.  Aff. of Jerónimo Emilio Meíja Edward, DE 22-2, at 6-7.  By contrast, in a special proceeding, an investigation may only be initiated by filing a complaint that demonstrates "*prueba idónea*," which is essentially equivalent to probable cause.  *Id.*

36

It should similarly defer to the Government of Panama with respect to its assertion that it may be able to rely on the affidavit provided by Ismael Pitti in its proceeding against Martinelli Berrocal, despite Martinelli Berrocal's suggestion to the contrary (DE 18, at 9).  The affidavit has not yet been incorporated into the records of Panama's investigation because the proceedings were suspended after Martinelli Berrocal failed to appear when summoned in the case.  *See* Supp. Aff. of Harry Diaz ¶ 42.  However, according to the Government of Panama, once the proceedings are reopened, Article 385 of its Criminal Procedure Code will permit the prosecution to introduce the affidavit into the record at that time.  *Id*.  Accordingly, the fact that the affidavit is not currently part of the record in Panama does not necessarily prevent it from later being used in the prosecution against Martinelli Berrocal.[9]

### 2.   A Claim of Immunity Does Not Present a Valid Defense to Extradition

Martinelli Berrocal's claim that he cannot be prosecuted for the four Panamanian offenses because he has immunity—either as the former President of Panama pursuant to Article 191 of the Panamanian Constitution, or as a current member of the Central American Parliament ("PARLACEN")—is unfounded and unavailing in this extradition proceeding.  *See* DE 18, at 9-10.  As an initial matter, this Court has already found that "[i]mmunity is a defense Pres. Martinelli may raise if he is tried in Panama."  DE 38, at 25.  Indeed, it is not a proper consideration in an extradition proceeding.  *See, e.g.*, *DeSilva v. DiLeonardi*, 125 F.3d 1110, 1112 (7th Cir. 1997) ("Affirmative defenses not specified in the treaty may not be considered."); *Shaw*, 2015 WL

---

[9] Furthermore, particularly given that the U.S. federal rules of evidence do not apply in extradition proceedings, *see Afanasjev v. Hurlburt*, 418 F.3d 1159, 1164-65 (11th Cir.), *cert. denied*, 546 U.S. 993 (2005); Fed. R. Evid. 1101(d)(3); it would be nonsensical for an extradition court to consider foreign rules of evidence.

3442022, at *4 ("Courts have determined that affirmative defenses to the merits of the charge(s) are not to be considered at extradition hearings.") (citing cases).

Moreover, the Government of Panama has explained that neither Article 191 of its Constitution nor PARLACEN provides Martinelli Berrocal with immunity for the charges pending against him. According to the Government of Panama, Article 191 establishes the forum in which criminal charges against a president or former president may be heard (*i.e.*, the Supreme Court of Justice), but "does not prevent any President or former President from being investigated and tried for any offense he committed before he was President or during the time he was President." Supp. Aff. of Harry Diaz ¶ 35. Also according to the Government of Panama, PARLACEN Deputies, such as Martinelli Berrocal, has "the immunities enjoyed by the Representatives of the State where they were elected before their Congresses, Legislative Assemblies or National Assemblies"; however, Panamanian Deputies have no immunity in criminal matters. *Id.* ¶ 36. Therefore, Martinelli Berrocal "is not protected by immunity either as acting or former head of state, or as a member of PARLACEN." *Id.* ¶ 34. Even if this Court were to reconsider the issue of immunity, it should defer to the determination of Panama that Martinelli Berrocal enjoys no immunity from its charges.

### D.   The Political Offense Exception to Extradition Does Not Apply

1.   <u>The Offenses for Which Extradition Was Requested Are Not Political Offenses</u>

This Court properly rejected Martinelli Berrocal's argument that the four Panamanian offenses pending against him are "of a political character" such that he may not be extradited on them pursuant to Article VI of the Treaty. In particular, the Court found that "[o]ur review of the current record shows that none of the crimes with which Pres. Martinelli is charged appear to fall

within any relevant definition of [the prototypical "pure" political offenses of] 'treason, espionage, or sedition.'"   DE 38, at 27; *see also* Treaty, Article VI, App'x to Declaration of Susan R. Benda (DE 8) (providing that neither party will surrender a fugitive if the extraditable offense is of a "political character" or if the fugitive can prove that the request for extradition has "been made with a view to try or punish him for an offense of a political character").[10]

Martinelli Berrocal argues that the Panamanian offenses "sound in sedition" because they "are premised on President Martinelli's alleged misappropriation of government property (the surveillance system) to spy on then-current members of the Panamanian government and use the collected information against them," DE 18, at 13; but this argument is entirely misplaced.  As the government has previously explained, pure political offenses affect only the public interest and do not have any of the elements of a common crime.  DE 32, at 3 (citing *Ordinola v. Hackman*, 478 F.3d 588, 596 (4th Cir. 2007)); *Quinn*, 783 F.2d at 793; *In re Extradition of Sacirbegovic*, No. 03 CR. MISC. 01PAGE1, 2005 WL 107094, at *19 (S.D.N.Y. Jan. 19, 2005); *United States v. Avdic*, No. CR 07-M06, 2007 WL 1875778, *9 (D.S.D. Jun. 28, 2007)).  By contrast, the Panamanian offenses—which involve embezzlement and misuse of money and property, wiretapping of nonpublic conversations, and surveillance of private individuals—affect private interests and share at least some elements of common crimes.  The fact that the offenses involve government property and some victims who were government officials does not thereby convert the offenses into political offenses.  *See, e.g.*, *Escobedo v. United States*, 623 F.2d 1098, 1104 (5th Cir. 1980)

---

[10] Martinelli Berrocal has made no argument that the Panamanian offenses are "relative" political offenses, nor can he.  *See Meza v. U.S. Attorney Gen.*, 693 F.3d 1350, 1359 (11th Cir. 2012), *cert. denied*, *Meza v. Holder*, 133 S. Ct. 933 (2013) (to prove that extradition is sought for a "relative" political offense, fugitive must establish (1) the existence of an uprising or other violent political disturbance at the time of the charged offense; and (2) that the offense was incidental to or in furtherance of the uprising).

(attempted kidnapping of the Cuban Consul in Mexico not a political offense), *cert. denied*, 449 U.S. 1036 (1980); *Jhirad v. Ferrandina*, 536 F.2d 478, 485 (2d Cir. 1976) (embezzlement by public official "not in any sense a political offense"), *cert. denied*, 429 U.S. 833 (1976); *In re Solis*, 402 F. Supp. 2d 1128, 1130 (C.D. Cal. 2005) (rejecting fugitive's argument that the "killing of a political figure is sufficient to transform the crime into a political offense or one of a political character").

Moreover, Panama has confirmed that the offenses for which it has requested Martinelli Berrocal's extradition are "for common crimes" and are not related to the crimes of sedition, espionage or treason in any way.  Supp. Aff. of Harry Diaz ¶ 37.  Rather, other provisions of Panamanian law criminalize those "pure" political crimes.  *Id.* ¶ 38.

### 2.   Any Alleged Political Motivation Is Not a Defense to Extraditability

Relatedly, Martinelli Berrocal's allegations regarding the purported "transparently political nature of the charges" are also unavailing in this proceeding.  *See* DE 18, at 16.  As explained previously by the government, although Article VI of the Treaty prohibits extradition where a request has "been made with a view to try or punish [the fugitive] for an offense of a political character," the determination of whether a request of extradition has been made with such a view rests exclusively with the Secretary of State.  DE 1, at 25-26; *see also* Treaty, Art. VI, App'x to Declaration of Susan R. Benda (DE 8) ("If any question shall arise as to whether a case comes within the provisions of this article, the decision of the authorities of the government on which the demand for surrender is made . . . shall be final.").  Similarly, any questions of political motivation more generally are also reserved for consideration exclusively by the Secretary. *See, e.g.*, *Ordinola*, 478 F.3d at 604-05 ("the motives of the requesting government are irrelevant to our decision" and "must be addressed to the Secretary of State"); *Koskotas*, 931 F.2d at 174

("Extradition proceedings are grounded in principles of international comity, which would be ill-served by requiring foreign governments to submit their purposes and procedures to the scrutiny of United States courts."); *Eain v. Wilkes*, 641 F.2d 504, 516 (7th Cir. 1981) ("[E]valuations of the motivation behind a request for extradition so clearly implicate the conduct of this country's foreign relations as to be a matter better left to the Executive's discretion."), *cert. denied*, 454 U.S. 894 (1981); *In the Matter of the Extradition of Marzook*, 924 F. Supp. 565, 578 (S.D.N.Y. 1996) ("[T]he political motivation of the prosecution is not a business in which this court may delve."); *In the Matter of the Extradition of Pazienza*, 619 F. Supp. 611, 621 (S.D.N.Y. 1985) (relying on "the longstanding rule of 'non-inquiry' under which United States courts generally defer to the State Department on questions of whether the requesting State's motive is political"). Accordingly, any claim based on the political nature of the extradition request or the underlying offenses is not a valid defense to a determination of Martinelli Berrocal's extraditability.

## IV.  CONCLUSION

WHEREFORE, the United States requests that the Court certify to the Secretary of State that Martinelli Berrocal is extraditable to Panama on each of the charges for which his extradition

is requested.


Dated: August 1, 2017                                    Respectfully submitted,


                                                          BENJAMIN G. GREENBERG
                                                          ACTING UNITED STATES ATTORNEY

                                    By:   /s/Adam S. Fels
                                          ADAM S. FELS
                                          Assistant United States Attorney
                                          Court Identification No. A5501040
                                          99 Northeast 4th Street
                                          Miami, Florida 33132-2111
                                          Tel: (305) 961-9325, Fax: (305) 536-7213
                                          Email: adam.fels@usdoj.gov

                                          /s/ Christopher J. Smith
                                          CHRISTOPHER J. SMITH
                                          Acting Associate Director
                                          Office of International Affairs
                                          Criminal Division
                                          U.S. Department of Justice
                                          Court ID No. A5502264
                                          1301 New York Avenue NW
                                          Washington, D.C. 20530
                                          Tel: (202) 532-4254
                                          Fax: (202) 514-0080

                                          /s/ Rebecca A. Haciski
                                          REBECCA A. HACISKI
                                          Trial Attorney
                                          Office of International Affairs
                                          Criminal Division
                                          U.S. Department of Justice
                                          Court ID No. A5502265
                                          1301 New York Avenue NW
                                          Washington, D.C. 20530
                                          Tel: (202) 616-2534
                                          Fax: (202) 514-0080

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on August 1, 2017, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.

s/ *Adam S. Fels*
Assistant United States Attorney
