SECOND SUPPLEMENTAL DECLARATION OF TOM HEINEMANN

Pursuant to Title 28, United States Code, Section 1746

I, Tom Heinemann, hereby declare and say as follows:

1.  I am the Assistant Legal Adviser for Law Enforcement and Intelligence in the Office of the Legal Adviser, Department of State, Washington, D.C., the office responsible for extradition requests within the Department of State.  This declaration is intended to supplement the declarations previously submitted by Susan R. Benda and myself in order to provide additional information in the extradition request of Ricardo Alberto Martinelli Berrocal (Martinelli).

2.  On July 31, 2017, the Embassy of Panama presented the Department of State with Diplomatic Note NV-17-046, dated July 31, 2017, forwarding an affidavit issued by the Supreme Court of Justice, Prosecutor Magistrate and Guarantees Magistrate, and endorsed by the Ministry of External Relations of the Government of Panama, related to the extradition case of Martinelli. A copy of the affidavit is attached.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on July 31, 2017.

TOM HEINEMANN



**EMBAJADA DE PANAMÁ**
**ESTADOS UNIDOS**
**DE AMÉRICA**

L/LEI

2017 JUL 31 P 4: 38

DEPARTMENT OF STATE

NV-17-046

The Embassy of Panama presents its compliments to the Department of State and has the honor to refer to the **REQUEST OF PROVISIONAL ARREST AND EXTRADITION OF RICARDO ALBERTO MARTINELLI BERROCAL** to the Republic of Panama for the Crimes Against the Inviolability of the Secret and the Right to Privacy (Interception of Telecommunications without Judicial Authorization and Tracking, Persecution, and Surveillance without Judicial Authorization), as well as the Crimes Against the Public Administration, Different Kinds of Embezzlement (Embezzlement by Theft and Misappropriation and Embezzlement of Use), based on the Bilateral Extradition Treaty between the Republic of Panama and the United States of America signed in 1904, the Budapest Convention on Cybercrime signed in 2001 and the United Nations Convention against Corruption adopted in New York in 2003, as requested by the Supreme Court of Justice of the Republic of Panama.

In response to the request from the Department of Justice, the Embassy of Panama has the honor to submit the following documents:

- Affidavit issued by the Supreme Court of Justice, Prosecutor Magistrate (Magistrado Fiscal) and Guarantees Magistrate (Magistrado de Garantías), signed and sealed in Spanish duly translated to English.

The Embassy of Panama avails itself of this opportunity to express to the United States Department of State, the renewed assurances of its highest consideration.

Washington, D.C., July 31, 2017



*U.S. Department of State*
*Mr. THOMAS HEINEMANN*
*Office of the Legal Advisor, Law Enforcement and Intelligence*
*L/LEI Room 5419*
*2201 C. Street N.W.*
*Washington D.C. 20520*

*C.C.  Mrs. SUSAN BENDA, Office of the Legal Advisor, Law Enforcement and Intelligence*

EMBAJADA DE PANAMÁ, 2862 McGILL TERRACE NW, WASHINGTON D.C., 20008, ESTADOS UNIDOS DE AMÉRICA
TEL: (001) 202.483.1407, FAX: (001) 202.483.8413, CORREO ELECTRÓNICO: info@embassyofpanama.org



**REPÚBLICA DE PANAMÁ**
**Ministerio de Relaciones Exteriores**

PANAMÁ 4, PANAMÁ

31 de julio de 2017
**A. J. - MIRE-2017-62313**

Señor Embajador:

Tengo el agrado de dirigirme a usted en ocasión de hacer referencia a la solicitud recibida en el día de hoy, relativa a la solicitud de extradición del señor **RICARDO MARTINELLI BERROCAL.**

Sobre el particular, tengo a bien remitirle la declaración solicitada por el Departamento de Justicia del Gobierno de los Estados Unidos de América, con su respectiva traducción de cortesía en el idioma inglés.

Aprovecho la oportunidad para reiterar a Vuestra Excelencia las seguridades de mi más alta y distinguida consideración.

**FARAH DIVA URRUTIA**
Directora General de Asuntos Jurídicos y Tratados

A Su Excelencia
**EMANUEL GONZÁLEZ REVILLA**
Embajador de Panamá
Washington D.C., Estados Unidos de América

SOLICITUD DE EXTRADICION Y DE
ARRESTO CON FINES DE
EXTRADICION DEL CIUDADANO
RICARDO ALBERTO
MARTINELLI BERROCAL

CARPETILLA 138-2015

DECLARACION JURADA
DEL MAGISTRADO FISCAL

1. Yo, Harry A. Díaz, declaro bajo juramento y hago constar que:

2. Soy ciudadano panameño, con cédula de identidad personal ocho-
doscientos treinta y seis-setecientos ochenta y nueve (8-236-789), varón,
casado, con residencia en la ciudad de Panamá, República de Panamá.
Soy Magistrado de la Sala Penal de la Corte Suprema de Justicia de la
República de Panamá desde el 16 de Junio de 2011.

3. He sido asignado por el  Pleno de la Corte Suprema de Justicia de la
República de Panamá como *El Magistrado Fiscal*, dentro de la causa
identificada bajo el número de carpetilla 138-2015, seguida al Diputado del
Parlamento Centroamericano **(PARLACEN)** y ex Presidente de la
República de Panamá, **RICARDO ALBERTO MARTINELLI BERROCAL**,
al cual se le sigue proceso por la comisión de los delitos **CONTRA LA
INVIOLABILIDAD DEL SECRETO Y EL DERECHO A LA INTIMIDAD**
contemplados en los artículos 167 (interceptación de telecomunicaciones
sin autorización judicial) y 168 (seguimiento, persecución y vigilancia sin
autorización judicial), así como los delitos **CONTRA LA ADMINISTRACIÓN
PÚBLICA**, Diferentes formas de Peculado, contemplados en los artículos
338 (Peculado por sustracción o malversación) y 341 (Peculado de Uso).

4. Como *Magistrado Fiscal* llevé a cabo la investigación en contra del
Diputado **RICARDO ALBERTO MARTINELLI BERROCAL** y he presentado
acusación en su contra, por lo que me encuentro familiarizado con los
hechos que han dado lugar a la misma, así como con los cargos, la
evidencia en su contra y el derecho aplicable.

5. Los hechos que se exponen en la presente declaración jurada se
encuentran narrados con base en mi conocimiento personal, la información
que me ha sido brindada por instituciones estatales, las entrevistas de los
testigos y otras fuentes de información. Lo que se presenta constituye un
resumen de los hechos que he manejado durante la investigación y no
refleja en su totalidad mi conocimiento de la misma. La evidencia que se
menciona en esta declaración jurada no representa toda la evidencia
recolectada en el desarrollo de la investigación. Los números de "Exhibits" y
los números de página que se citan en esta declaración jurada
corresponden a la numeración de la traducción al inglés de las "Pruebas"
que fueron aportadas por *El Magistrado de Garantías* con la Solicitud de
Extradición y Arresto con Fines de Extradición del Ciudadano Panameño
Ricardo Alberto Martinelli Berrocal, las cuales he revisado:

1

I. EXPLICAR EL ALCANCE DEL CARGO DE MALVERSACIÓN DE FONDOS. ¿QUÉ FONDOS SE ALEGA QUE EL SEÑOR RICARDO MARTINELLI BERROCAL MALVERSÓ (EQUIPOS NSO Y MLM), Y QUÉ PRUEBAS HAY EN LA SOLICITUD DE EXTRADICIÓN QUE APOYE ESTOS ALEGATOS (INCLUYENDO PRUEBAS QUE SEÑALEN COMO EL SEÑOR RICARDO MARTINELLI UTILIZÓ LOS EQUIPOS NSO Y MLM PARA INTERVENIR LINEAS TELEFONICAS, Y PRUEBAS DE QUE FUERON UTILIZADOS FONDOS PÚBLICOS PARA EFECTUAR LA COMPRA DE LOS EQUIPOS NSO)?

## LOS CARGOS DE PECULADO

### A. PRUEBAS QUE DEMUESTRAN LA ADQUISICION, EL USO Y LA APROPIACION DE LOS EQUIPOS Y SISTEMAS QUE SE USARON PARA COMETER LOS DELITOS.

**Pruebas de la compra del equipo/sistema tecnológico a la empresa israelí MLM PROTECTION LTD.**

6. En el año 2010, dando cumplimiento a un compromiso que adquirió el Presidente de la República Ricardo Martinelli, el Director Ejecutivo del Fondo de Inversión Social suscribió el contrato No. 045/2010 mediante el cual le compró a la empresa privada de origen israelí MLM Protection Ltd. un equipo/sistema tecnológico con capacidad para interceptar llamadas telefónicas, computadoras, realizar geolocalización, captura de audio ambiente, entre otras funciones (Véase el Exhibits 4 de 9, páginas 838, 841 y 981-1056).

7. Este equipo/sistema tecnológico tuvo un costo de trece millones cuatrocientos setenta y cinco mil balboas (B/. 13, 475,000.00) (Véase el Exhibits 3 de 9, página 828), los cuales fueron pagados por el gobierno de Panamá (Véase el Exhibits 5 de 9, página 1277-1291).

8. El contrato firmado con MLM Protection Ltd. incluyó un equipo tecnológico, software, instalación entrenamiento y mantenimiento de un sistema de cuatro componentes: PSS Surveillance System, Circles, Software Biométrico de Voz y Cogito. (Véase Exhibits 4 de 9, páginas 981 a 1056). Este equipo servía para intervenir computadoras (Véase Exhibits 4 de 9, página 1026) y teléfonos celulares (Véase Exhibits 4 de 9, página 1045).

9. El producto descrito en el contrato fue despachado por MLM Protection Ltd. (Véase el Exhibits 3 de 9, página 828); recibido por el señor Gustavo Perez (Véase el Exhibits 4 de 9, página 1173) e instalado en Panamá (Véase el Exhibits 4 de 9, página 1169, 1171 y 1173).

2

**Pruebas de la compra del equipo/sistema tecnológico a la empresa NSO GROUP TECHNOLOGIES, LTD.**

10. El Consejo de Seguridad Nacional celebró un Acuerdo para comprarle a NSO GROUP Technologies un equipo tecnológico denominado Sistema Pegasus, a un costo de ocho millones de dólares de los Estados Unidos (US $. 8,000.000.00) (Véase el Exhibits 2 de 9, página 608).

11. Según el Acuerdo, el propósito final de este equipo tecnológico era la recolección y recopilación de información de dispositivos móviles para el uso exclusivo del Gobierno de Panamá (Véase el Exhibits 2 de 9, páginas 614).

12. En el acuerdo mediante el cual se compró el Sistema Pegasus se estableció que, para poder que se despachara el producto, era necesario que el Consejo de Seguridad le enviara a NSO Group Technologies Ltd. el certificado de usuario final del mismo y que el Consejo de Seguridad debía pagar el precio de la venta a más tardar tres (3) días después de completar la instalación y el entrenamiento descrito en el Anexo A de ese acuerdo (Véase el Exhibits 2 de 9, páginas 609-611).

13. NSO Group Technologies Ltd. certificó el 01 de julio de 2015 que "...instaló el sistema Pegasus en la ciudad de Panamá después de recibir la trasferencia de 8 millones de dólares EE.UU...", que el entrenamiento y la instalación del Usuario Final para el uso del sistema fue realizado en la ciudad de Panamá y que recibió la certificación de usuario final firmada por Gustavo Pérez, en la que se expresa que el usuario final era el Consejo de Seguridad Nacional (Véase el Exhibits 2 de 9, página 608 y 614).

**Pruebas de que el acusado RICARDO MARTINELLI BERROCAL, siendo Presidente de la República de Panamá y Presidente del Consejo de Seguridad, escogía los "objetivos" a los que se debía intervenir y afectar sus derechos a la inviolabilidad del secreto y el derecho a la intimidad.**

14. El señor Ricardo Martinelli Berrocal preparó el terreno que le facilitó la violación de los derechos a la inviolabilidad del secreto y a la intimidad de personas mediante la interceptación, grabación de comunicaciones, seguimiento y vigilancia y el acceso a sus datos e información.

15. En este sentido, reorganizó el Consejo de Seguridad Pública -que se encontraba integrado hasta ese momento por el Presidente, cuatro (4) Ministros de Estado y el Director del Servicio Nacional de inteligencia y

3

Seguridad- y, en asocio con un Ministro de Estado, dictó el Decreto Ejecutivo 263 del 19 de marzo de 2010, mediante el cual creó el Consejo de Seguridad Nacional como organismo consultivo y asesor del Presidente de la República en materia de Seguridad Pública y defensa nacional, el cual quedó compuesto de sólo dos (2) personas: el propio Presidente, que lo preside, y el Ministro de la Presidencia (Véase el artículo 3 del Decreto Ejecutivo N° 263 de 19 de marzo de 2010, que se aportó como Anexo 1 del Affidavit rendido por el suscrito el 21 de septiembre de 2016, el cual hace parte integrante de la solicitud de extradición y arresto con fines de extradición). Es importante destacar que el Ministro de la Presidencia es de libre nombramiento y remoción de Presidente de la República, según el artículo 183, numeral 1 de la Constitución de la República de Panamá, conforme al cual el Presidente puede "Nombrar y separar libremente a los Ministros de Estado".

16. El artículo 3 del Decreto Ejecutivo 263 de 2010 precisa que el Consejo de Seguridad Nacional es quien fija los objetivos de inteligencia que debe desarrollar la Secretaría Ejecutiva y el artículo 11 del referido Decreto Ejecutivo dispone que el Consejo de Seguridad también debe realizar "Las demás funciones que le asigne el Presidente de la República". El artículo 20 dispone que "Los miembros de la Secretaría serán de libre nombramiento y remoción del Presidente de la República" (Véanse los artículos 3, 11 y 20 del Decreto Ejecutivo N° 263 de 19 de marzo de 2010, que se aportó como Anexo 1 del Affidavit rendido por el suscrito, el 21 de septiembre de 2016, el cual hace parte integrante de la solicitud de extradición y arresto con fines de extradición).

17. Por tanto, si el señor Ricardo Martinelli como Presidente era el que determinaba qué es lo que hacía o no el Consejo de Seguridad Nacional y si el Consejo era el que determinaba qué hacía o no la Secretaría y si la Secretaría era la que se encargaba de hacer los trabajos de invasión a la privacidad a través de los equipos adquiridos a MLM y a NSO Group, entonces el señor Martinelli como Presidente era el que determinaba qué hacía o no la Secretaría, es decir, a quién se le invadía o no su privacidad. Por tanto, como la Secretaría respondía a su órdenes, éste era el medio utilizado por el señor Martinelli para cumplir su objetivo de invadir la privacidad de las víctimas a través de los equipos tecnológicos que se adquirieron a MLM PROTECTION LTD y NSO GROUP  TECHNOLOGIES LTD.

18. Sobre este particular existen declaraciones de los ex Ministros de la Presidencia, Demetrio Papadimitriu Bagatelas y Roberto Henríquez Cohen. El primero declaró que en el Consejo de Seguridad Nacional "no se realizó nunca una junta directiva, nunca se reunió, todo era directo con el

4

Presidente" (Véase el Exhibits 8 de 9, página 2312). Igualmente señaló que la Secretaría "respondía directamente al Presidente" (Véase el Exhibits 8 de 9, página 2314). Por su parte, Roberto Henríquez Cohen declaró que tanto el Consejo como la Secretaría "responden directamente a la Presidencia" (Véase el Exhibits 8 de 9, página 2321).

19. Un testigo que "conoce de primera mano trabajos sucios" que se realizaron en el Consejo de Seguridad Nacional en la administración pasada, manifiesta que en el Consejo se instaló "un sistema de espionaje ilegal" que "era capaz de intervenir todo lo que manejaba...un teléfono sofisticado". Dicho sistema "era operado por un grupo muy cerrado" que "recibía instrucciones específicas, claras y precisas de los lados de la Presidencia. Entre las personas...dentro del grupo cerrado que mencioné se encontraba RONNY RODRIGUEZ, que se conocía con el alias de DIDIER y WILLIAM PITTI conocido por el alias de GUILLERMO" (Véase el Exhibits 1 de 9, página 179). La persona que hizo esta declaración, fue ofrecida en el escrito de acusación por esta Fiscalía como testigo para el juicio.

20. Lo anterior se corrobora por lo declarado por las siguientes personas que trabajaban en el Consejo de Seguridad Nacional:

    a. Gustavo Pérez, Secretario Ejecutivo del Consejo de Seguridad Nacional, quien declaró que cuando llegó al Consejo "ya había un modus operandi de trabajo entre Ronny Rodríguez y la Presidencia" (Véase el Exhibits 8 de 9, página 2279); que "el señor RONNY no reportaba directamente conmigo, debido a que tenía órdenes estrictas de trabajar con la Presidencia" (Véase el Exhibits 8 de 9, página 2266); que cuando el Presidente "hablaba de algo, o sea, cuando él salía en la televisión hablando de que conocía o sabía alguna información de alguien, de Diputados o cualquier otro, se notaba que no venía de mi persona del Consejo, sino de RONNY RODRIGUEZ", quien "entregaba todas las mañanas esos sobres en la Presidencia y el lugar de donde venía él con esos sobres, se me era prohibido entrar" (Véase el Exhibits 8 de 9, página 2280).

    b. Gustavo Serrano, quien indicó que "nosotros teníamos conocimiento que Ronny Rodríguez se manejaba directamente con el señor Presidente de la República y realizaba trabajos que le ordenaba directamente el Presidente" (Véase el Exhibits 7 de 9, página 1868).

    c. Elvin Noget Ortiz González, quien dijo que "Rony manifestaba que se reunía en privado con Ricardo Martinelli y que recibía instrucciones directamente del señor Presidente" y que todas las mañanas recogían a Rony y "lo llevaban a la Presidencia y se le veía con un sobre amarillo el cual lo llevaba a la Presidencia" (Véase el Exhibits 7 de 9, paginas 1831).

5

    d. Júbilo Grael, conductor de Rony Rodríguez quien indicó que "Ronny reportaba directamente al Número 1". De acuerdo a este testigo "el Número 1 en la jerga del Consejo es el Presidente de la República" (Véase Exhibits 7 de 9, página 1978).

    e. Julio Palacios, otro conductor de Ronny Rodríguez, quien dijo que muchas veces Ronny bajaba del edificio 150 "con un sobre amarillo y lo llevaba a la Presidencia" (Véase Exhibits 7 de 9, página 2005).

    f. Miguel Alexander Mendoza, dijo que Ronny "llegaba por la mañana y se retiraba a reunión en la Presidencia" (Véase Exhibits 7 de 9, página 2039).

**Pruebas del uso de Ambos Equipos.**

21. Con la acusación se presentaron pruebas que fueron remitidas con la solicitud de extradición que demuestran que se compraron dos equipos/sistemas tecnológicos. El primero a la empresa israelí MLM Protection Ltd., instalado en Panamá en el año 2011 y que servía para intervenir computadoras y teléfonos celulares (Véase Exhibits 4 de 9, páginas 981 a 1056), y el segundo adquirido en julio de 2012 a otra empresa israelí denominada NSO Group Technologies Ltd. que servía para la recolección y recopilación de información de dispositivos móviles para el "uso exclusivo del Gobierno de Panamá" (Véase el Exhibits 2 de 9, paginas 608, 609 y 615).

22. Para llevar a cabo las intervenciones con los equipos comprados a MLM Protection Ltd. y a NSO Group Technologies Ltd., Ricardo Martinelli asignó a Ronny Rodríguez como Director de Inteligencia del  Consejo de Seguridad, cargo que ejerció desde el 28 de septiembre de 2009 hasta mayo de 2014. En ese lapso Rodríguez recibió varios ascensos y pasó del cargo de Teniente a ocupar el segundo cargo más importante en el escalafón de la Policía Nacional, como sub comisionado (Véase el Exhibits 2 de 9, página 501, 502). RONNY RODRIGUEZ, como se ha visto, es quien recibía órdenes directas del Presidente de la República, Ricardo Martinelli Berrocal.

23. El testigo "de primera mano" explicó que existía un correo electrónico en el que en ocasiones se guardaba informaciones producto de las intervenciones llevadas a cabo con los equipos tecnológicos antes mencionados. Ese correo es brad.pty507 @gmail.com, con la contraseña KATHIA03, al cual se le realizó una diligencia de inspección ocular. En dicha diligencia se obtuvo información que había sido recabada antes y después del 3 de julio de 2012, en virtud de las intervenciones efectuadas a las víctimas a través de ambos sistemas o equipos tecnológicos, lo que

6

comprueba que se utilizaron para cometer los delitos por los que se acusa al señor Ricardo Martinelli. Es importante destacar que el sistema Pegasus fue debidamente recibido en Panamá el 3 de julio de 2012, por lo que la información recabada antes se atribuye al sistema comprado a la empresa MLM PROTECTION LTD., y lo que es de fecha posterior se obtuvo a través de los dos equipos.

24. Se aporta muestra de documentos que se obtuvieron en la diligencia de inspección ocular practicada al correo brad.pty507_@gmail.com que tienen fecha anterior al 3 de julio de 2017, que fueron mostrados a las víctimas y que los reconocieron como suyos:

    a. Zulay Rodríguez reconoció los correos electrónicos de 23 de mayo de 2012 (Véase el Exhibits 8 de 9, página 2381), 9 de mayo de 2012(Véase el Exhibits 8 de 9, página 2382), 26 de abril de 2012(Véase el Exhibits 8 de 9, página 2383) y el chat vía BBPIN del 24 de abril de 2012 (Véase el Exhibits 8 de 9, página 2383), lo que demuestra que el equipo comprado a MLM era capaz de interceptar y acceder al contenido de teléfonos celulares.

    b. Francisco Sánchez Cárdenas reconoció las conversaciones vía BBPIN de 29 de mayo de 2012 (Véase el Exhibits 9 de 9, página 2555) y 10 de mayo de 2012 (Véase el Exhibits 9 de 9, página 2556). También reconoció el audio ambiente grabado de 3 de abril de 2012 (Véase el Exhibits 9 de 9, página 2556) y el correo electrónico de 16 de mayo de 2012 (Véase el Exhibits 9 de 9, página 2555).

    c. Mitchel Constantino Doens Ambrosio reconoció las conversaciones vía BBPIN de 19 de junio de 2012 (Véase el Exhibits 9 de 9, página 2434), 13 de junio de 2012 (Véase el Exhibits 9 de 9, página 2435) y 4 de junio de 2012 (Véase el Exhibits 9 de 9; página 2436); los correos electrónicos de 12 de junio de 2012 y 6 de junio de 2012 (Véase el Exhibits 9 de 9, página 2435).

    d. Erasmo Pinilla reconoció el correo electrónico de 29 de abril de 2012 (Véase el Exhibits 9 de 9, página 2518).

    e. Yassir Purcait reconoció el correo electrónico de 17 de abril de 2012 (Véase el Exhibits 9 de 9, página 2507).

25. De igual modo, se obtuvieron evidencias que acreditan el uso ilícito que se dio después del 3 de julio de 2012 a los sistemas o equipos, comprados a MLM PROTECTION LTD. y NSO GROUP TECHNOLOGIES LTD.:

    a. Jorge Barakat Pitti reconoció el correo electrónico de 11 de abril de 2013 (Véase el Exhibits 9 de 9, página 2569).

    b. Raúl Alberto Sandoval Chiari, reconoció el correo electrónico de 10 de marzo de 2013 (Véase el Exhibits 9 de 9, página 2514).

c. Zulay Rodríguez, reconoció las conversaciones vía wasap de 6 de febrero de 2013 y la agenda de 10 de diciembre de 2012 (Véase el Exhibits 8 de 9, página 2399).

d. Yassir Purcait, reconoció el correo electrónico de 13 de junio de 2013 (Véase el Exhibits 9 de 9, página 2507).

e. Luis Enrique Rivera Calles, perito de informática forense, describe los documentos obtenidos en la diligencia de inspección ocular practicada el 14 de agosto de 2014, al correo electrónico brad507pty@gmail.com y deja constancia que "los correos extraídos hacen referencia a formas de cómo infectar a través de mensajes algunos objetivos resultantes en números telefónicos a través de una plataforma diseñada para capturar y presentar informes de conversaciones telefónicas de diferentes personas ya sea por mensajes de wasap, textos, llamadas y correos electrónicos, utilizando un software especializado que podía capturar e interceptar contactos, mensajes de texto, correos, registros de llamadas, calendarios de cualquier modelo de teléfono celular que la plataforma que se utilizó para ellos pudiera soportar, entre ellos aplicaciones de conversaciones privadas, como Blackberry Messenger" (Véase el Exhibits 9 de 9, página 2706-2707).

26. En la acusación fueron aportadas muchas más evidencias sobre el uso ilícito de los sistemas o equipos que fueron anexadas como pruebas en la extradición. Además existen 7 cuadernillos (Véase el Exhibits 1 de 9, paginas 46-47) y 26 CD que contienen comunicaciones privadas de las víctimas, recabadas durante el periodo de investigación y las cuales tienen un carácter confidencial (Véase el Exhibits 1 de 9, página 57-58).

27. Cabe destacar que Ricardo Martinelli tenía conocimiento sobre comunicaciones privadas que no se podría haber conseguido de otra manera sino a través de la violación de la privacidad de las personas, teniendo acceso a sus comunicaciones privadas. En este sentido, el ex Magistrado Erasmo Pinilla Castillero, quien en ese entonces el presidente del Tribunal Electoral, testificó que Ricardo Martinelli Berrocal le reclamó sobre un asunto que era el tema de un intercambio de correos electrónicos que el Magistrado Pinilla había tenido con terceros. El magistrado Pinilla expresó que "el Presidente MARTINELLI, estaba al tanto del contenido del intercambio de correos" (Véase el Exhibits 8 de 9, página 2579).

28. Similarmente, Ricardo Martinelli Berrocal despidió a su abogado, Rosendo Enrique Rivera, al enterarse de comunicaciones privadas intercambiadas entre Rivera y un tercero (Véase el Exhibits 8 de 9, página 2476).

29. Ricardo Martinelli Berrocal también obtuvo ilegalmente correos electrónicos del director de la compañía de televisión TVN Luis Emilio Mouynes Kieswetter, los cuales detallaban medidas llevadas a cabo para confrontar

8

los esfuerzos de un canal competidor que buscaba llevarse a sus empleados. El dueño del canal competidor, Next Tv en aquel entonces, era Ricardo Martinelli Berrocal (Véase el Exhibits 8 de 9, página 2619-26220).

**Pruebas de la apropiación de los equipos/sistemas tecnológico comprados a las empresas MLN Protection, Ltd. Y NSO Group Technologies, Ltd.**

30. Ya se ha visto que Ricardo Martinelli usó los equipos para cometer los delitos de los que se le acusa. Por ello, tras perder su partido las elecciones presidenciales celebradas el 4 de mayo de 2014, procuró asegurarse de que los delitos cometidos no fueran descubiertos. Por ello, se desmanteló el área donde se realizaban las interceptaciones e intervenciones y se sustrajeron los equipos/sistemas tecnológicos del Consejo de Seguridad Nacional, existiendo evidencia de que el sistema Pegasus fue usado con posterioridad (el 16 de mayo de 2014) en un lugar muy distante del Consejo, lo que acredita la sustracción y apropiación de los mismos. Estos hechos se acreditan con las siguientes evidencias:

    a. La declaración del testigo con conocimiento "de primera mano" que narra que "a raíz de las pasadas elecciones se recibió la orden de desmantelar todo…las tres (3) computadoras de escritorio se encajetaron…Se procedió a desconectar el servidor que se mantenía allí y sacar el cableado…La impresora fue "dañada" por si guardaba "back up de todo el trabajo que se sacó impreso allí." (Véase el Exhibits 1 de 9, página 188). "Esa impresora no se pudo sacar de las instalaciones porque…estaba en el inventario del Consejo de Seguridad Nacional". El otro equipo fue "sacado de las instalaciones y para ello se esperó un día jueves o viernes de la misma semana de las elecciones para montarlos al vehículo que tenía asignado RONY RODRIGUEZ, el cual el conductor era GUILLERMO de nombre WILLIAM PITTI. El equipo se montó a eso de las siete y media de la noche (7:30 p.m.) ¿Por qué se esperó a esa hora? Porque no se quería que… personas ajenas a nosotros, a las personas que manejaban el sistema tuviesen acceso o vieran que se estaban ingresando cajetas de equipo al carro que mencioné, que corresponde a RONY RODRIGUEZ, que corresponde a una camioneta blanca. Ellos salieron los dos (2) RONY RODRIGUEZ y WILLIAM PITTI, luego de cargar todo el equipo y se retiraron de las instalaciones llevándose todo a un lugar, el cual desconozco. Ahora bien, el rack no cabía…por lo que al día siguiente se consiguió un vehículo pick up, color

9

blanco...conducido por MAYKOL de nombre JULIO (sic) GRAELL"
(Véase el Exhibits 1 de 9, página 189).

b.  Lo expresado por Júbilo Antonio Graell, quien narra que "después de
las elecciones del 4 de mayo" (Véase el Exhibits 7 de 9, página 1940),
"antes de entrar el nuevo Secretario del Consejo...recibí una llamada
telefónica del Comandante Rony Rodríguez...que procediera a las
instalaciones del Consejo de Seguridad...y abordara con mi otro
compañero JAVIER QUIROS, alias PEDRO, un vehículo Toyota Hi
Lux de color blanco, que estaba estacionado afuera del edificio 150. Al
llegar a dicho vehículo junto con mi compañero, ya estaba dentro del
mismo el comandante Rony Rodríguez y en el vagón de ese vehículo
se encontraba un anaquel negro de metal...Rony, me indicó que
procediera al Palacio Presidencial (Véase el Exhibits 7 de 9, página
1941)...Rony se bajó y llamó por teléfono al comandante JAIME
TRUJILLO, quien salió del Palacio y se entrevistó con Rony...y me
indicó que procediera hacia la vía España con dirección a Vía
Tocumen...entramos a Monte Oscuro y llegamos a un local que
estaba todo cerrado, no le vi nombre a ese local, pero estaba pintado
de color rojo oscuro, mantenía un portón color negro, allí el
comandante Rony se bajó y procedió a conversar con unos agentes
de seguridad... bajaron el anaquel lo dejaron ahí, el comandante
abordó el vehículo junto con mi compañero y regresamos a la ciudad
(Exhibits 7 de 9, página 1942)."

c.  Javier Quiroz Andreve señala que "en el mes de mayo de 2014" fue
con Júbilo Graell a acompañar a Ronny Rodríguez a trasladar "un
anaquel de mediano"...nos dirigimos hacia el área de la
presidencia...Al llegar a la presidencia de la República nos
estacionamos frente al Palacio de las Garzas... salimos de la
presidencia rumbo a Monte Oscuro, llegando a las oficinas
administrativas del súper 99, ingresando a las instalaciones,
estacionándonos dentro de un edificio que está dentro de los predios
de ese lugar.  Ronny se bajó del carro, se dirigió a una oficina que
está cerca de la entrada ... retornando aproximadamente con tres
ciudadanos, creo que esas personas eran funcionarios del súper
99...los cuales procedieron a bajar el aparato o anaquel, retirándonos
del lugar y retornamos al Consejo de Seguridad" (Véase el Exhibits 7
de 9, página 1923). Es válido señalar que la cadena de
Supermercados "Super 99" es una compañía relacionada a Ricardo
Martinelli Berrocal.

10

31. Ante estos hechos y conociendo que los sistemas/equipos tecnológicos que fueron utilizados por Rony Rodríguez y su personal para cumplir las órdenes de Ricardo Martinelli Berrocal de interceptar las comunicaciones privadas, realizar escuchas, grabar, transmitir y reproducir conversaciones y efectuar diversos tipos de violaciones a la privacidad de sus "objetivos", requerían servicio de internet para funcionar, el despacho del suscrito Magistrado Fiscal procedió a verificar la última conexión del equipo.

32. La empresa NSO GROUP Technologies, Ltd. certificó lo siguiente: "Last date of communication of the system installed in Panama 16.5.2014...the Static IP of the system was 186.74.207.178". Ello significa que el Sistema Pegasus funcionó en Panamá, por última vez, el 16 de mayo de 2014, doce días después de las elecciones Presidenciales celebradas el 4 de mayo de 2014 (Véase el Exhibits 2 de 9, página 608).

33. En una inspección ocular con asistencia de perito efectuada en la empresa Cables & Wireless (que es una proveedora de servicios de telefonía e internet), se le proporcionó a la oficina del suscrito Magistrado Fiscal, la información relacionada con el IP estático 186.74.207.178 a través del cual se realizó la última conexión del Sistema Pegasus en Panamá. De esa información se acredita que el IP estático 186.74.2007.178, utilizado para la última conexión del Sistema Pegasus, fue el de un local ubicado en "Panama San Francisco Punta Pacifica Oceania  Busines tower 3000 floor 6", que es una dirección que no corresponde a la del Consejo de Seguridad y que se ubica en lugar muy distante del Consejo de Seguridad Nacional (Véase el Exhibits 2 de 9, páginas 584-586). Ello demuestra la sustracción del sistema/equipo tecnológico y su movilización hacia ese lugar.

## II.   EXPLICAR SI EL SEÑOR RICARDO MARTINELLI BERROCAL ESTÁ PROTEGIDO POR INMUNIDAD COMO EX JEFE DE ESTADO Y COMO MIEMBRO DEL PARLACEN.

34. El señor Ricardo Martinelli Berrocal no está protegido por inmunidad ni como jefe, ni como ex jefe de Estado, ni como miembro del PARLACEN.

35. **Ausencia de inmunidad como jefe o ex jefe de Estado.** El artículo 191 de la Constitución de la República de Panamá no impide que ningún Presidente o ex Presidente pueda ser investigado y juzgado por cualquier delito que haya cometido antes de ser Presidente o durante el tiempo que fue Presidente. La Corte Suprema de Panamá ha sido muy clara al interpretar el artículo 191 de la Constitución (antes 186) y ha concluido que "tanto el Presidente de la República, como los Magistrados de la Corte Suprema de Justicia son, entonces responsables por la infracción del

11

Código Penal, sin importar la posición que ostentan" (Sentencia de 7 de abril de 1995). Los precedentes y la práctica demuestran que en Panamá se han seguido procesos penales contra Presidentes que están ocupando el cargo en ese momento, por delitos cometidos antes de haber sido electos y contra ex Presidentes por delitos cometidos durante el tiempo que fueron Presidentes. Actualmente se está adelantando un caso contra otro ex Presidente por un delito de Blanqueo de Capitales, por hechos ocurridos durante el tiempo que fue Presidente.

36. **Ausencia de inmunidad como parlamentario del PARLACEN.** El Tratado Constitutivo del Parlamento Centroamericano (PARLACEN) establece que los diputados de dicho Parlamento tienen las inmunidades de los que gozan los diputados del "Estado donde fueron electos" ante sus Congresos, Asambleas Legislativas o Asambleas Nacionales. En el caso de Ricardo Martinelli Berrocal sólo se le aplican las inmunidades en materia penal que tienen los Diputados en el "estado donde fueron electos" y, en el caso de Panamá NO existe ninguna disposición legal que les conceda inmunidad en materia penal a los Diputados panameños. Es más el Código Procesal Penal establece que los Diputados panameños pueden ser investigados y juzgados por el Pleno de la Corte Suprema de Justicia por cualquier delito que hayan cometido. La Corte les ha reconocido a los Diputados del PARLACEN el derecho de ser investigados y juzgados por ella, ya que el artículo 39 del Código Procesal Penal señala que es la Corte Suprema de Justicia es competente para conocer de los procesos penales contra los Diputados.

**III. EN RESPUESTA AL ARGUMENTO DE QUE LOS DELITOS POR LOS QUE SE HA SOLICITADO LA EXTRADICIÓN SON "DELITOS POLÍTICOS" NO EXTRADITABLES, EXPLICAR QUE LOS CARGOS DE MALVERSACIÓN Y DE ESCUCHAS TELEFÓNICAS NO SE REFIEREN A SEDICIÓN, A ESPIONAJE O TRAICIÓN, NI A LA   INCITACIÓN A LA SEDICIÓN, ESPIONAJE O TRAICIÓN.   EXPLICAR EL HECHO QUE PANAMÁ TIENE LEYES SEPARADAS QUE CRIMINALIZAN LA SEDICIÓN, EL ESPIONAJE Y LA TRAICIÓN.**

37. Los delitos por los cuales fue acusado el señor Ricardo Martinelli no guardan relación con delito político alguno. En este sentido, la acusación es por delitos comunes: Contra la  Inviolabilidad del Secreto y Derecho a la Intimidad   descritos   en   los   artículos   167   (interceptación   de telecomunicaciones sin autorización judicial), artículo 168 (seguimiento, persecución y vigilancia sin autorización judicial), y Contra la Administración Pública, diferentes formas de peculado, contemplados en los artículos 338 (Peculado   por sustracción o malversación) y 341 ( peculado de uso), normas estas del Código Penal Panameño. Los mencionados delitos se encuentran consagrados en las siguientes disposiciones del Código Penal:

12

a. Capítulo III (Delitos contra la Inviolabilidad del Secreto y Derecho a la Intimidad), Título II, Artículo 167: "Quien, sin contar con la autorización de la autoridad judicial, intercepte telecomunicaciones o utilice artificios técnicos de escucha, transmisión, grabación o reproducción de conversaciones no dirigidas al público será sancionado con pena de dos a cuatro años de prisión."

b. Capítulo III (Delitos contra la Inviolabilidad del Secreto y Derecho a la Intimidad), Título II, Artículo 168: "Quien, sin contar con la autorización correspondiente, practique seguimiento, persecución o vigilancia contra una persona, con fines ilícitos, será sancionado con dos a cuatro años de prisión. Igual sanción se impondrá a quien patrocine o promueva estos hechos."

c. Capítulo I, Título X (Diferentes Formas de Peculado), Artículo 338: "El servidor público que sustraiga o malverse de cualquier forma o consienta que otro se apropie, sustraiga o malverse de cualquier forma dinero, valores o bienes, cuya administración percepción o custodia le hayan sido confiados por razón de su cargo, será sancionado con prisión de cuatro a diez años. Si la cuantía de lo apropiado supera la suma de cien mil balboas (B/.100,000.00) o si el dinero, valores o bienes apropiados estuvieran destinados a fines asistenciales o a programas de desarrollo o de apoyo social, la pena será de ocho a quince años de prisión."

d. Capítulo I, Título X (Diferentes Formas de Peculado), Artículo 341: "El servidor público que, para fines ajenos al servicio, use en beneficio propio o ajeno, o permita que otro use dinero, valores o bienes que estén bajo su cargo por razón de sus funciones o que se hallen bajo su guarda será sancionado con prisión de uno a tres años, o su equivalente en días multa o arresto de fines de semana. La misma pena se aplicará al servidor público que utilice trabajos o servicios oficiales en su beneficio o permita que otro lo haga."

38. Por su parte, los delitos de espionaje, traición y sedición se encuentran regulados en otro Título del Código Penal panameño, Título XIV dentro de los Delitos Contra la Personalidad Internacional del Estado y Contra la Personalidad Interna del Estado y no tienen relación alguna con los delitos Contra la Inviolabilidad del Secreto y el Derecho a la Intimidad contemplados en los artículos 167 (interceptación de telecomunicaciones sin autorización judicial) y 168 (seguimiento, persecución y vigilancia sin autorización judicial), ni con los delitos Contra la Administración Pública, Diferentes formas de Peculado, contemplados en los artículos 338 (Peculado por sustracción o malversación) y 341 (Peculado de Uso) por los cuales se ha acusado en este proceso.

13

**IV. ACLARAR EN EL CASO DE LAS ESCUCHAS TELEFÓNICAS LA COMPETENCIA EXCLUSIVA PARA AUTORIZAR LAS MISMAS POR PARTE DEL ÓRGANO JUDICIAL, ESPECÍFICAMENTE, LA SALA SEGUNDA DE LA CORTE SUPREMA DE JUSTICIA.**

39. La Constitución de la República de Panamá en su artículo 29 dispone que "Todas las comunicaciones privadas son inviolables y no podrán ser interceptadas o grabadas, sino por mandato de autoridad judicial". La Corte Suprema de Justicia, en Sentencia de 17 de julio de 2007, ha precisado que cuando el artículo 29 de la Constitución establece a la "autoridad judicial como el único organismo que puede ordenar la interceptación y grabación de conversaciones telefónicas se está refiriendo única y exclusivamente al Órgano Judicial, entendido como tal a los jueces y magistrados de los distintos juzgados, tribunales, incluso, de la Corte Suprema de Justicia, competentes para conocer de determinada causa".

40. Para la época en que tuvieron lugar los hechos por los que se acusa a Ricardo Martinelli Berrocal, le correspondía de forma exclusiva y sin excepciones a la Sala Penal de la Corte Suprema de Justicia autorizar las interceptaciones y grabaciones, en el Primer Distrito Judicial de Panamá.

41. La Fiscalía en este caso investigó debidamente si en alguna ocasión la Sala Penal de la Corte Suprema de Justicia había autorizado judicialmente las interceptaciones de las comunicaciones telefónicas de las víctimas de los delitos por los que se acusa a Ricardo Martinelli Berrocal. La Sala Segunda de lo Penal de la Corte Suprema respondió que desde enero de 2012 hasta el 30 de mayo de 2014 no se recibió ninguna solicitud para interceptar y/o grabar comunicaciones, con respecto a los números de teléfonos móviles hallados en los correos electrónicos y archivos recuperados, ni que se haya autorizado mediante resolución judicial la intervención y/o grabación de comunicaciones telefónicas a través de los mismos (Véase el Exhibits 2 de 9, páginas 592-593; 595-596 y 598-599). Asimismo, el Ministerio Público negó haber formulado solicitud alguna respecto de los números telefónicos en cuestión (Véase el Exhibits 2 de 9, páginas 601-602).

**V. CON RELACIÓN A LAS DECLARACIONES INCORPORADAS DURANTE EL PROCESO DE EXTRADICIÓN, EXPLICAR SI LAS MISMAS PUEDEN UTILIZARSE EN EL PROCESAMIENTO DEL SEÑOR RICARDO MARTINELLI EN PANAMÁ.**

42. Con base en el artículo 345 del Código Procesal Penal de Panamá, la práctica judicial ha permitido que el Fiscal o el acusador autónomo puedan proponer una declaración jurada o cualquier otra prueba que se considere

14

necesaria, en la audiencia de acusación, (audiencia que se encuentra actualmente suspendida hasta que el acusado sea extraditado a Panamá); en tanto que el artículo 385 del Código Procesal Penal, permite proponer esa o cualquier otra prueba, cuya existencia se desconozca hasta ese momento, en el juicio oral.   Por tanto, el Fiscal podrá introducir una declaración jurada en esta coyuntura.

## VI. ANTE LOS ARGUMENTOS DE LA DEFENSA SOBRE PRESUNTAS IRREGULARIDADES PROCESALES EN EL CASO PANAMEÑO, ACLARAR LO RELACIONADO A LO SEÑALADO SOBRE LA NO IMPUTACIÓN AL SEÑOR RICARDO MARTINELLI.

43. En Panamá existen varios tipos de procedimientos para tramitar los diferentes asuntos penales (esto se encuentra ampliamente explicado de los párrafos 5 a 10 de la Solicitud de Extradición y de Arresto con Fines de Extradición del ciudadano panameño Ricardo Alberto Martinelli Berrocal, que presentó el Magistrado de Garantías.

44. En este caso el procedimiento aplicable, es el procedimiento especial, contenido en el Título VII, Procedimientos Especiales, Capítulo II (Juicios Penales ante la Corte Suprema de Justicia) del Código Procesal de Panamá.

45. En ninguno de los artículos que regulan este procedimiento especial se exige que se realice una audiencia como la que establece el procedimiento general, que regula el artículo 280 del Código Procesal Panameño, para "imputarle" un delito a un Diputado de la Asamblea Nacional o del PARLACEN.

46. El artículo 280 del Código Procesal Penal que rige para el procedimiento general u ordinario, lo que persigue es que la persona sepa cuáles son los hechos y delitos que se le imputan, así como que tenga conocimiento de las pruebas que existen en su contra hasta ese momento para que pueda defenderse.

47. En el caso del procedimiento especial que se le aplica a los Diputados, la norma aplicable es el artículo 488 del Código Procesal Penal, que establece lo siguiente: "**Artículo 488. Requisitos de la admisión.** La querella o la denuncia deberá promoverse por escrito, a través de abogado, y para su admisibilidad deberá expresar lo siguiente:1. Los datos de identidad, domicilio y firma del querellante o denunciante y de su apoderado legal. 2. Los datos de identificación del querellado y su domicilio. 3. Una relación precisa, clara y circunstanciada del hecho atribuido, lugar y tiempo de su realización. 4. Prueba idónea del hecho punible imputado. Si la querella o la denuncia no reúne estos requisitos para su calificación, será rechazada de plano".

48. La admisión de la denuncia o querella que realiza el Pleno de la Corte Suprema cumple con los requisitos y fines del artículo 280, pues el Diputado del Parlacen queda con pleno conocimiento de los hechos y

15

delitos que se le imputan y de las pruebas que existen en su contra, con lo cual se le brinda la oportunidad para que pueda ejercer todos sus derechos.

49. El artículo 488 establece que para que pueda iniciarse el procedimiento contra un Diputado del Parlacen, la Corte Suprema debe verificar que la querella o denuncia esté acompañada de prueba idónea del hecho punible, lo que hace que sea más difícil iniciar una investigación contra un diputado de la Asamblea Nacional o del PARLACEN. La prueba exigida en los procesos especiales de conformidad con el artículo 488 del Código Procesal Penal, no es requerida en los procesos seguidos bajo el procedimiento general u ordinario.

50. Por ello, el procedimiento especial ni siquiera contempla la celebración de una audiencia de imputación, pues el artículo 488 la sustituye. En conclusión, no se puede hablar de que se haya violado el debido proceso en este caso, por no haberse efectuado una imputación conforme al procedimiento general.

51. En el caso del señor Ricardo Martinelli, es importante destacar que desde que se recibieron en la Corte Suprema de Justicia, compulsas de copia, el 30 de enero de 2015, el señor Ricardo Martinelli Berrocal pudo obtener a través de sus abogados todas las pruebas que existían desde el mismo inicio de la investigación, se la ha permitido el pleno ejercicio de las garantías y derechos reconocidos en la Ley, la Constitución y los Tratados y Convenios Internacionales, celebrados y ratificados por la República de Panamá, y ha tenido acceso a la carpetilla de investigación, con lo que se le ha garantizado el derecho a conocer los delitos por los que se le acusa y las pruebas que sustentan esas acusaciones. (Ver Anexo 1)

**VII. ACLARAR QUE LA ORDEN DE DETENCIÓN CUBRE LOS CUATRO DELITOS POR LOS CUALES SE HA SOLICITADO LA EXTRADICIÓN. ACLARAR QUE LA EMISIÓN DE UNA ORDEN DE "REBELDÍA", COMO SE HIZO EN ESTE CASO ESTÁ DE ACUERDO CON EL PROCEDIMIENTO HABITUAL EN PANAMÁ.**

52. La Corte Suprema de Justicia decidió que se iniciara una investigación contra el señor Ricardo Martinelli Berrocal por considerar que existía prueba idónea de los delitos que se le imputaban. Desde ese momento el señor Ricardo Martinelli Berrocal tuvo conocimiento sobre los hechos, delitos y pruebas que se le imputan. También quedó en capacidad de obtener por su cuenta todas las pruebas para su defensa. Cuando el Magistrado Fiscal consideró que podía acusarlo en un juicio, presentó una acusación ante El Magistrado de Garantías. El señor Ricardo Martinelli Berrocal no asistió a la audiencia de acusación que estaba programada para el 11 de diciembre de 2015, pese a que estaba debidamente notificado, por lo cual el Magistrado de Garantías, Jerónimo Mejía, lo declaró "en rebeldía". La declaratoria de

16

rebeldía se sustentó en el artículo 158 del Código Procesal Penal, que dice que si la persona requerida no comparece se declarará en rebeldía y se ordenará su detención provisional.

53. El 21 de diciembre del 2015, ante una audiencia solicitada por mi persona, el Pleno de la Corte Suprema de Justicia de Panamá (los 9 Magistrados), con base en el artículo 490 del Código Procesal Penal, ordenó la detención provisional de Ricardo Martinelli Berrocal, por ser notorio "que la actitud asumida por el señor MARTINELLI BERROCAL de sustraerse de la jurisdicción nacional se ha convertido en una circunstancia que atenta contra el normal desenvolvimiento del proceso que se le sigue…La medida de detención provisional solicitada encuentra plena justificación por razón de la evidente desatención al proceso por parte del investigado… su ausencia impide el desarrollo y culminación del proceso".

54. La Corte Suprema de Justicia estimó que la detención preventiva procedía en este caso, porque antes de que se declarara en rebeldía al acusado, existía una acusación por los cuatro delitos antes señalados, acompañada de las pruebas que acreditan de que existe causa probable contra el acusado.

55. El Código Procesal Penal, en el artículo 222, establece que se puede aplicar una medida cautelar, como lo es la detención preventiva, cuando "existen medios probatorios demostrativos del hecho punible y la vinculación del imputado con el hecho". Esto, unido a que el señor Martinelli se dio a la fuga y se puso fuera del alcance de las autoridades panameñas, hizo que la Corte Suprema de Justicia expidiera la orden de detención, porque se cumple con todas las exigencias legales.

56. Cuando el señor Martinelli sea extraditado a Panamá, no es necesario que se dicte ninguna orden de detención en su contra, ya que a su llegada quedaría detenido para poder ser procesado por los delitos por los que fue acusado, que son por los mismos por los cuales se ha pedido su extradición.

Esta declaración de *El Magistrado Fiscal*, Harry A. Díaz,  ha sido jurada ante *El Magistrado de Garantías.*

**HARRY A. DÍAZ**
*El Magistrado Fiscal*

Jurado y firmado hoy  treinta y uno (31) de julio de dos mil diecisiete (2017), ante mí, Jerónimo Emilio Mejía Edward, *El Magistrado de Garantías.*

**JERONIMO EMILIO MEJIA EDWARD**
*El Magistrado de Garantías*
Corte Suprema de Justicia

17

**Actuaciones de la Defensa
dentro de la carpeta 138-15**

**Actuaciones del Magistrado Fiscal
dentro de la carpeta 138-15**

| | |
|---|---|
| Enero | Se recibe querella y compulsas de copias el 30/1/15. |
| Febrero | El 11/02/2015 presenta poder Lic. Sidney Sitton y Lic. Rogelio Cruz.<br>Lic. Sidney Sitton presenta solicitud especial.<br>Lic. Sidney Sitton, solicita copias.<br>Resolución de los Magistrados donde acumula querellas. |
| Marzo | Cuatro solicitudes del Lic. Sidney Sitton, entre ellas una de nulidad.<br>Lic. Sidney Sitton presenta solicitud de copias. |
| Abril | Lic. Leonardo Aparicio y Lic. Sidney Sitton presentan solicitudes.<br>Lic. Sidney Sitton aporta documentos. |
| Mayo | Lic. Sidney Sitton designa como abogado sustituto al Lic. Leonardo Aparicio.<br>Lic. Leonardo Aparicio solicita se desestimen las querellas. |
| Junio | Resolución que admite el conocimiento de la causa penal y se designa a MF (8/6/15).<br>Se le notifica al Lic. Rogelio Cruz dicha resolución.<br>Lic. Sidney Sitton presenta escrito advirtiendo violación al debido proceso.<br>Lic. Cruz sustenta recurso de reconsideración que admite el conocimiento de la causa penal.<br>El Pleno rechaza de plano por improcedente el recurso del Lic. Cruz.<br>El Tribunal Electoral remite certificación del fuero electoral del señor RM. |
| Julio | Se solicita al Tribunal Electoral el levantamiento del fuero a RM. |

| | |
|---|---|
| Agosto | Tribunal Electoral levanta el fuero penal electoral a RM.<br>Resolución del Pleno donde levanta la suspensión de la causa 138-15.<br>El Lic. Dimas Guevara y Lic. Leonardo Aparicio presentan poder.<br>El Lic. Dimas Guevara revisa y solicita copias. |
| Sept. | El Lic. Dimas Guevara solicita copias en tres ocasiones.<br>Lic. Dimas Guevara sustituye poder a favor del Lic. Cruz. |
| Octubre | El Lic. Leonardo Aparicio revisa y solicita copia en dos ocasiones. |
| Nov. | El Lic. Leonardo Aparicio presenta solicitud. |

| | |
|---|---|
| Agosto | Inician actos de investigación el 13/8/15. |
| Octubre | Resolución del 8/10/15 que comunica que ha concluido el término de la investigación.<br>Se presenta Acusación el 9/10/15. |

## 11 MESES

**12 Solicitudes de Copias
1 Recurso de Reconsideración
4 Solicitudes (1 de nulidad, 1 de desestimación de querellas, 2 de archivo, 1 advirtiendo violación de debido proceso)**

## 2 MESES

**(ANEXO 1)**

| REQUEST FOR EXTRADITION AND ARREST FOR THE PURPOSE OF EXTRADITION OF RICARDO ALBERTO MARTINELLI BERROCAL | DOSSIER 138-2015

AFFIDAVIT OF THE PROSECUTING MAGISTRATE |
|---|---|

1.  I, Harry A. Díaz, declare under oath and certify that:

2.  I am a Panamanian citizen, with personal identity card number eight – two hundred thirty-six – seven hundred eighty-nine (8-236-789), male, married, with residence in Panama City, Republic of Panama. I have been a Justice in the Criminal Chamber of the Supreme Court of Justice of the Republic of Panama since June 16, 2011.

3.  I have been assigned by the Supreme Court of Justice sitting *en banc* as *Prosecuting Magistrate [Magistrado Fiscal]* in the case identified under Dossier 138-2015, brought against the Representative in the Central American Parliament (PARLACEN) and former President of the Republic of Panamá, **RICARDO ALBERTO MARTINELLI BERROCAL**, who is under investigation for the commission for **CRIMES AGAINST THE INVIOLABILITY OF SECRECY AND THE RIGHT TO PRIVACY**, as contemplated in articles 167 (Interception of telecommunications without judicial authorization) as well as for **CRIMES AGAINST THE PUBLIC ADMINISTRATION**, as contemplated in articles 338 (Embezzlement by misappropriation) and 341 (Malfeasance).

4.  As Prosecuting Magistrate, I have conducted the investigation against the Representative **RICARDO ALBERTO MARTINELLI BERROCAL**, and I have filed an indictment against him, so I am familiar with the facts that gave rise to it, as well as the charges and the evidence against him.

5.  The facts set forth in this affidavit are narrated based on my personal knowledge, information provided to me by state institutions, witness interviews, and other sources of information. What is presented is a summary of the facts that I have handled during the investigation and does not fully reflect my knowledge of it. The evidence mentioned in this affidavit does not represent all the evidence gathered in the course of the investigation. The exhibit numbers and page numbers quoted in this affidavit correspond to the numbering of the English translation of the "Evidence" that was provided by the Magistrate of Guarantees (*Juez de Garantías*) with the Request for Extradition and Arrest for Extradition of the Panamanian Citizen Ricardo Alberto Martinelli Berrocal, which I have revised:

I.  **EXPLAIN THE SCOPE OF THE EMBEZZLEMENT CHARGE. WHAT FUNDS ARE ALLEGED TO HAVE BEEN MISUSED BY MR. RICARDO MARTINELLI BERROCAL (NSO AND MLM TEAMS), AND WHAT EVIDENCE IS THERE IN THE**

EXTRADITION REQUEST TO SUPPORT THESE ALLEGATIONS (INCLUDING EVIDENCE THAT MR. RICARDO MARTINELLI USED THE NSO AND MLM EQUIPMENT TO INTERVENE TELEPHONE LINES, AND EVIDENCE THAT PUBLIC FUNDS WERE USED TO PURCHASE THE NSO EQUIPMENT)?

THE EMBEZZLEMENT CHARGES

A.   EVIDENCE OF ACQUISITION, USE AND MISAPPROPRIATION OF EQUIPMENT AND SYSTEMS USED IN THE COMISSION OF THE CRIMES

**Proof of Purchase from Israeli company MLM PROTECTION LTD of technological equipment and systems**

6.   In 2010, in compliance with a commitment acquired by President Ricardo Martinelli, the Executive Director of the Social Investment Fund signed contract No. 045/2010 whereby he purchased from the private Israeli company MLM Protection Ltd.  equipment/ technological system with the ability to intercept telephone calls, computers, geolocation, capture of ambient audio, among other functions (See EXHIBITS 4 of 9, pages 838, 841 and 981-1056).

7.   This equipment/technological system cost thirteen million four hundred seventy-five thousand balboas (B / .13, 475,000.00) (See EXHIBITS 3 of 9, page 828), which were paid by the government of Panama (See EXHIBITS 5 of 9, page 1277-1291).

8.   The contract signed with MLM Protection Ltd. included a technological equipment, software, installation training and maintenance of a four component system: PSS Surveillance System, Circles, Biometric Voice Software and Cogito. (See EXHIBITS 4 of 9, pages 981 to 1056). This equipment was used to interfere with computers (See EXHIBITS 4 of 9, page 1026) and cell phones (See EXHIBITS 4 of 9, page 1045).

9.   The product described in the contract was shipped by MLM Protection Ltd. (See EXHIBITS 3 of 9, page 828); received by Mr. Gustavo Perez (See EXHIBITS 4 of 9, page 1173) and installed in Panama (See EXHIBITS 4 of 9, page 1169, 1171 and 1173).

**Proof of Purchase of equipment/technological systems from NSO GROUP TECHNOLOGIES LTD.**

10.   The National Security Council entered into an Agreement to buy from NSO GROUP Technologies a technological equipment called the Pegasus System, at a cost of eight million United States dollars (US $ 8,000,000.00) (See EXHIBITS 2 of 9, page 608).

11.   According to the Agreement, the ultimate purpose of this technology equipment was the collection and collection of information from mobile devices for the exclusive use of the Government of Panama (See EXHIBITS 2 of 9, pages 614).

12.     The agreement by which the Pegasus System was purchased established that, in order to be able to ship the product, it was necessary for the Security Council to send to NSO Group Technologies Ltd. the end-user certificate thereof and that the Security Council had to pay the sale price no later than three (3) days after completing the installation and training described in Annex A of that agreement (See EXHIBITS 2 of 9, pages 609-611).

13.     NSO Group Technologies Ltd. certified on July 1, 2015 that they "... installed the Pegasus system in Panama City after receiving the transfer of 8 million US dollars ...", that the training and installation of the End User for The use of the system was performed in Panama City and received the end-user certification signed by Gustavo Pérez, which states that the end user was the National Security Council (See EXHIBITS 2 of 9, page 608 and 614).

**EVIDENCE THAT THE ACCUSED RICARDO MARTINELLI BERROCAL, BEING PRESIDENT OF THE REPUBLIC OF PANAMA AND PRESIDENT OF THE SECURITY COUNCIL, CHOSE THE "OBJECTIVES" TO BE INTERVENED AND WHOSE RIGHTS TO THE INVIOLABILITY OF SECRECY AND THE RIGHT TO PRIVACY WOULD BE AFFECTED.**

14.     Ricardo Martinelli Berrocal laid the groundwork that facilitated the violation of the rights to the inviolability of secrecy and privacy through the interception, recording of communications, monitoring and surveillance and access to their data and information.

15.     To that end, he reorganized the Public Security Council, which until then was integrated by the President, four (4) Ministers of State and the Director of the National Intelligence and Security Service - and, in association with a Minister of State, Issued Executive Decree 263 of March 19, 2010, whereby it created the National Security Council as an advisory body of the President of the Republic in matters of Public Security and National Defense, which was composed of only two (2) individuals: the President himself, who presided over it, and the Minister of the Presidency (See Article 3 of Executive Decree No. 263 of March 19, 2010, which was provided as Annex 1 to the Affidavit rendered by the undersigned on September 21, of 2016, which forms an integral part of the request for extradition and arrest for extradition purposes). It is important to note that the Minister of the Presidency is free to appoint and remove by the President of the Republic, according to article 183, numeral 1 of the Constitution of the Republic of Panama, according to which the President can "Freely Appoint and Remove Ministers of State ".

16.     Article 3 of Executive Decree 263 of 2010 specifies that the National Security Council sets the intelligence objectives to be developed by the Executive Secretariat and Article 11 of the Executive Decree states that the Security Council must also carry out "Other functions as assigned by the President of the Republic." Article 20 provides that "The members of the Secretariat shall be of free appointment and removal by the President of the Republic" (See Articles

- 3 -

3, 11 and 20 of Executive Decree No. 263 of March 19, 2010, which was provided as Annex 1 of the Affidavit rendered by the undersigned, on September 21, 2016, which forms an integral part of the request for extradition and arrest for the purpose of extradition).

17. Therefore, if Mr. Ricardo Martinelli as President was the one who determined what the National Security Council was doing and if the Council was the one that determined what the Secretariat was doing and if it was the Secretariat that was in charge of carrying out the work of invasion to privacy through the equipment acquired from MLM and the NSO Group, then Mr. Martinelli as President was the one that determined what the Secretariat would or would not do, that is to say, whose privacy was invaded or not. Therefore, as the Secretariat responded to his orders, this was the means used by Mr. Martinelli to fulfill his objective of invading the privacy of the victims through the technological equipment acquired from MLM PROTECTION LTD and NSO GROUP TECHNOLOGIES LTD.

18. In this regard there are statements by former Ministers of the Presidency, Demetrio Papadimitriu Bagatelas and Roberto Henríquez Cohen. The first stated that the National Security Council "never held a meeting, never convened, everything was done directly with the President" (EXHIBITS 8 of 9, page 2312). He also pointed out that the Secretariat "responded directly to the President" (See EXHIBITS 8 of 9, page 2314). For his part, Roberto Henriquez Cohen stated that both the Council and the Secretariat "respond directly to the Presidency" (See EXHIBITS 8 of 9, page 2321).

19. The extradition request contained a transcript of the statement of a witness who knows *"firsthand about dirty work"* carried out *"in the office of the National Security Council during the previous administration."* According to this witness, the National Security Council *had* *installed "an illegal espionage system"* which "was capable of *intercepting everything it* *handled*...a sophisticated telephone." (EXHIBIT 1 of 9, p. 179). The equipment "was operated by a very closed group" that *"received specific, clear, and precise instructions* from over *at the* *Presidency."* Among the people...within the closed group I mentioned were Ronny Rodriguez, who was known by the alias Didier, and William Pitti, known by the alias Guillermo" (EXHIBIT 1 of 9, p. 179).

20. The above is corroborated by the following individuals who *worked in the National* *Security Council*:

    a. Gustavo Pérez, Executive Secretary of the Security Council from March to September, 2012, who said: "when I came to the National Security Council there was already a *modus operandi* of work between Ronny Rodríguez *and the*

*Presidency*." (EXHIBIT 8 of 9, p. 2279). He stated that "Ronny did not report directly to me, as he *had strict orders to work with the Presidency*" (EXHIBIT 8 of 9, p. 2266). He said that when the President "spoke about anything, that is, when *he appeared on television saying that he knew or someone knew some information*, about Representatives or anyone else, it was noted that it did not come from me on the Council, but rather from *Ronny Rodríguez, [who] delivered those envelopes every morning to the Presidency* and I was prohibited from entering the place he came out of with those envelopes..." (EXHIBIT 8 of 9, p. 2280).

b.      Gustavo Serrano, who explained that Ronny Rodríguez "was the one who *carried the information* to the President *every day.... We were aware* that Ronny Rodríguez *worked directly* with the *President* of the Republic *and did jobs that were directly ordered by the President*" (EXHIBIT 7 of 9, p. 1868).

c.      Elvin Noget Ortiz Gonzalez who said that "...Ronny said that he met in private with Ricardo Martinelli and that he *received instructions directly from the President*. While in the Intelligence Directorate, Ronny delegated instructions through William or did it directly with the official he wanted to carry out a job." (EXHIBIT 7 of 9, p. 1831). He says that every morning they picked Ronny up "and took him to the Presidency and he was seen with a yellow envelope that he took to the Presidency." (EXHIBIT 7 of 9, p. 1831).

d.      Júbilo Graell, who was one of the drivers for Ronny Rodríguez. This witness stated that: "Rony *reported directly* to the Number 1." According to this witness "*the No. 1* in the slang of the Council *is the President* of the Republic" (EXHIBIT 7 of 9, p. 1978).

e.      Julio Palacios, who was another one of the drivers for Ronny Rodríguez. This witness said that Ronny Rodriguez "*often*" came out of Building 150 "with a yellow envelope and *he took it to the Presidency*" (EXHIBIT 7 of 9, p. 2005).

f.      Miguel Alexander Mendoza Acevedo, who said that "Ronny...arrived in the morning and left for a *meeting at the Presidency*" (EXHIBIT 7 of 9, p. 2039).

### PROOF OF THE USE OF BOTH SYSTEMS

21.     With the indictment, evidence was submitted and sent with the extradition request that show that two sets of equipment and systems were purchased. The first was purchased from MLM PROTECTION LTD. This system was used to intercept computers and cell phones (as

shown in EXHIBIT 4 of 9, pp. 981–1056), and was installed and used in Panama beginning in 2011; the second was purchased in July 2012 from NSO GROUP TECHNOLOGIES LTD. This system was used to collect and gather information from mobile devices for the "*exclusive use* of the Government of Panama." (EXHIBIT 2 of 9, pp. 608, 609 and 615).

22.    In order to carry out the interventions with equipment purchased from MLM Protection Ltd. and NSO Group Technologies Ltd., Ricardo Martinelli assigned Ronny Rodriguez as Intelligence Director of the Security Council, a position which he held from September 28, 2009 until May 2014. In that period Rodríguez received several promotions and moved from the position of Lieutenant to occupy the second most important position in the rank of National Police, as sub commissioner (See EXHIBITS 2 of 9, page 501, 502). RONNY RODRIGUEZ, as we have seen, received direct orders from the President of the Republic, Ricardo Martinelli Berrocal.

23.    The "first-hand" witness explained that there was an email in which information was sometimes stored as a result of the interventions carried out with the aforementioned technological equipment. That email is brad.pty507@gmail.com , with the password KATHIA03, to which a visual inspection was performed. In this proceeding, information obtained prior to and after July 3, 2012 was obtained by virtue of the interventions made to the victims through both systems or technological equipment, which proves that they were used to commit the crimes of which Mr. Ricardo Martinelli is accused of. It is important to emphasize that the Pegasus system was duly received in Panama on July 3, 2012, so the information collected above is attributed to the system purchased from the company MLM PROTECTION LTD., and later information was obtained through the use of both sets of equipment.

24.    **A sample of documents obtained during the visual inspection made to the mail brad.pty507@gmail.com , dated prior to July 3, 2017, were presented to the victims and were recognized as theirs:**

    a.  Zulay Rodríguez recognized as his own the emails dated **May 23, 2012,** (EXHIBIT 8 of 9, p. 2381); **May 9, 2012** (EXHIBIT 8 of 9, p. 2382); **April 26, 2012** (EXHIBIT 8 of 9, p. 2382); and the **Chat via BBPIN** dated **April 24, 2012** (EXHIBIT 8 of 9, p. 2383). This last chat reveals that the system/equipment purchased from MLM PROTECTION LTD. was capable of intercepting and accessing the contents of cell phones.

    b.  Francisco Sánchez Cardenas recognized as his own **the conversations he held via BBPIN,** to wit: **May 29, 2012** (EXHIBIT 9 of 9, p. 2555); **May 10, 2012** (EXHIBIT 9 of 9, p. 2556). He also recognized the conversation that was recorded

in background sound on **April 3, 2012** (EXHIBIT 9 of 9, p. 2556). He also recognized as his own the email dated **May 16, 2012** (EXHIBIT 9 of 9, p. 2555).

c. Mitchell Constantino Doens Ambrosio recognized as his own **the conversations he held via BBPIN**, to wit: **June 19, 2012** (EXHIBIT 9 of 9, p. 2434); **June 13, 2012** (EXHIBIT 9 of 9, p. 2435); **June 4, 2012** (EXHIBIT 9 of 9, p. 2436). He also recognized as his own the email dated **June 12, 2012,** and **June 6, 2012** (EXHIBIT 9 of 9, p. 2435).

d. Erasmo Pinilla recognized as his own the email dated **April 29, 2012** (EXHIBIT 9 of 9, p. 2518).

e. Yassir Purcait recognized as his own the email dated **April 17, 2012** (EXHIBIT 9 of 9, p. 2507).

25. Likewise, evidence was obtained to prove the unlawful use that occurred after July 3, 2012 of the systems or equipment purchased from MLM PROTECTION LTD. And NSO GROUP TECHNOLOGIES LTD.:

a. Jorge Barakat Pitty recognized as his own the email dated **April 11, 2013** (EXHIBIT 9 of 9, p. 2569).

b. Raúl Alberto Sandoval Chiari recognized as his own the email dated **March 10, 2013** (EXHIBIT 9 of 9, p. 2514).

c. Zulay Rodriguez recognized as his own **the conversations he held via "WHATSSAPP"** [sic] on **February 6, 2013** (EXHIBIT 8 of 9, p. 2399). He also recognized as his own the calendar from **December 10, 2012** (EXHIBIT 8 of 9, p. 2399).

d. Yassir Purcait recognized as his own the email dated **June 13, 2013** (EXHIBIT 9 of 9, p. 2507).

e. Luis Enrique Rivera Calles, forensic computer expert, described the documents obtained from the visual inspection conducted on August 14, 2014, of the email account brad.pty507@gmail.com : "The extracted emails make reference to methods for infecting certain targets through messages, resulting in telephone numbers, through a platform designed to capture and present reports of telephone conversations of different people, whether by WhatsApp messages, texts, calls and emails, using a specialized software that could capture and intercept contacts, text messages, emails, call logs, calendars, from any model of cell phone supported by the platform used for it, among

these, private conversation applications such as Blackberry Messenger... (EXHIBIT 9 of 9, pp. 2706–2707).

26.    Much more evidence was provided in the indictment regarding the illicit use of the systems or equipment that were annexed as evidence in extradition. In addition, there are 7 booklets (see EXHIBITS 1 of 9, pages 46-47) and 26 CDs containing private communications of victims, collected during the investigation period and which are confidential (See EXHIBITS 1 of 9, page 57-58).

27.    It should be noted that Ricardo Martinelli had knowledge about private communications that could not have been obtained otherwise but through the violation of people's privacy, having access to their private communications. In this sense, former Magistrate Erasmo Pinilla Castillero, who at the time was the president of the Electoral Tribunal, testified that Ricardo Martinelli Berrocal confronted him regarding a matter that was the subject of an exchange of emails that Judge Pinilla had had with third parties. Judge Pinilla expressed that "President MARTINELLI was aware of the content of the exchange of mails" (See Exhibits 8 of 9, page 2579).

28.    Similarly, Ricardo Martinelli Berrocal dismissed his attorney, Rosendo Enrique Rivera, upon learning of private communications exchanged between Rivera and a third party (See Exhibits 8 of 9, page 2476).

29.    Ricardo Martinelli Berrocal also illegally obtained e-mails from the director of television company TVN Luis Emilio Mouynes Kieswetter, which detailed measures carried out to confront the efforts of a competitor channel that sought to take its employees. The owner of the competitor channel, Next TV at the time, was Ricardo Martinelli Berrocal (See Exhibits 8 of 9, page 2619-26220).

**Proof of ownership of technology equipment/systems purchased from MLN Protection, Ltd. and NSO Group Technologies, Ltd.**

30.    It has already been established that Ricardo Martinelli used the equipment to commit the crimes of which he is accused. Therefore, after his political party lost the presidential elections held on May 4, 2014, it is logical to assume that he needed to ensure that the crimes committed were not discovered. As a result, the area where the interceptions and interventions were carried out was dismantled and the equipment/technological systems of the National Security Council were relocated, and there is evidence that the Pegasus system was subsequently used (on May 16, 2014) in a place very distant from the Council, which proves the relocation and use of said equipment. These facts are credited with the following evidence:

a.  The testimony of the witness with "firsthand" knowledge that narrates that "following the past elections the order was received to dismantle everything ... the three (3) desktop computers were boxed ... we proceeded to disconnect the server that was there and remove the wiring ... the printer was "damaged" in case it kept "back up of all the work that was printed there." (Exhibits 1 of 9, page 188). "That printer could not be taken off the premises because ... it was on the National Security Council's inventory." The other equipment was "removed from the premises and for this they waited until Thursday or Friday of the same week of the elections to mount them to the vehicle that was assigned to RONY RODRIGUEZ, driven by GUILLERMO, of full name WILLIAM PITTI. The team set up around seven-thirty in the evening (7:30 p.m.). Why did they wait until that time? Because they did not want people ... outside of ourselves, the people who handled the system, to have access or see that they were boxing and loading equipment to the car that I mentioned, assigned to RONY RODRIGUEZ, which was a white pickup truck. Both RONY RODRIGUEZ and WILLIAM PITTI, after loading all the equipment, left the premises taking everything to an unknown place, I do not know where. Now, the rack did not fit ... so the next day a white pick-up was obtained ... driven by MAYKOL, also named JULIO (sic) GRAELL "(See Exhibits 1 of 9, page 189).

b.  Jubilo Antonio Graell, who says that "after the elections on May 4" (see Exhibits 7 of 9, page 1940), "before entering the new Secretary of the Council ... I received a telephone call from Commander Rony Rodriguez ... to proceed to the premises of the Security Council ... and to meet with my other companion JAVIER QUIROS, aka PEDRO, in a white Toyota Hi Lux vehicle, which was parked outside building 150. When I arrived at the vehicle together with my companion, Rony Rodriguez was already inside, and in the bed of that vehicle was a black metal shelf ... Rony told me to proceed to the Presidential Palace (See Exhibits 7 of 9, page 1941) ... Rony got out and called commander JAIME TRUJILLO by telephone, who left the Palace and met with Rony ... and indicated to me to drive through Vía España towards Vía Tocumen ... we entered Monte Oscuro and arrived at a place that was all closed, I did not see the name of that place, but it was painted dark red, it had a black door. There Commander Rony got out and proceeded to talk to some security agents ... they unloaded the shelf and left it

there, the commander boarded the vehicle with my partner and we returned to the city (Exhibits 7 of 9, page 1942)."

c.   Javier Quiroz Andreve says that "in May 2014" he joined Jubilo Graell to accompany Ronny Rodriguez to move "a medium shelf" ... we went to the area of the presidency ... when we reach the presidency of the Republic we parked in front of the Presidential Palace (Palacio de las Garzas) ... we left the presidency heading to Monte Oscuro, arriving at the administrative offices of the super 99, entering the premises, parking inside a building that is inside the premises of that place. Ronny got out of the car, went to an office near the entrance ... returning with approximately three citizens, I think those people were super 99 employees ... and proceeded to unload the shelf or device, leaving the place and returning to the Security Council "(See Exhibits 7 of 9, page 1923). It is worth noting that the Supermarket chain "Super 99" is a company related to Ricardo Martinelli Berrocal.

31.     Given these facts and knowing that the technological systems/equipment that were used by Rony Rodríguez and his staff to comply with the orders of Ricardo Martinelli Berrocal to intercept private communications, eavesdrop, record, transmit and reproduce conversations and carry out various types of violations to the privacy of its "objectives", required internet service to operate, the office of the undersigned Prosecuting Magistrate proceeded to verify the last connection of the equipment.

32.     The company NSO GROUP Technologies, Ltd. certified the following: "Last date of communication of the system installed in Panama 16.5.2014 ... the Static IP of the system was 186.74.207.178". This means that the Pegasus System operated in Panama for the last time on May 16, 2014, twelve days after the Presidential elections held on May 4, 2014 (See Exhibits 2 of 9, page 608).

33.     In an visual inspection with expert assistance carried out at the company Cable & Wireless (which is a telephone and internet services provider), the office of the undersigned Prosecuting Magistrate was provided with the information related to the static IP 186.74.207.178, through which the last connection of the Pegasus System was made in Panama. From this information it is believed that the static IP 186.74.2007.178, used for the last connection of the Pegasus System, was that of a location in "Panama San Francisco Punta Pacifica Oceania Business tower 3000 floor 6", which is an address that does not correspond to that of the Security Council

- 10 -

and which is located far from the National Security Council (See Exhibits 2 of 9, pages 584–586). This demonstrates the removal of the technological system/equipment and its relocation to that place.

## II.   REGARDING THE ALLEGED IMMUNITY OF RICARDO ALBERTO MARTINELLI BERROCAL FOR BEING A HEAD OF STATE AND A MEMBER OF PARLACEN

34.    Mr. Ricardo Martinelli Berrocal is not protected by immunity either as acting or former head of state, or as a member of PARLACEN.

35.    **Absence of immunity as head or former head of state**. Article 191 of the Constitution of the Republic of Panama does not prevent any President or former President from being investigated and tried for any offense he committed before being President or during the time he was President. The Supreme Court of Panama has been very clear in interpreting Article 191 of the Constitution (previously 186) and has concluded that "both the President of the Republic and the Magistrates of the Supreme Court of Justice are then responsible for the violation of Criminal Procedure Code, regardless of their position "(Judgment of April 7, 1995). The precedents and practice show that in Panama criminal proceedings have been followed against Presidents who are currently occupying the post, for crimes committed before they were elected and against former Presidents for crimes committed during the time they were Presidents. A case is now being brought forward against another former President for a crime of money laundering, for events during the time he was President.

36.    **Absence of immunity as a member of PARLACEN**. The Founding Treaty of the Central American Parliament (PARLACEN) establishes that the Representatives of this Parliament have the immunities enjoyed by the Representatives of the "State where they were elected" before their Congresses, Legislative Assemblies or National Assemblies. In the case of Ricardo Martinelli Berrocal, only the immunities in criminal matters that the Representatives have in the "State where they were elected" apply, and in the case of Panama there is no legal provision that grants immunity in criminal matters to Panamanian Representatives. Moreover, the Criminal Procedure Code states that Panamanian Representatives can be investigated and tried by the Supreme Court of Justice for any crime they have committed. The Court has recognized the Representatives of PARLACEN the right to be investigated and tried by it, since Article 39 of the Criminal Procedure Code states that the Supreme Court of Justice is competent to hear criminal proceedings against the Representatives.

III.   **THE CRIMES FOR WHICH THE EXTRADITION OF RICARDO MARTINELLI BERROCAL HAS BEEN REQUESTED ARE NOT POLITICAL OFFENSES OR RELATED TO THE CRIMES OF SEDITION, ESPIONAGE OR TREASON, NOR TO INCITEMENT TO SEDITION, ESPIONAGE OR TREASON.**

37.    The crimes for which Mr. Ricardo Martinelli was accused are not related to any political crime. In this sense, the accusation is for common crimes: Against the Inviolability of the Secret and Right to Intimacy described in articles 167 (interception of telecommunications without judicial authorization), article 168 (follow-up, prosecution and surveillance without judicial authorization), and Against Public Administration, different forms of embezzlement, contemplated in the articles 338 (Embezzlement by misappropriation) and 341 (Malfeasance), both contemplated in the Panamanian Criminal Procedure Code. These crimes are enshrined in the following provisions of the Criminal Procedure Code:

   a.   Chapter III (Crimes against Inviolability of the Secret and Right to Intimacy), Title II, Article 167: "Whoever, without the authorization of the judicial authority, intercepts telecommunications or uses technical artifice of listening, transmission, recording or reproduction of conversations not addressed to the public will be punished with a penalty of two to four years in prison. "

   b.   Chapter III (Crimes against the Inviolability of the Secret and Right to Intimacy), Title II, Article 168: "Any person who, without proper authorization, pursues, surveys or monitors a person for unlawful purposes, shall be punished with two to four years in prison. The same sanction shall be imposed on whoever sponsors or promotes these acts. "

   c.   Chapter I, Title X (Different Forms of Misappropriation), Article 338: "A public servant who removes or misappropriates in any way or consents appropriating, subtracting or otherwise embezzling money, securities or property by another person, in whose custody or management by way of their position said goods were entrusted, will be punished with imprisonment of four to ten years. If the amount of appropriation exceeds one hundred thousand balboas (B/.100,000.00) or if the money, securities or appropriate goods were destined for welfare purposes or development or social support programs, the penalty will be from eight to fifteen years of prison. "

   d.   Chapter I, Title X (Different Forms of Peculation), Article 341: "A public servant who, for purposes other than their public service, uses for the benefit of himself or others, or allows another to use money, securities or property under his charge

by reason of their functions or that they are under their custody will be sanctioned with prison of one to three years, or its equivalent in fine days or arrest of weekends. The same penalty shall apply to the public servant who uses official services or works for his benefit or allows another to do so."

38. In addition, crimes of espionage, treason and sedition are regulated in another Title of the Panamanian Criminal Procedure Code, within Crimes Against the International Personality of the State and Against the Internal Personality of the State and have no relation to crimes Against the Inviolability of the Secret and the Right to Intimacy referred to in articles 167 (interception of telecommunications without judicial authorization) and 168 (follow-up, prosecution and surveillance without judicial authorization), or with crimes against the Public Administration, Different forms of Misappriation , Contemplated in articles 338 (Misappropriation by subtraction or embezzlement) and 341 (Malfeasance) for which it has been accused in this process.

## IV.   CLARIFY   IN   THE   CASE   FOR   WIRETAPPING   WHAT   EXCLUSIVE COMPETENCY IS POSSESSED BY THE JUDICIAL BRANCH TO ORDER THEM, SPECIFICALLY THE SUPREME COURT OF JUSTICE.

39.     Article 29 of the Constitution of the Republic of Panama provides that "All private communications are inviolable and may not be intercepted or recorded except by a judicial authority." The Supreme Court of Justice, in its judgment of July 17, 2007, stated that when Article 29 of the Constitution establishes "judicial authority as the only body that can order the interception and recording of telephone conversations, it is referring only and exclusively to the Judicial Body, understood as such to the judges and magistrates of the different courts, even courts of the Supreme Court, competent to hear a particular case."

40.     At the time of the events for which Ricardo Martinelli Berrocal was accused, it was exclusively and without exceptions, for the Criminal Chamber of the Supreme Court of Justice, to authorize interceptions and recordings, in the First Judicial Circuit of Panama.

41.     The Office of the Prosecutor in this case properly investigated whether the Criminal Chamber of the Supreme Court of Justice had judicially authorized interceptions of the telephone communications of the victims of the crimes for which Ricardo Martinelli Berrocal is accused. The Second Criminal Chamber of the Supreme Court replied that from January 2012 until May 30, 2014 no requests for interception and/or recording of communications were received with respect to the numbers of mobile phones found in the emails and Files retrieved, or that the intervention and/or recording of telephone communications through them has been authorized by

judicial resolution (See Exhibits 2 of 9, pages 592-593, 595-596 and 598-599). Likewise, the Public Ministry denied having made any request regarding the telephone numbers in question (See Exhibits 2 of 9, pages 601-602).

**V.     WITH REGARDS TO THE STATEMENTS INCORPORATED DURING THE EXTRADITION PROCESS, EXPLAIN IF SAID STATEMENTS MAY BE USED DURING THE PROCEEDINGS AGAINST MR. RICARDO MARTINELLI BERROCAL IN PANAMA.**

42.     Based on Article 345 of the Criminal Procedure Code of Panama, legal practice allows the prosecution or accusing party to present an affidavit or any other evidence deemed necessary in the indictment hearing (which has been suspended until the accused is extradited to Panama). Furthermore, Article 385 of the Criminal Procedure Code allows the admission of an affidavit or any other evidence previously unknown, during the hearing. Therefore, the Prosecutor may introduce an affidavit at this juncture.

**VI.     REGARDING DEFENSE ARGUMENTS REGARDING ALLEGED IRREGULARITIES IN THE PANAMANIAN CASE, CLARIFY ALL FACTS PERTAINING TO THE NON EXISTANCE OF CHARGES AGAINST MR. RICARDO MARTINELLI.**

43.     There are several types of procedures in Panama to deal with different criminal matters (this is extensively explained in paragraphs 5 to 10 of the Panamanian Request for Extradition and Arrest with Extradition Purposes OF Ricardo Alberto Martinelli Berrocal, submitted by the Magistrate of Guarantees.

44.     In this case, the applicable procedure is the special procedure, contained in Title VII, Special Procedures, Chapter II (Criminal Trials before the Supreme Court of Justice) of the Panama Code of Procedure.

45.     None of the articles regulating this special procedure requires that a hearing be held, such as that established in the general procedure, which regulates article 280 of the Panamanian Code of Procedure, in order to "impute" an offense to a Representative of the National Assembly or of PARLACEN.

46.     Article 280 of the Code of Criminal Procedure, which governs the general or ordinary procedure, seeks to ensure that the person is aware of the facts and offenses against him and that he is aware of the evidence against him until that moment they can defend yourself.

47.     In the case of the special procedure that is applied to Representatives (Diputados), the applicable rule is article 488 of the Code of Criminal Procedure, which states: "**Article 488.**

- 14 -

**Admission requirements.** The complaint or indictment must be provided in writing, through an attorney, and for its admissibility must state the following: 1. The identity, address and signature of the complainant or complainants and their legal representative. 2. The identification data of the defendant and his address. 3. A precise, clear and detailed relation of the attributed fact, place and time of its realization. 4. Proof of the punishable act imputed. If the complaint or complaint does not meet these requirements for qualification, it will be rejected. "

48.     The admission of the complaint or indictment made by the Plenum of the Supreme Court complies with the requirements and purposes of article 280, as the Representative of PARLACEN is fully aware of the facts and crimes that against him and of the evidence that exist against them, which gives him the opportunity to exercise all his rights.

49.     Article 488 provides that, in order to initiate proceedings against a Member of PARLACEN, the Supreme Court must verify that the complaint or indictment is accompanied by adequate evidence of the punishable act, making it more difficult to initiate an investigation against a Representative of the National Assembly or PARLACEN. The evidence required in special proceedings under Article 488 of the Code of Criminal Procedure is not required in proceedings followed under the general or ordinary procedure.

50.     Accordingly, the special procedure does not even contemplate holding a hearing of attribution, as Article 488 replaces it. In conclusion, it is not possible to speak of a violation of due process in this case, since no accusation was made under the general procedure.

51.     In the case of Ricardo Martinelli, since the very beginning of the investigation, he has been allowed to exercise fully the guarantees and rights recognized in the Law, the Constitution and the International Treaties and Conventions, which have been signed and ratified by the Republic of Panama, and has had access to the investigation dossier, and has been guaranteed the right to know the crimes of which he is being accused and the evidence that support these allegations.

VII.    **CLARIFY THAT THE ARREST WARRANT COVERS THE FOUR OFFENSES FOR WHICH EXTRADITION HAS BEEN REQUESTED. CLARIFY THAT THE ISSUANCE OF AN "IN CONTEMPT" ORDER, AS WAS DONE IN THIS CASE IS IN ACCORDANCE WITH THE USUAL PROCEDURE IN PANAMA.**

52.     The Supreme Court of Justice decided to initiate an investigation against Mr. Ricardo Martinelli Berrocal on the grounds that there was adequate evidence of the crimes against him. From that moment Mr. Ricardo Martinelli Berrocal was aware of the facts, crimes and evidence that are imputed to him. It is important to note that since that moment Mr. Ricardo Martinelli Berrocal was able to obtain through his lawyers all the evidence that existed and that were incorporated during the investigation. He also was able to obtain on his own all the evidence

for his defense. When the Prosecutor considered that he could accuse him in a trial, he filed an indictment with the Magistrate of Guarantees. Mr. Ricardo Martinelli Berrocal did not attend the indictment hearing that was scheduled for December 11, 2015, despite being duly notified, for which the Magistrate of Guarantees, Jerónimo Mejía, declared it "in contempt." The declaration of contempt was based on article 158 of the Code of Criminal Procedure, which states that if the requested person does not appear, he will be declared in contempt and his provisional detention shall be ordered.

53.      On December 21, 2015, before a hearing requested by myself, the Plenum of the Supreme Court of Justice of Panama (the 9 Magistrates), based on Article 490 of the Code of Criminal Procedure, ordered the provisional arrest of Ricardo Martinelli Berrocal, noting "that the attitude taken by Mr. MARTINELLI BERROCAL to evade national jurisdiction has become a circumstance that undermines the normal development of the process that follows ... the requested provisional detention measure finds full justification because of the evident inattention to the process by the investigated ... their absence prevents the development and completion of the process."

54.      The Supreme Court considered that preventive detention proceeded in this case, because before the defendant was found guilty, there was an accusation for the four crimes mentioned above, accompanied by evidence that there is probable cause against the accused.

55.      The Code of Criminal Procedure, in article 222, establishes that a precautionary measure, such as preventive detention, can be applied when "there is evidentiary means of demonstrating the punishable act and the attachment of the accused to the fact." This, together with the fact that Mr. Martinelli fled and was out of the reach of the Panamanian authorities, caused the Supreme Court of Justice to issue the warrant of detention, because it complies with all legal requirements.

56.      When Mr. Martinelli is extradited to Panama, there is no need to issue an arrest warrant against him, since upon his arrival he would be detained in order to be prosecuted for the crimes for which he was charged, for which his extradition has been requested.


This statement of the Prosecuting Magistrate, Harry A. Diaz, has been sworn before the Magistrate of Guarantees.


HARRY A. DIAZ

Prosecuting Magistrate

Sworn and signed today, thirty-first (31) of July two thousand and seventeen (2017), before me,

Jerónimo Emilio Mejía Edward, the Magistrate of Guarantees.

JERÓNIMO EMILIO MEJÍA EDWARD

Magistrate of Guarantees

Supreme Court of Justice

Luis Carlos Tomás Abraham
Traductor Público Autorizado
Lic. No. 631( 12 de Junio de 2006

| Actions of the Defense within the folder 138-15 | | Actions of the Fiscal Magistrate within the folder 138-15 | |
|---|---|---|---|
| January | Complaint and copies are received on 1/30/15 | | |
| February | On the 11/02/2015 Att. Sidney Sitton and Att. Rogelio Cruz present power of attorney.<br>Att. Sidney Sitton presents special request.<br>Att. Sidney Sitton request copies.<br>Resolution of the Magistrates where it accumulates the complaints. | | |
| March | Four requests from Att. Sidney Sitton, including one of nullity.<br>Att. Sidney Sitton submits a request for copies. | | |
| April | Att. Leonardo Aparicio and Att. Sidney Sitton present requests.<br>Att. Sidney Sitton provides documents. | | |
| May | Att. Sidney Sitton appoints Att. Leonardo Aparicio as deputy lawyer.<br>Att. Leonardo Aparicio requests the dismissal of the complaints. | | |
| June | Resolution that admits the knowledge of the criminal case and designates MF (8/6/15).<br>Att. Rogelio Cruz is notified of such resolution.<br>Att. Sidney Sitton presents written notice of violation of due process.<br>Att. Cruz presents an appeal for reconsideration to the resolution that admits the knowledge of the criminal case.<br>The Plenary dismisses Att. Cruz's appeal as unfounded.<br>The Electoral Court sends certification of the electoral privilege of Mr. RM. | | |
| July | The Electoral Court is requested to lift the privilege to RM. | | |
| August | The Electoral Court raises the electoral criminal privilege to RM.<br>Resolution of the Plenary where it raises the suspension of the case 138-15.<br>Att. Dimas Guevara and Att. Leonardo Aparicio present power of attorney.<br>Att. Dimas Guevara revises and requests copies. | | |
| September | Att. Dimas Guevara requests copies three times.<br><br>Att. Dimas Guevara replaces power of attorney in favor of Att. Cruz. | | |
| October | Att. Leonardo Aparicio revises and requests copies twice. | August | Investigation acts begins on 8/13/15 |
| November | Att. Leonardo Aparicio submits request. | October | Resolution of 10/8/15 that announces that the investigation has ended.<br><br>The criminal accusation is presented on 9/10/15 |

## 11 MONTHS

**12 Requests for copies**
**1 Reconsideration Application**
**4 Requests (1 of nullity, 1 dismissal of complaints, 1 of file, 1 warning violation of due process)**

## 2 MONTHS

*Luis Carlos Tomas Abraham*
Traductor Público Autorizado
Lic. No. 831( 12 de Junio de 2006

(ANNEX1)