## UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF FLORIDA

Case No. 17-22197-MC-TORRES

IN THE MATTER OF THE
EXTRADITION OF RICARDO
ALBERTO MARTINELLI BERROCAL

_____/

### RESPONDENT RICARDO ALBERTO MARTINELLI BERROCAL'S
### ANSWER AND DEFENSES TO EXTRADITION

Marcos Daniel Jiménez
 Florida Bar No. 441503
**MARCOS D. JIMÉNEZ, P.A.**
255 Alhambra Circle, Suite 800
Coral Gables, Florida 33134
Telephone:      305.772.6026
Email:  mdj@mdjlegal.com

John R. Byrne
 Florida Bar No. 0126294
Jordi C. Martínez-Cid
 Florida Bar No. 100566
Jeremy L. Kahn
 Florida Bar No. 105277
**LEÓN COSGROVE, LLC**
255 Alhambra Circle, Suite 800
Coral Gables, Florida 33134
Telephone:      305.570.3233
Facsimile:      305.437.8158
Email:  jbyrne@leoncosgrove.com
Email:  jmartinez-cid@leoncosgrove.com
Email:  jkahn@leoncosgrove.com
Email:  lburns@leoncosgrove.com

*Counsel for Ricardo Alberto Martinelli Berrocal*

## <u>TABLE OF CONTENTS</u>

I.   ANSWER ........................................................................................................... 1

II.  INTRODUCTION TO DEFENSES ................................................................. 2

III. FACTS ............................................................................................................. 4

   A.   Background ................................................................................................ 4

   B.   Alleged Conduct in Panama ..................................................................... 10

     1.   The MLM equipment. ........................................................................ 11

     2.   The Pegasus equipment. .................................................................... 15

   C.   The Extradition Request ........................................................................... 20

IV.  DISCUSSION ................................................................................................. 21

   A.   Due Process Precludes Extradition .......................................................... 21

     1.   The DOJ has presented this Court with materially and obviously false statements. .... 23

     2.   The DOJ has presented this Court with a corrupt extradition request. ......................... 25

   B.   The "Surveillance" Crimes Are Not Extraditable Offenses ...................... 27

   C.   Panama Cannot Satisfy the Treaty's Warrant Requirement ...................... 30

     1.   Because the Panama court lacked jurisdiction, there is no valid arrest warrant. .......... 30

     2.   Even if the Panama court had jurisdiction, the arrest warrant is insufficient. ............. 32

   D.   Panama Cannot Establish Probable Cause ............................................... 33

     1.   Panama cannot establish probable cause regarding the surveillance crimes. ................ 34

       a.   Panama cannot show probable cause because Pitti's testimony is unreliable and false. 34

       b.   Panama cannot establish an essential element of the surveillance crimes. ............. 43

     2.   Panama cannot establish probable cause regarding the embezzlement crimes ............... 45

       a.   There is no probable cause that President Martinelli embezzled the MLM Equipment. .................................................................................. 45

       b.   There is no probable cause that President Martinelli embezzled the Pegasus equipment. ................................................................................. 47

     3.   The atrocious nature of the proceedings here obliterates probable cause. .................... 49

   E.   Dual Criminality is Panama's Burden ...................................................... 50

V.   DOCTRINE OF SPECIALTY ....................................................................... 51

VI.  CONCLUSION ............................................................................................... 52

# TABLE OF AUTHORITIES

**Cases**                                                                                                    Page(s)

*Bailey v. Bd. of Cty. Com'rs of Alachua Cty., Fla.*,
   956 F.2d 1112 (11th Cir. 1992) ................................................................... 34, 35, 36

*Bonner v. Prichard, Ala.*,
   661 F.2d 1206 (11th Cir. 1981) ............................................................................ 21

*Caplan v. Vokes*,
   649 F.2d 1336 (9th Cir. 1981) ............................................................................. 51

*Chambo v. Time Warner Cable, N.Y. City*,
   2013 WL 7904304 (S.D.N.Y. Dec. 20, 2013)..............................................................41

*Collins v. Loisel*,
   259 U.S. 309 (1922) .......................................................................................... 50

*Hill v. United States*,
   737 F.2d 950 (11th Cir. 1984) ......................................................................... 32, 33

*Galanis v. Pallanck*,
   568 F.2d 234 (2d Cir. 1977) ............................................................................... 29

*Grider v. City of Auburn*,
   Ala., 618 F.3d 1240 (11th Cir. 2010) .............................................................. 33-34

*In re Chrismatt*,
   No. 2:16-mc-29-FtM-CM (M.D. Fla. May 30, 2017) ..............................................51

*In re* Extradition of *Ben-Dak*,
   2008 WL 1307816 ........................................................................................... 40

*In re Extradition of Platko*,
   213 F. Supp. 2d 1229 (S.D. Cal. 2002) .............................................................. 43

*In re Extradition of Shaw*,
   No. 14-CV-81475-WM, 2015 WL 3442022 (S.D. Fla. May 28, 2015) ................................ 33

*In re Mazur*,
   No. 06M295, 2007 WL 2122401 (N.D. Ill. July 20, 2007) ..................................... 37

*In re Surrender of Ntakirutimana*,
   988 F. Supp. 1038 (S.D. Tex. 1997) .................................................................. 38

*Martin v. Warden*,
   Atlanta Penitentiary, 993 F.2d 824 (11th Cir. 1993) ............................................ 22

*Matter of Extradition of Santos*,
   228 F. Supp. 3d 1034 (C.D. Cal. 2017) .............................................................. 42

*Maximov v. U.S.*, 373 U.S. 49 (1963) ........................................................................ 29

LEÓN COSGROVE, LLC

255 ALHAMBRA CIR.  |  SUITE 800  |  CORAL GABLES, FL 33134  |  T 305.740.1975  |  WWW.LEONCOSGROVE.COM

*Olmstead v. U.S.*,
   277 U.S. 438 (1928) ............................................................................ 27

*Peters v. Egnor*,
   888 F.2d 713 (10th Cir. 1989) ............................................................ 50

*Petition of Geisser*,
   627 F.2d 745 (5th Cir. 1980) .............................................................. 21

*Plaster v. U.S.*,
   720 F.2d 340 (4th Cir. 1983) .............................................................. 22

*Plyler v. Doe*,
   457 U.S. 202 (1982) ............................................................................ 22

*Quinn v. Robinson*,
   783 F.2d 776 (9th Cir. 1986) ........................................... 42, 42-43, 43

*Republic of France v. Moghadam*,
   617 F. Supp. 777 (N.D. Cal. 1985) .................................................... 49

*Sacirbey v. Guccione*,
   589 F.3d 52 (2d Cir. 2009) ....................................................... 30, 31, 32

*Santobello v. N.Y.*,
   404 U.S. 257 (1971) .........................................................................25

*U.S. v. Agurs*,
   427 U.S. 97, 103 (1976) ...................................................................24

*U. S. v. Peterka*,
   307 F. Supp. 2d 1344 (M.D. Fla. 2003) ............................................ 50

*U.S. ex rel.* Argento *v. Jacobs*,
   176 F. Supp. 877 (N.D. Ohio 1959) .................................................. 41

*U.S. v. Alvarez-Machain*,
   504 U.S. 655 (1992) ........................................................................... 29

*U.S. v. Fernandez-Morris*,
   99 F. Supp. 2d 1358 (S.D. Fla. 1999) ................................... 44, 47, 48

*U.S. v. Flores*,
   538 F.2d 939 (2d Cir. 1976) .............................................................. 51

*U.S. v. Giraldo*,
   352 Fed. App'x 300 (11th Cir. 2009) ................................................ 24

*U.S. v. Harvey*,
   869 F.2d 1439 (11th Cir.1989) ........................................................25

*U.S. v. Mills*,
   704 F.2d 1553 (11th Cir. 1983) ......................................................... 25

*U.S. v. Noriega*,
   117 F.3d 1206 (11th Cir. 1997) ......................................................... 25

{00137875. 1 }

LEÓN COSGROVE, LLC

255 ALHAMBRA CIR.  |  SUITE 800  |  CORAL GABLES, FL 33134  |  T 305.740.1975  |  WWW.LEONCOSGROVE.COM

*U.S. v. Salerno*,
  481 U.S. 739 (1987) ................................................................ 26

*U.S. v. Samuels*,
  2009 WL 367578 .................................................................. 40

*Valenzuela v. U.S.*,
  286 F.3d 1223 (11th Cir. 2002) ..........................................27, 31, 55, 82

## U.S. Constitutions, Treaties, and Statutes

18 U.S.C. § 641 ...................................................................... 52

18 U.S.C. § 3184 ...................................................................... 1

18 U.S.C. § 3186 ......................................................................51

Convention on Cybercrime,
  Jan. 7, 2004, Council of Eur., T.I.A.S. No. 13174, C.E.T.S. No. 185 ......................3, 28

Treaty Between the United States of America and
the Republic of Panama Providing For Extradition of Criminals,
  U.S.-Pan., May 25, 2904, 34 Stat. 2851 ..............................................3

U.S. Const. amend. V. ...............................................................22

## Foreign Law

*Código Procesal Penal* [Criminal Procedure Code], Panama,  art. 280....................….........7

*Código Penal* [Penal Code], Panama, art. 167 ....................................…..…......45, 46

*Código Penal* [Penal Code], Panama, art. 168 ....................................…..…......45, 46

## Other Authorities

Black's Law Dictionary (9th ed. 2009) .....................................................34

U.S. Dep't of State, Bureau of Democracy, H.R. and Lab.,
Panama 2016 Human Rights Report (2016) ..............................................25

LEÓN COSGROVE, LLC

255 ALHAMBRA CIR.  |  SUITE 800  |  CORAL GABLES, FL 33134  |  T 305.740.1975  |  WWW.LEONCOSGROVE.COM

## I.     ANSWER

Respondent and former President of the Republic of Panama Ricardo Alberto Martinelli Berrocal answers and poses his defenses to the extradition complaint purportedly brought pursuant to 18 U.S.C. § 3184.   Except as specifically stated, statements of "admitted" or "denied" correspond only to the allegations contained in the identically numbered paragraphs in said complaint.

1.     The allegation calls for a legal conclusion as to the role of the United States pursuant to this extradition request and therefore requires no response, but to the extent a response is required, denied.  President Martinelli specifically denies this allegation to the extent it claims to comport with the treaties referenced in paragraph 2.

2.     Admitted.

3.     Admitted.

4.     Admitted to the extent that Prosecuting Magistrate Harry Díaz purports to have accused President Martinelli of the crimes listed in this paragraph.  The allegations are otherwise denied.  President Martinelli specifically denies this allegation to the extent it claims that he committed any crimes.  President Martinelli affirmatively alleges that the purported indictment is invalid under the law of Panama, has not been accepted by the pretrial judge under Panamanian law, and constitutes part of Panama's corrupt effort to extradite President Martinelli.

5.     Admitted to the extent that a Panamanian court purportedly held President Martinelli in *rebeldía* (roughly, contempt) for not personally appearing before that court at a time that President Martinelli was in the United States seeking asylum.  The allegations are otherwise denied including, specifically, the allegation that President Martinelli committed any of the described offenses.

LEÓN COSGROVE, LLC
255 ALHAMBRA CIR.  |  SUITE 800  |  CORAL GABLES, FL 33134  |  T 305.740.1975  |  WWW.LEONCOSGROVE.COM

6.    President Martinelli admits the allegation that he served as the President of Panama from July 2009 to July 2014.  President Martinelli denies all other allegations in this paragraph.

7.    Admitted.

8.    The allegations call for a legal conclusion as to the admissibility and proper certification of evidence and therefore require no response, but to the extent a response is required, the allegations are denied.  President Martinelli is without sufficient knowledge as to the truth of the remaining allegations in this paragraph and therefore denies the same.

9.    The documents referenced in this paragraph speak for themselves.  To the extent a response is required, the allegations are denied.  President Martinelli objects to Exhibit 1 as incomplete and affirmatively alleges that Exhibit 1 is a selective compilation from various criminal investigative files in Panama and does not include all materials in those files, including those that are exculpatory in nature.

10.    Denied.

The allegations in the "WHEREFORE" clause call for legal conclusions and require no response, but to the extent a response is required, those allegations are denied.  President Martinelli specifically denies that his arrest and detention accord with the extradition treaty between the United States and Panama.

## II.    INTRODUCTION TO DEFENSES

This extradition request is a political persecution masquerading as legal process.  From the moment that President Martinelli's political rival Juan Carlos Varela was elected President of Panama, Panama and President Varela have pursued President Martinelli's conviction.  Panama has launched numerous investigations, appointed a prosecutor who admits he has no independence and operates as part of a corrupt court, flouted mandatory prerequisites to bringing a criminal

charge in Panama, and obtained a defective warrant for President Martinelli's arrest.  Panama then submitted an extradition request to this Court that contains lies made under oath.

Panama's multiple violations have resulted in an infirm extradition request that should be denied for a combination of five reasons.

First, Panama's extradition request violates President Martinelli's Fifth Amendment rights to due process of law because Panama and its counsel, the United States Department of Justice, have presented materially false statements to this Court in support of the extradition request.  For example, in a transparent attempt to support the embezzlement charges, the foreign prosecutor, Harry Díaz, claimed that members of Panama's National Security Council misused and ultimately purloined state-purchased "MLM equipment."  Panama's own evidence proves that this statement is a lie.

Second, two of the four crimes, the alleged surveillance offenses, are non-extraditable offenses under the extradition Treaty.[1]  Although the Treaty incorporates by reference the Convention on Cybercrime, this incorporation did not occur until July 1, 2014, *after* the alleged crimes took place.  *See* Convention on Cybercrime, Jan. 7, 2004, Council of Eur., T.I.A.S. No. 13174, C.E.T.S. No. 185.  Because the Treaty has a non-retroactivity provision, Panama cannot seek extradition for these alleged crimes.

Third, Panama has failed to produce a valid arrest warrant for the four crimes with which President Martinelli is purportedly charged, a pre-requisite for extradition under the Treaty.  This failure is the result of: (i) the court lacking jurisdiction to issue the warrant, and (ii) the arrest

---

[1] Treaty Between the United States of America and the Republic of Panama Providing For Extradition of Criminals, U.S.-Pan., May 25, 2904, 34 Stat. 2851.

{00137875. 1 }

LEÓN COSGROVE, LLC
255 ALHAMBRA CIR.  |  SUITE 800  |  CORAL GABLES, FL 33134  |  T 305.740.1975  |  WWW.LEONCOSGROVE.COM

warrant failing to refer to a single extraditable offense in violation of binding Eleventh Circuit precedent.

Fourth, and despite producing nearly 3,000 pages of purported evidence against President Martinelli, Panama has not established probable cause that he committed *any* of the charged crimes. With respect to the two wiretapping crimes, Panama cannot establish probable cause because its entire case hinges on an eleventh-hour affidavit from a paid-off government witness, Ismael Pitti, that is both legally incompetent and inherently unreliable. With respect to the embezzlement crimes, Panama cannot establish probable cause that President Martinelli embezzled *any* equipment, much less equipment purchased with state funds.

Fifth, and specific to the embezzlement offenses, because Panama's embezzlement charges deal with private equipment, extraditing President Martinelli on those charges would violate the rule of dual criminality.

This Court is required to ensure that President Martinelli's constitutional rights are respected, that there is probable cause as to each charge for which extradition is sought, and that the charges and extradition request comply with the applicable treaties. To extradite President Martinelli would violate those fundamental principles.

### III.    FACTS

#### A.    Background

President Martinelli is the founder and current president of the Cambio Democrático Party, the main opposition party to current President Juan Carlos Varela and his Panameñista Party.

In 2009, President Martinelli ran for President of the Republic, with Juan Carlos Varela running as vice-president. Although Varela was a member of the opposition, he and President Martinelli agreed that, if elected, they would run a coalition government. They were elected, and in addition to his role as Vice-President, President Martinelli appointed Varela to the cabinet post

{00137875. 1 }

4

of Foreign Minister.  Two years into his term, however, President Martinelli learned that Varela had been receiving kickbacks.  He fired Varela as foreign minister.  On the five-year anniversary of this firing, Varela held a press conference and stated that the firing was "probably one of the most difficult days in my public life."[2]

Panamanian law prohibited President Martinelli from firing Varela from his position as vice-president and Varela technically remained in that position.  As the upcoming elections neared, President Martinelli announced that his party would nominate someone other than Varela as its candidate for president.   In response, Varela announced that he was leaving the coalition government and running for the presidency as a member of the Panameñista Party.  President Martinelli moved to the United States, lived here openly, and sought asylum.

After Varela ascended to the presidency, criminal investigations were launched into President Martinelli and his political allies.[3]  In June 2015, approximately a year after prosecutors in Panama had begun investigating alleged wiretapping or surveillance crimes, the Supreme Court of Panama "admitted" private criminal complaints filed by political opponents of President Martinelli, including Varela's brother, thereby officially recognizing the existence of a criminal investigation against President Martinelli.  To lead the investigations that ultimately resulted in the charges in this case, Panama appointed Harry Díaz, a magistrate of Panama's Supreme Court, as "Prosecuting Magistrate."[4]  Díaz has stated that the Panamanian Supreme Court has been in a "free

---

[2] Juan Carlos Varela, Sistema Estatal de Radio y Televisión [State Radio and Television System], *Presentación de Plan Estratégico Interinstitucional de Juventudes* [Presentation of Inter-institutional  Strategic  Plans  for  Youths]  (Aug.  30,  2016)  (available  at, https://www.youtube.com/watch?v=eBC3WNFnfog).

[3] Under the Varela administration, more than 10 criminal investigations have been launched against President Martinelli or former members of his administration.

[4] The order also designated Jerónimo Mejía "Magistrate of Guarantees."

{00137875. 1 }

LEÓN COSGROVE, LLC
255 ALHAMBRA CIR.  |  SUITE 800  |  CORAL GABLES, FL 33134  |  T 305.740.1975  |  WWW.LEONCOSGROVE.COM

fall" since Varela's ascension to the presidency.[5]  He has publicly maligned the influence of the executive on the judiciary, observing that the independence of the judiciary is likely in the "negative numbers."[6] He has conceded that he feels "squeezed" in his role as prosecutor,[7] admitted that he lacks any independence,[8] and repeatedly described the Supreme Court on which he sits as corrupt.[9]

During the investigation, President Varela himself appeared as a witness.  Testimony of Juan Carlos Varela Rodríguez, RAMB002663-2668, at RAMB002664 (Mar. 26, 2015) (attached as Exhibit 2).  When informed that his status as president meant he did not have to appear in person, Varela insisted on giving his account in person.  *Id.*  Panama's star witness, Ismael Pitti, worked at Building 150 at the National Security Council.  Pitti Aff. ¶¶ 1, 4 [D.E. 18-2, *104-*105].  One witness testified that the last time he saw Pitti was when President Varela "went to building 150." *See* Testimony of Júbilo Antonio Graell de Gracia, RAMB001923-33 at RAMB001930 (Dec. 15, 2014) ("Graell Test. I") (attached as Exhibit 3).  This statement and other evidence indicates that

---

[5] Flor Mizrachi Angel, *'He venido a manchar mi nombre siendo magistrago'* ["I've Stained my Good Name Serving as a Magistrate"], La Prensa [D.E. 18-3, *33] (Mar. 12, 2017) (Spanish original available at, http://impresa.prensa.com/panorama/venido-manchar-nombre-magistrado_0_4708779163.html) ("Díaz 2017 Interview"). Unless otherwise noted, the asterisked number following a docket entry number are references to the page number as stamped by the CM/ECF system.

[6] Díaz 2017 Interview [D.E. 18-3, *35].

[7] Díaz 2017 Interview [D.E. 18-3, *34].

[8] Díaz 2017 Interview [D.E. 18-3,*36] ("The complaints arrive, and I have to say file a charge, I can't do anything.").

[9] Díaz 2017 Interview [D.E. 18-3, at *33] ("The surveys show a total lack of independence and credibility"); *Harry Díaz: 'Moncada Luna solo es la punta del iceberg'* [Harry Díaz: Moncada Luna is Only the Tip of the Iceberg], La Prensa (Oct. 26, 2014) (Spanish original available at http://impresa.prensa.com/panorama/KNOCKOUT-Harry-Díaz-Moncada-Luna_0_4058594101.html) (translation attached as Exhibit 1) ("Díaz 2014 Interview"); Álvaro Alvarado, *Magistrado Díaz detalla proceso contra Martinelli y hace fuertes críticas a la Corte* [Magistrate Díaz Details the Process Against Martinelli and Makes Strong Criticisms of the Court], telemetro (Jan. 14, 2016) (available at http://www.telemetro.com/nacionales/entrevistas_exclusivas/Magistrado-Díaz-Martinelli-Corte-P22_3_880441956) ("Díaz 2016 Interview").

LEÓN COSGROVE, LLC
255 ALHAMBRA CIR.  |  SUITE 800  |  CORAL GABLES, FL 33134  |  T 305.740.1975  |  WWW.LEONCOSGROVE.COM

Varela himself has been involved in the process of securing the paid affidavit of Ismael Pitti – the affidavit on which Panama principally relies in this matter.[10]

The political motives behind the investigation of President Martinelli permeated the legal proceedings in Panama.   Prosecutor Díaz and the Supreme Court have repeatedly violated President Martinelli's rights.   In addition to ignoring President Martinelli's immunity from prosecution, Díaz and the court have flouted longstanding and mandatory requirements of Panamanian law, including the prerequisite to indictment known as the *imputación*.

The *imputación* is "a guarantee of due process and fundamental right."   Decl. of Roberto J. Moreno ¶ 4 (Aug. 2, 2017) (attached as Exhibit 5).   Until there is *imputación*, a criminal case may not formally commence, and a prosecutor may not bring an indictment.   *Id.*   During the *imputación*, the prosecutor, at a hearing before a magistrate, formally advises a person that he or she is being investigated for specific crimes.   *Id.* at ¶ 4; Statement of Roberto J. Moreno [D.E. 24-1, *3]; *Código Procesal Penal* [Criminal Procedure Code], art. 280 [D.E. 28-2, 15] ("Procedural Code").   The *imputación* must advise the person of the relevant facts underlying his or her *imputación* and the evidence known to the prosecutor.   Statement of Roberto J. Moreno [D.E. 24-1, *3].   The *imputación* then triggers a "preparatory" investigation phase that usually lasts up to six months and during which the defense can present evidence to the prosecutor.   *Id*.   The *imputación* is a fundamental and mandatory part of the criminal justice process, as before that time

---

[10] For example, the head of Varela's National Security Council promoted Pitti and placed him in Washington, where Pitti could not be reached for questioning by defense counsel in Panama. Letter from Omar A. Pinzón M., Director of the Ministry of Public Safety, to Ricardo Augusto Muñoz Dominguez, Assistant Prosecutor (Apr. 8, 2015) ("Pitti Promotion") (attached as Exhibit 4).   President Varela decreed the firing of William Pitti.   *See* Decree, RAMB000503-04, at RAMB000503 (Sept. 3, 2014) (attached as Exhibit 32).   Varela also decreed the elimination of Ronny Rodríguez's pension and retirement.   *See* Executive Decree No. 415, RAMB000563-67 at RAMB000563-64 (Aug. 11, 2014) (attached as Exhibit 33).

{00137875. 1 }

LEÓN COSGROVE, LLC
255 ALHAMBRA CIR.  |  SUITE 800  |  CORAL GABLES, FL 33134  |  T 305.740.1975  |  WWW.LEONCOSGROVE.COM

the person under investigation has no knowledge of the charges being considered against him and no right to present evidence.  *Id*.  After the preparatory investigation phase, the prosecutor may indict the imputed person.  *Id*.  In fact, under article 340 of Panama's Procedural Code an indictment may *only* refer to facts and persons included in the formulation of the *imputación*.  *Id.* So vital is a proper *imputación*, that without one, "the Supreme Court would be forced to terminate the investigation" and "the underlying Panamanian proceedings and the related order of detention are null."  Ex. 5, Decl of Roberto J. Moreno at ¶¶ 15, 17.

During the investigation of President Martinelli, Díaz did not bother to honor the *imputación* process, something he has admitted.[11]  Díaz has conceded that this meant that, under Panama's judicial system, President Martinelli could not be charged.  Díaz 2017 Interview [D.E. 18-3, *33].  In an interview, a reporter asked the following:  "According to you, the accusatory criminal system requires the presence of Martinelli <u>in order for him to be charged</u>.  Can he keep the process stopped as long as he wants?"  Díaz responded:  "Until he is extradited."  *Id.* (emphasis added).  Multiple legal scholars agree that Panama's failure to honor the *imputación* requirement in President Martinelli's case means that a Panamanian court has no jurisdiction over the case. Supplemental Affidavit of Roberto J. Moreno at ¶ 10 (June 21, 2017) [DE 28-2, *3] ("Moreno Supp. Aff. I");  Statement of Dr. Silvio Guerra Morales [D.E. 18-2, at *54]; Ex. 5, Decl. of Roberto J. Moreno at ¶ 12; Statement of Silvio Guerra Morales [D.E. 18-2, at *54].

---

[11] Open Letter from Harry Díaz, Magistrate of the Supreme Court of Justice to Ricardo Martinelli, former President of the Republic (Dec. 2016) (attached as Exhibit 6).  ("As to your argument that you should have been imputed first, this should be debated in the correct hearing, to which you should appear now that you have been declared in contempt" (translation ours)). *see also*, Ex. 5, Decl. of Roberto J. Moreno at ¶ 5 (stating that an *imputación* never took place).

{00137875. 1 }

LEÓN COSGROVE, LLC
255 ALHAMBRA CIR.  |  SUITE 800  |  CORAL GABLES, FL 33134  |  T 305.740.1975  |  WWW.LEONCOSGROVE.COM

In October 2015, despite the fact that the required *imputación* had not occurred, Díaz issued an indictment against President Martinelli.[12]  After this indictment, Díaz gave an interview in which he admitted that the charging decisions in Panama are "sold"[13] and that he "has to say file a charge, I can't do anything."[14]  Díaz summarized his experiences as a prosecuting magistrate, commenting, "I believe I have stained my name, serving as a [prosecuting] magistrate."[15]

In December 2015, Panama issued an arrest warrant for President Martinelli after it decided that he should be held in "contempt" for not attending the indictment hearing.  In addition to not being a *crime* in Panama, contempt is not an extraditable offense under the Treaty.

Panama formally requested President Martinelli's extradition in May 2016.  The extradition papers include a request for extradition signed by a magistrate judge and an affidavit from Díaz in support of the request.  On June 12, 2017, after Panama's extradition request had been pending for approximately a year, federal agents arrested President Martinelli.  This arrest occurred exactly one week before Varela's scheduled visit to the White House. Although Varela's Vice President claimed that President Martinelli's extradition was not on the White House meeting agenda, few analysts believed her.[16]

On August 1, 2017, Panama filed an additional affidavit from Harry Díaz.  President Martinelli has not had sufficient time to review this affidavit, for obvious reasons.  Among other things, it alleges new underlying facts and arguments not previously asserted by Panama.

---

[12] No hearing was held before the pretrial magistrate in connection with this indictment.

[13] Díaz 2017 Interview [D.E. 18-3, *36]; Díaz 2014 Interview ("Shelve investigations and sell judgments").

[14] Díaz 2017 Interview [D.E. 18-3, *36].

[15] Díaz 2017 Interview [D.E. 18-3, *35].

[16] *Presidente de Panamá visitará a Trump tras establecer lazos con China* [President of Panama Will Visit Trump After Establishing Ties With China], telemetro (June 18, 2017) (available at, http://www.telemetro.com/nacionales/Presidente-Panama-Trump-establecer-China_0_1036696418.html).

{00137875. 1 }

9

Therefore, President Martinelli will amend and supplement his answer after having sufficient time to address these new allegations.

**B.      Alleged Conduct in Panama**

Panama's case revolves around an allegedly illegal wiretapping scheme conducted by a "special, covert unit within the [National Security Council] known as 'Special Services'" from 2012 to 2014.  *See generally,* Compl. [D.E. 1].  This unit had three members, Ronny Rodríguez, William Pitti, and Ismael Pitti, and allegedly used a surveillance system called "Pegasus and its associated equipment from M.L.M Protection Ltd."  *Id.* at ¶ 6.  Following the May 2014 elections, the equipment supposedly disappeared.  *Id.*  Principally relying on the affidavit of Ismael Pitti signed in Washington, D.C. on January 2017, Panama claims that President Martinelli directed the activities of these National Security Council members.  Based on this purported conduct, Díaz's invalid indictment charges President Martinelli with four crimes, two "surveillance" crimes (roughly intercepting telecommunications and unlawful tracking) and two "embezzlement" crimes, embezzlement by misappropriation, misuse, and theft.  *Id.* at ¶ 4.

Panama has always feared, with good reason, that it could not have President Martinelli extradited for the alleged surveillance crimes.   For that reason, Panama concocted false embezzlement accusations to tack onto the extradition request.   The principal aspect of Panama's false embezzlement charges revolves around equipment allegedly provided by a company known as M.L.M. Protection Ltd.   Panama and DOJ have highlighted this equipment because it was purchased with Panamanian government funds.   They falsely claimed in the complaint and in Díaz's initial affidavit in support of extradition that the MLM equipment *included* equipment known as "Pegasus."  *See id.* at ¶ 4; Aff. of Harry Díaz, RAMB000045-66 at RAMB000049 [D.E. 36-8, *6] (Sept. 21, 2016).   In fact, the MLM equipment and Pegasus equipment are entirely

distinct sets of equipment.  They came from different companies, have different functionalities, were the subject of different trainings by different representatives, were purchased with different funds, and were used at different time periods.  Indeed, in Panama, there is a criminal case regarding the MLM equipment and a separate criminal case regarding Pegasus.  Critically, however, President Martinelli has not been named as a target or defendant in these cases because he did not direct anyone from the National Security Council to misuse, misappropriate, or steal *either* the MLM equipment or the Pegasus equipment.

1.     The MLM equipment.

Panama's evidence regarding the MLM equipment establishes three key points: (1) the equipment was incapable of infiltrating cellular telephones, and no evidence shows that it could extract emails, contact lists, text messages, or anything else from a cellular phone; (2) there is ***no*** evidence regarding the use of MLM equipment during the time period charged in the indictment, 2012 to 2014; and (3) the Panamanian government has not charged Ronny Rodríguez, Williami Pitti, or Ismael Pitti, the ones who allegedly used the equipment, with embezzlement for the loss or use of the MLM equipment.

In 2010, Panama entered into a contract with an Israeli company called "MLM Protection LTD." Audit Report No. 03-003-2015-DAF, RAMB000687-775, at RAMB000692 [D.E. 36-1, *7] (May 5, 2015).  The MLM equipment cost $13,475,000.00.  *Id.*  Panama has provided many pages and detailed payment records showing that Panama used public funds to buy the equipment. *See generally*, Audit Report No. 03-003-2015-DAF [D.E. 36-1].  As far as what the MLM equipment included in terms of hardware, various witnesses have stated that an MLM representative, Mikey Kerem,[17] installed *five laptops* at the National Security Council.  *See* Test.

---

[17] The witnesses refer to this person as having the first name Mikey, Miki, or Miky and the last name Keren or Kerem.

of Elvin Noget Ortiz González, RAMB001770-1776, at RAMB001772 (Dec. 10, 2014) ("Ortiz Test. I") (attached as Exhibit 7); *See* Test. of Elvin Noget Ortiz González, RAMB001786-1795, at RAMB001790 (Aug. 31, 2015) ("Ortiz Test. III") (attached as Exhibit 8); Test. of Elyvs Abdiel Moreno Murillo, RAMB001796-1804, at RAMB001799-1780 (Dec. 10, 2014) ("E. Moreno Test. I") (attached as Exhibit 9).

The MLM equipment was apparently capable of performing two discrete functions.  First, the equipment included something called the "PSS Pc Surveillance System" that could infiltrate *computers*.  MLM Proposal for Intelligence Technologies, RAMB000937-972, at RAMB000938-39 [D.E. 36-2, *2-*3] (Mar. 2010) (noting that the PSS Pc Surveillance System could infiltrate "selected targeted <u>computers</u>" (emphasis added)).  Once the system infiltrated a computer, it could covertly gather things like email.  *Id.* at RAMB000939 [D.E. 36-2, *4].  Second, the equipment included something called "Circles Technology" that could track the *location* of a cellular phone.  *Id.* at RAMB000945 [D.E. 36-2, *10].

Importantly, the MLM equipment was *incapable* of intercepting or "intervening" with cellular phones.  Ex. 7, Ortiz Test. I at RAMB001773; *see also*, Ex. 9, E. Moreno Test. I at RAMB001798.

In approximately June 2011, Mikey Keren installed the MLM equipment, more specifically, five laptops and a server.  Ex. 7, Ortiz Test. I at RAMB001772.  During training, Keren told National Security Council employees that the equipment could be used to "geo locate" a target through a phone number and record information from a target's computer.  Test. of Elyvs Abdiel Moreno Murillo, RAMB001805-1809, at RAMB001805 (Mar. 18, 2015) ("E. Moreno Test. II") (attached as Exhibit 10); Ex. 9, E. Moreno Test. I at RAMB001798.

Panama provides scant evidence of the use of the MLM equipment.  Only two witnesses claimed to have used the equipment.  They said that they used the MLM equipment in 2011 to infiltrate *computers*.   *See* Test. of Elvin Noget Ortiz González, RAMB001781-1784, at RAMB001781-82 (Mar. 25, 2015) ("Ortiz Test. II") (attached as Exhibit 11); Test. of Elyvs Abdiel Moreno Murillo, RAMB001810-1821, at RAMB001814-16 (Sept. 3, 2015) ("E. Moreno Test. III") (attached as Exhibit 12).   Neither witness claims to have used the MLM equipment to intercept cellular phones or mobile devices, and, in fact, both stated that the MLM equipment could not perform such a task.  *See* Ex. 7, Ortiz Test. I at RAMB0001773; Ex. 9, E. Moreno Test. I at RAMB0001798.

No witness has testified that the MLM equipment was used between 2012 and 2014, the time period charged in Díaz's indictment and referenced in the DOJ's complaint.  Further, it appears that no one *could have* used the MLM equipment during the relevant time period because the license to use the MLM software seemingly expired at the end of 2011.  *See* Ex. 7, Ortiz Test. I at RAMB001773 (discussing the witness' upcoming transfer due to the imminent expiration of the MLM license); Ex. 12, E. Moreno Test. III at RAMB001815 (same).

Despite submitting thousands of pages of exhibits, Panama has provided no supporting documentation regarding what happened to the MLM equipment.  Panamanian authorities asked both Ortiz and E. Moreno if either knew how long the equipment remained at the National Security Council building.  Ex. 7, Ortiz Test. I, at RAMB001774; Ex. 9, E. Moreno Test. I at RAMB001801. Both said that they did not know.  *Id.*[18]

---

[18] In fact, Panama provided documents accounting for the *return* of certain equipment, including laptops.  Letter from Iris González, Engineer, to Rolando López Pérez, Executive Secretary of the National Security Council, RAMB000349-50 at RAMB000349 (Aug. 14, 2014) (attached as Exhibit 13).  It is entirely unclear whether these laptops were part of the MLM equipment.

{00137875. 1 }

LEÓN COSGROVE, LLC

255 ALHAMBRA CIR.  |  SUITE 800  |  CORAL GABLES, FL 33134  |  T 305.740.1975  |  WWW.LEONCOSGROVE.COM

Significantly, in May 2015, the General Comptrollership of Panama conducted an audit of the purchase and custody of the MLM equipment. *See generally*, Audit Report No. 03-003-2015-DAF [D.E. 36-1]. The audit identified nine government employees as having had responsibility for the purchase and custody of the equipment. *See*, Audit Report No. 03-003-2015-DAF [D.E. 36-1, *81-*90], at RAMB000765-775. This list of employees does *not* include President Martinelli or, for that matter, any of the members of the National Security Council that were allegedly involved in the illegal surveillance scheme. *Id.* The audit report says nothing about "Pegasus" or "NSO Group Technologies Ltd." *Id.*

Even more significantly, in December 2014, the current head of the National Security Council (appointed by President Varela) filed a criminal complaint related to the alleged embezzlement of the MLM equipment. MLM Compl. (Dec. 2014) (attached as Exhibit 14) (translation forthcoming).[19] Neither Panama nor DOJ have advised this Court about that case because it demonstrates the complete lack of any basis for charging President Martinelli with embezzlement related to the MLM equipment. The complaint implicated the former head of the National Security Council, Alejandro Garuz, and the former head of Panama's Social Investment Fund, Giacomo Tamburelli. *Id.* It said nothing about President Martinelli.

Panamanian anti-corruption prosecutors subsequently investigated five individuals for the alleged embezzlement of the MLM equipment: Garuz, Tamburelli, Gustavo Pérez (Garuz's predecessor), and, significantly, Ronny Rodríguez and William Pitti, who are accused by Ismael

---

[19] President Martinelli will provide an English translation of this and the other non-translated documents as soon as able and apologizes to the Court for any inconvenience this causes. The sheer volume of the papers submitted by Panama, the complicated nature of these proceedings, and the hearing set for August 3, 2017, have made obtaining all the requisite translations before the hearing impossible.

{00137875. 1 }

Pitti as removing surveillance equipment following Varela's election.  *See* Vista Fiscal No. 231-16 (Oct. 19, 2016) ("Vista Fiscal") (attached as Exhibit 15) (translation forthcoming).

On October 19, 2016, a year after Díaz indicted President Martinelli for the alleged embezzlement, the prosecutors in the MLM case decided that there was not enough evidence to charge Ronny Rodríguez and William Pitti, President Martinelli's supposed agents in the embezzlement crimes.  *Id*. at 30.  The prosecutors in their charging document described much of the *same* evidence cited by Díaz in his indictment of President Martinelli.[20]  Yet, the prosecutors said: "we consider that after developing the evidence and making a legal analysis of the crimes, so far there is no element that could support the calling to trial for" Ronny Rodríguez and William Pitti."  Ex. 15, Vista Fiscal at 30 (translation ours).  Thus, Harry Díaz charged President Martinelli with embezzlement of the MLM equipment, even though Rodríguez and William Pitti, the men who allegedly conspired with him, were *not charged* for any type of embezzlement regarding the same equipment.

2.     The Pegasus equipment.

Panama's evidence about the Pegasus equipment establishes that: (1) Panama has no payment records showing that government funds, including National Security Council funds, were used to purchase the Pegasus equipment; (2) unlike the MLM equipment, the equipment was capable of extracting information from cellular phones; and (3) following the 2014 elections in Panama, the alleged Pegasus computers and related equipment were moved from one government building to another.

---

[20] This included various witnesses who said that Ronny Rodríguez and William Pitti had exclusive access to Building 150, where the equipment allegedly was used, and who described the movement of a "rack" from the building to the offices of "Super 99."  *See, e.g.,* Eye Witness Inspection Procedure, RAMB001913-15 at RAMB001914 (Nov. 18, 2014) (attached as Exhibit 16).

{00137875. 1 }

A different company called "NSO Group Technologies Ltd" allegedly provided the so-called Pegasus equipment. NSO Contract Materials, RAMB000614-622 [D.E. 36-4] (Jan. 1, 2015).[21]  The Pegasus equipment was capable of "[c]ollecting and gathering information from mobile devices[.]"  NSO Contract Materials at RAMB000621 [D.E. 36-4, *9] (emphasis added).

In contrast with the MLM equipment, Panama has failed to produce *any* payment documentation with respect to the Pegasus equipment.  In fact, when the current head of the National Security Council filed a criminal complaint regarding the alleged embezzlement of this equipment, he offered no evidence that public funds were used.  Pegasus Compl. (Aug. 5, 2015) (attached as Exhibit 18) (translation forthcoming).  Instead, the criminal complaint mentions a news article that claims that the Pegasus equipment was purchased with *private* funds.  *Id*.  The National Security Council itself has made clear that it has no official records of any dealings with NSO Group.  Ex. 17, NSC Letter ("[T]his Office [the National Security Council], does not have nor has had, for the last few years, a commercial relationship with the company called NSO Group, of Israeli origin.").  Unlike the state-purchased MLM equipment, the Pegasus equipment has never been the subject of an audit by Panama's General Comptrollership.

The only evidence submitted by Panama regarding the nature of the Pegasus equipment is the belated affidavit of Ismael Pitti.  Aff. of Ismael Pitti [D.E. 18-2, *103-*118] (Jan. 23, 2017)

---

[21]This is without concession as to the contract's validity, as the contract has been explicitly disavowed by both the purported signor and the National Security Council itself.  *See* Vista Fiscal (where Gustavo Pérez denies that the signature on the MLM contract is his); Letter from Rolando López Pérez, Executive Secretary of the National Security Council, to Marcelino Aguilar Aizprúa, Assistant Prosecutor of the Republic (Oct. 30, 2014) ("NSC Letter") (attached as Exhibit 17) ("[T]his Office [the National Security Council], does not have nor has had, for the last few years, a commercial relationship with the company called NSO Group, of Israeli origin.").

LEÓN COSGROVE, LLC

255 ALHAMBRA CIR.  |  SUITE 800  |  CORAL GABLES, FL 33134  |  T 305.740.1975  |  WWW.LEONCOSGROVE.COM

("Pitti Aff.").[22]  Pitti has claimed that it included *three desktops*, complete with towers and screens, and a server.  *Id.*[23]

According to Pitti, Pegasus could extract information from a *cellular phone* in four ways.  First, it could access certain items stored on the phone, including emails and messages sent via WhatsApp or Blackberry Messenger.  Pitti Aff. at ¶¶ 13-14 [D.E. 18-2, *107].  Second, it could "record and listen to [phone] calls."  *Id.* at ¶ 14 [D.E. 18-2, *107].  Third, it could remotely access a cellular phone's microphone and camera.  *Id.* at ¶ 15 [D.E. 18-2, *108].  Fourth, it could "locate cell phones via GPS[.]"  *Id.* at ¶ 13 [D.E. 18-2, *107].

---

[22] It is clear that Pitti is referring to the Pegasus equipment and not the MLM equipment for three reasons: (1) he identifies NSO Group representatives as having installed the equipment and trained National Security Council members on it; (2) he references the equipment as arriving sometime in 2012, which is consistent with the date of the Pegasus contract and inconsistent with the June 2011 installation of the MLM equipment; and (3) he said the equipment could extract information from a cellular phone, a capability that, as noted above, the MLM equipment did *not* have.  Pitti Aff. at ¶¶ 1, 8, 11, 13 [D.E. 18-2, *104, *106-*107].

[23] Although both a protected witness and a confidential informant also purport to describe the Pegasus equipment, neither add much to Pitti's description.  With respect to the protected witness, he or she disclaims personal knowledge about the equipment, claiming his or her information came from an "acquaintance."  *See* Sworn Statement of Witness 8430145, RAMB000364-368 at RAMB000364 [D.E. 36-5, *2] ("Protected Witness Test.").  In fact, there is serious doubt as to whether the Protected Witness even existed and President Martinelli is unable to locate or question said witness.  *See* Oficio No. 2974 [Communication No. 2974] (Mar. 19, 2015) (attached as Exhibit 19) (translation forthcoming) (stating that attempts to contact the protected witness have been fruitless and that the information contained in the registry regarding the protected witness is incorrect).

With respect to the confidential informant, a review of his testimony and Ismael Pitti's testimony proves they are the same person.  In addition to the similarities of their testimonies, Pitti's affidavit testimony identifies three users of Pegasus (himself, William Pitti, and Ronny Rodríguez) and the confidential informant's testimony identifies three users of Pegasus (the confidential informant, William Pitti, and Rodríguez).  And Pitti's affidavit and the confidential informant's testimony provide nearly exact descriptions about the removal of the equipment from the National Security Council building.  *See* Transcription Report of on Film Views [sic], RAMB000244-255, at RAMB000245-246, RAMB000250-253 [D.E. 36-6, *3-*4, *8-*11] ("Confidential Informant Test."); Pitti Aff. at ¶¶ 20-21, 27-43[D.E. 18-2, *109, *111-*115].  As a result, the confidential informant can only be Ismael Pitti.

{00137875. 1 }

17

Pitti is the only witness who purports to provide a firsthand account of the use of the Pegasus equipment.  He provides this account both in his videotaped statement as confidential informant and his affidavit.  *See* Pitti Aff.; Confidential Informant Test. [D.E. 36-6].  Although Pitti's two accounts are consistent when discussing how National Security Council members used Pegasus to wiretap individuals in Panama, they are inconsistent when it comes to President Martinelli's involvement in this wiretapping.

In his affidavit, Pitti testified that "the instructions for operating the system were given by President Martinelli himself through Ronny Rodríguez, who invariably said that 'el Jefe' wanted us to tap a certain person's telephone."  Pitti Aff. at ¶ 20 [D.E. 18-2, *109].  Pitti also provided other details about President Martinelli's alleged involvement in the wiretapping, crediting Ronny Rodríguez as the source of these details.  *See* Pitti Aff. at ¶¶ 21, 27, 28 [D.E. 18-2, *109, *111].

By contrast, in Pitti's videotaped account, he did not name President Martinelli once.  *See generally* Confidential Informant Test. [D.E. 36-6].  Indeed, Pitti said that orders about wiretapping came from "the *area* of the presidency," not President Martinelli.  *See* Spanish original of Confidential Informant Test. (attached as Exhibit 20) (emphasis added).

In both his videotaped statement and his affidavit, Pitti discussed the alleged removal of the Pegasus equipment.  *See* Protected Witness Test. at RAMB000253-254 [D.E. 36-6, *12-*13]; Pitti Aff. at ¶¶ 44-47 [D.E. 18-2, *116-*117].  According to Pitti, "[a]fter the presidential elections in May of 2014," he, Ronny Rodríguez, and William Pitti dismantled the "espionage system" and placed the "desktop computers" into the boxes in which they originally came.  Pitti Aff. at ¶ 44 [D.E. 18-2, *116].  They also disconnected the server and William Pitti "poured acid" on the printer.  *Id.* at ¶¶ 44-45 [D.E. 18-2, *116].  Ismael Pitti then claimed that, after doing all this, Rodríguez loaded the equipment, except for the printer, into a car assigned to Rodríguez and took

LEÓN COSGROVE, LLC
255 ALHAMBRA CIR.  |  SUITE 800  |  CORAL GABLES, FL 33134  |  T 305.740.1975  |  WWW.LEONCOSGROVE.COM

the equipment "to a location I do not know." *Id.* at ¶ 46 [D.E. 18-2, *116]  William Pitti and Ronny Rodríguez then "waited until around seven-thirty in the evening to remove the computers and the server so that no one who worked in Building 150 would see them." *Id.* at ¶ 46 [D.E. 18-2, *116]. Although the Pegasus equipment did *not* include any "rack," Pitti testified that, after the Pegasus equipment was moved, "they" (ostensibly referring to William Pitti and Rodríguez) and a man named "Júbilo Grael" moved the "Rack to a location I do not know." *Id.* at ¶ 47 [D.E. 18-2, *116-*117].

At least three other National Security Council witnesses—Júbilo Graell, Julio Palacios, and Vildia Torres—gave prosecutors a *different* account of what happened.  Graell testified that he and others actually moved the equipment, including the "desktops" and "computers," to a different government building.   Testimony of Júbilo Antonio Graell de Gracia, RAMB001934-1947, at RAMB001944 (Aug. 25, 2015) (attached as Exhibit 21) ("Graell Test. II").  Martinez and Torres testified similarly about moving desktops and related equipment into the building.  *See* Testimony of Julio Palacios Martínez, RAMB001960-72 at RAMB01970 (Aug. 27, 2015) (attached as Exhibit 22) ("Palacios Test."); Testimony of Vildia del Carmen Torres Potes, RAMB002040-2044, at RAMB002042-43 (Jan. 5, 2015) (attached as Exhibit 23) ("Torres Test. I"); Testimony of Vildia del Carmen Torres Potes, RAMB002045-2057, at RAMB002051-52, RAMB0002056 (Sept. 1, 2015) (attached as Exhibit 24) ("Torres Test. II").  Torres inventoried the equipment, which she said included desktops.  Ex. 24, Torres Test. II at RAMB002052-2053.  And although Ismael Pitti claims that William Pitti had poured acid on a printer, which was left behind, Torres reported that the printer left at Building 150 was "full of water" "because the men's bathroom was flooded." *Id.* at RAMB002056.

Most notably, all three witnesses also testified that, at the time they moved the equipment, Ismael Pitti had already been transferred to a different province in Panama.  Ex. 21, Graell Test. II at RAMB001944 (noting that, at the time he and others moved the equipment, "Ismael (Brad) has [sic] already been transferred to Chiriqui"); Ex. 22, Palacios Test. at RAMB001970 (same); Ex. 24, Torres Test. II at RAMB002051 (same).

The two documents prepared by Díaz, the October 2015 indictment and his September 2016 affidavit in support of extradition, mention only the rack allegedly taken to "Super 99"[24] and "laptops and a server" allegedly provided by "MLM" and removed from the National Security Council in May 2014.[25]  They say nothing about the desktops and server provided by the NSO Group, which is what Pitti claimed was removed from the National Security Council.   Pitti Aff. at ¶ 46 [D.E. 18-2, *116].

## C.    The Extradition Request

On September 21, 2016, Díaz, under oath, submitted an affidavit in support of Panama's extradition request.  In this affidavit, Díaz falsely swore (1) that the MLM equipment was the Pegasus equipment and (2) that the MLM equipment could intercept wireless devices.  Aff. of Harry Díaz at RAMB000049 [D.E. 36-8, *6].  After noting that President Martinelli had approved the $13,475,000 publicly funded contract with MLM, Díaz stated:

> The [$13,470,000] contract included a Surveillance System PSS (PC Surveillance System) [a title given to the MLM equipment] *called Pegasus* and a program which *allowed the interception of wireless devices* as well as the training of people for these programs.  *The wireless device equipment* was able to capture instant messaging and e-mails, in addition to recording conversations taking place within the radius of location of the device, as well as to access the contact lists of *cell*

---

[24] Accusation Filed Against… [President Martinelli], RAMB000072-124, at RAMB000075-76 (Oct. 9, 2015) (attached as Exhibit 35) ("Díaz Indictment"); Aff. of Harry Díaz at RAMB000059 [D.E. 36-8, *16].

[25] Aff. of Harry Díaz at RAMB000057 [D.E. 36-8, *14].

LEÓN COSGROVE, LLC

255 ALHAMBRA CIR.  |  SUITE 800  |  CORAL GABLES, FL 33134  |  T 305.740.1975  |  WWW.LEONCOSGROVE.COM

***phones***, information from memory cards and GPS location.  For some ***wireless devices***, the equipment allowed access and the recording of ***telephone*** calls.

*Id.* (emphasis added).

Díaz also falsely swore that the equipment allegedly used to intercept cellular phones (1) had been purchased with public funds and (2) had "disappeared."  *Id.*  Díaz stated:

> Upon termination of the presidential term of Mr. RICARDO MARTINELLI BERROCAL, the equipment disappeared from the facilities of the National Security Council . . . . even though witnesses have indicated having transported a metal rack that contained the server to the corporate offices of the Super 99, a supermarket chain linked to Mr. MARTINELLI BERROCAL.  This situation causes a detriment to the patrimony of the Panamanian State that acquired said equipment through the Social Investment Fund,[26] to meet "social interest needs" by "improving the quality of life of underprivileged people."

*Id.* at RAMB000050 [D.E. 36-8, *7].

Panama seeks to extradite President Martinelli through false statements provided by Díaz.  There is simply no way that Díaz committed a mistake or got confused as to the fact that MLM and Pegasus are two wholly distinct things.  The only reasonable conclusion is that Díaz intentionally lied.  And it is those lies that form the basis of the extradition request and serve to highlight that these extradition proceedings are a politically motivated, retaliatory act by Panama.

## IV.  DISCUSSION

### A.  Due Process Precludes Extradition

The Eleventh Circuit has made clear that the Court "must ensure that the constitutional rights of individuals subject to extradition are observed." *Valenzuela v. U.S.*, 286 F.3d 1223, 1229 (11th Cir. 2002) (Tjoflat, J.); *see also, Petition of Geisser*, 627 F.2d 745, 750 (5th Cir. 1980)[27]

---

[26] The Social Investment Fund is where the proceeds for the MLM equipment was purchased, not Pegasus.  *See* Audit Report No. 03-003-2015-DAF [D.E. 36-1].

[27] In *Bonner v. City of Prichard, Ala.*, the Eleventh Circuit held that decisions of the Fifth Circuit handed down before October 1, 1981, are binding precedent in this circuit.  661 F.2d 1206, 1207 (11th Cir. 1981).

("[A] purported treaty obligation of the United States government cannot override an individual constitutional right").  This includes a person's rights under the Due Process Clause of the Fifth Amendment, which states that "no person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. Because the "constitutional rights of individuals, including the right to due process, are superior to the government's treaty obligations," this proceeding must comport with the Fifth Amendment's promise of due process.  *Martin v. Warden, Atlanta Penitentiary*, 993 F.2d 824, 829 (11th Cir. 1993).[28]

In terms of what a due process violation looks like in the extradition context, the Eleventh Circuit's decision in *Valenzuela* is illustrative.  In that case, the respondents made inculpatory statements to DEA agents in exchange for a promise of confidentiality.  286 F.3d at 1225.  Breaking that promise, the agents provided the statements to the foreign government, which then incorporated them into an affidavit in support of its extradition request.  *Id*.  The magistrate judge admitted the evidence and ultimately found that the defendants were extraditable, as did the district judge when presented with a petition for *habeas corpus*.  *Id*. at 1225.

The Eleventh Circuit reversed and held that the U.S. prosecutors' breach of the confidentiality agreement and use of the statements to establish probable cause was "contrary to [respondents'] due process right to a fundamentally fair hearing," and thus they were entitled to a grant of their *habeas* petition. *Id*. at 1230.  Notably, the Eleventh Circuit recognized three layers

---

[28] President Martinelli is entitled to the same due process rights as any U.S. citizen. "[T]he due process clause protects all persons, not merely citizens." *Plaster v. U.S.*, 720 F.2d 340, 347 n.8 (4th Cir. 1983); *see also* U.S. Const. amend. V. (providing that "no person shall . . . be deprived of life, liberty, or property, without due process of law" (emphasis added)). "Whatever his status under the immigration laws," President Martinelli "is surely a 'person' in any ordinary sense of that term. Aliens, even aliens whose presence in this country is unlawful, have long been recognized as 'persons' guaranteed due process of law by the Fifth and Fourteenth Amendments." *Plyler v. Doe*, 457 U.S. 202, 210 (1982).

LEÓN COSGROVE, LLC
255 ALHAMBRA CIR. | SUITE 800 | CORAL GABLES, FL 33134 | T 305.740.1975 | WWW.LEONCOSGROVE.COM

of the due process violation: (1) the foreign government's method of obtaining the confidential statements by way of a breach of the confidentiality agreement; (2) the U.S. prosecutors' presentation of the statements to the magistrate to establish probable cause; and (3) the judiciary's "countenance" of DOJ's misconduct. *See id.* ("In this case, the Government not only ignored the agents' promise-by revealing petitioners' identity and the information they provided to the Italian authorities—but it went one step further: it used the fruits of the breach by presenting the information to the magistrate judge, all to petitioners' detriment. To affirm the district court's judgment would be to countenance the Government's conduct.").  The facts of this case are no less shameful.

1.    The DOJ has presented this Court with materially and obviously false statements.

The complaint expressly adopts materially and obviously false statements provided by Prosecuting Magistrate Harry Díaz in his sworn request for extradition.

First, Díaz falsely swore that members of the National Security Council used publicly purchased MLM surveillance equipment, which Díaz called "Pegasus," to unlawfully wiretap individuals in Panama from 2012 to 2014.  Aff. of Harry Díaz at RAMB000049 [D.E. 36-8, *6]. The DOJ repeats that claim in its complaint.  *See* Compl. at ¶ 6 [D.E. 1, *4].  But Panama's own evidence proves that the MLM equipment, unlike the entirely separate and distinct Pegasus equipment, was technically incapable of intercepting wireless communications.  *See, e.g.,* MLM Proposal for Intelligence Technologies at RAMB000939 [D.E. 36-2, *85]; Ex. 7, Ortiz Test. I at RAMB001773; Ex. 9, E. Moreno Test. I at RAMB001798.  And not a single witness has said that the MLM equipment was even used between 2012 and 2014, which, according to the complaint and Panamanian indictment, are the years when the alleged unlawful wiretapping took place.  *See* Compl. at ¶ 6 [D.E. 1, *2] (alleging that, "from 2012 to May 2014, [President Martinelli] misappropriated government resources to illegally intercept and record the private

communications of at least 150 individuals"); Ex. 25, Díaz Indictment at RAMB000080, RAMB000082-90, RAMB000099.

Second, Díaz falsely swore that, after the elections, the MLM equipment "disappeared from the facilities of the National Security Council," causing a detriment to the Social Investment Fund, which is the fund that financed the purchase of the MLM equipment.  Aff. of Harry Díaz at RAMB000050 [D.E. 36-8, *7].  The DOJ's complaint again repeats Díaz's false claim.  Compl. at ¶ 6 [D.E. 1, *7].  Panama has produced no evidence about the "disappearance" of the MLM equipment, which was the equipment bought with state funds.  Instead, it has attempted to prove the disappearance of entirely *different* equipment, the Pegasus equipment, which had nothing to do with the Social Investment Fund.  Although intentionally conflating the two pieces of equipment is problematic enough, to make matters worse, the evidence calls into question and does not establish probable cause that even this Pegasus equipment "disappeared."  Rather, Panama's evidence indicates that government employees moved, at the very least, Pegasus computers from point A (Building 150) to point B (a government warehouse).  *See* Ex. 21, Graell Test. II at RAMB001944; Ex. 22, Palacios Test. at RAMB001970; Ex. 23, Torres Test. I at RAMB002042-43; Ex. 24, Torres Test. II at RAMB002051-52, RAMB002056.  One witness even prepared some paperwork documenting the return of the items removed from the National Security Council building.  Ex. 24, Torres Test. II at RAMB002053.

 Like the use of statements provided to a foreign government in breach of an immunity agreement, the DOJ's use of materially false statements to support probable cause violates due process.  *U.S. v. Giraldo*, 352 Fed. App'x 300, 302 (11th Cir. 2009) (*per curiam*) ("Due process is denied and a new trial required when the government obtains a conviction using material evidence that it 'knew, or should have known,' was false." (quoting *U.S. v. Agurs*, 427 U.S. 97, 103 (1976)));

*U.S. v. Noriega*, 117 F.3d 1206, 1220-21 (11th Cir. 1997) ("The Supreme Court long has held that deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with rudimentary demands of justice.  As a result, due process is violated when the prosecutor, although not soliciting false evidence from a Government witness, allows it to stand uncorrected when it appears." (internal citations and quotation marks omitted)); *U.S. v. Mills*, 704 F.2d 1553, 1565 (11th Cir. 1983) ("For the prosecution to offer testimony into evidence, knowing it or believing it to be false is a violation of the defendant's due process rights.").[29]

> 2.   The DOJ has presented this Court with a corrupt extradition request.

The United States has recognized that the Panamanian judiciary is "susceptible to corruption and outside influence" and faces "allegations of manipulation by the executive branch." U.S. Dep't of State, Bureau of Democracy, H.R. and Lab., Panama 2016 Human Rights Report 1, 6 (2016) [D.E. 18-3, *2, *7].  Despite this, the DOJ has presented an indictment from a foreign prosecutor who has admitted that his charging decisions are "sold" and that he has no independence.

Díaz has repeatedly admitted in media appearances that he operates in and is part of a corrupt system.

In October 2014, he gave an interview to La Prensa.[30]  When asked if there were other cases of judicial corruption like the case against Alejandro Moncada Luna, the former president of

---

[29] It is irrelevant that the above-cited cases were decided outside the extradition context. Notably, in *Valenzuela*, the Eleventh Circuit expressly relied on case law <u>outside</u> the extradition context for the proposition that the admission of evidence in breach of a plea bargain or immunity agreement violates due process, and had no trouble applying that due process principle to the extradition context. 286 F.3d at 1230 (relying on *Santobello v. N.Y.*, 404 U.S. 257 (1971) and *U.S. v. Harvey*, 869 F.2d 1439 (11th Cir.1989) (*en banc*)).

[30] Ex. 1, Díaz 2014 Interview.

the Supreme Court, Díaz said that Moncada was "the tip of the iceberg." *Id.* He added that the bad practices of the magistrates are "[s]helving cases and selling judgments." *Id.*

In January 2016, ***after*** his indictment of President Martinelli in this case, Díaz sat down for an "exclusive" videotaped interview with telemetro.com, during which he attacked former and current members of the Supreme Court.[31]

Just a few months ago, Díaz publicly maligned the independence of the Panamanian Supreme Court on which he sits. Díaz 2017 Interview [D.E. 18-3, *33-*37]. Noting that the Court had been in a "free fall" since President Varela's ascension to the presidency, Díaz pointed out the national police's frequent visits to Court chambers, President Varela's selection of judges who would answer to him, and the various surveys that showed the court's "lack of independence and credibility." *Id.* The reporter then asked Díaz to rate the independence of the judiciary, on a scale of 1 to 10. *Id.* [D.E. 18-3, *35]. Díaz's response: "Can we go into negative numbers?" *Id.* [D.E. 18-3 *35]. After Díaz complained about the influence of the executive on the judiciary, he was asked if he felt "squeezed." Díaz responded, "Me? Yes." *Id.* [D.E. 18-3, *34]. The reporter then asked Díaz, "How common is it still for decisions to be sold?" Díaz responded: "The complaints arrive, and I have to say file a charge, I can't do anything." *Id.* [D.E. 18-3, *36]. Díaz also said, "I believe I have stained my name, serving as a magistrate." *Id.* [D.E. 18-3, *35].

To date, neither Panama nor the DOJ has denied Díaz's statements. It is shocking that the DOJ is attempting to honor an indictment issued by a man who has admitted that money, not merits, drives his charging decisions. *See U.S. v. Salerno*, 481 U.S. 739, 746 (1987) (noting that due process "prevents the government from engaging in conduct that 'shocks the conscience' or interferes with rights 'implicit in the concept of ordered liberty.'"); *U.S. v. Fernandez-Morris*, 99

---

[31] Díaz 2016 Interview.

LEÓN COSGROVE, LLC
255 ALHAMBRA CIR.  |  SUITE 800  |  CORAL GABLES, FL 33134  |  T 305.740.1975  |  WWW.LEONCOSGROVE.COM

F. Supp. 2d 1358, 1372 (S.D. Fla. 1999) (observing that the "[foreign] court's apparent disregard for its own procedures and substantive law, and the unquestioning acceptance of obviously perjured testimony" caused the court to cast "a skeptical eye on the evidence presented by the Government in this case.").

The rule of non-inquiry has no application here.  Extradition should be denied on due process grounds because of the corrupt actions that led to Díaz's indictment and his repeated admissions that he operates as part of a corrupt Supreme Court.  Díaz has admitted that, in the Panama Supreme Court, charging decisions are "sold," he has denied President Martinelli his rights under Panama's criminal justice system, and has misrepresented material facts in his extradition request.  Although this misconduct occurred in Panama geographically speaking, DOJ has relied on and affirmatively used the products of this misconduct in the complaint it filed against President Martinelli, thereby violating President Martinelli's due process rights here. *Cf. Olmstead v. U.S.*, 277 U.S. 438, 483 (1928) (Brandeis, J., dissenting) ("When the government, having full knowledge, sought, through the Department of Justice, to avail itself of the fruits of these acts in order to accomplish its own ends, it assumed moral responsibility for the officers' crimes.").

## B.    The "Surveillance" Crimes Are Not Extraditable Offenses

The Treaty between the United States and Panama contains a provision that precludes the Treaty from operating retroactively.  Treaty, art. XII ("The present Treaty… shall not operate retroactively.").  This is a rare provision in an extradition treaty and prevents the extradition of persons who allegedly commit offenses before their inclusion in the Treaty.

Panama has charged President Martinelli with two non-extraditable "surveillance crimes": (1) interception of telecommunications without judicial authorization and (2) tracking, persecution, and surveillance without judicial authorization.  Both crimes are alleged to have been

committed <u>before</u> such crimes were incorporated into the Treaty, which occurred when Panama acceded to the Cybercrime Convention on July 1, 2014.  Therefore, a certificate of extradition must not issue.  *Fernandez-Morris*, 99 F. Supp. 2d at 1360 ("In order for an extradition to be proper . . . (2) the charges must be included in the treaty as extraditable offenses[.]").

The Treaty between Panama and the United States entered into force on May 8, 1905.  *See* Treaty.  Article II of the Treaty enumerates thirteen specific crimes for which extradition shall be granted. [DE 33-1, *2-*3].  Absent from this list of enumerated crimes are the surveillance crimes, which, of course, did not exist in 1905.  Consequently, Panama's asserted basis for the extradition of President Martinelli on the surveillance crimes is the Cybercrime Convention.  Countries that are neither a member of the Council of Europe nor non-member states that have participated in its elaboration—such as Panama—may join the Cybercrime Convention through a process called "accession."  *See* Cybercrime Convention, art. 37.  When a country joins via accession, "the Convention shall enter into force on the first day of the month following the expiration of a period of <u>three months after the date of deposit</u> of the instrument of accession with the Secretary General of the Council of Europe."  *Id.*, at art. 37 ¶ 2 (emphasis added). Panama ratified the Cybercrime Convention on March 5, 2014, so by its terms, and as conceded by Panama, the Cybercrime Convention entered into force with respect to Panama on July 1, 2014.  *See* Request for Extradition, ¶ 7 (attached as Exhibit 26) ("[t]he Convention on Cybercrime, held in Budapest on November 23, 2001 that entered into force for the Republic of Panama on July 1, 2014").[32]

---

[32] Though this document was produced by Panama, it was not Bates-labeled.

28

LEÓN COSGROVE, LLC
255 ALHAMBRA CIR.  |  SUITE 800  |  CORAL GABLES, FL 33134  |  T 305.740.1975  |  WWW.LEONCOSGROVE.COM

Here, because the alleged surveillance crimes occurred <u>before July 1, 2014</u>,[33] any offenses added to the Treaty by the Cybercrime Convention may not be applied retroactively under the express terms of the Treaty and the Convention itself.  The law is clear here.  Extradition treaties have retroactive effect "<u>unless they contain a clause to the contrary</u>." *Galanis v. Pallanck*, 568 F.2d 234, 237 (2d Cir. 1977) (Friendly, J.) (emphasis added).  The Treaty in this case expressly provides that it "<u>shall not operate retroactively</u>."  Treaty, art XII [D.E. 33-1, *6] (emphasis added).  And under the Cybercrime Convention, the Treaty's anti-retroactivity provision governs: "Extradition shall be <u>subject to the conditions</u> provided for by the law of the requested Party <u>or by applicable extradition treaties</u> . . . ." Cybercrime Convention, art. 24 ¶ 5 (emphasis added); *see also id.* at art. 39 ¶¶ 1, 3 ("The purpose of the present Convention is to <u>supplement</u> applicable multilateral or bilateral treaties or arrangements between the Parties . . . . <u>Nothing</u> in this Convention shall affect other rights, <u>restrictions</u>, obligations and responsibilities of a Party." (emphasis added)). This plain language controls.  *U.S. v. Alvarez-Machain*, 504 U.S. 655, 663 (1992) ("In construing a treaty, as in construing a statute, we first look to its terms to determine its meaning."); *Maximov v. U.S.*, 373 U.S. 49, 54 (1963) ("[I]t is particularly inappropriate for a court to sanction a deviation from the clear import of a solemn treaty between this Nation and a foreign sovereign, when, as here, there is no indication that application of the words of the treaty according to their obvious meaning effects a result inconsistent with the intent or expectations of its signatories.").

In sum, the Cybercrime Convention—which is the only asserted basis for the extradition with respect to the surveillance crimes—is effective only as to Panamanian crimes that occur after July 1, 2014, and a certificate cannot issue as to the surveillance crimes.

---

[33] Compl. at ¶ 6 [D.E. 1, *3] (alleging that the crimes occurred "from 2012 to May 2014").

LEÓN COSGROVE, LLC
255 ALHAMBRA CIR.  |  SUITE 800  |  CORAL GABLES, FL 33134  |  T 305.740.1975  |  WWW.LEONCOSGROVE.COM

C.      **Panama Cannot Satisfy the Treaty's Warrant Requirement**

The Court cannot extradite President Martinelli on *any* of the charged crimes because Panama has not satisfied the Treaty's warrant requirement.  Panama cannot do this for two alternative reasons:  (1) the Panama court that issued the arrest warrant lacked jurisdiction to do so and (2) even if the Panama court had jurisdiction, it has issued a warrant for a non-extraditable offense.

1.      Because the Panama court lacked jurisdiction, there is no valid arrest warrant.

The Panamanian court that issued the arrest warrant never had jurisdiction over President Martinelli's case.  Where a defendant has been charged with an offense, the Treaty requires that the country seeking extradition produce "a duly authenticated copy of the warrant of arrest in the country where the crime has been committed[.]"  Treaty, art. III.  This arrest warrant, of course, must be "valid."  *Sacirbey v. Guccione*, 589 F.3d 52, 67 (2d Cir. 2009).  If the court that issued the arrest warrant does not have jurisdiction over the case, the arrest warrant is invalid.  *Id.*

Here, Panama cannot produce a valid arrest warrant because the court that issued the warrant lacked jurisdiction.  Under Panama's Criminal Procedure Code, before a criminal court can obtain jurisdiction over a person, that person must undergo the process of *imputación*.  Procedural Code, art. 280 [D.E. 28-2, 15]; *see* Moreno Supp. Aff. I at ¶ 7 [DE 28-2, *3] ("The only way to formally associate a person to a criminal procedure is by personally indicting the individual before a Judge of Guarantees.");[34] *id.* at ¶ 13 [D.E. 28-2, *4] ("[I]n order to be able to order a detention due to contempt, a previous indictment hearing is required, which has not occurred in the case of Ricardo Martinelli Berrocal[.]").

---

[34] Though the affidavit uses the word "indictment" instead of *imputación*, those words are not cognates, and the original Spanish uses *imputación*.

As explained above, because Panama intentionally ignored the *imputación* in President Martinelli's case, there can be no valid arrest warrant. *See id.* at ¶13 [D.E. 28-2, *4] ("[I]t is my legal opinion . . . that . . . to acquire jurisdiction and the power to apply personal precautionary measures against Ricardo Martinelli, his previous personal indictment is indispensable[.]"); *id.* at ¶ 4 [D.E. 28-2, *2] ("Ricardo Martinelli Berrocal has not been indicted in the process, since he has not personally attended any hearing."); *see also* Statement of Dr. Silvio Guerra Morales ¶3 [D.E. 18-2, *54] (referring to Panama's purported jurisdiction here as a "pseudo exercise of jurisdiction").

Indeed, Panama has effectively *admitted* that it has no jurisdiction over President Martinelli. First, the Panamanian court that issued the arrest warrant here has conceded that the proceedings against President Martinelli deviated from the "normal" procedures. *See* Provisional Arrest Warrant, RAMB000069-70, at RAMB000069 (Apr. 25, 2016) (attached as Ex. 27). The Court of Justices stated: "It is clear for this Court of Justices that the behavior assumed by Mr. MARTINELLI BERROCAL of withdrawing from the national jurisdiction has become a ***challenging circumstance against the normal development*** of the proceeding pursued against him." *Id.* (emphasis added). The Supreme Court of Justice, however, fails to explain how it has overcome that "challenging circumstance." Second, Díaz himself conceded in an interview that President Martinelli could not be "charged" until he was extradited. Díaz 2017 Interview [D.E. 18-3, *33]. Under the Treaty, that is putting the proverbial cart before the horse. You need a valid charge *before* you can extradite a person, or there can be no extradition.

The Second Circuit's opinion in *Sacirbey* is on point. There, the Second Circuit held that Bosnia could not "satisfy the Treaty's requirement that Bosnia demonstrate a 'charge' by producing a valid arrest warrant." 589 F.3d. at 67. Relying on warrant language identical to the

warrant language in the applicable Treaty here, the court began by noting that "the 'warrant of arrest' is a formal legal instrument that is required by the Treaty to show that a person has been charged with an extraditable crime." *Id.* at 66.   Because the Bosnian court "lack[ed] jurisdiction over the investigation of Sacirbey's alleged crimes," the Second Circuit reasoned, Bosnia could not produce a valid arrest warrant. *Id.* at 67.   The same is true here.   Panama never had jurisdiction over President Martinelli and, as a result, it cannot satisfy the Treaty's requirement of a valid arrest warrant.

> 2.    <u>Even if the Panama court had jurisdiction, the arrest warrant is insufficient.</u>

Even if the Panama court had jurisdiction over President Martinelli, and it did not, Panama has nevertheless produced an insufficient arrest warrant to this Court.   The arrest warrant is for contempt, a non-extraditable offense, and does not reference a single extraditable crime.   This violates binding Eleventh Circuit precedent.

In *Hill v. United States*, the Eleventh Circuit held that, to satisfy the warrant requirement, a foreign country had to produce an arrest warrant that refers to *at least one* extraditable offense. 737 F.2d 950, 952 (11th Cir. 1984).   There, Canada had charged the relator for five crimes in total, four drug-related crimes and one false-statements crime. *Id.* at 951.   But, in its extradition request, Canada presented an arrest warrant for only two crimes, one of the four drug-related crimes as well as the crime of failure to appear (presumably, contempt). *Id.* at 952.   Under the treaty between Canada and the United States, only the drug crime qualified as an extraditable offense. *Id.* at 952. The Eleventh Circuit held that respondent could be extradited because the arrest warrant referred to at least one extraditable offense: the drug crime.[35]   In their exact words, "The warrant *may*

---

[35] Part and parcel of this holding is that extradition would have been improper in the event it only listed a non-extraditable offense.   Like in *Hill*, the arrest warrant against President Martinelli is solely for contempt, which is not a crime, much less an extraditable one.

LEÓN COSGROVE, LLC
255 ALHAMBRA CIR.  |  SUITE 800  |  CORAL GABLES, FL 33134  |  T 305.740.1975  |  WWW.LEONCOSGROVE.COM

specify all the charges if the requesting country so chooses, but it *need* refer to only one."   *Id.* (emphasis in original).

The arrest warrant here does not refer to a single extraditable offense.  Rather, it refers only to the offense of contempt.  This is due to Panama's failure to comply with its own laws, including those with respect to *imputación*, which precluded the issuance of a valid warrant on the charges. As a result, the warrant fails to satisfy Eleventh Circuit precedent.

Panama has argued that the Eleventh Circuit's reasoning in *Hill* is dictum, saying that "the court [in *Hill*] found mention of the offense as a sufficient, but not necessary, condition[.]" Opp. to Emergency Mot. (June 19, 2017) [D.E. 22, *8].  But the Eleventh Circuit could not have been clearer that it was a necessary condition, going so far as to emphasize the word "need."  *Hill*, 737 F.2d at 952.  The court's reasoning was not dictum.  Black's Law Dictionary defines obiter dictum as "[a] judicial comment made while delivering a judicial opinion, but one that is unnecessary to the decision in the case and therefore not precedential[.]"  Black's Law Dictionary, 1177 (9th ed. 2009).   The Eleventh Circuit's statement that the arrest warrant must refer to at least one extraditable offense was *essential* to its ruling, as the arrest warrant in *Hill* included only one extraditable offense.  In sum, *Hill* clearly set the extraditable offense bar for arrest warrants at one, a bar that this arrest warrant falls short of making.

## D.     Panama Cannot Establish Probable Cause

A key issue at an extradition hearing is "whether there is competent evidence to establish probable cause that the defendant committed the offense(s) underlying the request for extradition." *In re Extradition of Shaw*, No. 14-CV-81475-WM, 2015 WL 3442022, at *5 (S.D. Fla. May 28, 2015).  Probable cause consists of "'facts and circumstances sufficient to warrant a prudent man in believing that the suspect had committed or was committing an offense.'" *Grider v. City of*

*Auburn, Ala.*, 618 F.3d 1240, 1257 (11th Cir. 2010) (quoting *Gerstein v. Pugh*, 420 U.S. 103, 111 (1975).  Although meeting the probable cause standard "does not require convincing proof," it "requires more than mere suspicion."  *Bailey v. Bd. of Cty. Com'rs of Alachua Cty., Fla.*, 956 F.2d 1112, 1120 (11th Cir. 1992).

Below, President Martinelli will take up surveillance and embezzlement crimes separately, outlining the evidentiary shortfalls that preclude the Court from finding probable in support of the charged crimes.

1.    Panama cannot establish probable cause regarding the surveillance crimes.

Panama cannot establish probable cause as to the surveillance crimes for two alternative reasons.  First, Panama's case for probable cause hinges on the fundamentally flawed testimony of Ismael Pitti.  Second, even if the Court were to credit Panama's evidence in its entirety, including Pitti's testimony, Panama could still not establish probable cause because there is no evidence on an essential element of the surveillance crimes, namely, President Martinelli's knowledge that the alleged surveillance occurred without judicial authorization.

a.  *Panama cannot show probable cause because Pitti's testimony is unreliable and false.*

Panama's surveillance case depends on the testimony of one man, Ismael Pitti.  He is the only witness, out of more than two dozen, who has testified about the central issue here, which is whether President Martinelli ordered members of the National Security Council to surveil people in Panama.

The rest of Panama's evidence, nearly 3,000 pages in total, does not even address this issue, much less establish probable cause.  Although President Martinelli will not address every piece of evidence to show why this is the case, the following three examples are illustrative.

First, ostensibly to connect Ronny Rodríguez to President Martinelli, Panama has offered testimony from witnesses who have said that : (1) Ronny Rodríguez claimed that he received instructions "directly" from President Martinelli;[36] (2) Ronny Rodríguez said that other, non-wiretapping surveillance had been done for President Martinelli;[37] and (3) Ronny Rodríguez visited the presidential offices.[38]

Putting aside that most of this is hearsay, this evidence is innocuous. Ronny Rodríguez held a high-ranking position within the National Security Council. It is uncontroversial that someone in his position would meet with the president regularly.

Second, Panama has offered testimony from alleged victims of the unlawful wiretapping. Of these victims, only two mention an exchange with President Martinelli about allegedly wiretapped material: Yassir Purcait and Erasmo Pinilla. Neither witness moves the needle on probable cause.

With respect to Purcait, President Martinelli allegedly played him audio clips of a phone conversation between two men who were talking about a hit on Purcait. Test. of Yassir Aboobeker Purcait Saborio, RAMB002479-90 at RAMB002482-84 (Aug. 20, 2015) ("Purcait Test.") (attached as Exhibit 28). Purcait did not claim that *he* was wiretapped during that call and the phone number that he gave for himself in the interview does not appear on the list of "unauthorized" phone numbers. *See* Written Communication No. 23-DMF-OJ, RAMB000599-

---

[36] Ex. 8, Ortiz Test. III at RAMB001793.

[37] Ex. 21, Graell Test. II at RAMB001942. It is clear that Graell is not talking about the charged surveilling because when the interviewer asked Graell about his knowledge about the unlawful "telephone listening or espionage," Graell responded by saying, "Well, what I knew was because of the rumors from everyone in the job, it was said that wiretapping was being done and that in the intelligence group there were rumors that the wiretapping was done in commander Ronny's office." *Id.* at RAMB001946.

[38] Ex. 22, Palacios Test. at RAMB001971.

LEÓN COSGROVE, LLC
255 ALHAMBRA CIR. | SUITE 800 | CORAL GABLES, FL 33134 | T 305.740.1975 | WWW.LEONCOSGROVE.COM

600 at RAMB000599 (Sept. 17, 2015) ("Phone List") (attached as Exhibit 29).  Most critically, there is no evidence that this alleged conversation was intercepted *unlawfully*.

With respect to Pinilla, the prosecutor presented him with a purportedly wiretapped email exchange between himself and two leaders of another political party, the Partido Revolucionario Democrático.  Test. of Erasmo Pinilla Castillero RAMB002545-48 at RAMB002546 (Jan. 7, 2015) ("Pinilla Test.") (attached as Exhibit 30).  President Martinelli allegedly complained to Pinilla about the exchange.  *Id.*  Apart from the obvious possibility that the two party leaders could have mentioned the email exchange to President Martinelli, the testimony offers nothing on the key issue—whether President Martinelli ordered the wiretapping that captured the email exchange.[39]

Third, Panama has offered President Martinelli's supposed statement on television that he had "The dossier and pedigree on everyone, everything in this country" and that he knew, "what each person has done and not done."  Pitti Aff. at ¶ 41 [D.E. 18-2, *114-*115].  The statement does not mention wiretapping or electronic surveillance at all.  And, even if the Court were to construe it in the most nefarious light, it does not help establish probable cause that President Martinelli ordered wiretapping.

This exercise makes clear that Panama submitted the Pitti affidavit in a belated attempt to establish probable cause that President Martinelli ordered members of the National Security

---

[39] The complaint only mentions two alleged victims: Pinilla and a man named Rosendo Enrique Rivera, a former attorney of President Martinelli.  *See* Compl. at ¶ 6 [D.E. 1, *6].  Pinilla's testimony has already been covered.  Rivera's testimony, though, also does not add to the probable cause mix.  Rivera claimed that he ran into someone who worked at the presidential office named Rodrigo Sarasqueta and, during their exchange, Sarasqueta referred to a conversation that Rivera had with a third-party.  Test. of Rosendo Enrique Rivera Botello RAMB002434-37 at RAMB002435 (Jan. 26, 2015) (attached as Exhibit 31).  Although Rivera's alleged conversation was not even with President Martinelli, DOJ claims that President Martinelli "fired" Rivera "based on private communications between Mr. Rivera and a third party."  *Id.*

LEÓN COSGROVE, LLC
255 ALHAMBRA CIR.  |  SUITE 800  |  CORAL GABLES, FL 33134  |  T 305.740.1975  |  WWW.LEONCOSGROVE.COM

Council to unlawfully wiretap individuals in Panama.  Indeed, Panama has effectively admitted as much.  Panama, through DOJ, did not present its complaint until after it got Pitti's affidavit.

Ultimately, however, instead of saving Panama's wiretapping case, the Pitti affidavit, for three main reasons, only underscores the absence of probable cause.  First, Panama's own evidence impeaches Pitti's testimony.  Second, the Court should not rely on large portions of the affidavit because Pitti fails to identify the source of his allegations.  And third, the affidavit is inherently unreliable because the critical parts of it are triple hearsay, and Panama has bought Pitti's testimony.  In short, the Pitti affidavit "turned out to be so internally inconsistent, so patently unreliable, that it obliterated, all on its own, any semblance of probable cause."  *See In re Mazur*, No. 06M295, 2007 WL 2122401, at *27 (N.D. Ill. July 20, 2007).[40]

### i. Panama's Own Evidence Impeaches Pitti

Panama's own evidence eviscerates Pitti's credibility.  As part of its supporting documentation, Panama produced a transcript of a videotaped statement provided by a confidential informant, who clearly is Ismael Pitti.  That statement is inconsistent with Pitti's affidavit in material respects.  Most notably, in his videotaped statement, Pitti, despite covering the surveillance scheme in great detail, did not mention President Martinelli *once*.  Instead, he said that someone "*in the area of* the presidency" instructed National Security Council members to use the equipment.  Confidential Informant Test. at RAMB000245 [D.E. 36-6, *3].[41]  Yet in his

---

[40] Although the Court should give no weight to the Pitti affidavit, President Martinelli alternatively argues that the Court should not even consider it because it would be inadmissible in a future trial in Panama against President Martinelli.  Here, as Robert J. Moreno has discussed in an affidavit, the Pitti affidavit cannot be admitted in Panama because it was not obtained in accordance with Panamanian law.  *See* Statement From Roberto J. Moreno (June 19, 2017) [D.E. 24-3, *3].

[41] The English translation cuts out the word "*Presidencia*," which is in the original Spanish-language materials.  *Compare* Confidential Informant Test. at RAMB000245 [D.E. 36-6, *3] *with*

affidavit, Pitti discusses President Martinelli at length, claiming, by way of information from Ronny Rodríguez, that President Martinelli was intimately involved in the wiretapping.  Pitti's failure to mention President Martinelli in his videotaped statement is damning, as the involvement of the President of Panama in a wiretapping scheme is not something a person either forgets or decides is not worth noting.  *See In re Surrender of Ntakirutimana*, 988 F. Supp. 1038, 1044 (S.D. Tex. 1997) (finding no probable cause where, among other things, witness did not specifically implicate the defendant in a crime until the witness's third interview).  There is no doubt that Pitti's sudden recollection of President Martinelli's involvement is the product of the deal that Panama cut with him, as discussed below.

Pitti's account about another key issue—the purported disappearance of the Pegasus equipment—is also negated by multiple witnesses.  In his affidavit, Pitti claims that, after the 2014 elections, William Pitti and Ronny Rodríguez loaded all the Pegasus equipment into a car and took it to an unknown location.  Pitti Aff. at ¶ 46 [D.E. 18-2, *116].  Putting aside the fact that Pitti's testimony does not even establish that the equipment was stolen, multiple witnesses tell a far different story.  They testified that, after the elections, they picked up equipment, including three "desktops," from Building 150, moved it to another government-owned building, and documented the return of the equipment.[42]  One of these witnesses even noted that the printer had water damage, not acid burns, due to a bathroom flood.  Ex. 24, Torres Test. II at RAMB002056.  Perhaps most notably, these witnesses make clear that, when they moved the equipment, Pitti had already been transferred to a different *province.  See* Ex. 21, Graell Test. II at RAMB001944 (noting that, at the

---

Ex. 20, Spanish original Confidential Informant Test. ("de los lados de la <u>Presidencia</u>." (emphasis supplied)).

[42] Ex. 21, Graell Test. II at RAMB001944; Ex. 22, Palacios Test. at RAMB01970; Ex. 23, Torres I at RAMB002042-43; Ex. 24, Torres Test. II at RAMB002051-52, RAMB0002056.

{00137875. 1 }

LEÓN COSGROVE, LLC
255 ALHAMBRA CIR.  |  SUITE 800  |  CORAL GABLES, FL 33134  |  T 305.740.1975  |  WWW.LEONCOSGROVE.COM

time he and others moved the equipment, "Ismael (Brad) has [sic] already been transferred to Chiriqui"); Ex. 22, Palacios Test. at RAMB001970 (same); Ex. 24, Torres Test. II at RAMB002051 (same).

On this point, any argument that Ismael Pitti could have been talking about different equipment is eliminated when one considers Pitti's videotaped account regarding Júbilo Graell's involvement in the movement of the "rack." In his videotaped statement, Pitti claimed that, after the elections, Ronny Rodríguez and William Pitti moved the Pegasus equipment on one day and that, the *next* day, Rodríguez and Graell moved a rack. Ex. 24, Torres Test. II at RAMB000254.[43] But Graell's testimony proves that Pitti could not have been present for the movement of *either* the Pegasus equipment or the rack. He testifies about the same events in the same order, but notes that, at the time of the events, Pitti had already been transferred to an entirely different province. Ex. 21, Graell Test. II at RAMB001944. In other words, Pitti's affidavit account about the removal of the Pegasus equipment, replete with nefarious-sounding details, is pure fiction.

In short, Panama's evidence proves that Pitti has been inconsistent on one material issue (President Martinelli's purported involvement in the wiretapping) and made up testimony about another (the removal of the Pegasus equipment). Such testimony should be given no weight.

ii.  The Court Should not Rely on Pitti's Unsourced Allegations

As a basic procedural matter, the Court should not consider large portions of the affidavit because Pitti failed to identify the source or sources of his information. Although the government may offer unsworn hearsay to help establish probable cause, the government must still identify the *source* of the hearsay. *U.S. v. Samuels*, No. 08-MJ-445 (RLM), 2009 WL 367578, at *7 (E.D.N.Y.

---

[43] In his affidavit, Pitti is vaguer about when, in comparison to the other equipment, the rack was moved, simply saying that the rack was moved the "same week" as the other equipment. *See* Pitti Aff. at ¶ 47 [D.E. 18-2, *116-*117].

{00137875. 1 }

LEÓN COSGROVE, LLC
255 ALHAMBRA CIR.  |  SUITE 800  |  CORAL GABLES, FL 33134  |  T 305.740.1975  |  WWW.LEONCOSGROVE.COM

Feb. 10, 2009) ("To be sure, in order to support a finding of probable cause, such hearsay statements must identify the source of the information and may not consist of conclusory or speculative statements."); *In re Extradition of Ben-Dak*, No. 06 MAG. 1540 GWG, 2008 WL 1307816, at *6 (S.D.N.Y. Apr. 11, 2008) (finding that no probable cause supported the extradition request where the affidavit failed to "disclose which factual allegations are based on [the affiant's] personal knowledge, which are based on the personal knowledge of some other individual, and which are merely conjecture").

Here, in many instances, Pitti's affidavit makes it impossible for the Court to perform this task. The affidavit contains numerous "unsourced" hearsay allegations. For example, Pitti states, "[W]henever we got audio or video that was particularly sensational, 'el Jefe' would request that it be uploaded to YouTube." Pitti Aff. at ¶ 29 [D.E. 18-2, *129]. Pitti fails to say how he knows that this is the case. Without such information, the Court cannot determine the probative value of the unsourced allegations, and the evidence cannot support a finding of probable cause. *See U.S. v. Samuels*, 2009 WL 367578, at *7; *In re Extradition of Ben-Dak*, 2008 WL 1307816, at *6. As in *Ben-Dak*, Pitti's affidavit is submitted on "information and belief," leaving one to speculate which parts are based on information and which are based on mere belief, which is insufficient to establish probable cause.

Pitti's failure to identify the basis or bases for many of his allegations is compounded by the fact that Pitti makes it sound like he has first-hand knowledge of things that he plainly did not have. Here, once again, Pitti's testimony about the post-election removal of items from the National Security Council building is illustrative. Pitti provides granular details about how National Security Council members removed surveillance equipment and a rack from the National Security Council building, even suggesting that he helped with parts of the move:

> That same week, <u>we</u> took the furniture out of the office on the top floor of Building 150 to a NSC storage warehouse, with the exception of the Rack [sic] on which the espionage system server was connected.  The Rack [*sic*] was not removed from the top floor of Building 150 when the rest of the equipment was removed because it would not fit in the car.  In order to remove this Rack [*sic*], they brought a white pickup truck driven by another NSC employee, Jubilo Grael, known by his pseudonym, 'Maycol.'  Jubilo Grael and Ronny Rodríguez  took the Rack to a location I do not know.

Pitti Aff. at ¶ 47 [D.E. 18-2, *116-*117] (emphasis added).  But Panama's own evidence proves that this would have been impossible.  Jubilo Graell testified that, at the time he helped move the rack, Pitti had already been transferred to a different *province*, Chiriqui, and that he (Graell) helped Rodríguez, and no one else, move the rack.  Ex. 21, Graell Test. II at RAMB001944.

In short, Pitti's repeated failure to identify the source of his alleged facts makes it impossible for the Court to credit those facts in its probable cause analysis.[44]

### iii.  Pitti's Testimony is Inherently Unreliable

Pitti's affidavit is inherently unreliable for three notable reasons.  First, parts of the affidavit that purport to implicate President Martinelli consist of <u>triple</u> hearsay.  *See U.S. ex rel. Argento v. Jacobs*, 176 F. Supp. 877, 881 (N.D. Ohio 1959) (noting that, although an extradition court may consider hearsay, "the hearsay character of a statement is a factor to be considered in determining the weight to be accorded it").  For example, Pitti's affidavit says, "Moreover, the instructions for operating the system were given by Ricardo Martinelli himself through Ronny Rodríguez, who invariably said that 'el jefe' wanted us to tap a certain person's telephone."  Pitti Aff. at ¶ 20 [D.E. 18-2, *109].  That is the same as saying Ismael Pitti *said* that Ronny Rodríguez *said* that President Martinelli *said* to tap a person's phone.  The probative value of such parroted statements is infinitesimal.  *See Chambo v. Time Warner Cable, N.Y. City*, No. 11 CIV. 09555 AJN, 2013 WL

---

[44] For this same reason, the Court cannot rely on *any* of the allegations in the DOJ's complaint. The complaint does not cite a *single* source for its numerous allegations.

LEÓN COSGROVE, LLC
255 ALHAMBRA CIR.  |  SUITE 800  |  CORAL GABLES, FL 33134  |  T 305.740.1975  |  WWW.LEONCOSGROVE.COM

7904304, at *7 (S.D.N.Y. Dec. 20, 2013) (noting that "the hearsay rule" was "meant to exclude" "unreliable evidence" like the "triple hearsay statement" before the court).

Second, Pitti also makes allegations that Panama has conspicuously failed to corroborate. For example, Pitti alleged that President Martinelli instructed Pitti (again through Ronny Rodríguez), William Pitti, and Rodríguez to spy on his supposed mistress, even giving her full name. Pitti Aff. at ¶¶ 32, 39 [D.E. 18-2, *112, *114]. One would think that Panama would seek to corroborate such an explosive and potentially incriminatory allegation by interviewing this person or, at the very least, confirming that her phone number is included among the numbers for which no judicial authorization to wiretap was obtained. *Cf.* Ex. 29, Phone List. Panama has done neither.

Third, Panama has purchased Pitti's testimony. "Although an extradition court is not authorized to conduct a mini-trial, it still must determine the competency of evidence—a determination which involves assessing the credibility of the government's evidence." *Matter of Extradition of Santos*, 228 F. Supp. 3d 1034, 1054 (C.D. Cal. 2017); *Quinn v. Robinson*, 783 F.2d 776, 815 (9th Cir. 1986) ("The credibility of witnesses and the weight to be afforded their testimony is solely within the province of the extradition magistrate.").

Here, despite Pitti's claimed involvement in illegal activity, Panama has not charged him with a single crime. But, even more, Panama has paid him off. Almost immediately after Pitti appears as the confidential informant in a video provided on August 11, 2014, the head of Panama's National Security Council (appointed by Varela) put in a request that Pitti be granted a license to travel to Washington, D.C. as a Police Attaché in the service of the Inter-American Defense Board. Ex. 4, Pitti Promotion. Curiously, that request stated that Pitti will be serving in that role backdated to August 8, 2014—the day *after* Pitti first gave his statement *Id.* (stating that

by means of an order dated August 14, 2014, Rolando López Pérez, Executive Secretary of the National Security Council, requested paid leave for Pitti backdated to August 8, 2014).

Notably, Panama offered the same deal to Rodríguez: "a diplomatic post in Washington DC, at the Interamerican Defense Board, if [he] would collaborate with them to incriminate the former president, RICARDO MARTINELLI, in cases of illegal wiretapping." Rodríguez Aff. [DE 18-2 at *121].  Later, Panama pushed again, with a government official offering to take Rodríguez "directly to the Office of the President of the Republic, to Mr. JUAN CARLOS VARELA, who was willing to offer [Rodríguez ] 'WHATEVER HE WANTED' if he would incriminate former President RICARDO MARTINELLI.'"  *Id.*  When Rodríguez  refused, they threatened to charge him with multiple crimes, a threat Panama ultimately backed up.  *Id.*  Varela, apparently, approached Pitti directly.  When witness Júbilo Graell was asked when he last saw Ismael Pitti, he said, "The last time I saw ISMAEL PITTI was when Mr. President JUAN CARLOS VARELA went to building 150." Ex. 3, Graell Test. I at RAMB001930.

In sum, the Court should give no probative value to the Pitti affidavit.  And, without that affidavit, Panama cannot establish probable cause.

> b.    *Panama cannot establish an essential element of the surveillance crimes.*

Second, Panama has failed to offer *any* evidence on an essential element of both surveillance crimes—knowledge that President Martinelli knew that the purported surveillance was not authorized.

The government must establish that "probable cause exists as to *each required element*." *In re Extradition of Platko*, 213 F. Supp. 2d 1229, 1240 (S.D. Cal. 2002) (emphasis added); *Fernandez-Morris*, 99 F. Supp. 2d at 1367 (finding lack of probable cause because government failed to show defendant "had the requisite criminal intent").  With respect to both surveillance

offenses, Panama must prove, of course, that the alleged surveillance was not authorized. *See Código Penal* [Criminal Code], art. 167 [D.E. 18-2, *14] (criminalizing interception of "telecommunications" or private "conversations" without "authorization of the judicial authority"); *id*. at art. 168 (criminalizing surveillance of a person "without proper authorization"). But, as Panama's own indictment makes clear, Panama must *also* prove that the defendant *knew* that he or she did *not* have the requisite authority to conduct the surveillance.   Ex. 25, Díaz Indictment at RAMB000073 (alleging that the "officers of the National Security Council . . . were fully aware of the illegality of these [surveillance] activities").

Here, even if the Court were to accept wholesale every piece of evidence offered by Panama, including the Pitti affidavit, it could not find probable cause that President Martinelli *knew* the alleged surveillance was unauthorized.   There is nothing inherently illegal about the surveillance activities purportedly conducted by the members of the National Security Council. Rather, it was the members' purported failure to get judicial authorization before conducting the surveillance that rendered the activities unlawful.   Critically, Panama has offered no evidence— double hearsay, triple hearsay, or otherwise—that President Martinelli *knew* that his National Security Council had not applied for and received the requisite judicial authorizations to wiretap phones.  *Fernandez-Morris*, 99 F. Supp. 1358 (finding no probable cause supported extradition where "[t]here is no evidence beyond mere speculation that [the defendant] had any knowledge of his son' actions or their supposed [criminal] intent").   Indeed, given that Pitti's affidavit states that the National Security Council *routinely* sought and obtained judicial authorization to tap phones in Panama, one would be hard-pressed to even argue that President Martinelli *should have known* that the National Security Council was not obtaining the requisite approvals.  *See* Pitti Aff. at ¶¶ 22-26 [D.E. 18-2, *110-*111].

LEÓN COSGROVE, LLC
255 ALHAMBRA CIR.  |  SUITE 800  |  CORAL GABLES, FL 33134  |  T 305.740.1975  |  WWW.LEONCOSGROVE.COM

2.     <u>Panama cannot establish probable cause regarding the embezzlement crimes</u>

Panama has also charged President Martinelli with two different "embezzlement crimes": embezzlement by theft and misappropriation, in violation of article 338 of the Criminal Code of Panama and embezzlement of use, in violation of article 168 of that same code.  [D.E. 18-2, *14, *17].  Although Panama and the DOJ conflate the MLM surveillance equipment with the Pegasus surveillance equipment, it is clear that they have charged embezzlement of *equipment* rather than cash, securities, or other assets.  And it is equally clear that, regardless of which equipment Panama is referring to, Panama cannot show probable cause that President Martinelli embezzled *anything*.

   a.   *There is no probable cause that President Martinelli embezzled the MLM Equipment.*

There is no evidence that President Martinelli directly or indirectly misused, misappropriated, or stole MLM equipment.  But, even more, Panamanian prosecutors have actually conceded that President Martinelli's purported co-conspirators regarding the MLM equipment, Ronny Rodríguez and William Pitti, could not be called to trial on MLM-related charges.  Ex. 15, Vista Fiscal at *31 (translation ours).

With respect to misuse and misappropriation, Panama cannot connect the MLM equipment either causally or temporally to the alleged surveillance.  From a temporal standpoint, Díaz's indictment covers the years 2012 to May 2014.  *See* Compl. [D.E. 1, *4] ¶ 6; Ex. 25, Díaz Indictment at RAMB000045.  Panama has submitted no evidence that anyone *used* the MLM Equipment during that time frame, much less misused or misappropriated the equipment at President Martinelli's direction.  To the contrary, the individuals who testified about using the MLM equipment, Ortiz and E. Moreno, said that they last used it in 2011, eliminating any temporal connection to the time frame of the events alleged in the Díaz indictment.  Ex. 7, Ortiz Test. I at RAMB001773; Ex. 12, E. Moreno Test. III at RAMB001815.

From a causation standpoint, technically speaking, it would have been impossible for the National Security Council members to use the MLM equipment to carry out the alleged unlawful surveillance.  Pitti's affidavit says that they used equipment that could extract information "flowing through a *cellular telephone*," Pitti Aff. at ¶ 13 [D.E. 18-2, *107].  The MLM equipment is *incapable* of performing such a task.  Ex. 7, Ortiz Test. I at RAMB001773; *see also*, Ex. 9, E. Moreno Test. I at RAMB001798.

Finally, Panama itself has expressly tied the purported email account where intercepted information was allegedly stored—brad.pty507@gmail.com—to Pegasus.  Panama did so through the Pitti affidavit.  Pitti testified that he and others would use the "espionage equipment" for "monitoring" and then sometimes save the surveillance results in the brad.pty507@gmail.com email account.  Pitti Aff. at ¶¶ 8, 28 [D.E. 18-2, *106, *111].  The "espionage equipment" that Pitti refers to is unquestionably the Pegasus equipment.  For one thing, Pitti testified that Martin Berenstein and Sharon Oknin, both NSO Group representatives, installed the "espionage equipment."  Pitti Aff. at ¶ 8 [D.E. 18-2, *106].  For another, Pitti testified that the equipment could extract information from a cellular phone, again, something only Pegasus could do.

With respect to any alleged theft, Panama's evidence, at best, shows that the MLM equipment, which apparently consisted of five laptops and a server, was last seen in 2011.  Ex. 7, Ortiz Test. I at RAMB001773; Ex. 12, E. Moreno Test. III at RAMB001815.  Although it is entirely unclear what happened to the equipment, no one has alleged that President Martinelli stole it himself or ordered his purported underlings at the National Security Council to steal it.  The only evidence regarding removal of computer equipment comes from Ismael Pitti, who claims that, after the 2014 elections, Rodríguez and William Pitti took computer equipment "to a location I do

not know." Pitti Aff. at ¶ 46 [D.E. *116].   This testimony does not relate to the MLM equipment because, again, Pitti only purported to describe to the Pegasus system, not the MLM equipment.

Panama's complete lack of probable cause for embezzlement relating to the MLM equipment is reflected by the actions of its own government.   First, Panama's own Comptroller General investigated the purchase and custody of the MLM equipment and held various individuals responsible for it, none of which are President Martinelli, Ronny Rodríguez, Ismael Pitti, or William Pitti.   *See* Audit Report [D.E. 36-1].   In other words, not even the Panamanian government thinks President Martinelli stole or was responsible for the MLM equipment.[45]   Second, Panamanian prosecutors investigated Ronny Rodríguez and William Pitti regarding the alleged embezzlement of MLM equipment.   *See* Ex. 15, Vista Fiscal.[46]   The prosecutors considered much of the *same* evidence that Díaz considered when he indicted President Martinelli.   Logic would dictate that the prosecutors would charge the people who allegedly misused and misappropriated the equipment at President Martinelli's direction.   But the prosecutors did the opposite: they recommended dismissal of the embezzlement case against Rodríguez and William Pitti.   *Id.*

> b.   *There is no probable cause that President Martinelli embezzled the Pegasus equipment.*

Regarding the Pegasus equipment, the Court should make the same finding—no probable cause that President Martinelli embezzled the Pegasus equipment—but for different reasons.

---

[45] Further, it boggles the mind to think that the five laptops and a server purportedly embezzled could be valued at nearly $13.5 million.   The only reasonable conclusion from the evidence is that nearly all of the *value* of the surveillance system was the license to utilize the surveillance software which, according to evidence, expired in 2011.   In other words, Panama received exactly what it bargained for when it purchased the system from MLM: the capabilities, for a limited time, to utilize the surveillance software.   That Panama seeks to extradite Martinelli and hold him responsible for nearly $13.5 million instead of the price of five laptops and a server (which may not constitute a felony or crime justifying imprisonment under the Treaty) only further buttresses the point that Panama will disregard the truth in the hopes of persecuting President Martinelli.

[46] Although Ismael Pitti claims to have played a central role in the alleged unlawful activities, the prosecutors did not investigate him.

First, to prove embezzlement under Panama law, Panama must show that the embezzled equipment was property of the State.  Statement From Roberto J. Moreno (June 19, 2017) [D.E. 24-3, *2] (noting that, for embezzlement offenses, the "assets, monies, or securities" must be "property of the State").  Although Panama has offered evidence that the MLM equipment was purchased with State funds, there is no such evidence as to the Pegasus equipment.  Indeed, if anything, Panama has established probable cause that the Pegasus equipment was *not* purchased with State funds.  Specifically, Pitti himself contrasted a printer with the Pegasus equipment by observing that the printer, unlike the Pegasus equipment "could not be removed because it [unlike the Pegasus equipment] was included in the [government] inventory and paid for out of the NSC budget."  Pitti Aff. at ¶ 45 [D.E. 18-2, *116].  This factual distinction between the pieces of equipment makes a legal difference—MLM equipment can technically be embezzled; Pegasus cannot.  This is why Díaz falsely claimed that the MLM equipment *was* the Pegasus equipment.  Aff. of Harry Díaz at RAMB000049 [D.E. 36-8, *6].

Second, even if the Pegasus equipment *were* state property, and it is not, there is no evidence that President Martinelli misused it or misappropriated it, for at least two reasons.  To prove embezzlement under both articles, Panama has to establish that a defendant had custody over the embezzled asset.  Statement From Roberto J. Moreno (June 19, 2017) [D.E. 24-2, *3] (noting that, under article 388, in addition to being state owned, the public servant must have "custody and responsibility of such State assets); *id.* [D.E. 24-2, *4] (noting that, under article 341, the public servant must be "a public servant who has custody or guardianship of the asset").  There is no report by the Comptroller General as to the Pegasus equipment – an essential element to charge embezzlement in Panama.  Here, Panama has offered no evidence that President Martinelli had the required custody over the equipment.  Moreover, as developed in the surveillance section

above, there is no probable cause that President Martinelli directed anyone to use any surveillance equipment unlawfully.

On the theft front, no one, not even Ismael Pitti, has alleged that President Martinelli ordered anyone to steal or discard the Pegasus equipment.[47]  And, for reasons already pointed out above, Panama's own evidence indicates that Pegasus computers and other items were simply moved from one government building to another.  Ex. 21, Graell Test. II at RAMB001944; Ex. 22, Palacios Test. at RAMB01970; Ex. 23, Torres Test. I at RAMB002042-43; Torres Test. II at RAMB002051-52, RAMB0002056.  To be sure, Panama's evidence covers, in great detail, the supposed movement of a rack from the National Security Council building to the corporate offices of the Super 99.  *See, e.g.,* Ex. 16, Eye Witness Inspection Procedure at RAMB001914.  There is no evidence, though, that this rack, which is a piece of furniture, was part of either the MLM equipment or the Pegasus equipment.

      3.     The atrocious nature of the proceedings here obliterates probable cause.

A court may consider "disturbing" conduct of the government when deciding whether probable cause supports the charged crimes.  *See Republic of France v. Moghadam*, 617 F. Supp. 777 (N.D. Cal. 1985) (holding that "disturbing" conduct of both the French and United States government would be "considered in determining probable cause"); *Valenzuela*, 286 F.3d at 1229 (remanding with instructions to the district court that it find no probable cause after expunging evidence obtained in violation of due process); *Fernandez-Morris*, 99 F. Supp. 2d at 1367 (finding lack of probable cause where court was "skeptical" regarding the evidence because the foreign government violated defendant's rights).

---

[47] Again, like the MLM equipment, it is illogical to believe that a significant portion of whatever multi-million dollar value Panama ascribes to Pegasus can be attributed to a handful of computers or the infamous "Rack."

For all the reasons previously discussed, including Harry Díaz's lack of independence and material lies, there can be no probable cause; quite simply Panama's credibility is zero and the probative value of its evidence nearly non-existent.  If this proceeding were a preliminary hearing, and Prosecuting Magistrate Díaz were an Assistant United States Attorney presenting an indictment to this Court, these facts alone would justify throwing the indictment out based on a lack of probable cause.  The Court should do no less here, where the legal standard is the same.

**E.**      **Dual Criminality is Panama's Burden**

Panama has the burden of proving dual criminality.  *U. S. v. Peterka*, 307 F. Supp. 2d 1344, 1349 (M.D. Fla. 2003) ("Dual criminality is an essential element of the government's burden of proof to establish a basis for extradition.").  Panama can only prove dual criminality by establishing that the conduct for which extradition is sought is illegal both in the United States and Panama. *Collins v. Loisel*, 259 U.S. 309, 312 (1922).  Dual criminality and probable cause are intertwined, and "the resolution of one guides the resolution of the other."  *Peters v. Egnor*, 888 F.2d 713, 716 (10th Cir. 1989).

As developed in the probable cause section, Panama cannot establish probable cause that President Martinelli embezzled public assets.  Panama's embezzlement case against President Martinelli relies on his purported embezzlement of private assets, namely, the Pegasus equipment.[48]  To the extent that embezzlement of private assets is permissible under Panamanian law, and President Martinelli maintains that it is not, this would violate the rule on dual criminality because analogous American statutes require that the embezzled property be public in nature.  *See,*

---

[48] Panama has not sought extradition on a charge of larceny nor provided evidence supporting the same.

{00137875. 1 }

LEÓN COSGROVE, LLC
255 ALHAMBRA CIR.  |  SUITE 800  |  CORAL GABLES, FL 33134  |  T 305.740.1975  |  WWW.LEONCOSGROVE.COM

*e.g.*, 18 U.S.C. § 641 (criminalizing the embezzlement "of any record, voucher, money, or thing of value *of the United States*" (emphasis added)).

## V.   DOCTRINE OF SPECIALTY

"[T]he Supreme Court established as a judicially enforceable principle of our domestic law that an extradited defendant may not be charged and tried for crimes not enumerated in the applicable extradition treaty."   *U.S. v. Flores*, 538 F.2d 939, 944 (2d Cir. 1976).   This principle, referred to as the doctrine of speciality, has evolved "to provide that even if the treaty specifies crimes for which the defendant may be criminally responsible, prosecution for such offenses will be barred if the asylum state did not grant extradition for such crimes."   *Id.*; *see also,* 18 U.S.C. § 3186 ("The Secretary of State may order the person… to be deliver to any authorized agent of such foreign government, to be tried for the offense of which charged.").   While the doctrine applies even if the applicable treaty is silent, the Treaty explicitly prohibits President Martinelli from being tried for crimes or offense "other than that for which he was delivered up."   Treaty, art. VIII; *see also, In re Chrismatt*, No. 2:16-mc-29-FtM-CM (M.D. Fla. May 30, 2017) (in an extradition case to Panama, noting the cited provision, and including language in the certificate of extraditability regarding the same).

As a result, the Court must determine the extraditability as to each charge.   *See Caplan v. Vokes*, 649 F.2d 1336, 1344 (9th Cir. 1981) ("[A]n adequate extradition proceeding must include in its record a specific delineation, as to each charge, of the legal theories under the requesting country's law by which the accused's conduct is alleged to constitute an extraditable offense. … Because this proceeding lacks such a record, we are constrained to grant relief to [Respondent].").   Though issuing a certificate of extradibility in this case would be wholly inappropriate, to the extent such a certificate is issued, it should specifically specify as to which charges—an important

consideration given that Panamanian proceeding against President Martinelli are corrupted and likely preordained.

## VI.   CONCLUSION

WHEREFORE, Respondent Ricardo Alberto Martinelli Berrocal requests that a certificate of extraditability not issue, that he be released immediately from federal detention, that judgment be entered in his favor or the complaint for extradition be dismissed, and such other relief as the Court deems proper.

Dated:  August 2, 2017                          Respectfully submitted,


                                                *s/ Marcos Daniel Jiménez*
                                                Marcos Daniel Jiménez
                                                 Florida Bar No. 441503
                                                **MARCOS D. JIMÉNEZ, P.A.**
                                                255 Alhambra Circle, Suite 800
                                                Coral Gables, Florida 33134
                                                Telephone:    305.772.6026
                                                Email:  mdj@mdjlegal.com

                                                John R. Byrne
                                                 Florida Bar No. 126294
                                                Jordi C. Martínez-Cid
                                                 Florida Bar No. 100566
                                                Jeremy L. Kahn
                                                 Florida Bar No. 105277
                                                **LEÓN COSGROVE, LLC**
                                                255 Alhambra Circle, Suite 800
                                                Coral Gables, Florida 33134
                                                Telephone:    305.570.3233
                                                Facsimile:    305.437.8158
                                                Email:  jbyrne@leoncosgrove.com
                                                Email:  jmartinez-cid@leoncosgrove.com
                                                Email:  jkahn@leoncosgrove.com
                                                Email:  lburns@leoncosgrove.com

                                                *Counsel for Ricardo Alberto Martinelli Berrocal*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 2, 2017, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which in turn will serve a copy by electronic mail to all counsel of record.

<u>*s/ Marcos Daniel Jiménez*</u>
Marcos Daniel Jiménez