```
 1                IN THE UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF FLORIDA
 2                              MIAMI
                    CASE NO. 17-CV-22197-EGT
 3       _____

 4       UNITED STATES OF AMERICA,
                              Plaintiff
 5            vs.                           August 3, 2017

 6       RICARDO ALBERTO
         MARTINELLI-BERROCAL,
 7                            Defendant.

 8       _____

 9                        EXTRADITION HEARING

10            BEFORE THE HONORABLE EDWIN G. TORRES,

11       UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

12       _____

13                      A P P E A R A N C E S

14       FOR THE PLAINTIFF:    ADAM S. FELS, AUSA
         UNITED STATES OF      CHRISTOPHER J. SMITH, AUSA
15       AMERICA               REBECCA A. HACISKI, AUSA
                               United States Attorney's Office
16                             99 NE 4th Street
                               Miami, FL 33132
17                             (305) 961-9325
                               Adam.fels@usdoj.gov
18                             Christopher.j.smith@usdoj.gov
                               Rebecca.haciski@usdoj.gov.

19       FOR THE DEFENDANT:    MARCOS D. JIMENEZ, ESQ
         RICARDO ALBERTO       JOHN R. BYRNE, ESQ
20       MARTINELLI-BERROCAL   JORDI C. MARTINEZ-CID, ESQ
                               JUAN FERNANDEZ-BARQUIN, ESQ
21                             Marcos D. Jimenez, PA
                               255 Alhambra Circle, Suite 800
22                             Coral Gables, FL 33134
                               (305) 570-3249
23                             Mdj@mdjlegal.com
                               Jbyrne@leoncosgrove.com
24                             Cid@leoncosgrove.com

25
```

```
 1   REPORTED BY:        GIZELLA BAAN-PROULX, RPR, FCRR
                         United States Court Reporter
 2                       400 North Miami Avenue, Suite 8S32
                         Miami  FL  33128
 3                       (305) 523-5294
                         gizella_baan-proulx@flsd.uscourts.gov
 4

 5

 6                    P R O C E E D I N G S

 7        (The following proceedings were held in open court.)

 8        THE COURT:  Good morning.  Have a seat.

 9        THE COURTROOM DEPUTY:  Case 17-CV-22197-Torres.

10   United States of America versus Ricardo Alberto Martinelli

11   Berrocal.  May we have counsel appearance starting with the

12   government?

13        MR. FELS:  Good morning, Your Honor.  Adam Fels,

14   assistant United States attorney.  With me at couple table are

15   office of international affairs Christopher Smith and seated to

16   Mr. Smith's right is trial attorney Rebecca Haciski, also from

17   the department of international affairs.

18        THE COURT:  Thank you.

19        MR. JIMENEZ:  Good morning, Your Honor.  Marcos

20   Jiménez for Ricardo Alberto Martinelli.  With me is John Byrne

21   and Jordi Martínez-Cid and Juán Fernandez representing our

22   client, and we would ask that he be allowed to write, so could

23   we have him uncuffed?

24        THE COURT:  I'll authorize it.

25        MR. JIMENEZ:  Thank you.
```

1          **THE COURT:**  Sorry about the late start, but we're

2     ready to go now.  Mr. Martinelli, defendant, is here.

3          So this is the extradition treaty for Mr. Martinelli.

4     Did the government review the response memorandum and answer

10:21  5   filed by the defendant last night?

6          **MR. FELS:**  Your Honor, we have taken a look at it.

7     And we're prepared to respond to the best of our ability and,

8     obviously, if there are issues that come up, we would ask for

9     some additional briefings, since many of these arguments came

10:21  10  up for the first time last night, but we did get a chance to

11    review it, Your Honor.

12         **THE COURT:**  Well, let me back up.  What is your

13    proposed game plan in terms of what you've put into the record

14    at this point?

10:21  15      **MR. FELS:**  It's a good first start so right before

16    Your Honor took the bench, I shared with defense counsel what

17    we have to introduce to Your Honor which are the official

18    exhibits.  They would consist of the extradition request, the

19    treaty declaration of Ms. Benda from the State Department, the

10:22  20  various affidavits that we have submitted, at least up to now,

21    Your Honor, with their official seals, with their official 3190

22    certification so that they shall be admitted as evidence in

23    this proceeding.

24         If Your Honor has no objection, we would move to

10:22  25  introduce these documents into evidence.  I have them in these

1  two banker's boxes right here.

2          THE COURT:  Is there anything in there that is new

3  that the defendant hasn't seen?

4          MR. FELS:  No, Your Honor.

10:22  5          THE COURT:  Any objection to introducing that?

6          MR. JIMENEZ:  Your Honor, can I back up and first talk

7  about schedule and the submissions?  We received less than 48

8  hours ago lengthy government submissions, which included, among

9  other things, a new affidavit from Harry Diaz which alleges new

10:22  10  facts for the first time.  It makes new arguments for the first

11  time.

12          We, obviously, haven't had time to respond to that in

13  writing to Your Honor.  What we submitted last night was based

14  initially on our review of the original documents that were

10:22  15  submitted.

16          THE COURT:  Okay.

17          MR. JIMENEZ:  It's -- and so we would ask for an

18  opportunity to brief that and have a supplemental hearing on

19  those points because -- I want to stress it does introduce

10:23  20  quite a large amount of new things.

21          As far as the record goes, as we stated in our answer,

22  we object to these exhibits because they're incomplete and in

23  part they lack, and it appears that selected materials that are

24  exculpatory in nature, have been taken out.  For example, in

10:23  25  our review of the Panamanian court cases or court files, which

1    is what Exhibits 1 through 9 largely consist of, there are

2    things like inventory lists of equipment that was returned or

3    inventoried by the National Security Council of Panama.

4            After that case -- well, as part of the investigation

10:23    5    of the case, those items have been removed.  There are things

6    that we need to submit to the Court and make sure that we have

7    them all complete.

8            So we object to the exhibits for that reason.  We

9    don't object to the actual extradition request and the

10:24    10    affidavit itself, but we do object to the Exhibits 1 through 9.

11           **THE COURT:**  Okay.  I'll admit for purposes of the

12    hearing Exhibits 1 through 9 noting that the defendant's

13    objection.  Obviously, I can hear you on anything in particular

14    that you believe is particularly relevant to the issue that

10:24    15    you're raising.

16           (Thereupon, the exhibit was admitted into evidence.)

17           **THE COURT:**  With the introduction of those exhibits,

18    for the record, anything else the government wishes to admit?

19           **MR. FELS:**  Yes -- well, not to admit, Your Honor, but

10:24    20    Your Honor mentioned in your last order that was very difficult

21    to read, the Ismael Pitti (ph.) affidavit.  I have copies for

22    both you and for defense counsel which are much clearer in case

23    Your Honor would like to --

24           **THE COURT:**  Okay.  Sure.

10:24    25           **MR. FELS:**  May I approach, Your Honor?

1          **THE COURT:**  I assume it's the same affidavit, just a

2    better copy?

3          **MR. FELS:**  Correct, Your Honor, okay.

4          Your Honor, just a quick housekeeping matter, Number

10:25   5    3, I suppose.  We'd like to get some guidance from you as to

6    how you would like us to proceed, if you would like us to

7    proceed element by element, if you would like us to proceed

8    just having me do a presentation, having Mr. Jiménez or one of

9    the member of his counsel team doing a presentation in toto.

10:25  10   However that would be most helpful to you, we can accommodate

11   in any way we can.

12          **THE COURT:**  Right.  I have been able to review the --

13   both government's original motion, the defendant's answer and

14   the materials that have been submitted.  So to some extent I

10:25  15   don't necessarily want to just go through all of those in

16   details.  So I think what I would like to do is have a little

17   bit more expedited process, but since this is really the

18   defendant's first hearing going to the merits of the petition,

19   I do want to make sure I give the defendant sufficient time to

10:26  20   present whatever else he wants to present.  So let me pause and

21   turn it over to Mr. Jiménez.

22          Is there anything you wish to introduce at this stage

23   to make it part of the record that is not already in the record

24   by virtue of having been attached to your answer?

10:26  25          **MR. JIMENEZ:**  Well, Your Honor, only to the extent

1    that it's necessary for the exhibits to our answer and

2    affirmative defenses to be admitted as well, I would ask that

3    that be done.  At this point in time, we don't have any other

4    materials.

10:26    5         As we noted in our brief, we haven't --

6         **THE COURT:**  Do you have a binder, by the way, of all

7    the exhibits from your answer?

8         **MR. JIMENEZ:**  I do, Your Honor.

9         **THE COURT:**  I think what I'd like to do is I'd like to

10:26   10   have that all together.

11        **MR. JIMENEZ:**  Would you like me to hand up the binder,

12   Your Honor?

13        **THE COURT:**  No.  I'll make that the official copy and

14   I'll use it now.  So any objection to the introduction of what

10:26   15   I'll call Defense Exhibit 1, which is the answer and then

16   attached exhibits?

17        **MR. FELS:**  Yes, Your Honor, we would object.  And for

18   the simple reason the law is very clear.  They're not allowed

19   to introduce contradictory evidence to try to explain what the

10:27   20   evidence in the record is.  It's very clear in extradition

21   proceedings if you try to introduce something, for example, we

22   tried it the last time, which is the Ronny Rodriguez affidavit,

23   just completely denying it.

24        That's a contradictory affidavit, and that's not well

10:27   25   taken in any sort of extradition proceeding.  And that is a

common theme that goes throughout their arguments.  They want

to try to undercut the case, and this is just not the place or

time for that.  Once they are in Panama, if this Court

certifies extradition and the secretary of state ultimately

10:27   grants it, that's the time to get into some of the various

contradictions or instances that they allege are in the case

law, but that's our objection.

          **THE COURT:**  I'll do the same thing.  I'm going to

allow the exhibits to be introduced into the record so that

10:27   it's part of the record, reserving your right to challenge any

particular thing that you want to bring to my attention as

being unreliable or beyond the scope of the proceeding.

          And I understand what you're saying, but some of this,

since this is all in documentary form, even if it is something

10:28   that is incompetent for purposes of the proceeding, I

understand it's better to have it in the record so that it's

all here.  And I will -- I'll evaluate each particular item on

an item by item basis.

          So anything else you wish to introduce?

10:28          (Thereupon, the exhibit was admitted into evidence.)

          **MR. JIMENEZ:**  Yes, Your Honor, and I was just going to

add as we stated in our brief, we had originally asked for some

additional and we appreciate the time the Court has given us

here today.  We haven't had time to obtain English translations

10:28   of all of the exhibits.  We have some but not all, so we would

1    like to -- we will provide those as soon as we can, the English

2    translations of the remaining documents that weren't

3    translated.

4         **THE COURT:**  Very well.  I assume that you weren't

10:29  5    going to, but just for the record, the government is correct

6    that there's very limited opportunity to introduce testimony in

7    an extradition hearing.  You know those cases as well as I.

8         Is there anything that you wanted to try to make it

9    proper for in that regard?

10:29 10    **MR. JIMENEZ:**  In terms of the actual documents that

11   are attached here?

12        **THE COURT:**  Not the documents, but any testimony at

13   the hearing.

14        **MR. JIMENEZ:**  Oh.  No, Your Honor.  We don't plan to

10:29 15   introduce actual testimony here today.  What we do have,

16   Roberto Moreno, who is our expert who has submitted

17   declarations previously in connection with, I believe, our

18   motion to dismiss and our bond submissions previously, he

19   submitted an additional supplemental declaration which has been

10:29 20   translated, and if those go to the issue, some of the issues in

21   the hearing.

22        In fact, Harry Diaz's affidavit, that they just

23   offered, responds to those.  So he is here.  We don't plan to

24   call him as a witness but if the Court has any questions for

10:30 25   him he's here to answer them.

1          **THE COURT:**  Okay, very well.  And I take it his

2    supplemental affidavit is one of these exhibits?

3          **MR. JIMENEZ:**  Yes, Your Honor.  It's -- I don't have

4    the exact number here, but I'll get you the exact number.

5          **THE COURT:**  Okay.  Fine.  All right.  So let me start

6    with -- since what is now in the record is the government's

7    submission, the defendant's answer with exhibits, let me --

8    rather than going through an overall summary, I think I'd

9    rather do this through a targeted process.  And that also will

10   take less time, I think.

11         Having now read everything that both sides have

12   submitted, let me start with the government.  There is one

13   issue that I don't believe I have seen before.  And if you did

14   raise it before, I just don't remember.

15         One issue that the defendant raises in the response is

16   this question about the relevance of the surveillance and the

17   viability charges filed in Panama as being non-extraditable.

18   And my understanding of the argument is that -- and you'll

19   correct me if I'm wrong, obviously -- my understanding in that

20   argument is that the treaty that allows for that offense to be

21   extraditable offense was entered into or became final for

22   purposes of Panama in July of 2014.  These offenses alleged in

23   the prosecutor's submission occurred, I believe, from 2011 or

24   2012 through 2014.

25         And so their argument is that because the offenses

1  predated the existence of the treaty, from Panama's

2  perspective, they are not extraditable offenses, because they

3  already preexisting charges.  And I believe as a corollary to

4  that, they rely on a provision of the 1904 treaty having to do

10:32  5  with a clause that specifically says that there would be no

6  retroactivity as part of that treaty.

7        And so their argument is that if you combine the two,

8  what that means is that you can't charge this defendant for

9  anything that occurred prior to July 2014.  And they relied on

10:32  10  the Trendell (ph.) opinion for the general proposition.

11        Do you have -- at this point, do you have a response

12  on that issue?

13        MR. FELS:  We do, and we're going to get you the

14  certified State Department response.  They've already given us

10:33  15  an oral response.  We'll have that very shortly.

16        THE COURT:  Okay.  What's the oral response?

17        MR. FELS:  The oral response is there's no issue

18  because, as the defense points out, the default rule is, unless

19  you say otherwise, treaties are retroactive.  They point out

10:33  20  this is rare.  The U.S. Panama treaty actually invokes that

21  clause, but what doesn't invoke that clause is the convention.

22  There he's nothing in the convention that invokes the clause

23  that says nothing here will be retroactive.

24        So by operation of law, since basically everything

10:33  25  within the convention winds up getting subsumed in the treaty,

1   you have no retroactivity problem.  That's the essence of the

2   argument.

3           THE COURT:  And I guess their argument is that -- I

4   guess their argument to that is that you have to -- it's not

10:33  5   just that provision of the convention.  But there are other

6   provisions of the convention that tie back into any existing

7   conditions of any treaties that member state is already a part

8   of.

9           MR. FELS:  No.  That makes no sense because if that's

10:34 10  the case, essentially no new treaties, no new bilateral or

11  multilateral treaties can ever be an incorporated in the

12  treaty.  If basically the position that they're taking, which

13  just logically makes no sense, would mean that essentially the

14  treaty would be frozen in time and Panama would be legally

10:34 15  unable to enter into any new convention that would modify the

16  treaty.

17          THE COURT:  I don't understand that.  I'm sorry.

18          MR. FELS:  Well, so essentially, as I understand their

19  argument, they say, well, because the treaty says nothing can

10:34 20  be retroactive --

21          THE COURT:  The 1904 treaty?

22          MR. FELS:  The 1904 one.  Then, therefore, it doesn't

23  matter what essentially you signed after that because the

24  treaty says nothing can be retroactive, and that's just a very

10:35 25  strained and improper construction of the treaty.

1          The treaties need to be construed in a way in favor of

2     granting extradition, broadly, as broadly as possible.

3          So by their own argument, as I understand it, because

4     the treaty says nothing can be retroactive or the treaty is not

10:35   5     retroactive, is really what it say, then by their argument

6     Panama could legally not enter into any new conventions that

7     could broaden the treaty.

8          THE COURT:  Well, I don't -- in other words, I don't

9     understand that.  Because this has to do with whether or not

10:35  10     what period of time would be covered.  There's no dispute, for

11     example, that if in 2014 Panama enters into a treaty that

12     provides that this offense is an extraditable offense, any

13     offense committed thereafter would be extraditable, right?

14          I mean, in other words, they have extended the

10:36  15     original treaty.  So I don't understand the point you're

16     making.  The issue is only what happens between -- for offenses

17     that occurred prior to that and how do you read the two

18     treaties together I think is the issue, is how do you reconcile

19     the different provisions together in deciding how the

10:36  20     convention should be applied.

21          MR. FELS:  So, again, the best way to read this is to

22     go with, as I said, the default rule that absent something the

23     specifically to the contrary, the treaties are meant to be

24     retroactive.  So what his argument is on page 34 is that the

10:36  25     Cyber Crime Convention says, well, extradition should be

1    subject to the conditions provided by the requested party or by

2    applicable extradition treaties.  So he's basically trying to

3    say that that language means necessarily that that also adopts

4    the retroactivity clause of the treaty.

10:37  5         THE COURT:  What page did you say, I'm sorry?

6         MR. FELS:  Page 34.  Sorry.  It's page 29 on the

7    bottom, but page 34 of the filing.

8         THE COURT:  Got it.

9         MR. FELS:  But that's not what -- that's not

10:37 10   sufficient to invoke the anti-retroactivity, the presumption

11   for, or the presumption against retroactivity, excuse me.

12         So, in other words, the argument -- what he's trying

13   to say is let's interpret this clause saying, hey, you have to

14   -- this agreement is subject to all treaties and all other --

10:37 15   subject to the conditions provided by the laws by all

16   applicable extradition treaties.  But you can't have this

17   constrained reading to say that that means, oh, well, okay, so

18   this won't be retroactive.

19         If they wanted to make this convention so that there

10:38 20   was no retroactivity issues, the convention could clearly say

21   it, as Panama and the United States did in their own treaty.

22         THE COURT:  Right.

23         MR. FELS:  But because the convention itself makes no

24   reference to retroactivity, the default rule applies and,

10:38 25   therefore, the convention is retroactive.

1        **THE COURT:**  So what legal effect do you think Article

2   24, paragraph 5 has?

3        **MR. FELS:**  Well, I think it may it may relate to --

4   well, how about this, Your Honor, how about getting a warrant?

10:38  5   How about making sure that there's proper evidence pursuant to

6   the treaty so that there's probable cause to believe that these

7   cyber crimes were, in fact, committed.  Those are conditions

8   within the treaty.

9        **THE COURT:**  I guess why wouldn't non-retroactivity be

10:39 10   a condition of a treaty?

11        **MR. FELS:**  It is a condition of the treaty, but it

12   specifically refers to the treaty itself, not to anything that

13   could potentially amend the treaty.  My argument before was

14   this constrained reading of the treaty saying that basically

10:39 15   nothing could ever be retroactive would essentially mean it

16   would defeat the purposes of the individual conventions which

17   don't say that they're supposed to be -- that they're not

18   supposed to be retroactive.

19        **THE COURT:**  Right.

10:39 20        **MR. FELS:**  But in any event, the Court has to defer

21   under the law to the State Department's analysis of this

22   reading of the treaty.  The State Department is the body that

23   essentially governs this treaty and, as I understand, we'll get

24   you the response and we can address this particular argument.

10:40 25        **THE COURT:**  One particular inquiry that I had was,

1  well, how has that provision been applied in other treaties

2  with other countries having to do with something like a

3  retroactivity provision?  At this point, you don't know the

4  answer to that; is that fair to say?

10:40  5         **MR. FELS:**  One second, Your Honor, I'm going to tag.

6         **THE COURT:**  Sure.

7         **MR. SMITH:**  Good morning, Your Honor, it's a pleasure

8  to be in front of you today.  I think the government, in

9  response to your question, has three basic points here.  I

10:40  10  think that our view is that the plain language of the bilateral

11  treaty refers to -- it says it shall not apply retroactively,

12  referring to that treaty.

13         The way that we read that is that saying basically

14  that crimes committed before 1905 cannot be incorporated into

10:40  15  that treaty.  The evidence of that is the preceding clause that

16  basically refers to the exchange of ratifications as being the

17  triggering effect for what follows in that clause.

18         So one) is that we think the plain language of the

19  bilateral treaty makes that point clear.  Two) as Mr. Fels has

10:41  20  indicated, I spoke with the legal advisor's office in the State

21  Department this morning.  That's their reading of the treaty as

22  well, they intend to give us a declaration which the law

23  indicates that this Court should defer to.  And three) is that

24  to the extent that there is any ambiguity here, there is an old

10:41  25  Supreme Court cases called Factor v. Laubenheimer, which makes

1    clear that contrary to the Rule of Lenity in the criminal

2    context, extradition treaties are to be read broadly to their

3    purpose, which is to facilitate extradition between the

4    parties.  This principle was mimicked recently in the Fifth

10:41  5   Circuit in an en banc case called Cruz Martínez and is one that

6    circuits have repetitively applied.

7         To Your Honor's point about what does this mean in the

8    convention, incorporating the restrictions of the treaty, Your

9    Honor, I don't want to speak for the State Department on that.

10:41 10  But on my first read of this argument, what I would read that

11   as is incorporating, for example, treaty defenses like if there

12   were a political event or if there were other conditions on

13   extradition in the treaty that might defeat extradition, it is

14   saying, you just read this crime into Article 2 of the treaty,

10:42 15  which basically lists the extraditable offenses, you pretend

16   like it was always there.  The retroactivity provision applies

17   to this treaty, bilateral treaty going in force.

18        But yes, the other provisions of the treaty, which

19   could provide other arguments to defeat extradition, would

10:42 20  apply.

21        **THE COURT:**  But on the other hand, why wouldn't non-

22   retroactivity be something like that?  In other words, why

23   would that fall outside of the scope of the type of thing that

24   you were just talking about?

10:42 25       **MR. SMITH:**  Well, Your Honor, I think in my plain

1  reading of the language in the retroactivity article, it reads

2  differently than some of the other articles in this treaty.

3  The other articles in this treaty --

4          THE COURT:  Remind me what article we're talking

10:42  5  about.

6          MR. SMITH:  I believe it's the very last one, Article

7  12.

8          THE COURT:  Twelve.

9          MR. SMITH:  Which says the present treaty, referring

10:42 10  to the bilateral treaty, shall take effect on the 30th day

11  after the date of the exchange of ratifications, and not --

12  shall not operate retroactively.

13          It's saying right there, the way I read that sentence,

14  is prior to that date in 1905, you can't charge crimes.  The

10:43 15  Cyber Crime Convention, by contrast, has, to my knowledge, no

16  retroactive provision.  Basically, what the Cyber Crime

17  Convention says is you simply act like the crimes incorporated

18  by the Cyber Crime Convention were always listed in Article 2

19  of this treaty.  It basically applies to import these crimes

10:43 20  into this treaty and --

21          THE COURT:  Why would it import those crimes but then

22  not import Condition 12, I guess?

23          MR. SMITH:  Well, Your Honor, in my view, I believe

24  that the reference in Condition 12 refers to a specific point

10:43 25  in time, 30 days after the exchange of instruments of this

1   bilateral treaty.  That's the beginning of that sentence.

2          I think that, as a plain reading of the language, that

3   is what -- what it's clear that that means but, again, to the

4   extent that there is any ambiguity here it's going to be the

10:44   5   unambiguous view of the State Department that we interpret

6   that, not only to Panama's request to us, but if we were making

7   an outgoing request to Panama for the return of a cyber crime

8   fugitive who committed it before 2014.

9          The position of the United States Department of State

10:44   10   is that this provision, that this would be extraditable

11   offense, despite the argument that the fugitive is making at

12   this juncture.

13          THE COURT:  Again, do you know, and you might not

14   know, this may be too soon, do you know if this has come up

10:44   15   before?  It doesn't have to be this convention, it could be any

16   modern convention that basically adds, you know, is hooking

17   back to an earlier treaty, that it may have come up before.

18          MR. SMITH:  Your Honor, I am unaware of this specific

19   point having come up before.  What the assistant legal advisor

10:44   20   at the State Department explained to me this morning is that

21   the broad principles in the negotiation of these multilateral

22   treaties is that there is not a retroactivity issue.

23          So I know that the State Department's view in

24   negotiating and executing these things is not intended to

10:45   25   implicate retroactivity.  I'm unaware of an extradition case

with regard to this treaty or a similar situation where it's

been definitively addressed, but, again, I think that's why the

deference to the State Department in view of the Article 2

power of foreign relations and also the Factor v. Laubenheimer

10:45  principle that to the extent there's ambiguity here, it's

resolved in favor of extradition.

          THE COURT:  Let me ask this question.  How common is a

non-retroactivity provision in a treaty like this one, Article

12.

10:45  MR. SMITH:  So I have not given an opinion --

          THE COURT:  Because my understanding of the case they

cited, that's all I read, so -- is that the general rule is

that it is retroactive.  There's no preclusion for

retroactivity, unless the treaty expressly says so as kind of

10:46  an exception to that general rule.  Is that true?

          MR. SMITH:  Your Honor, without having researched that

extensively, my understanding is the same as Your Honor's, that

that is the general presumption which I think indeed feeds into

our argument because the Cyber Crime Convention was ratified

10:46  with that as a background principle, and to the extent that

there's ambiguity here, you have that factor on principle, the

construction of treaties, extradition treaties being liberal

and the United States Department of State exercising its

Article 2 powers being entitled to Your Honor's deference, and

10:46  I think those three point get us to where we need to go.

1          THE COURT:  And I take it how common are these types

2     of nonretroactive provisions, as far as you know?

3          MR. SMITH:  Your Honor, as far as I know, as Your

4     Honor said the general presumption is that there is

10:46   5     retroactivity and I haven't done a survey of all of our

6     extradition treaties, but I think this is not necessarily a

7     common provision.

8          THE COURT:  This is not a common provision or is it

9     not uncommon?

10:47  10          MR. SMITH:  Your Honor, I think that's a point that we

11     need to research.

12          THE COURT:  You don't know.

13          MR. SMITH:  I just don't know.

14          THE COURT:  So on that point, let me turn to

10:47  15     Mr. Jiménez.

16          MR. JIMENEZ:  Is it okay if I stay here, Your Honor.

17          THE COURT:  Sure.  If the court reporter can't hear

18     you, she'll let you know.

19          MR. JIMENEZ:  Okay.  Your Honor, I think you have it

10:47  20     exactly right in terms of what our argument is.  And we don't

21     think it's ambiguous at all.  The treaty provides for, I

22     believe, 13 specific offenses and that means that there are a

23     lot of other offense that were not included at the time this

24     treaty was entered into in 1904, if I have the date right, or

10:47  25     '04.

1        So, for example, if they tried to indict somebody for

2    an income tax violation, it's not in the treaty.  So you can't

3    extradite a person for that.

4        So the question is, this is an extraditable offense

10:48  5    under the treaty.  It's not in the 13 original ones.  Their

6    position is it was added subsequently through a convention

7    that's not, by the way, just between Panama and the U.S., it's

8    between a lot of member countries.  We cited the website.

9    You'll see there's lots of European nations, there's nine

10:48 10    Council of Europe member nations, all of those nations have

11    different treaties.

12        So what the convention said is when you add offenses

13    to a treaty, pursuant to the convention, and it's not just a

14    Panama treaty but many other treaties, and Your Honor has cited

10:48 15    the points.  You keep the conditions and the restrictions and

16    the obligation that are in the original treaty.

17        Here, they added the offense, the surveillance

18    offenses under the convention on July 1, 2014.  When Your Honor

19    explained the time frame, if you look at the actual indictment

10:48 20    it says it started in 2012, and I use the word indictment

21    loosely, Your Honor.  Certainly, we don't admit it's a valid

22    indictment.

23        It started in 2012 and it ended in May of 2014.  So in

24    July of 2014, subsequent to that, is when they added this

10:49 25    offense through the convention.  So clearly, it's being

1  retroactively applied in violation of the treaty.  And you have

2  to read them together.

3          The answers to your questions --

4          **THE COURT:**  Do you have any authority for the

10:49  5  proposition that you have to read them together?

6          **MR. JIMENEZ:**  Your Honor, I think we could research

7  that in terms of reading them together, but I think we rely

8  principally on the language of the convention which says,

9  "Extradition shall be subject to the conditions provided for by

10:49  10  the law of the requested party or by applicable extradition

11  treaties," plural.  It also says, "The purpose of this present

12  convention is to supplemental the applicable treaties.  Nothing

13  in this convention shall affect other rights, restrictions,

14  obligations, and responsibilities of a party."

10:50  15          That plain language controls.  This is a supplemental

16  treaty.

17          To answer your question, Your Honor, the treatise, one

18  of the treatises on extradition says that supplemental -- and

19  I'm reading from Michael Abell, 2010.

10:50  20          **THE COURT:**  Okay.

21          **MR. JIMENEZ:**  I think this is one of the most recent

22  ones.  "Supplemental extradition treaties," which is what this

23  is, "frequently the convention is frequently specifically

24  provided that they relate back to the date of the entry into

10:50  25  force of the original treaties that they amend."

 1           They don't -- the convention doesn't that say that.

 2    What the convention says is just the opposite, that the

 3    convention is to respect all of the restrictions, conditions,

 4    and obligations under the original treaty.  And a principle one

10:50  5    of that is the fact that it can't be retroactivity applied.

 6           When Your Honor said that you didn't understand the

 7    government's initial argument, you were right.  Their argument

 8    doesn't make sense that it -- that the convention would be

 9    ineffective.  The convention is effective.  Starting July of

10:51 10    2014, U.S. and Panama can extradite individuals to each other

11    for offenses committed after that date.  But if you extradite

12    someone for an offense committed prior to that date, you're

13    violating -- I don't mean to say you, Your Honor -- it would be

14    a violation of the treaty's prohibition against retroactivity.

10:51 15           The answer to your second -- you also asked about

16    rarity in other cases.  It is extremely rare, only a minority

17    of the pre-1970 treaties contain a prohibition against

18    retroactivity.  The U.S. and Panama could have at any time

19    before today changed that.  They could have agreed that we're

10:51 20    going to get rid of the retroactivity or prohibition, but they

21    haven't.  So that's what the agreement is.

22           Post 1970 treaties do have language that -- or don't

23    have that language so in that case, under the Judge Friendly

24    decision and under the law, I think they would have an argument

10:52 25    that it can be retroactivity applied, but not this treaty.

1  This treaty prohibits retroactive application.  It's not

2  ambiguous.  It's plain as day.

3        As far as other cases go, we've looked, there's not

4  another case where, at least not a reported case where the

10:52  5  government has tried to extradite someone in violation of an

6  anti-retroactivity provision like this with an offense that was

7  added after the original date of the treaty.

8        **THE COURT:**  What about cases just interpreting the

9  effect of language in Article 24 of the convention?

10:52  10       **MR. JIMENEZ:**  I don't know that there are, but we will

11  look for those, Your Honor.

12       **THE COURT:**  Okay.  Because I guess their argument is,

13  the way I would rephrase it is, that the convention, since the

14  convention didn't address retroactivity and it would have been

10:53  15  something that, as you indicated, is a common topic, at least

16  post 1970; isn't that fair to say?

17       **MR. JIMENEZ:**  Yes.

18       **THE COURT:**  That the failure to put in a provision

19  that precludes retroactivity is an indication that the drafters

10:53  20  were including it, had no problem with it.

21       **MR. JIMENEZ:**  I think you can say that, Your Honor, if

22  the convention wasn't so clear that all of the -- I don't want

23  to reread the language -- that it's a supplemental treaty and

24  that it doesn't affect all other rights, restrictions of a

10:53  25  party under that treaty.  That the restrictions against

1    retroactive application applies, and the obligation not to

2    extradite someone for a retroactively applied offense applies.

3            So that's the convention language that governs, Your

4    Honor.

10:53  5        THE COURT:  Now let me ask you this question.  On the

6    -- focusing on these two surveillance charges --

7            MR. JIMENEZ:  Yes.

8            THE COURT:  -- my reading, and this is a very quick

9    reading of your answer, of your memorandum from last night, was

10:54  10   that basically your defense on extradition as to those charges

11   rises and falls on this issue.

12           MR. JIMENEZ:  No, Your Honor.  That's one of the

13   issues.  The other issue is we have said there's no -- well, we

14   have got a due process argument.  We have the warrant argument.

10:54  15   We have a probable cause argument.  They all deal with the

16   surveillance crime as well as the embezzling crimes.

17           THE COURT:  See, I didn't read.  I understand the

18   warrant requirement, but as to the probable cause requirement I

19   didn't read your response as challenging that as to these

10:54  20   offenses.

21           MR. JIMENEZ:  And Your Honor, I apologize for the late

22   submission.  We worked as hard as we could to get it in good

23   shape.  But if could I just refer to page 34.  That's the

24   probable cause argument.

10:55  25           THE COURT:  34?

1          **MR. JIMENEZ:**  No, Your Honor.

2          **THE COURT:**  Oh, okay.

3          **MR. JIMENEZ:**  And let me rephrase what I said.

4          **THE COURT:**  Okay.  I missed this section.

10:55   5          **MR. JIMENEZ:**  Yeah.  Let me rephrase what I said,

6    Your Honor, about the due process argument.  The due process

7    argument relates -- it's based on Harry Diaz's obviously false

8    misrepresentations in his affidavit about the embezzlement

9    charges, and also with respect to the overall corrupt nature of

10:55  10    the court system down there as he's repeatedly admitted in

11    2014, 2016, 2017 in public interviews.

12          In that respect, the second part of it applies to the

13    entire request for extradition, which includes the surveillance

14    crimes, but I think Your Honor is right, you read, at least the

10:55  15    first part of that argument, as focusing on the embezzlement

16    charges.

17          But we do have additional argument.  I think what

18    happened here, Your Honor, is -- and I think we said this in

19    our brief, it's pretty clear.  Panama believed it could not

10:56  20    extradite president Martinelli for these surveillance crimes,

21    with good reason, as we have just explained.

22          In fact, the vice president, Mr. Varela's vice

23    president gave an interview during which she talked extensively

24    about that.  They didn't think they could extradite him for

10:56  25    surveillance crimes, so what they did is they and tacked on --

1          THE COURT:  What reason did they give?

2          MR. JIMENEZ:  I'm sorry?

3          THE COURT:  What reason did they give?

4          MR. JIMENEZ:  In the interview she said the treaty,

10:56  5   that it was not included in the treaty.

6          THE COURT:  Okay.

7          MR. JIMENEZ:  And then they tacked on these fake

8   embezzlement charges that are completely built on lies, as we

9   have established in our brief.  And why did they do that?

10:56 10  Because of this issue, because they did not believe it was an

11  extraditable offense under the treaty.

12         THE COURT:  Well, let's stick to the surveillance

13  charges because I want to make sure I cover -- well, let me ask

14  another question:  On the surveillance charges, what is the

10:57 15  strongest argument you have as to why the Court should not

16  certify as to the two surveillance charges?

17         MR. JIMENEZ:  Just the one argument?

18         THE COURT:  Well, I'm asking you for the strongest,

19  I'm not saying that you're precluded from raising other ones,

10:57 20  but I want to make sure, since this is the hearing, then you

21  need to convince me.  I figured you should go with the

22  strongest argument.  And then that way -- and I'm not -- by

23  focusing on that, I know you're not waiving your other

24  arguments, so just to make it very clear, but I want to make

10:57 25  sure I hear you out thoroughly on your strongest point, so that

1  way I focus on that, not to the exclusion of everything else,

2  but really with as much emphasis as I can bring to bear on it.

3         MR. JIMENEZ:   Sure.  Well, Your Honor, let me preface

4  it by saying this, and it's what I said briefly already.

10:58  5         To my knowledge, I have never read a case, seen a

6  case, or extradition request where a country sought the

7  extradition of an individual and the United States Department

8  of Justice representing that country came forward and said,

9  let's extradite this person to someone who has admittedly and

10:58 10 openly admitted that he operates as part of a corrupt system

11  already.

12         He's not -- we're not talking about what's going to

13  happen down the road.  He said in 2014 repeatedly that

14  judgments are sold in Panama.  That cases are shelved by his

10:58 15 court, by the Supreme Court.  In the 2016 interview on

16  television, or on the internet, which I think the Court may

17  want to look at, I think we cited the link, he criticized the

18  members of the Court as being corrupt and he criticized the

19  person he had just indicted, President Martinelli.

10:59 20        In 2007, he gave another interview just three months

21  before the request in this case saying the same thing, that

22  corruption is endemic in this Court.  That he has no

23  discretion.  That he's ordered and being told what to do.

24         I have never seen a case where someone has requested,

10:59 25 a government has requested extradition for prosecution by that

1  very same prosecutor who has made those statements and those

2  admissions.  It shocks the conscience.  So it's a due process

3  violation to begin with and it applies to all four crimes, the

4  surveillance crimes.

10:59  5       THE COURT:  You know, the problem with that is I hear

6  what you're saying.  Do you know how many other countries in

7  the world you say there's been corruption in their judicial

8  system and so, therefore, here you have an honest prosecutor,

9  you really don't get interviewed especially when you're in a

11:00  10  current position, but you know how many countries that could

11  potentially apply to, including ours, by the way.  We have had

12  situations when judges have been bribed.  In fact, about a mile

13  down the road, right?  We have had five judges incarcerated.

14       MR. JIMENEZ:  Sure.

11:00  15       THE COURT:  We have had prosecutors incarcerated.  We

16  have had judges paid off.  That's happened in the history of

17  our country.  Does that mean that the whole system, the whole

18  country is, therefore, corrupt?  Of course not.  So, therefore,

19  you don't focus on that, other than under the standard that

11:00  20  applies as we assume the good faith of the country, of a

21  signatory country, just as we want them to assume our good

22  faith, notwithstanding our own blemishes.

23       MR. JIMENEZ:  Your Honor, I think that you're

24  referring to cases in general where general statements are

11:00  25  made.  In fact, the State Department itself has said Panama's

judicial system is corrupt and, yet, it's asking that this

defendant be extradited back there.  That's in those country

reports.  But here we go way beyond that.

        If you had an Assistant U.S. Attorney stand up in

11:01   court and say, I operate as part of a corrupt office, and my

colleagues are corrupt, and I'm told to sell judgments and

shelf judgments, I don't think that case would go very far.  So

I think we have to look at we're not in Panama.  We have to

look at U.S. law.

11:01        Judge Tjoflat made it very clear in the Valenzuela

case that we cited that extradition relators are entitled to

our rights under our constitution.  And it's a violation of due

process, of his due process rights, to be sent back to be

prosecuted by the man who himself has made those statements,

11:01   and those statements by corruption inform the rest of what

happened in this case.

        The fact that he was denied his right to the

*imputación* here, which we talked about, which isn't a

technicality, it's an essential part of the process.  Before

11:02   that, he doesn't even become officially part of the criminal

case.  Panama has not indicted murderers because of the failure

of *imputación*, as our expert has said.  But here they

completely ignored that, and in television he said, well, we'll

deal with that later.  We'll deal with this issue later.  But

11:02   now we have a second affidavit that he submitted where he says,

1    oh, it doesn't apply.

2         Well, that's completely wrong as we are going to

3    establish when we respond to that.  That's another

4    misrepresentation by this corrupt prosecutor in an affidavit

11:02  5   submitted to Your Honor.

6         In addition to that, it's not just what's happened in

7    general in the country, it's what's happened in front of you,

8    Your Honor.  He made bald-faced misrepresentations in his

9    affidavit submitted to you about this so-called MLM equipment.

11:02 10   He said that that's the equipment that was stolen.

11        Why did he do that?  For the reason I have already

12   explained because they were concerned about extradition, but

13   also because they wanted to make him look bad.  Oh, he stole

14   13.5 million dollars from the Treasury or from the State.  So

11:03 15   he purposely misrepresented the nature of the equipment as

16   being that equipment that was stolen and taken.

17        What they didn't tell you, among other things, and I

18   don't want to repeat our entire brief, is that that equipment

19   was not even used according to their star witnesses, it was

11:03 20   different equipment.  That was not the equipment that was

21   misappropriated, according to their star witness, it was

22   another equipment.

23        And, more importantly, that in Panama, and in those

24   two big boxes, you are not going to find this, there is a case

11:03 25   involving the misappropriation of that MLM equipment.  And they

1  investigated five people.  They investigated two high -- three

2  high-ranking people that were involved in the social investment

3  fund that provided the money, and the two heads of the National

4  Security Council.  And Ronny Rodriguez and William Pitti, the

11:04  5  other two people who their star witness said were involved in

6  the misuse and misappropriation of that equipment.

7          And what did the Panamanian prosecution -- not Harry

8  Diaz, what did the Panamanian prosecutors investigating those

9  people decide?  We just provided this in Spanish, which we'll

11:04  10  translate, but you'll see in the -- in our translation of that

11  one page, their recommendation was to indict only two of the

12  three high ranking people, but they did not --

13          THE COURT:  Just so I remember, what document is it?

14          MR. JIMENEZ:  It is Number 15 Your Honor.

11:04  15          THE COURT:  Page of what?  What kind of document?

16          MR. JIMENEZ:  Oh, it is under the Panamanian procedure

17  in that case, the actual prosecution charging document is

18  called a *vista fiscal*, not what it's called our case, but in

19  that case.  And that's our Exhibit 15.

11:05  20          At the end of that exhibit, the prosecutors did not

21  even recommend that charges be brought against William Pitti

22  and Ronny Rodriguez, the two people that their star witness

23  says were involved in the misuse and misappropriation of that

24  equipment.  Why?  Because it doesn't explain why, it just says

11:05  25  lack of proof.  But our expert explains why.  Our expert says

1   there's no custody, they had no custody under the official

2   process down there.  There was no audit report and, therefore,

3   they weren't charged.  Yet, Harry Diaz charged him for that a

4   year earlier based on his invalid charge that President

11:05   5   Martinelli who supposedly ordered his people to do that.

6           So I think that is very telling in terms of the lack

7   of probable cause for that offense, and Diaz's corrupt acts in

8   this case which include not just ignoring the process down

9   there, not just misrepresenting things to Your Honor in the

11:06   10  affidavit, but failing to advise Your Honor what's happened in

11  Panama in that case, dealing with the very same equipment that

12  he's being charged with now by Diaz.

13          So that's why it's not just a general situation, Your

14  Honor, involving corruption.  We're talking about what happened

11:06   15  in this case by this prosecutor and misrepresentations that

16  have been made to you.

17          Now --

18          **THE COURT**:  Let me ask you this question.  I'll take a

19  look at it, especially the translation that you filed, but

11:06   20  you're telling me, really, there's nothing in here that says

21  why they wouldn't charge him.  They just said they recommended

22  not charging him.

23          **MR. JIMENEZ**:  No, Your Honor.  Let me add something

24  else.  Those prosecutors, if you look at that charging

11:06   25  document, covered much of the very same evidence that Diaz

reviewed.  In fact, if you look at the summary of the

statements, they talk about the same people and I'll just give

one example.  This fellow Graell, who was involved in moving

equipment after -- supposedly after the May 2014 elections.

11:07    If you go through that, it's very similar to the

evidence that Diaz cites because it's the same evidence.  What

they did is they obtained statements and testimony and

documents from people and they used them to build different

criminal cases.  So those prosecutors, based on the same

11:07    evidence, decided that William Pitti and Ronny Rodriguez should

no be charged.

    **THE COURT:**  With what?

    **MR. JIMENEZ:**  Embezzlement of the MLM equipment.

    There's also another case, Your Honor --

11:07    **THE COURT:**  Now, isn't there a possibility, though,

that, again, looking at this from -- in the light most

favorable to the charge, you know, just the four corners of the

charge, isn't there a possibility that an underling in this

situation may not be chargeable with embezzlement as opposed to

11:08    the head of an organization, because the head of an

organization, one could argue, is ultimately the one who is in

charge.

    **MR. JIMENEZ:**  Right.

    **THE COURT:**  As opposed to, for example, a subsidiary

11:08    type secondary employee.

1          MR. JIMENEZ:  Yes.

2          THE COURT:  Who, you know, would argue that any

3    anything he did was at the direction of the boss.

4          MR. JIMENEZ:  Yes.

11:08    5          THE COURT:  So that kind of thing.  So isn't it

6    possible that actually in that situation of an embezzlement

7    charge like this, the only one you may be able to charge is the

8    head of the overall organization?

9          MR. JIMENEZ:  And that's exactly what the prosecutors

11:08  10    did.  They recommended and the people who were charged were

11    Rolando Lopez, the head of the National Security Council, and

12    Giacomo Tamburelli, who is the head of the Social Investment

13    Fund, the two people that were responsible for the contract,

14    the signing of that MLM equipment.  They don't mention

11:09  15    President Martinelli.  They don't mention anybody else, they

16    just mention those two and they are underlings, to use Your

17    Honor's word.

18          THE COURT:  And then what happened with that

19    prosecution.

11:09  20          MR. JIMENEZ:  It's still pending, Your Honor, against

21    those two people, not against Rodriguez and Pitti, who are the

22    ones who are alleged to have taken out this equipment, removed

23    it, and misused it.

24          So, Your Honor, and I didn't want to also not pay some

11:09  25    attention to this.  You know, we have an argument in our brief

about probable cause relating to the surveillance crimes.  It

deals with the inherently false nature of Pitti's affidavit

which, by the way, covers the same point.  He says that he was

there or he knows that this equipment was removed in the middle

11:09  of the night, that later a rack was taken somewhere else.  And

we have provided to Your Honor very detailed citations and

attached, I believe as exhibits, testimony of another

individual who said Pitti wasn't even there.

THE COURT:  But that all goes to the weight, doesn't

11:10  it?

MR. JIMENEZ:  It does, Your Honor, but --

THE COURT:  There's not much I can do with that.

MR. JIMENEZ:  It is consistent -- it goes to weight,

but I think it's for you to consider in terms of determining

11:10  whether or not there's probable cause as to any crime that

this --

THE COURT:  But I always assume --

MR. JIMENEZ:  -- is talking about.

THE COURT:  But I do probable cause determinations

11:10  every day, so I am familiar generally with the process.  But

one of the things that happens is the prosecutor, or actually a

police officer will say, this is what the guy told me and the

guy is an informant.  Right?  And he says that the informant

met with this charged defendant, and on the face of the

11:10  affidavit, I could, especially wearing my lawyer hat, I could

1   say, well, that informant's credibility is highly suspicious.

2        But as a reviewing court, I assume the truth of the

3   allegation and then let the process go forward and then let the

4   informant be impeached at trial and see what happens.  I mean,

11:11  5   that's kind of how we do things.

6        So I would normally credit the face of an affidavit,

7   and if the affidavit alleges sufficient facts, that's all I

8   look at.

9        How would that be any different in an extradition

11:11 10   process?

11        MR. JIMENEZ:  Well, Your Honor, if they had just

12   submitted that affidavit to you, then I could -- I think I

13   could respond and say something different.  But that's not what

14   they did in this case.  They submitted 3,000 pages of

11:11 15   documents.  We have had a very hard time going through and

16   reviewing, we have worked as hard as we can under difficult

17   conditions where our client is detained, and we found

18   contradictory evidence that they were submitted that completely

19   contradicts the affidavit.

11:11 20        When the agent goes into Your Honor's chambers and

21   gives you an affidavit, he does not also simultaneously bring a

22   statement that contradicts it exactly, which is what the

23   situation is here.  So that's why there's no probable cause or

24   that affidavit cannot be viewed as reliable because it just

11:12 25   contains things that's they refute that's refuted by their own

1   evidence on its face.

2          So that's the point, Your Honor.  It's not an agent

3   walking in with an affidavit.  It's different in this context

4   because of what they themselves have submitted to you.

11:12   5          THE COURT:  Well, let's talk about it more

6   specifically.  The question of the -- one of the issues that

7   you raised is let's -- focusing on the embezzlement charges.

8          MR. JIMENEZ:  Yes.

9          THE COURT:  One of the issues you raise is the

11:12  10   difference between the MSM -- is it MLM or MSM?

11          MR. JIMENEZ:  MLM.

12          THE COURT:  The difference between the MLM process and

13   the Pegasus process, right?  And one of the points that I took

14   from what you're saying is to the extent that there's any

11:12  15   evidence in the record of misuse of funds, the evidence of that

16   relates to the MLM process.

17          MR. JIMENEZ:  Yes.

18          THE COURT:  Not the Pegasus process.

19          MR. JIMENEZ:  Yes.

11:13  20          THE COURT:  Correct?

21          MR. JIMENEZ:  Yes.

22          THE COURT:  Now, explain to that to me in a little

23   more detail.  What about this the eight million cost to the

24   Pegasus system?  Where are you saying that that is not a public

11:13  25   fund?

1        **MR. JIMENEZ:**  Your Honor, if you look at our Exhibit

2    18, and it may be one of the documents that hasn't been

3    translated --

4        **THE COURT:**  Okay.

11:13  5        **MR. JIMENEZ:**  It's a complaint filed by the new head

6    of the National Security Council with respect to that

7    equipment.  And that's the Pegasus case, the embezzlement case

8    in Pegasus.  Just like there's an embezzlement with respect to

9    MLM, which I have already discussed, where William Pitti and

11:13 10   Ronny Rodriguez were not even charged, there's a case involving

11   Pegasus.  And the complaint by the National Security Council

12   head says that there's no evidence that public funds were used.

13   In fact, he cites to a news article where it's alleged that a

14   private company purchased that equipment or provided the funds

11:14 15   for the purchase of that equipment.  And it cites to a private

16   entity called Caribbean Holdings, I think.

17        So that's why there's no evidence in this record that

18   they have submitted to you that indicates that public funds

19   were used to buy Pegasus or that any official money was used to

11:14 20   buy Pegasus because there is no such proof.  In fact, their own

21   complaint, the National Security Council's own criminal

22   complaint says to the contrary.

23        **THE COURT:**  And just so I understand the content of

24   this document.

11:14 25        **MR. JIMENEZ:**  Yes.

1          **THE COURT:**  What is it?

2          **MR. JIMENEZ:**  It is a criminal complaint filed in

3    Panama by the head of the National Security Council and sent to

4    a prosecutor which starts a criminal case.

11:15  5          **THE COURT:**  Okay.

6          **MR. JIMENEZ:**  Alleging the embezzlement and misuse,

7    the word in Spanish is *especulado*, which is what the two

8    embezzlement crimes are here.  It's the same exact crime that's

9    charged, and you will see in that complaint there's no mention

11:15  10   of President Martinelli.  There is no mention of public funds,

11   as I have already said.  So --

12          **THE COURT:**  Why is it relevant to me?

13          **MR. JIMENEZ:**  Here is why it's relevant, Your Honor.

14   Because Harry Diaz, in order to make an embezzlement case, has

11:15  15   to prove that it's public property.  Has to prove that public

16   funds were used to buy the equipment that was allegedly used

17   improperly for this surveillance.  He knew very well when he

18   presented this invalid indictment that he did not have that

19   proof as to the Pegasus equipment.  So what did he do?  He

11:15  20   prepared an affidavit that directly misrepresented that the MLM

21   equipment was the Pegasus equipment.

22          When I say Pegasus, I want to make sure, Your Honor,

23   it was equipment provided by this NSO Group company, so if you

24   see the words NSO, I'm referring to that same equipment.

11:16  25          **THE COURT:**  Right.

1          **MR. JIMENEZ:**  That's why I said quite a while ago, I

2  guess, that this is a trumped up embezzlement charge.

3          **THE COURT:**  Well, focus on -- in this document 15, I'm

4  sorry -- 18, where is it exactly where he says anything

11:16   5  relevant to what I'm focusing on?  Like, for example, does he

6  -- is there anywhere in here where he, from his perspective

7  says, no public funds were used?

8          **MR. JIMENEZ:**  Again, Your Honor, it hasn't been

9  translated but if you start at page -- should I will just refer

11:17  10  to the Court's number at the top of the page?

11          **THE COURT:**  Sure.  Sure.

12          **MR. JIMENEZ:**  Page 5 of 19.  He says that that's the

13  equipment that was provided by NSO Group, and he names various

14  individuals, the former heads of the National Security Council,

11:17  15  in other words his predecessors.  He also talks on page 7 of

16  the Caribbean holding company.

17          **THE COURT:**  Oh, yeah.  Where is that?  Okay.

18          **MR. JIMENEZ:**  And he -- I believe that's the same

19  part, Your Honor, that talks about the news article that he's

11:17  20  referring to.  But that's the relevant section, Your Honor.

21          And, Your Honor, in terms of, just to go back very

22  briefly to your probable cause question about the agent.  We

23  cited a case called In Re: Mazur which is extradition case

24  where extradition was denied and the Court there found that

11:18  25  there was no probable cause because the government's own

1  evidence contradicted the account of their star witness, which

2  is what we have here.

3            So I believe that under the cases, Your Honor, and

4  even with the narrow reading that's urged by Panama in this

11:18  5  case, those types of things --

6            **THE COURT:**  There are a lot of cases.

7            **MR. JIMENEZ:**  -- can be considered and should be

8  considered because they submitted it themselves.

9            **THE COURT:**  But there are a lot of cases that say that

11:18 10  the presence of contradictory evidence is not a ground to deny

11  extradition.  There are hundreds of those.

12            **MR. JIMENEZ:**  I don't know if there's hundreds, but

13  I'm sure there are some.  But it's not a contradiction here.

14  It's a complete evisceration and, more importantly, with

11:19 15  respect to these embezzlement charges, it's not a

16  contradiction, it's a complete absence of proof that any public

17  funds were embezzlement.  There is no one who in those 3,000

18  pages says that the MLM equipment disappeared or was lost as a

19  result of any action of President Martinelli or his agents.

11:19 20  The only thing you will see is William Pitti's account about

21  this movement in the middle of the night about some computer

22  equipment.

23            And to get -- to focus a little bit on the detail on

24  that point, Your Honor, it's very clear that he's talking about

11:19 25  the Pegasus equipment.  When you read our brief you will see he

describes the people who installed that equipment as being

certain individuals.  Those are the same individuals that the

proof shows were affiliated with NSO Group.  He describes three

desktops and servers as the ones that were installed by that

11:20  group, and the ones that were moved later.

So this whole movement of equipment at the end, and

this whole thing that is the basis of their embezzlement case

is based on that.  It's not the MLM equipment where public

funds were used.  It's private property, according to their own

11:20  complaint, or the National Security Council, Panamanian

government's own complaint, as we showed it to Your Honor.

Pitti himself says that Pegasus was not part of the

NSC budget and he makes the point that they left a printer

behind and poured acid on it because that was in the actual NSC

11:20  inventory.  That is contradicted by other witnesses who say

it's water damage.  But you can credit to him.  He had said

it's not part of the budget.  There's no proof at all that that

equipment was purchased with public funds and, therefore, could

be embezzled.  And even if it could be embezzled because it was

11:21  public property, there's no proof, there's no audit, there's no

indication that President Martinelli had any responsibility for

that equipment.

That -- I think that is very, very clear from our

brief, there's no contradictory submission on that point.  And

11:21  it shows that these embezzlement charges, without any probable

cause whatsoever, were tacked on by a corrupt prosecutor in

order to overcome their perceived problem with extradition

because of the surveillance, the lack of extraditability of the

surveillance crimes.

11:21         THE COURT:  Now let me follow up on that.  The

distinction, as I understand it, between the MLM equipment and

the Pegasus equipment, is that the Pegasus equipment was

primarily used in connection with cellular communication?

        MR. JIMENEZ:  Yes.

11:21         THE COURT:  And interception of cellular

communication?

        MR. JIMENEZ:  Yes.

        THE COURT:  And a great deal of what Mr. Pitti's

affidavit talks about are phone intercepts.

11:21         MR. JIMENEZ:  All of it.

        THE COURT:  And what you're arguing is that there's a

differentiation between that and anything having to do with the

MLM system because the MLM system is strictly a computer

interception mechanism.

11:22         MR. JIMENEZ:  Your Honor, that's undoubtedly true

based on the MLM proposal itself and based on the evidence or

the testimony of the two witnesses, the only two witnesses who

testified that they used the MLM equipment.

        Those two individuals say that they used it in 2011

11:22 which is prior to the --

1        THE COURT:  Which individual are we talking about?

2        MR. JIMENEZ:  They're both -- I believe they're both

3   named Elvis, their first name.

4        THE COURT:  Literally?

11:22  5        MR. JIMENEZ:  One may be Elvis and one may be Elvin.

6   I know them as the two Elvises.

7        THE COURT:  Last name?

8        MR. JIMENEZ:  Moreno and Murillo (ph.).  And by the

9   way, they're cited, their testimony is cited by the (coughing)

11:22 10   and to some extension the probable cause submission.  They say

11   that they used that equipment in 2011 and that's prior to the

12   Diaz invalid indictment.  The Diaz invalid indictment only says

13   2012 to May of 2014.  So there's not a single person who has

14   testified that that MLM equipment was used after 2011.

11:23 15        In fact, those two individuals say they were

16   transferred out of that area where they were working previously

17   and sent to another building.  And Mr. Pitti, the star witness,

18   says that the equipment that he used was this NSO Group

19   equipment, not the MLM equipment.  And the distinction between

11:23 20   the two couldn't be clearer.

21        THE COURT:  And what about the -- wasn't there also

22   some discussion about e-mail and I guess smart phone -- what is

23   it -- WhatsApp, so the communications?

24        MR. JIMENEZ:  Yes, Your Honor, those are all things

11:23 25   that are available on a cell phone.  WhatsApp is an

1    application.  E-mails, as we all know, are available on cell

2    phones.  I think those are -- I think that is what Your Honor

3    is referring to.  That's what Pitti was talking about.  Pitti

4    is clearly talking about the interception of cellular devices

11:24  5    and, Your Honor, very importantly, when Mr. Diaz was preparing

6    his indictment, he submitted a request to the Supreme Court

7    saying, please certify that these 40 telephone numbers were not

8    the subject of a court order authorizing their interception.

9              THE COURT:  Right.

11:24  10             MR. JIMENEZ:  And he got a response back saying, no,

11   there was none.  He didn't check for e-mails.  He didn't check

12   for any computer-related, he only checked the 40 phone numbers

13   because that's what this equipment did.

14             There's no proof in this record that there was a lack

11:24  15   of authorization for the interception or the intervention of

16   computers and that's one of our points, Your Honor, in terms of

17   the surveillance.  The lack of probable cause, even for

18   surveillance, which is that there's no proof that there was

19   specific intent on Mr. Martinelli's part that these

11:25  20   interceptions occurred without court order or court

21   authorization.  No one says that.  That's just simply what the

22   allegation is.

23             THE COURT:  Well, let me stop you there and turn back

24   to Mr. Fels on this question of the probable cause of the

11:25  25   embezzlement charges vis-a-vis the distinction between the MLM

1   system and the Pegasus system.  The first question I have is,

2   is there something that I can quickly use to rebut the

3   allegation that there are no public funds involved in the

4   Pegasus system?

11:25   5        MR. FELS:  Your Honor, there's absolutely nothing in

6   the statute that requires the public funds be used to buy

7   equipment.  They are making that up out of whole cloth.  What

8   it says is that it has to be government equipment.  There's

9   nothing that says it has to be paid with public funds.  If

11:26  10   someone brings something in --

11        THE COURT:  How would it be government equipment if it

12   wasn't?

13        MR. FELS:  If someone brings it in, donates it, hands

14   it over, I want the government to have this property.  Think of

11:26  15   it this way --

16        THE COURT:  Nobody does that.  Well, do but --

17   (laughter).  Certainly, not for 13 million dollars.

18        MR. FELS:  What they would have you believe is that

19   the following scenario isn't true:  I donate some public land.

11:26  20   And then after I donate it to the government and I give it over

21   to the government, whatever consideration or for maybe no

22   consideration, that doesn't give me the right to now go on that

23   land and do whatever I want, build a house on that land.  I've

24   given it up.  That is now government property.

11:26  25        The law says that basically it's a crime to

1  embezzlement public property.  It doesn't say it has to be paid

2  for with public funds.  And the reason we can prove that

3  there's probable cause that it was public property is because

4  on the end user agreement, it's very clear, this is -- we're

11:27  5  talking about the Pegasus system now.

6        **THE COURT:**  Right.

7        **MR. FELS:**  That this is for the exclusive use of the

8  government of Panama.

9        **THE COURT:**  Where do I find that?

11:27  10        **MR. FELS:**  Sure.  So, Your Honor, it's at RAMB 621.

11        **THE COURT:**  That's the Bates number?

12        **MR. FELS:**  That is the Bates number, Your Honor.  It

13  says end use user certificate.

14        **THE COURT:**  Hold on.  It would probably be attached to

11:27  15  an affidavit?

16        **MR. FELS:**  I don't know that it is, Your Honor.  But

17  certainly it's among the documents -- I can give you a copy of

18  it if you'd like.  RAMB 000621.

19        **THE COURT:**  Yeah, I don't think I have that.

11:27  20        **MR. FELS:**  Well, let's see how good my memory is.

21        (Hands a copy to the courtroom deputy to hand up to

22  the Court).

23        **THE COURT:**  Just so I understand, RAMB stands for?

24        **MR. FELS:**  That's just the initials for Mr.

11:28  25  Martinelli.  That's just the Bates range.

1          THE COURT:  Oh, this comes from Mr. Martinelli.

2          MR. FELS:  No, no.  This is -- meaning we Bates

3     stamped all of our exhibits.

4          THE COURT:  Oh, you used this as your --

11:28  5          MR. FELS:  Correct.  Just to make it easy on Your

6     Honor.  So the originals won't have the Bates stamp.  But what

7     we filed with the Court as a -- I guess as an attachment to our

8     complaint will have the Bates stamp.  So we tried wherever we

9     can to use both.

11:28  10          THE COURT:  Gotcha.  So what am I looking at now?

11          MR. FELS:  This is the Spanish version.  Hold on.

12          Well, what it says -- let me see if I can do it from

13     the Spanish.  This always a -- all right.  So what it says is,

14     if you look at the use, final use, Number 6.

11:29  15          THE COURT:  Okay.

16          MR. FELS:  Right?  It says right there this equipment

17     is for the exclusive use of the government of Panama.

18          THE COURT:  And who is signing this on behalf of the

19     government of Panama?

11:29  20          MR. FELS:  This is signed by Gustavo Perez, the

21     secretary of the NSC, dated July 3rd, 2012.

22          THE COURT:  Okay.

23          MR. FELS:  All right.  So you can see also the end

24     user, now it's in Spanish, but it says *Consejo de Seguridad*,

11:29  25     National Security Council.  Now why is this so important?  It's

1    really important because take a look at the certification of

2    ultimate end user on the very next page.  Representative of

3    government of Panama says, look, we are not going to sell,

4    deliver, otherwise transfer to any party, under any conditions

11:29    5    whatsoever, temporarily or permanently, the items listed in 7,

6    which includes the Pegasus system -- you can refer back on the

7    previous page -- without the prior written approval of the

8    government of Israel.  This is super, super secret stuff, only

9    for governments, Your Honor.

11:30   10          And so this became a property of the government of

11    Panama, regardless of who pays for it.

12          THE COURT:  What is your understanding of who paid for

13    it?

14          MR. FELS:  Your Honor, I don't see the documentation

11:30   15    in the evidence.  I mean, there wasn't evidence on what there

16    was.  But here is another issue.  One of the things that the

17    defense is doing a lot is not only reading things into the law

18    that isn't there, but they're trying to blend the whole MLM/NSO

19    story, and I understand it, it is complicated.  But, Your

11:30   20    Honor, there's nothing in the charges that is specific to

21    either one of those systems.

22          If the government can show probable cause that

23    Mr. Martinelli-Berrocal directed the use of this government

24    equipment, regardless who pays for it whether it was the MLM or

11:31   25    the NSO equipment, then there's probable cause to believe that

1  there was embezzlement by use.  If there's probable cause to

2  believe that Mr. Martinelli-Berrocal directed the -- sorry,

3  that the theft, the ultimate taking away of either one of those

4  equipment, MLM or NSO, then there's probable cause to believe

11:31  5  there's been embezzlement by theft.

6          There's really no -- it's not helpful to focus on

7  necessarily which system did what because there's ample

8  evidence in the record that certainly at a bear minimum that

9  Mr. Martinelli-Berrocal, with respect to the MLM equipment,

11:31  10  directed that it be embezzlement by theft.

11          Should we go over that?

12          THE COURT:  Yes.

13          MR. FELS:  So the probable cause for that, I listed --

14  I have an addendum to my brief which laid out our facts.

11:31  15          THE COURT:  I have it.

16          MR. FELS:  So we'll walk through that.  So this would

17  be on page -- we'll talk about the embezzlement by theft first.

18          THE COURT:  Yeah.

19          MR. FELS:  And I believe that's Article 338.  So that

11:32  20  would be on page 18, which also happens to be Exhibit 18 of

21  Attachment 4 to our brief that we filed on the 1st.

22          THE COURT:  Okay.

23          MR. FELS:  Okay.  So here's how you lay it out.

24  Mr. Martinelli-Berrocal is a public officer.  He's sworn in as

11:32  25  the president of Panama.  He creates this and modifies this

executive decree which essentially puts him in charge of this

National Security Council, that everyone essentially has to

report directly to him, and here are all the cites to the

evidence on that.

11:32    He has Mr. Ronny Rodriguez, Ismael Pitti and William

Pitti, who was working at the NSC during the relevant dates,

all up to 2014.  And by the way, they say that Mr. Pitti was

reassigned.  Well, according to the documentation that we cite

right here in Bullet 3, he was still at the NSC up until May of

11:33  2014, which is the date of the election, the next election.

Okay.  So that you have these two separate sets of specialized

equipment, the MLM equipment, and -- which is purchased with

funds from the government.  We can track all that down.  I'm

trying to summarize here.  And then you have the NSO.  This is

11:33  what I just told you about on July 3rd, 2012.  You have that

end user agreement that says it was an exclusive use of

Panama's government after receiving eight million dollars, NSO

installed the Pegasus system.

    You have Mr. Gustavo Perez, who is the individual who

11:34  purportedly signed that end user agreement saying essentially,

look, Ryan reports to me, even though he should have been under

the chain of command, he had strict orders to work with the

presidential office.  There was already an operation between

Ronny and the presidential office, he would deliver envelopes

11:34  from the presidential office, that relates to the surveillance

1    really more, and then now you get into the meat of it.

2           Shortly after the elections on May 4th of 2014, when

3    Mr. Martinelli-Berrocal was about to leave office, members of

4    the NSC removed the surveillance equipment from Building 115

11:34  5    after business hours one evening.  Pitti says that he received

6    instructions to dismantle the system, remove the computers.  He

7    doesn't know where that went to.  Rodriguez took it away.  But

8    they couldn't remove the printer because it had been poured

9    with acid.  He knows that the server rack was taken by Jubilo

11:35 10    Graell and Rodriguez, to a location unknown to the witness.

11           So he wasn't taking that server rack, and by the way,

12    the server rack was the MLM equipment, as they concede it

13    wasn't the Pegasus equipment, they conceded that in their

14    brief.  So --

11:35 15           **THE COURT:**  Now why is it that we don't know where the

16    eight million dollars came from to pay for the Pegasus

17    equipment?

18           **MR. FELS:**  That I don't know, Your Honor.  I don't --

19    I didn't see any documentation to determine where that money

11:35 20    came from.  I mean, if I had to guess, somebody wanted to keep

21    this out of the government funds so there would be less

22    questions because, let's face it, what they did with the MLM

23    equipment, which I can go through later, because that is pretty

24    relevant to establishing the investment by use.

11:35 25           But the MLM equipment there's a very, very clear path

1    where that all went through federal funds.  The MLM equipment

2    was done first.  You'd think someone would probably learned

3    from their mistakes and said, we can't leave this kind of paper

4    trial, but that's conjecture on my part.  But, again, our

11:36  5    position is it doesn't matter because there's nothing that says

6    that it has to be government funds and, plus, like I said, we

7    can prove that embezzlement by theft of the MLM equipment

8    anyway.

9                So Jubilo Graell, he talks about this as well.  He

11:36  10   says that Ronny instructed him to come over.  They brought it

11   to a building -- first they took it to the presidential palace,

12   then to a building by Monte Oscuro, which is a place in Panama

13   City where they left the rack.  Later they went along with

14   investigators, they followed his path and they realized that

11:36  15   that place that the witness identifies where the rack was taken

16   away was a Super 99.

17                Why is that important?  Because that's a company owned

18   by Martinelli-Berrocal.  Circumstantial evidence that he wants

19   this equipment out of the government because he doesn't want it

11:36  20   to get found, Your Honor.  But it also shows, and it's more

21   than sufficient probable cause, that he was responsible for

22   having this equipment moved.

23                We have other witnesses here that I've listed who also

24   -- I mean, they do have, perhaps, some inconsistencies as you

11:37  25   would expect from eyewitness testimony.  But it's the same

1  general story, that they dropped off some of this equipment and

2  rack at the Super 99 offices.

3       Later there was an inventory done of the MLM

4  equipment.  I should not say an inventory, they did an

11:37  5  analysis, basically, to try to figure out and backtrack what

6  happened with the MLM equipment.  And this audit conducted by

7  the comptroller general concluded that the loss that Panama

8  sustained as a result of the purchase and disappearance of that

9  MLM equipment is 10.8 million dollars.  That's it.  That right

11:37  10  there, alone, is probable cause to believe that

11  Mr. Martinelli-Berrocal directed the theft by embezzlement of

12  some computer equipment, whether -- we don't have to prove --

13  and the Panamanian government doesn't have to prove whether

14  it's the MLM or the NSO.  They just have to prove that it's

11:38  15  one, it's some equipment, and certainly for probable cause

16  purposes we have done that.

17       Your Honor, I wanted to raise some other points.  If

18  Your Honor didn't --

19       **THE COURT:**  Well, just to circle back on the Pegasus

11:38  20  issue in response to their argument.  Your argument is that

21  you're relying upon, in this record, that based upon the end

22  user agreement, that was executed by a public official, who

23  reported directly to the president, right?

24       **MR. FELS:**  He was the secretary of the National

11:38  25  Security Council.

|       |    |                                                                      |
|-------|----|----------------------------------------------------------------------|
|       | 1  | **THE COURT:**  Okay.  That that public official entered             |
|       | 2  | into an end agreement with the government of Israel basically,       |
|       | 3  | where highly sensitive information -- materials were purchased       |
|       | 4  | for the use of the Panamanian government, not be transferred to      |
| 11:38 | 5  | anybody else.                                                        |
|       | 6  | **MR. FELS:**  (Nodding).                                            |
|       | 7  | **THE COURT:**  At a cost of eight million dollars?                  |
|       | 8  | **MR. FELS:**  Correct, Your Honor.                                  |
|       | 9  | **THE COURT:**  So even though there's been no tracing of            |
| 11:39 | 10 | funds to be able to identify the source of those eight million       |
|       | 11 | dollars, what you're saying is that that document is evidence        |
|       | 12 | of Panama's right to control that property.                          |
|       | 13 | **MR. FELS:**  Not only a right, but an obligation under             |
|       | 14 | the terms of that end user agreement.  Because as this end user      |
| 11:39 | 15 | agreement makes clear, the government of Panama can't transfer       |
|       | 16 | it to anyone else.  Not even for a minute.  Not even for five        |
|       | 17 | days, not even for any period of time.  Not even temporarily.        |
|       | 18 | They have to get written approval from the government of Israel      |
|       | 19 | to transfer it, which there's no evidence of that.                   |
| 11:39 | 20 | So there's more than probable cause to believe that                  |
|       | 21 | this particular equipment, as well as the MLM equipment, which       |
|       | 22 | we can easily trace through public funds, is property of the         |
|       | 23 | government of Panama.  And that's how we read the law, Your          |
|       | 24 | Honor, is that there's nothing in that law that says that it         |
| 11:40 | 25 | has to be paid for by public funds.                                  |

1          By the way, I don't think --

2          **THE COURT:**  Just so I'm clear, the law that you're

3    applying in this aspect is Article 338 of the code?

4          **MR. FELS:**  Correct, and 341 would be the same as well.

11:40  5    They both are the same.

6          **THE COURT:**  Because 338 talks about a public officer

7    who takes or embezzles in any way or consents that somebody

8    else appropriates, takes or embezzles any form of money,

9    security or property which administration, collection or

11:40  10   custody has been entrusted by virtue of the position.

11         What was the other one, I'm sorry.

12         **MR. FELS:**  Yes, 341 and 338, Your Honor, which says a

13   public officer takes or embezzles in any way, or consents that

14   somebody else appropriates, takes or embezzles any form of

11:40  15   money, securities, or here it's property, which administration,

16   collection or custody has been entrusted by virtue of his

17   position shall be punished.

18         Mr. Martinelli-Berrocal controlled the National

19   Security Council.  That's made clear by the executive decree

11:41  20   that we introduced in evidence.  So that's property that the

21   National Security Council is entrusted to him.  It's his --

22   it's basically in his custody.  And he directs various people,

23   whether they flicked it on for a moment and used it at all, it

24   doesn't matter.  If it's government property, as certainly the

11:41  25   MLM became when it was bought with government funds, and

1  there's also other documentation on MLM that shows that it's

2  also the government of Panama's property, or the NSO, which by

3  June -- July 3rd, 2012, once you have the signature saying,

4  hey, we agree that this is exclusive use of a Panamanian

11:41  5  government, and it's to the National Security Council, once

6  that happens, they don't even have to turn it on in order for

7  the embezzlement by theft.  Once they take it away somewhere

8  else, that's probable cause to believe you have an embezzlement

9  by theft.

11:42  10          THE COURT:  You were going to talk about the MLM

11  equipment, in particular.

12          MR. FELS:  Oh, sure.

13          THE COURT:  In terms of its relevance to the charge.

14  One of the arguments the defense makes is that that -- that the

11:42  15  charge here does not encompass a period of time when the MLM

16  equipment was used.

17          MR. FELS:  Well, there are a couple of arguments to

18  that, Your Honor.  One is if you take a look at the MLM

19  contract, which I believe we actually have written -- I have

11:42  20  the Bates range for that, too.  It says that it has a maximum

21  term of four years.  Okay.  It basically it's a contract not

22  only for the equipment, but also for services because they have

23  to maintain it, et cetera.

24          Four years from the date that it was signed, which is

11:42  25  July 2010, means that July 2014.  There is a portion of that

1    contract that says with 30 days notice, the government of

2    Panama can cancel this agreement.  But there's no evidence in

3    all of the documentation that they ever did.

4           So, therefore, they maintain this contract with MLM

11:43  5    for four years since we have no cancellation.  I think that's

6    at least -- there's at least probable cause to believe that.

7    So the system was there, whether we have some substantive proof

8    as to whether it was used from 2012, Your Honor, we can

9    supplement the record with that, but I think the larger point

11:43 10    is it doesn't matter.  Because they essentially concede that

11    the NSO equipment was used.

12           Again, it doesn't matter which set of equipment was

13    used.  The NSO equipment is used.  If some sort of equipment is

14    used then now you have embezzlement by use.  And again, the

11:43 15    embezzlement by use doesn't require that the equipment be

16    purchased with Panamanian funds, all it says is that it's

17    property entrusted to the public official.  So that would be

18    our argument, Your Honor.

19           THE COURT:  Well, is there anything in the record that

11:44 20    you know of that indicates that the MLM system was actually

21    used for anything other than ultra vires acts?

22           MR. FELS:  No, Your Honor.

23           THE COURT:  In other words, was it actually used for

24    purposes of developing a criminal case against someone?

11:44 25           MR. FELS:  No, Your Honor.  In fact, what the evidence

1  suggests is that by somebody's orders, we have multiple

2  witnesses saying this, that the only three individuals who were

3  allowed in after a certain point were Ismael Pitti, William

4  Pitti and Ronny Rodriguez, and they took away everybody else's

11:44  5  cards, which means that basically nobody else had access.  The

6  people who were actually going out and getting the warrants in

7  order to do surveillance, they weren't allowed to access this

8  equipment because they didn't have cards.

9       So -- and I might also point out, I guess, maybe Your

11:45 10  Honor is getting at as well, if they allowed the government to

11  use it as well, would that undercut the embezzlement use, and I

12  don't believe that that's what the law is.  I think that if

13  somebody takes property and uses it -- let me take a look at

14  the statute again --

11:45 15       **THE COURT:**  I guess your argument is that under

16  Article 341, that if 50 percent of the time it was used for non

17  -- for purely governmental purposes, if the other 50 percent of

18  the time it was being used for nongovernmental purposes, that

19  would be a violation of the statute.

11:45 20       **MR. FELS:**  Yeah, it doesn't say who exclusively uses

21  in any way.  If they wanted to make it so that embezzlement by

22  use required that you use it to the exclusion of the government

23  officials.  It says any person who -- oh, wait, that's 338.

24  Let me see.  341, any public -- any public officer who for

11:46 25  purposes other than service, meaning ultra virus, uses in his

1   own or another benefit or allows somebody else to use the

2   property under his charge.

3          So in your example, I think that's absolutely right.

4   If I have control of this equipment because I'm

11:46   5   Mr. Martinelli-Berrocal and I effectively control the National

6   Security Council, based on this executive decree, and I'm

7   giving orders to Ronny Rodriguez about who I want to have

8   intercepted and who I want to have targeted, even if Mr. Ronny

9   Rodriguez says, you know what, I hear what the boss is, El Jefe

11:46  10   Number 1 is saying, but I want to let some other people kind

11   use this agreement -- I mean this equipment on a part-time

12   basis, it's still a violation of the statute.

13          It's still a violation because, again, there's nothing

14   in here that says that it has to be exclusive use.  And there's

11:47  15   certainly probable cause to believe, as I said, under the

16   circumstances.

17          **THE COURT:**  In response to the argument about the MLM,

18   whatever is in the record, is there that MLM system was, in

19   fact, used for nongovernmental purposes?

11:47  20          **MR. FELS:**  Well, there's certainly evidence that it

21   was used for nongovernmental purposes in 2010 and 2011.  You

22   have multiple witnesses who talk about the fact that they were

23   given targets by either William Pitti or Ronny Rodriguez, that

24   they weren't -- as far as they knew they had no authorization

11:47  25   to do it.  And that they would make recordings of these

1    conversations.

2          One of the particular witnesses who I wanted to point

3    out said that in September of 2010, so that's well refer before

4    the NSO equipment, the Pegasus system is brought in, that he

11:47   5    was given a recording by Ronny Rodriguez in September of 2010,

6    approximately, and he recognized one of the voices as being --

7    as belonging to a politician named Mitchell Dones, who is

8    talking about another male who didn't know about events

9    occurring in Bocas del Toro, a particular part of Panama.  That

11:48   10   was Julio Palacio Martínez, we include that in our submission,

11   and then when he finished with the transcription, he handed it

12   to an envelope to Mr. Ronny Rodriguez and a few days later,

13   Mr. Palacio Martinez found that the transcription had been

14   published in one of the Panamanian newspapers.  That is one

11:48   15   example of use of the surveillance system.

16          Whether it was NSO, whether it was MLM, again, it

17   doesn't matter for purposes of the law.  It's just uses,

18   illicit use of a surveillance system.

19          Now, we can track this particular call, this

11:48   20   particular recording to Mitchell Dones because he was

21   interviewed as a victim, and he recalled being shown a

22   recording of his voice talking with another individual, and

23   that that individual that he was referring to the Ngäbe tribe,

24   I think it's a native tribe.  We had a third witness who can

11:49   25   connect those two, meaning that the Bocas del Toro was the

1   Ngäbe tribe, because that witness said that Martinelli had

2   murdered some -- the Ngäbe tribe in Bocas del Toro.

3           So that's the chain right there to show -- we have a

4   witness saying, I got the recording from Mr. Rodriguez, I

11:49  5   transcribed it and it showed up in the newspaper, and we have

6   the victim himself saying, I listened to the recording and that

7   was a recording of my conversation.

8           So that's one example of -- but again, that's outside

9   the statute.  That's outside the charged conduct.  The charged

11:49 10  conduct is in 2012 and 2014.

11          THE COURT:  Does that make a difference?  In other

12  words, at this point is there any charged conduct within the

13  relevant period that involved the MLM system, as far as you

14  know?

11:50 15          MR. FELS:  Your Honor, I don't think it's clear.  I

16  think we'd have to look into that.  But again --

17          THE COURT:  Now is the time to do it.

18          MR. FELS:  No.  But again, Your Honor, our position is

19  it's not irrelevant --

11:50 20          THE COURT:  I understand.  I get you.

21          MR. FELS:  But you have the --

22          THE COURT:  If I'm focusing on, and I understand what

23  you're saying.  You're saying don't fall into their trap of

24  looking into the minutiae of the difference between the two

11:50 25  systems.  I get your point.  Let's assume I fell into that

1  trap.  If I did that, I wouldn't find any MLM-related activity

2  during the charging period in this chart, in this complaint.

3       MR. FELS:  Your Honor, it's not clear.  I need to get

4  more -- a better understanding of it.  And there are recordings

11:50  5  of, or I should say there are --

6       THE COURT:  Because recordings --

7       MR. FELS:  There is evidence of e-mails, right, which

8  the -- certainly the MLM was capable of intercepting in the

9  period of time prior to the signing of the end user

11:50  10  certificate.

11       THE COURT:  Oh.

12       MR. FELS:  So the end user certificate is signed on

13  July 3rd, 2012.

14       THE COURT:  Okay.

11:51  15       MR. FELS:  There is evidence that we put in the record

16  that that show that various witnesses were confronted with

17  e-mails that had been intercepted.

18       THE COURT:  Prior to that.

19       MR. FELS:  That had been intercepted prior to the

11:51  20  effective end user certificate.

21       THE COURT:  Gotcha.  And certainly the MLM system may

22  have been able to do that, because it's a computer-based

23  system.

24       MR. FELS:  Correct.  That doesn't mean that the NSO

11:51  25  system couldn't have also been able to do it.

 1          **THE COURT:**  Because it's through a phone.

 2          **MR. FELS:**  They could have been able -- and yes, and

 3  the NSO system may have been operational at that time, but

 4  there is evidence to suggest at least that there were

11:51 5  interceptions of e-mails that predated the end user certificate

 6  being issued.

 7          **THE COURT:**  And therefore --

 8          **MR. FELS:**  Would support an argument that the MLM

 9  system was intercepting in 2012.

11:51 10          **THE COURT:**  Oh.  At least for some period of time in

11  2012.

12          **MR. FELS:**  Correct.

13          **THE COURT:**  Because the complaint that we're dealing

14  with starts with what time period?

11:51 15          **MR. FELS:**  Beginning of 2012 until May, middle of May

16  of 2014.

17          **THE COURT:**  Middle of May.  So what you're saying is

18  that even if it's only for a short period, there is evidence of

19  the relevance of the MLM system to this complaint at least for

11:52 20  that time period.

21          **MR. FELS:**  Correct, and I need to get a little more

22  clarity, like I said, because it does appear that the NSO

23  system could have intercepted e-mails as well and that while

24  the NSO system, the end user agreement starts on July 3rd,

11:52 25  2012, it says that the equipment has already been installed.

1           THE COURT:  But doesn't Pitti's affidavit talk about

2    when it was installed.

3           MR. FELS:  Pitti's affidavit -- well, obviously,

4    Pitti's affidavit doesn't mention the systems by name, I don't

11:52  5    believe, but he says --

6           THE COURT:  But he talks about the installation of an

7    Israeli system, I remember that.

8           MR. FELS:  That's correct.

9           THE COURT:  He's got to be talking about the Pegasus

11:52 10    system.

11           MR. FELS:  Correct.  I don't believe that he says

12    exactly -- I'm looking at the affidavit right now -- I don't

13    believe he says what date -- what date that system was

14    installed.

11:53 15           THE COURT:  Okay.

16           MR. FELS:  But like I said, we can get more clarity,

17    but again, just not at the risk of repeating myself, there's

18    ample evidence by which this Court can conclude that the NSO

19    Pegasus system was used, and that's all you need for probable

11:53 20    cause.

21           I wanted to turn also to some of the points that

22    Mr. Jiménez made relating to the political environment.

23           THE COURT:  Hold that thought.  Let me go back to

24    Mr. Jiménez.  Respond to his response to your point.  His

11:53 25    response is that they don't have to do a tracing because the

manner in which that equipment was rented, and I'm talking

about specifically the Pegasus equipment, was -- the manner it

was acquired shows that it was being acquired by the government

of Panama and that officials of the government of Panama were

11:54 5   using the equipment and so, therefore, you don't need to, you

know, the tracing of the funds is really secondary to the fact

that there's no dispute that by entering into that agreement,

government officials were in charge of that and had custody of

it on behalf of the people of Panama.  And so, therefore, if

11:54 10  the government can prove that they were misused, that triggers

at least an Article 341 violation.

12          MR. JIMENEZ:  Well, Your Honor, I don't believe that

they have presented any testimony or anything from a lawyer in

Panama or an expert in Panama as to what the law in Panama is.

11:54 15  So what you've heard from Panama's lawyer today is simply the

opinion of someone who has no expertise and no knowledge of

what Panama law requires.

18          We have submitted --

19          THE COURT:  Well, they do have the benefit of the

11:55 20  charge.  In other words, they don't need to do that because

they have a complaint that is based on it.

22          MR. JIMENEZ:  Correct.  But we have submitted the

declaration of Mr. Moreno.  And we also have another -- we can

get into the embezzlement elements further, Your Honor, and we

11:55 25  plan to do that, but for now I think it's sufficient to answer

1    the Court questions to refer to what he said previously, and

2    I'm referring to docket entry 24-2, that prior statement he

3    made that we filed in connection with our bond motion.

4          Under Article 338, in addition to it being public

11:55   5    property, the public servant must have custody and

6    responsibility of those assets.  So let's focus on who Panama

7    itself has determined had custody over those assets.  When you

8    go and you look at their evidence, Your Honor, there is an

9    audit report by the controller general of the republic, which

11:56   10   says -- identifies the MLM contract and the purchase of it and

11   the custody of it.  And they identify, I believe, if my memory

12   serves, nine individuals who had custody over that asset.

13   President Martinelli was not one of them.

14         The two people who did have custody under their law,

11:56   15   and that's Panama's own evidence, were -- that were charged,

16   two of those nine were charged.  Those two people are the same

17   people that I mentioned to you before, Gustavo Perez, the

18   former head of the National Security Council, and Giacomo

19   Tamburelli, the head of the Public Investment Plan.

11:56   20         So the prosecutors in Panama that just in October of

21   2016, a year after Diaz's invalid indictment, prepared that

22   *vista fiscal* which I've shown you, they've charged only two

23   those individuals.  Those are two of the nine that had custody.

24         So when you hear statements here today about how he

11:57   25   was the head of the National Security Council because he was

1    the president, that doesn't matter because that's not what the

2    Panama court has found, and that is required proof for that

3    type of embezzlement.  You have to have custody or guardianship

4    over the asset.

11:57    5        Secondly, and I do want to distinguish between the

6    two.  What you just heard about the rack being part of the MLM

7    equipment is pure fiction.  There's nothing in any of those

8    papers that they submitted that indicates that a rack was part

9    of the MLM equipment.

11:57   10        What the witnesses that they themselves have provided

11   to you, the testimony of the witnesses that they themselves

12   provided you, said that the MLM equipment was five laptops and

13   a server.  And we haven't gotten into this, but it will, and

14   this is part of the point I made at the beginning which is that

11:57   15   they have not given you a complete accounting of all the

16   stocking.  There were laptops that were returned at the end.

17   There was a server that was returned at the end.

18        There's no proof that the actual MLM equipment

19   included a rack of any kind.  That's just supposition.  So the

11:58   20   officials in Panama have decided that he did not have custody

21   over the asset.  The officials in Panama have decided that the

22   two people who they allege actually removed the equipment and

23   the rack should not be charged, Mr. Perez -- I mean Mr. William

24   Pitti and Mr. Rodriguez.  Yet, they stand here and they tell

11:58   25   you there's probable cause to charge him with that, when the

11:58

1    individuals, the officials and the actual actors haven't

2    been -- well, the officials haven't been charged properly

3    because they had custody, that's not present, that element is

4    not present, and the actual actors weren't charged because

5    there was insufficient proof relying on the same evidence.

6         If you look at -- and we'll translate it for you as

7    soon as possible, but it's the exact same testimony about the

8    removal of the equipment in the middle of the night and their

9    taking of the rack to Super 99.  They weren't charged, the two

11:59 10  actors.  And he didn't have custody as established by the audit

11   of the controller general, so that eliminates probable cause as

12   to the MLM equipment.

13        Now as to Pegasus, I don't see anything in the record

14   that says it was donated or whatever, and I understand the

11:59 15  point about the end user certificate.  But again, there has to

16   be proof that it is state property and in Panama that requires

17   an audit report, that requires an investigation by the

18   controller general, that public funds were used and that

19   doesn't exist in this case.

11:59 20        The proof, in fact, is the opposite, that it was

21   private property so it can't be the subject of embezzlement.

22   But even if it were, even if it were public property --

23        **THE COURT:**  Right.

24        **MR. JIMENEZ:**  -- this allegation about this stuff

11:59 25  being moved in the middle of the night, if you read our brief,

Your Honor, you'll see that that is also pure fiction.  There

are other witnesses that they themselves have -- their

testimony has been submitted to you who say that the Pegasus

equipment included three desktops and a server, and these guys

describe how these desktops were taken to a government

warehouse in the NSC building.  Pitti doesn't say where that

equipment went, he just says it was taken to an unknown

location.  He, by the way, hadn't been reassigned to the

National -- I didn't say that.  I didn't say he had been

reassigned from the Natural Security Council.  He was in the

National Security Council but in a different province.

         If you look at the difference between Panama City and

Chiriquí, which is where he was, it's a long distance, he

wasn't even there, according to their own witness, so he

doesn't know.  But there's no proof that President Martinelli

ordered that it be removed or taken.  That's just pure fiction

as well.

         So there a total lack of probable cause for the

embezzlement, it's a tacked on, trumped up, manufactured

charge.

         **THE COURT:**  But isn't the -- I guess to some extent,

doesn't the embezzlement charge him with multiple components

and I suppose one of them is --

         **MR. JIMENEZ:**  Yes.

         **THE COURT:**  For example, as you pointed out in your

1    brief, the $13,000,000 charge wasn't for the literal physical

2    cost of the equipment, it was for the technology inside of it.

3    Right?  And so their argument is, so the reason it's valued at

4    that amount is because of that -- if it was all used, according

12:01    5    to the allegation, for nongovernmental purposes, personal

6    purposes, that's the embezzlement.  It basically -- it doesn't

7    matter whether or not the property ended up at Super 99 or it

8    ended up at the NSC because the value in that is not the

9    physical property, it's the technology within it.

12:01   10              **MR. JIMENEZ:**  Your Honor, first of all, again, just to

11    differentiate as to use, and I think your question is as to

12    use, there's no evidence that the MLM equipment was used.

13    None.  You heard about a lot about 2010, 2011, the star

14    witness, Ismael Pitti, talks about things that happened in 2012

12:02   15    and he identifies that two people that installed is as being

16    the NSO Group representatives, so it's not talking about the

17    use of the MLM equipment.

18              With respect to Pegasus, there's a complete failure of

19    proof as to either use or theft for the following reason.  All

12:02   20    you have to do is read Mr. Diaz's indictment.  In October of

21    2015, he said that there are facts which constitute crimes

22    under the Panamanian legislation that there was used

23    equipment -- I think he meant to say use of equipment --

24    personnel and resources of the National Security Council

12:02   25    derived from state funds or public funds.

1          So that's the importance of the state funds or public

2     funds.  I said -- I don't want to again repeat what I said, but

3     there's no proof that the Pegasus equipment was actually public

4     property or that it was used in a public manner.  So that's a

12:03  5     failure of proof.

6          But even so, the testimony of Ismael Pitti about this

7     rule the equipment is totally contradicted and eviscerated by

8     their own evidence about the removal of this -- the desktops

9     were removed to another place.  There's no evidence that any

12:03  10     computer equipment was taken to Super 99, it's a rack.  All the

11     witnesses say the same thing, it's a piece of furniture.

12     That's not worth 13.5 million dollars.  It's not what the MLM

13     equipment was.  The MLM equipment was five laptops and a

14     server, according to their own witnesses.  So that's the

12:03  15     problem with the removal of the Pegasus equipment.

16          So as to both the MLM and the Pegasus, there's no

17     probable cause, Your Honor.  It was added on at the end because

18     they were afraid they could not extradite him for the

19     surveillance crimes.  That's why it's in there, because that's

12:03  20     why they ignored Panama law on the requirement of custody over

21     the assets.  That's why they have ignored all his rights and

22     just -- and that's why the prosecutors in Panama haven't

23     charged the very actors that he supposedly ordered to do these

24     things, because they don't have the proof for embezzlement, it

12:04  25     just isn't there.

1          THE COURT:  Okay.

2          MR. FELS:  Your Honor, I just want to raise one other

3    thing to your attention, additional proof that the Pegasus

4    equipment was actually paid for.  Actually some evidence that

12:04  5    the government -- that the Pegasus equipment was paid for by

6    the government of Panama.

7          Right after the end user agreement that I handed up to

8    you, we have an agreement of summary of terms dated July 3rd,

9    2012, and I don't believe you have a copy of it.  But I'm just

12:04  10    going to read it in and then I'll hand it to you up.

11          Payment terms.  This is an agreement of proposed --

12          THE COURT:  What's the Bates number of that?

13          MR. FELS:  616 and 617, and 618 is the signature page.

14    Also signed by Gustavo Perez on behalf of the National Security

12:05  15    Council.

16          The agreement and the payment terms, the consideration

17    which is -- which we've laid out somewhere else but the

18    consideration shall be paid by the end user to the company.

19    National Security Council secretary or -- no, sorry, the

12:05  20    director signs off on these terms.  He doesn't cross it out and

21    say, no, no, no, we have private funding for this.  He agrees

22    to these terms.  He doesn't change it in any way, which is,

23    again, evidence for probable cause to believe that, in fact,

24    the government of Panama paid for this property.

12:05  25          Okay.  So it says it right there, consideration should

1  be paid by the end user.  The document you have up there, the

2  prior document which is the end user certificate says end user

3  is the National Security Council.

4       **MR. JIMENEZ:**  Your Honor, may I respond to one of your

12:06  5  questions that I neglected to answer?

6       **THE COURT:**  Sure.

7       **MR. JIMENEZ:**  You asked if there was any proof of use

8  of the MLM equipment for other reasons, not these alleged ultra

9  vires acts, and there's plenty of that, and the answer you got

12:06 10  from Panama's a lawyer is no, there isn't.  There is plenty of

11  evidence that there was surveillance conducted and envelopes

12  were taken to the presidential office with respect to the

13  normal functions of the National Security Council.  Their own

14  witnesses are the same ones that we have been talking about say

12:06 15  that.

16       Now they do say that there was another envelope,

17  that's the only guy that says it, by the way, really is Ismael

18  Pitti who says there's another envelope with the other

19  nefarious stuff in it, but there's evidence of actual

12:06 20  surveillance that was conducted by the National Security

21  Council and taken by (inaud.) Lutzo (ph.).  He's the one that

22  provided those names and information to you.

23       But again, it's a minor point.  I think the major

24  point is the lack of proof that President Martinelli ordered

12:07 25  anyone to take equipment or remove equipment that is so-called

1   MLM, 13.5 million dollar contract, and the Pegasus equipment.

2          THE COURT:  Let's talk about that issue because I

3   guess that's an over-arching issue.  Mr. Pitti never says in

4   his affidavit that President Martinelli ordered me to do this.

12:07   5          MR. JIMENEZ:  Correct.  It's triple hearsay.  He says

6   that President Martinelli told Mr. Rodriguez who told Pitti who

7   then submits an affidavit.  Yes.

8          THE COURT:  Now, there's obviously a defense to the

9   charge based upon that.  But the question is whether or not the

12:07  10   record that they have amassed is sufficient circumstantial

11   evidence to make the allegation.  That's the question.

12          MR. JIMENEZ:  Yes, Your Honor.  And I'm glad you asked

13   that question because if Panama itself believed there was

14   probable cause based on that mass record, it would have

12:08  15   proceeded before the guidance counsel.  These 3,000 pages were

16   all compiled before Ismael Pitti in January of 2017 signed that

17   affidavit.  And I'd like to talk about it a little bit.  He's

18   the one who supposedly did this surveillance.

19          We submitted evidence to Your Honor that what happened

12:08  20   is they purchased his testimony.  They tried to coerce

21   individuals in Panama to incriminate President Martinelli.

22   They did it for political reasons, as we have explained.

23          One of them, Ronny Rodriguez, explains it in the

24   affidavit that was submitted as part of the asylum process.

12:08  25   Pitti decided to take the money.  So he goes up to Washington,

1  gets promoted, he gets a big pay raise, and then he signs that

2  affidavit.  It wasn't until he signed that affidavit in January

3  2017 that this extradition request was prepared, at least the

4  complaint and the actual extradition was acted upon.

12:09  5       So even they don't believe that there's probable cause

6  without the Pitti affidavit.  So the Pitti affidavit really

7  is --

8       **THE COURT:**  Which was dated -- when was the Pitti

9  affidavit dated?

12:09  10      **MR. JIMENEZ:**  January 2017.  It's very -- and the

11  extradition request was prepared in May of 2016.  Diaz signed

12  his affidavit containing the misrepresentations about the

13  Pegasus equipment and the MLM equipment in September of 2016.

14  The Pitti affidavit is dated January of 2017.  And all those

12:09  15  other 3,000 pages precede all of those acts.  It's all evidence

16  that they developed during 2014, 2015.

17      So that's what the Court has to look at.  We cited

18  cases, Your Honor, that indicates that triple hearsay is

19  unreliable and shouldn't be considered, and that's what this

12:09  20  is.  This is a paid off guy who allegedly was -- alleged by

21  another person to have been coerced into doing it and that's

22  all they have.

23      **THE COURT:**  Why aren't the -- let me ask this

24  question:  Why aren't the victim statements in terms of the --

12:10  25  that are recounted throughout here, why aren't their testimony

1  relevant to the circumstantial evidence and pieces of the

2  puzzle if, for example, they're being confronted by, sometimes

3  personally, but other times indirectly --

4       **MR. JIMENEZ:**  Yes.

12:10  5       **THE COURT:**  - by President Martinelli with information

6  that could not have been obtained through any other way other

7  than surveillance?  Why doesn't that confirm what Mr. Pitti was

8  alleging.

9       **MR. JIMENEZ:**  Well, let -- I'll give you one example.

12:10 10  There's an individual I think who even wrote a letter to the

11  Court named Purcait, P-U-R-C-A-I-T.  The conversation he

12  recounts with President Martinelli is one where they discussed

13  a legitimate recording involving a crime that was about to

14  occur and a hit that was about to occur.  That's the only

12:11 15  conversation that occurred.  There's no indication that

16  President Martinelli spoke to him about any unauthorized report

17  or other e-mails.  It was about that and it was done for his

18  safety.

19       So those -- all those things, and I think you heard

12:11 20  Panama's lawyer talk about this other person who refers to a

21  third person, who says that he's the one who confirmed and ties

22  the puzzle.  That's what it is.  It's all just a bunch of mish-

23  mash of people, but no one says, yes, President Martinelli

24  ordered this other than Ismael Pitti and those statements of

12:11 25  the victims don't say that either.

1          And also, if you look at the Pitti affidavit it's so

2     clearly written with the view to just be nasty and slander.  It

3     talks about the mistress, the alleged mistress, and it talks

4     about statements made on national television.  There's no

12:12  5     evidence that the mistress was illegally surveilled.  That's

6     not a victim that you see here.  It's just thrown in here to

7     make President Martinelli look bad.  That speaks to the vile

8     nature of that affidavit.  That's what it's about.  It's a

9     political persecution.

12:12 10          That's why we're here.  That's why he was arrested a

11    week before President Varela went to the White House, because

12    it's political and the courts of this country are the ones who

13    stand between abuse by political entities and the

14    constitutional rights of individuals like Mr. Martinelli,

12:12 15    whether they're citizens or not.

16          And he has a due process right in this country as the

17    11th Circuit has found not to be extradited based on obviously

18    false statements and misrepresentations made.  And when we

19    address the supplemental affidavit that was submitted two days

12:12 20    ago by Mr. Diaz, we're going to show you that he made other

21    misrepresentations in that affidavit, so they're continuing to

22    do it.

23          That's why he shouldn't be extradited.  That's why we

24    fought so hard to get him released on bond, and I know you

12:13 25    disagreed with us.  But we have had a hard time even

1   communicating with him.  They threw him in the shoe last week

2   for three days without telling him why, and stopped us from

3   being able to really work on the case.

4          So that's what's going on here.  There's a rush to

12:13  5   judgment.  There's a rush to charge him with triple hearsay

6   affidavits, and accuse him of stealing 13.5 million dollars on

7   a basis of a rack allegedly being moved that wasn't even part

8   of the equipment, according to their own evidence.

9          So that's why we would like Your Honor not only to

12:13  10  deny extradition, but, in the meantime, we'd like to have, you

11  know, better access to our client.  But I know that you've

12  ruled on that point.

13          **THE COURT:**  Do you want to finish the thought before

14  we break for lunch?

12:14  15          **MR. FELS:**  Yes, please.

16          **THE COURT:**  Tell me -- actually, start by answering me

17  the relevance of the supplemental affidavit from your

18  perspective, the supplemental Diaz affidavit.

19          **MR. FELS:**  The Diaz affidavit.  He addresses a number

12:14  20  of different points, Your Honor, relating to arguments that

21  were made in the past.  For example, this *imputado* argument

22  that they advanced through one of their experts that the proper

23  procedure wasn't done with Mr. Martinelli's case.

24          One of the things that Mr. -- Justice Diaz (ph.) says

12:14  25  is, well, of course not, because he has a completely different

1  process since he's a member of PARLACEN.  Article 280, which

2  applies to the *imputado*, that's not the process that he went

3  through.  He went through a completely different court system,

4  which is, by the way, they keep saying, well, how come Mr.

12:14  5  Martinelli was not charged in these other cases, well, because

6  he's a member of PARLACEN so he has to be charged in a specific

7  way as made clear in the very first declaration, actually.

8       But Mr. -- Justice Diaz, again, talks about that law.

9  He also talks about, he clarifies about the illegal

12:15  10  interceptions and why there was no legal authorization to

11  intercept.  He talks about whether these crimes were related to

12  sedition and, basically he addresses most of the issues that

13  the defense had previously put before Your Honor.

14       **THE COURT:**  So --

12:15  15       **MR. FELS:**  That's what a good chunk of it does.  It

16  also summarize some of the evidence to establish probable

17  cause.

18       But I wanted to make a couple of points.  There's no

19  question based on the evidence that Mr. Martinelli directly

12:15  20  confronted some of these witnesses.  Now, they talked about

21  Yassir Purcait and what they say is true.  They played for him

22  some recordings of people who were about to rob him.  But then

23  as Mr. Purcait makes clear, the turn turned very darkly where

24  Mr. Martinelli-Berrocal sort of wanted to take credit, and then

12:16  25  there was an incident later, you can read it about in his

1   affidavit, where he talks about how there was a news article

2   saying, hey, we saved his life and something like that.  How

3   ungrateful he is.  He was also a political figure, Your Honor.

4           But the important point of what he says is, it was

12:16   5   very clear, when he looks at the laptop in the presidential

6   office that Mr. Martinelli is playing these recordings, he

7   says, wait a minute, he has the ability to intercept people?

8   And Mr. Martinelli-Berrocal says, oh, I'm not interception you,

9   but he knows, Mr. Purcait knows that now that

12:16  10   Mr. Martinelli-Berrocal has the ability to do it, and sure

11   enough, about a year or two later, he has some communications

12   intercepted.  As victim he's played those communications back,

13   he says, yep, those re my communications, they were

14   intercepted.  I was right.  My instincts were right when

12:17  15   Mr. Martinelli is telling me, he is showing these recordings on

16   his laptop computer, that he has the ability to do it, that

17   eventually it would be my turn some day.

18           I also want to talk to you about Erasmo Pinilla.  He's

19   a judge in -- let me just pull this document -- here it is.

12:17  20   He's a Panamanian electoral tribunal.  He, as a victim, is

21   shown an e-mail taken from the Brad PTY e-mail account, Brad

22   PTY e-mail account.  By the way, that Brad PTY e-mail account,

23   described by Ismael Pitti, that's who describes it.  When they

24   went back to analyze that Brad PTY account, whose e-mail

12:17  25   address did they find in the correspondence but Ronny

1    Rodriguez's official address.  So he's receiving those

2    communications from that Brad PTY e-mail account, corroborating

3    Mr. Pitti's account that all this was going to Ronny Rodriguez

4    because he was ordering it on behalf of the president.

12:18 5         But I want to get back to Erasmo Pinilla.  He's shown

6    an e-mail taken from an e-mail account dated April 29th, 2012.

7    This an example of one of those e-mails that predate the end

8    user agreement in the NSO equipment, by the way.  And he says

9    that this was an e-mail exchange he had with Mitchell Dones, a

12:18 10   democratic revolutionary party leader, and another individual

11   who is requesting the intervention of the tribunal so that the

12   National Sports Institute would allow the use of a gymnasium to

13   hold a political event.  We referenced this in our factual

14   findings.

12:18 15        But later, this witness says Martinelli Berrocal

16   complained to the justice about that e-mail exchange and the

17   witness replied to him, hey, look, what the democratic

18   revolution party requested, it's the usually support that the

19   electoral tribunal gave to all political parties, and at that

12:18 20   point the witness realized the contents of the e-mail exchange

21   had been brought to Mr. Martinelli-Berrocal's attention.

22        So there's an example of Mr. Martinelli-Berrocal

23   confronting somebody that he has had intercepted with those

24   intercepts, proving circumstantially that he ordered them.

12:19 25        The other great evidence of the circumstantial

1    evidence, it's not just that he was having political rivals

2    intercepted, he's also having business rivals intercepted.

3         He owns a TV station, and there's testimony from

4    another victim of intercepts and that individual was the -- I

12:19  5    believe it's the manager of the television station, it was a

6    rival television station to Mr. Martinelli-Berrocal's.  And

7    basically he -- his name is Luis Emilio Mounes Kaisweter (ph.).

8         **THE COURT:**  How do you spell Mounes?

9         **MR. FELS:**  M-O-U-N-E-S.  He recognized his e-mail from

12:19 10    March 15th, 2013, he recognized it as an e-mail he had written

11    to other members of his network's management commenting on the

12    departure of one of his network's anchors for Next TV, which

13    was a network that he says was owned by Martinelli-Berrocal.

14    In the e-mail he is saying to the executives, hey, here are the

12:20 15    reasons why I think the anchor and others are leaving, here is

16    what we can do to retain our craft staff.

17         So it's not just that Mr. Martinelli-Berrocal -- I

18    mean, that's, first of all, circumstantial evidence that this

19    is not just a political opponent.  This is somebody who is a

12:20 20    general manager of a business in direct competition with a

21    business that Mr. Martinelli-Berrocal still owns while he's

22    president of the United States (sic).  Again, great

23    circumstantial evidence.

24         If it was just some political intrigue where some

12:20 25    rogue people were trying to intercept political figures, that's

1    one thing.  But when it includes someone who happens to be a

2    business competitor or represent a business that is a business

3    competitor for Martinelli-Berrocal, again, strong

4    circumstantial evidence to support Mr. Pitti's affidavit, and

12:21   5    let's talk about that for a moment.

6         Your Honor, Mr. Pitti's affidavit and what he says

7    about Ronny Rodriguez and his orders that he got from

8    Martinelli-Berrocal, that would be admissible in a trial in the

9    United States.  Why?  It's a co-conspirator statement.

12:21   10        THE COURT:  Run that by me again, I'm sorry.  Pitti

11   says what now?

12        MR. FELS:  Well, Pitti says, oh, I never spoke -- he

13   doesn't say that he spoke with Martinelli-Berrocal directly.

14   But he said that on multiple occasions, that Ronny Rodriguez

12:21   15   who is his boss, says, hey, we're doing this for El Jefe, we

16   are doing this for Martinelli.  He wants us to do this.  He is

17   directing us to do this.  He's getting the envelopes.  Every

18   day that he's physically in country, Ronny Rodriguez would

19   bring those envelopes over to him.

12:21   20        Now, the complaint about this is that, oh, it's

21   speculative, it's hearsay within hearsay within hearsay.  But

22   what I'm explaining to you is that Ismael Pitti, if he were to

23   testify in a court in the United States, I think that would be

24   admissible because he is in a conspiracy to do these illegal

12:22   25   intercepts with both Ronny Rodriguez and Ricardo Martinelli,

1  even though he has never had direct communications.

2         And when Ronny Rodriguez is telling his underlings,

3  hey, this is coming right from the boss, that is a statement of

4  a co-conspirator within the scope of the conspiracy, and that

12:22  5  would be admissible under U.S. law.

6         So not only would be it admissible, but it's also, on

7  many different points, maybe not specifically on that point,

8  but many different points corroborated.  You have other people

9  who say that there was a very close relationship between Ronny

12:22  10  Rodriguez and the President Martinelli-Berrocal.  And that

11  Gustavo Perez said, in fact, even those he was my underling,

12  Ronny was reporting directly to the president.  So that

13  corroborates Ismael Pitti's statement.

14         You have all sorts of other evidence, as you pointed

12:22  15  out, from the victims who show that they were being

16  intercepted -- there was actually another one I wanted to talk

17  about.  This one is a little bit vague, I will concede.  It's

18  an individual by the name of Rosendo Rivera Botello.  The

19  defense concludes that there is no evidence that Martinelli

12:23  20  himself directly talked to Rivera Botello.  I can go on what

21  the translation says.  He says that basically this was an

22  attorney of Mr. Martinelli-Berrocal who had given him power of

23  attorney.  And he's confronted by someone from the security

24  council by the name of Rodrigo Sarasqueta saying, if you're not

12:23  25  with us -- let me see what, specifically what the statement is.

1    If you are not with us, you are against us.  That's RAMB

2    002441.

3             But later, the same witness says that he delivered a

4    document to Mr. Tourism, Mr. Solomon Sharma, following the

12:24   5    indications of Mr. Ricardo Martinelli who informed me that I

6    was no longer going to be his lawyer, repeating the same words

7    that a few days Rodrigo Sarasqueta told me, if you are not with

8    us, you are against us.  I'm read that as him saying that

9    Martinelli told him specifically and repeated the same line, if

12:24  10    you are not with us, you are against us.  I guess,

11    theoretically, it could also be Mr. Solomon Sharma who said it,

12    but I think there's enough probable cause with all the other

13    statements and all the other evidence that there is of

14    Mr. Ricardo Martinelli-Berrocal directly going to these people

12:24  15    and confronting them with recordings that he was behind this

16    whole thing.

17             I also want to point out that he went on a television

18    program, again with being interviewed by a person he later also

19    had victimized and had his recordings done.

12:25  20             **THE COURT:**  He being --

21             **MR. FELS:**  Mr. Martinelli-Berrocal, and basically the

22    quote was, I know everything that there is to know.  I have a

23    dossier on everybody.  Again, circumstantial evidence that he

24    has been directing these wire intercepts and electronic

12:25  25    intercepts.

1   **THE COURT:**  Respond to the accusation made in the

2   defense position brief and earlier that the fact that the

3   government hasn't charged Rodriguez, or the other individual

4   Ronny Rodriguez, has undermined the probable cause as to

12:25   5   Mr. Martinelli.

6   **MR. FELS:**  There's a jury instruction in federal court

7   where we instruct juries, you're not to consider who else was

8   indicted.  This is a case about the defendant here.  This is

9   sort of to defeat the empty chair defense.  And the reason that

12:26   10   you tell juries that is because it's not relevant.  It's not

11   relevant even to at a beyond reasonable cause standard.  It's

12   not relevant if the government chose, for whatever reason, not

13   to charge other people who might be culpable.  It's certainly

14   not within the canon of an extradition proceeding to determine

12:26   15   whether that sheds any light on probable cause to believe that

16   there is reason to believe that he has committed the crimes for

17   which extradition is sought.

18   There may be any one of a number of reasons why they

19   never charged William Pitti and Ronny Rodriguez.  I don't know.

12:26   20   I don't know the answer to that.  But what I can see is that we

21   have multiple statements relating to specifically the

22   embezzlement charges, not just from Ismael Pitti, but from

23   others who talk about how these people, Rodriguez, Jubilo, and

24   some other individuals took the stuff in the dead of night

12:27   25   right after the election and moved it somewhere else.

1          And I shall point out, let's be clear, there is

2   evidence in this case that at least from the perspective of the

3   MLM equipment, the government of Panama said there's a 10.8

4   million dollar loss.  We're not talking about whether the rack

12:27  5   is 10.8 million.  The rack, all that is is that is

6   circumstantial evidence that it was Mr. Martinelli who was

7   directing it, since the rack was part of the equipment in that

8   150 building, the top floor that was being, basically being --

9   they're leaving in the dead of night after the election is

12:27  10  over, he doesn't want to get caught with this equipment, and

11  some portion of that equipment winds up at the company that he

12  owns.  Where the rest of is, we don't know but we know from the

13  government of Panama's submission and their audit, that the

14  government of Panama is out at least 10.8 million dollars.

12:27  15          So that alone is sufficient evidence of the theft, the

16  embezzlement by theft.

17          **THE COURT**:  Okay.  Did you want to add anything at

18  this point or just break?

19          **MR. JIMENEZ**:  Your Honor, just two quick points.

12:28  20  Number one, and then I'll be happy to take a break whenever

21  Your Honor, I don't want to keep you here if you want to take a

22  break.

23          You just heard that they don't know why the others

24  weren't charged and things about empty chair.  If you look at

12:28  25  page 15 of our brief, Your Honor, we did -- this is our

1   translation.  If you look at Exhibit 15, which is the *vista*

2   *fiscal* that I mentioned, at page 30 at the top, it says, "We

3   consider after developing the evidence and making a legal

4   analysis of the crime, so far there is no element that could

12:28   5   support the calling to trial for Ronny Rodriguez and William

6   Pitti."

7              So they, like I said previously, they looked at the

8   same evidence.  In fact, they even talk about the same movement

9   of the equipment and the same movement of the rack allegedly to

12:28  10   locations that Ismael Pitti doesn't even know where they went.

11   And they said that there was not sufficient evidence to

12   develop -- there was not evidence developed and after their

13   legal analysis of the crime, there's no element that supports

14   calling to trial of Ronny Rodriguez and William Pitti for

12:29  15   embezzlement.

16              And as far as these other victims, alleged victims,

17   Your Honor, you didn't hear anybody say that they -- that these

18   e-mails that supposedly were shown or intercepted were obtained

19   legally.  In fact, the evidence is to the contrary that the

12:29  20   evidence, like I mentioned, the recordings that were shown to

21   Mr. Purcait, that a crime was about to be committed and if

22   someone gave President Martinelli that information to protect

23   him, that's not nefarious, that's not circumstantial evidence

24   of Ismael Pitti whose affidavit says nothing about e-mails.

12:29  25   This talks about phones that were subsequently supposedly

1   intercepted, and that's what their case is about.  It's about

2   the interception of phones, not about the other conduct.

3          And the comment about the television station, I can't

4   even follow that.  But my understanding is that he has a five

12:30  5   percent ownership or had a five percent ownership at some

6   point, and that's it, you know.  So these are just vague

7   accusations that he directed something, based on people who are

8   his political enemies.  Every one of those four people have a

9   motive to lie because they are political enemies of his.  So

12:30 10   that contradicts their corroboration.  Or I would say it

11   removes it.

12          But to go back, Your Honor, on the -- and the last

13   point I'll make before we break, it's not just the fact that

14   Ronny Rodriguez and William Pitti were not charged, it's who

12:30 15   was charged.  The two people who had, according to Panama's own

16   prosecutors and analysis, had custody over the MLM equipment,

17   Gustavo Perez and Giacomo Tamburelli, and it wasn't even based

18   solely on the decision of the prosecutors.  It was because the

19   controller general did an analysis, did an audit of what

12:31 20   happened to that equipment and how it was purchased.  This

21   $10,000,000 loss number comes from that audit, and that audit

22   wasn't limited -- wasn't limited to by rank or position.  It

23   was basically anybody who had custody or control of that asset,

24   did not include President Martinelli, and the two people who

12:31 25   were charged by the prosecutors were the ones who -- two of the

1   nine were in custody.

2           That's, as Roberto Moreno explained in his affidavit,

3   that's the law in Panama that requires -- I mean, that's the

4   kind of proof that's required to charge somebody and that's why

12:31  5   the prosecutor didn't even charge Ronny Rodriguez and William

6   Pitti.

7           So it all, I think, goes together, Your Honor, and it

8   speaks to the lack of probable cause for any of this equipment

9   or whether it was stolen or misused, especially as to the MLM

12:31  10  equipment.

11          THE COURT:  Well, let's talk about what more we need

12  to do.  The biggest question I have that you've only really

13  touched the surfaces on, the issue of the conditions to the

14  surveillance convention.

12:32  15          MR. JIMENEZ:  Yes.

16          THE COURT:  So the Cyber Crime Convention.

17          MR. JIMENEZ:  Yes.

18          THE COURT:  I am going to want to think about that

19  further.  You're not going to have -- Mr. Fels, you're not

12:32  20  going to have your legal brief on that for a week.

21          MR. FELS:  Your Honor, I actually have it on my phone.

22  We have the response from the State Department.  I can read it

23  into the record if you'd like.

24          THE COURT:  Okay.

12:32  25          MR. FELS:  We'll get it all the nice --

1    **THE COURT:**  I do want to give the defendant an

2  opportunity to review it, though.  Why don't I -- well, one

3  possibility what we can do is --

4    **MR. JIMENEZ:**  Your Honor, I have a suggestion.  Since

12:33   5  we haven't responded to this second supplemental affidavit, if

6  we could have an additional briefing period of ten days to deal

7  with that and to do submissions, and certainly they can respond

8  to what we submitted, and then reconvene at that time after the

9  Court's had a chance to review those.  I understand I believe

12:33  10  that you're going to be out, or you're not able for other

11  reasons in the next two weeks, so I certainly want to work with

12  Your Honor's schedule, but I think that would be a more

13  informed way to proceed after today.

14    **THE COURT:**  Maybe you're right.

12:33  15    Well, I do want to expedite matters, but I do think

16  that this issue is one that merits some discussion.  Because I

17  hear both sides on this point about -- and both arguments make

18  sense to me which is what -- any time that happens, I'm thrown

19  for a loop.  Because usually one argument makes sense and the

12:34  20  other one makes a lot less sense, so, therefore, I can usually

21  know where to go.

22    In this case I can see both arguments very well.  So

23  I'm going to want to have try to find some more support for

24  that.  So I do think it makes sense to give ourselves more

12:34  25  time.  It does make a big difference if we end up extraditing

1 Mr. Martinelli only on one charge or two charges versus the

2 four.

3       **MR. JIMENEZ:**  I'm sorry, Your Honor, you said it does

4 make a big difference.

**12:34** 5       **THE COURT:**  It would make a difference, in any

6 respect.  So it's not an insignificant issue simply that I can

7 gloss over.

8       Did you say -- oh, right, because when we're trying to

9 set this hearing I believe we were trying to figure out --

**12:34** 10       **MR. JIMENEZ:**  You said you weren't available for

11 August 7th, which is the day we initially requested.

12       **THE COURT:**  Now you say you have your -- you already

13 have the State Department's legal analysis available?

14       **MR. FELS:**  Yes, we do, Your Honor.  I mean, like I

**12:35** 15 said, we can -- at the break if we're going to reconvene --

16       **THE COURT:**  Right.

17       **MR. FELS:**  -- we can print it out and hand it to you

18 and to the defense, or we can -- we can read it into the record

19 now and then provide the formal copy at the next hearing.

**12:35** 20 However you'd like to do it.

21       **THE COURT:**  Let's do this.  Let me actually read it

22 and give you an opportunity to read it.  That doesn't mean that

23 we won't do what you're saying that we should do.  But since

24 we're all here, I think it may make -- there may be some value

**12:35** 25 in that, at least taking a look at it.  And then I'll look at

1   my schedule in the break as well and then we'll figure out --

2   if we were to come back on this and the other open questions,

3   when do you proposed?  When do you proposed, Mr. Jiménez?

4          MR. JIMENEZ:  Your Honor, I think in order to give us

12:36   5   sufficient time to review what they've submitted and respond to

6   it, I think we would need at least ten to 14 days so maybe -- I

7   don't know if the Court is available because there are -- this

8   Diaz affidavit is lengthy and does introduce some new things.

9   And, of course, we'll come back whenever the Court wants but

12:36   10   sometime early the week of the 21st, if the Court is available,

11   or towards the end of the week before that.

12          MR. FELS:  Yes, Your Honor.  Again, I'm very cognizant

13   of wanting to move this expeditiously as possible.  We might

14   need some time to respond.  It wouldn't be a bad idea just to

12:37   15   maybe clear up some issues that we might have a week after that

16   in order to file whatever response we need necessary to their

17   response.

18          THE COURT:  Well, can you file something by the 11th?

19          MR. JIMENEZ:  Yes.

12:37   20          THE COURT:  Okay.  Then I'll have the government file

21   their response by the 18th.  Okay?  That gives you a week.  And

22   then we'll reconvene, we will reconvene the week of the 21st.

23   Okay.  I have something set, but I'll move them.  Actually, the

24   21st I have -- do I have anything on the 21st?

12:38   25          THE COURTROOM DEPUTY:  On the CEO, no, Your Honor.

1        THE COURT:  For some reason I'm thinking --

2        (Thereupon, there was a brief discussion off the

3    record.)

4        THE COURT:  So I'm available on the 21st.  We can then

12:38  5    reconvene, which wouldn't be too far away.  Because then

6    whatever ruling I'm going to make I'm going to want to make

7    expeditiously after that.  So that way if the issue is to

8    extradite, then that process can go forward.  You have very

9    limited appeal rights but you can certainly try to appeal it.

12:38 10    Actually, you can't appeal, right, you have to file a habeas.

11    Isn't that the process?

12        MR. JIMENEZ:  Yes, Your Honor.

13        THE COURT:  And then does the government have a

14    right -- Mr. Fels, do you have a right to appeal if I deny the

12:39 15    extradition?  Does that matter?

16        MR. FELS:  Again, I'm going to tap my expert.

17        MR. SMITH:  Your Honor, we do not because it's not a

18    final order pursuant to 28 USC 1291.  The government's remedy

19    -- because there's no jeopardy in extradition, the government's

12:39 20    remedy would be to re-file the extradition remedying whatever

21    the issue is.

22        THE COURT:  I see.  Okay.

23        MR. FELS:  Your Honor, the only thing I would ask is

24    that we -- since briefings will be on the 18th, that we at

12:39 25    least have maybe a day in between, a workday in between to be

1  able to process everything and be prepared for you and maybe

2  start on the 22nd, if that's possible.

3          THE COURT:  Okay.  I can move --

4          THE COURTROOM DEPUTY:  The settlement conferences.

12:39  5          THE COURT:  All right.  The 22nd.

6          MR. JIMENEZ:  Your Honor, I have a request given the

7  fact that this is going on.  Would the Court consider

8  transferring or recommending to transfer President Martinelli

9  to the FDCI down south, I forget what it's called, where it is

12:40  10  easier to work with?

11          THE COURT:  The Everglades, you mean?

12          MR. JIMENEZ:  No, it's by the zoo.

13          THE COURT:  I'm not familiar with it.  I'm not an

14  expert on --

12:40  15          MR. JIMENEZ:  It's the one -- it's -- I think it's

16  called Miami, FCI Miami.

17          THE COURT:  I thought this was FCI Miami.

18          MR. JIMENEZ:  No, that's the federal detention center.

19          THE COURT:  The only one I know about is the

12:40  20  Everglades.

21          THE COURTROOM DEPUTY:  There's one by the zoo, yes,

22  off 152nd.

23          MR. JIMENEZ:  It's easier to have access and it's an

24  easier environment to function in for counsel and for President

12:40  25  Martinelli.

1      **MR. FELS:**  Your Honor, we have no objection.  The only

2 thing I might note is I know from doing these kinds of hearings

3 in the past that the marshals will move inmates to different

4 facilities, assuming that there's enough time in between the

12:41  5 hearings.  It's usually more like 60 days or 45 days.

6      **THE COURT:**  Not for a couple weeks?

7      **MR. FELS:**  Not for a couple weeks.  But, again, we

8 don't have objections, but I'm just giving a heads-up as to

9 what the standard protocol is, based on my understanding.

12:41 10      **THE COURT:**  Would it not make sense then that it may

11 be more relevant after the 22nd to do that?

12      **MR. JIMENEZ:**  Your Honor, look, I think if the

13 marshals can facilitate it, I think we would prefer that it

14 happen now, Your Honor.

12:41 15      **THE COURT:**  Okay.  Well, I'll enter an order.  Whether

16 it gets executed in time, we'll find out.

17      **MR. JIMENEZ:**  Thank you.

18      **THE COURT:**  So I'll grant your request and I'll set

19 the matter then for the 22nd.

12:41 20      In that case, maybe we should just go ahead and

21 adjourn and maybe that way we're going to be contemplating this

22 more carefully anyway.  So let's go ahead and do that.

23      The issue that I think I've been concerned with we

24 have talked a lot about.  I guess we really -- oh, on the

12:42 25 question of -- Mr. Fels, on the issue of the argument about,

1   just focusing on our law for a moment.  The argument that

2   you're making on the Pegasus argument that they're raising,

3   your argument being that, well, we don't need to trace the

4   funds because it's undeniable that the equipment was purchased

12:42   5   on the order of the Panamanian government by a very high level

6   official.  And we have evidence of its use.  And so, therefore,

7   whether or not the government of Panama can actually do an

8   audit to trace the funds directly is irrelevant because, at

9   least by implication, it became property of Panama's to control

12:43   10   and that it was misused, and your argument is that, therefore,

11   at the very least that triggers article, the use article which

12   is 341.

13          MR. FELS:  341.

14          THE COURT:  Yeah.  Article 341.  Is there -- would

12:43   15   there be authority and even on our -- in our law that would be

16   somewhat similar where property that the government had at its

17   use was then misused and then that could be the basis for a

18   embezzlement or conversion charge?  Now this would be more of a

19   state charge as opposed to a federal charge probably, but is

12:43   20   there any -- would we have it?

21          In other words, if this charge was made, if this

22   accusation was made of a public official here, would we have

23   jurisdiction to charge him in that situation?

24          MR. FELS:  Your Honor, I can certainly supplement with

12:44   25   case law.  But I do think there would be a federal law, too.

1    Let me see.  I wrote this down here.

2          641 is the embezzlement charge but there are other

3    charges as well.  That's sort of the standard embezzlement by a

4    public official.  But I think there's also a conspiracy.  These

12:44  5  facts would support a conspiracy, a 371 conspiracy to defraud

6    the government.

7          I believe there's also under 18 USC 666, there's theft

8    of property, of government property.  Your Honor, let me see if

9    I can find specific argument that I had prepared.  But, Your

12:45  10  Honor, like I said, I'll do some additional research on it.

11         **THE COURT:**  Yeah, if you can include that in your

12   supplemental response.  And I guess your first argument is just

13   using as an example 666, talking about somebody who embezzles

14   without authority the use of any person -- property that is

12:45  15  valued at $5,000 or more, and is owned by or is under the care,

16   custody or control of such organization, government or agency.

17         **MR. FELS:**  Right.  There you go right there.  That

18   shows you it doesn't need to be purchased by the government.

19   If it's under the care and control of the government, that's a

12:45  20  crime.

21         I think 641 is embezzlement or conversion to use of

22   any money, thing or value of the United States worth over

23   $1,000.  Again, there is nothing in there that says purchased

24   by the United States.  Purchased with federal funds.  But, as I

12:46  25  said, I will do some additional research on it to determine

1   whether or not there needs to be some proof by the government

2   that the -- whatever property was allegedly converted or

3   embezzled had to have been purchased by federal funds.

4        MR. JIMENEZ:  And, Your Honor, we're going to brief

12:46   5   that as well, but just to be clear, the point we made has

6   nothing to with whether it's a crime here.  It's whether there

7   is probable cause to believe that President Martinelli

8   committed a crime there.  That's what the Court has to

9   determine, not whether it is a crime here.  That would be more

12:46   10   akin to a dual criminality type of argument.

11        THE COURT:  And just so we're clear, the treaty

12   language that we're operating under is only Article 2, Section

13   6, right, embezzlement by public officers?

14        MR. FELS:  Are you talking about the convention?

12:47   15        THE COURT:  Of the 1904 treaty, is that it's

16   embezzlement by a public officer.

17        MR. FELS:  Yes, Your Honor.  That is a specific

18   enumerated offense in the treaty itself.

19        THE COURT:  Right.

12:47   20        MR. FELS:  But as Susan Benda also says in her

21   declaration, there's really two ways because there's a UN

22   convention --

23        THE COURT:  Right.

24        MR. FELS:  -- on bribery which is also incorporated

12:47   25   into that treaty.  And that conviction of bribery also talks

1   about embezzlement.

2          THE COURT:  I do remember that now.  I was going to

3   ask.  I'm glad you bring me that point.  I was going to ask you

4   about that argument.

12:47  5          MR. FELS:  Sure.

6          THE COURT:  I don't remember seeing that before.  Yes.

7   I read Ms.  -- what was the state -- Benda?

8          MR. FELS:  Yes, Susan Benda, Your Honor.

9          THE COURT:  So tell me about that provision now.  What

12:47 10  does that actually say?

11          MR. FELS:  That's an Article 17 of the UN Convention

12   against corruption.  It enumerates as an offense to that

13   convention, here's a quote, embezzlement, misappropriation or

14   other diversion of property by a public official.

12:48 15          THE COURT:  And what is the treaty of -- the effective

16   date for purposes of Panama?

17          MR. FELS:  Your Honor, the --

18          MR. JIMENEZ:  2004, Your Honor.

19          THE COURT:  2004?

12:48 20          MR. JIMENEZ:  Approximately.

21          THE COURT:  Okay.  And one of the terms it uses is

22   misappropriation?

23          MR. FELS:  Correct Your Honor.

24          THE COURT:  And so, Mr. Jiménez, on that, what's our

12:48 25   argument on that?

1    **MR. JIMENEZ:**  Your Honor, we're not arguing that that

2    is being retroactively applied.  That argument is as to the

3    surveillance crimes which were the other convention, Cyber

4    Crime Convention.

12:48   5    **THE COURT:**  Right.

6    **MR. JIMENEZ:**  The embezzlement we have talked about is

7    that the complete lack of probable cause based on what we

8    already discussed.

9    **THE COURT:**  Right.  So for that one, you're simply

12:48  10   focusing on the statutory language under the Panamanian code,

11   right?

12   **MR. JIMENEZ:**  Yes, and what's required in Panama to

13   prove that crime.  The Court has to determine whether there's

14   probable cause to believe that occurred, that that has happened

12:49  15   here with this proof that has been submitted.

16   **THE COURT:**  Now, let me ask you about the Moreno

17   affidavit, the expert affidavit.

18   **MR. JIMENEZ:**  Yes.

19   **THE COURT:**  Other than his own opinion, is there any

12:49  20   specific case or is there any specific provision of the code

21   that he relied upon that I should look at?

22        In other words, is he looking at the same statutory

23   language that the government relied upon in Article 341?

24   **MR. JIMENEZ:**  Yes, Your Honor.  Again, it's a civil

12:49  25   law county.

1          **THE COURT:**  Right, they don't have cases.

2          **MR. JIMENEZ:**  There are cases, I'm not sure how

3    much -- I'll give this answer for you, I don't know how much

4    presidential value they have.  But our point on the proof is

12:49  5    that Panama's own actions demonstrate that custody is

6    necessary, that demonstration of public funds through the

7    (inaud.) is necessary, things we have already discussed.

8    That's why those individuals have been charged or not charged

9    in Panama, as we have already argued.

12:50  10         But I understand your question, which is that is there

11   anything outside the statutory language that would support his

12   opinion and will answer that question for you.

13         I understand that your question is whether there's

14   anything outside the statutory language, and we will answer

12:50  15   that question for you.

16         **THE COURT:**  Okay.

17         **MR. FELS:**  And, again, Your Honor, just, again, don't

18   want to keep beating this drum over and over again, but it's

19   really irrelevant what a lawyer in Panama has to say about the

12:50  20   law since you have an affidavit from the Supreme Court of

21   Panama who are the best arbiters of their own law.  And under

22   the case law, overwhelming case law, we have to defer to their

23   interpretation of their own law.

24         **MR. JIMENEZ:**  Your Honor, that's an accusation.

12:50  25   That's not an opinion by the Supreme Court of Panama.  It's an

1  accusation by a corrupt prosecutor who has charged him with

2  embezzlement, and I'm not going to repeat my arguments, but

3  he's not a Panamanian lawyer so his opinions about Panama are

4  even more irrelevant than those of a real Panamanian lawyer.

12:51  5       So if we're going to talk about what the law in Panama

6  requires, let's have an expert on Panama law opine, as we have

7  done, as other cases in the extradition context have

8  considered, and let's base it on that, not on guesses or

9  suppositions by someone who is not qualified to make that

12:51  10  assertion.

11       THE COURT:  Well, you'll hash it out on your

12  supplemental.  All right.  So let's go ahead and break for now

13  and then we'll come back, I'll set an order for the 22nd.  And

14  then if you'll just file, Mr. Fels, you'll just file a supp

12:51  15  authority the opinion that you were going to talk about.

16       MR. FELS:  Yes, Your Honor.  I mean, we have no

17  problem doing that.  We may want to supplement yet again

18  depending on what their response is.

19       THE COURT:  Well, you're going to -- in other words,

12:52  20  anything else that you would want to submit to me in writing,

21  you're going to do on the 18th.

22       MR. FELS:  Correct.

23       THE COURT:  So including --

24       MR. FELS:  Yes.

12:52  25       THE COURT:  They're going to give you everything they

 1    have on the 11th, and then do it on the 18th.

 2              **MR. FELS:**  Correct, Your Honor.

 3              **THE COURT:**  Okay.  So you file that today because I

 4    want to read it this afternoon.

12:52  5              **MR. JIMENEZ:**  Your Honor, should we prepare an order

 6    for the transfer?

 7              **THE COURT:**  I'll let you know.  Thank you.  We're

 8    done.

 9              **THE COURTROOM DEPUTY:**  Judge, do you want to set the

12:52 10    time for the 22nd?

11              **THE COURT:**  Nine o'clock.

12              **THE COURTROOM DEPUTY:**  Nine o'clock.

13

14              (Thereupon, the above hearing was concluded.)

15

16                        *          *          *

17

18

19

20

21

22

23

24

25

1

**C E R T I F I C A T E**

2

3          I hereby certify that the foregoing is an accurate

4   transcription of the proceedings in the above-entitled

5   matter.

6

7       08/04/2017

8   _____          _____

9   DATE COMPLETED          GIZELLA BAAN-PROULX, RPR, FCRR

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**$**

**$1,000** [1] - 101:23
**$10,000,000** [1] - 92:21
**$13,000,000** [1] - 73:1
**$5,000** [1] - 101:15

**'**

**'04** [1] - 21:25

**0**

**000621** [1] - 49:18
**002441** [1] - 88:2
**08/04/2017** [1] - 108:7

**1**

**1** [6] - 5:1, 5:10, 5:12, 7:15, 22:18, 62:10
**10.8** [4] - 56:9, 90:3, 90:5, 90:14
**115** [1] - 54:4
**11th** [3] - 80:17, 96:18, 107:1
**12** [4] - 18:7, 18:22, 18:24, 20:9
**1291** [1] - 97:18
**13** [3] - 21:22, 22:5, 48:17
**13.5** [4] - 32:14, 74:12, 77:1, 81:6
**14** [1] - 96:6
**15** [5] - 33:14, 33:19, 42:3, 90:25, 91:1
**150** [1] - 90:8
**152nd** [1] - 98:22
**15th** [1] - 85:10
**17** [1] - 103:11
**18** [5] - 40:2, 42:4, 52:20, 101:7
**18th** [4] - 96:21, 97:24, 106:21, 107:1
**19** [1] - 42:12
**1904** [5] - 11:4, 12:21, 12:22, 21:24, 102:15
**1905** [2] - 16:14, 18:14
**1970** [2] - 24:22, 25:16
**1st** [1] - 52:21

**2**

**2** [5] - 17:14, 18:18, 20:3, 20:24, 102:12
**2004** [2] - 103:18, 103:19
**2007** [1] - 29:20
**2010** [6] - 23:19, 59:25, 62:21, 63:3, 63:5, 73:13
**2011** [6] - 10:23, 45:24, 46:11, 46:14, 62:21, 73:13
**2012** [17] - 10:24, 22:20, 22:23, 46:13, 50:21, 53:15, 59:3, 60:8, 64:10, 65:13, 66:9, 66:11, 66:15, 66:25, 73:14, 75:9,

84:6
**2013** [1] - 85:10
**2014** [20] - 10:22, 10:24, 11:9, 13:11, 19:8, 22:18, 22:23, 22:24, 24:10, 27:11, 29:13, 35:4, 46:13, 53:7, 53:10, 54:2, 59:25, 64:10, 66:16, 78:16
**2015** [2] - 73:21, 78:16
**2016** [5] - 27:11, 29:15, 69:21, 78:11, 78:13
**2017** [5] - 27:11, 77:16, 78:3, 78:10, 78:14
**21st** [5] - 96:10, 96:22, 96:24, 97:4
**22nd** [6] - 98:2, 98:5, 99:11, 99:19, 106:13, 107:10
**24** [2] - 15:2, 25:9
**24-2** [1] - 69:2
**28** [1] - 97:18
**280** [1] - 82:1
**29** [1] - 14:6
**29th** [1] - 84:6

**3**

**3** [2] - 6:5, 53:9
**3,000** [4] - 38:14, 43:17, 77:15, 78:15
**30** [3] - 18:25, 60:1, 91:2
**30th** [1] - 18:10
**3190** [1] - 3:21
**338** [6] - 52:19, 58:3, 58:6, 58:12, 61:23, 69:4
**34** [6] - 13:24, 14:6, 14:7, 26:23, 26:25
**341** [9] - 58:4, 58:12, 61:16, 61:24, 68:11, 100:12, 100:13, 100:14, 104:23
**371** [1] - 101:5
**3rd** [6] - 50:21, 53:15, 59:3, 65:13, 66:24, 75:8

**4**

**4** [1] - 52:21
**40** [2] - 47:7, 47:12
**45** [1] - 99:5
**48** [1] - 4:7
**4th** [1] - 54:2

**5**

**5** [2] - 15:2, 42:12
**50** [2] - 61:16, 61:17

**6**

**6** [2] - 50:14, 102:13
**60** [1] - 99:5
**616** [1] - 75:13
**617** [1] - 75:13
**618** [1] - 75:13

**621** [1] - 49:10
**641** [2] - 101:2, 101:21
**666** [2] - 101:7, 101:13

**7**

**7** [2] - 42:15, 51:5
**7th** [1] - 95:11

**9**

**9** [3] - 5:1, 5:10, 5:12
**99** [5] - 55:16, 56:2, 71:9, 73:7, 74:10

**A**

**Abell** [1] - 23:19
**ability** [4] - 3:7, 83:7, 83:10, 83:16
**able** [9] - 6:12, 36:7, 57:10, 65:22, 65:25, 66:2, 81:3, 94:10, 98:1
**above-entitled** [1] - 108:4
**absence** [1] - 43:16
**absent** [1] - 13:22
**absolutely** [2] - 48:5, 62:3
**abuse** [1] - 80:13
**access** [4] - 61:5, 61:7, 81:11, 98:23
**accommodate** [1] - 6:10
**according** [9] - 32:19, 32:21, 44:9, 53:8, 72:14, 73:4, 74:14, 81:8, 92:15
**account** [9] - 43:1, 43:20, 83:21, 83:22, 83:24, 84:2, 84:3, 84:6
**accounting** [1] - 70:15
**accurate** [1] - 108:3
**accusation** [4] - 89:1, 100:22, 105:24, 106:1
**accusations** [1] - 92:7
**accuse** [1] - 81:6
**acid** [2] - 44:14, 54:9
**acquired** [2] - 68:3
**act** [1] - 18:17
**acted** [1] - 78:4
**action** [1] - 43:19
**actions** [1] - 105:5
**activity** [1] - 65:1
**actors** [4] - 71:1, 71:4, 71:10, 74:23
**acts** [4] - 34:7, 60:21, 76:9, 78:15
**actual** [11] - 5:9, 9:10, 9:15, 22:19, 33:17, 44:14, 70:18, 71:1, 71:4, 76:19, 78:4
**add** [4] - 8:22, 22:12, 34:23, 90:17
**added** [5] - 22:6, 22:17, 22:24, 25:7, 74:17
**addendum** [1] - 52:14
**addition** [2] - 32:6, 69:4
**additional** [8] - 3:9, 8:23, 9:19, 27:17, 75:3, 94:6, 101:10, 101:25
**address** [5] - 15:24, 25:14, 80:19,

83:25, 84:1

**addressed** [1] - 20:2
**addresses** [2] - 81:19, 82:12
**adds** [1] - 19:16
**adjourn** [1] - 99:21
**administration** [2] - 58:9, 58:15
**admissible** [4] - 86:8, 86:24, 87:5, 87:6
**admissions** [1] - 30:2
**admit** [4] - 5:11, 5:18, 5:19, 22:21
**admitted** [6] - 3:22, 5:16, 7:2, 8:20, 27:10, 29:10
**admittedly** [1] - 29:9
**adopts** [1] - 14:3
**advanced** [1] - 81:22
**advise** [1] - 34:10
**advisor** [1] - 19:19
**advisor's** [1] - 16:20
**affect** [2] - 23:13, 25:24
**affidavit** [57] - 4:9, 5:10, 5:21, 6:1, 7:22, 7:24, 9:22, 10:2, 27:8, 31:25, 32:4, 32:9, 34:10, 37:2, 37:25, 38:6, 38:7, 38:12, 38:19, 38:21, 38:24, 39:3, 41:20, 45:14, 49:15, 67:1, 67:3, 67:4, 67:12, 77:4, 77:7, 77:17, 77:24, 78:2, 78:6, 78:9, 78:12, 78:14, 80:1, 80:8, 80:19, 80:21, 81:17, 81:18, 81:19, 83:1, 86:4, 86:6, 91:24, 93:2, 94:5, 96:8, 104:17, 105:20
**affidavits** [2] - 3:20, 81:6
**affiliated** [1] - 44:3
**afraid** [1] - 74:18
**afternoon** [1] - 107:4
**agency** [1] - 101:16
**agent** [3] - 38:20, 39:2, 42:22
**agents** [1] - 43:19
**ago** [3] - 4:8, 42:1, 80:20
**agree** [1] - 59:4
**agreed** [1] - 24:19
**agreement** [18] - 14:14, 24:21, 49:4, 53:16, 53:20, 56:22, 57:2, 57:14, 57:15, 60:2, 62:11, 66:24, 68:7, 75:7, 75:8, 75:11, 75:16, 84:8
**agrees** [1] - 75:21
**ahead** [3] - 99:20, 99:22, 106:12
**akin** [1] - 102:10
**allegation** [4] - 38:3, 47:22, 48:3, 71:24, 73:5, 77:11
**allege** [2] - 8:6, 70:22
**alleged** [7] - 10:22, 36:22, 40:13, 76:8, 78:20, 80:3, 91:16
**allegedly** [5] - 41:16, 78:20, 81:7, 91:9, 102:2
**alleges** [2] - 4:9, 38:7
**alleging** [2] - 41:6, 79:8
**allow** [2] - 8:9, 84:12
**allowed** [4] - 7:18, 61:3, 61:7, 61:10
**allows** [1] - 10:20, 62:1
**alone** [2] - 56:10, 90:15

**amassed** [1] - 77:10
**ambiguity** [4] - 16:24, 19:4, 20:5, 20:21
**ambiguous** [2] - 21:21, 25:2
**amend** [2] - 15:13, 23:25
**amount** [2] - 4:20, 73:4
**ample** [2] - 52:7, 67:18
**analysis** [7] - 15:21, 56:5, 91:4, 91:13, 92:16, 92:19, 95:13
**analyze** [1] - 83:24
**anchor** [1] - 85:15
**anchors** [1] - 85:12
**answer** [20] - 3:4, 4:21, 6:13, 6:24, 7:1, 7:7, 7:15, 9:25, 10:7, 16:4, 23:17, 24:15, 26:9, 68:25, 76:5, 76:9, 89:20, 105:3, 105:12, 105:14
**answering** [1] - 81:16
**answers** [1] - 23:3
**anti** [2] - 14:10, 25:6
**anti-retroactivity** [2] - 14:10, 25:6
**anyway** [2] - 55:8, 99:22
**apologize** [1] - 26:21
**appeal** [4] - 97:9, 97:10, 97:14
**appear** [1] - 66:22
**applicable** [4] - 14:2, 14:16, 23:10, 23:12
**application** [3] - 25:1, 26:1, 47:1
**applied** [8] - 13:20, 16:1, 17:6, 23:1, 24:5, 24:25, 26:2, 104:2
**applies** [9] - 14:24, 17:16, 18:19, 26:1, 26:2, 27:12, 30:3, 30:20, 82:2
**apply** [4] - 16:11, 17:20, 30:11, 32:1
**applying** [1] - 58:3
**appreciate** [1] - 8:23
**approach** [1] - 5:25
**appropriates** [2] - 58:8, 58:14
**approval** [2] - 51:7, 57:18
**April** [1] - 84:6
**arbiters** [1] - 105:21
**arching** [1] - 77:3
**area** [1] - 46:19
**argue** [2] - 35:21, 36:2
**argued** [1] - 105:9
**arguing** [2] - 45:16, 104:1
**argument** [54] - 10:18, 10:20, 10:25, 11:7, 12:2, 12:3, 12:4, 12:19, 13:3, 13:5, 13:24, 14:12, 15:13, 15:24, 17:10, 19:11, 20:19, 21:20, 24:7, 24:24, 25:12, 26:14, 26:15, 26:24, 27:6, 27:7, 27:15, 27:17, 28:15, 28:17, 28:22, 36:25, 56:20, 60:18, 61:15, 62:17, 66:8, 73:3, 81:21, 94:19, 99:25, 100:1, 100:2, 100:3, 100:10, 101:9, 101:12, 102:10, 103:4, 103:25, 104:2
**arguments** [11] - 3:9, 4:10, 8:1, 17:19, 28:24, 59:14, 59:17, 81:20, 94:17, 94:22, 106:2
**arrested** [1] - 80:10
**article** [9] - 18:1, 18:4, 40:13, 42:19, 82:1, 83:1, 100:11, 100:14

**Article** [16] - 15:1, 17:14, 18:6, 18:18, 20:3, 20:8, 20:24, 25:9, 52:19, 58:3, 61:16, 68:11, 69:4, 102:12, 103:11, 104:23
**articles** [2] - 18:2, 18:3
**aspect** [1] - 58:3
**assertion** [1] - 106:10
**asset** [4] - 69:12, 70:4, 70:21, 92:23
**assets** [3] - 69:6, 69:7, 74:21
**Assistant** [1] - 31:4
**assistant** [1] - 19:19
**assume** [7] - 6:1, 9:4, 30:20, 30:21, 37:17, 38:2, 64:25
**assuming** [1] - 99:4
**asylum** [1] - 77:24
**attached** [5] - 6:24, 7:16, 9:11, 37:7, 49:14
**Attachment** [1] - 52:21
**attachment** [1] - 50:7
**attention** [4] - 8:11, 36:25, 75:3, 84:21
**attorney** [2] - 87:22, 87:23
**Attorney** [1] - 31:4
**audit** [11] - 34:2, 44:20, 56:6, 69:9, 71:10, 71:17, 90:13, 92:19, 92:21, 100:8
**August** [1] - 95:11
**authority** [2] - 23:4, 100:15, 101:14, 106:15
**authorization** [4] - 47:15, 47:21, 62:24, 82:10
**authorizing** [1] - 47:8
**available** [7] - 46:25, 47:1, 95:10, 95:13, 96:7, 96:10, 97:4

**B**

**BAAN** [1] - 108:9
**BAAN-PROULX** [1] - 108:9
**background** [1] - 20:20
**backtrack** [1] - 56:5
**bad** [3] - 32:13, 80:7, 96:14
**bald** [1] - 32:8
**bald-faced** [1] - 32:8
**banc** [1] - 17:5
**banker's** [1] - 4:1
**base** [1] - 106:8
**based** [19] - 4:13, 27:7, 34:4, 35:9, 44:8, 45:21, 56:21, 62:6, 65:22, 68:21, 77:9, 77:14, 80:17, 82:19, 92:7, 92:17, 99:9, 104:7
**basic** [1] - 16:9
**basis** [5] - 8:18, 44:7, 62:12, 81:7, 100:17
**Bates** [8] - 49:11, 49:12, 49:25, 50:2, 50:6, 50:8, 59:20, 75:12
**bear** [2] - 29:2, 52:8
**beating** [1] - 105:18
**became** [4] - 10:21, 51:10, 58:25, 100:9

**become** [1] - 31:20
**begin** [1] - 30:3
**beginning** [3] - 19:1, 66:15, 70:14
**behalf** [4] - 50:18, 68:9, 75:14, 84:4
**behind** [2] - 44:14, 88:15
**belonging** [1] - 63:7
**bench** [1] - 3:16
**Benda** [4] - 3:19, 102:20, 103:7, 103:8
**benefit** [2] - 62:1, 68:19
**Berrocal** [24] - 51:23, 52:2, 52:9, 52:24, 54:3, 55:18, 56:11, 58:18, 62:5, 82:24, 83:8, 83:10, 84:15, 84:22, 85:13, 85:17, 85:21, 86:3, 86:8, 86:13, 87:10, 87:22, 88:14, 88:21
**Berrocal's** [2] - 84:21, 85:6
**best** [3] - 3:7, 13:21, 105:21
**better** [4] - 6:2, 8:16, 65:4, 81:11
**between** [19] - 13:16, 17:3, 22:7, 22:8, 39:10, 39:12, 45:6, 45:17, 46:19, 47:25, 53:23, 64:24, 70:5, 72:12, 80:13, 87:9, 97:25, 99:4
**beyond** [4] - 8:12, 31:3, 89:11
**big** [4] - 32:24, 78:1, 94:25, 95:4
**biggest** [1] - 93:12
**bilateral** [6] - 12:10, 16:10, 16:19, 17:17, 18:10, 19:1
**binder** [2] - 7:6, 7:11
**bit** [4] - 6:17, 43:23, 77:17, 87:17
**blemishes** [1] - 30:22
**blend** [1] - 51:18
**Bocas** [3] - 63:9, 63:25, 64:2
**body** [1] - 15:22
**bond** [3] - 9:18, 69:3, 80:24
**boss** [4] - 36:3, 62:9, 86:15, 87:3
**Botello** [2] - 87:18, 87:20
**bottom** [1] - 14:7
**bought** [1] - 58:25
**boxes** [2] - 4:1, 32:24
**Brad** [5] - 83:21, 83:22, 83:24, 84:2
**break** [8] - 81:14, 90:18, 90:20, 90:22, 92:13, 95:15, 96:1, 106:12
**bribed** [1] - 30:12
**bribery** [2] - 102:24, 102:25
**brief** [19] - 4:18, 7:5, 8:22, 27:19, 28:9, 32:18, 36:25, 43:25, 44:24, 52:14, 52:21, 54:14, 71:25, 73:1, 89:2, 90:25, 93:20, 97:2, 102:4
**briefing** [1] - 94:6
**briefings** [2] - 3:9, 97:24
**briefly** [2] - 29:4, 42:22
**bring** [5] - 8:11, 29:2, 38:21, 86:19, 103:3
**brings** [2] - 48:10, 48:13
**broad** [1] - 19:21
**broaden** [1] - 13:7
**broadly** [3] - 13:2, 17:2
**brought** [4] - 33:21, 55:10, 63:4, 84:21
**budget** [2] - 44:13, 44:17
**build** [2] - 35:8, 48:23

**Building** [1] - 54:4
**building** [5] - 46:17, 55:11, 55:12, 72:6, 90:8
**built** [1] - 28:8
**Bullet** [1] - 53:9
**bunch** [1] - 79:22
**business** [7] - 54:5, 85:2, 85:20, 85:21, 86:2
**buy** [4] - 40:19, 40:20, 41:16, 48:6

## C

**cancel** [1] - 60:2
**cancellation** [1] - 60:5
**cannot** [2] - 16:14, 38:24
**canon** [1] - 89:14
**capable** [1] - 65:8
**cards** [2] - 61:5, 61:8
**care** [2] - 101:15, 101:19
**carefully** [1] - 99:22
**Caribbean** [2] - 40:16, 42:16
**case** [51] - 5:4, 5:5, 5:22, 8:2, 8:6, 12:10, 17:5, 19:25, 20:11, 24:23, 25:4, 29:5, 29:6, 29:21, 29:24, 31:7, 31:11, 31:16, 31:21, 32:24, 33:17, 33:18, 33:19, 34:8, 34:11, 34:15, 35:14, 38:14, 40:7, 40:10, 41:4, 41:14, 42:23, 43:5, 44:7, 60:24, 71:19, 81:3, 81:23, 89:8, 90:2, 92:1, 94:22, 99:20, 100:25, 104:20, 105:22
**cases** [17] - 4:25, 9:7, 16:25, 24:16, 25:3, 25:8, 29:14, 30:24, 35:9, 43:3, 43:6, 43:9, 78:18, 82:5, 105:1, 105:2, 106:7
**caught** [1] - 90:10
**cell** [2] - 46:25, 47:1
**cellular** [3] - 45:8, 45:10, 47:4
**center** [1] - 98:18
**CEO** [1] - 96:25
**certain** [2] - 44:2, 61:3
**certainly** [15] - 22:21, 48:17, 49:17, 52:8, 56:15, 58:24, 62:15, 62:20, 65:8, 65:21, 89:13, 94:7, 94:11, 97:9, 100:24
**certificate** [7] - 49:13, 65:10, 65:12, 65:20, 66:5, 71:15, 76:2
**certification** [2] - 3:22, 51:1
**certified** [1] - 11:14
**certifies** [1] - 8:4
**certify** [3] - 28:16, 47:7, 108:3
**cetera** [1] - 59:23
**chain** [2] - 53:22, 64:3
**chair** [2] - 89:9, 90:24
**challenge** [1] - 8:10
**challenging** [1] - 26:19
**chambers** [1] - 38:20
**chance** [2] - 3:10, 94:9
**change** [1] - 75:22
**changed** [1] - 24:19
**charge** [32] - 11:8, 18:14, 34:4, 34:21,

35:17, 35:18, 35:22, 36:7, 42:2, 53:1, 59:13, 59:15, 62:2, 68:8, 68:20, 70:25, 72:20, 72:22, 73:1, 77:9, 81:5, 89:13, 93:4, 93:5, 95:1, 100:18, 100:19, 100:21, 100:23, 101:2
**chargeable** [1] - 35:19
**charged** [30] - 34:3, 34:12, 35:11, 36:10, 37:24, 40:10, 41:9, 64:9, 64:12, 69:15, 69:16, 69:22, 70:23, 71:2, 71:4, 71:9, 74:23, 82:5, 82:6, 89:3, 89:19, 90:24, 92:14, 92:15, 92:25, 105:8, 106:1
**charges** [19] - 10:17, 11:3, 26:6, 26:10, 27:9, 27:16, 28:8, 28:13, 28:14, 28:16, 33:21, 39:7, 43:15, 44:25, 47:25, 51:20, 89:22, 95:1, 101:3
**charging** [4] - 33:17, 34:22, 34:24, 65:2
**chart** [1] - 65:2
**check** [2] - 47:11
**checked** [1] - 47:12
**Chiriqui** [1] - 72:13
**chose** [1] - 89:12
**chunk** [1] - 82:15
**circle** [1] - 56:19
**Circuit** [2] - 17:5, 80:17
**circuits** [1] - 17:6
**circumstances** [1] - 62:16
**circumstantial** [10] - 55:18, 77:10, 79:1, 84:25, 85:18, 85:23, 86:4, 88:23, 90:6, 91:23
**circumstantially** [1] - 84:24
**citations** [1] - 37:6
**cite** [1] - 53:8
**cited** [9] - 20:12, 22:8, 22:14, 29:17, 31:11, 42:23, 46:9, 78:17
**cites** [4] - 35:6, 40:13, 40:15, 53:3
**citizens** [1] - 80:15
**City** [2] - 55:13, 72:12
**civil** [1] - 104:24
**clarifies** [1] - 82:9
**clarity** [2] - 66:22, 67:16
**clause** [8] - 11:5, 11:21, 11:22, 14:4, 14:13, 16:15, 16:17
**clear** [25] - 7:18, 7:20, 16:19, 17:1, 19:3, 25:22, 27:19, 28:24, 31:10, 43:24, 44:23, 49:4, 54:25, 57:15, 58:2, 58:19, 64:15, 65:3, 82:7, 82:23, 83:5, 90:1, 96:15, 102:5, 102:11
**clearer** [2] - 5:22, 46:20
**clearly** [4] - 14:20, 22:25, 47:4, 80:2
**client** [2] - 38:17, 81:11
**close** [1] - 87:9
**cloth** [1] - 48:7
**co** [2] - 86:9, 87:4
**co-conspirator** [2] - 86:9, 87:4
**code** [3] - 58:3, 104:10, 104:20
**coerce** [1] - 77:20
**coerced** [1] - 78:21
**cognizant** [1] - 96:12

**colleagues** [1] - 31:6
**collection** [2] - 58:9, 58:16
**combine** [1] - 11:7
**coming** [1] - 87:3
**command** [1] - 53:22
**comment** [1] - 92:3
**commenting** [1] - 85:11
**committed** [9] - 13:13, 15:7, 16:14, 19:8, 24:11, 24:12, 89:16, 91:21, 102:8
**common** [6] - 8:1, 20:7, 21:1, 21:7, 21:8, 25:15
**communicating** [1] - 81:1
**communication** [2] - 45:8, 45:11
**communications** [6] - 46:23, 83:11, 83:12, 83:13, 84:2, 87:1
**company** [6] - 40:14, 41:23, 42:16, 55:17, 75:18, 90:11
**competition** [1] - 85:20
**competitor** [2] - 86:2, 86:3
**compiled** [1] - 77:16
**complained** [1] - 84:16
**complaint** [15] - 40:5, 40:11, 40:21, 40:22, 41:2, 41:9, 44:10, 44:11, 50:8, 65:2, 66:13, 66:19, 68:21, 78:4, 86:20
**complete** [6] - 5:7, 43:14, 43:16, 70:15, 73:18, 104:7
**COMPLETED** [1] - 108:9
**completely** [7] - 7:23, 28:8, 31:23, 32:2, 38:18, 81:25, 82:3
**complicated** [1] - 51:19
**components** [1] - 72:22
**comptroller** [1] - 56:7
**computer** [7] - 43:21, 45:18, 47:12, 56:12, 65:22, 74:10, 83:16
**computer-based** [1] - 65:22
**computer-related** [1] - 47:12
**computers** [2] - 47:16, 54:6
**concede** [3] - 54:12, 60:10, 87:17
**conceded** [1] - 54:13
**concerned** [2] - 32:12, 99:23
**conclude** [1] - 67:18
**concluded** [2] - 56:7, 107:14
**concludes** [1] - 87:19
**condition** [2] - 15:10, 15:11
**Condition** [2] - 18:22, 18:24
**conditions** [12] - 12:7, 14:1, 14:15, 15:7, 17:12, 22:15, 23:9, 24:3, 38:17, 51:4, 93:13
**conduct** [4] - 64:9, 64:10, 64:12, 92:2
**conducted** [3] - 56:6, 76:11, 76:20
**conferences** [1] - 98:4
**confirm** [1] - 79:7
**confirmed** [1] - 79:21
**confronted** [4] - 65:16, 79:2, 82:20, 87:23
**confronting** [2] - 84:23, 88:15
**conjecture** [1] - 55:4
**connect** [1] - 63:25
**connection** [3] - 9:17, 45:8, 69:3

**conscience** [1] - 30:2
**Consejo** [1] - 50:24
**consents** [2] - 58:7, 58:13
**consider** [4] - 37:14, 89:7, 91:3, 98:7
**consideration** [5] - 48:21, 48:22, 75:16, 75:18, 75:25
**considered** [4] - 43:7, 43:8, 78:19, 106:8
**consist** [2] - 3:18, 5:1
**consistent** [1] - 37:13
**conspiracy** [5] - 86:24, 87:4, 101:4, 101:5
**conspirator** [2] - 86:9, 87:4
**constitute** [1] - 73:21
**constitution** [1] - 31:12
**constitutional** [1] - 80:14
**constrained** [2] - 14:17, 15:14
**construction** [2] - 12:25, 20:22
**construed** [1] - 13:1
**contain** [1] - 24:17
**containing** [1] - 78:12
**contains** [1] - 38:25
**contemplating** [1] - 99:21
**content** [1] - 40:23
**contents** [1] - 84:20
**context** [3] - 17:2, 39:3, 106:7
**continuing** [1] - 80:21
**contract** [7] - 36:13, 59:19, 59:21, 60:1, 60:4, 69:10, 77:1
**contradicted** [3] - 43:1, 44:15, 74:7
**contradiction** [2] - 43:13, 43:16
**contradictions** [1] - 8:6
**contradictory** [5] - 7:19, 7:24, 38:18, 43:10, 44:24
**contradicts** [3] - 38:19, 38:22, 92:10
**contrary** [4] - 13:23, 17:1, 40:22, 91:19
**contrast** [1] - 18:15
**control** [7] - 57:12, 62:4, 62:5, 92:23, 100:9, 101:16, 101:19
**controlled** [1] - 58:18
**controller** [4] - 69:9, 71:11, 71:18, 92:19
**controls** [1] - 23:15
**Convention** [8] - 13:25, 18:15, 18:17, 18:18, 20:19, 93:16, 103:11, 104:4
**convention** [38] - 11:21, 11:22, 11:25, 12:5, 12:6, 12:15, 13:20, 14:19, 14:20, 14:23, 14:25, 17:8, 19:15, 19:16, 22:6, 22:12, 22:13, 22:18, 22:25, 23:8, 23:12, 23:13, 23:23, 24:1, 24:2, 24:3, 24:8, 24:9, 25:9, 25:13, 25:14, 25:22, 26:3, 93:14, 102:14, 102:22, 103:13, 104:3
**conventions** [2] - 13:6, 15:16
**conversation** [3] - 64:7, 79:11, 79:15
**conversations** [1] - 63:1
**conversion** [2] - 100:18, 101:21
**converted** [1] - 102:2
**conviction** [1] - 102:25
**convince** [1] - 28:21

**copies** [1] - 5:21
**copy** [6] - 6:2, 7:13, 49:17, 49:21, 75:9, 95:19
**corners** [1] - 35:17
**corollary** [1] - 11:3
**correct** [17] - 6:3, 9:5, 10:19, 39:20, 50:5, 57:8, 58:4, 65:24, 66:12, 66:21, 67:8, 67:11, 68:22, 77:5, 103:23, 106:22, 107:2
**correspondence** [1] - 83:25
**corroborated** [1] - 87:8
**corroborates** [1] - 87:13
**corroborating** [1] - 84:2
**corroboration** [1] - 92:10
**corrupt** [11] - 27:9, 29:10, 29:18, 30:18, 31:1, 31:5, 31:6, 32:4, 34:7, 45:1, 106:1
**corruption** [5] - 29:22, 30:7, 31:15, 34:14, 103:12
**cost** [3] - 39:23, 57:7, 73:2
**coughing** [1] - 46:9
**council** [1] - 87:24
**Council** [26] - 5:3, 22:10, 33:4, 36:11, 40:6, 40:11, 41:3, 42:14, 44:10, 50:25, 53:2, 56:25, 58:19, 58:21, 59:5, 62:6, 69:18, 69:25, 72:10, 72:11, 73:24, 75:15, 75:19, 76:3, 76:13, 76:21
**Council's** [1] - 40:21
**counsel** [3] - 3:16, 5:22, 6:9, 77:15, 98:24
**countries** [4] - 16:2, 22:8, 30:6, 30:10
**country** [11] - 29:6, 29:8, 30:17, 30:18, 30:20, 30:21, 31:2, 32:7, 80:12, 80:16, 86:18
**county** [1] - 104:25
**couple** [4] - 59:17, 82:18, 99:6, 99:7
**course** [3] - 30:18, 81:25, 96:9
**COURT** [224] - 3:1, 3:12, 4:2, 4:5, 4:16, 5:11, 5:17, 5:24, 6:1, 6:12, 7:6, 7:9, 7:13, 8:8, 9:4, 9:12, 10:1, 10:5, 11:16, 12:3, 12:17, 12:21, 13:8, 14:5, 14:8, 14:22, 15:1, 15:9, 15:19, 15:25, 16:6, 17:21, 18:4, 18:8, 18:21, 19:13, 20:7, 20:11, 21:1, 21:8, 21:12, 21:14, 21:17, 23:4, 23:20, 25:8, 25:12, 25:18, 26:5, 26:8, 26:17, 26:25, 27:2, 27:4, 28:1, 28:3, 28:6, 28:12, 28:18, 30:5, 30:15, 33:13, 33:15, 34:18, 35:12, 35:15, 35:24, 36:2, 36:5, 36:18, 37:9, 37:12, 37:17, 37:19, 39:5, 39:9, 39:12, 39:18, 39:20, 39:22, 40:4, 40:23, 41:1, 41:5, 41:12, 41:25, 42:3, 42:11, 42:17, 43:6, 43:9, 45:5, 45:10, 45:13, 45:16, 46:1, 46:4, 46:7, 46:21, 47:9, 47:23, 48:11, 48:16, 49:6, 49:9, 49:11, 49:14, 49:19, 49:23, 50:1, 50:4, 50:10, 50:15, 50:18, 50:22, 51:12, 52:12, 52:15, 52:18, 52:22, 54:15, 56:19, 57:1, 57:7, 57:9, 58:2, 58:6, 59:10, 59:13, 60:19, 60:23, 61:15, 62:17, 64:11, 64:17, 64:20,

64:22, 65:6, 65:11, 65:14, 65:18, 65:21,
66:1, 66:7, 66:10, 66:13, 66:17, 67:1,
67:6, 67:9, 67:15, 67:23, 68:19, 71:23,
72:21, 72:25, 75:1, 75:12, 76:6, 77:2,
77:8, 78:8, 78:23, 79:5, 81:13, 81:16,
82:14, 85:8, 86:10, 88:20, 89:1, 90:17,
93:11, 93:16, 93:18, 93:24, 94:1, 94:14,
95:5, 95:12, 95:16, 95:21, 96:18, 96:20,
97:1, 97:4, 97:13, 97:22, 98:3, 98:5,
98:11, 98:13, 98:17, 98:19, 99:6, 99:10,
99:15, 99:18, 100:14, 101:11, 102:11,
102:15, 102:19, 102:23, 103:2, 103:6,
103:9, 103:15, 103:19, 103:21, 103:24,
104:5, 104:9, 104:16, 104:19, 105:1,
105:16, 106:11, 106:19, 106:23,
106:25, 107:3, 107:7, 107:11
  **Court** [27] - 5:6, 8:3, 8:23, 9:24, 15:20,
16:23, 16:25, 28:15, 29:15, 29:16,
29:18, 29:22, 42:24, 47:6, 50:7, 67:18,
69:1, 78:17, 79:11, 96:7, 96:9, 96:10,
98:7, 102:8, 104:13, 105:20, 105:25
  **court** [14] - 4:25, 21:17, 27:10, 29:15,
31:5, 38:2, 47:8, 47:20, 70:2, 82:3,
86:23, 89:6
  **Court's** [2] - 42:10, 94:9
  **Court)** [1] - 49:22
  **COURTROOM** [5] - 96:25, 98:4, 98:21,
107:9, 107:12
  **courtroom** [1] - 49:21
  **courts** [1] - 80:12
  **cover** [1] - 28:13
  **covered** [2] - 13:10, 34:25
  **covers** [1] - 37:3
  **craft** [1] - 85:16
  **creates** [1] - 52:25
  **credibility** [1] - 38:1
  **credit** [3] - 38:6, 44:16, 82:24
  **crime** [15] - 17:14, 19:7, 26:16, 37:15,
41:8, 48:25, 79:13, 91:4, 91:13, 91:21,
101:20, 102:6, 102:8, 102:9, 104:13
  **Crime** [7] - 13:25, 18:15, 18:16, 18:18,
20:19, 93:16, 104:4
  **crimes** [20] - 15:7, 16:14, 18:14, 18:17,
18:19, 18:21, 26:16, 27:14, 27:20,
27:25, 30:3, 30:4, 37:1, 41:8, 45:4,
73:21, 74:19, 82:11, 89:16, 104:3
  **criminal** [7] - 17:1, 31:20, 35:9, 40:21,
41:2, 41:4, 60:24
  **criminality** [1] - 102:10
  **criticized** [2] - 29:17, 29:18
  **cross** [1] - 75:20
  **Cruz** [1] - 17:5
  **culpable** [1] - 89:13
  **current** [1] - 30:10
  **custody** [22] - 34:1, 58:10, 58:16,
58:22, 68:8, 69:5, 69:7, 69:11, 69:12,
69:14, 69:23, 70:3, 70:20, 71:3, 71:10,
74:20, 92:16, 92:23, 93:1, 101:16,
105:5
  **cyber** [2] - 15:7, 19:7

  **Cyber** [7] - 13:25, 18:15, 18:16, 18:18,
20:19, 93:16, 104:3

# D

  **damage** [1] - 44:16
  **darkly** [1] - 82:23
  **date** [12] - 18:11, 18:14, 21:24, 23:24,
24:11, 24:12, 25:7, 53:10, 59:24, 67:13,
103:16
  **DATE** [1] - 108:9
  **dated** [6] - 50:21, 75:8, 78:8, 78:9,
78:14, 84:6
  **dates** [1] - 53:6
  **days** [11] - 18:25, 57:17, 60:1, 63:12,
80:19, 81:2, 88:7, 94:6, 96:6, 99:5
  **de** [1] - 50:24
  **dead** [2] - 89:24, 90:9
  **deal** [5] - 26:15, 31:24, 45:13, 94:6
  **dealing** [3] - 34:11, 66:13
  **deals** [1] - 37:2
  **decide** [1] - 33:9
  **decided** [4] - 35:10, 70:20, 70:21,
77:25
  **deciding** [1] - 13:19
  **decision** [2] - 24:24, 92:18
  **declaration** [6] - 3:19, 9:19, 16:22,
68:23, 82:7, 102:21
  **declarations** [1] - 9:17
  **decree** [3] - 53:1, 58:19, 62:6
  **default** [3] - 11:18, 13:22, 14:24
  **defeat** [4] - 15:16, 17:13, 17:19, 89:9
  **defendant** [10] - 3:2, 3:5, 4:3, 6:19,
10:15, 11:8, 31:2, 37:24, 89:8, 94:1
  **defendant's** [4] - 5:12, 6:13, 6:18, 10:7
  **Defense** [1] - 7:15
  **defense** [11] - 3:16, 5:22, 11:18, 26:10,
51:17, 59:14, 77:8, 82:13, 87:19, 89:2,
89:9, 95:18
  **defenses** [2] - 7:2, 17:11
  **defer** [3] - 15:20, 16:23, 105:22
  **deference** [2] - 20:3, 20:24
  **definitively** [1] - 20:2
  **defraud** [1] - 101:5
  **del** [3] - 63:9, 63:25, 64:2
  **deliver** [2] - 51:4, 53:24
  **delivered** [1] - 88:3
  **democratic** [2] - 84:10, 84:17
  **demonstrate** [1] - 105:5
  **demonstration** [1] - 105:6
  **denied** [2] - 31:17, 42:24
  **deny** [3] - 43:10, 81:10, 97:14
  **denying** [1] - 7:23
  **Department** [13] - 3:19, 11:14, 15:22,
16:21, 17:9, 19:5, 19:9, 19:20, 20:3,
20:23, 29:7, 30:25, 93:22
  **Department's** [3] - 15:21, 19:23, 95:13
  **departure** [1] - 85:12
  **deputy** [1] - 49:21

  **DEPUTY** [5] - 96:25, 98:4, 98:21,
107:9, 107:12
  **derived** [1] - 73:25
  **describe** [1] - 72:5
  **described** [1] - 83:23
  **describes** [3] - 44:1, 44:3, 83:23
  **desktops** [4] - 44:4, 72:4, 72:5, 74:8
  **despite** [1] - 19:11
  **detail** [2] - 39:23, 43:23
  **detailed** [1] - 37:6
  **details** [1] - 6:16
  **detained** [1] - 38:17
  **detention** [1] - 98:18
  **determinations** [1] - 37:19
  **determine** [5] - 54:19, 89:14, 101:25,
102:9, 104:13
  **determined** [1] - 69:7
  **determining** [1] - 37:14
  **develop** [1] - 91:12
  **developed** [2] - 78:16, 91:12
  **developing** [2] - 60:24, 91:3
  **devices** [1] - 47:4
  **Diaz** [17] - 4:9, 33:8, 34:3, 34:12,
34:25, 35:6, 41:14, 46:12, 47:5, 78:11,
80:20, 81:18, 81:19, 81:24, 82:8, 96:8
  **Diaz's** [5] - 9:22, 27:7, 34:7, 69:21,
73:20
  **difference** [8] - 39:10, 39:12, 64:11,
64:24, 72:12, 94:25, 95:4, 95:5
  **different** [14] - 13:19, 22:11, 32:20,
35:8, 38:9, 38:13, 39:3, 72:11, 81:20,
81:25, 82:3, 87:7, 87:8, 99:3
  **differentiate** [1] - 73:11
  **differentiation** [1] - 45:17
  **differently** [1] - 18:2
  **difficult** [2] - 5:20, 38:16
  **direct** [2] - 85:20, 87:1
  **directed** [5] - 51:23, 52:2, 52:10,
56:11, 92:7
  **directing** [3] - 86:17, 88:24, 90:7
  **direction** [1] - 36:3
  **directly** [9] - 41:20, 53:3, 56:23, 82:19,
86:13, 87:12, 87:20, 88:14, 100:8
  **director** [1] - 75:20
  **directs** [1] - 58:22
  **disagreed** [1] - 80:25
  **disappearance** [1] - 56:8
  **disappeared** [1] - 43:18
  **discretion** [1] - 29:23
  **discussed** [4] - 40:9, 79:12, 104:8,
105:7
  **discussion** [3] - 46:22, 94:16, 97:2
  **dismantle** [1] - 54:6
  **dismiss** [1] - 9:18
  **dispute** [2] - 13:10, 68:7
  **distance** [1] - 72:13
  **distinction** [3] - 45:6, 46:19, 47:25
  **distinguish** [1] - 70:5
  **diversion** [1] - 103:14

**docket** [1] - 69:2
**document** [11] - 33:13, 33:15, 33:17, 34:25, 40:24, 42:3, 57:11, 76:1, 76:2, 83:19, 88:4
**documentary** [1] - 8:14
**documentation** [5] - 51:14, 53:8, 54:19, 59:1, 60:3
**documents** [9] - 3:25, 4:14, 9:2, 9:10, 9:12, 35:8, 38:15, 40:2, 49:17
**dollar** [2] - 77:1, 90:4
**dollars** [10] - 32:14, 48:17, 53:17, 54:16, 56:9, 57:7, 57:11, 74:12, 81:6, 90:14
**donate** [2] - 48:19, 48:20
**donated** [1] - 71:14
**donates** [1] - 48:13
**done** [10] - 7:3, 21:5, 55:2, 56:3, 56:16, 79:17, 81:23, 88:19, 106:7, 107:8
**Dones** [3] - 63:7, 63:20, 84:9
**dossier** [1] - 88:23
**down** [8] - 27:1, 29:13, 30:13, 34:2, 34:8, 53:13, 98:9, 101:1
**drafters** [1] - 25:19
**dropped** [1] - 56:1
**drum** [1] - 105:18
**dual** [1] - 102:10
**due** [7] - 26:14, 27:6, 30:2, 31:12, 31:13, 80:16
**during** [4] - 27:23, 53:6, 65:2, 78:16

**E**

**e-mail** [15] - 46:22, 83:21, 83:22, 83:24, 84:2, 84:6, 84:9, 84:16, 84:20, 85:9, 85:10, 85:14
**e-mails** [10] - 47:1, 47:11, 65:7, 65:17, 66:5, 66:23, 79:17, 84:7, 91:18, 91:24
**early** [1] - 96:10
**easier** [3] - 98:10, 98:23, 98:24
**easily** [1] - 57:22
**easy** [1] - 50:5
**effect** [4] - 15:1, 16:17, 18:10, 25:9
**effective** [3] - 24:9, 65:20, 103:15
**effectively** [1] - 62:5
**eight** [5] - 39:23, 53:17, 54:16, 57:7, 57:10
**either** [5] - 51:21, 52:3, 62:23, 73:19, 79:25
**El** [2] - 62:9, 86:15
**election** [4] - 53:10, 89:25, 90:9
**elections** [2] - 35:4, 54:2
**electoral** [2] - 83:20, 84:19
**electronic** [1] - 88:24
**element** [5] - 6:7, 71:3, 91:4, 91:13
**elements** [1] - 68:24
**eliminates** [1] - 71:11
**Elvin** [1] - 46:5
**Elvis** [2] - 46:3, 46:5
**Elvises** [1] - 46:6

**embezzled** [3] - 44:19, 102:3
**embezzlement** [51] - 27:8, 27:15, 28:8, 35:13, 35:19, 36:6, 39:7, 40:7, 40:8, 41:6, 41:8, 41:14, 42:2, 43:15, 43:17, 44:7, 44:25, 47:25, 49:1, 52:1, 52:5, 52:10, 52:17, 55:7, 56:11, 59:7, 59:8, 60:14, 60:15, 61:11, 61:21, 68:24, 70:3, 71:21, 72:19, 72:22, 73:6, 74:24, 89:22, 90:16, 91:15, 100:18, 101:2, 101:3, 101:21, 102:13, 102:16, 103:1, 103:13, 104:6, 106:2
**embezzles** [5] - 58:7, 58:8, 58:13, 58:14, 101:13
**embezzling** [1] - 26:16
**Emilio** [1] - 85:7
**emphasis** [1] - 29:2
**employee** [1] - 35:25
**empty** [2] - 89:9, 90:24
**en** [1] - 17:5
**encompass** [1] - 59:15
**end** [29] - 33:20, 44:6, 49:4, 49:13, 50:23, 51:2, 53:16, 53:20, 56:21, 57:2, 57:14, 65:9, 65:12, 65:20, 66:5, 66:24, 70:16, 70:17, 71:15, 74:17, 75:7, 75:18, 76:1, 76:2, 84:7, 94:25, 96:11
**ended** [3] - 22:23, 73:7, 73:8
**endemic** [1] - 29:22
**enemies** [2] - 92:8, 92:9
**English** [2] - 8:24, 9:1
**enter** [3] - 12:15, 13:6, 99:15
**entered** [3] - 10:21, 21:24, 57:1
**entering** [1] - 68:7
**enters** [1] - 13:11
**entire** [2] - 27:13, 32:18
**entities** [1] - 80:13
**entitled** [3] - 20:24, 31:11, 108:4
**entity** [1] - 40:16
**entrusted** [4] - 58:10, 58:16, 58:21, 60:17
**entry** [2] - 23:24, 69:2
**enumerated** [1] - 102:18
**enumerates** [1] - 103:12
**envelope** [3] - 63:12, 76:16, 76:18
**envelopes** [4] - 53:24, 76:11, 86:17, 86:19
**environment** [2] - 67:22, 98:24
**equipment** [130] - 5:2, 32:9, 32:10, 32:15, 32:16, 32:18, 32:20, 32:22, 32:25, 33:6, 33:24, 34:11, 35:4, 35:13, 36:14, 36:22, 37:4, 40:7, 40:14, 40:15, 41:16, 41:19, 41:21, 41:23, 41:24, 42:13, 43:18, 43:22, 43:25, 44:1, 44:6, 44:8, 44:18, 44:22, 45:6, 45:7, 45:23, 46:11, 46:14, 46:18, 46:19, 47:13, 48:7, 48:8, 48:11, 50:16, 51:24, 51:25, 52:4, 52:9, 53:12, 54:4, 54:12, 54:13, 54:17, 54:23, 54:25, 55:1, 55:7, 55:19, 55:22, 56:1, 56:4, 56:6, 56:9, 56:12, 56:15, 57:21, 59:11, 59:16, 59:22, 60:11, 60:12, 60:15, 61:8, 62:4, 62:11,

63:4, 66:25, 68:1, 68:2, 68:5, 70:7, 70:9, 70:12, 70:18, 70:22, 71:8, 71:12, 72:4, 72:7, 73:2, 73:12, 73:17, 73:23, 74:3, 74:7, 74:10, 74:13, 74:15, 75:4, 75:5, 76:8, 76:25, 77:1, 78:13, 81:8, 84:8, 90:7, 90:10, 90:11, 91:9, 92:16, 92:20, 93:8, 93:10, 100:4
**Erasmo** [2] - 83:18, 84:5
**especially** [4] - 30:9, 34:19, 37:25, 93:9
**especulado** [1] - 41:7
**essence** [1] - 12:1
**essential** [1] - 31:19
**essentially** [10] - 12:10, 12:13, 12:18, 12:23, 15:15, 15:23, 53:1, 53:2, 53:20, 60:10
**establish** [2] - 32:3, 82:16
**established** [2] - 28:9, 71:10
**establishing** [1] - 54:24
**et** [1] - 59:23
**Europe** [1] - 22:10
**European** [1] - 22:9
**evaluate** [1] - 8:17
**evening** [1] - 54:5
**event** [3] - 15:20, 17:12, 84:13
**events** [1] - 63:8
**eventually** [1] - 83:17
**Everglades** [2] - 98:11, 98:20
**evidence** [75] - 3:22, 3:25, 5:16, 7:19, 7:20, 8:20, 15:5, 16:15, 34:25, 35:6, 35:10, 38:18, 39:1, 39:15, 40:12, 40:17, 43:1, 43:10, 45:21, 51:15, 52:8, 53:4, 55:18, 57:11, 57:19, 58:20, 60:2, 60:25, 62:20, 65:7, 65:15, 66:4, 66:18, 67:18, 69:8, 69:15, 71:5, 73:12, 74:8, 74:9, 75:4, 75:23, 76:11, 76:19, 77:11, 77:19, 78:15, 79:1, 80:5, 81:8, 82:16, 82:19, 84:25, 85:1, 85:18, 85:23, 86:4, 87:14, 87:19, 88:13, 88:23, 90:2, 90:6, 90:15, 91:3, 91:8, 91:11, 91:12, 91:19, 91:20, 91:23, 100:6
**eviscerated** [1] - 74:7
**evisceration** [1] - 43:14
**exact** [4] - 10:4, 41:8, 71:7
**exactly** [5] - 21:20, 36:9, 38:22, 42:4, 67:12
**example** [18] - 4:24, 7:21, 13:11, 17:11, 22:1, 35:3, 35:24, 42:5, 62:3, 63:15, 64:8, 72:25, 79:2, 79:9, 81:21, 84:7, 84:22, 101:13
**exception** [1] - 20:15
**exchange** [6] - 16:16, 18:11, 18:25, 84:9, 84:16, 84:20
**exclusion** [2] - 29:1, 61:22
**exclusive** [4] - 49:7, 50:17, 53:16, 59:4, 62:14
**exclusively** [1] - 61:20
**exculpatory** [1] - 4:24
**excuse** [1] - 14:11
**executed** [2] - 56:22, 99:16

**executing** [1] - 19:24
**executive** [3] - 53:1, 58:19, 62:6
**executives** [1] - 85:14
**exercising** [1] - 20:23
**Exhibit** [5] - 7:15, 33:19, 40:1, 52:20, 91:1
**exhibit** [3] - 5:16, 8:20, 33:20
**Exhibits** [3] - 5:1, 5:10, 5:12
**exhibits** [13] - 3:18, 4:22, 5:8, 5:17, 7:1, 7:7, 7:16, 8:9, 8:25, 10:2, 10:7, 37:7, 50:3
**exist** [1] - 71:19
**existence** [1] - 11:1
**existing** [1] - 12:6
**expect** [1] - 55:25
**expedite** [1] - 94:15
**expedited** [1] - 6:17
**expeditiously** [2] - 96:13, 97:7
**expert** [9] - 9:16, 31:22, 33:25, 68:14, 97:16, 98:14, 104:17, 106:6
**expertise** [1] - 68:16
**experts** [1] - 81:22
**explain** [2] - 7:19, 33:24, 39:22
**explained** [6] - 19:20, 22:19, 27:21, 32:12, 77:22, 93:2
**explaining** [1] - 86:22
**explains** [2] - 33:25, 77:23
**expressly** [1] - 20:14
**extended** [1] - 13:14
**extension** [1] - 46:10
**extensively** [2] - 20:17, 27:23
**extent** [8] - 6:14, 6:25, 16:24, 19:4, 20:5, 20:20, 39:14, 72:21
**extraditability** [1] - 45:3
**extraditable** [9] - 10:17, 10:21, 11:2, 13:12, 13:13, 17:15, 19:10, 22:4, 28:11
**extradite** [10] - 22:3, 24:10, 24:11, 25:5, 26:2, 27:20, 27:24, 29:9, 74:18, 97:8
**extradited** [3] - 31:2, 80:17, 80:23
**extraditing** [1] - 16:8
**extradition** [45] - 3:3, 3:18, 5:9, 7:20, 7:25, 8:4, 9:7, 13:2, 13:25, 14:2, 14:16, 17:2, 17:3, 17:13, 17:19, 19:25, 20:6, 20:22, 21:6, 23:10, 23:18, 23:22, 26:10, 27:13, 29:6, 29:7, 29:25, 31:11, 32:12, 38:9, 42:23, 42:24, 43:11, 45:2, 78:3, 78:4, 78:11, 81:10, 89:14, 89:17, 97:15, 97:19, 97:20, 106:7
**Extradition** [1] - 23:9
**extremely** [1] - 24:16
**eyewitness** [1] - 55:25

## F

**face** [4] - 37:24, 38:6, 39:1, 54:22
**faced** [1] - 32:8
**facilitate** [2] - 17:3, 99:13
**facilities** [1] - 99:4

**fact** [23] - 9:22, 15:7, 24:5, 27:22, 30:12, 30:25, 31:17, 35:1, 40:13, 40:20, 46:15, 60:25, 62:19, 62:22, 68:6, 71:20, 75:23, 87:11, 89:2, 91:8, 91:19, 92:13, 98:7
**factor** [1] - 20:21
**Factor** [2] - 16:25, 20:4
**facts** [5] - 4:10, 38:7, 52:14, 73:21, 101:5
**factual** [1] - 84:13
**failing** [1] - 34:10
**failure** [4] - 25:18, 31:21, 73:18, 74:5
**fair** [2] - 16:4, 25:16
**faith** [2] - 30:20, 30:22
**fake** [1] - 28:7
**fall** [2] - 17:23, 64:23
**falls** [1] - 26:11
**false** [3] - 27:7, 37:2, 80:18
**familiar** [1] - 37:20, 98:13
**far** [10] - 4:21, 21:2, 21:3, 25:3, 31:7, 62:24, 64:13, 91:4, 91:16, 97:5
**favor** [2] - 13:1, 20:6
**favorable** [1] - 35:17
**FCI** [2] - 98:16, 98:17
**FCRR** [1] - 108:9
**FDCI** [1] - 98:9
**federal** [4] - 55:1, 89:6, 98:18, 100:19, 100:25, 101:24, 102:3
**feeds** [1] - 20:18
**fell** [1] - 64:25
**fellow** [1] - 35:3
**FELS** [106] - 3:6, 3:15, 4:4, 5:19, 5:25, 6:3, 7:17, 11:13, 11:17, 12:9, 12:18, 12:22, 13:21, 14:6, 14:9, 14:23, 15:3, 15:11, 15:20, 16:5, 48:5, 48:13, 48:18, 49:7, 49:10, 49:12, 49:16, 49:20, 49:24, 50:2, 50:5, 50:11, 50:16, 50:20, 50:23, 51:14, 52:13, 52:16, 52:19, 52:23, 54:18, 56:24, 57:6, 57:8, 57:13, 58:4, 58:12, 59:12, 59:17, 60:22, 60:25, 61:20, 62:20, 64:15, 64:18, 64:21, 65:3, 65:7, 65:12, 65:15, 65:19, 65:24, 66:2, 66:8, 66:12, 66:15, 66:21, 67:3, 67:8, 67:11, 67:16, 75:2, 75:13, 81:15, 81:19, 82:15, 85:9, 86:12, 88:21, 89:6, 93:21, 93:25, 95:14, 95:17, 96:12, 97:16, 97:23, 99:1, 99:7, 100:13, 100:24, 101:17, 102:14, 102:17, 102:20, 102:24, 103:5, 103:8, 103:11, 103:17, 103:23, 105:17, 106:16, 106:22, 106:24, 107:2
**Fels** [6] - 16:19, 47:24, 93:19, 97:14, 99:25, 106:14
**few** [2] - 63:12, 88:7
**fiction** [3] - 70:7, 72:1, 72:16
**Fifth** [1] - 17:4
**figure** [4] - 56:5, 83:3, 95:9, 96:1
**figured** [1] - 28:21
**figures** [1] - 85:25
**file** [8] - 96:16, 96:18, 96:20, 97:10,

97:20, 106:14, 107:3
**filed** [8] - 3:5, 10:17, 34:19, 40:5, 41:2, 50:7, 52:21, 69:3
**files** [1] - 4:25
**filing** [1] - 14:7
**final** [3] - 10:21, 50:14, 97:18
**findings** [1] - 84:14
**fine** [1] - 10:5
**finish** [1] - 81:13
**finished** [1] - 63:11
**first** [17] - 3:10, 3:15, 4:6, 4:10, 6:18, 17:10, 27:15, 46:3, 48:1, 52:17, 55:2, 55:11, 73:10, 82:7, 85:18, 101:12
**fiscal** [3] - 33:18, 69:22, 91:2
**five** [7] - 30:13, 33:1, 57:16, 70:12, 74:13, 92:4, 92:5
**flicked** [1] - 58:23
**floor** [1] - 90:8
**focus** [6] - 29:1, 30:19, 42:3, 43:23, 52:6, 69:6
**focusing** [6] - 26:6, 27:15, 28:23, 39:7, 42:5, 64:22, 100:1, 104:10
**follow** [2] - 45:5, 92:4
**followed** [1] - 55:14
**following** [3] - 48:19, 73:19, 88:4
**follows** [1] - 16:17
**force** [2] - 17:17, 23:25
**foregoing** [1] - 108:3
**foreign** [1] - 20:4
**forget** [1] - 98:9
**form** [3] - 8:14, 58:8, 58:14
**formal** [1] - 95:19
**former** [2] - 42:14, 69:18
**forward** [3] - 29:8, 38:3, 97:8
**fought** [1] - 80:24
**four** [7] - 30:3, 35:17, 59:21, 59:24, 60:5, 92:8, 95:2
**frame** [1] - 22:19
**frequently** [2] - 23:23
**Friendly** [1] - 24:23
**front** [3] - 16:8, 32:7
**frozen** [1] - 12:14
**fugitive** [2] - 19:8, 19:11
**function** [1] - 98:24
**functions** [1] - 76:13
**Fund** [1] - 36:13
**fund** [2] - 33:3, 39:25
**funding** [1] - 75:21
**funds** [34] - 39:15, 40:12, 40:14, 40:18, 41:10, 41:16, 42:7, 43:17, 44:9, 44:18, 48:3, 48:6, 48:9, 49:2, 53:13, 54:21, 55:1, 55:6, 57:10, 57:22, 57:25, 58:25, 60:16, 68:6, 71:18, 73:25, 74:1, 74:2, 100:4, 100:8, 101:24, 102:3, 105:6
**furniture** [1] - 74:11

## G

**game** [1] - 3:13

**general** [16] - 11:10, 20:12, 20:15, 20:18, 21:4, 30:24, 32:7, 34:13, 56:1, 56:7, 69:9, 71:11, 71:18, 85:20, 92:19
**generally** [1] - 37:20
**Giacomo** [3] - 36:12, 69:18, 92:17
**given** [9] - 8:23, 11:14, 20:10, 48:24, 62:23, 63:5, 70:15, 87:22, 98:6
**GIZELLA** [1] - 108:9
**glad** [2] - 77:12, 103:3
**gloss** [1] - 95:7
**gotcha** [2] - 50:10, 65:21
**government** [65] - 3:4, 4:8, 5:18, 9:5, 10:12, 16:8, 25:5, 29:25, 48:8, 48:11, 48:14, 48:20, 48:21, 48:24, 49:8, 50:17, 50:19, 51:3, 51:8, 51:10, 51:22, 51:23, 53:13, 53:17, 54:21, 55:6, 55:19, 56:13, 57:2, 57:4, 57:15, 57:18, 57:23, 58:24, 58:25, 59:2, 59:5, 60:1, 61:10, 61:22, 68:3, 68:4, 68:8, 68:10, 72:5, 75:5, 75:6, 75:24, 89:3, 89:12, 90:3, 90:13, 90:14, 96:20, 97:13, 100:5, 100:7, 100:16, 101:6, 101:8, 101:16, 101:18, 101:19, 102:1, 104:23
**government's** [7] - 6:13, 10:6, 24:7, 42:25, 44:11, 97:18, 97:19
**governmental** [1] - 61:17
**governments** [1] - 51:9
**governs** [2] - 15:23, 26:3
**Graell** [3] - 35:3, 54:10, 55:9
**grant** [1] - 99:18
**granting** [1] - 13:2
**grants** [1] - 8:5
**great** [3] - 45:13, 84:25, 85:22
**ground** [1] - 43:10
**Group** [5] - 41:23, 42:13, 44:3, 46:18, 73:16
**group** [1] - 44:5
**guardianship** [1] - 70:3
**guess** [16] - 12:3, 12:4, 15:9, 18:22, 25:12, 42:2, 46:22, 50:7, 54:20, 61:9, 61:15, 72:21, 77:3, 88:10, 99:24, 101:12
**guesses** [1] - 106:8
**guidance** [2] - 6:5, 77:15
**Gustavo** [6] - 50:20, 53:19, 69:17, 75:14, 87:11, 92:17
**guy** [4] - 37:22, 37:23, 76:17, 78:20
**guys** [1] - 72:4
**gymnasium** [1] - 84:12

## H

**habeas** [1] - 97:10
**hand** [5] - 7:11, 17:21, 49:21, 75:10, 95:17
**handed** [2] - 63:11, 75:7
**hands** [2] - 48:13, 49:21
**happy** [1] - 90:20
**hard** [5] - 26:22, 38:15, 38:16, 80:24,

80:25
**Harry** [6] - 4:9, 9:22, 27:7, 33:7, 34:3, 41:14
**hash** [1] - 106:11
**hat** [1] - 37:25
**head** [11] - 35:20, 36:8, 36:11, 36:12, 40:5, 40:12, 41:3, 69:18, 69:19, 69:25
**heads** [3] - 33:3, 42:14, 99:8
**heads-up** [1] - 99:8
**hear** [8] - 5:13, 21:17, 28:25, 30:5, 62:9, 69:24, 91:17, 94:17
**heard** [5] - 68:15, 70:6, 73:13, 79:19, 90:23
**hearing** [10] - 4:18, 5:12, 6:18, 9:7, 9:13, 9:21, 28:20, 95:9, 95:19, 107:14
**hearings** [2] - 99:2, 99:5
**hearsay** [6] - 77:5, 78:18, 81:5, 86:21
**helpful** [2] - 6:10, 52:6
**hereby** [1] - 108:3
**high** [4] - 33:1, 33:2, 33:12, 100:5
**high-ranking** [1] - 33:2
**highly** [2] - 38:1, 57:3
**himself** [4] - 31:14, 44:12, 64:6, 87:20
**history** [1] - 30:16
**hit** [1] - 79:14
**hold** [4] - 49:14, 50:11, 67:23, 84:13
**holding** [1] - 42:16
**Holdings** [1] - 40:16
**honest** [1] - 30:8
**Honor** [158] - 3:6, 3:11, 3:16, 3:17, 3:21, 3:24, 4:4, 4:6, 4:13, 5:19, 5:20, 5:23, 5:25, 6:3, 6:4, 6:25, 7:8, 7:12, 7:17, 8:21, 9:14, 10:3, 15:4, 16:5, 16:7, 17:9, 17:25, 18:23, 19:18, 20:16, 21:3, 21:4, 21:10, 21:16, 21:19, 22:14, 22:18, 22:21, 23:6, 23:17, 24:6, 24:13, 25:11, 25:21, 26:4, 26:12, 26:21, 27:1, 27:6, 27:14, 27:18, 29:3, 30:23, 32:5, 32:8, 33:14, 34:9, 34:10, 34:14, 34:23, 35:14, 36:20, 36:24, 37:6, 37:11, 38:11, 39:2, 40:1, 41:13, 41:22, 42:8, 42:19, 42:20, 42:21, 43:3, 43:24, 44:11, 45:20, 46:24, 47:2, 47:5, 47:16, 48:5, 49:10, 49:12, 49:16, 50:6, 51:9, 51:14, 51:20, 54:18, 55:20, 56:17, 56:18, 57:8, 57:24, 58:12, 59:18, 60:8, 60:18, 60:22, 60:25, 61:10, 64:15, 64:18, 65:3, 68:12, 68:24, 69:8, 72:1, 73:10, 74:17, 75:2, 76:4, 77:12, 77:19, 78:18, 81:9, 81:20, 82:13, 83:3, 86:6, 90:19, 90:21, 90:25, 91:17, 92:12, 93:7, 93:21, 94:4, 95:3, 95:14, 96:4, 96:12, 96:25, 97:12, 97:17, 97:23, 98:6, 99:1, 99:12, 99:14, 100:24, 101:8, 101:10, 102:4, 102:17, 103:8, 103:17, 103:18, 103:23, 104:1, 104:24, 105:17, 105:24, 106:16, 107:2, 107:5
**Honor's** [6] - 17:7, 20:17, 20:24, 36:17, 38:20, 94:12
**hooking** [1] - 19:16
**hours** [2] - 4:8, 54:5

**House** [1] - 80:11
**house** [1] - 48:23
**housekeeping** [1] - 6:4
**hundreds** [2] - 43:11, 43:12

## I

**idea** [1] - 96:14
**identifies** [3] - 55:15, 69:10, 73:15
**identify** [2] - 57:10, 69:11
**ignored** [3] - 31:23, 74:20, 74:21
**ignoring** [1] - 34:8
**illegal** [2] - 82:9, 86:24
**illegally** [1] - 80:5
**illicit** [1] - 63:18
**impeached** [1] - 38:4
**implicate** [1] - 19:25
**implication** [1] - 100:9
**import** [3] - 18:19, 18:21, 18:22
**importance** [1] - 74:1
**important** [4] - 50:25, 51:1, 55:17, 83:4
**importantly** [3] - 32:23, 43:14, 47:5
**improper** [1] - 12:25
**improperly** [1] - 41:17
**imputación** [2] - 31:18, 31:22
**imputado** [2] - 81:21, 82:2
**inaud** [2] - 76:21, 105:7
**incarcerated** [2] - 30:13, 30:15
**incident** [1] - 82:25
**include** [4] - 34:8, 63:10, 92:24, 101:11
**included** [5] - 4:8, 21:23, 28:5, 70:19, 72:4
**includes** [3] - 27:13, 51:6, 86:1
**including** [3] - 15:20, 30:11, 106:23
**income** [1] - 22:2
**incompetent** [1] - 8:15
**incomplete** [1] - 4:22
**inconsistencies** [1] - 55:24
**incorporated** [4] - 12:11, 16:14, 18:17, 102:24
**incorporating** [2] - 17:8, 17:11
**incriminate** [1] - 77:21
**indeed** [1] - 20:18
**indicated** [2] - 16:20, 25:15
**indicates** [5] - 16:23, 40:18, 60:20, 70:8, 78:18
**indication** [3] - 25:19, 44:21, 79:15
**indications** [1] - 88:5
**indict** [2] - 22:1, 33:11
**indicted** [3] - 29:19, 31:21, 89:8
**indictment** [9] - 22:19, 22:20, 22:22, 41:18, 46:12, 47:6, 69:21, 73:20
**indirectly** [1] - 79:3
**individual** [12] - 15:16, 29:7, 37:8, 46:1, 53:19, 63:22, 63:23, 79:10, 84:10, 85:4, 87:18, 89:3
**individuals** [14] - 24:10, 42:14, 44:2,

45:24, 46:15, 61:2, 69:12, 69:23, 71:1,
77:21, 80:14, 89:24, 105:8
  **ineffective** [1] - 24:9
  **inform** [1] - 31:15
  **informant** [3] - 37:23, 38:4
  **informant's** [1] - 38:1
  **information** [4] - 57:3, 76:22, 79:5,
91:22
  **informed** [2] - 88:5, 94:13
  **inherently** [1] - 37:2
  **initial** [1] - 24:7
  **initials** [1] - 49:24
  **inmates** [1] - 99:3
  **inquiry** [1] - 15:25
  **inside** [1] - 73:2
  **insignificant** [1] - 95:6
  **installation** [1] - 67:6
  **installed** [7] - 44:1, 44:4, 53:18, 66:25,
67:2, 67:14, 73:15
  **instances** [1] - 8:6
  **instincts** [1] - 83:14
  **Institute** [1] - 84:12
  **instruct** [1] - 89:7
  **instructed** [1] - 55:10
  **instruction** [1] - 89:6
  **instructions** [1] - 54:6
  **instruments** [1] - 18:25
  **insufficient** [1] - 71:5
  **intend** [1] - 16:22
  **intended** [1] - 19:24
  **intent** [1] - 47:19
  **intercept** [3] - 82:11, 83:7, 85:25
  **intercepted** [12] - 62:8, 65:17, 65:19,
66:23, 83:12, 83:14, 84:23, 85:2, 87:16,
91:18, 92:1
  **intercepting** [2] - 65:8, 66:9
  **interception** [7] - 45:10, 45:19, 47:4,
47:8, 47:15, 83:8, 92:2
  **interceptions** [3] - 47:20, 66:5, 82:10
  **intercepts** [6] - 45:14, 84:24, 85:4,
86:25, 88:24, 88:25
  **internet** [1] - 29:16
  **interpret** [2] - 14:13, 19:5
  **interpretation** [1] - 105:23
  **interpreting** [1] - 25:8
  **intervention** [2] - 47:15, 84:11
  **interview** [4] - 27:23, 28:4, 29:15,
29:20
  **interviewed** [3] - 30:9, 63:21, 88:18
  **interviews** [1] - 27:11
  **intrigue** [1] - 85:24
  **introduce** [10] - 3:17, 3:25, 4:19, 6:22,
7:19, 7:21, 8:19, 9:6, 9:15, 96:8
  **introduced** [2] - 8:9, 58:20
  **introducing** [1] - 4:5
  **introduction** [2] - 5:17, 7:14
  **invalid** [5] - 34:4, 41:18, 46:12, 69:21
  **inventoried** [1] - 5:3
  **inventory** [4] - 5:2, 44:15, 56:3, 56:4

  **investigated** [2] - 33:1
  **investigating** [1] - 33:8
  **investigation** [2] - 5:4, 71:17
  **investigators** [1] - 55:14
  **Investment** [1] - 36:12, 69:19
  **investment** [2] - 33:2, 54:24
  **invoke** [2] - 11:21, 14:10
  **invokes** [2] - 11:20, 11:22
  **involved** [6] - 33:2, 33:5, 33:23, 35:3,
48:3, 64:13
  **involving** [4] - 32:25, 34:14, 40:10,
79:13
  **irrelevant** [4] - 64:19, 100:8, 105:19,
106:4
  **Ismael** [14] - 5:21, 53:5, 61:3, 73:14,
74:6, 76:17, 77:16, 79:24, 83:23, 86:22,
87:13, 89:22, 91:10, 91:24
  **Israel** [3] - 51:8, 57:2, 57:18
  **Israeli** [1] - 67:7
  **issue** [24] - 5:14, 9:20, 10:13, 10:15,
11:12, 11:17, 13:16, 13:18, 19:22,
26:11, 26:13, 28:10, 31:24, 51:16,
56:20, 77:2, 77:3, 77:3, 93:13, 94:16, 95:6,
97:7, 97:21, 99:23, 99:25
  **issued** [1] - 66:6
  **issues** [8] - 3:8, 9:20, 14:20, 26:13,
39:6, 39:9, 82:12, 96:15
  **item** [3] - 8:17, 8:18
  **items** [2] - 5:5, 51:5
  **itself** [8] - 5:10, 14:23, 15:12, 30:25,
45:21, 69:7, 77:13, 102:18

## J

  **January** [4] - 77:16, 78:2, 78:10, 78:14
  **Jefe** [2] - 62:9, 86:15
  **jeopardy** [1] - 97:19
  **JIMENEZ** [107] - 4:6, 4:17, 6:25, 7:8,
7:11, 8:21, 9:10, 9:14, 10:3, 21:16,
21:19, 23:6, 23:21, 25:10, 25:17, 25:21,
26:7, 26:12, 26:21, 27:1, 27:3, 27:5,
28:2, 28:4, 28:7, 28:17, 29:3, 30:14,
30:23, 33:14, 33:16, 34:23, 35:13,
35:23, 36:1, 36:4, 36:9, 36:20, 37:11,
37:13, 37:18, 38:11, 39:8, 39:11, 39:17,
39:19, 39:21, 40:1, 40:5, 40:25, 41:2,
41:6, 41:13, 42:1, 42:8, 42:12, 42:18,
43:7, 43:12, 45:9, 45:12, 45:15, 45:20,
46:2, 46:5, 46:8, 46:24, 47:10, 68:12,
68:22, 71:24, 72:24, 73:10, 76:4, 76:7,
77:5, 77:12, 78:10, 79:4, 79:9, 90:19,
93:15, 93:17, 94:4, 95:3, 95:10, 96:4,
96:19, 97:12, 98:6, 98:12, 98:15, 98:18,
98:23, 99:12, 99:17, 102:4, 103:18,
103:20, 104:1, 104:6, 104:12, 104:18,
104:24, 105:2, 105:24, 107:5
  **Jiménez** [7] - 6:8, 6:21, 21:15, 67:22,
67:24, 96:3, 103:24
  **Jubilo** [3] - 54:9, 55:9, 89:23

  **Judge** [1] - 24:23
  **judge** [3] - 31:10, 83:19, 107:9
  **judges** [3] - 30:12, 30:13, 30:16
  **judgment** [1] - 81:5
  **judgments** [3] - 29:14, 31:6, 31:7
  **judicial** [2] - 30:7, 31:1
  **Julio** [1] - 63:10
  **July** [13] - 10:22, 11:9, 22:18, 22:24,
24:9, 50:21, 53:15, 59:3, 59:25, 65:13,
66:24, 75:8
  **juncture** [1] - 19:12
  **June** [1] - 59:3
  **juries** [2] - 89:7, 89:10
  **jurisdiction** [1] - 100:23
  **jury** [1] - 89:6
  **justice** [1] - 84:16
  **Justice** [3] - 29:8, 81:24, 82:8

## K

  **Kaisweter** [1] - 85:7
  **keep** [5] - 22:15, 54:20, 82:4, 90:21,
105:18
  **kind** [8] - 20:14, 33:15, 36:5, 38:5,
55:3, 62:10, 70:19, 93:4
  **kinds** [1] - 99:2
  **knowledge** [3] - 18:15, 29:5, 68:16
  **knows** [4] - 37:4, 54:9, 83:9

## L

  **lack** [10] - 4:23, 33:25, 34:6, 45:3,
47:14, 47:17, 72:18, 76:24, 93:8, 104:7
  **laid** [2] - 52:14, 75:17
  **land** [3] - 48:19, 48:23
  **language** [17] - 14:3, 16:10, 16:18,
18:1, 19:2, 23:8, 23:15, 24:22, 24:23,
25:9, 25:23, 26:3, 102:12, 104:10,
104:23, 105:11, 105:14
  **laptop** [2] - 83:5, 83:16
  **laptops** [3] - 70:12, 70:16, 74:13
  **large** [1] - 4:20
  **largely** [1] - 5:1
  **larger** [1] - 60:9
  **last** [10] - 3:5, 3:10, 4:13, 5:20, 7:22,
12:6, 26:9, 46:7, 81:1, 92:12
  **late** [2] - 3:1, 26:21
  **Laubenheimer** [2] - 16:25, 20:4
  **laughter)** [1] - 48:17
  **law** [34] - 7:18, 8:7, 11:24, 15:21,
16:22, 23:10, 24:24, 31:9, 48:25, 51:17,
57:23, 57:24, 58:2, 61:12, 63:17, 68:14,
68:17, 69:14, 74:20, 82:8, 87:5, 93:3,
100:1, 100:15, 100:25, 104:25, 105:20,
105:21, 105:22, 105:23, 106:5, 106:6
  **laws** [1] - 14:15
  **lawyer** [9] - 37:25, 68:13, 68:15, 76:10,
79:20, 88:6, 105:19, 106:3, 106:4

**lay** [1] - 52:23
**leader** [1] - 84:10
**learned** [1] - 55:2
**least** [18] - 3:20, 25:4, 25:15, 27:14, 60:6, 66:4, 66:10, 66:19, 68:11, 78:3, 90:2, 90:14, 95:25, 96:6, 97:25, 100:9, 100:11
**leave** [2] - 54:3, 55:3
**leaving** [2] - 85:15, 90:9
**left** [2] - 44:13, 55:13
**legal** [8] - 15:1, 16:20, 19:19, 82:10, 91:3, 91:13, 93:20, 95:13
**legally** [3] - 12:14, 13:6, 91:19
**legislation** [1] - 73:22
**legitimate** [1] - 79:13
**lengthy** [2] - 4:8, 96:8
**Lenity** [1] - 17:1
**less** [4] - 4:7, 10:10, 54:21, 94:20
**letter** [1] - 79:10
**level** [1] - 100:5
**liberal** [1] - 20:22
**lie** [1] - 92:9
**lies** [1] - 28:8
**life** [1] - 83:2
**light** [2] - 35:16, 89:15
**limited** [4] - 9:6, 92:22, 97:9
**line** [1] - 88:9
**link** [1] - 29:17
**listed** [4] - 18:18, 51:5, 52:13, 55:23
**listened** [1] - 64:6
**lists** [2] - 5:2, 17:15
**literal** [1] - 73:1
**literally** [1] - 46:4
**location** [2] - 54:10, 72:8
**locations** [1] - 91:10
**logically** [1] - 12:13
**look** [32] - 3:6, 22:19, 25:11, 29:17, 31:8, 31:9, 32:13, 34:19, 34:24, 35:1, 38:8, 40:1, 50:14, 51:1, 51:3, 53:21, 59:18, 61:13, 64:16, 69:8, 71:6, 72:12, 78:17, 80:1, 80:7, 84:17, 90:24, 91:1, 95:25, 99:12, 104:21
**looked** [2] - 25:3, 91:7
**looking** [5] - 35:16, 50:10, 64:24, 67:12, 104:22
**looks** [1] - 83:5
**loop** [1] - 94:19
**loosely** [1] - 22:21
**Lopez** [1] - 36:11
**loss** [3] - 56:7, 90:4, 92:21
**lost** [1] - 43:18
**Luis** [1] - 85:7
**lunch** [1] - 81:14
**Lutzo** [1] - 76:21

## M

**M-O-U-N-E-S** [1] - 85:9
**mail** [15] - 46:22, 83:21, 83:22, 83:24,
84:2, 84:6, 84:9, 84:16, 84:20, 85:9, 85:10, 85:14
**mails** [10] - 47:1, 47:11, 65:7, 65:17, 66:5, 66:23, 79:17, 84:7, 91:18, 91:24
**maintain** [2] - 59:23, 60:4
**major** [1] - 76:23
**male** [1] - 63:8
**man** [1] - 31:14
**management** [1] - 85:11
**manager** [2] - 85:5, 85:20
**manner** [2] - 68:1, 68:2, 74:4
**manufactured** [1] - 72:19
**March** [1] - 85:10
**marshals** [2] - 99:3, 99:13
**Martinelli** [67] - 3:2, 3:3, 27:20, 29:19, 34:5, 36:15, 41:10, 43:19, 44:21, 49:25, 50:1, 51:23, 52:2, 52:9, 52:24, 54:3, 55:18, 56:11, 58:18, 62:5, 64:1, 69:13, 72:15, 76:24, 77:4, 77:6, 77:21, 79:5, 79:12, 79:16, 79:23, 80:7, 80:14, 82:5, 82:19, 82:24, 83:6, 83:8, 83:10, 83:15, 84:15, 84:21, 84:22, 85:6, 85:13, 85:17, 85:21, 86:3, 86:8, 86:13, 86:16, 86:25, 87:10, 87:19, 87:22, 88:5, 88:9, 88:14, 88:21, 89:5, 90:6, 91:22, 92:24, 95:1, 98:8, 98:25, 102:7
**Martinelli's** [2] - 47:19, 81:23
**Martinelli-Berrocal** [23] - 51:23, 52:2, 52:9, 52:24, 54:3, 55:18, 56:11, 58:18, 62:5, 82:24, 83:8, 83:10, 84:22, 85:13, 85:17, 85:21, 86:3, 86:8, 86:13, 87:10, 87:22, 88:14, 88:21
**Martinelli-Berrocal's** [2] - 84:21, 85:6
**Martinez** [1] - 63:13
**Martinez** [2] - 17:5, 63:10
**mash** [1] - 79:23
**mass** [1] - 77:14
**materials** [4] - 4:23, 6:14, 7:4, 57:3
**matter** [12] - 6:4, 12:23, 55:5, 58:24, 60:10, 60:12, 63:17, 70:1, 73:7, 97:15, 99:19, 108:5
**matters** [1] - 94:15
**maximum** [1] - 59:20
**Mazur** [1] - 42:23
**mean** [19] - 12:13, 13:14, 15:15, 17:7, 24:13, 30:17, 38:4, 51:15, 54:20, 55:24, 62:11, 65:24, 70:23, 85:18, 93:3, 95:14, 95:22, 98:11, 106:16
**meaning** [3] - 50:2, 61:25, 63:25
**means** [7] - 11:8, 14:3, 14:17, 19:3, 21:22, 59:25, 61:5
**meant** [2] - 13:23, 73:23
**meantime** [1] - 81:10
**meat** [1] - 54:1
**mechanism** [1] - 45:19
**member** [6] - 6:9, 12:7, 22:8, 22:10, 82:1, 82:6
**members** [3] - 29:18, 54:3, 85:11
**memorandum** [2] - 3:4, 26:9
**memory** [2] - 49:20, 69:11

**mention** [6] - 36:14, 36:15, 36:16, 41:9, 41:10, 67:4
**mentioned** [4] - 5:20, 69:17, 91:2, 91:20
**merits** [2] - 6:18, 94:16
**met** [1] - 37:24
**Miami** [3] - 98:16, 98:17
**Michael** [1] - 23:19
**middle** [6] - 37:4, 43:21, 66:15, 66:17, 71:8, 71:25
**might** [7] - 17:13, 19:13, 61:9, 89:13, 96:13, 96:15, 99:2
**mile** [1] - 30:12
**million** [12] - 32:14, 39:23, 48:17, 53:17, 54:16, 56:9, 57:7, 57:10, 74:12, 77:1, 81:6, 90:4, 90:5, 90:14
**mimicked** [1] - 17:4
**minimum** [1] - 52:8
**minor** [1] - 76:23
**minority** [1] - 24:16
**minute** [2] - 57:16, 83:7
**minutiae** [1] - 64:24
**misappropriated** [1] - 32:21
**misappropriation** [5] - 32:25, 33:6, 33:23, 103:13, 103:22
**mish** [1] - 79:22
**misrepresentation** [1] - 32:4
**misrepresentations** [6] - 27:8, 32:8, 34:15, 78:12, 80:18, 80:21
**misrepresented** [2] - 32:15, 41:20
**misrepresenting** [1] - 34:9
**missed** [1] - 27:4
**mistakes** [1] - 55:3
**mistress** [3] - 80:3, 80:5
**misuse** [4] - 33:6, 33:23, 39:15, 41:6
**misused** [5] - 36:23, 68:10, 93:9, 100:10, 100:17
**Mitchell** [3] - 63:7, 63:20, 84:9
**MLM** [67] - 32:9, 32:25, 35:13, 36:14, 39:10, 39:11, 39:12, 39:16, 40:9, 41:20, 43:18, 44:8, 45:6, 45:18, 45:21, 45:23, 46:14, 46:19, 47:25, 51:24, 52:4, 52:9, 53:12, 54:12, 54:22, 54:25, 55:1, 55:7, 56:3, 56:6, 56:9, 56:14, 57:21, 58:25, 59:1, 59:10, 59:15, 59:18, 60:4, 60:20, 62:17, 62:18, 63:16, 64:13, 65:1, 65:8, 65:21, 66:8, 66:19, 69:10, 70:6, 70:9, 70:12, 70:18, 71:12, 73:12, 73:17, 74:12, 74:13, 74:16, 76:8, 77:1, 78:13, 90:3, 92:16, 93:9
**MLM-related** [1] - 65:1
**MLM/NSO** [1] - 51:18
**modern** [1] - 19:16
**modifies** [1] - 52:25
**modify** [1] - 12:15
**moment** [3] - 58:23, 86:5, 100:1
**money** [7] - 33:3, 40:19, 54:19, 58:8, 58:15, 77:25, 101:22
**Monte** [1] - 55:12
**months** [1] - 29:20

**Moreno** [5] - 9:16, 46:8, 68:23, 93:2, 104:16

**morning** [3] - 16:7, 16:21, 19:20
**most** [4] - 6:10, 23:21, 35:16, 82:12
**motion** [3] - 6:13, 9:18, 69:3
**motive** [1] - 92:9
**Mounes** [2] - 85:7, 85:8
**move** [5] - 3:24, 96:13, 96:23, 98:3, 99:3
**moved** [5] - 44:5, 55:22, 71:25, 81:7, 89:25
**movement** [4] - 43:21, 44:6, 91:8, 91:9
**moving** [1] - 35:3
**MR** [225] - 3:6, 3:15, 4:4, 4:6, 4:17, 5:19, 5:25, 6:3, 6:25, 7:8, 7:11, 7:17, 8:21, 9:10, 9:14, 10:3, 11:13, 11:17, 12:9, 12:18, 12:22, 13:21, 14:6, 14:9, 14:23, 15:3, 15:11, 15:20, 16:5, 16:7, 17:25, 18:6, 18:9, 18:23, 19:18, 20:10, 20:16, 21:3, 21:10, 21:13, 21:16, 21:19, 23:6, 23:21, 25:10, 25:17, 25:21, 26:7, 26:12, 26:21, 27:1, 27:3, 27:5, 28:2, 28:4, 28:7, 28:17, 29:3, 30:14, 30:23, 33:14, 33:16, 34:23, 35:13, 35:23, 36:1, 36:4, 36:9, 36:20, 37:11, 37:13, 37:18, 38:11, 39:8, 39:11, 39:17, 39:19, 39:21, 40:1, 40:5, 40:25, 41:2, 41:6, 41:13, 42:1, 42:8, 42:12, 42:18, 43:7, 43:12, 45:9, 45:12, 45:15, 45:20, 46:2, 46:5, 46:8, 46:24, 47:10, 48:5, 48:13, 48:18, 49:7, 49:10, 49:12, 49:16, 49:20, 49:24, 50:2, 50:5, 50:11, 50:16, 50:20, 50:23, 51:14, 52:13, 52:16, 52:19, 52:23, 54:18, 56:24, 57:6, 57:8, 57:13, 58:4, 58:12, 59:12, 59:17, 60:22, 60:25, 61:20, 62:20, 64:15, 64:18, 64:21, 65:3, 65:7, 65:12, 65:15, 65:19, 65:24, 66:2, 66:8, 66:12, 66:15, 66:21, 67:3, 67:8, 67:11, 67:16, 68:12, 68:22, 71:24, 72:24, 73:10, 75:2, 75:13, 76:4, 76:7, 77:5, 77:12, 78:10, 79:4, 79:9, 81:15, 81:19, 82:15, 85:9, 86:12, 88:21, 89:6, 90:19, 93:15, 93:17, 93:21, 93:25, 94:4, 95:3, 95:10, 95:14, 95:17, 96:4, 96:12, 96:19, 97:12, 97:16, 97:17, 97:23, 98:6, 98:12, 98:15, 98:18, 98:23, 99:1, 99:7, 99:12, 99:17, 100:13, 100:24, 101:17, 102:4, 102:14, 102:17, 102:20, 102:24, 103:5, 103:8, 103:11, 103:17, 103:18, 103:20, 103:23, 104:1, 104:6, 104:12, 104:18, 104:24, 105:2, 105:17, 105:24, 106:16, 106:22, 106:24, 107:2, 107:5
**MSM** [2] - 39:10
**multilateral** [2] - 12:11, 19:21
**multiple** [5] - 61:1, 62:22, 72:22, 86:14, 89:21
**murdered** [1] - 64:2
**murderers** [1] - 31:21
**Murillo** [1] - 46:8
**must** [1] - 69:5

# N

**name** [6] - 46:3, 46:7, 67:4, 85:7, 87:18, 87:24
**named** [3] - 46:3, 63:7, 79:11
**names** [2] - 42:13, 76:22
**narrow** [1] - 43:4
**nasty** [1] - 80:2
**National** [27] - 5:3, 33:3, 36:11, 40:6, 40:11, 40:21, 41:3, 42:14, 44:10, 50:25, 53:2, 56:24, 58:18, 58:21, 59:5, 62:5, 69:18, 69:25, 72:9, 72:11, 73:24, 75:14, 75:19, 76:3, 76:13, 76:20, 84:12
**national** [1] - 80:4
**nations** [3] - 22:9, 22:10
**native** [1] - 63:24
**Natural** [1] - 72:10
**nature** [5] - 4:24, 27:9, 32:15, 37:2, 80:8
**necessarily** [4] - 6:15, 14:3, 21:6, 52:7
**necessary** [4] - 7:1, 96:16, 105:6, 105:7
**need** [16] - 5:6, 13:1, 20:25, 21:11, 28:21, 65:3, 66:21, 67:19, 68:5, 68:20, 93:11, 96:6, 96:14, 96:16, 100:3, 101:18
**needs** [1] - 102:1
**nefarious** [2] - 76:19, 91:23
**neglected** [1] - 76:5
**negotiating** [1] - 19:24
**negotiation** [1] - 19:21
**network** [1] - 85:13
**network's** [2] - 85:11, 85:12
**never** [6] - 29:5, 29:24, 77:3, 86:12, 87:1, 89:19
**new** [11] - 4:2, 4:9, 4:10, 4:20, 12:10, 12:15, 13:6, 40:5, 96:8
**news** [3] - 40:13, 42:19, 83:1
**newspaper** [1] - 64:5
**newspapers** [1] - 63:14
**Next** [1] - 85:12
**next** [4] - 51:2, 53:10, 94:11, 95:19
**Ngäbe** [3] - 63:23, 64:1, 64:2
**nice** [1] - 93:25
**night** [10] - 3:5, 3:10, 4:13, 26:9, 37:5, 43:21, 71:8, 71:25, 89:24, 90:9
**nine** [7] - 22:9, 69:12, 69:16, 69:23, 93:1, 107:11, 107:12
**nobody** [2] - 48:16, 61:5
**Nodding)** [1] - 57:6
**non** [5] - 10:17, 15:9, 17:21, 20:8, 61:16
**non-extraditable** [1] - 10:17
**non-retroactivity** [2] - 15:9, 20:8
**none** [2] - 47:11, 73:13
**nongovernmental** [4] - 61:18, 62:19, 62:21, 73:5
**nonretroactive** [1] - 21:2
**normal** [1] - 76:13

**normally** [1] - 38:6
**note** [1] - 99:2
**noted** [1] - 7:5
**nothing** [18] - 11:22, 11:23, 12:19, 12:24, 13:4, 15:15, 23:12, 34:20, 48:5, 48:9, 51:20, 55:5, 57:24, 62:13, 70:7, 91:24, 101:23, 102:6
**notice** [1] - 60:1
**noting** [1] - 5:12
**notwithstanding** [1] - 30:22
**NSC** [8] - 44:13, 44:14, 50:21, 53:6, 53:9, 54:4, 72:6, 73:8
**NSO** [22] - 41:23, 41:24, 42:13, 44:3, 46:18, 51:25, 52:4, 53:14, 53:17, 56:14, 59:2, 60:11, 60:13, 63:4, 63:16, 65:24, 66:3, 66:22, 66:24, 67:18, 73:16, 84:8
**number** [10] - 10:4, 42:10, 49:11, 49:12, 75:12, 81:19, 89:18, 90:20, 92:21
**Number** [4] - 6:4, 33:14, 50:14, 62:10
**numbers** [2] - 47:7, 47:12

# O

**o'clock** [2] - 107:11, 107:12
**object** [5] - 4:22, 5:8, 5:9, 5:10, 7:17
**objection** [6] - 3:24, 4:5, 5:13, 7:14, 8:7, 99:1
**objections** [1] - 99:8
**obligation** [3] - 22:16, 26:1, 57:13
**obligations** [2] - 23:14, 24:4
**obtain** [1] - 8:24
**obtained** [3] - 35:7, 79:6, 91:18
**obviously** [8] - 3:8, 4:12, 5:13, 10:19, 27:7, 67:3, 77:8, 80:17
**occasions** [1] - 86:14
**occur** [2] - 79:14
**occurred** [6] - 10:23, 11:9, 13:17, 47:20, 79:15, 104:14
**occurring** [1] - 63:9
**October** [2] - 69:20, 73:20
**offense** [17] - 10:20, 10:21, 13:12, 13:13, 19:11, 21:23, 22:4, 22:17, 22:25, 24:12, 25:6, 26:2, 28:11, 34:7, 102:18, 103:12
**offenses** [10] - 10:22, 10:25, 11:2, 13:16, 17:15, 21:22, 22:12, 22:18, 24:11, 26:20
**offered** [1] - 9:23
**office** [8] - 16:20, 31:5, 53:23, 53:24, 53:25, 54:3, 76:12, 83:6
**officer** [6] - 37:22, 52:24, 58:6, 58:13, 61:24, 102:16
**officers** [1] - 102:13
**offices** [1] - 56:2
**official** [14] - 3:17, 3:21, 7:13, 34:1, 40:19, 56:22, 57:1, 60:17, 84:1, 100:6, 100:22, 101:4, 103:14
**officially** [1] - 31:20

**officials** [7] - 61:23, 68:4, 68:8, 70:20, 70:21, 71:1, 71:2
**old** [1] - 16:24
**once** [4] - 8:3, 59:3, 59:5, 59:7
**one** [75] - 6:8, 10:2, 10:12, 10:15, 12:22, 15:25, 16:5, 16:18, 17:5, 18:6, 20:8, 23:17, 23:21, 24:4, 26:12, 28:17, 33:11, 35:3, 35:21, 36:7, 37:21, 39:6, 39:9, 39:13, 40:2, 43:17, 46:5, 47:16, 47:21, 51:16, 51:21, 52:3, 54:5, 56:15, 58:11, 59:14, 59:18, 63:2, 63:6, 63:14, 64:8, 69:13, 72:23, 75:2, 76:4, 76:21, 77:18, 77:23, 79:9, 79:12, 79:21, 79:23, 81:22, 81:24, 84:7, 85:12, 86:1, 87:16, 87:17, 89:18, 90:20, 92:8, 94:2, 94:16, 94:19, 94:20, 95:1, 98:15, 98:19, 98:21, 103:21, 104:9
**ones** [9] - 22:5, 23:22, 28:19, 36:22, 44:4, 44:5, 76:14, 80:12, 92:25
**open** [1] - 96:2
**openly** [1] - 29:10
**operate** [2] - 18:12, 31:5
**operates** [1] - 29:10
**operating** [1] - 102:12
**operation** [2] - 11:24, 53:23
**operational** [1] - 66:3
**opine** [1] - 106:6
**opinion** [7] - 11:10, 20:10, 68:16, 104:19, 105:12, 105:25, 106:15
**opinions** [1] - 106:3
**opponent** [1] - 85:19
**opportunity** [4] - 4:18, 9:6, 94:2, 95:22
**opposed** [3] - 35:19, 35:24, 100:19
**opposite** [2] - 24:2, 71:20
**oral** [3] - 11:15, 11:16, 11:17
**order** [14] - 5:20, 41:14, 45:2, 47:8, 47:20, 59:6, 61:7, 96:4, 96:16, 97:18, 99:15, 100:5, 106:13, 107:5
**ordered** [8] - 29:23, 34:5, 72:16, 74:23, 76:24, 77:4, 79:24, 84:24
**ordering** [1] - 84:4
**orders** [4] - 53:22, 61:1, 62:7, 86:7
**organization** [4] - 35:20, 35:21, 36:8, 101:16
**original** [8] - 4:14, 6:13, 13:15, 22:5, 22:16, 23:25, 24:4, 25:7
**originally** [1] - 8:22
**originals** [1] - 50:6
**Oscuro** [1] - 55:12
**otherwise** [2] - 11:19, 51:4
**ourselves** [1] - 94:24
**outgoing** [1] - 19:7
**outside** [5] - 17:23, 64:8, 64:9, 105:11, 105:14
**over-arching** [1] - 77:3
**overall** [3] - 10:8, 27:9, 36:8
**overcome** [1] - 45:2
**overwhelming** [1] - 105:22
**own** [21] - 13:3, 14:21, 30:22, 38:25, 40:20, 40:21, 42:25, 44:9, 44:11, 62:1, 69:15, 72:14, 74:8, 74:14, 76:13, 81:8, 92:15, 104:19, 105:5, 105:21, 105:23
**owned** [1] - 55:17, 85:13, 101:15
**ownership** [1] - 92:5
**owns** [3] - 85:3, 85:21, 90:12

## P

**P-U-R-C-A-I-T** [1] - 79:11
**page** [19] - 13:24, 14:5, 14:6, 14:7, 26:23, 33:11, 33:15, 42:9, 42:10, 42:12, 42:15, 51:2, 51:7, 52:17, 52:20, 75:13, 90:25, 91:2
**pages** [4] - 38:14, 43:18, 77:15, 78:15
**paid** [11] - 30:16, 48:9, 49:1, 51:12, 57:25, 75:4, 75:5, 75:18, 75:24, 76:1, 78:20
**palace** [1] - 55:11
**Palacio** [1] - 63:10
**palacio** [1] - 63:13
**Panama** [67] - 5:3, 8:3, 10:17, 10:22, 11:20, 12:14, 13:6, 13:11, 14:21, 19:7, 22:7, 22:14, 24:10, 24:18, 27:19, 29:14, 31:8, 31:21, 32:23, 34:11, 41:3, 43:4, 49:8, 50:17, 50:19, 51:3, 51:11, 52:25, 55:12, 56:7, 57:15, 57:23, 60:2, 63:9, 68:4, 68:9, 68:14, 68:17, 69:6, 69:20, 70:2, 70:20, 70:21, 71:16, 72:12, 74:20, 74:22, 75:6, 75:24, 77:13, 77:21, 90:3, 90:14, 93:3, 100:7, 103:16, 104:12, 105:9, 105:19, 105:21, 105:25, 106:3, 106:5, 106:6
**Panama's** [14] - 11:1, 19:6, 30:25, 53:17, 57:12, 59:2, 68:15, 69:15, 76:10, 79:20, 90:13, 92:15, 100:9, 105:5
**Panamanian** [16] - 4:25, 33:7, 33:8, 33:16, 44:10, 56:13, 57:4, 59:4, 60:16, 63:14, 73:22, 83:20, 100:5, 104:10, 106:3, 106:4
**paper** [1] - 55:3
**papers** [1] - 70:8
**paragraph** [1] - 15:2
**PARLACEN** [2] - 82:1, 82:6
**part** [25] - 4:23, 5:4, 6:23, 8:10, 11:6, 12:7, 27:12, 27:15, 29:10, 31:5, 31:19, 31:20, 42:19, 44:12, 44:17, 47:19, 55:4, 62:11, 63:9, 70:6, 70:8, 70:14, 77:24, 81:7, 90:7
**part-time** [1] - 62:11
**particular** [11] - 5:13, 8:11, 8:17, 15:24, 15:25, 57:21, 59:11, 63:2, 63:9, 63:19, 63:20
**particularly** [1] - 5:14
**parties** [2] - 17:4, 84:19
**party** [7] - 14:1, 23:10, 23:14, 25:25, 51:4, 84:10, 84:18
**past** [2] - 81:21, 99:3
**path** [2] - 54:25, 55:14
**pause** [1] - 6:20

**pay** [3] - 36:24, 54:16, 78:1
**payment** [2] - 75:11, 75:16
**pays** [2] - 51:11, 51:24
**Pegasus** [38] - 39:13, 39:18, 39:24, 40:7, 40:8, 40:11, 40:19, 40:20, 41:19, 41:21, 41:22, 43:25, 44:12, 45:7, 48:1, 48:4, 49:5, 51:6, 53:18, 54:13, 54:16, 56:19, 63:4, 67:9, 67:19, 68:2, 71:13, 72:3, 73:18, 74:3, 74:15, 74:16, 75:3, 75:5, 77:1, 78:13, 100:2
**pending** [1] - 86:20
**people** [34] - 33:1, 33:2, 33:5, 33:9, 33:12, 33:22, 34:5, 35:2, 35:8, 36:10, 36:13, 36:21, 44:1, 58:22, 61:6, 62:10, 68:9, 69:14, 69:16, 69:17, 70:22, 73:15, 79:23, 82:22, 83:7, 85:25, 87:8, 88:14, 89:13, 89:23, 92:7, 92:8, 92:15, 92:24
**perceived** [1] - 45:2
**percent** [4] - 61:16, 61:17, 92:5
**Perez** [7] - 50:20, 53:19, 69:17, 70:23, 75:14, 87:11, 92:17
**perhaps** [1] - 55:24
**period** [11] - 13:10, 57:17, 59:15, 64:13, 65:2, 65:9, 66:10, 66:14, 66:18, 66:20, 94:6
**permanently** [1] - 51:5
**persecution** [1] - 80:9
**person** [10] - 22:3, 29:9, 29:19, 46:13, 61:23, 78:21, 79:20, 79:21, 88:18, 101:14
**personal** [1] - 73:5
**personally** [1] - 79:3
**personnel** [1] - 73:24
**perspective** [4] - 11:2, 42:6, 81:18, 90:2
**petition** [1] - 6:18
**ph** [3] - 5:21, 11:10, 81:24
**ph.)** [3] - 46:8, 76:21, 85:7
**phone** [6] - 45:14, 46:22, 46:25, 47:12, 66:1, 93:21
**phones** [3] - 47:2, 91:25, 92:2
**physical** [2] - 73:1, 73:9
**physically** [1] - 86:18
**piece** [1] - 74:11
**pieces** [1] - 79:1
**Pinilla** [2] - 83:18, 84:5
**pitti** [2] - 53:7, 77:3
**Pitti** [44] - 5:21, 33:4, 33:21, 35:10, 36:21, 37:8, 40:9, 44:12, 46:17, 47:3, 53:5, 53:6, 54:5, 61:3, 61:4, 62:23, 70:24, 72:6, 73:14, 74:6, 76:18, 77:6, 77:16, 77:25, 78:6, 78:8, 78:14, 79:7, 79:24, 80:1, 83:23, 86:10, 86:12, 86:22, 89:19, 89:22, 91:6, 91:10, 91:14, 91:24, 92:14, 93:6
**Pitti's** [10] - 37:2, 43:20, 45:13, 67:1, 67:3, 67:4, 84:3, 86:4, 86:6, 87:13
**place** [4] - 8:2, 55:12, 55:15, 74:9
**plain** [6] - 16:10, 16:18, 17:25, 19:2, 23:15, 25:2

**plan** [4] - 3:13, 9:14, 9:23, 68:25
**Plan** [1] - 69:19
**played** [2] - 82:21, 83:12
**playing** [1] - 83:6
**pleasure** [1] - 16:7
**plenty** [2] - 76:9, 76:10
**plural** [1] - 23:11
**plus** [1] - 55:6
**point** [43] - 3:14, 7:3, 11:11, 11:19, 13:15, 16:3, 16:19, 17:7, 18:24, 19:19, 20:25, 21:10, 21:14, 28:25, 37:3, 39:2, 43:24, 44:13, 44:24, 60:9, 61:3, 61:9, 63:2, 64:12, 64:25, 67:24, 70:14, 71:15, 76:23, 76:24, 81:12, 83:4, 84:20, 87:7, 88:17, 90:1, 90:18, 92:6, 92:13, 94:17, 102:5, 103:3, 105:4
**pointed** [2] - 72:25, 87:14
**points** [13] - 4:19, 11:18, 16:9, 22:15, 39:13, 47:16, 56:17, 67:21, 81:20, 82:18, 87:7, 87:8, 90:19
**police** [1] - 37:22
**political** [15] - 17:12, 67:22, 77:22, 80:9, 80:12, 80:13, 83:3, 84:13, 84:19, 85:1, 85:19, 85:24, 85:25, 92:8, 92:9
**politician** [1] - 63:7
**portion** [2] - 59:25, 90:11
**position** [10] - 12:12, 19:9, 22:6, 30:10, 55:5, 58:10, 58:17, 64:18, 89:2, 92:22
**possibility** [3] - 35:15, 35:18, 94:3
**possible** [5] - 13:2, 36:6, 71:7, 96:13, 98:2
**post** [2] - 24:22, 25:16
**potentially** [2] - 15:13, 30:11
**poured** [2] - 44:14, 54:8
**power** [2] - 20:4, 87:22
**powers** [1] - 20:24
**pre-1970** [1] - 24:17
**precede** [1] - 78:15
**preceding** [1] - 16:15
**precluded** [1] - 28:19
**precludes** [1] - 25:19
**preclusion** [1] - 20:13
**predate** [1] - 84:7
**predated** [2] - 11:1, 66:5
**predecessors** [1] - 42:15
**preexisting** [1] - 11:3
**preface** [1] - 29:3
**prefer** [1] - 99:13
**prepare** [1] - 107:5
**prepared** [7] - 3:7, 41:20, 69:21, 78:3, 78:11, 98:1, 101:9
**preparing** [1] - 47:5
**presence** [1] - 43:10
**present** [6] - 6:20, 18:9, 23:11, 71:3, 71:4
**presentation** [2] - 6:8, 6:9
**presented** [2] - 41:18, 68:13
**president** [10] - 27:20, 27:22, 27:23,

52:25, 56:23, 69:13, 70:1, 84:4, 85:22, 87:12
**President** [23] - 29:19, 34:4, 36:15, 41:10, 43:19, 44:21, 72:15, 76:24, 77:4, 77:6, 77:21, 79:5, 79:12, 79:16, 79:23, 80:7, 80:11, 87:10, 91:22, 92:24, 98:8, 98:24, 102:7
**presidential** [7] - 53:23, 53:24, 53:25, 55:11, 76:12, 83:5, 105:4
**presumption** [4] - 14:10, 14:11, 20:18, 21:4
**pretend** [1] - 17:15
**pretty** [2] - 27:19, 54:23
**previous** [1] - 51:7
**previously** [6] - 9:17, 9:18, 46:16, 69:1, 82:13, 91:7
**primarily** [1] - 45:8
**principally** [1] - 23:8
**principle** [5] - 17:4, 20:5, 20:20, 20:21, 24:4
**principles** [1] - 19:21
**print** [1] - 95:17
**printer** [2] - 44:13, 54:8
**private** [5] - 40:14, 40:15, 44:9, 71:21, 75:21
**probable** [44] - 15:6, 26:15, 26:18, 26:24, 34:7, 37:1, 37:15, 37:19, 38:23, 42:22, 42:25, 44:25, 46:10, 47:17, 47:24, 49:3, 51:22, 51:25, 52:1, 52:4, 52:13, 55:21, 56:10, 56:15, 57:20, 59:8, 60:6, 62:15, 67:19, 70:25, 71:11, 72:18, 74:17, 75:23, 77:14, 78:5, 82:16, 88:12, 89:4, 89:15, 93:8, 102:7, 104:7, 104:14
**problem** [6] - 12:1, 25:20, 30:5, 45:2, 74:15, 106:17
**procedure** [2] - 33:16, 81:23
**proceed** [4] - 6:6, 6:7, 94:13
**proceeded** [1] - 77:15
**proceeding** [5] - 3:23, 7:25, 8:12, 8:15, 89:14
**proceedings** [2] - 7:21, 108:4
**process** [25] - 6:17, 10:9, 26:14, 27:6, 30:2, 31:13, 31:19, 34:2, 34:8, 37:20, 38:3, 38:10, 39:12, 39:13, 39:16, 39:18, 77:24, 80:16, 82:1, 82:2, 97:8, 97:11, 98:1
**program** [1] - 88:18
**prohibition** [3] - 24:14, 24:17, 24:20
**prohibits** [1] - 25:1
**promoted** [1] - 78:1
**proof** [27] - 33:25, 40:20, 41:19, 43:16, 44:3, 44:17, 44:20, 47:14, 47:18, 60:7, 70:2, 70:18, 71:5, 71:16, 71:20, 72:15, 73:19, 74:3, 74:5, 74:24, 75:3, 76:7, 76:24, 93:4, 102:1, 104:15, 105:4
**proper** [3] - 9:9, 15:5, 81:22
**properly** [1] - 71:2
**property** [33] - 41:15, 44:9, 44:20, 48:14, 48:24, 49:1, 49:3, 51:10, 57:12, 57:22, 58:9, 58:15, 58:20, 58:24, 59:2,

60:17, 61:13, 62:2, 69:5, 71:16, 71:21, 71:22, 73:7, 73:9, 74:4, 75:24, 100:9, 100:16, 101:8, 101:14, 102:2, 103:14
**proposal** [1] - 45:21
**proposed** [4] - 3:13, 75:11, 96:3
**proposition** [2] - 11:10, 23:5
**prosecuted** [1] - 31:14
**prosecution** [4] - 29:25, 33:7, 33:17, 36:19
**prosecutor** [9] - 30:1, 30:8, 32:4, 34:15, 37:21, 41:4, 45:1, 93:5, 106:1
**prosecutor's** [1] - 10:23
**prosecutors** [11] - 30:15, 33:8, 33:20, 34:24, 35:9, 36:9, 69:20, 74:22, 92:16, 92:18, 92:25
**protect** [1] - 91:22
**protocol** [1] - 99:9
**PROULX** [1] - 108:9
**prove** [9] - 41:15, 49:2, 55:7, 56:12, 56:13, 56:14, 68:10, 104:13
**provide** [3] - 9:1, 17:19, 95:19
**provided** [13] - 14:1, 14:15, 23:9, 23:24, 33:3, 33:9, 37:6, 40:14, 41:23, 42:13, 70:10, 70:12, 76:22
**provides** [2] - 13:12, 21:21
**province** [1] - 72:11
**proving** [1] - 84:24
**provision** [14] - 11:4, 12:5, 16:1, 16:3, 17:16, 18:16, 19:10, 20:8, 21:7, 21:8, 25:6, 25:18, 103:9, 104:20
**provisions** [4] - 12:6, 13:19, 17:18, 21:2
**PTY** [5] - 83:21, 83:22, 83:24, 84:2
**Public** [1] - 69:19
**public** [43] - 27:11, 39:24, 40:12, 40:18, 41:10, 41:15, 42:7, 43:16, 44:8, 44:18, 44:20, 48:3, 48:6, 48:9, 48:19, 49:1, 49:2, 49:3, 52:24, 56:22, 57:1, 57:22, 57:25, 58:6, 58:13, 60:17, 61:24, 69:4, 69:5, 71:18, 71:22, 73:25, 74:1, 74:3, 74:4, 100:22, 101:4, 102:13, 102:16, 103:14, 105:6
**published** [1] - 63:14
**pull** [1] - 83:19
**punished** [1] - 58:17
**Purcait** [5] - 79:11, 82:21, 82:23, 83:9, 91:21
**purchase** [2] - 40:15, 56:8, 69:10
**purchased** [12] - 40:14, 44:18, 53:12, 57:3, 60:16, 77:20, 92:20, 100:4, 101:18, 101:23, 101:24, 102:3
**pure** [3] - 70:7, 72:1, 72:16
**purely** [1] - 61:17
**purportedly** [1] - 53:20
**purpose** [2] - 17:3, 23:11
**purposely** [1] - 32:15
**purposes** [15] - 5:11, 8:15, 10:22, 15:16, 56:16, 60:24, 61:17, 61:18, 61:25, 62:19, 62:21, 63:17, 73:5, 73:6, 103:16

pursuant [3] - 15:5, 22:13, 97:18
put [4] - 3:13, 25:18, 65:15, 82:13
puts [1] - 53:1
puzzle [2] - 79:2, 79:22

## Q

qualified [1] - 106:9
questions [6] - 9:24, 23:3, 54:22, 69:1, 76:5, 96:2
quick [3] - 6:4, 26:8, 90:19
quickly [1] - 48:2
quite [2] - 4:20, 42:1
quote [2] - 88:22, 103:13

## R

rack [18] - 37:5, 54:9, 54:11, 54:12, 55:13, 55:15, 56:2, 70:6, 70:8, 70:19, 70:23, 71:9, 74:10, 81:7, 90:4, 90:5, 90:7, 91:9
raise [5] - 10:14, 39:9, 56:17, 75:2, 78:1
raised [1] - 39:7
raises [1] - 10:15
raising [5] - 5:15, 28:19, 100:2
RAMB [4] - 49:10, 49:18, 49:23, 88:1
range [2] - 49:25, 59:20
rank [1] - 92:22
ranking [2] - 33:2, 33:12
rare [2] - 11:20, 24:16
rarity [1] - 24:16
rather [2] - 10:8, 10:9
ratifications [2] - 16:16, 18:11
ratified [1] - 20:19
Re [1] - 42:23
re [2] - 83:13, 97:20
re-file [1] - 97:20
read [30] - 5:21, 10:11, 13:17, 13:21, 16:13, 17:2, 17:10, 17:14, 18:13, 20:12, 23:2, 23:5, 26:17, 26:19, 27:14, 29:5, 43:25, 57:23, 71:25, 73:20, 75:10, 82:25, 88:8, 93:22, 95:18, 95:21, 95:22, 103:7, 107:4
reading [12] - 14:17, 15:14, 15:22, 16:21, 18:1, 19:2, 23:7, 23:19, 26:8, 26:9, 43:4, 51:17
reads [1] - 18:1
ready [1] - 3:2
real [1] - 106:4
realized [2] - 55:14, 84:20
really [16] - 6:17, 13:5, 29:2, 30:9, 34:20, 51:1, 52:6, 54:1, 68:6, 76:17, 78:6, 81:3, 93:12, 99:24, 102:21, 105:19
reason [13] - 5:8, 7:18, 27:21, 28:1, 28:3, 32:11, 49:2, 73:3, 73:19, 89:9, 89:12, 89:16, 97:1

reasonable [1] - 89:11
reasons [5] - 76:8, 77:22, 85:15, 89:18, 94:11
reassigned [2] - 53:8, 72:8, 72:10
rebut [1] - 48:2
recalled [1] - 63:21
received [2] - 4:7, 54:5
receiving [2] - 53:17, 84:1
recent [1] - 23:21
recently [1] - 17:4
recognized [2] - 63:6, 85:9, 85:10
recommend [1] - 33:21
recommendation [1] - 33:11
recommended [2] - 34:21, 36:10
recommending [1] - 98:8
reconcile [1] - 13:18
reconvene [5] - 94:8, 95:15, 96:22, 97:5
record [26] - 3:13, 4:21, 5:18, 6:23, 7:20, 8:9, 8:10, 8:16, 9:5, 10:6, 39:15, 40:17, 47:14, 52:8, 56:21, 60:9, 60:19, 62:18, 65:15, 71:13, 77:10, 77:14, 93:23, 95:18, 97:3
recording [7] - 63:5, 63:20, 63:22, 64:4, 64:6, 64:7, 79:13
recordings [9] - 62:25, 65:4, 65:6, 82:22, 83:6, 83:15, 88:15, 88:19, 91:20
recounted [1] - 78:25
recounts [1] - 79:12
refer [5] - 26:23, 42:9, 51:6, 63:3, 69:1
reference [1] - 14:24, 18:24
referenced [1] - 84:13
referring [8] - 16:12, 18:9, 30:24, 41:24, 42:20, 47:3, 63:23, 69:2
refers [5] - 15:12, 16:11, 16:16, 18:24, 79:20
refute [1] - 38:25
refuted [1] - 38:25
regard [2] - 9:9, 20:1
regardless [2] - 51:11, 51:24
relate [2] - 15:3, 23:24
related [2] - 47:12, 65:1, 82:11
relates [3] - 27:7, 39:16, 53:25
relating [4] - 37:1, 67:22, 81:20, 89:21
relations [1] - 20:4
relationship [1] - 87:9
relators [1] - 31:11
released [1] - 80:24
relevance [4] - 10:16, 59:13, 66:19, 81:17
relevant [5] - 5:14, 41:12, 41:13, 42:5, 42:20, 53:6, 54:24, 64:13, 79:1, 89:10, 89:11, 89:12, 99:11
reliable [1] - 38:24
relied [3] - 11:9, 104:21, 104:23
rely [1] - 11:4, 23:7
relying [2] - 56:21, 71:5
remaining [1] - 9:2
remedy [2] - 97:18, 97:20

remedying [1] - 97:20
remember [5] - 10:14, 33:13, 67:7, 103:2, 103:6
remind [1] - 18:4
removal [3] - 71:8, 74:8, 74:15
remove [3] - 54:6, 54:8, 76:25
removed [7] - 5:5, 36:22, 37:4, 54:4, 70:22, 72:16, 74:9
removes [1] - 92:11
rented [1] - 68:1
repeat [3] - 32:18, 74:2, 106:2
repeated [1] - 88:9
repeatedly [2] - 27:10, 29:13
repeating [2] - 67:17, 88:6
repetitively [1] - 17:6
rephrase [3] - 25:13, 27:3, 27:5
replied [1] - 84:17
report [5] - 34:2, 53:3, 69:9, 71:17, 79:16
reported [2] - 25:4, 56:23
reporter [1] - 21:17
reporting [1] - 87:12
reports [2] - 31:3, 53:21
represent [1] - 86:2
representative [1] - 51:2
representatives [2] - 73:16
representing [1] - 29:8
republic [1] - 69:9
request [12] - 3:18, 5:9, 19:6, 19:7, 27:13, 29:6, 29:21, 47:6, 78:3, 78:11, 98:6, 99:18
requested [6] - 14:1, 23:10, 29:24, 29:25, 84:18, 95:11
requesting [1] - 84:11
require [1] - 60:15
required [4] - 61:22, 70:2, 93:4, 104:12
requirement [2] - 26:18, 74:20
requires [6] - 48:6, 68:17, 71:16, 71:17, 93:3, 106:6
reread [1] - 25:23
research [4] - 21:11, 23:6, 101:10, 101:25
researched [1] - 20:16
reserving [1] - 8:10
resolved [1] - 20:6
resources [1] - 73:24
respect [10] - 24:3, 27:9, 27:12, 40:6, 40:8, 43:15, 52:9, 73:18, 76:12, 95:6
respond [10] - 3:7, 4:12, 32:3, 38:13, 67:24, 76:4, 89:1, 94:7, 96:5, 96:14
responded [1] - 94:5
responds [1] - 9:23
response [21] - 3:4, 10:15, 11:11, 11:14, 11:15, 11:16, 11:17, 15:24, 16:9, 26:19, 47:10, 56:20, 62:17, 67:24, 67:25, 93:22, 96:16, 96:17, 96:21, 101:12, 106:18
responsibilities [1] - 23:14
responsibility [2] - 44:21, 69:6

**responsible** [2] - 36:13, 55:21
**rest** [2] - 31:15, 90:12
**restrictions** [6] - 17:8, 22:15, 23:13, 24:3, 25:24, 25:25
**result** [2] - 43:19, 56:8
**retain** [1] - 85:16
**retroactive** [15] - 11:19, 11:23, 12:20, 12:24, 13:4, 13:5, 13:24, 14:18, 14:25, 15:15, 15:18, 18:16, 20:13, 25:1, 26:1
**retroactively** [5] - 16:11, 18:12, 23:1, 26:2, 104:2
**retroactivity** [25] - 11:6, 12:1, 14:4, 14:10, 14:11, 14:20, 14:24, 15:3, 17:16, 17:22, 18:1, 19:22, 19:25, 20:8, 20:14, 21:5, 24:5, 24:14, 24:18, 24:20, 24:25, 25:6, 25:14, 25:19
**return** [1] - 19:7
**returned** [3] - 5:2, 70:16, 70:17
**review** [8] - 3:4, 3:11, 4:14, 4:25, 6:12, 94:2, 94:9, 96:5
**reviewed** [1] - 35:1
**reviewing** [2] - 38:2, 38:16
**revolution** [1] - 84:18
**revolutionary** [1] - 84:10
**Ricardo** [3] - 86:25, 88:5, 88:14
**rid** [1] - 24:20
**rights** [7] - 23:13, 25:24, 31:12, 31:13, 74:21, 80:14, 97:9
**rises** [1] - 26:11
**risk** [1] - 67:17
**rival** [1] - 85:6
**rivals** [2] - 85:1, 85:2
**Rivera** [2] - 87:18, 87:20
**road** [2] - 29:13, 30:13
**rob** [1] - 82:22
**Roberto** [2] - 9:16, 93:2
**Rodrigo** [2] - 87:24, 88:7
**Rodriguez** [34] - 7:22, 33:4, 33:22, 35:10, 36:21, 40:10, 53:5, 54:7, 54:10, 61:4, 62:7, 62:9, 62:23, 63:5, 63:12, 64:4, 70:24, 77:6, 77:23, 84:3, 86:7, 86:14, 86:18, 86:25, 87:2, 87:10, 89:3, 89:4, 89:19, 89:23, 91:5, 91:14, 92:14, 93:5
**Rodriguez's** [1] - 84:1
**rogue** [1] - 85:25
**Rolando** [1] - 36:11
**Ronny** [30] - 7:22, 33:4, 33:22, 35:10, 40:10, 53:5, 53:24, 55:10, 61:4, 62:7, 62:8, 62:23, 63:5, 63:12, 77:23, 83:25, 84:3, 86:7, 86:14, 86:18, 86:25, 87:2, 87:9, 87:12, 89:4, 89:19, 91:5, 91:14, 92:14, 93:5
**Rosendo** [1] - 87:18
**RPR** [1] - 108:9
**rule** [6] - 11:18, 13:22, 14:24, 20:12, 20:15, 74:7
**Rule** [1] - 17:1
**ruled** [1] - 81:12
**ruling** [1] - 97:6

**run** [1] - 86:10
**rush** [2] - 81:4, 81:5
**Ryan** [1] - 53:21

## S

**safety** [1] - 79:18
**Sarasqueta** [2] - 87:24, 88:7
**saved** [1] - 83:2
**scenario** [1] - 48:19
**schedule** [3] - 4:7, 94:12, 96:1
**scope** [3] - 8:12, 17:23, 87:4
**seals** [1] - 3:21
**second** [5] - 16:5, 24:15, 27:12, 31:25, 94:5
**secondary** [2] - 35:25, 68:6
**secondly** [1] - 70:5
**secret** [1] - 51:8
**secretary** [4] - 8:4, 50:21, 56:24, 75:19
**section** [2] - 27:4, 42:20
**Section** [1] - 102:12
**securities** [1] - 58:15
**Security** [26] - 5:3, 33:4, 36:11, 40:6, 40:11, 40:21, 41:3, 42:14, 44:10, 50:25, 53:2, 56:25, 58:19, 58:21, 59:5, 62:6, 69:18, 69:25, 72:10, 72:11, 73:24, 75:14, 75:19, 76:3, 76:13, 76:20
**security** [2] - 58:9, 87:23
**sedition** [1] - 82:12
**see** [23] - 22:9, 26:17, 33:10, 38:4, 41:9, 41:24, 43:20, 43:25, 49:20, 50:12, 50:23, 51:14, 54:19, 61:24, 71:13, 72:1, 80:6, 87:25, 89:20, 94:22, 97:22, 101:1, 101:8
**seeing** [1] - 103:6
**Seguridad** [1] - 50:24
**selected** [1] - 4:23
**sell** [2] - 31:6, 51:3
**sense** [8] - 12:9, 12:13, 24:8, 94:18, 94:19, 94:20, 94:24, 99:10
**sensitive** [1] - 57:3
**sent** [3] - 31:13, 41:3, 46:17
**sentence** [2] - 18:13, 19:1
**separate** [1] - 53:11
**September** [3] - 63:3, 63:5, 78:13
**servant** [1] - 69:5
**server** [7] - 54:9, 54:11, 54:12, 70:13, 70:17, 72:4, 74:14
**servers** [1] - 44:4
**serves** [1] - 69:12
**service** [1] - 61:25
**services** [1] - 59:22
**set** [6] - 60:12, 95:9, 96:23, 99:18, 106:13, 107:9
**sets** [1] - 53:11
**settlement** [1] - 98:4
**shall** [9] - 3:22, 16:11, 18:10, 18:12, 23:9, 23:13, 58:17, 75:18, 90:1
**shape** [1] - 26:23

**shared** [1] - 3:16
**Sharma** [2] - 88:4, 88:11
**sheds** [1] - 89:15
**shelf** [1] - 31:7
**shelved** [1] - 29:14
**shocks** [1] - 30:2
**shoe** [1] - 81:1
**short** [1] - 66:18
**shortly** [2] - 11:15, 54:2
**show** [5] - 51:22, 64:3, 65:16, 80:20, 87:15
**showed** [2] - 44:11, 64:5
**showing** [1] - 83:15
**shown** [6] - 63:21, 69:22, 83:21, 84:5, 91:18, 91:20
**shows** [6] - 44:3, 44:25, 55:20, 59:1, 68:3, 101:18
**sic)** [1] - 85:22
**sides** [2] - 10:11, 94:17
**signatory** [1] - 30:21
**signature** [2] - 59:3, 75:13
**signed** [9] - 12:23, 50:20, 53:20, 59:24, 65:12, 75:14, 77:16, 78:2, 78:11
**signing** [3] - 36:14, 50:18, 65:9
**signs** [2] - 75:20, 78:1
**similar** [3] - 20:1, 35:5, 100:16
**simple** [1] - 7:18
**simply** [5] - 18:17, 47:21, 68:15, 95:6, 104:9
**simultaneously** [1] - 38:21
**single** [1] - 46:13
**situation** [6] - 20:1, 34:13, 35:19, 36:6, 38:23, 100:23
**situations** [1] - 30:12
**slander** [1] - 80:2
**smart** [1] - 46:22
**SMITH** [12] - 16:7, 17:25, 18:6, 18:9, 18:23, 19:18, 20:10, 20:16, 21:3, 21:10, 21:13, 97:17
**so-called** [2] - 32:9, 76:25
**Social** [1] - 36:12
**social** [1] - 33:2
**sold** [1] - 29:14
**solely** [1] - 92:18
**Solomon** [2] - 88:4, 88:11
**someone** [14] - 24:12, 25:5, 26:2, 29:9, 29:24, 48:10, 48:13, 55:2, 60:24, 68:16, 86:1, 87:23, 91:22, 106:9
**sometime** [1] - 96:10
**sometimes** [1] - 79:2
**somewhat** [1] - 100:16
**somewhere** [4] - 37:5, 59:7, 75:17, 89:25
**soon** [3] - 9:1, 19:14, 71:7
**sorry** [11] - 3:1, 12:17, 14:5, 14:6, 28:2, 42:4, 52:2, 58:11, 75:19, 86:10, 95:3
**sort** [5] - 7:25, 60:13, 82:24, 89:9, 101:3
**sorts** [1] - 87:14

**sought** [2] - 29:6, 89:17
**source** [1] - 57:10
**south** [1] - 98:9
**Spanish** [5] - 33:9, 41:7, 50:11, 50:13, 50:24
**speaks** [2] - 80:7, 93:8
**specialized** [1] - 53:11
**specific** [10] - 18:24, 19:18, 21:22, 47:19, 51:20, 82:6, 101:9, 102:17, 104:20
**specifically** [10] - 11:5, 13:23, 15:12, 23:23, 39:6, 68:2, 87:7, 87:25, 88:9, 89:21
**speculative** [1] - 86:21
**spell** [1] - 85:8
**Sports** [1] - 84:12
**staff** [1] - 85:16
**stage** [1] - 6:22
**stamp** [2] - 50:6, 50:8
**stamped** [1] - 50:3
**stand** [3] - 31:4, 70:24, 80:13
**standard** [4] - 30:19, 89:11, 99:9, 101:3
**stands** [1] - 49:23
**star** [7] - 32:19, 32:21, 33:5, 33:22, 43:1, 46:17, 73:13
**start** [7] - 3:1, 3:15, 10:5, 10:12, 42:9, 81:16, 98:2
**started** [2] - 22:20, 22:23
**starting** [1] - 24:9
**starts** [3] - 41:4, 66:14, 66:24
**State** [16] - 3:19, 11:14, 15:21, 15:22, 16:20, 17:9, 19:5, 19:9, 19:20, 19:23, 20:3, 20:23, 30:25, 32:14, 93:22, 95:13
**state** [7] - 8:4, 12:7, 71:16, 73:25, 74:1, 100:19, 103:7
**statement** [6] - 38:22, 69:2, 86:9, 87:3, 87:13, 87:25
**statements** [13] - 30:1, 30:24, 31:14, 31:15, 35:2, 35:7, 69:24, 78:24, 79:24, 80:4, 80:18, 88:13, 89:21
**States** [9] - 14:21, 19:9, 20:23, 29:7, 85:22, 86:9, 86:23, 101:22, 101:24
**station** [4] - 85:3, 85:5, 85:6, 92:3
**statute** [5] - 48:6, 61:14, 61:19, 62:12, 64:9
**statutory** [4] - 104:10, 104:22, 105:11, 105:14
**stay** [1] - 21:16
**stealing** [1] - 81:6
**stick** [1] - 28:12
**still** [5] - 36:20, 53:9, 62:12, 62:13, 85:21
**stocking** [1] - 70:16
**stole** [1] - 32:13
**stolen** [3] - 32:10, 32:16, 93:9
**stop** [1] - 47:23
**stopped** [1] - 81:2
**story** [2] - 51:19, 56:1

**strained** [1] - 12:25
**stress** [1] - 4:19
**strict** [1] - 53:22
**strictly** [1] - 45:18
**strong** [1] - 86:3
**strongest** [4] - 28:15, 28:18, 28:22, 28:25
**stuff** [4] - 51:8, 71:24, 76:19, 89:24
**subject** [6] - 14:1, 14:14, 14:15, 23:9, 47:8, 71:21
**submission** [7] - 10:7, 10:23, 26:22, 44:24, 46:10, 63:10, 90:13
**submissions** [4] - 4:7, 4:8, 9:18, 94:7
**submit** [2] - 5:6, 106:20
**submits** [1] - 77:7
**submitted** [27] - 3:20, 4:13, 4:15, 6:14, 9:16, 9:19, 10:12, 31:25, 32:5, 32:9, 38:12, 38:14, 38:18, 39:4, 40:18, 43:8, 47:6, 68:18, 68:22, 70:8, 72:3, 77:19, 77:24, 80:19, 94:8, 96:5, 104:15
**subsequent** [1] - 22:24
**subsequently** [2] - 22:6, 91:25
**subsidiary** [1] - 35:24
**substantive** [1] - 60:7
**subsumed** [1] - 11:25
**sufficient** [6] - 6:19, 14:10, 38:7, 55:21, 68:25, 77:10, 90:15, 91:11, 96:5
**suggest** [1] - 66:4
**suggestion** [1] - 94:4
**suggests** [1] - 61:1
**summarize** [2] - 53:14, 82:16
**summary** [3] - 10:8, 35:1, 75:8
**super** [2] - 51:8
**Super** [5] - 55:16, 56:2, 71:9, 73:7, 74:10
**supp** [1] - 106:14
**supplement** [3] - 60:9, 100:24, 106:17
**supplemental** [14] - 4:18, 9:19, 10:2, 23:12, 23:15, 23:18, 23:22, 25:23, 80:19, 81:17, 81:18, 94:5, 101:12, 106:12
**support** [7] - 66:8, 84:18, 86:4, 91:5, 94:23, 101:5, 105:11
**supports** [1] - 91:13
**suppose** [2] - 6:5, 72:23
**supposed** [2] - 15:17, 15:18
**supposedly** [6] - 34:5, 35:4, 74:23, 77:18, 91:18, 91:25
**supposition** [1] - 70:19
**suppositions** [1] - 106:9
**Supreme** [5] - 16:25, 29:15, 47:6, 105:20, 105:25
**surfaces** [1] - 93:13
**surveillance** [29] - 10:16, 22:17, 26:6, 26:16, 27:13, 27:20, 27:25, 28:12, 28:14, 28:16, 30:4, 37:1, 41:17, 45:3, 45:4, 47:17, 47:18, 53:25, 54:4, 61:7, 63:15, 63:18, 74:19, 76:11, 76:20, 77:18, 79:7, 93:14, 104:3
**surveilled** [1] - 80:5

**survey** [1] - 21:5
**Susan** [2] - 102:20, 103:8
**suspicious** [1] - 38:1
**sustained** [1] - 56:8
**sworn** [1] - 52:24
**system** [36] - 27:10, 29:10, 30:8, 30:17, 31:1, 39:24, 45:18, 48:1, 48:4, 49:5, 51:6, 52:7, 53:18, 54:6, 60:7, 60:20, 62:18, 63:4, 63:15, 63:18, 64:13, 65:21, 65:23, 65:25, 66:3, 66:9, 66:19, 66:23, 66:24, 67:7, 67:10, 67:13, 67:19, 82:3
**systems** [3] - 51:21, 64:25, 67:4

# T

**tacked** [4] - 27:25, 28:7, 45:1, 72:19
**tag** [1] - 16:5
**talks** [15] - 42:15, 42:19, 45:14, 55:9, 58:6, 67:6, 73:14, 80:3, 82:8, 82:9, 82:11, 83:1, 91:25, 102:25
**Tamburelli** [3] - 36:12, 69:19, 92:17
**tap** [1] - 97:16
**targeted** [2] - 10:9, 62:8
**targets** [1] - 62:23
**tax** [1] - 22:2
**team** [1] - 6:9
**technicality** [1] - 31:19
**technology** [2] - 73:2, 73:9
**telephone** [1] - 47:7
**television** [7] - 29:16, 31:23, 80:4, 85:5, 85:6, 88:17, 92:3
**temporarily** [2] - 51:5, 57:17
**ten** [2] - 94:6, 96:6
**term** [1] - 59:21
**terms** [17] - 3:13, 9:10, 21:20, 23:7, 34:6, 37:14, 42:21, 47:16, 57:14, 59:13, 75:8, 75:11, 75:16, 75:20, 75:22, 78:24, 103:21
**testified** [2] - 45:23, 46:14
**testify** [1] - 86:23
**testimony** [16] - 9:6, 9:12, 9:15, 35:7, 37:7, 45:22, 46:9, 55:25, 68:13, 70:11, 71:7, 72:3, 74:6, 77:20, 78:25, 85:3
**THE** [229] - 3:1, 3:12, 4:2, 4:5, 4:16, 5:11, 5:17, 5:24, 6:1, 6:12, 7:6, 7:9, 7:13, 8:8, 9:4, 9:12, 10:1, 10:5, 11:16, 12:3, 12:17, 12:21, 13:8, 14:5, 14:8, 14:22, 15:1, 15:9, 15:19, 15:25, 16:6, 17:21, 18:4, 18:8, 18:21, 19:13, 20:7, 20:11, 21:1, 21:8, 21:12, 21:14, 21:17, 23:4, 23:20, 25:8, 25:12, 25:18, 26:5, 26:8, 26:17, 26:25, 27:2, 27:4, 28:1, 28:3, 28:6, 28:12, 28:18, 30:5, 30:15, 33:13, 33:15, 34:18, 35:12, 35:15, 35:24, 36:2, 36:5, 36:18, 37:9, 37:12, 37:17, 37:19, 39:5, 39:9, 39:12, 39:18, 39:20, 39:22, 40:4, 40:23, 41:1, 41:5, 41:12, 41:25, 42:3, 42:11, 42:17, 43:6,

43:9, 45:5, 45:10, 45:13, 45:16, 46:1, 46:4, 46:7, 46:21, 47:9, 47:23, 48:11, 48:16, 49:6, 49:9, 49:11, 49:14, 49:19, 49:23, 50:1, 50:4, 50:10, 50:15, 50:18, 50:22, 51:12, 52:12, 52:15, 52:18, 52:22, 54:15, 56:19, 57:1, 57:7, 57:9, 58:2, 58:6, 59:10, 59:13, 60:19, 60:23, 61:15, 62:17, 64:11, 64:17, 64:20, 64:22, 65:6, 65:11, 65:14, 65:18, 65:21, 66:1, 66:7, 66:10, 66:13, 66:17, 67:1, 67:6, 67:9, 67:15, 67:23, 68:19, 71:23, 72:21, 72:25, 75:1, 75:12, 76:6, 77:2, 77:8, 78:8, 78:23, 79:5, 81:13, 81:16, 82:14, 85:8, 86:10, 88:20, 89:1, 90:17, 93:11, 93:16, 93:18, 93:24, 94:1, 94:14, 95:5, 95:12, 95:16, 95:21, 96:18, 96:20, 96:25, 97:1, 97:4, 97:13, 97:22, 98:3, 98:4, 98:5, 98:11, 98:13, 98:17, 98:19, 98:21, 99:6, 99:10, 99:15, 99:18, 100:14, 101:11, 102:11, 102:15, 102:19, 102:23, 103:2, 103:6, 103:9, 103:15, 103:19, 103:21, 103:24, 104:5, 104:9, 104:16, 104:19, 105:1, 105:16, 106:11, 106:19, 106:23, 106:25, 107:3, 107:7, 107:9, 107:11, 107:12

**theft** [12] - 52:3, 52:5, 52:10, 52:17, 55:7, 56:11, 59:7, 59:9, 73:19, 90:15, 90:16, 101:7

**theme** [1] - 8:1

**themselves** [5] - 39:4, 43:8, 70:10, 70:11, 72:2

**theoretically** [1] - 88:11

**thereafter** [1] - 13:13

**therefore** [14] - 12:22, 14:25, 30:8, 30:18, 34:2, 44:18, 60:4, 66:7, 68:5, 68:9, 94:20, 100:6, 100:10

**Thereupon** [4] - 5:16, 8:20, 97:2, 107:14

**they've** [3] - 11:14, 69:22, 96:5

**thinking** [1] - 97:1

**third** [2] - 63:24, 79:21

**thoroughly** [1] - 28:25

**three** [10] - 16:9, 16:23, 20:25, 29:20, 33:1, 33:12, 44:3, 61:2, 72:4, 81:2

**threw** [1] - 81:1

**throughout** [2] - 8:1, 78:25

**thrown** [2] - 80:6, 94:18

**tie** [1] - 12:6

**ties** [1] - 79:21

**Tjoflat** [1] - 31:10

**today** [8] - 8:24, 9:15, 16:8, 24:19, 68:15, 69:24, 94:13, 107:3

**together** [7] - 7:10, 13:18, 13:19, 23:2, 23:5, 23:7, 93:7

**took** [6] - 3:16, 39:13, 54:7, 55:11, 61:4, 89:24

**top** [3] - 42:10, 90:8, 91:2

**topic** [1] - 25:15

**Toro** [3] - 63:9, 63:25, 64:2

**total** [1] - 72:18

**totally** [1] - 74:7

**toto** [1] - 6:9

**touched** [1] - 93:13

**tourism** [1] - 88:4

**towards** [1] - 96:11

**trace** [3] - 57:22, 100:3, 100:8

**tracing** [2] - 57:9, 67:25, 68:6

**track** [2] - 53:13, 63:19

**transcribed** [1] - 64:5

**transcription** [3] - 63:11, 63:13, 108:4

**transfer** [5] - 51:4, 57:15, 57:19, 98:8, 107:6

**transferred** [2] - 46:16, 57:4

**transferring** [1] - 98:8

**translate** [2] - 33:10, 71:6

**translated** [4] - 9:3, 9:20, 40:3, 42:9

**translation** [4] - 33:10, 34:19, 87:21, 91:1

**translations** [2] - 8:24, 9:2

**trap** [2] - 64:23, 65:1

**Treasury** [1] - 32:14

**treaties** [24] - 11:19, 12:7, 12:10, 12:11, 13:1, 13:18, 13:23, 14:2, 14:14, 14:16, 16:1, 17:2, 19:22, 20:22, 21:6, 22:11, 22:14, 23:11, 23:12, 23:22, 23:25, 24:17, 24:22

**treatise** [1] - 23:17

**treatises** [1] - 23:18

**treaty** [77] - 3:3, 3:19, 10:20, 11:1, 11:4, 11:6, 11:20, 11:25, 12:12, 12:14, 12:16, 12:19, 12:21, 12:24, 12:25, 13:4, 13:7, 13:11, 13:15, 14:4, 14:21, 15:6, 15:8, 15:10, 15:11, 15:12, 15:13, 15:14, 15:22, 15:23, 16:11, 16:12, 16:15, 16:19, 16:21, 17:8, 17:11, 17:13, 17:14, 17:17, 17:18, 18:2, 18:3, 18:9, 18:10, 18:19, 18:20, 19:1, 19:17, 20:1, 20:8, 20:14, 21:21, 21:24, 22:2, 22:5, 22:13, 22:14, 22:16, 23:1, 23:16, 24:4, 24:25, 25:1, 25:7, 25:23, 25:25, 28:4, 28:5, 28:11, 102:11, 102:15, 102:18, 102:25, 103:15

**treaty's** [1] - 24:14

**Trendell** [1] - 11:10

**trial** [5] - 38:4, 55:4, 86:8, 91:5, 91:14

**tribe** [4] - 63:23, 63:24, 64:1, 64:2

**tribunal** [3] - 83:20, 84:11, 84:19

**tried** [5] - 7:22, 22:1, 25:5, 50:8, 77:20

**triggering** [1] - 16:17

**triggers** [2] - 68:10, 100:11

**triple** [3] - 77:5, 78:18, 81:5

**true** [4] - 20:15, 45:20, 48:19, 82:21

**trumped** [2] - 42:2, 72:19

**truth** [1] - 38:2

**try** [7] - 7:19, 7:21, 8:2, 9:8, 56:5, 94:23, 97:9

**trying** [7] - 14:2, 14:12, 51:18, 53:14, 85:25, 95:8, 95:9

**turn** [7] - 6:21, 21:14, 47:23, 59:6, 67:21, 82:23, 83:17

**turned** [1] - 82:23

**TV** [2] - 85:3, 85:12

**twelve** [1] - 18:8

**two** [43] - 4:1, 11:7, 13:17, 16:19, 26:6, 28:16, 32:24, 33:1, 33:3, 33:5, 33:11, 33:22, 36:13, 36:16, 36:21, 41:7, 45:22, 45:24, 46:6, 46:15, 46:20, 53:11, 63:25, 64:24, 69:14, 69:16, 69:22, 69:23, 70:6, 70:22, 71:9, 73:15, 80:19, 83:11, 90:19, 92:15, 92:24, 92:25, 94:11, 95:1, 102:21

**type** [4] - 17:23, 35:25, 70:3, 102:10

**types** [2] - 21:1, 43:5

## U

**U.S** [7] - 11:20, 22:7, 24:10, 24:18, 31:4, 31:9, 87:5

**ultimate** [1] - 51:2, 52:3

**ultimately** [2] - 8:4, 35:21

**ultra** [3] - 60:21, 61:25, 76:8

**UN** [2] - 102:21, 103:11

**unable** [1] - 12:15

**unambiguous** [1] - 19:5

**unauthorized** [1] - 79:16

**unaware** [2] - 19:18, 19:25

**uncommon** [1] - 21:9

**undeniable** [1] - 100:4

**under** [30] - 15:21, 22:5, 22:18, 24:4, 24:23, 24:24, 25:25, 28:11, 30:19, 31:12, 33:16, 34:1, 38:16, 43:3, 51:4, 52:21, 57:13, 61:15, 62:2, 62:15, 69:4, 69:14, 73:22, 87:5, 101:7, 101:15, 101:19, 102:12, 104:10, 105:21

**undercut** [2] - 8:2, 61:11

**underling** [2] - 35:18, 87:11

**underlings** [2] - 36:16, 87:2

**undermined** [1] - 89:4

**undoubtedly** [1] - 45:20

**ungrateful** [1] - 83:3

**United** [9] - 14:21, 19:9, 20:23, 29:7, 85:22, 86:9, 86:23, 101:22, 101:24

**unknown** [2] - 54:10, 72:7

**unless** [2] - 11:18, 20:14

**unreliable** [2] - 8:12, 78:19

**up** [30] - 3:8, 3:10, 3:12, 3:20, 4:6, 7:11, 11:25, 19:14, 19:17, 19:19, 31:4, 42:2, 45:5, 48:7, 48:24, 49:21, 53:7, 53:9, 64:5, 72:19, 73:7, 73:8, 75:7, 75:10, 76:1, 77:25, 90:11, 94:25, 96:15, 99:8

**urged** [1] - 43:4

**USC** [2] - 97:18, 101:7

**user** [21] - 49:4, 49:13, 50:24, 51:2, 53:16, 53:20, 56:22, 57:14, 65:9, 65:12, 65:20, 66:5, 66:24, 71:15, 75:7, 75:18, 76:1, 76:2, 84:8

**uses** [5] - 61:13, 61:20, 61:25, 63:17, 103:21

## V

**vague** [2] - 87:17, 92:6
**Valenzuela** [1] - 31:10
**valid** [1] - 22:21
**value** [4] - 73:8, 95:24, 101:22, 105:4
**valued** [2] - 73:3, 101:15
**Varela** [1] - 80:11
**Varela's** [1] - 27:22
**various** [5] - 3:20, 8:5, 42:13, 58:22, 65:16
**version** [1] - 50:11
**versus** [1] - 95:1
**viability** [1] - 10:17
**vice** [2] - 27:22
**victim** [7] - 63:21, 64:6, 78:24, 80:6, 83:12, 83:20, 85:4
**victimized** [1] - 88:19
**victims** [4] - 79:25, 87:15, 91:16
**view** [6] - 16:10, 18:23, 19:5, 19:23, 20:3, 80:2
**viewed** [1] - 38:24
**vile** [1] - 80:7
**violating** [1] - 24:13
**violation** [10] - 22:2, 23:1, 24:14, 25:5, 30:3, 31:12, 61:19, 62:12, 62:13, 68:11
**vires** [2] - 60:21, 76:9
**virtue** [3] - 6:24, 58:10, 58:16
**virus** [1] - 61:25
**vis** [2] - 47:25
**vis-a-vis** [1] - 47:25
**vista** [3] - 33:18, 69:22, 91:1
**voice** [1] - 63:22
**voices** [1] - 63:6

## W

**wait** [2] - 61:23, 83:7
**waiving** [1] - 28:23
**walk** [1] - 52:16
**walking** [1] - 39:3
**wants** [4] - 6:20, 55:18, 86:16, 96:9
**warehouse** [1] - 72:6
**warrant** [3] - 15:4, 26:14, 26:18
**warrants** [1] - 61:6
**Washington** [1] - 77:25
**water** [1] - 44:16
**ways** [1] - 102:21
**wearing** [1] - 37:25
**website** [1] - 22:8
**week** [8] - 80:11, 81:1, 93:20, 96:10, 96:11, 96:15, 96:21, 96:22
**weeks** [3] - 94:11, 99:6, 99:7
**weight** [2] - 37:9, 37:13
**WhatsApp** [2] - 46:23, 46:25
**whatsoever** [2] - 45:1, 51:5
**White** [1] - 80:11
**whole** [7] - 30:17, 44:6, 44:7, 48:7,

51:18, 88:16
**William** [14] - 33:4, 33:21, 35:10, 40:9, 43:20, 53:5, 61:3, 62:23, 70:23, 89:19, 91:5, 91:14, 92:14, 93:5
**winds** [2] - 11:25, 90:11
**wire** [1] - 88:24
**wish** [2] - 6:22, 8:19
**wishes** [1] - 5:18
**witness** [17] - 9:24, 32:21, 33:5, 33:22, 43:1, 46:17, 54:10, 55:15, 63:24, 64:1, 64:4, 72:14, 73:14, 84:15, 84:17, 84:20, 88:3
**witnesses** [16] - 32:19, 44:15, 45:22, 55:23, 61:2, 62:22, 63:2, 65:16, 70:10, 70:11, 72:2, 74:11, 74:14, 76:14, 82:20
**word** [2] - 22:20, 36:17, 41:7
**words** [13] - 13:8, 13:14, 14:12, 17:22, 41:24, 42:15, 60:23, 64:12, 68:20, 88:6, 100:21, 104:22, 106:19
**workday** [1] - 97:25
**world** [1] - 30:7
**worth** [2] - 74:12, 101:22
**writing** [2] - 4:13, 106:20
**written** [5] - 51:7, 57:18, 59:19, 80:2, 85:10
**wrote** [2] - 79:10, 101:1

## Y

**Yassir** [1] - 82:21
**year** [3] - 34:4, 69:21, 83:11
**years** [3] - 59:21, 59:24, 60:5

## Z

**zoo** [2] - 98:12, 98:21