# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

Case No. 17-22197-Civ-TORRES

IN THE MATTER OF THE
EXTRADITION OF RICARDO
ALBERTO MARTINELLI BERROCAL

_____/

# FINAL ORDER ON THE GOVERNMENT'S MOTION
# FOR A CERTIFICATE TO EXTRADITE TO PANAMA

One of our nation's greatest Justices, Oliver Wendell Holmes, disfavored lengthy opinions. He preferred a "short little opinion" over a lengthy one "padded" with unnecessary discourse.[1] The following lengthy analysis of the relevant facts and governing law would not be warmly greeted in his Chambers. But given the importance of the outcome to all interested parties, and this Court's obligation to satisfy the requirements of 18 U.S.C. § 3184, we offer a detailed recitation of all the issues raised by the parties and the Court's reasoning.

Because Justice Holmes has penned or participated in many important decisions that, to this day, define the essential nature of the extradition process, our decision can be distilled to a few paragraphs quoting and paraphrasing those opinions.

To begin,

> It is common in extradition cases to attempt to bring to bear all the factitious niceties of a criminal trial at common law. But it is a waste of time. For while, of course, a man is not to be sent from the country merely upon demand or surmise, yet if there is presented, even in somewhat untechnical form according to our ideas, such reasonable ground to suppose him guilty as to make it proper that he should be tried, good faith to the demanding government requires his surrender.[2]

In our case,

> [O]ut of a natural anxiety to save [Pres. Martinelli] if possible from being sent from [Florida] to [Panama] for trial, it has been presented as if this were the final stage and every technical detail were to be proved beyond a reasonable doubt. This is not

---

[1]     G. Edward White, *Justice Oliver Wendell Holmes: Law and The Inner Self,* 310 (1993).

[2]     *Glucksman v. Henkel,* 221 U.S. 508, 512 (1911) (affirming extradition to Russia on fraud charges).

the law. Form is not to be insisted upon beyond the requirements of safety and justice. Competent evidence to establish reasonable grounds is not necessarily evidence competent to convict.[3]

And notwithstanding Pres. Martinelli's technical but meritless objections to the process that led to this extradition request,

[His main] objection is that there is no evidence that the defendant is guilty of the crime charged. This is rather a bold contention seeing that [he was President and Head of the National Security Council at a time that the Council was allegedly and unlawfully surveilling the President's political opponents, and using public funds in the process for purely personal gain.] It is unnecessary to go into greater detail. We are of the opinion that probable cause to believe [Pres. Martinelli] guilty was shown by competent evidence. . . . [4]

As "[w]e are bound by the existence of an extradition treaty to assume that the trial will be fair," that is the end of our inquiry. Or as Justice Holmes succinctly declared, "that is enough."[5]

\* \* \*

---

[3]     *Fernandez v. Phillips,* 268 U.S. 311, 312 (1925) (affirming extradition of Mexican public official to Mexico on embezzlement charges) (citations omitted).

[4]     *Id.* at 314.

[5]     *Glucksman,* 221 U.S. at 512, 514.

## TABLE OF CONTENTS

I.   BACKGROUND ................................................................................. 5

   A.   Panama's Request for Extradition ................................................ 5

   B.   The Charges Against Pres. Martinelli ........................................ 7

   C.   The Relevant Treaties ................................................................ 9

   D.   Disputes Regarding Allegations and Underlying Law ............... 12

II.  ANALYSIS .................................................................................... 16

   A.   General Principles of Extradition .............................................. 18

   B.   The Authority to Conduct Extradition Proceedings ................. 23

   C.   Valid Extradition Treaties Exist ................................................ 24

   D.   The Alleged Crimes Are Extraditable Under the Treaties .......... 25

      1.   The Embezzlement Charges ................................................. 27

      2.   The Surveillance Charges ................................................... 31

   E.   Probable Cause Exists for Each Extraditable Charge ............... 48

      1.   The Arrest Warrant and Panamanian Procedures ............... 52

      2.   Immunity Defenses ............................................................ 64

      3.   Due Process ....................................................................... 65

      4.   The Embezzlement Charges ............................................... 73

      5.   The Surveillance Charges ................................................... 82

III. CONCLUSION ............................................................................. 92

# *I. BACKGROUND*

This matter is before the Court on the United States of America's (the "Government") motion [D.E. 46] for an order certifying the extradition of Ricardo Alberto Martinelli Berrocal ("Pres. Martinelli") on behalf of the Republic of Panama ("Panama"). Pres. Martinelli timely responded to the Government's motion on August 11, 2017 [D.E. 58] to which the Government replied on August 18, 2017. [D.E. 62]. Therefore, the Government's motion is now ripe for disposition. After careful consideration of the entire record, the evidence presented at the extradition hearings, along with the benefit of oral argument, and the papers applicable thereto, the Government's motion is **GRANTED** and the Court finds that Pres. Martinelli is extraditable for all four alleged offenses pursuant to the Treaty Between the United States of America and Panama Providing for the Extradition of Criminals, U.S.-Pan., May 25, 1904, 34 Stat. 2851 (the "Treaty"); the U.N. Convention Against Corruption, Dec. 9, 2003, S. Treaty Doc. No. 109-6, 2349 U.N.T.S. 41 (the "UNCAC"); and the Convention on Cybercrime, Jan. 7, 2004, Council of Eur., T.I.A.S. No. 13174, C.E.T.S. No. 185 (the "Budapest Convention").

## A. *Panama's Request for Extradition*

This case involves an extradition request by Panama, approved by the United States Department of State, for the arrest and extradition of Pres. Martinelli – the former President of Panama. The Supreme Court of Panama has requested extradition on the grounds of alleged violations of Panamanian law that occurred while Pres. Martinelli was in office. Pres. Martinelli left Panama and traveled to the United States where he filed an application for asylum in 2015. While that

application remains pending, the Department of State and the United States Attorneys' Office here in Miami have now filed this action to authorize his extradition to Panama pursuant to multiple treaties between the United States and Panama.

Specifically, Pres. Martinelli's extradition is sought by Panama for trial on four charges: (1) interception of telecommunications without judicial authorization, in violation of Article 167 of the Criminal Code of Panama; (2) tracking, persecution, surveillance without judicial authorization, in violation of Article 168 of the same code; (3) embezzlement by theft and misappropriation, in violation of Article 338 of the same code; and (4) embezzlement of use, in violation of Article 341 of the same code. Harry Díaz ("Díaz"), a Justice of the Criminal Chamber of the Supreme Court of Justice of the Republic of Panama, issued an indictment against Pres. Martinelli for these offenses on October 9, 2015. After Pres. Martinelli failed to appear in court when summoned for a hearing on the charges, on December 21, 2015, the Supreme Court issued an order for Pres. Martinelli's arrest. Panama subsequently submitted a request to the United States for Pres. Martinelli's extradition.

Pursuant to Panama's extradition request, Pres. Martinelli was arrested in on June 12, 2017, in Coral Gables, Florida. He then filed an emergency motion to dismiss [D.E. 12], alleging that Panama had failed to comply with the requirement in the Treaty that it provide a warrant in support of its extradition request; he also filed multiple motions for release on bond. [D.E. 18, 24, 26, 34, 36]. The Government responded to these motions and filed a separate motion

seeking Pres. Martinelli's detention. [DE 13, 15, 22, 32]. After holding a hearing on June 20, 2017, we denied Pres. Martinelli's motions and granted the Government's request for detention in an opinion issued on July 7, 2017. [D.E. 38]. The immediate motion pending before the Court arises from the Government's motion for extradition. [D.E. 46].

**B.**    *The Charges Against Pres. Martinelli*

Justice Mejía Edward listed the charges that *El Magistrado Fiscal* intends to prove against Pres. Martinelli. [D.E. 13-1 at 15-25, ¶27]. According to the charges, Pres. Martinelli:

> established an organized apparatus of power acting beyond the Social and Democratic State of Law, and through this apparatus of power instructions were given to officers of The National Security Council, who were fully aware of the illegality of these activities and without a judicial authorization undertook interceptions of electronic communications in various forms, surveillance and tracking of people, which they called targets, who belong to difference political, economic, civic groups and unions of the country, extending this systematic violation of human rights, in some cases, to family and friends of individuals subject to interceptions, surveillance and tracking; and that in order to achieve these activities outside the Constitution and the Law, the organization of State power led by Ricardo Alberto Martinelli Berrocal supplied the equipment, resources, and personnel necessary to achieve the aforesaid illicit activities, using State funds.

*Id.* at 15-16, ¶27(b). These alleged crimes occurred between 2012 and mid-May 2014, during the time that Pres. Martinelli was in office. *Id.* at 16, ¶27(c). According to the Government, "[a]n audit conducted by the Comptroller General concluded that the loss to the state sustained as a result of the purchase and disappearance of the surveillance equipment amounted to US $ 10,861,857.48." [D.E. 15 at 6].

The first alleged crime for which Panama requests Pres. Martinelli's extradition is the:

> *Crime against the inviolability of secret and the right to privacy* (Interception of private telecommunications without judicial authority), provided under Article 167, Title II, Chapter II of the Second Book of The Panamanian Criminal Code, reading as follows:
>
> Article 167. Whoever, without the authorization of the judicial authority, intercepts telecommunications or uses technical devices for listening, transmission, recording, or reproducing conversations that are not for the public shall be punished from two to four years in prison.

[D.E. 13-1 at 26-27, ¶31(a)] (internal quotation marks omitted).

The second alleged crime for which Panama requests Pres. Martinelli's extradition is the:

> *Crime against the inviolability of secret and the right to privacy* (Tracking, Persecution and Surveillance without judicial authority), provided under Article 168, Title II, Chapter III of the Second Book of The Panamanian Criminal Code, reading as follows:
>
> Article 168. Whoever, without proper authorization, practices tracking, persecution, or surveillance against a person, for illicit purposes, shall be punished from two to four years in prison. The same punishment is imposed on anyone who sponsors or promotes these facts.

*Id.* at 27, ¶31(b) (internal quotation marks omitted).

The third alleged crime for which Panama requests Pres. Martinelli's extradition is the:

> *Crime against the public administration*, Different Kinds of Embezzlement (embezzlement by theft or misappropriation), provided under Article 338, Title X, Chapter I of the Second Book of The Panamanian Criminal Code, reading as follows:
>
> Article 338. A public officer who takes or embezzles in any way, or consents that somebody else appropriates, takes or embezzles any

form of money, securities or property which administration, collection or custody have been entrusted by virtue of his position, shall be punished from four to ten years in prison.

If the amount of the appropriated exceeds the sum of one hundred thousand dollars (US$100,000.00) or the money, securities or appropriate goods were intended for welfare purposes or for development programs or social support, the punishment shall be from eight to fifteen years in prison.

*Id.* at 27, ¶ 31(c) (internal quotation marks omitted).

The fourth and final alleged crime for which Panama requests Pres. Pres. Martinelli's extradition is the:

*Crime against the public administration*, different kinds of embezzlement (embezzlement of use), provided under Article 341, Title X, Chapter I of the Second Book of the Panamanian Criminal Code, reading as follows:

Article 341. A public officer who, for purposes other than service, uses in his own or another's benefit, or allows somebody else to use money, securities or property under his charge by reasons of his duties or which are in his custody, shall be punished from one to three years in prison, or its equivalent in daily fines or weekend arrest.

The same punishment shall be applied to the public officer that uses official works or services for his benefit or allows someone else to do it.

*Id.* at 27-28, ¶ 31(d) (internal quotation marks omitted).

### C.     *The Relevant Treaties*

Panama formalized its extradition request "pursuant to the Extradition Treaty between the United States of America and the Republic of Panama, signed on May 25, 1904, which entered into force for the United States of America on May 8, 1905, and for the Republic of Panama on April 8, 1905 . . . ." *Id.* at 3, ¶ 1. The Treaty provides:

The Government of the United States and the Government of the Republic of Panamá mutually agree to deliver up persons who, having been charged with or convicted of any of the crimes and offenses specified in the following article, committed within the jurisdiction of one of the contracting parties, shall seek an asylum or be found within the territories of the other: Provided, that this shall only be done upon such evidence of Criminality as, according to the laws of the place where the fugitive or person so charged shall be found, would justify his or her apprehension and commitment for trial if the crime or offense had been there committed.

[D.E. 12-1 at 3].

Relevant to this case, the Treaty also provides that the signatories shall grant extradition for "[e]mbezzlement by public officers; embezzlement by persons hired or salaried, to the detriment of their employers; where in either class of cases the embezzlement exceeds the sum of two hundred dollars; larceny." Treaty at Art. II; [D.E. 12-1 at 4]. Further, the Treaty states that "if the fugitive is merely charged with a crime, a duly authenticated copy of the warrant of arrest in the country where the crime has been committed, and of the depositions or other evidence upon which such warrant was issued, shall be produced." Treaty at Art. III; [D.E. 12-1 at 5].

The final relevant article from this Treaty states:

A fugitive criminal shall not be surrendered if the offense in respect of which his surrender is demanded be of a political character, or if he proves that the requisition for his surrender has, in fact, been made with a view to try or punish him for an offense of a political character. No person surrendered by either of the high contracting parties to the other shall be triable or tried, or be punished, for any political crime or offense, or for any act connected therewith, committed previously to his extradition. If any question shall arise as to whether a case comes within the provisions of this article, the decision of the authorities of the government on which the demand for surrender is made, or which may have granted the extradition, shall be final.

Treaty at Art. VI; [D.E. 12-1 at 5].

In addition to the 1904 Treaty, the Government relies on two more recent treaties in its Complaint: the Budapest Convention and the UNCAC. [D.E. 1 at 1]. According to the Budapest Convention, a multilateral treaty to which the United States and Panama are both parties:

> Each Party shall adopt such legislative and other measures as may be necessary to establish as criminal offences under its domestic law, when committed intentionally, the interception without right, made by technical means, of non-public transmissions of computer data to, from or within a computer system, including electromagnetic emissions from a computer system carrying such computer data. A Party may require that the offence be committed with dishonest intent, or in relation to a computer system that is connected to another computer system.

Convention on Cybercrime Art. 3, Nov. 23, 2001, T.I.A.S. No. 13174. The treaty expressly includes an article on extradition, quite relevant here, which provides:

> This article applies to extradition between Parties for the criminal offences established in accordance with Articles 2 through 11 of this Convention, provided that they are punishable under the laws of both Parties concerned by deprivation of liberty for a maximum period of at least one year, or by a more severe penalty. [24(1)(a)]

> The criminal offences described in paragraph 1 of this article shall be deemed to be included as extraditable offences in any extradition treaty existing between or among the Parties. The Parties undertake to include such offences as extraditable offences in any extradition treaty to be concluded between or among them. [24(2)]

*Id*. at Art. 24(1)(a), 24(2).

The third and final treaty relied upon by the government is the UNCAC, another multilateral treaty to which the United States and Panama are both parties, that provides:

> Embezzlement, misappropriation or other diversion of property by a public official
>
> Each State Party shall adopt such legislative and other measures as may be necessary to establish as criminal offences, when committed intentionally, the embezzlement, misappropriation or other diversion by a public official for his or her benefit or for the benefit of another person or entity, of any property, public or private funds or securities or any other thing of value entrusted to the public official by virtue of his or her position.

UNCAC Art. 17, Oct. 23, 2003, S. Treaty Doc. No. 109-6. The treaty also includes an express provision relating to extradition, which provides:

> This article shall apply to the offences established in accordance with this Convention where the person who is the subject of the request for extradition is present in the territory of the requested State Party, provided that the offence for which extradition is sought is punishable under the domestic law of both the requesting State Party and the requested State Party. [1]
>
> Notwithstanding the provisions of paragraph 1 of this article, a State Party whose law so permits may grant the extradition of a person for any of the offences covered by this Convention that are not punishable under its own domestic law. [2]
>
> Each of the offences to which this article applies shall be deemed to be included as an extraditable offence in any extradition treaty existing between States Parties. States Parties undertake to include such offences as extraditable offences in every extradition treaty to be concluded between them. A State Party whose law so permits, in case it uses this Convention as the basis for extradition, shall not consider any of the offences established in accordance with this Convention to be a political offence. [4]

*Id.* at Art. 44(1), 44(2), 44(4), Oct. 23, 2003, S. Treaty Doc. No. 109-6.

### D.     *Disputes Regarding Allegations and Underlying Law*

Pres. Martinelli has disputed both the allegations surrounding his potential extradition as well as the law on which the extradition is based. [D.E. 18-2 at 13,

120-23; D.E. 12 at 1-3; D.E. 18 at 1-2, 7-21].  Regarding Pres. Martinelli's potential

immunity for the alleged crimes, he relies on the Panamanian Constitution:

> Article 191.  The President and the Vice-President of the Republic are responsible only in the following cases:
>
> 1. For exceeding their constitutional powers;
> 2. For acts of violence or coercion during the electoral process; for impeding the meeting of the National Assembly, for blocking the exercise of its functions or of the functions of the other public organizations or authorities that are established by this Constitution;
> 3. For offenses against the international personality of the State or against the public administration.
>
> In the first and second case, the penalty shall be removal from office, and disqualification to hold public office for a period fixed by law. In the third case ordinary law shall apply.

[D.E. 18-2 at 13].  Based on this article, Pres. Martinelli argues that he "generally

has immunity for crimes committed during his presidency."  [D.E. 18 at 9].  He also

claims that this article "clearly applies to the 'wiretapping' crimes charged here (i.e.,

interception of telecommunications/surveillance without authorization)." *Id.* He

states that "as a member of the Central American Parliament, [he] has 'Parlecen'

immunity that precludes him from being charged for any crime." *Id.*

As for the allegations themselves, Pres. Martinelli has denied them in their

entirety.  [D.E. 18 at 6].  According to Pres. Martinelli, the affidavit executed by a

former official with the Panamanian National Security Council during Pres.

Martinelli's tenure, Ismael Pitti ("Pitti") (which constitutes the primary sworn

testimony relied upon by the Government) is a sham:

> [It] was executed on the basis of "information and belief" and reeks of rank hearsay, as Pitti does not identify a single personal interaction with [Mr.] Martinelli [Berrocal].  The Panamanian government has

bought and paid [Mr. Pitti] as a witness, providing him with a well-paid job in Washington, D.C., despite his alleged participation in the alleged offenses.

*Id.*

Pres. Martinelli points instead to a competing affidavit executed by Ronny Rodriguez Mendoza, a former aide to Pres. Martinelli. *See id.* at 6, 9. Mr. Rodriguez Mendoza's affidavit avers that National Police Directorate Commissioner Rolando Lopez:

> [O]ffered to take [him] directly to the Office of the President of the Republic, to Mr. JUAN CARLOS VARELA, who was willing to offer [him] 'WHATEVER [HE] WANTED' if [he] would incriminate former President RICARDO MARTINELLI, and that [the National Police Directorate], in January 2015, had seized the Office of the Procurator General of the Nation, and that [he] could testify as a 'protected witness'. [He] maintained that [he] would no [sic] do so. A few days later, ROLANDO LOPEZ PEREZ called [him] again, but this time in order to threaten and intimidate [him]. The conversation ended with these words: 'we're going to cancel your retirement, we're going to open 3 criminal dockets against you, we're going to remove you from the National Police, we're going to throw you in jail, and you won't last a week at La Joya'.

[D.E. 18-2 at 121].

Pres. Martinelli also addressed the enforceability of the arrest warrant issued against him. [D.E. 28 at 1]. "[T]he arrest warrant issued for President Martinelli is unprecedented in Panama and null and void because the issuing court lacked jurisdiction over him." *Id.* To support this statement, Pres. Martinelli provides an affidavit from his expert, Roberto J. Moreno. [D.E. 28-2]. Mr. Moreno is a Panamanian lawyer and in 2009 he "obtained a Masters in Law (LL.M.) with a specialization in International Human Rights, in the United States of America in

the prestigious American University Washington College of Law, Washington D.C.,
thanks to a Fulbright Scholarship from the State Departament [sic] of the United
States of America . . . ." [D.E. 24-2 at 1]. Mr. Moreno concluded:

> [T]hat based on the norms and the precedents that: (1) Due the
> absence of indictment of [Mr.] Martinelli Berrocal, the Order of
> Detention against him is nullified; (2) That in order to acquire
> jurisdiction and the power to apply personal precautionary measures
> against [Mr.] Martinelli [Berrocal], his previous personal indictment is
> indispensable; (3) That in order to be able to order a detention due to
> contempt, a previous indictment hearing is required, which has not
> occurred in the case of [Mr.] Martinelli Berrocal, violating due process
> and the fundamental guarantees of Mr. Martinelli [Berrocal].

[D.E. 28-2].

Pres. Martinelli has also tackled the specific charges to undermine the
strength of the case against him. He argues that the weak and impeachable
evidence presented bars his extradition. For instance, Pres. Martinelli has
highlighted numerous contradictions or inconsistencies between Díaz's extradition
affidavit and the supporting documentation that Díaz relied upon. It turns out that
the surveillance system that his affidavit cited as evidence of Pres. Martinelli's
embezzlement of Panamanian funds was not the surveillance system that Pitti
described in his affidavit. [D.E. 36 at 11-12]. As such, Pres. Martinelli concludes
that there is a material disconnect between the charge of embezzlement of funds
and the sworn evidence provided to sustain that charge. And that disconnect
purportedly undermines the case for extradition under all of the applicable treaties.

To determine whether the Government has complied with all of the statutory requirements of 18 U.S.C. § 3184 to justify a certificate of extradition to the Secretary of State, we turn our attention to the arguments presented.

## II.    ANALYSIS

Pres. Martinelli raises four primary arguments in opposition to the Government's motion for extradition.   First, when requesting extradition on the surveillance offenses, Pres. Martinelli contends that Panama has ignored the plain language of the Treaty's non-retroactivity provision.   Pres. Martinelli suggests that the Government lacks any authority for the position that the Treaty operates retroactively with respect to the crimes charged and, on this basis, the surveillance crimes should be outright dismissed as a violation of the Treaty's plain language.

Second, Pres. Martinelli argues that the Government has not produced a valid arrest warrant as required under the Treaty for two reasons:  (1) the court that issued the arrest warrant lacked jurisdiction because it flouted a mandatory phase called *imputación*, and (2) the arrest warrant fails to refer to at least one extraditable offense.  While Díaz declares that *imputación* was unnecessary in this case and that the arrest warrant is valid, Pres. Martinelli maintains (citing his expert's affidavits) that Panamanian law conclusively provides otherwise and that these procedural failures are fatal to the Government's attempt to extradite him.

Third, Pres. Martinelli suggests that Panama and the Department of Justice (the "DOJ") have violated his due process rights, on several occasions, by presenting material lies by Díaz under oath to this Court.  Díaz allegedly continues to swear, in

the face of insurmountable evidence to the contrary, that the publicly purchased MLM equipment was both capable of and used for infiltrating and extracting content from cellular phones. Pres. Martinelli believes that Díaz 's repeated lies are not harmless embellishments, as they are purportedly critical to Panama establishing probable cause on the embezzlement crimes, and constitute brazen misconduct that prohibits extradition.

Fourth, Pres. Martinelli argues that the Government has failed to establish probable cause for both the surveillance and embezzlement offenses. On the surveillance charges, Pres. Martinelli suggests that the Government's case rises and falls on the affidavit of Pitti – an affidavit that Martinelli suggests is inherently unreliable and therefore must be discredited. On the embezzlement charges, Pres. Martinelli believes that the Government cannot establish probable cause that he embezzled either the MLM equipment or the Pegasus equipment. The MLM equipment – last seen in 2011 – is purportedly irrelevant to this case because there is zero evidence of its use in connection with the alleged surveillance at issue in his case. And, at least, there is supposedly no evidence that it has been used during the relevant time period of 2012 and 2014.

As for the Pegasus equipment, Pres. Martinelli argues that the Government cannot establish probable cause because there is no evidence that the Pegasus equipment was in his custody as required under Panamanian law, nor is there evidence that it was acquired with public funds contrary to Díaz's defective indictment and false affidavits. Pres. Martinelli concludes, instead, that the alleged

crimes against him are politically driven and that there are a plethora of reasons as to why a certification for his extradition should not be issued to the Secretary of State.

### A.    *General Principles of Extradition*

"An extradition treaty creates in a foreign government the right to demand and obtain extradition of an accused criminal . . . [a]bsent a treaty, the federal government lacks the authority to turn the accused over to the foreign government." *United States v. Fernandez–Morris,* 99 F. Supp. 2d 1358, 1360 (S.D. Fla. 1999) (citation omitted).  When there is a treaty of extradition between the United States and any foreign government, international extradition requests are governed by 18 U.S.C. §§ 3184, *et seq*.  The statute provides in relevant part:

> Whenever there is a treaty or convention for extradition between the United States and any foreign government, . . . any magistrate judge authorized so to do by a court of the United States, . . . may, upon complaint made under oath, charging any person found within his jurisdiction, with having committed within the jurisdiction of any such foreign government any of the crimes provided for by such treaty or convention, ... issue his warrant for the apprehension of the person so charged, that he may be brought before such . . . magistrate judge, to the end that the evidence of criminality may be heard and considered . . . If, on such hearing, he deems the evidence sufficient to sustain the charge under the provisions of the proper treaty or convention, or under section 3181(b), he shall certify the same, together with a copy of all the testimony taken before him, to the Secretary of State, that a warrant may issue upon the requisition of the proper authorities of such foreign government, for the surrender of such person, according to the stipulations of the treaty or convention; and he shall issue his warrant for the commitment of the person so charged to the proper jail, there to remain until such surrender shall be made.

18 U.S.C. § 3184.

The extradition process "is a function of the Executive," allowing the courts to conduct only limited inquiry.[6] *Kastnerova v. United States*, 365 F.3d 980, 984 n.5 (11th Cir. 2004) (citation omitted). And although our inquiry is a limited one, it is critical to the extradition process because "[t]he executive may not foreclose the courts from exercising their responsibility to protect the integrity of the judicial process." *Ahmad v. Wigen,* 726 F. Supp. 389, 412 (E.D.N.Y. 1989) ("A court must ensure that it is not used for purposes which do not comport with our Constitution or principles of fundamental fairness."), *aff'd,* 910 F.2d 1063 (2d Cir. 1990). In fulfilling this obligation, the court "conducts a hearing simply to determine whether there is evidence sufficient to sustain the charge against the defendant under the provisions of the proper treaty or convention." *Kastnerova,* 365 F.3d at 984 n.5 (citation and internal quotation marks omitted). In other words, "[a]n extradition hearing is not a trial on the merits and does not require proof sufficient to satisfy the factfinder in a criminal trial." *Cheng Na–Yuet v. Hueston,* 734 F. Supp. 988, 995 (S.D. Fla. 1990).

An extradition hearing is therefore akin to a preliminary hearing, where the primary purpose is to decide if there is sufficient evidence of the charge under the applicable treaty – not guilt or innocence. *See Neely v. Henkel,* 180 U.S. 109, 123

---

[6] Neither the Federal Rules of Criminal Procedure, nor the Federal Rules of Evidence, apply to international extradition proceedings. *See* Fed. R. Crim. P. 1(a)(5)(A); Fed. R. Evid. 1101(d)(3); *Afanesjev v. Hurlburt,* 418 F.3d 1159, 1164–65 (11th Cir. 2005); *Bovio v. United States,* 989 F.2d 255, 259 n.3 (7th Cir. 1993); *Melia v. United States,* 667 F.2d 300, 302 (2d Cir. 1981). Thus, for instance, hearsay and excludable evidence is admissible. *See United States v. Peterka,* 307 F. Supp. 2d 1344, 1349 (M.D. Fla. 2003).

(1901); *see, e.g., Afanasjev,* 418 F.3d at 1164 (finding that courts do "not inquire into the guilt or innocence of the accused.") (quoting *Kastnerova,* 365 F.3d at 987); *In re Extradition of Mohammad Safdar Gohir,* 2014 WL 2123402, at *6 (D. Nev. 2014) ("Foreign extraditions are *sui generis* in nature, neither civil nor criminal in nature and set forth their own law.").  And in determining whether there is sufficient evidence to sustain the charge, section 3184 requires only a finding of probable cause.  *See Hoxha v. Levi,* 465 F.3d 554, 560 (3d Cir. 2006) (interpreting the "sufficient" evidence standard set forth in section 3184 as requiring probable cause); *Sayne v. Shipley,* 418 F.2d 679, 685 (5th Cir. 1969) (during a section 3184 extradition hearing the magistrate judge determines the sufficiency of evidence establishing reasonable ground for the accused's guilt).

A certification of extradition is generally based entirely on the authenticated documentary evidence provided by the requesting government.  *See, e.g., Castro Bobadilla v. Reno,* 826 F. Supp. 1428, 1433–1434 (S.D. Fla. 1993) (documents and statements sufficient for extradition to Honduras), *aff'd,* 28 F.3d 116 (11th Cir. 1994).  In fact, "[i]t is exceedingly rare for the Government to submit anything other than documents in support of an extradition request."  *In re Extradition of Nunez–Garrido,* 829 F. Supp. 2d 1277, 1287 (S.D. Fla. 2011).  As such, "one of the principal objectives of the extradition statute is 'to obviate the necessity of confronting the accused with the witnesses against him' by enabling the requesting country to meet its burden of proof through documents subject only to requirements necessary to

guarantee their authenticity." *Id.* (quoting *Bingham v. Bradley,* 241 U.S. 511, 517 (1916)).

While an extraditee is allowed to present evidence to clarify or explain the explanatory evidence, contradictory evidence against the requesting country's case is inadmissible. *See Cheng Na–Yuet,* 734 F. Supp. at 995. "Because of the circumscribed nature of an extradition proceeding, the importance of international obligations and the inherent practical difficulties in international proceedings, a defendant's right to challenge evidence against him at an extradition hearing is limited." *In re Extradition of Nunez-Garrido*, 829 F. Supp. 2d at 1281. "Generally, evidence that explains away or *completely obliterates* probable cause is the only evidence admissible at an extradition hearing, whereas evidence that merely controverts the existence of probable cause, or raises a defense, is not admissible." *Barapind v. Enomoto,* 400 F.3d 744, 749 (9th Cir. 2005) (quoting with emphasis added *Mainero v. Gregg,* 164 F.3d 1199, 1207 n.7 (9th Cir. 1999)); *see also Ordinola v. Hackman,* 478 F.3d 588, 608–09 (4th Cir. 2007); *Hoxha v. Levi,* 465 F.3d 554, 561 (3d Cir. 2006).

In other words, "[t]estimony that merely gives the opposite version of the facts does not destroy the probably of guilt" and is therefore inadmissible. *See Fernandez–Morris*, 99 F. Supp. 2d at 1360 (citation omitted). As such, affirmative defenses to the merits of the charges are not to be considered at extradition hearings. *See Charlton v. Kelly,* 229 U.S. 447, 462 (1913); *Collins v. Loisel,* 259 U.S. 309, 316–17 (1922); *Hooker v. Klein,* 573 F.2d 1360, 1368 (9th Cir. 1978); *DeSilva v.*

*DiLeonardi,* 125 F.3d 1110, 1112 (7th Cir. 1997). And an extraditee is also not permitted to introduce evidence that seeks to impeach the credibility of the demanding country's witnesses. *See Bovio v. United States,* 989 F.2d 255, 259 (7th Cir. 1993).

Once the evidence is determined to be sufficient, a court "makes a finding of extraditability and certifies the case to the Secretary of State." *Martin v. Warden, Atlanta Pen,* 993 F.2d 824, 828 (11th Cir. 1993). Thereafter, the Secretary of State makes the final decision to determine whether to surrender the accused. *See* 18 U.S.C. § 3186; *Martin,* 993 F.2d at 829 ("The Secretary exercises broad discretion and may properly consider myriad factors affecting both the individual defendant as well as foreign relations which an extradition magistrate may not. The Secretary of State's decision is not generally reviewable by the courts.") (citation omitted). As explained by the Eleventh Circuit:

> Extradition ultimately remains an Executive function. After the courts have completed their limited inquiry, the Secretary of State conducts an independent review of the case to determine whether to issue a warrant of surrender. The Secretary exercises broad discretion and may properly consider myriad factors affecting both the individual defendant as well as foreign relations which an extradition magistrate may not.

*Martin,* 993 F.2d at 829.

To make a finding of extraditability, courts generally consider four factors: (1) whether the judicial officer has authority to conduct extradition proceedings and the court has jurisdiction over the extraditee; (2) whether a valid extradition treaty exists; (3) whether the crime with which the accused is charged is extraditable

under the extradition treaty; and (4) whether there is probable cause to believe that the accused is guilty of the charge pending against him in the requesting state. *See Martin*, 993 F.2d at 828; *United States v. Peterka*, 307 F. Supp. 2d 1344, 1349 (M.D. Fla. 2003). In making this determination, courts do not weigh conflicting evidence, "but rather, determine[] only whether there is competent evidence to support the belief that the accused has committed the charged offense." *Quinn v. Robinson*, 783 F.2d 776, 787 (9th Cir. 1986).

If an extradition treaty requires that the doctrine of dual criminality be satisfied – meaning that the conduct charged is a crime under the law of the respective states (i.e. Panama and the United States in this case) – courts must also consider if this requirement is met. *See Gallo–Chamorro v. United States*, 233 F.3d 1298, 1306 (11th Cir. 2000); *see also United States v. Cardoso*, 2005 WL 1228826, at *3 (M.D. Fla. May 10, 2005) ("Acts are considered criminal in the United States if they would be unlawful under federal statutes, the law of the state where the accused is found, or by a preponderance of the states.") (citing *Wright v. Henkel,* 190 U.S. 40, 61 (1903)). In light of these principles, we turn to the four enumerated factors to determine if certification for the extradition of Pres. Martinelli should be issued.

### B.    *The Authority to Conduct Extradition Proceedings*

There is no dispute between the parties that the Court has jurisdiction over Pres. Martinelli to conduct his extradition proceedings. Section 3184 explicitly authorizes any magistrate judge authorized by a court of the United States to conduct extradition proceedings. *See id*. ("[A]ny justice or judge of the United

States, or any magistrate judge authorized so to do by a court of the United States, or any judge of a court of record of general jurisdiction of any States.").  And Local Magistrate Rule 1(a)(3) also empowers United States Magistrate Judges of this District to conduct extradition proceedings.  Furthermore, Pres. Martinelli was arrested in Coral Gables, Florida, which confers jurisdiction upon this Court.  *See* 18 U.S.C. § 3184 (stating that a judge "may, upon complaint made under oath, charging any person found within his jurisdiction . . . issue [its] warrant for the apprehension of the person so charged.").  Therefore, the first factor has been met because the Court has jurisdiction over Pres. Martinelli and possesses the authority to conduct his extradition proceedings.  *See* 18 U.S.C. § 3184.

### C.  *Valid Extradition Treaties Exist*

Section 3184 provides for extraditions in instances in which a treaty or convention is in force between the requesting state and the United States.  Here, Susan Benda, Assistant Legal Adviser for Law Enforcement and Intelligence in the Office of the Legal Adviser for the Department of State, has attested by declaration that the Treaty is in full force and effect between Panama and the United States. [D.E. 8].  She also averred that the Treaty is supplemented by the UNCAC and the Budapest Convention, to which both Panama and the United States are parties. *See id*. ("Each of the offenses to which this article applies shall be deemed to be included as an extraditable offense in any extradition treat existing between States Parties.").

Because every Circuit Court, including our own, has deferred to the executive branch on this factor, we find based on the unrebutted evidence, and the lack of

opposition from the Government or Pres. Martinelli, that the Treaty between Panama and the United States remains in full force and effect. *See Kastnerova*, 365 F.3d at 986 ("[E]very other Court of Appeals to consider whether a treaty has lapsed has deferred to the Executive's determination.") (citing *United States ex rel. Saroop v. Garcia,* 109 F.3d 165, 171 (3d Cir. 1997); *Then v. Melendez,* 92 F.3d 851, 854 (9th Cir. 1996); *New York Chinese TV Programs, Inc. v. U.E. Enters., Inc.,* 954 F.2d 847, 852 (2d Cir. 1992); *Sabatier v. Dabrowski,* 586 F.2d 866, 868 (1st Cir. 1978)); *see also Sumitomo Shoji Am., Inc. v. Avagliano*, 457 U.S. 176, 184–85 (1982) ("Although not conclusive, the meaning attributed to treaty provisions by the Government agencies charged with their negotiation and enforcement is entitled to great weight."); *United States v. Duarte-Acero*, 296 F.3d 1277, 1282 (11th Cir. 2002) ("[T]he State Department's interpretation of a treaty is entitled to great deference.") (citations omitted). Therefore, we find that the second extradition factor has been met and that all of the applicable treaties between Panama and the United States are in effect.

### D. *The Alleged Crimes Are Extraditable Under the Treaties*

The third factor is an inquiry that depends on the language of the particular treaty at issue. Extradition treaties "either list the offenses for which extradition shall be granted or designate a formula by which to determine extraditable offenses." *United States v. Herbage,* 850 F.2d 1463, 1465 (11th Cir. 1988) (internal quotation marks and citation omitted). Because the 1904 Treaty enumerates the offenses for which extradition may be sought, we must determine whether the alleged crimes in this case are included.

Article I of the 1904 Treaty provides for the return of fugitives charged with, or convicted of, an extraditable offense. Offenses are extraditable if (1) they are encompassed by the list set forth in Article II of the Treaty, or (2) they are encompassed by the lists of offenses set forth in the UNCAC and the Budapest Convention, and meet the requirement of dual criminality. [D.E. 15 at 9-11]. The dual criminality requirement is met where the description of criminal conduct provided by Panama in support of its charges would be criminal under U.S. federal law. *See, e.g.*, *Gallo-Chamorro*, 233 F.3d at 1306 ("Dual criminality mandates that a prisoner be extradited only for conduct that constitutes a serious offense in both the requesting and surrendering country."). The corresponding offenses need not be mirror images of each other because "the law does not require that the name by which the crime is described in the two countries shall be the same; nor that the scope of liability shall be coextensive, or, in other respects the same in the two countries." *Collins,* 259 U.S. at 312. Dual criminality only requires that the "particular act charged is criminal in both jurisdictions," *id.,* and that "[t]he essential character of the transaction is the same . . . ." *Wright,* 190 U.S. at 58; *see also In re Extradition of Russell,* 789 F.2d 801, 803 (9th Cir. 1986) ("[E]ach element of the offense purportedly committed in a foreign country need not be identical to the elements of a similar offense in the United States. It is enough that the conduct involved is criminal in both countries.").

Here, the Government argues that *all* four of the charges pending against Pres. Martinelli are extraditable and that this comports with the view of the State

Department and Panama. [D.E. 8 ("The offenses of embezzlement for which extradition is sought are covered under Article II of the Treaty," and "are among the offenses . . . specified [in the UNCAC] . . . The offenses of interception of private telecommunications without judicial authority and tracking, persecution and surveillance without judicial authority for which extradition is sought are among the offenses . . . specified [in the Budapest Convention]. Therefore, all crimes for which extradition is sought are incorporated as extraditable offenses under the Treaty.")].

Moreover, even if ambiguity existed as to whether the Panamanian offenses were covered under the Treaty, the Government maintains that we should find that all of the offenses are extraditable because in interpreting the Treaty, "a narrow and restricted construction is to be avoided," and "if a treaty fairly admits of two constructions, one restricting the rights which may be claimed under it, and the other enlarging it, the more liberal construction is to be preferred." *Factor v. Laubenheimer*, 290 U.S. 276, 294 (1933) (citations omitted); *see, e.g., Martinez v. United States*, 828 F.3d 451, 463 (6th Cir. 2016) ("[E]ven if there were ambiguity about the point, that would not change things. For ambiguity in an extradition treaty must be construed in favor of the 'rights' the 'parties' may claim under it.") (citing *Factor*, 290 U.S. at 294).

## 1. *The Embezzlement Charges*

First, the Government contends that the two embezzlement charges are extraditable because they are expressly provided for under Article II of the Treaty,

which enumerates "embezzlement by public officers" in excess of $200.  *See* Treaty at Art. II.  Specifically, Article 338 of the Criminal Code of Panama (embezzlement by theft and misappropriation) provides that "[a] public officer who takes or embezzles in any way, or consent that somebody else appropriates, takes or embezzles any form of money, securities or property which administration, collection or custody have been entrusted by virtue of his position, shall be punished . . . ."  (RAMB000031).[7]  And Article 341 of the same code (embezzlement of use) provides that "[a] public officer who, for purposes other than service, uses in his own or another's benefit, or allows somebody else to use money, securities or property under his charge by reasons of his duties or which are in his custody, shall be punished . . . ."  (RAMB000032).  Thus, the Government argues that the conduct prohibited under Articles 338 and 341 constitute embezzlement by public officers under the Treaty and that the charges against Pres. Martinelli are extraditable offenses.

The Government also suggests that Pres. Martinelli is incorrect in his view that embezzlement under the Treaty covers only the embezzlement of money. Instead, the Treaty, when interpreted liberally, purportedly refers to the embezzlement of anything of *value* in excess of $200.  And the Government believes that "[t]here is no requirement in the Treaty that the crime charged needs to be the mirror image of an offense listed in the Treaty."  *Matter of the Extradition of Pineda Lara*, 1998 WL 67656, at *13 (S.D.N.Y. Feb. 18, 1998); *see, e.g., Matter of the*

---

[7]    References to the government's documents and exhibits shall be to the Bates Numbered documents identified as "RAMB____."

*Extradition of Matus*, 784 F. Supp. 1052, 1057 (S.D.N.Y. 1992) (the fact that a Chilean offense included "additional essential elements [when compared with the offense listed in the applicable treaty] . . . [did] not render [the Chilean offense] non-extraditable"); *Polo v. Horgan*, 828 F. Supp. 961, 964-65 (S.D. Fla. 1993) (treaty that listed "fraud" as extraditable encompassed offenses charged as "embezzlement" and "unfaithful management"); *Artukovic v. Rison*, 784 F.2d 1354, 1356 (9th Cir. 1986) (treaty that listed "murder" as extraditable encompassed offenses charged as "war crimes").

Alternatively, even if Article II of the Treaty did not encompass the embezzlement charges, the Government contends that the UNCAC provides an independent basis for finding the embezzlement charges against Pres. Martinelli extraditable. That convention enumerates "embezzlement, misappropriation or other diversion of property by a public official." UNCAC, Art. 17. The Government argues that Panama's embezzlement charges clearly fall within that broad definition because it refers to "property" and not simply "money." The charges also allegedly meet the UNCAC's dual criminality requirement because Pres. Martinelli's conduct is "punishable under the domestic law of both the requesting state and the requested State Party." UNCAC, Art. 44(a). Therefore, if Pres. Martinelli committed the same offenses in the United States, the Government

concludes that his conduct would be criminal under U.S. law[8], including embezzlement in violation of 18 U.S.C. § 641.

Our review of the record on extradition confirms that the 1904 Treaty covers the embezzlement charges alleged against Pres. Martinelli. The Government correctly relies on the treaty language that embezzlement is extraditable when it "*exceeds the sum of two hundred dollars.*" *See* Treaty at Art. II. (emphasis added). Nothing in the plain language of the Treaty supports the view that embezzlement must be restricted solely to money and cannot be applied to the embezzlement of property.

Moreover, the Supreme Court has made it clear that if a treaty has two conflicting interpretations, the more liberal construction is to be preferred in favor of extradition:

> In choosing between conflicting interpretations of a treaty obligation, a narrow and restricted construction is to be avoided as not consonant with the principles deemed controlling in the interpretation of international agreements. Considerations which should govern the diplomatic relations between nations, and the good faith of treaties, as well require that their obligations should be liberally construed so as to effect the apparent intention of the parties to secure equality and reciprocity between them. For that reason if a treaty fairly admits of two constructions, one restricting the rights which may be claimed

---

[8] The elements required for a conviction under Section 641 are as follows: (1) the money or thing of value described in the indictment belonged to the United States; (2) the defendant embezzled, stole, or knowingly converted the money or thing of value to his own use or to someone else's use; (3) the defendant knowingly and willfully intended to deprive the United States of the use or benefit of the money or thing of value; and (4) the money or thing of value had a value greater than $1,000. *See* Eleventh Circuit Pattern Jury Instructions (Criminal) (hereinafter "Pattern"), Offense Instruction No. 21 (2016); *see also, e.g.*, *United States v. McCree*, 7 F.3d 976, 980 (11th Cir. 1993).

under it, and the other enlarging it, the more liberal construction is to
be preferred.

*Factor*, 290 U.S. at 293-94.  In other words, "[t]he correct analysis must focus on

whether the crime charged contains at least the same essential elements as offenses

listed in the Treaty."  *Pineda Lara*, 1998 WL 67656, at *13 (citing *Matter of*

*Extradition of Matus*, 784 F. Supp. 1052, 1057 (S.D.N.Y. 1992) (offense is

extraditable where crime charged contains essential elements of treaty offense);

*Koskotas v. Roche*, 740 F. Supp. 904, 910 (D. Mass. 1990), *aff'd*, 931 F.2d 169 (1st

Cir. 1991) ("The focus should be on whether the crime charged and the treaty

offense share the same essential elements")).  Therefore, we need not reach the

question of whether embezzlement is extraditable under the UNCAC because we

hold that the embezzlement of property or money in excess of $200 is an

extraditable offense under the 1904 Treaty.

## 2.  *The Surveillance Charges*

The next issue – and perhaps the most contested – is whether the Treaty

covers the alleged surveillance crimes.  There is no dispute that the two surveillance

crimes were originally not extraditable offenses under the 1904 Treaty.  The

surveillance crimes were added as extraditable offenses under the Budapest

Convention effective as to Panama on July 1, 2014.  The original Treaty provides

that "[t]he present Treaty shall not operate retroactively."  Treaty, Art. XII.  Yet,

the charges against President Martinelli are based on crimes alleged to have

occurred *before* July 1, 2014.  [D.E. 1].  Therefore, Pres. Martinelli contends on three

separate grounds that extradition on the surveillance charges would require

applying the Budapest Convention retroactively, in violation of the original Treaty's non-retroactivity language. *See Galanis v. Pallanck*, 568 F.2d 234, 239 (2d Cir. 1977) ("[T]he enlargement in the list of extraditable crimes would not subject to extradition persons who had committed such crimes prior to the effective date of the new treaty.").

First, Pres. Martinelli claims that the Budapest Convention did not contain any non-retroactivity language. Like all multilateral conventions, Pres. Martinelli suggests that the Budapest Convention applies to bilateral treaties between signatory states – each of which have different terms, conditions, and restrictions. As such, the Budapest Convention supposedly applies to different treaties in different ways. *See* Budapest Convention, Art. 24 ¶ 5 ("Extradition shall be *subject to the conditions* provided for by the law of the requested Party *or by applicable extradition treaties*[.]" (emphasis added)); *id.* at Art. 39 ¶¶ 1, 3 ("The purpose of the present Convention is to *supplement* applicable multilateral or bilateral treaties or arrangements between the Parties[.] *Nothing* in this Convention shall affect other rights, *restrictions*, obligations and responsibilities of a Party." (emphasis added)).

Pres. Martinelli suggests that the language from the Budapest Convention is not surprising considering it would be an efficient way to handle all conditions and restrictions that may vary from treaty to treaty, including warrant requirements, political offense exceptions, statutes of limitations, and non-retroactivity provisions. Thus, the Budapest Convention's addition of surveillance crimes purportedly has no effect on the 1904 Treaty's non-retroactivity provision. Courts in our district have

held in prior cases that conventions with similar language have expressly incorporated the conditions of the underlying treaty notwithstanding the addition of extraditable offenses. *See, e.g., Matter of Extradition of Aguilar*, 2004 WL 763802, at *3 (S.D. Fla. Apr. 7, 2004) ("This Court disagrees with the Government's interpretation of the Treaty and Convention. The Convention merely added extraditable offenses, it did not in any way constitute a blanket modification of the Treaty which would eliminate the presence in the country requirement.").

Second, Pres. Martinelli acknowledges that the State Department is accorded deference on the interpretation of international treaties. Yet, Pres. Martinelli argues that the supplemental declaration from a State Department official that addresses the Treaty's non-retroactivity provision is only one page in length and cites no authority – legal, factual, or otherwise – for the position that the Treaty can apply retroactively for the surveillance crimes. Instead, the declaration merely surmises that "[t]his provision was intended to preclude extradition in cases where the criminal conduct at issue occurred prior to entry into force of the Treaty in 1905." [D.E. 51-1]. Pres. Martinelli contends that this letter offers nothing of substance from an analytical perspective and, aside from being conclusory, the declaration purports to inform what the parties intended the non-retroactivity provision to mean. Not only is this something that the State Department official cannot do because of a lack of evidence, it is something he may not do under the plain and unambiguous terms of the non-retroactivity provision. *See United States v. Alvarez-Machain*, 504 U.S. 655, 663 (1992) ("In construing a treaty, as in

construing a statute, we first look to its terms to determine its meaning."); *Maximov v. United States,* 373 U.S. 49, 54 (1963) ("[I]t is particularly inappropriate for a court to sanction a deviation from the clear import of a solemn treaty between this Nation and a foreign sovereign, when, as here, there is no indication that application of the words of the treaty according to their obvious meaning effects a result inconsistent with the intent or expectations of its signatories.").

Third, Pres. Martinelli contends that there is nothing ambiguous about the sentence in the 1904 Treaty containing the non-retroactivity provision. The Treaty states it "shall take effect on the thirtieth day after the date of the exchange of ratifications, and shall not operate retroactively." Treaty, Art. XII. This allegedly means two distinct and separate things: (1) that the Treaty will take effect on a certain date, and (2) that the Treaty will not operate retroactively. Pres. Martinelli argues that this undercuts the Government's entire position, which is that the clause preceding the non-retroactivity provision shows that the provisions applies only to offenses committed before 1905, i.e. the Treaty's effective date.

Instead, Pres. Martinelli suggests that the conjunction – *"and"* – links two independent clauses and therefore involves two independent conditions. He also contends that the sentence employs the verb *shall* twice as further evidence that the verb refers back to the subject of the sentence: the Treaty. In other words, Pres. Martinelli argues that the Treaty *shall* be effective on the applicable date and the

Treaty *shall* not operate retroactively.[9]   Pres. Martinelli believes that, under the Government's interpretation, the second "*shall*" would be surplusage, in derogation of basic principles of statutory construction.  *See* Black's Law Dictionary, 1581 (9th ed. 2009) (defining "surplusage" as "[r]edundant words in a statute or legal instrument; language that does not add meaning"); s*ee also Brotherhood of Locomotive Eng'rs & Trainmen Gen. Comm. of Adjustment CSX Transp. N. Lines v. CSX Transp., Inc.*, 522 F.3d 1190, 1195 (11th Cir. 2008) ("[C]ourts must reject statutory interpretations that would render portions of a statute surplusage."); *United States v. Canals-Jimenez*, 943 F.2d 1284, 1287 (11th Cir. 1991) ("A basic premise of statutory construction is that a statute is to be interpreted so that no words shall be discarded as being meaningless, redundant, or mere surplusage."). Because both conditions were incorporated via the Budapest Convention, extradition on the surveillance charges against Pres. Martinelli would run afoul of non-retroactivity clause in the 1904 Treaty.

Pres. Martinelli also argues that if the parties wanted to give the Treaty retroactive effect – like the United States has done in numerous other treaties – they would said so through unambiguous language that accomplished this goal.[10]

---

[9]    Pres. Martinelli also states that the Treaty employs a comma before the conjunction linking the clauses as further evidence that the two are independent.  As such, Pres. Martinelli believes that the comma would serve no discernible purpose apart from emphasizing the separateness of the two clauses.

[10]    *See, e.g.,* Treaty on Extradition Between New Zealand and the United States of America, U.S.-N.Z., Dec. 8, 1970, T.I.A.S. No. 7035 ("This Treaty shall apply to offenses specified in Article II committed before as well as after the date this Treaty enters into force, provided that no extradition shall be granted for an

The parties failed to do so. So Pres. Martinelli urges the Court to deny extradition on the surveillance offenses because that would constitute a retroactive application of the Treaty. *See Fernandez-Morris*, 99 F. Supp. 2d at 1360 ("In order for an extradition to be proper . . . the charges must be included in the treaty as extraditable offenses[.]").

The Government strongly disputes Pres. Martinelli's interpretation of the non-retroactivity provision for several reasons. First, the Government argues that the plain language of the Treaty precludes extradition only for offenses occurring *prior* to its entry into force and that the plain language supports this view: "The present Treaty shall take effect on the thirtieth day after the date of the exchange of ratifications and shall not operate retroactively." Treaty, Art. XII.[11] In other

_____

offense committed before the date this Treaty enters into force which was not an offense under the laws of both countries at the time of its commission."); Treaty on Extradition Between the United States and Paraguay, U.S.-Par., May 7, 1974, T.I.A.S 7838 ("This Treaty shall apply to offenses specified in Article 2 committed before as well as after the date this Treaty enters into force, provided that no extradition shall be granted for an offense committed before the date this Treaty enters into force which was not an offense under the laws of both Contracting Parties at the time of its commission."); Treaty on Extradition Between the United States and Italy, U.S.-Ita., Mar. 11, 1975, T.I.A.S. 8052 ("This Treaty shall apply to offenses mentioned in Article II committed before as well as after the date this Treaty enters into force, provided that no extradition shall be granted for an offense committed before the date this Treaty enters into force which was not an offense under the laws of both Contracting Parties at the time of its commission.").

[11]     Although anti-retroactivity provisions are not a common feature of many modern extradition treaties, the provision at issue here is not unique. *See, e.g.*, Treaty Between the United States and the Kingdom of Denmark for the Extradition of Fugitives from Justice, Art. XII, U.S.-Den., Jan. 6, 1902, 32 Stat. 1906 (applicable in Iceland) ("The present Treaty shall take effect on the thirtieth day after the date of the exchange of ratifications, and shall not operate retroactively."); Treaty Between the United States and Servia for the Mutual

words, the plain language allegedly indicates that the Treaty has effect only *after* the date of the exchange of ratification, May 8, 1905, and does not cover offenses occurring prior to that date. The Government contends that this reading is reinforced by the fact that the next sentence relates *again* to the year 1905: "The ratifications of the present Treaty shall be exchanged at Washington or at Panama as soon as possible, and it shall remain in force for a period of six months after either of the contracting Governments shall have given notice of a purpose to terminate it." *Id.* So the Government concludes that the Budapest Convention preserves the entire condition in Article XII, which is that the Treaty may not be applied to offenses occurring before May 8, 1905.

The Government also suggests that Pres. Martinelli's reading of the non-retroactivity provision is not supported by the text. The Government argues that the comma separating the two clauses in the first sentence of Article XII – which does not appear in the equally valid Spanish version of the Treaty – merely sets apart the string of prepositional phrases in the first clause from the second clause.[12] The dependence of the second clause of the first sentence in Article XII ("shall not operate retroactively") upon the first clause is apparently evident from the fact that it lacks a subject, and thus does not make sense standing alone. *See Hamilton v.*

---

Extradition of Fugitives from Justice, Art. XI, U.S.-Yugo., Oct. 25, 1901, 32 Stat. 1890 ("The present Treaty shall take effect on the thirtieth day after the date of the exchange of ratifications and shall not act retroactively.").

[12]     In Spanish, Article XII of the Treaty reads: "El presente Tratado empezará a regir el trigésimo día después de la fecha en que se hayan canjeado las ratificaciones y no tendrá efecto retroactivo." App'x to Declaration of Susan R. Benda [D.E. 8].

*Werner Co.*, 268 F. Supp. 2d 1085, 1088 (S.D. Iowa 2003) ("An independent clause is one that contains a subject and a predicate and makes sense standing alone, that is, it expresses a complete thought."); *In re Swetic*, 493 B.R. 635, 639 (Bankr. M.D. Fla. 2013) (finding that a clause following the conjunction "and" was "not an independent clause" because it did "not have a subject, and it [did] not make sense on its own").

Under this interpretation, the first clause of the sentence ("[t]he present Treaty shall take effect on the thirtieth day after the date of the exchange of ratifications") is independent (i.e. the controlling clause) and is merely complemented by the second clause. *See In re Rowe*, 750 F.3d 392, 396 (4th Cir. 2014) ("[T]he most natural reading of [a provision containing "shall"] is that the independent clause states a mandatory rule, while the dependent clause states when that rule applies.") (quotation omitted). Therefore, the most natural reading, in the Government's view, is that the second clause prohibits a retroactive application of the Treaty with respect to the timeframe identified in the clause preceding it. *See Freeman v. Brown Bros. Harriman & Co.*, 250 F. Supp. 32, 34 (S.D.N.Y.), *aff'd*, 357 F.2d 741 (2d Cir. 1966) ("In construing a statute, a particular expression should not be detached from its context so as to give it a special meaning.").

The Government also takes issue with Pres. Martinelli's reliance on the Second Circuit's decision in *Galanis v. Pallanck*, 568 F.2d at 234. The Government argues that *Galanis* did not involve the supplementation of an extradition treaty by

a multilateral convention, as is the case here.  Rather, the Second Circuit allegedly only considered whether a fugitive, whose extradition had been requested in 1974 pursuant to an 1842 extradition treaty between the United States and Canada, could take advantage of a double-jeopardy defense added to the bilateral extradition effective in 1976.  *See id.* at 237. The latter treaty provided that it "terminate[d] and replace[d] any extradition agreements . . . in force between the United States and Canada; except that the crimes listed in such agreements and committed prior to the entry into force of this Treaty shall be subject to extradition pursuant to the provisions of such agreements."  *Id.*  The Government suggests that the Second Circuit held that, despite this language, "the double jeopardy clause of the [1976] treaty applies in all proceedings begun after the exchange of ratifications even though the crime occurred before."  *Id.* at 239.  In so holding, the Second Circuit purportedly rejected the contrary view of the U.S. Department of State in light of the fact that "it would seem reasonable to conclude that [the drafters of the 1976 treaty] . . . wished this and other improvements implemented by the 1976 treaty to become operative as soon as the treaty became effective."  *Id.*

By contrast, the Government believes that in this case there is no similar reason why it would be reasonable to reject the view of the State Department, particularly where this view is shared by Panama and is supported by the parties' past practices.[13]

---

[13]     The Government maintains that Pres. Martinelli's reliance on *Galanis* is also somewhat misleading because he claims that the Second Circuit "consider[ed] nearly identical language" to the language at issue here and "found

39

In any event, the Government believes that there is strong support to find that the supplemental addition of surveillance crimes had no effect on the Treaty's non-retroactivity provision because that provision simply discusses how the Treaty shall "operate." Treaty, Art. XII. The non-retroactivity provision is also allegedly not a "condition" of extradition,[14] but even if it was, the Government believes it would be of no help to Pres. Martinelli because it remains tied to the date of the original Treaty. *See* Budapest Convention, Art. 24(5) ("Extradition shall be subject to the conditions provided for by the law of the requested Party or by applicable

that [a] statement that '[t]he Treaty is not retroactive in effect' meant, at a *minimum*, that 'the enlargement in the list of extraditable crimes would not subject to extradition persons who had committed such crimes prior to the effective date of the new treaty.'" [D.E. 58, at 4 (emphasis in original) (quoting *Galanis*, 568 F.2d at 239).] The Government argues that the language in *Galanis* regarding the non-retroactive effect of the treaty did not appear in the treaty itself, but rather in a letter from the Acting Secretary of State when he submitted the treaty to the president. Plus the Second Circuit found the statement "altogether inconclusive" and speculated as to "what [the statement] could mean." *Galanis*, 568 F.2d at 239. As such, *Galanis* allegedly has no application here. Similarly, the Government also argues that Pres. Martinelli's reliance on *In re Extradition of Aguilar* is misplaced because the court in that case found that the relevant convention "merely added extraditable offenses," but "did not in any way constitute a blanket modification of the Treaty." *See* 2004 WL 763802, at *3. Along those same lines, the Government suggests that Budapest Convention did not amend the non-retroactivity provision; rather, the operative date for anti-retroactivity, "the thirtieth day after the date of the exchange of ratifications," remains fixed. Therefore, following Panama's accession to the Budapest Convention well after that date, Panama could supposedly request extradition for the crimes enumerated therein, irrespective of when those crimes were alleged to have occurred.

[14] The examples of conditions described in the Explanatory Report to the Budapest Convention are where the treaty provides "that extradition shall be refused if the offence is considered political in nature, or if the request is considered to have been made for the purpose of prosecuting or punishing a person on account of, *inter alia*, race, religion, nationality or political opinion." Council of Eur., Explanatory Report to the Convention on Cybercrime, ¶ 250 (Nov. 23, 2001), *available at* https://rm.coe.int/16800cce5b.

extradition treaties, including the grounds on which the requested Party may refuse extradition.").  And to the extent the non-retroactivity provision may be construed as a "restriction[,]" the Government argues that the relevant text is still tied exclusively to the date of ratification.  *See id.* Art. 39(3) ("Nothing in this Convention shall affect other rights, restrictions, obligations and responsibilities of a Party.").  In sum, the Government contends that (1) the Budapest Convention merely supplemented the list of extraditable offenses set forth in the Treaty as of the date of Panama's accession, and that (2) the Convention is not being applied retroactively because the non-retroactivity language only applies to crimes committed before 1905.

Second, the Government argues that the Court should defer to the view of the State Department – which Panama concurs – that the non-retroactivity provision does not prevent extradition in this case.  The State Department unequivocally views the Treaty's non-retroactivity provision as precluding extradition only in cases where the criminal conduct at issue occurred *prior* to the entry into force of the Treaty in 1905.  [D.E. 51-1].  The State Department claims "that the criminal conduct in this case alleged to constitute interception of private telecommunications without judicial authority and tracking, persecution, and surveillance without judicial authority under Panamanian law, which occurred prior to Panama's accession to the [Budapest Convention], but well after the entry into force of the [Treaty], is extraditable under the terms of the Treaty."  Declaration of Tom Heinemann (Aug. 18, 2017), Exh. A, ¶ 2.  And although Panama's accession to the

Budapest Convention on July 1, 2014, was significant in that it allowed Panama to request and grant extradition for crimes such as wiretapping offenses as of that date, the Government suggests that the date is irrelevant to the issue of non-retroactivity. *See id.*

In light of the State Department's view on the non-retroactivity provision in the Treaty, the Government urges the Court to defer to this interpretation because "[i]t is well settled that the Executive Branch's interpretation of a treaty is entitled to great weight." *Abbott v. Abbott*, 560 U.S. 1, 15 (2010) (citation and internal quotation marks omitted); *see, e.g., Duarte- Acero*, 296 F.3d at 1282 ("[T]he State Department's interpretation of a treaty is entitled to great deference."); *Demjanjuk v. Petrovsky*, 776 F.2d 571, 579 (6th Cir. 1985) (deferring to Department of State's view that the offense for which the fugitive's extradition had been requested constituted "murder," which was listed as an extraditable offense in the U.S.-Israel extradition treaty), *vacated on other grounds*, 10 F.3d 338 (6th Cir. 1993); *Heilbronn v. Kendall*, 775 F. Supp. 1020, 1023-24 (W.D. Mich. 1991) (deferring to Department of State's view that the offense for which the fugitive's extradition had been requested constituted "bribery," which was listed as an extraditable offense in the U.S.-Israel extradition treaty).

Furthermore, the State Department's interpretation is purportedly consistent with the practice adopted by the United States and Panama in recent extraditions involving alleged offenses pre-dating the entry into force of multilateral conventions. For example, the United States has previously submitted, and

Panama previously granted, an extradition request relying on the UNCAC for a defendant charged with bribery and money laundering offenses allegedly committed prior to when the United States and Panama became parties to that Convention. Declaration of Tom Heinemann (Aug. 18, 2017), Exh. A, ¶ 6. Similarly, the United States submitted an extradition request, which Panama granted, relying on the United Nations Convention Against Illicit Traffic in Narcotic Drugs and Psychotropic Substances, for a defendant charged with drug trafficking offenses alleged committed prior to when Panama became a party to that Convention. *See id.* The United States has apparently followed the same practice with other countries with which it has a treaty containing anti-retroactivity language identical to that at issue here. *See id.* ¶ 7 (discussing two separate cases in which the United States granted extradition requests submitted by Bosnia- Herzegovina for fugitives charged with war crimes, relying on the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, to which the United States became a party after the alleged crimes occurred).

Though the Government believes that the view of the State Department is alone sufficient to end the inquiry into meaning of the non-retroactivity provision, deference to that view is allegedly warranted even more where Panama's Ministry of Foreign Affairs concurs with that view. *See Kolovrat v. Oregon*, 366 U.S. 187, 194 (1961) (noting that "[w]hile courts interpret treaties for themselves, the meaning given them by the departments of government particularly charged with their negotiation and enforcement is given great weight," and referring to the views of the

"responsible agencies of the United States and of Yugoslavia"); *cf. In re the Extradition of Arias Leiva*, 2017 WL 486942, at *6 (S.D. Fla. Feb. 6, 2017) (finding that the U.S.-Colombia extradition is in full force and effect because "the executive branches of the United States and Colombia have stated that it is the understanding of both sovereigns that the Extradition Treaty is currently in effect").[15]

The Government's final argument is that, even if the non-retroactivity provision was ambiguous, the Court should follow the general cannon of extradition law requiring that extradition treaties be construed liberally in favor of extradition. *See Factor*, 290 U.S. at 293-94 (1933); *Martinez*, 828 F.3d at 463. Pres. Martinelli's only alleged response is that the canon should not be applied here because there is no ambiguity in the provision. [D.E. 58, at 7-8]. But, the Government contends that Pres. Martinelli has no support for this argument. As such, Pres. Martinelli's contentions are meritless; hence, the Court should construe the Treaty in favor of finding the surveillance offenses extraditable.

As an initial matter, "[t]he interpretation of a treaty, like the interpretation of a statute, begins with its text." *Medellín v. Texas*, 552 U.S. 491, 506 (2008). Here, the relevant text provides that "[t]he present Treaty shall take effect on the

---

[15]    Panama's official stance is that the anti-retroactivity provision "establishes that the 1904 Treaty will not operate—by creating any treaty rights or obligations—before its entry into effect on . . . 8 May 1905," thus "exclud[ing] crimes committed before that date from the 1904 Treaty's scope." Declaration of Panama's Ministry of Foreign Affairs – Directorate General of Legal Affairs and Treaties, Exh. A, ¶ 3. Furthermore, in Panama's view, from the "date [of its accession to the Budapest Convention] forward, Panama had a right under the 1904 Treaty, or any other extradition treaty, to submit a request for extradition in respect of those offenses." *Id.* ¶ 5.

thirtieth day after the date of the exchange of ratifications and shall not operate retroactively."  Treaty, Art. XII.  Given the structure of this sentence, the parties disagree on whether the sentence contains (1) two independent clauses, or (2) an independent clause and a dependent clause.  The reason why this is important is that the Government suggests that the sentence can only be read as one condition, or restriction, tied together between an independent and dependent clause.  In other words, the non-retroactivity language is tethered to the ratification date of the Treaty in 1905.

On the other hand, Pres. Martinelli construes the sentence as two independent clauses that contain two separate conditions.  If Pres. Martinelli is correct, that means that the latter condition – that the Treaty is non-retroactive – stands on its own, has no limitation to the year 1905, applies to the crimes incorporated via the Budapest Convention, and bars the Government from pursuing his extradition for offenses that occurred prior to July 1, 2014.

While both parties have certainly presented reasonable interpretations of the meaning of this sentence, we agree with the Government that the relevant text contains both an independent clause ("[t]he present Treaty shall take effect on the thirtieth day after the date of the exchange of ratifications") and a dependent clause ("shall not operate retroactively").  We reach this conclusion because the latter part of the sentence is dependent on the first and lacks a subject.  In other words, the latter part only contains a predicate and, without more, makes little sense on its own.  *See Hamilton*, 268 F. Supp. 2d at 1088 ("An independent clause is one that

contains a subject and a predicate and makes sense standing alone, that is, it expresses a complete thought."). This means that the likeliest interpretation of the relevant text, when juxtaposed with the language in the Budapest Convention, is that the non-retroactivity provision is linked to the date the original Treaty took effect (i.e. 1905) as one overarching condition or restriction and that no crime committed before 1905 may be considered extraditable.

A second point of inquiry is whether the non-retroactivity provision is ultimately a condition or a restriction. According to the Budapest Convention, "[e]xtradition shall be subject to the *conditions* provided for by the law of the requested party or by applicable extradition treaties," but "[n]othing in this Convention shall affect the other rights, *restrictions*, obligations and responsibilities of a Party." Budapest Convention, Arts. 24(5) & 39(3) (emphasis added). Given the parties' disagreement on the structural components of the non-retroactivity provision, the relevant text can arguably be construed as a condition or a restriction. For example, assuming that Pres. Martinelli is correct as to the presence of two independent clauses, there would be two conditions, one of which includes a standalone condition of non-retroactivity. Yet, if the Government's interpretation is correct, then the relevant text is actually a single restriction because it limits the applicability of the non-retroactivity provision to the date in which the Treaty was ratified in 1905. Hence, the structural breakdown of the sentence is crucial because under one interpretation, it leads to a condition that can

be enforced via the Budapest Convention. On the other hand, it otherwise leads to a restriction that applies solely to the 1904 Treaty.

As stated earlier, we find, based on the structural breakdown of the relevant text, that there is a both an independent clause and a dependent clause that applies the non-retroactivity language exclusively to the year 1905. The relevant text operates as a single restriction, rather than as two separate conditions, which restriction limits the non-retroactivity provision to the year 1905. That is so because, as a restriction, the Budapest Convention makes clear that "[n]othing in this Convention shall affect other rights, *restrictions*, obligations and responsibilities of a Party." Budapest Convention, Art. 39(3) (emphasis added). Under this interpretation, the non-retroactivity language, that is limited to 1905, remains unchanged when incorporated into the Budapest Convention and does not bar the Government from pursuing surveillance charges against Pres. Martinelli. The Government's arguments on this matter are more persuasive.

In any event, a conclusive determination on whether the relevant text constitutes a condition or a restriction – or for that matter two independent clauses as opposed to an independent clause and a dependent clause – is not absolutely essential to whether the surveillance crimes are incorporated into the Treaty. The reason why is that the U.S. Supreme Court adopted a principle long ago that "if a treaty fairly admits of two constructions, one restricting the rights which may be claimed under it, and the other enlarging it, the more liberal construction is to be preferred." *Factor*, 290 U.S. at 294 (citations omitted). The reason for adhering to

this principle stems from the purpose of an extradition treaty, which is to ultimately facilitate extradition. As such, *Factor* requires courts to "interpret extradition treaties to produce reciprocity between, and expanded rights on behalf of, the signatories." *In re Extradition of Howard*, 996 F.2d 1320, 1330–31 (1st Cir. 1993).

Because Pres. Martinelli's construction, *at best*, raises an ambiguity on the applicability of the non-retroactivity provision, it is not enough to conclude that his interpretation ultimately prevails and bars his extradition. *See, e.g., Martinez*, 828 F.3d at 463 ("In the face of one reading of 'lapse of time' that excludes the speedy-trial right and another reading that embraces it, *Factor* says we must prefer the former."). Therefore, we hold that the alleged surveillance crimes are incorporated into the Treaty and that the non-retroactivity provision does not bar the Government from seeking Pres. Martinelli's extradition.[16]

### E. Probable Cause Exists for Each Extraditable Charge

The Court must now determine whether the evidence in the extradition record is sufficient to sustain the charges filed in Panama. If there is insufficient evidence of probable cause, then the statutory requirements have not been met and Panama's allegations "are nothing more than suspicions, and the request must be

---

[16] The State Department and Panama both agree with our interpretation on the non-retroactivity clause, and while their views are not conclusive, they are given great weight and considerable deference. *See Kolovrat*, 366 U.S. at 194 (noting that "[w]hile courts interpret treaties for themselves, the meaning given them by the departments of government particularly charged with their negotiation and enforcement is given great weight," and referring to the views of the "responsible agencies of the United States and of Yugoslavia"); *In re the Extradition of Arias Leiva*, 2017 WL 486942, at *6 (finding that the U.S.-Colombia extradition is in full force and effect because "the executive branches of the United States and Colombia have stated that it is the understanding of both sovereigns that the Extradition Treaty is currently in effect").

denied." *Fernandez-Morris*, 99 F. Supp. 2d at 1366. "The purpose [of the extradition hearing] is to inquire into the presence of probable cause to believe that there has been a violation of one or more of the criminal laws of the extraditing country, that the alleged conduct, if committed in the United States, would have been a violation of our criminal law, and that the extradited individual is the one sought by the foreign nation for trial on the charge of violation of its criminal laws." *Peroff v. Hylton,* 542 F.2d 1247, 1249 (4th Cir. 1976).

Probable cause is a standard defined by federal law, *Sindona v. Grant,* 619 F.2d 167 (2d Cir. 1980), and is established when a "prudent man" believes that the suspect has committed or was committing an offense. *See Gerstein v. Pugh*, 420 U.S. 103, 111 (1975); *Collins*, 259 U.S. at 316 ("The function of the committing magistrate is to determine whether there is competent evidence to justify holding the accused to await trial, and not to determine whether the evidence is sufficient to justify a conviction.") (citations omitted); *Fernandez v. Phillips*, 268 U.S. 311, 312 (1925) ("Competent evidence to establish reasonable grounds is not necessarily evidence competent to convict.").

The probable cause determination is not a finding of fact "in the sense that the court has weighed the evidence and resolved disputed factual issues," *Caplan v. Vokes*, 649 F.2d 1336, 1342 (9th Cir. 1981) (citing *Heiniger v. City of Phoenix*, 625 F.2d 842, 843 (9th Cir. 1980)). Instead, probable cause "serve[s] only the narrow function of indicating those items of submitted evidence on which the decision to certify extradition is based." *Caplan*, 649 F.2d at 1342 n.10. Thus, it requires

"only a probability or substantial chance of criminal activity," *Illinois v. Gates,* 462 U.S. 213, 243 n.13 (1983), or, in other words, "the existence of a reasonable ground to believe the accused guilty'" of the crime charged. *Escobedo v. United States,* 623 F.2d 1098, 1102 (5th Cir. 1980) (quoting *Garcia–Guillern v. United States,* 450 F.2d 1189, 1192 (5th Cir. 1971)). And although probable cause is not necessarily a difficult standard to meet, "[c]onclusory statements do not satisfy the probable cause standard." *In re Lehming,* 951 F. Supp. 505, 517 (D. Del. 1996) (failing to find probable cause where the report relied upon by the government did not personally implicate the relator in the transaction thus leaving that court to speculate as to the nature of his involvement).

In making a probable cause determination, an extraditee cannot merely allege that the evidence submitted by the requesting country contains inconsistencies. *See, e.g.*, *Matter of Extradition of Shaw*, 2015 WL 3442022, at *7 (S.D. Fla. May 28, 2015) (finding probable cause despite extradite arguing that the evidence presented was "unreliable, contradictory, inconsistent, unbelievable, and inadmissible"); *Matter of Extradition of Figueroa*, 2013 WL 3243096, at *8 (N.D. Ill. June 26, 2013) ("In sum, although we agree with [the extraditee] that the evidence that Mexico has provided is by no means perfect, the issue before us is not whether [he] should be convicted of the crime. . . . Although there may be some inconsistencies in the record, we do not believe that these are so compelling as to negate a finding of probable cause."); *Castro Bobadilla*, 826 F. Supp. at 1433-34

(upholding probable cause finding despite "contradictions in the evidence [that] may create a reasonable doubt as to [the fugitive's] guilt").

Rather, an extraditee must negate or completely obliterate the requesting country's showing of probable cause. As Judge Hoeveler stated nearly thirty-years ago, an extraditee cannot avoid extradition simply by contradicting the requesting country's case or its witnesses:

> In order to 'negate' Hong Kong's showing of probable cause, Petitioner must discredit the testimony relied upon by Hong Kong to the extent that this Court can find that there is not 'any evidence warranting the finding that there was reasonable ground to believe the accused guilty.' Although some doubt as to the credibility of Chan Kam Chuen's version of what actually transpired is cast by the fact that his testimony was provided while he was in prison awaiting sentencing for the very crime in which he was implicating Petitioner, the appropriate acid test for his testimony must take place at a trial on the merits, not on motion for writ of habeas corpus.

*Cheng Na-Yuet*, 734 F. Supp. at 996 (internal citation omitted). As one might expect, "[t]his is a very difficult standard to meet," *Shaw*, 2015 WL 3442022, at *9, especially where "[t]he primary source of evidence for the probable cause determination is the extradition request, and any evidence submitted in it is deemed truthful for purposes of this determination." *Matter of Extradition of Atta*, 706 F. Supp. 1032, 1051 (E.D.N.Y. 1989) (citing *Collins,* 259 U.S. at 315-16).

Because an extradition hearing is only preliminary in nature and not a determination of guilt or innocence, the resolution of any inconsistencies in the record is of no consequence as long as sufficient evidence of probable cause remains. *See Matter of Extradition of Rodriguez Ortiz*, 444 F. Supp. 2d 876, 891-93 (N.D. Ill. 2006) (holding that the issue of inconsistencies in witness statements are "properly

reserved for the eventual trial in Mexico"). Therefore, we must exercise our independent judgment, as required under federal law, to determine the propriety of Pres. Martinelli's extradition.

### 1. The Arrest Warrant and Panamanian Procedures

Pres. Martinelli first feverishly raises several procedural challenges to the Government's evidence of probable cause. He points to an allegedly defective arrest warrant under Panamanian law, as well as other failures by Panamanian officials tasked with this investigation. First, they failed to comply with a mandatory procedure in this case – *imputación* – which failure precludes the Panamanian courts from exercising jurisdiction to issue a valid indictment or arrest warrant. More specifically, Pres. Martinelli argues that the Treaty requires that the country seeking extradition produce "a duly authenticated copy of the warrant of arrest in the country where the crimes has been committed[.]" Treaty at Art. III. Article 481 of the Panamanian Penal Code provides that special procedures include "the common and ordinary proceedings," and that it is only after *imputación* occurs that a fundamental and mandatory investigation phase may begin. And Pres. Martinelli also argues that it is not until after the conclusion of the investigation phase that a prosecutor can issue an indictment. Thus, Pres. Martinelli contends that Díaz – who claims that *imputación* is not required in this case – has continually misled the Court on Panamanian law.[17]

---

[17] According to Díaz, *imputación* is only required by the general procedures in a criminal action. Because this case is governed by special

Second, Pres. Martinelli argues that Eleventh Circuit precedent requires a foreign country seeking extradition to produce an arrest warrant that refers to at least *one* extraditable offense. *See Hill v. United States*, 737 F.2d 950, 951 (11th Cir. 1984) ("The warrant *may* specify all the charges if the requesting country so chooses, but it *need* refer to only one.") (emphasis in original). Because the arrest warrant in this case does not do so, and instead focuses on his "contempt" in failing to appear, Pres. Martinelli believes it is insufficient on its face to support his extradition.

Third, Pres. Martinelli takes issue with the Government's reliance on an opinion from the State Department that claims that the Treaty "does not require the warrant of arrest to list the charges for which extradition is sought." [D.E. 22-1]. Pres. Martinelli argues that the State Department official cited no legal support for his opinion and, while the State Department is entitled to some deference on the interpretation of the Treaty between Panama and the United States, this deference cannot overcome binding Eleventh Circuit precedent.

As a broad overview, the Government's response is that Pres. Martinelli's arguments lack merit because: (1) they improperly challenge Panama's assertion that it had jurisdiction to issue the warrant, and any arguments to the contrary based on the lack of an *imputación* are properly decided by a Panamanian court; (2) they are not factually viable, as the warrant refers to the four charges pending against Martinelli Berrocal by reference to the number of the criminal case pending

procedures, Díaz attests in his supporting affidavits that *imputación* is not required to charge Pres. Martinelli.

against him; (3) they would improperly require the Court to second-guess Panama's conclusion that under its legal system, the warrant serves as the mechanism to arrest Martinelli Berrocal on the charges against him; (4) they would improperly require the Court to read an additional requirement into the Treaty beyond what the state parties agreed to, *see* Treaty, Art. III, (requiring only that warrant be "duly authenticated"); (5) they would be contrary to the parties' intent to provide for mutual extradition, as it would impose a requirement at odds with Panama's usual legal process; (6) they would be contrary to the canon of extradition law requiring that ambiguities in the Treaty must be resolved in favor of extradition; and (7) they would be contrary to the view of the Department of State – which is entitled to great weight – that the Treaty's warrant requirement has been satisfied in this case. [D.E. 22, at 4-11].

In sum, the Government's primary contention is that the Court should defer to the view of Panama in interpreting its own laws. That position stands on very firm footing. *See, e.g.*, *Basic v. Steck*, 819 F.3d 897, 901 (6th Cir. 2016) (concluding that "[w]e will not second guess th[e] determination" by the Government of Bosnia that a "[d]irective to find and arrest" the fugitive constituted the "arrest warrant" required under the applicable extradition treaty); *Skaftouros v. United States*, 667 F.3d 144, 160 n.20 (2d Cir. 2011) (noting that "we defer to the Greek courts, which may consider whether [the fugitive] or the Greek prosecutors have the better of the argument" regarding whether the warrant underlying the extradition request was valid under Greek law); *Matter of Extradition of Jimenez*, 2014 WL 7239941, at

*1-2 (D. Md. Dec. 16, 2014) (noting that the court would not "question the reliability or trustworthiness of a judicial decree from a foreign nation" which stated that the fugitive's sentence had not lapsed, despite the fugitive's claim to the contrary); *Matter of Extradition of Robertson*, 2012 WL 5199152, at *7-12 (E.D. Cal. Oct. 19, 2012) (declining to examine Canadian law and Canada's representation that a "long term supervision order" forms part of the fugitive's sentence and is not separate therefrom); *Matter of Extradition of Basic*, 2012 WL 3067466, at *19 (E.D. Ky. July 27, 2012) ("declin[ing] to weigh the extent of [Bosnia's] procedural compliance with its own laws" because "[t]his court is ill-equipped to parse Bosnian or Republika Srpska practice for the fine technical points on the topic of warrant issuance").

As a result, we agree with the Government that it is not the role of U.S. judges presiding over extradition proceedings to opine on, or worse challenge, a foreign government's interpretation of its own law. *See, e.g.*, *Grin v. Shine*, 187 U.S. 181, 190 (1902) ("[I]t can hardly be expected of us that we should become conversant with the criminal laws of Russia, or with the forms of warrants of arrest used for the apprehension of criminals."); *Matter of Extradition of Mathison*, 974 F. Supp. 2d 1296, 1310 (D. Or. 2013) ("An American extradition court is neither equipped nor empowered to interpret and apply the Mexican constitution or to determine was rights it bestows upon the individuals charged with violating Mexican laws"); *Skaftouros*, 667 F.3d at 156 ("Any arguments regarding the demanding country's compliance with its own laws . . . are properly reserved for the courts of that country.").

The governing principle here is that there are important policy considerations – international comity and respect for a foreign nation's sovereignty – that protect a foreign government from being forced to prove that it is properly construing its own laws. *See, e.g.*, *Sainez v. Venables*, 588 F.3d 713, 717 (9th Cir. 2009) ("[W]e have declined to rule on the procedural requirements of foreign law out of respect for other nations' sovereignty . . . ."); *Koskotas*, 931 F.2d at 174 ("Extradition proceedings are grounded in principles of international comity, which would be ill- served by requiring foreign governments to submit their purposes and procedures to the scrutiny of United States courts."); *In re Application for an Order for Judicial Assistance in a Foreign Proceeding in the Labor Court of Brazil*, 466 F. Supp. 2d 1020, 1028 (N.D. Ill. 2006) ("American courts should treat foreign law the way American courts want foreign courts to treat American law: avoid determining foreign law whenever possible.").

Adhering to these principles avoids the risk that a U.S. Court might erroneously interpret the law of a foreign country. *See Sainez*, 588 F.3d at 717 ("[W]e recognize the chance of erroneous interpretation is much greater when we try to construe the law of a country whose legal system is not based on common law principles.") (internal quotation marks and citation omitted); *Matter of Assarsson*, 635 F.2d 1237, 1244 (7th Cir. 1980) ("We often have difficulty discerning the laws of neighboring States, which operate under the same legal system as we do; the chance of error is much greater when we try to construe the law of a country whose legal system is much different from our own. The

possibility of error warns us to be even more cautious of expanding judicial power over extradition matters.").

In response to Pres. Martinelli's specific argument that Panama has failed to produce a valid arrest warrant in this case, the Government contends that this argument has been proffered several times and still has no merit. The Government reiterates that, in the time that Pres. Martinelli has been detained pending his extradition, further confirmation has been obtained that the Panamanian warrant is valid in all respects. In fact, Panama has unequivocally stated that the arrest warrant "complies with all legal requirements." Supp. Aff. of Harry Díaz ¶55. And the Government also states that a copy of the accusations against Pres. Martinelli was provided to his defense counsel on November 16, 2015, and a hearing on the charges was set for December 11, 2015. *See id.* ¶52. When Pres. Martinelli failed to appear for that hearing, the Government claims that an arrest warrant was properly issued pursuant to Article 158 of Panama's Code of Criminal Procedure, which provides that when a defendant fails to appear when summoned, he "shall be declared in contempt and his provisional detention shall be ordered." *Id.* As such, the Government believes that the arrest warrant in this case does not need to enumerate the specific charges against Pres. Martinelli, particularly because Panama has repeatedly asserted that the warrant is proper and that this Court should not find otherwise.[18]

---

[18]    Panama previously explained that its warrant serves as "the basis for detaining [Pres. Martinelli] on . . . the charges for which his extradition was requested" and comports with Panamanian criminal procedure law. [D.E. 22-1].

The Government also disputes Pres. Martinelli's suggestion that it failed to follow the proper process by foregoing the *imputación* phase of the investigation. The Government argues that Panama has clarified that an *imputación* is required in general prosecutions[19] (of anyone subject to Panama's jurisdiction), but not in matters of special prosecutions (of people holding special positions of authority such as Parlacen Deputies). [D.E. 22-2]; *see also* Supp. Aff. of Harry Díaz ¶¶43-45. For special prosecutions, such as the extradition of Pres. Martinelli, instead of an *imputación*, a defendant is allegedly provided notice of the charges against him through a detailed written complaint describing, *inter alia*, the acts underlying the crimes of which he is accused and the evidence proving those acts. Thus, the Government argues that no *imputación* was required in this case. And in any event, the Government points out that Panama has affirmed that Pres. Martinelli "has been allowed to exercise fully the guarantees and rights recognized in the Law, the Constitution, and the International Treaties and Conventions, which have been signed by the Republic of Panama, . . . and has been guaranteed the right to know the crimes of which he is being accused and the evidence that support these

---

Moreover, the U.S. Department of State has expressed its view that the warrant requirement of the Treaty has been satisfied—a view to which this Court allegedly should defer. *See id*; Declaration of Tom Heinemann, Assistant Legal Adviser for Law Enforcement and Intelligence in the Office of the Legal Adviser, Department of State (June 20, 2017). [D.E. 22-1].

[19] Panama contends that in a general proceeding, an investigation may be initiated merely upon the filing of a report of a crime with the police or prosecution office, without any specific evidentiary showing. Aff. of Jerónimo Emilio Meíja Edward, [D.E. 22-2, at 6-7]. By contrast, in a special proceeding, an investigation may only be initiated by filing a complaint that demonstrates "*prueba idónea*," which is the equivalent to probable cause.

allegations." Supp. Aff. of Harry Díaz ¶51. Therefore, the Government strongly urges the Court to defer to Panama's analysis on the process of *imputación*.

The Government further contends that we should similarly defer to Panama with respect to its assertion that it may properly rely on the affidavit provided by Pitti, despite Pres. Martinelli's suggestion to the contrary. The affidavit has not yet been incorporated into the records of Panama's investigation allegedly because the proceedings were suspended after Pres. Martinelli failed to appear when summoned in the case. *See* Supp. Aff. of Harry Díaz ¶42. But, according to Panama, once the proceedings are reopened, Article 385 of its Criminal Procedure Code will permit the prosecution to introduce the affidavit into the record at that time. *See id*. Accordingly, the Government believes that the fact that the affidavit is not currently part of the record in Panama does not necessarily prevent it from later being used in the prosecution against Pres. Martinelli.

And finally, contrary to Pres. Martinelli's assertions, the Government contends that the Eleventh Circuit did not hold in *United States v. Hill*, 737 F.2d 950, 952 (11th Cir. 1984), that an extradition treaty's requirement must refer to at least one extraditable offense. In *Hill*, the Eleventh Circuit purportedly considered (and found sufficient under the U.S.-Canada extradition treaty) a warrant that referred to one of the multiple offenses for which a fugitive's extradition had been requested. *See id*. The Eleventh Circuit allegedly held that there is no "implicit requirement [in the applicable treaty] of a warrant containing

all the extraditable charges." *Id.* Then, in the following sentence, the Government points out that the Eleventh Circuit noted that the "warrant may specify all the charges if the requesting country so chooses, but it need refer to only one." *Id.*

The Government believes it is clear that the Eleventh Circuit's holding was limited to the conclusion that a warrant reciting one charge satisfies a treaty's warrant requirement. *Id.* And because the court was supposedly not confronted with the issue of whether a warrant that did not expressly list any charges would also be sufficient to satisfy the warrant requirement, its statement that a warrant "need refer to only one" is purportedly *dictum. See Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 557 (2001) ("Judicial decisions do not stand as binding 'precedent' for points that were not raised, not argued, and hence not analyzed.") (Scalia, dissenting) (collecting cases). The Eleventh Circuit apparently engaged in no analysis regarding the inclusion of one offense, and only decided whether the inclusion of one offense was sufficient – not whether it was necessary – to satisfy the treaty requirement.

After full consideration of the arguments presented in connection with the Panamanian arrest warrant and the process of *imputación*, we find Pres. Martinelli's contentions to be unpersuasive. First, while it is true that the arrest warrant in this case refers only to the offense of "contempt" on the face of the warrant, the associated evidence (i.e. the affidavits and the reference to the criminal case number) makes clear that there are four charges pending against

Pres. Martinelli.  And it is equally clear that the four charges are included as an extraditable offense to satisfy the Eleventh Circuit's requirement that at least one charge from the requesting country be extraditable.  *See Hill*, 737 F.2d at 951 ("The warrant *may* specify all the charges if the requesting country so chooses, but it *need* refer to only one.") (emphasis in original).

Specifically, the Treaty provides that the signatories shall grant extradition for "[e]mbezzlement by public officers; embezzlement by persons hired or salaried, to the detriment of their employers; where in either class of cases the embezzlement exceeds the sum of two hundred dollars; larceny."  Treaty at Art. II; [D.E. 12-1 at 4].  The Treaty also states that "if the fugitive is merely charged with a crime, a duly authenticated copy of the warrant of arrest in the country where the crime has been committed, and of the depositions or other evidence upon which such warrant was issued, shall be produced."  Treaty at Art. III; [D.E. 12-1 at 5].

Although Pres. Martinelli wishes to impose upon the Government a far more restrictive standard that requires that a U.S.-style arrest warrant expressly identify the extraditable charges, we find no authority that supports that view. The U.S. Supreme Court explained nearly eighty years ago that "a narrow and restricted construction is to be avoided" when interpreting treaties, *Factor*, 290 U.S. at 293.  And requests for extradition, even in a form that may be technically faulty under our own procedures, should be honored in good faith whenever possible. *Glucksman,* 221 U.S. at 512; *Fernandez,* 268 U.S. at 312. We see no

reason why the arrest warrant in this case should be construed so narrowly to require Panama to specifically include on its face an extraditable charge when the warrant, as a whole, makes it clear the grounds for Pres. Martinelli's extradition. Accordingly, because extradition treaties should be "interpreted with a view to fulfil our just obligations to other powers[,]" *Grin*, 187 U.S. at 184, we hold that the arrest warrant in this case is valid, satisfies the plain language of the Treaty, and comports with Eleventh Circuit precedent. *See also Fernandez,* 268 U.S. at 312 ("Form is not to be insisted upon beyond the requirements of safety and justice."); *McElvy v. Civiletti*, 523 F. Supp. 42, 48 (S.D. Fla. 1981) (finding that courts should "approach challenges to extradition with a view towards finding the offenses within the treaty").

Second, the State Department and Panama are in agreement that the arrest warrant is valid in this case and that the process of *imputación* was not required to extradite Pres. Martinelli. In its extradition request, Panama provided an overview of the process applicable to its prosecution of Pres. Martinelli. And Panama also explained that, under its law, different procedures apply to general prosecutions and special prosecutions. This view is supported by the declaration of Díaz, who stated that an *imputación* only applies to general prosecutions to provide the defendant with notice of the charges against him. Supp. Aff. of Harry Díaz ¶¶45-46.

On the other hand, we have studied the numerous provisions of Panamanian law cited by the declarations from Pres. Martinelli's expert, Roberto

Moreno. He avers that an *imputación* was required and that Panama's interpretation of its law is erroneous. But like almost every other court tasked with such a risky enterprise, we ultimately choose to defer to Panama as we will not second guess its interpretation of how its laws operate. *See Skaftouros*, 667 F.3d at 160 n.20 (noting that "we defer to the Greek courts, which may consider whether [the fugitive] or the Greek prosecutors have the better of the argument."). While Pres. Martinelli raises plausible arguments why an *imputación* was required, we are simply not equipped to opine on a foreign government's interpretation of its own law. *See In re Extradition of Basic*, 2012 WL 3067466, at *19 ("declin[ing] to weigh the extent of [Bosnia's] procedural compliance with its own laws" because "[t]his court is ill-equipped to parse Bosnian or Republika Srpska practice for the fine technical points on the topic of warrant issuance"). Díaz explained that than an *imputación* is not required in special proceedings because a defendant is provided notice of the charges and evidence against him in writing through an indictment instead of at a hearing. [D.E. 46-1, at 36]. While Pres. Martinelli may not accept this explanation, he may raise his concerns over the interpretation of Panamanian criminal procedures once he has returned to Panama. *See, e.g.*, *Basic*, 819 F.3d at 901; *Skaftouros*, 667 F.3d at 160 n.20). In sum, we find that the challenged process of an *imputación* is for our purposes no bar to the extradition of Pres. Martinelli.

## 2. *Immunity Defenses*

Next, Pres. Martinelli argues that there is no probable cause to support his extradition because he has multiple forms of immunity that bar the four Panamanian offenses presented against him. In response the Government of Panama takes the position that neither Article 191 of its Constitution, nor his role with the Central American Parliament ("Parlacen"),[20] provides Pres. Martinelli with immunity for the charges pending against him. According to Panama, Article 191 establishes the forum in which criminal charges against a president or former president may be heard (*i.e.*, the Supreme Court of Justice), but "does not prevent any President or former President from being investigated and tried for any offense he committed before he was President or during the time he was President." Supp. Aff. of Harry Díaz ¶35.

Also according to the Government of Panama, Parlacen Deputies, such as Pres. Martinelli, have "the immunities enjoyed by the Representatives of the State where they were elected before their Congresses, Legislative Assemblies or National Assemblies"; however, Panamanian Deputies have no immunity in criminal matters. *Id.* ¶ 36. Therefore, there is competent evidence in the record to

---

[20] Parlacen, created in 1991, consists of elected representatives from Guatemala, El Salvador, Honduras, Nicaragua, Panama and the Dominican Republic. This regional parliamentary entity has its head office in Guatemala City and runs subsidiary organs in the capital of each member state. The Parlacen is the regional and permanent political entity tasked with implementing the integration of Central American countries. *See* http://www.parlacen.int/Portals/0/Language/English2016-18.pdf.

show that Pres. Martinelli "is not protected by immunity either as acting or former head of state, or as a member of [Parlacen]." *Id.* ¶ 34.

That being said, the most persuasive reason why Pres. Martinelli's immunity defense fails is that it is an issue solely reserved for adjudication in Panama. It is well established that an immunity defense – which is undeniably an affirmative defense – is not a proper consideration in an extradition proceeding. *See, e.g.*, *DeSilva v. DiLeonardi*, 125 F.3d 1110, 1112 (7th Cir. 1997) ("Affirmative defenses not specified in the treaty may not be considered."); *Shaw*, 2015 WL 3442022, at *4 ("Courts have determined that affirmative defenses to the merits of the charge(s) are not to be considered at extradition hearings.") (citing *Charlton v. Kelly,* 229 U.S. 447, 462 (1913); *Collins,* 259 U.S. at 316–17; *Hooker v. Klein,* 573 F.2d 1360, 1368 (9th Cir. 1978); *DeSilva,* 125 F.3d at 1112)). Because Pres. Martinelli's immunity defense is not an issue that this Court may consider in an extradition proceeding, we find that this argument lacks merit. *See Matter of Extradition of Harusha*, 2008 WL 1701428, at *5 (E.D. Mich. Apr. 9, 2008) ("[A]ffirmative defenses, including self-defense, are not relevant in extradition hearings and should not be considered.") (citations omitted).

### 3. Due Process

Pres. Martinelli's third argument is that there is no probable cause because Díaz has violated his due process rights through several misrepresentations. Rather than conceding that the MLM equipment was not used in the alleged wiretapping scheme, Pres. Martinelli contends that Díaz doubles down on his

previous lies by claiming that (1) the MLM equipment was capable of infiltrating and extracting content from cellular phones, and (2) that members of the National Security Council used MLM equipment to infiltrate and extract content from cellular phones.

Pres. Martinelli argues that the deception by Díaz is not an arguable point because Panama's own evidence purportedly proves that Díaz's statements are lies. And the success of Panama's embezzlement case hinges on Díaz. So Pres. Martinelli accuses the DOJ in suborning this perjury and colluding with Díaz to violate Pres. Martinelli's right to due process.[21]

Yet, Pres. Martinelli's argument is misdirected because due process is not violated "so long as the United States has not breached a specific promise to an accused regarding his or her extradition, and bases its extradition decisions on diplomatic considerations without regard to such constitutionally impermissible factors as race, color, sex, national origin, religion, or political beliefs, and in accordance with such other exceptional constitutional limitations as may exist because of particularly atrocious procedures or punishments employed by the foreign jurisdiction." *Matter of Extradition of Burt*, 737 F.2d 1477, 1487 (7th Cir. 1984) (internal citations omitted).

Moreover, "an accused in an extradition hearing has no right . . . to pose questions of credibility as in an ordinary trial, but only to offer evidence which explains or clarifies that proof." *Eain v. Wilkes*, 641 F.2d 504, 511 (7th Cir. 1981)

---

[21]     Díaz has also supposedly misrepresented the testimony of Francisco Sanchez Cardenas.

(citing *Shapiro v. Ferrandina*, 478 F.2d 894, 905 (2d Cir. 1973)); *see also Austin v. Healey,* 5 F.3d 598, 605 (2d Cir. 1993) (stating that respondent's challenge to "the reliability and credibility of the evidence is misdirected"); *Rodriguez Ortiz,* 444 F. Supp. 2d at 891–93 (holding that the issue of inconsistencies in witness statements are "properly reserved for the eventual trial in Mexico"); *Matter of Extradition of Solis,* 402 F. Supp. 2d 1128, 1131 (C.D. Cal. 2005) (holding that respondent could not challenge the veracity or validity of a witness's statement because "a fugitive in international extradition proceedings is not permitted to introduce evidence that contradicts the evidence submitted by the requesting country"); *United States v. Peterka,* 307 F. Supp. 2d 1344, 1349 (M.D. Fla. 2003) (at an extradition hearing, "the court shall exclude evidence that is proffered to . . . challenge the credibility of witnesses"); *Matter of Extradition of Mainero,* 990 F. Supp. 1208, 1218 (S.D. Cal. 1997) ("Evidence that conflicts with that submitted on behalf of the demanding party is not permitted, nor is impeachment of the credibility of the demanding country's witnesses."). "To do otherwise would convert the extradition into a full-scale trial, which it is not to be." *Eain*, 641 F.2d at 511.

Here, Díaz's purported inconsistencies and lack of credibility may surely be a weakness in Panama's case against Pres. Martinelli, but those possible deficiencies do not obliterate all evidence of probable cause.[22]   "When analyzing all of the

---

[22]     Although Pres. Martinelli disputes that the MLM equipment was capable of intercepting information from cell phones, Díaz has offered evidence that he believes establishes that it did have such capabilities.   Second Supp. Aff. of Harry Díaz, Exh. B, ¶¶8-12 (describing messages intercepted from Blackberry messenger and recorded phone conversations); Supp. Aff. of Harry Díaz, ¶¶24-25 (describing

evidence provided in support of probable cause, including the witness statements, the Court must apply a 'totality of the circumstances analysis and make a practical, common sense decision whether, given all the circumstances, there is a fair probability that the defendant committed the crime.'" *Matter of Extradition of Garcia*, 825 F. Supp. 2d 810, 838 (S.D. Tex. 2011) (citing *Rodriguez Ortiz,* 444 F. Supp. 2d at 884). By employing that standard here, we do not pretend that there are no inconsistencies or doubts on how the MLM equipment was used and by whom, including information on the equipment's technical specifications. Yet, there remains an indicia of reliability in this record that Pres. Martinelli may have committed the charged offenses given all of the evidence presented. And, in any event, Panama is not required to provide "an air-tight narrative of the events surrounding a crime," because it "is not a precondition for granting extradition." *Rodriguez Ortiz,* 444 F. Supp. 2d at 891–93.

As such, we find that Pres. Martinelli's accusations – that Díaz is a consistent liar and therefore a primary participant in the violation of Pres. Martinelli's due process rights – is not enough to obliterate probable cause.[23] *See Shaw*, 2015 WL 3442022, at *8 ("Defendant has consistently attempted to contradict the case

---

messages intercepted from Blackberry messenger and WhatsApp); *see also, e.g.*, Statement by Julio Martinez, Exh. 7 (RAMB001953) (describing how in September 2010, prior to the installation of the NSO equipment, the witness was given a CD from Ronny Rodriguez containing a telephone interception of a call between politician Mitchel Doens and another person who were discussing a protest happening in Bocas del Toro).

[23]    Pres. Martinelli is certainly entitled to challenge Díaz's credibility or reliability before the Court in Panama.

brought against him in Thailand. He has continually sought to turn this limited extradition proceeding into a full trial in an effort to prove his asserted innocence. This the Defendant cannot do."); *Garcia*, 825 F. Supp. 2d at 839 ("The Court finds that the witnesses' statements, while subject to impeachment due to some inconsistencies, are sufficiently reliable to provide the requisite 'any evidence' establishing probable cause to believe that Respondent committed the charged crime."); *Bovio,* 989 F.2d at 259 ("[I]ssues of credibility are to be determined at trial) (citation omitted).

As for Pres. Martinelli's allegations of corruption in Panama, we are "bound by the existence of an extradition treaty to assume that the trial will be fair." *Glucksman*, 221 U.S. at 512. This means that a claim of corruption in a foreign proceeding is not a valid defense to a finding of extraditability. *See, e.g.*, *Matter of Extradition of Cruz*, 2016 WL 6248184, at *6 (N.D. Ill. Oct. 26, 2016) (disregarding fugitive's argument that "he will not receive a fair trial in Mexico due to corruption that he says exists in the Mexican judiciary" because "[t]he Secretary of State decides whether Cruz Montes should be extradited," and "[t]he Court expresses no opinion as to Cruz Montes's concern that he will not receive a fair trial in Mexico."); *Matter of Extradition of Knotek*, 2016 WL 4726537, at *5 (C.D. Cal. Sept. 8, 2016) (disregarding fugitive's argument that the foreign prosecution was "tainted by corruption," and noting that "[p]ursuant to the rule of non-inquiry, challenges to the legal processes and penal systems of a foreign country— such as a claim that a foreign country's legal proceedings are corrupt—cannot be considered

by extradition courts") (citing *Matter of Extradition of Singh*, 2005 WL 3030819, at *65 (E.D. Cal. Nov. 9, 2005) ("The rule [of non-inquiry] requires that extradition courts not undertake inquiries into the justice system of foreign countries . . . ."); *Lopez-Smith v. Hood*, 121 F.3d 1322, 1327 (9th Cir. 1997) ("[U]nder what is called the 'rule of non-inquiry' in extradition law, courts in this country refrain from examining the penal systems of requesting nations . . . ."); *Matter of Requested Extradition of Smyth*, 61 F.3d 711, 714 (9th Cir. 1995) ("Undergirding [the rule of non-inquiry] is the notion that courts are ill-equipped . . . and ill-advised . . . to make inquiries into and pronouncements about the workings of foreign countries' justice systems.")); *Ntakirutimana v. Reno*, 184 F.3d 419, 430 (5th Cir. 1999) (refusing to consider fugitive's claim that the foreign tribunal was unable to protect his due process rights).

The rule of non-inquiry requires that any contention that the justice system of the requesting state is corrupt must be addressed by the Secretary of State, and not the federal courts. *See, e.g.*, *Hilton*, 754 F.3d at 84-85 & 87 (rejecting fugitive's argument that "the rule of non-inquiry has no application here," and stating that the rule of non- inquiry "bars courts from evaluating the fairness and humaneness of another country's criminal justice system, requiring deference to the Executive Branch on such matters"); *Lopez-Smith*, 121 F.3d at 1327 ("[U]nder what is called the 'rule of non-inquiry' in extradition law, courts in this country refrain from examining the penal systems of requesting nations, leaving to the Secretary of State determinations of whether the defendant is likely to be treated humanely");

*Koskotas*, 931 F.2d at 174 ("Extradition proceedings are grounded in principles of international comity, which would be ill-served by requiring foreign governments to submit their purposes and procedures to the scrutiny of United States courts."); *Eain*, 641 F.2d at 516-17 (discussing sole discretion of Secretary of State to establish "an American position on the honesty and integrity of a requesting foreign government"); *Jhirad v. Ferrandina*, 536 F.2d 478, 484-85 (2d Cir. 1976) ("It is not the business of our courts to assume the responsibility for supervising the integrity of the judicial system of another sovereign nation.").

Indeed, a determination that a foreign judicial system is plagued by corruption could have serious foreign relations implications. *See United States v. Fernandez-Pertierra*, 523 F. Supp. 1135, 1141-42 (S.D. Fla. 1981) (citing *Dames & Moore v. Regan*, 453 U.S. 654 (1981), and *Haig v. Agee*, 453 U.S. 280 (1981) (noting that a "long judicial tradition" supports a "general judicial policy of deference to the executive in the area of foreign relations")). Considerations of the level of corruption by the requesting state hence fall within the exclusive jurisdiction of the Secretary of State. This recognition comports with due process because "[f]undamental principles in our American democracy limit the role of courts in certain matters, out of deference to the powers allocated by the Constitution to the President and to the Senate, particularly in the areas of foreign relations." *United States v. Kin-Hong,* 110 F.3d 103, 106 (1st Cir. 1997); *see also Martin v. Warden, Atlanta Pen.*, 993 F.2d 824, 830 n.10 (11th Cir. 1993) (noting the viability of the rule of non-inquiry despite potential due process challenges).

The Court's refusal to consider a claim of corruption is also appropriate because "comity considerations lurk beneath the surface of all extradition cases," and courts "must take care to avoid 'supervising the integrity of the judicial system of another sovereign nation' because doing so 'would directly conflict with the principle of comity upon which extradition is based.'" *Martinez*, 828 F.3d at 463-64 (quoting *Jhirad v. Ferrandina*, 536 F.2d 478, 484–85 (2d Cir. 1976)).  This is why, for example, an American citizen who commits a crime in Panama "cannot complain if required to submit to such modes of trial . . . as the laws of that country may prescribe for its own people."  *Neely v. Henkel*, 180 U.S. 109, 123 (1901).  It is also why "[w]e are bound by the existence of an extradition treaty to assume that the trial [that occurs after extradition is granted] will be fair."  *Glucksman*, 221 U.S. at 512.  This reflects the reality that political actors, such as the Secretary of State, rather than judicial ones like Magistrate Judges, are best equipped to make the "sensitive foreign policy judgments" that Panama's request demands.  *Hoxha v. Levi*, 465 F.3d 554, 563 (3d Cir. 2006); *see also Sandhu v. Burke*, 2000 WL 191707, at *11-12 (S.D.N.Y. Feb. 10, 2000) (finding that extradition magistrate's refusal to consider evidence of corruption in India that had allegedly resulted in the charging of individuals with crimes they had not committed, including a former judge's conclusion that "'almost 90% percent of the criminal cases launched against Sikh Youth were fabricated and trumped-up,' and that [the fugitives] were implicated in one of those 'false cases'" did not violate due process).   Therefore, we find that Pres. Martinelli's repeated allegations of

corruption in Panama present no obstacle to this Court's certification of extradition.

### 4. The Embezzlement Charges

Pres. Martinelli's next argument is that the evidence presented lacks probable cause to support the embezzlement charges in Panama. Specifically, Pres. Martinelli contends that the Government's case with respect to the MLM equipment is a red herring. First, Pres. Martinelli argues that the last time that the MLM equipment was used or even seen was in 2011, before the relevant time period. Second, the MLM equipment was purportedly incapable of carrying out the kind of misuse and misappropriation that Panama has charged here, which is the unlawful use of surveillance to infiltrate cellular phones. Third, Pres. Martinelli believes that the Government has not even tried to prove that the MLM equipment was used unlawfully. The Government apparently did not, for example, seek confirmation that the National Security Council lacked judicial authorization to infiltrate certain computers. Rather, the Government purportedly focused solely on establishing the unlawful infiltration of cellular phones by requesting a letter from the clerk of court that confirmed that no judge had authorized anyone to wiretap certain phone numbers. And fourth, the Government's own investigation regarding the MLM equipment has allegedly resulted in prosecutors acknowledging that there was

insufficient evidence that Pres. Martinelli's subordinates embezzled the MLM equipment.[24]

As for the embezzlement charges in connection with the Pegasus equipment, Pres. Martinelli suggests that there are two fundamental obstacles to the Government's ability to establish probable cause. First, under Panamanian law, a defendant allegedly must have *custody* over the embezzled asset. [D.E. 58-6, Moreno Decl. (stating that a public servant "has to have under his authority or duties the administration, receipt, custody or responsibility of government assets")]. Pres. Martinelli argues that the Government has not produced an audit from the General Comptrollership of Panama establishing who had custody over the Pegasus equipment. In fact, Díaz has purportedly not stated an intention to introduce this type of document into evidence. Without the audit, Pres. Martinelli believes that it cannot be established that the item belonged to Panama, what the damages may be, and who is responsible for the property under Panamanian law. In sum, Pres. Martinelli argues that he cannot be charged with the crime of embezzlement for

---

[24] Pres. Martinelli points out that neither Rodriguez nor Pitti have had criminal charges brought against them, and that this demonstrates that the Government lacks probable cause in this case. But, it is by no means certain that the alleged deficiency in those cases is similarly a deficiency in the case against Pres. Martinelli. As the Eleventh Circuit has stated, consistent verdicts are not required for co-conspirators tried jointly because a conviction may be upheld "even where all but one of the charged conspirators are acquitted." *United States v. Andrews*, 850 F.2d 1557, 1561 (11th Cir. 1988); *see also United States v. Issa*, 265 F. App'x 801, 808-09 (11th Cir. 2008) (affirming a conspiracy conviction where one other co-defendant was acquitted). Therefore, we find that this argument has no merit.

equipment for which he was not responsible and where it has not been proven that it belonged to the Panamanian state.

Pres. Martinelli next contends that Panama cannot establish probable cause that he embezzled the Pegasus equipment with *public funds*, as charged in the indictment.[25]   In his affidavit, Pitti contrasted a printer with the Pegasus equipment by observing that the printer, unlike the Pegasus equipment, "could not be removed because it [unlike the Pegasus equipment] was included in the [government] inventory and paid for out of the NSC budget."  [D.E. 18-2].  Yet, when the current head of the National Security Council, Rolando López, filed a criminal complaint regarding the alleged embezzlement of this equipment, Pres. Martinelli stated that López offered no evidence that public funds were used.[26] [D.E. 54-3].  Instead, López suggested that a private company paid for the Pegasus equipment.  *Id.*  Therefore, unlike the many pages of evidence offered to prove that

---

[25]   Pres. Martinelli accuses the Government of changing its position in the middle of these extradition proceedings because Díaz charged Pres. Martinelli with a specific kind of embezzlement, namely an embezzlement of property "derived from the State or public funds."  [D.E. 49-25].  As such, the Government is now allegedly attempting to establish probable cause that Pres. Martinelli embezzled another piece of equipment that was not bought with public funds and that this inconsistency is fatal to Panama's probable cause argument.

[26]   The criminal complaint contains a quotation attributed to a news report by *La Prensa* that "'[a] company [Caribbean Holdings] linked to Aaron Mizrachi, brother-in-law of former president Ricardo Martinelli, paid the Israeli company NSO Group to purchase a sophisticated espionage equipment acquired by the last administration, which had disappeared . . . .'"  [D.E. 54-3].  Yet, this evidence is hardly persuasive, and likely inadmissible in this extradition proceeding, because it merely contradicts the evidence submitted by Panama.

public funds were used to purchase the MLM equipment, Panama has apparently not produced any evidence for the embezzlement of the Pegasus equipment.

Yet, we find that there is sufficient evidence in the record to establish probable cause that Pres. Martinelli committed both embezzlement offenses. The MLM audit establishes that the MLM equipment belonged to the Government of Panama and has since disappeared, and this fact, coupled with the circumstantial eivdence that the property was in Pres. Martinelli's control and that he ordered that it be taken from the Government of Panama, establishes probable cause that Pres. Martinelli committed embezzlement by theft in violation of Article 338 of the Criminal Code.[27] There is also sufficient evidence to suggest that the relevant equipment was used to conduct surveillance without judicial authorization, which together with the other evidence submitted by Panama, establishes probable cause that Pres. Martinelli committed embezzlement of use in violation of Article 341 of the Criminal Code.[28]

Therefore, even if we accept Pres. Martinelli's arguments, there is still probable cause of embezzlement by theft involving one surveillance system, and

---

[27] Article 338 of the Criminal Code of Panama (embezzlement by theft and misappropriation) provides: "A public officer who takes or embezzles in any way, or consents that somebody else appropriates, takes or embezzles any form of money, securities or property which administration, collection or custody have been entrusted by virtue of his position, shall be punished . . . ." (RAMB 000031).

[28] Article 341 of the same code (embezzlement of use) provides: "A public officer who, for purposes other than service, uses in his own or another's benefit, or allows somebody else to use money, securities or property under his charge by reasons of his duties or which are in his custody, shall be punished . . . ." (RAMB 000032).

probable cause of embezzlement of use involving the other. And together, this provides enough evidence "sufficient to sustain the charge," as required under the extradition statute. *See* 18 U.S.C. § 3184.

Furthermore, to commit a violation of Article 338 of the Criminal Code of Panama, a public officer must have been "entrusted" by virtue of his position with the "administration, collection or custody" of property (RAMB000031), and to commit a violation of Article 341 of the Criminal Code of Panama, the property at issue must be "under [the public officer's] charge by reason of his duties" or "in his custody" (RAMB000032). Contrary to Pres. Martinelli's argument, nothing in either statute appears to create a requirement that the embezzled property must have been purchased with public funds. In fact, Díaz states in his supplemental affidavit that "it is not relevant for the purpose of committing Embezzlement by theft or use that the money, assets or goods are owned by the State or have been acquired with public funds." Second Supp. Aff. of Harry Díaz, Exh. B, ¶20.

Notwithstanding the evidence submitted in support of the finding that public funds are not required to commit embezzlement, Panama's evidence suggests that both the MLM and the Pegasus equipment were purchased with public funds. Specifically, documents indicate that Panama paid MLM $13,475,000 for its system. *See* Audit Report Summary, Exh. 3 at 684 (RAMB000692); *see also, e.g.*, Request of Banking Transfer, Exh. 4 at 1272 (RAMB001229) (showing December 10, 2010 transfer of approximately USD $5.4 million as partial payment to MLM from the Ministry of the Presidential Office – Social Investment Fund); Request of Banking

Transfer, Exh. 5 at 1277 (RAMB001237) (showing August 10, 2010 transfer of approximately USD $3.3 million).

As for the Pegasus equipment, a purchase agreement signed by the Director of the NSC, dated July 3, 2012, required that "the End User [the NSC] shall pay the Company [NSO] an aggregate amount of $US 6,000,000 [plus applicable taxes, tariffs, duties, and surcharges]." *See* Agreement Between NSO and the NSC, Exh. 2 at 609 (RAMB000616). And NSO later certified that it received $8,000,000 pursuant to that agreement. *See* Letter from NSO to Government of Panama, Exh. 2 at 607, (RAMB000614) (stating that NSO had "installed the Pegasus System [pursuant to a purchase agreement signed by the Director of the NSC] in Panama City after receiving money transfer of 8 million American Dollars, the first stage was 6 million American Dollars and the second stage was additional 2 million American Dollars").

The evidence further suggests that the relevant equipment was within the custody of Pres. Martinelli because both sets of equipment were installed in the NSC's Special Services office in Building 150. *See, e.g.*, Statement of Elvys Moreno Murillo, Exh. 7 at 1855 (RAMB001817) (stating that "the [MLM] laptops were placed, printers, servers that were located on a black rack at a corner in the office [in Building 150]"); Pitti Aff. ¶ 8 (discussing installation by NSO personnel of surveillance equipment in Building 150). Thus, it appears that both sets of equipment were intended to be used by the NSC. *See* NSO's End Use/User Certificate, Exh. 2 at 614 (RAMB000621) (providing that NSO equipment was "for

the exclusive use of Panama's government"); Agreement Between NSO and the NSC, Exh. 2 at 609 (RAMB000616) (providing that the NSC was the end user of the NSO equipment); Statement of Carlos Antonio Orillac Arias, Exh. 8 at 2176 (RAMB002141) (indicating that the Director of the NSC signed the Final Acceptance Letter for the MLM equipment); Resolution No. 24-2015-DAF, Exh. 3 at 829 (RAMB000777) (noting that the "destination" of the MLM equipment was the NSC).

Pres. Martinelli allegedly controlled the NSC and conducted the surveillance conducted by the Special Services unit. And Díaz has stated that, to be guilty of embezzlement, pursuant to Article 43 of the Criminal Code, a defendant is culpable if he "'performs, by himself or by proxy, the conduct described in the criminal conduct,' that is, the offense."[29] Second Supp. Aff. of Harry Díaz, Exh. B, ¶29. Therefore, an individual may commit embezzlement "by proxy," *i.e.*, by directing another individual who has actual custody over certain property to embezzle it. *Id.* ¶¶ 29-31. Because Panama alleges that Pres. Martinelli committed embezzlement by proxy, and after analyzing the evidence in the record supporting that charge, we find that there is sufficient probable cause to warrant extradition.

---

[29] Díaz also states that a comptroller audit is not required to prove a violation of Article 338 or Article 341 in Panama; rather, other evidence may be used to demonstrate the defendant's custody of the property at issue. *See* Second Supp. Aff. of Harry Díaz, Exh. B, ¶¶ 35-39. As such, the fact that Pres. Martinelli's name does not appear in the audit of the MLM equipment conducted by the General Comptrollership of Panama, and that no such audit was conducted for the NSO equipment, does not weaken a finding of probable cause.

Moreover, the evidence suggests that Pres. Martinelli "t[ook] or embezzle[d]" the MLM and Pegasus equipment, as required under Article 338 of the Criminal Code. The MLM Audit report confirms that the MLM equipment disappeared. *See* May 4, 2015 Audit Report No. 03-003-2015-DIAF, Exh. 3 at 720-21 (RAMB000728-729). The MLM equipment included "servers that were located on a black rack," Statement of Elvys Moreno Murillo, Exh. 7 at 1855 (RAMB001817), which multiple witnesses said was removed following the May 2014 elections and taken to Super 99, *see, e.g.*, Statement of Javier Antonio Quiroz Andreve, Exh. 7 at 1916-17 (RAMB0001878-1879); Statement of Jubilo Antonio Graell de Gracia, Exh. 7 at 1941-1942 (RAMB001905-1906); *see also* Pitti Aff. ¶ 47 (describing removal of the rack); Interview of Jubilo Antonio Graell, Exh. 7 at 1963 (RAMB001932) (describing the rack as "lost").

Specifically for the Pegasus equipment, witnesses testified that it was removed from Building 150. *See* Pitti Aff. ¶ 46; Interview of Jubilo Antonio Graell, Exh. 7 at 1975 (RAMB001944) (discussing removal of desktops). And although some witnesses testified that the equipment was moved to a different government building, this does not weaken the alleged embezzlement offense because the evidence indicates that Panama never recovered the equipment. *See* Letter from NSO to Government of Panama, Exh. 2 at 607 (RAMB000614) (certifying that the last date of communication from its system in Panama was May 16, 2014).

Finally, both sets of equipment satisfy the "use" requirement of Article 341 of the Criminal Code. In regard to the Pegasus equipment, the evidence demonstrates

it was used to intercept the communications of numerous individuals during the relevant time period. [D.E. 46]. As for the MLM equipment, there is a plethora of circumstantial evidence that supports the same conclusion. For example, there was a contract that had a four-year term beginning in 2010. Contract No. 045/2010, Exh. 4 (RAMB001200) ("The term of duration of this Contract shall be for a maximum period of four (4) years.").[30] It seems reasonable to infer that the MLM equipment, which cost millions of dollars to purchase, continued to be used for the duration of the contract through 2014, absent any indication to the contrary.[31]

Regardless, additional evidence from several witnesses suggests that the MLM equipment was used to intercept their communications in 2012. *See* Supp. Aff. of Harry Díaz , DE 46-1, ¶¶24-25 (describing intercepted communications from early 2012); Statement of Gustavo Pérez, Exh. 8 at 2280 (RAMB002245); Pitti Aff. ¶¶21, 29 & 43; Statement of Rosendo Enrique Rivera Botello, Exh. 8 at 2469-70 (RAMB002435-36); Statement of Mitchell Constantino Doens Ambrosio, Exh. 8 at 2429 (RAMB002394); Statement of Erasmo Pinilla Castillero, Exh. 9 at 2577-79

---

[30] The evidence suggests that the MLM equipment was also used prior to 2012. *See, e.g.*, Statement of Elvys Moreno Murillo, Exh. 7 at 1852-55 (RAMB001814-1817).

[31] The NSC did not execute its contract for the Pegasus equipment, and the related End Use/User Certificate, until July 3, 2012. *See* Agreement Between NSO and the NSC, Exh. 2 at 609 (RAMB000616); NSO's End Use/User Certificate, Exh. 2 at 615 (RAMB000622). According to Pitti, in order for the Pegasus equipment to operate, fifteen-megabyte broadband internet service had to be installed, Pitti Aff. ¶ 7; and the internet service was not installed until June 1, 2012, *see id.* (describing that internet service was obtained from "Liberty Technology"); Liberty Technologies Contract of Services dated June 1, 2012 (RAMB000278). As such, this constitutes additional circumstantial evidence that that MLM equipment was, in fact, used in 2012.

(RAMB002545-47). For instance, Díaz points out that Ronny Rodriguez was emailed some of the communications well before the June 2012 installation of the fifteen-megabyte broadband service necessary to power the Pegasus system. *See* Second Supp. Aff. of Harry Diaz, Exh. B, ¶¶ 8-12. And although Pres. Martinelli contends that these types of communications could have been easily captured after-the-fact using the Pegasus equipment, the evidence suggests that only the MLM equipment could have been used to allow Pres. Martinelli to receive daily summaries of intercepted information and to be able to react in real time. This is particularly true because the Pegasus equipment was likely not yet operational. Therefore, there is sufficient circumstantial evidence in the record to find probable cause that the Pres. Martinelli embezzled the MLM and Pegasus equipment.

Finally, we reiterate that "competent evidence to establish reasonable grounds is not necessarily evidence competent to convict." *Fernandez,* 268 U.S. at 312. Given the holes in the case, it is certainly plausible that Panama's charges will be dismissed or rejected at trial in Panama. As is often the case, allegations of public corruption are difficult to prove for many reasons, not the least of which is the claim of a political "witch hunt" that is not unique to Panama. But those claims and defenses are properly presented to the court of law that has jurisdiction over the dispute. In this case, that lies in Panama.

### 5. The Surveillance Charges

Pres. Martinelli's final argument is that Panama cannot establish probable cause to support the surveillance charges because of the tenuous link between the

purported crimes and Pitti's affidavit, which should allegedly be discredited. Alternatively, even if we were to accept all of Panama's evidence, Pres. Martinelli contends that there is no evidence that he *knew* that the National Security Council had not obtained the requisite judicial authorizations for the alleged wiretapping. Because both of these deficiencies are purportedly fatal, Pres. Martinelli surmises that we should find that there is no probable cause to support the Government's extradition request in connection with these alleged surveillance crimes.

In particular, Pres. Martinelli first argues that Panama's case hinges on whether he ordered members of his National Security Council to conduct unlawful wiretapping. Pitti allegedly remains the only witness who testified that Pres. Martinelli through Ronny Rodríguez, selected the targets, ordered the wiretapping, and received the illicit results from the surveillance. And while the Government has purportedly tried to corroborate Pitti's testimony, Pres. Martinelli believes that there is not a *single* argument that substantiates a key allegation – namely, that Pres. Martinelli ordered members of the National Security Council to conduct unlawful surveillance. For example, Pres. Martinelli contends that Panama has discussed the alleged 2010 wiretapping of a person named Mitchell Constantino Doens Abrosio. The wiretapping supposedly captured a conversation that Doens had about events involving the Ngabe Bugle tribe. Yet, Pres. Martinelli believes that the wiretapping did *not* occur during the charged time period (2012 to 2014) and pre-dated both the MLM equipment and the Pegasus equipment. As such,

there is allegedly no evidence that President Martinelli directed this alleged wiretapping or that it was unauthorized.

In Pres. Martinelli's view, the Pitti affidavit is the only glue that establishes Panama's argument for probable cause, but the Court should supposedly not credit Pitti's affidavit for several reasons. As one primary example, in his affidavit Pitti purportedly attempts to suggest that he was present and participated in the alleged removal of computer equipment and the so-called "rack" from the National Security Council. *See* Pitti Aff. at ¶¶46-47 [D.E. 18-2]. Yet, according to multiple witnesses, Pitti had already been transferred to a different province. *See* Testimony of Júbilo Antonio Graell de Gracia, RAMB001934-1947, at RAMB001944 (Aug. 25, 2015) [D.E. 49-21, *12 (noting that, at the time he and others moved the equipment, "Ismael (Brad) has [sic] already been transferred to Chiriqui")]; Testimony of Julio Palacios Martínez, RAMB001960-72 at RAMB01970 (Aug. 27, 2015) [D.E. 49-22, *12 (same)]; Testimony of Vildia del Carmen Torres Potes, RAMB002045-2057, at RAMB002051 (Sept. 1, 2015) [D.E. 49-24, *8 (same)]. Accordingly, Pres. Martinelli concludes that Panama's own evidence contradicts Pitti's affidavit, and that Pitti's affidavit is both inherently reliable and contains unsourced allegations.

Pres. Martinelli equates Pitti's affidavit to the same scenario at issue in *In re Mazur*, 2007 WL 2122401 (N.D. Ill. July 2, 2007), where a foreign country's case depended on a witness whose testimony was inconsistent on key details and contradicted by other witnesses. Pres. Martinelli claims that the court found an absence of probable cause because the foreign country's evidence "though seemingly

damning on its face, on close scrutiny, turned out to be so internally inconsistent, so patently unreliable, that it obliterated, all on its own, any semblance of probable cause." *Id.* Like *In re Mazur*, we should find that Pitti's testimony is riddled with material inconsistencies, falsehoods, and unsourced and unreliable allegations. Therefore, Pres. Martinelli urges the Court to not credit Pitti's testimony and find that the surveillance charges lack probable cause.

Second, Pres. Martinelli argues that, even if the Court credits all of Panama's evidence, there is still an absence of sufficient evidence regarding a key element on whether Pres. Martinelli *knew* that the alleged wiretapping was done without judicial authorization. Under Panamanian law, Pres. Martinelli contends that the requisite level of intent requires something akin to specific intent or a knowing violation for the alleged surveillance crimes. *See* Roberto J. Moreno's Decl. (Aug. 11, 2017) ("[C]riminal intent, in other words personal behavior plus the subjective knowledge that the act carried out is unlawful"); *see also*, Díaz Indictment at RAMB000073 [D.E. 49-25, *3 (alleging that the "officers of the National Security Council . . . were fully aware of the illegality of these [surveillance] activities")].

The Government has purportedly not established probable cause regarding this critical element. *See* Moreno Decl. ("[I]f only one element is missing . . . the crime cannot be consummated"). In fact, the Government has allegedly highlighted some evidence that indicates that President Martinelli would have had no reason to suspect that the National Security Council members were not getting the requisite judicial authorizations. For instance, in the addendum on probable cause, the

Government supposedly notes that Rodríguez delivered lawfully obtained surveillance results to President Martinelli at the same time as the purported unlawfully obtained surveillance results. *See* Summary Chart For Probable Cause [D.E. 46-4]; Pitti Aff. at ¶ 26 [D.E. 18-2]. These results were apparently presented in the same envelope. *Id.* And the Government has allegedly offered no evidence that would allow this Court to distinguish between President Martinelli's involvement in legal wiretapping with his purported involvement in illegal wiretapping.

Therefore, Pres. Martinelli contends that the Government cannot ask this Court to draw any inferences regarding President Martinelli's knowledge of illegality. In sum, "[t]he basic problem with the government's case is that it ignores the intent element." *In re Petition of France for the Extradition of Sauvage*, 819 F. Supp. 896, 904 (S.D. Cal. 1993).

After conducting our own objective review of the evidence, we find to the contrary on both points. First, the Government has shown that knowledge is not an element of wiretapping offenses under Panamanian law. *See* Second Supp. Aff. of Harry Díaz, Exhibit B, ¶18 (stating that "the prosecution does not have to prove that Mr. Martinelli Berrocal had no knowledge that the activities that were reported to him were executed without judicial authorization"). While Pres. Martinelli believes that this interpretation is wrong, we decline the opportunity to opine on the complexities of Panamanian privacy law. In the face of competing

interpretations of foreign law, we defer to the State Department and Panama, as we have no basis to credit Moreno's declaration over Díaz's.

"In other words, the type of conclusion which [Pres. Martinelli] asks this Court to make here would require a weighing of evidence and a selection of one version over another version," but "[t]his type of evidence evaluation is precisely what this Court cannot do in an extradition hearing." *In re Extradition of Nunez-Garrido*, 829 F. Supp. 2d at 1294 (citing *Bovio,* 989 F.2d at 259–261 (evaluating accused's challenge to extradition request from Sweden, rejecting his challenge that the investigator's statements were made five years after the investigation and that there was no record of original witness interviews and concluding that the defendant "has no right to attack the credibility" of either of the two witnesses "at this stage of the proceedings" because "issues of credibility are to be determined at trial")); *see also Barapind v. Enomoto*, 400 F.3d 744, 750 (9th Cir. 2005) ("[E]xtradition courts do not weigh conflicting evidence in making their probable cause determinations") (citation and quotation marks omitted).

Second, we do not find that Pitti's affidavit is so patently unreliable that it obliterates a finding of probable cause.[32] To the contrary, Pitti's affidavit appears to

---

[32] Pres. Martinelli's reliance on *In re Mazur* is also unpersuasive because the issue in that case was whether abstracts from fourteen separate statements contained multiple material inconsistencies (including who participated in a meeting held to plan a murder, whether there was any subsequent meeting, and who ultimately hired the hit man), all of which were given by one witness who later admitted that he had lied under oath and had fabricated at least part of his story. *See In re Mazur*, 2007 WL 2122401, at *20-22 (finding that the statements contained "so many inconsistencies that it is difficult to image that the government

be corroborated by other evidence in the record. For example, Ortiz Gonzalez testified that "Ronny said that he reported directly to the President Ricardo Martinelli," and that Ronny "met privately with Ricardo Martinelli and he was receiving instructions directly from Mr. President." *Id.* (RAMB001793). Similarly, an Intelligence Officer for the NSC, Jubilo Antonio Graell, avers that Ronny instructed him on several occasions to conduct surveillance on certain individuals, and that "Ronny told us that that information is needed by number one (1) [whom Graell made clear] is the President of the Republic. *See* Interview of Jubilo Antonio Graell, Exh. 7 at 1978-79 & 1982 (RAMB001942-1943 &-1946). The surveillance was conducted solely by the NSC, over which Martinelli Berrocal had effective control. [D.E. 46, at 3-4].

We also find Pres. Martinelli's challenge unpersuasive because any inconsistencies between Pitti's affidavit and other evidence submitted by Panama is not enough to bar Pres. Martinelli's extradition. For instance, a failure by Pitti to source all of his allegations, and a reliance on hearsay or uncorroborated evidence, is insufficient to defeat probable cause. With respect to the argument that Pitti should have sourced allegations, we find no authority for the this requirement, especially in light of the principle that a ""country seeking extradition is not required to produce all its evidence at an extradition hearing," and that a full trial and determination of guilt will occur in the requesting country. *Quinn*, 783 F.2d at 815.

that they could give rise to probable cause"). When compared to the facts of this case, *In re Mazur* is noticeably distinguishable.

As touched upon earlier, numerous courts have found that probable cause exists despite allegations of inconsistencies in the evidence submitted by the requesting country. The reason inconsistencies do not regularly defeat an extradition request is because courts "must accept as true all of the statements and offers of proof by the demanding state," reserving the weighing of evidence and making of credibility determinations for the courts in the requesting country— which is where the determination of guilt will be made. *Schmeer v. Warden of Santa Rosa Cty. Jail*, 2014 WL 5430310, at *4 (N.D. Fla. Oct. 22, 2014) (citation and internal quotation marks omitted); *see also, e.g.*, *Collins*, 259 U.S. at 316; *Quinn*, 783 F.2d at 791; *Ahmad,* 726 F. Supp. at 399-400 ("The primary source of evidence for the probable cause determination is the extradition request, and any evidence submitted in it is deemed truthful for purposes of this determination.") (quotation omitted). Therefore, we find that probable cause exists even when the requesting country's documents contain inconsistencies and discrepancies because this fact is "of no consequence if there exists in those documents 'any' other sufficient competent evidence" to establish probable cause. *United States ex rel. Sakaguchi v. Kaulukukui*, 520 F.2d 726, 728 (9th Cir. 1975).

Furthermore, a court may fairly infer sources of information by reference to the language of an affidavit. *See, e.g.*, *United States v. Summage*, 481 F.3d 1075, 1077-78 (8th Cir. 2007) (finding that a reference in an affidavit to was sufficient to infer the source of information); *United States v. Colbert*, 605 F.3d 573, 576 (8th Cir. 2010) (even though affidavit was not explicit about the source of information, it

"supported a fair inference that the police officers were the source"). In the case of Pitti's affidavit, the Court may infer that Pitti is offering information based upon his personal knowledge or from his conversations from others such as Ronny Rodriguez. Accordingly, any lack of explicit sourcing does not prevent this Court from relying upon Pitti's affidavit.

The Seventh Circuit's decision in *Bovio v. United States* is also instructive because the extradition judge in that case found that probable cause existed based solely upon the affidavit of a Swedish investigator. *See Bovio,* 989 F.2d at 258. The extraditee contested the district court's finding in the Seventh Circuit, and made four arguments in support:

> (1) [the investigator's] statements do not indicate how he obtained the information on which the statements are based, whether witnesses were under oath, and whether there are any original notes or recordings of witness interviews; (2) all the evidence implicating Bovio is hearsay; (3) there is no physical evidence implicating Bovio; and (4) the major witness relied upon by the Swedish government, Perttunen, has admitted lying during the investigation, and there is otherwise no corroboration of her account.

*Id*. at 259. The Seventh Circuit rejected all of these arguments, noting that a extraditee has "no right to attack the credibility" of witnesses in an extradition hearing, as "issues of credibility are to be determined at trial," and that "hearsay testimony is often used in extradition hearings." *Id*. at 259-60 (citing *Collins,* 259 U.S. at 317 and FED. R. CRIM. P. 5.1(a) ("The finding of probable cause [at a preliminary examination] may be based upon hearsay evidence in whole or in part."). The same conclusion can be drawn here.

As for Pres. Martinelli's argument about the dangers of multiple hearsay, courts have often relied on these statements in making probable cause findings and have rejected challenges to the reliability of such evidence. *See, e.g.*, *Afanasjev*, 418 F.3d at 1166 n.13 (upholding a probable cause finding based on hearsay; and discussing *Zanazanian v. United States*, 729 F.2d 624, 625-27 (9th Cir. 1984), where the Ninth Circuit rejected a extraditee's argument that "multiple hearsay does not constitute competent evidence"); *Escobedo v. United States*, 623 F.2d 1098, 1102 n.10 & 1103 (5th Cir. 1980) (upholding magistrate's finding of probable cause, and rejecting fugitive's argument that evidence submitted by the requesting state "constitutes compound hearsay and is untrustworthy"); *Matter of Extradition of Jarsosz*, 800 F. Supp. 2d 935, 947 n.4 (N.D. Ill. 2011) ("In extradition cases, the hearsay exists on at least two levels. First, is the statement of the absent declarant who prepared and submits the witness summaries. The second level is comprised of the hearsay statements of the witnesses to the prosecutor or police officer. There can even be three or more levels of hearsay. For example, a witness may recount statements made by another witness, which are then recounted to the declarant who prepares the summaries used in the extradition hearing."); *Matter of Extradition of Chan Hon-Ming*, 2006 WL 3518239, at *8 (E.D.N.Y. Dec. 6, 2006) (noting that "[i]t is well established that hearsay evidence, including multiple hearsay and the unsworn statements of absent witnesses, is admissible at extradition hearings and may support a finding of extraditability"); *Matter of the Extradition of Marzook*, 924 F. Supp. 565, 592 (S.D.N.Y. 1996) (finding probable

cause that fugitive committed crimes in Israel despite his argument that the extradition complaint was based "purely upon multiple hearsay").[33]

In sum, after careful review of the evidence in the record, we are duty bound to find that the extradition request submitted by Panama satisfies all of the statutory requirements of 18 U.S.C. § 3184 and that there is sufficient evidence to establish probable cause for all of the charges brought against Pres. Martinelli. In drawing this conclusion, we find only that there are reasonable grounds to suppose him guilty of all or some of the offenses charged. As a result, "good faith to the demanding government [in Panama] requires his surrender." *Glucksman,* 221 U.S. at 512.

## III.    CONCLUSION

For the foregoing reasons, it is hereby **ORDERED AND ADJUDGED** that the Government's motion [D.E. 46] for an order certifying the extradition of Pres. Martinelli is **GRANTED** and that a certified copy of this Order, together with a copy of all the testimony and evidence taken before the undersigned, be forwarded without delay by the Clerk of the Court to the Secretary of State to the attention of the Office of the Legal Adviser. Pres. Martinelli shall be committed to the custody of the United States Marshal for this District, to be held at the Federal Detention Center, Miami, Florida, or another suitable facility, pending final disposition of this

---

[33] We add that under U.S. law, there is also no rule that multiple hearsay is "per se unreliable." *See, e.g.*, *United States v. Crawford*, 734 F.3d 339, 342 (4th Cir. 2013). We should not hold Panama to a greater standard in the extradition context.

matter by the Secretary of State to the designated agents of the Government of Panama.

For all other purposes, this action is now **CLOSED**.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 31st day of August, 2017.

_____
EDWIN G. TORRES
United States Magistrate Judge